**EXHIBIT "A" (2 of 4)**

Page 53

Robert LeFever

2  a correction officer know which reasons should be
3  in the P-1 and which reasons don't have to be
4  listed?
5     A.  Yes.
6     Q.  What is that?
7     A.  Again, it's experience; just the
8  higher level item issues would be on the
9  memorandum.
10    Q.  Such as?
11    A.  Agitated; you know, incoherent.
12 Things like that.
13    Q.  How about if somebody had a high
14 score of eight or more on a suicide prevention
15 form, would that be on a P-1?
16    A.  No.
17    Q.  Would anything about the answers on
18 the Suicide Prevention Screening Guidelines be in
19 the P-1?
20    A.  Not necessarily.
21    Q.  Under what circumstances would it
22 be, and what circumstances wouldn't it be?
23    A.  If there was a significant
24 statement, perhaps. Other than that, no.
25    Q.  If an inmate came into the facility

COMPU-TRAN SHORTHAND REPORTING

Page 54

Robert LeFever

2  having a history of addiction or significant
3  history of drug use or alcohol use, would that be
4  in a P-1?
5     A.  No.
6     Q.  If an inmate was placed on a
7  heightened level of supervision, like a constant
8  watch or a 15-minute watch, would that be in the
9  P-1?
10    A.  That's what the P-1 would say, yes.
11    Q.  And in terms of that P-1, if
12 somebody was placed on a 15-minute supervisory
13 visit or a constant watch and the reason for it
14 related to a history of drug or alcohol use,
15 should that go in the P-1?
16    A.  Not necessarily.
17    Q.  If the reason for the heightened
18 level of supervision was answers on a suicide
19 screening form, should that go in a P-1?
20    A.  No.
21    Q.  In terms of the policies -- again,
22 Exhibit 2, Number 6 -- it says, "The booking
23 officer shall assign appropriate housing based
24 upon the results of the completed form Number 330
25 ADM and other classification determination."

COMPU-TRAN SHORTHAND REPORTING

Page 55

Robert LeFever

2     Do you see that?
3     A.  Yes.
4     Q.  Is there anything in any written
5  policy or procedure that indicates what
6  appropriate housing should be, based on the
7  results of a suicide screening form?
8     A.  No.
9     Q.  Any practices or training as far as
10 you're aware?
11    A.  No.
12    Q.  And in terms of the "Other"
13 classification determination, do you have any
14 understanding as to what that refers to?
15    A.  Victimization, hostile relations,
16 prior incarcerations or lack thereof.
17    Q.  Number 7 refers to "Initiate the
18 required documentation for prisoner referral to
19 appropriate health service agency, if required."
20    Is that the Mental Health Routing
21 Sheet that you referred to earlier?
22    A.  Yes.
23    Q.  Anything else?
24    A.  No.
25    Q.  Flip to the next page, Article 15-3,

COMPU-TRAN SHORTHAND REPORTING

Page 56

Robert LeFever

2  Mental Health Referral Policy.
3     Do you see that section?
4     A.  Yes.
5     Q.  Go to the next page, which has
6  letter D, Procedural Guidelines. "Tour
7  supervisor will..." Do you see that?
8     A.  Yes.
9     Q.  If you take a look at Number 1,
10 small letter (d): "Tour supervisor will ensure
11 that appropriate supervision is given to any
12 prisoner who is determined to be a threat to
13 himself or herself."
14    Do you see that?
15    A.  Yes.
16    Q.  And in terms of making a
17 determination as to whether somebody's a threat
18 to himself or herself, is that based on the
19 suicide prevention screening results?
20    A.  Yes.
21    Q.  So, if there is a score of eight or
22 higher, that person would be considered a threat
23 to himself or herself?
24    A.  Yes.
25    Q.  And the tour supervisor has the

COMPU-TRAN SHORTHAND REPORTING

Page 57

Robert LeFever

2 responsibility to ensure that appropriate
3 supervision is given to those types of prisoners;
4 correct?
5   A.  Yes.
6   Q.  So, if a correction officer failed
7 to do that, a tour supervisor would have that
8 back-up responsibility?
9   A.  Yes.
10   Q.  Is that one of the reasons why a
11 tour supervisor is required to review the suicide
12 screening form?
13   A.  Yes.
14   Q.  Tour supervisor will, Number 1,
15 small letter (e): "Forward a copy of screening
16 form Number 330 ADM with the inmate if he she is
17 being referred to a health-service provider."
18       Do you see that?
19   A.  Yes.
20   Q.  Is it in fact practiced that the
21 inmate gets a copy of the suicide screening form?
22   A.  No.
23   Q.  And how is it, then, that that form
24 is forwarded with the inmate?
25   A.  The inmate doesn't go with the form.

Page 58

Robert LeFever

2   Q.  So, where does the form go; to
3 medical on its own?
4   A.  Yes. The form goes to medical on
5 its own.
6   Q.  In terms of medical, are you aware
7 of any requirements that they see an inmate
8 within any certain number of days or hours of
9 their arrival at the facility?
10   A.  Within two hours.
11   Q.  And is that contained in any policy
12 or procedure?
13   A.  Policy and procedure, no.
14   Q.  That's the practice in the jail?
15   A.  Yes.
16   Q.  And for how long has that been true?
17   A.  Since we started with the contract
18 service.
19   Q.  AmeriCor?
20   A.  Yes.
21   Q.  And do you know for how long
22 AmeriCor has been providing medical services in
23 the jail?
24   A.  Five years this year.
25   Q.  As far as you know, does AmeriCor's

Page 59

Robert LeFever

2 staff have any role in determining level of
3 supervision that's instituted for an incoming
4 inmate?
5   A.  Yes.
6   Q.  What is their role?
7   A.  If they see a medical problem, like
8 high blood pressure, they may put someone on a
9 15-minute supervision.
10   Q.  How about if it's not a medical but
11 a mental issue, such as a suicide risk --
12   A.  No.
13   Q.  -- does AmeriCor have any role in
14 determining a level of --
15   A.  No.
16   Q.  -- supervision?
17   Q.  Are you aware of whether or not
18 AmeriCor staff reviews the Suicide Prevention
19 Screening Guidelines for an incoming inmate?
20   A.  No.
21   Q.  You're not aware; or no, they don't?
22   A.  I'm not aware.
23   Q.  Are you aware of any training that's
24 been given to any of the medical staff from
25 AmeriCor?

Page 60

Robert LeFever

2   A.  In regards to?
3   Q.  Suicide prevention.
4   A.  Yes.
5   Q.  And when did that training begin?
6   A.  Last year.
7   Q.  In 2007?
8   A.  In '07.
9   Q.  And whose determination was that?
10   A.  Myself and Sheriff Smith.
11   Q.  And did that come about as a result
12 of a discussion that you had with Smith?
13   A.  Yes.
14   Q.  What was the nature of that
15 discussion?
16   A.  Just to have medical more involved.
17 They were involved in the medical piece and just
18 not to have them involved with the suicide
19 screening after the fact was -- was -- we just
20 thought it would be more appropriate for them to
21 be involved with it.
22   Q.  And why is that?
23   A.  Because they're part of the medical
24 staff. They just get the record for them to
25 understand what they're looking at.

## Page 61

Robert LeFever

Q. And are you aware of, with respect to the training that the medical staff received, if they were told that they have an obligation to do anything if the score is eight or higher?

MR. COON: Objection to form.

A. No.

Q. Are you aware if they were told or trained as to what to do if a shaded area is checked?

A. No.

Q. Are you aware of -- again, since that training -- medical staff making recommendations to correction officers or sergeants about the level of supervision that should be instituted?

A. No.

Q. Other than you and Smith, did anybody else partake in the discussions about having medical involved in the suicide screening?

A. I don't remember.

Q. Do you recall if that discussion was prompted by anything that was issued by the State Commission?

## Page 62

Robert LeFever

A. No.

Q. No, it wasn't?

A. No, it was not.

Q. When AmeriCor came into the facility, did you review anything pertaining to their proposal?

A. Yes.

Q. And at some point in time, a contract was entered into.

You're aware of that?

A. Yes.

Q. Did you review that contract, as well?

A. Yes.

Q. As part of that contract, there were modifications over the years, but there was an addendum which listed, on Schedule A, the services that AmeriCor would provide.

Do you recall that?

A. Yes.

Q. Did you review that at that time, also?

A. Yes.

Q. Did you have any discussions with

## Page 63

Robert LeFever

Smith about anything pertaining to what AmeriCor indicated it would do?

A. I don't remember.

Q. Including in or about '07 or '06, when it was determined that medical staff would be trained?

A. No.

Q. Take a look, if you would, at the next page. It's Policy Section 15-4. Do you see that at the top?

A. Yes. Yes.

Q. And that section, Article 15-4 continues to the next page, Number 3: "Tour supervisor will, (a): Assure that constant supervision is immediately provided for the following types of prisoners: One, suicidal prisoners."

Do you see that?

A. Yes.

Q. And in terms of that responsibility on the part of the tour supervisor, suicidal prisoners, is that determination made based on the score of the Suicide Prevention Screening Guideline form?

## Page 64

Robert LeFever

A. No.

Q. What is it based on?

A. It's based on the score and also observation; subjective, again.

Q. But one of the determinations could be made solely on the basis of the score of eight or more?

A. Yes.

Q. So, if somebody scored an eight or higher on the form, not only would the correction officer have the responsibility to implement constant supervision, but the tour supervisor would also be responsible for ensuring that that was carried out?

A. Yes.

Q. Letter (c) says: "Assure that active supervision is immediately provided for prisoners who are intoxicated by drugs or alcohol, but who do not appear to be a danger to themselves or others."

What is "active supervision," as referred to there?

A. Active supervision is our 15-minute supervisory visit.

Page 65

Robert LeFever

1
2  Q. Is that defined anywhere?
3  A. Yes; in one of our procedures.
4  Q. Do you know which one?
5  A. No, I do not.
6  Q. So, prisoners who come in, who are
7  visibility intoxicated by drugs or alcohol, are
8  required to be placed on a 15-minute watch?
9  A. Yes.
10 Q. And if the inmate does not appear to
11 be at that time intoxicated by drugs or alcohol
12 but has a history of addiction or significant use
13 of drugs or alcohol, is there anything that
14 requires active or other supervision in that
15 case?
16 A. No.
17 Q. Would that be left to the discretion
18 of the correction officer or sergeant?
19 A. Yes.
20 Q. With respect to the ADM 330 and the
21 form that Putnam County uses, which both have
22 been marked as -- Exhibit 1 as the state's form,
23 Exhibit 3 as the county's form -- there are
24 differences in those forms; correct?
25 A. Yes.

COMPU-TRAN SHORTHAND REPORTING

Page 67

Robert LeFever

1
2  A. No.
3  Q. Would it have been somebody higher
4  in the chain of command than you?
5  A. Yes.
6  Q. And do you recall what level?
7  A. No.
8  Q. Prior to the form being implemented
9  by Putnam County, do you know if the sheriff at
10 that time reviewed it?
11 A. I don't remember.
12 Q. Or if anybody from the
13 administration reviewed it?
14 A. I don't remember.
15 Q. And have you had discussions with
16 anybody at any point in time about that
17 modification that was done on the form?
18 A. No.
19 Q. Has anybody ever asked you any
20 questions, including through today, as to why
21 there is a difference between those two forms?
22 A. Only with counsel.
23 Q. Other than with counsel?
24 A. No.
25 Q. And with respect to the form,

COMPU-TRAN SHORTHAND REPORTING

Page 66

Robert LeFever

1
2  Q. And one of the references pertains
3  to the bottom section, where it refers to the
4  action that should be taken; correct?
5  A. Yes.
6  Q. And the state form, the ADM 330,
7  specifies in substance that if the score is eight
8  or more or a shaded box is checked or for any
9  other reason that is apparent to an intake
10 officer, they not only have to notify the
11 supervisor but also institute constant watch?
12 A. Yes.
13 Q. And that says that directly on the
14 form; correct?
15 A. Yes.
16 Q. The Putnam County form does not have
17 any language along those lines; correct?
18 A. Correct.
19 Q. And who made the determination,
20 then, to modify the state's form and remove the
21 provision that requires constant watch if the
22 score is eight or higher or a shaded box is
23 checked?
24 A. I don't remember.
25 Q. Do you recall if that was you?

COMPU-TRAN SHORTHAND REPORTING

Page 68

Robert LeFever

1
2  itself, you were aware that there was -- at least
3  through training -- a requirement that constant
4  watch be implemented if the score was eight or
5  higher; correct?
6  A. Yes.
7  Q. In all of these years, have you ever
8  thought to make that change to the form?
9  A. No.
10       MR. RANDAZZO: Objection to
11 the form.
12 Q. In fact, the Putnam County
13 regulations, the Article 15, specifically refers
14 to the 330 ADM; correct?
15 A. Yes.
16 Q. And the training that the officers
17 are given shows them the ADM 330; correct?
18 A. Yes.
19 Q. Did anybody in all of those years
20 ever ask any questions as to why the state form
21 is different from the county's form?
22 A. No.
23 Q. Including, in any training?
24 A. No.
25 Q. In any training that you've

COMPU-TRAN SHORTHAND REPORTING

Page 69

Robert LeFever

2  attended, has anybody ever explained to an
3  officer that even though the county form does not
4  have that language, that's what's required;
5  meaning, constant watch must be implemented if
6  the score is eight or higher?
7      A.  Yes.
8      Q.  That's been explained?
9      A.  Yes.
10     Q.  Has anybody pointed out, in all of
11 the training, that even though it's not on the
12 form, that's what's required?
13     A.  Yes.
14     Q.  So, they've specified that the
15 county form does not contain that language in the
16 training sessions?
17     A.  Yes.
18     Q.  And they've explained in the
19 training sessions that you've personally been at,
20 that constant watch should be implemented?
21     A.  Yes.
22     Q.  Would it surprise you if I told you
23 that correction officers in the facility are not
24 aware of that?
25         MR. RANDAZZO:  Objection to

COMPU-TRAN SHORTHAND REPORTING

Page 70

Robert LeFever

2  the form.
3         MR. COON:  Objection.
4      A.  I -- I don't know.
5      Q.  With respect to the ADM 330, it
6  specifically refers to, if a shaded box is
7  checked, institute constant watch; correct?
8      A.  Yes.
9      Q.  But as far as you can recall,
10 there's been no policy, procedure, or training
11 that tells an officer that if a shaded box is
12 checked, constant watch should be instituted?
13     A.  That's correct.
14     Q.  Did anybody at any of the training
15 sessions you've attended ever explain why the
16 form that the state uses differs from the county
17 form in that regard?
18     A.  No.
19     Q.  Did you ever see Exhibit 9, which is
20 an officer's handbook on suicide prevention and
21 crisis intervention in county jails and police
22 lock-ups?
23     A.  Yes.
24     Q.  Under what circumstances have you
25 seen that?

COMPU-TRAN SHORTHAND REPORTING

Page 71

Robert LeFever

2      A.  This is handed out at training.
3      Q.  And is this handed out at every
4  training that you've attended?
5      A.  I don't recall.
6      Q.  Do you recall, for example, if it
7  was not your first time attending training but a
8  subsequent time, if you didn't receive a copy of
9  this?
10     A.  Maybe a couple of times in all the
11 training.
12     Q.  And has it always been this form,
13 the 1994 version?
14     A.  I don't know.
15     Q.  Do you know of any other officer's
16 handbooks that have been handed out in training?
17     A.  Regarding this?
18     Q.  Yes.
19     A.  Only this one that I know of.
20     Q.  The 1994 version?
21     A.  There may have been one, you know,
22 from '88.  I don't know.
23     Q.  But since '94, this is the one
24 that's been handed out?
25     A.  I believe so, yes.

COMPU-TRAN SHORTHAND REPORTING

Page 72

Robert LeFever

2      Q.  And do you know who created the
3  officer's handbook?
4      A.  I believe the State Office of Mental
5  Hygiene.
6      Q.  And is that, then, provided to the
7  county facility for use in its training?
8      A.  Yes.
9      Q.  Have you ever inquired of anybody at
10 the State Office of Mental Hygiene or the
11 Commission of Correction as to whether this
12 handbook has been updated at all?
13     A.  About two weeks ago.
14     Q.  And what did you learn?
15     A.  That it has not been updated.
16     Q.  If you would just take a look at
17 Page 17 under the section that says
18 "Supervision," the bottom:  "Once you have made
19 an assessment of a suicide risk, supervision is
20 your basic prevention tool.  According to
21 Commission of Correction regulations, constant
22 supervision should be given to all high-risk
23 inmates."
24         Do you see that?
25     A.  Yes.

COMPU-TRAN SHORTHAND REPORTING

Page 73

Robert LeFever

```
 2  Q.  Was that covered as part of the
 3  training?
 4  A.  I believe so.
 5  Q.  And in terms of this handbook, was
 6  it, the substance of it, gone over in the
 7  training classes you've attended?
 8  A.  Yes.
 9  Q.  And in terms of this provision, it
10  refers to the Commission of Correction
11  regulations.
12       Do you know what those regulations
13  are?
14  A.  No.
15  Q.  Did you ever inquire?
16  A.  No.
17  Q.  In terms of "all high-risk inmates,"
18  do you understand that to be somebody among the
19  others, but somebody who scores eight or higher
20  on the Suicide Prevention Screening Form?
21  A.  Yes. Yes.
22  Q.  Would it surprise you if I told you
23  that there was testimony in this case that
24  individuals were unaware of Commission of
25  Correction regulations requiring constant
```

COMPU-TRAN SHORTHAND REPORTING

Page 74

Robert LeFever

```
 2  supervision --
 3  A.  No.
 4  Q.  -- for all high-risk inmates?
 5  A.  No.
 6       MR. RANDAZZO: Objection to
 7  the form.
 8  Q.  Why wouldn't that surprise you?
 9       MR. RANDAZZO: Objection to
10  the form.
11  A.  It's not trained that way.
12  Q.  How is it trained?
13  A.  It's trained that it's a subjective
14  evaluation.
15  Q.  So, what does that mean?
16  A.  It -- you can put somebody on
17  constant watch for one -- for a score of two or
18  three.
19  Q.  But if the score is eight or higher,
20  it's trained that they must be placed on a
21  constant watch?
22  A.  Yes.
23  Q.  You're sure of that?
24       MR. RANDAZZO: Objection to
25  the form.
```

COMPU-TRAN SHORTHAND REPORTING

Page 75

Robert LeFever

```
 2  A.  Yes.
 3  Q.  Take a look, if you would, at Page 6.
 4  A.  (Witness complies)
 5  Q.  Under the "Detoxification" section --
 6  do you see that, six. Right there. (Indicating)
 7  A.  Okay. Yes.
 8  Q.  You got that?
 9  A.  Yes.
10  Q.  Do you recall if, during the
11  training, anything was discussed about how --
12  what's indicated here, "Somebody who's
13  withdrawing from alcohol or drugs, especially if
14  the person is addicted, can be so physically
15  painful and psychologically uncomfortable that
16  suicide may seem like the only relief available
17  at the time."
18  A.  Yes.
19  Q.  And that was gone over at each of
20  the training sessions that you've attended?
21  A.  Yes.
22  Q.  Do you know if there's any policies
23  or procedures at Putnam County Correctional
24  Facility that take into consideration the fact
25  that individuals who are withdrawing can
```

COMPU-TRAN SHORTHAND REPORTING

Page 76

Robert LeFever

```
 2  oftentimes resort to suicide, due to the mental
 3  and physical pain of that withdrawal?
 4  A.  No.
 5  Q.  So, other than the verbal training,
 6  are you aware of anything that provides any
 7  guidance to correction officers or sergeants, for
 8  those who are going through withdrawal?
 9  A.  No.
10       MR. KLEINBERG: Can we take
11  a break?
12       MS. BERG: You want to take
13  a break? Sure.
14       (Recess held)
15       MR. RANDAZZO: He just
16  wanted to clarify something from something
17  earlier.
18  CONTINUED EXAMINATION BY MS. BERG:
19  Q.  Go ahead.
20  A.  Earlier, you asked if there were
21  discussions about changing the form, Suicide
22  Screening Prevention form.
23  Q.  Yes.
24  A.  Yes, there was discussion recently
25  with Sheriff Smith, and the discussion ended --
```

COMPU-TRAN SHORTHAND REPORTING

## Page 77

Robert LeFever

2 we decided to do away with our county form and go
3 with the state form.
4   Q. And when was that?
5   A. Within the last month.
6   Q. Who else was involved in that
7 discussion, if anyone?
8   A. No one else, I believe.
9   Q. And since that discussion, has the
10 form actually been changed?
11   A. We use the state form now, yes.
12   Q. And when was the first time that the
13 state form was used?
14   A. About a month ago.
15   Q. And do you recall who first proposed
16 changing the form?
17   A. No, I don't.
18   Q. How was it that you became involved
19 in the discussions?
20   A. As the jail administrator.
21   Q. In other words, did Smith call you
22 in and suggest it to you? Did you suggest it to
23 Smith? You know, something else?
24   A. I think it was just in a discussion,
25 mutual discussion on the topic.

## Page 78

Robert LeFever

2   Q. And do you recall if anything more
3 specific was said, other than, you're going to go
4 with the state form?
5   A. No.
6   Q. Was any reason given?
7   A. Just to use the state form.
8   Q. Was any reason given, though?
9   A. Just to make it easier, I guess;
10 simplify it.
11   Q. Do you know what, if anything,
12 prompted that discussion?
13   A. No.
14   Q. Part of the state form, Exhibit 1,
15 has an Instruction Sheet.
16      Have you ever seen that?
17   A. Yes.
18   Q. Is that also provided to the
19 correction officers?
20   A. Yes.
21   Q. And has that been true since the
22 state form has been used?
23   A. Yes.
24   Q. Prior to that time, were
25 instructions provided with the suicide screening

## Page 79

Robert LeFever

2 forms?
3   A. No.
4   Q. Prior to your recent discussion with
5 Sheriff Smith in the last month or so, did you
6 ever have any communications with anybody as to
7 why there was no written policy or procedure
8 that, with respect to a score of eight or higher,
9 constant watch is automatic?
10   A. No.
11   Q. In other words, in all of the years
12 of training that you've attended where that's
13 been verbally told to you, as you say, did you
14 ever point out to anyone, as the jail
15 administrator or otherwise, that there was
16 nothing in writing in Putnam County that provided
17 that?
18   A. No.
19   Q. Whose responsibility would it be to
20 implement policies or procedures that are
21 consistent with the state standards?
22      MR. RANDAZZO: Objection to
23   the form.
24      MR. KLEINBERG: Objection.
25   A. Sheriff Smith.

## Page 80

Robert LeFever

2   Q. Or the prior sheriff?
3   A. Or the prior sheriff. The sheriff,
4 the sitting sheriff.
5   Q. In terms of the ADM 330 and the
6 county form -- again, prior to the state form
7 coming into the facility about a month ago -- you
8 indicated back in 1988 or so, you did have input
9 into drafting the SOJ 32?
10   A. Yes.
11   Q. And do you recall at that point in
12 time you were a sergeant, but you were acting in
13 the role of lieutenant?
14   A. The administrative sergeant, yes.
15   Q. Because there was no lieutenant at
16 the time?
17   A. Correct.
18   Q. And so, who did you report to then?
19 The captain?
20   A. Yes.
21   Q. Was that Butler?
22   A. Yes.
23   Q. And who was the undersheriff?
24   A. Phil Prinz.
25   Q. And who was the sheriff?

## Page 81

Robert LeFever

2  A. Thoubboron.
3  Q. And do you recall having any
4  discussion with Butler, Prinz, and Thoubboron, or
5  any of them, about modifying the state form?
6  A. I don't remember.
7  Q. Do you recall if anybody higher than
8  you in the chain of command approved the use of
9  the SOJ 32?
10 A. I don't remember. I would imagine
11 so, yes.
12 Q. And would you at that time, as
13 administrative sergeant, have the authority to
14 put the form in place?
15 A. No.
16 Q. Do you recall who, then -- either
17 Captain Butler, Undersheriff Prinz, or Sheriff
18 Thoubboron -- approved the use of that form?
19 A. Don't remember.
20 Q. Do you recall who first suggested
21 modifying the form to remove the part about
22 implementing constant watch?
23 A. No, I don't remember.
24 Q. Did you have any discussions with
25 anybody as to why the form was changed in that

## Page 82

Robert LeFever

2  way?
3  A. Don't remember.
4  Q. Do you recall any discussions at
5  that time about cost saving?
6  A. No.
7  Q. When Sheriff Smith took office in
8  about January of 2002 and since that time, have
9  you had any discussions with him about any of the
10 suicide-prevention procedures or policies?
11 A. No.
12 Q. Have you had any discussions with
13 him about -- other than the one a month ago --
14 about the form being different?
15 A. No.
16 Q. Has he ever asked you any questions,
17 either through him or through his undersheriff,
18 about what procedures or policies are in place in
19 the jail?
20 A. No.
21 Q. When Sheriff Smith took office, did
22 anybody in his administration, including him,
23 ever conduct any review of jail policies or
24 procedures?
25 A. They may have.

## Page 83

Robert LeFever

2  Q. Do you recall?
3  A. No.
4  Q. Did you bring anybody in the
5  administration, either undersheriff or sheriff,
6  up to speed on how the workings of the jail at
7  that time and since that time have operated?
8  A. Yes.
9  Q. Did you do that on a regular basis?
10 A. Periodic.
11 Q. And during any of those updates or
12 bringing them up to speed, did anything about
13 suicide prevention come up?
14 A. No.
15 Q. Since Smith took office, there have
16 been two suicides in the jail; correct?
17 A. Yes.
18 Q. One was Rivera, and one was Sinkov?
19 A. Yes.
20 Q. And there was also an attempted
21 suicide; correct?
22 A. Yes.
23 Q. By a man named Rodriguez?
24 A. Yes.
25 Q. Any other attempted suicides since

## Page 84

Robert LeFever

2  Smith took office?
3  A. No.
4  Q. In connection with any of the
5  attempted or actual suicides in the jail, did you
6  have any conversations with Undersheriff Convery
7  or Sheriff Smith about the jail's policies or
8  procedures?
9  A. No.
10 Q. Did you have any conversations with
11 them about the suicide screening forms?
12 A. No.
13 Q. Did they ask you any questions at
14 any point in time about what methods or
15 procedures are in place to ensure that a suicide
16 didn't happen or an attempt didn't happen again?
17 A. No.
18 Q. Did you ever see Exhibit 8, which is
19 the Trainer's Manual?
20 A. Yes.
21 Q. Under what circumstances?
22 A. Yesterday, with counsel.
23 Q. Prior to that, had you ever seen it?
24 A. No.
25 Q. Do you see -- on the top page cover

## Page 85

Robert LeFever

2  sheet it has some handwritten notations.
3      Q.  Do you recognize the handwriting?
4      A.  No.
5      Q.  Do you know if anybody in the Putnam
6  County Correctional Facility has ever received a
7  copy of Exhibit 8, the Training Manual?
8      A.  Yes.
9      Q.  Those would be the individuals you
10 listed earlier?
11     A.  Yes.
12     Q.  And did you distribute the Training
13 Manual to them?
14     A.  No.
15     Q.  Do you know how they got it?
16     A.  No.
17     Q.  On the first page -- I'm sorry;
18 second page, small "ii" at the bottom: "Message
19 to the trainer," in bold: **"Prior to training, it
20 is essential that local mental health and police/
21 correctional officials draft coordinated suicide
22 prevention procedures."** Continuing down on that
23 same paragraph, "We cannot over-emphasize the
24 importance of developing procedures; the program
25 cannot succeed unless staff knows what to do with

## Page 86

Robert LeFever

2  an identified high-risk inmate."
3      Q.  Did any instructor ever bring to
4  your attention anything about the fact that the
5  Putnam County Correctional Facility procedures
6  and policies did not have anything about constant
7  watch being automatic in the case of a high-risk
8  inmate?
9          MR. KLEINBERG:  Objection.
10     A.  No.
11     Q.  Did anybody ever -- did you ever
12 bring that to anybody's attention?
13     A.  No.
14     Q.  Did you ever have any discussions
15 with Sheriff Smith about changing any of the
16 procedures or policies?
17     A.  Just regarding the form.
18     Q.  Other than the form, itself?
19     A.  No.
20     Q.  If you take a look at Roman numeral
21 I-3.
22     A.  (Witness complies)
23     Q.  It refers to "Forensic Suicide
24 Prevention Crisis Service Project. 1986 to
25 2000."

## Page 87

Robert LeFever

2       Do you see that?
3      A.  Yes.
4      Q.  Do you know what that project is?
5      A.  No.
6      Q.  Have you ever heard of it before?
7      A.  No.
8      Q.  Did anybody ever indicate to you
9  that the form, the ADM 330, is part of that
10 project?
11     A.  No.
12     Q.  Or that that project was something
13 that came into place through the State Commission
14 after its collaborative efforts with local
15 sheriffs?
16     A.  No.
17     Q.  Did you ever come to learn that the
18 training that's given at Putnam County
19 Correctional Facility is part of that project?
20     A.  No.
21     Q.  Turn towards the back, if you would,
22 Roman numeral VI-11. It refer to, at the top,
23 "Action to the taken by supervisor: Constant
24 (one-to-one) is the only acceptable level for
25 supervision watch in New York State."

## Page 88

Robert LeFever

2       Do you see that?
3      A.  Yes.
4      Q.  In the right column, the
5  Instructor's note: "See New York State
6  Commission of Correction Chairman's Memorandum
7  Number 17.99, November 1, 1999."
8       Do you recall if anybody, as part of
9  your training, referred to that memorandum?
10     A.  Yes.
11     Q.  Was it given to you as a hand-out?
12     A.  I don't remember, as a hand-out.
13     Q.  And do you recall if it was
14 explained what was contained in that memorandum?
15     A.  They were reaffirming the
16 Commission's standard that a 15-minute watch or
17 any other type of watch is not acceptable for
18 suicide risk.
19     Q.  And reaffirming the Commission's
20 standard that constant watch is automatic in
21 cases where the person poses as a suicide risk?
22     A.  No.
23     Q.  It didn't confirm that?
24     A.  No.
25     Q.  So, it just confirmed that the

## Page 89

Robert LeFever

1 15-minute watch or other level of watch is
2 insufficient?
3   A.  Correct.
4   Q.  And "other level," meaning other
5 than constant?
6   A.  Yes; a lesser level.
7   Q.  Was that memorandum shown to the
8 members in attendance at the training?
9   A.  I believe so.
10        MS. BERG:  I'd like to have
11 marked as Exhibit 34 a copy of the
12 Chairman's Memorandum Number 17-99,
13 November 1, 1999.
14        (Whereupon, Chairman's Memorandum
15 17-99, November 1, 1999, was marked as
16 Plaintiff's Exhibit No. 34, for id.)
17   Q.  I'm just showing you Exhibit 34.
18 (Handing)
19        Do you recognize that as the
20 Chairman's Memorandum from November 1, 1999?
21   A.  Yes.
22   Q.  And do you recall if that
23 memorandum, the substance of it was discussed at
24 each of the training sessions you've attended

## Page 90

Robert LeFever

1 since 1988 -- or I'm sorry; I should say, since
2 1999.
3   A.  I believe so.
4   Q.  And do you recall if anything
5 specific was highlighted at that time, in or
6 around '99, as to the issuance of this
7 memorandum?
8   A.  No.
9   Q.  On the second page, the first
10 paragraph refers to an investigation that was
11 conducted by the Medical Review Board, in
12 which -- the second page at the top, I'm just
13 summarizing.
14   A.  Oh.
15   Q.  In which it was determined that
16 supervisory-visit intervals that were shortened
17 from 30 minutes to 15 minutes for suicide
18 prevention precautions was, quote, "plainly
19 inadequate and in violation of Section 7003.3 H."
20        Do you recall if that's the
21 substance of what was communicated to you during
22 the training?
23   A.  Yes.
24   Q.  And are you familiar with Section

## Page 91

Robert LeFever

1 7003.3 H?
2   A.  I believe it's Security and
3 Supervision.
4   Q.  That's in the minimum standards;
5 correct?
6   A.  Yes.
7   Q.  It also says in this Chairman's
8 Memorandum that if the objective is to prevent
9 suicide, only constant observation is effective;
10 correct?
11   A.  Correct.
12   Q.  Was that covered as part of the
13 training, then, since 1999, when this memorandum
14 was discussed?
15   A.  Yes.
16   Q.  And in terms of constant observation
17 being the only effective method, do you have any
18 explanation as to why, then, Putnam County's
19 policies and procedures didn't say that?
20   A.  No.
21   Q.  Since the time that Spencer Sinkov
22 died in the Putnam County Correctional Facility,
23 have there been any modifications to any of the
24 policies which relate in any way to suicide

## Page 92

Robert LeFever

1 prevention?
2   A.  No.
3   Q.  Do you recall any modifications to
4 any?
5        (Cell phone interruption and recess
6 held from 12:47 to 12:53 p.m.)
7 CONTINUED EXAMINATION BY MS. BERG:
8   Q.  I understand you want to change an
9 answer.
10   A.  Yes; clarify from before.
11   Q.  Go ahead.
12   A.  You said, did we change anything in
13 regards to the forms.
14        No, but we added a step.  The
15 sergeants now have to go and review all the
16 intakes and sign off on them.
17   Q.  And when you say "all the intakes,"
18 you mean the suicide prevention form?
19   A.  And the medical screening, yes.
20   Q.  Part of the same packet?
21   A.  Yes.
22   Q.  And when was that step added?
23   A.  A year and a half ago.
24   Q.  And was that added in some type of

## Page 93

Robert LeFever

1 policy or procedure?
2 A. No.
3 Q. How was the staff then notified of this additional step?
4 A. They were told.
5 Q. And did you actually tell them or somebody else?
6 A. I did, yes, and someone else.
7 Q. Each member of the staff?
8 A. Yes.
9 Q. And was that in some kind of a group setting?
10 A. No; individually.
11 Q. Was it reduced to writing anywhere, as far as you know?
12 A. No.
13 Q. Prior to the year and a half ago when this step was added, what was the difference in terms of the practice?
14 A. They were supposed to look at it. It wasn't required. You know, it was recommended, but it wasn't required.
15 Q. They didn't have to sign off on it?
16 A. No, they didn't have to sign off on

## Page 94

Robert LeFever

it.
Q. Any other changes in any policies or procedures or practices?
A. No.
Q. Did you ever see Exhibit 18??
(Handing)
A. Yes.
Q. And it has an effective date of August 12th, '05.
Do you see that?
A. Yes.
Q. And it has a date of amendment of February 23rd, '06.
Do you see that?
A. Yes.
Q. It's entitled a "Procedure;" correct?
A. Yes.
Q. And do you recall when, if at all, this procedure was either distributed or given verbally to staff at the jail?
A. The first time or the amended time?
Q. The first time.
A. That would be somewhere in '99.

## Page 95

Robert LeFever

Q. And how about the amended time?
A. February of 2006.
Q. And do you recall what was amended in 2006?
A. No, but it's right here on the front; we added significant events and activities.
Q. That's the title, if you will, to this section that was added on Page 3, Number 2?
A. Yes.
Q. Before February 23, 2006, was there anything in the procedure that indicated on Page 2, letter H, 15-minute supervisory visits are not adequate as suicide prevention precaution?
A. Yes.
Q. And do you recall when that provision was part of this policy, either from inception or at some point thereafter?
A. November of '05.
Q. Are these procedures kept in the facility?
A. Yes.
Q. And what is the method of distribution of a procedure? Is this the one

## Page 96

Robert LeFever

that goes into the housing unit and booking officer books?
A. Yes.
Q. Is there any verbal notification to officers that a new procedure came out or an amendment came out?
A. Currently, yes.
Q. How about before?
A. No.
Q. When did that come into place?
A. A year and a half ago.
Q. And what happened a year and a half ago?
A. I put them all in the books myself, now. And there's also one at briefing for 30 days, which is -- the staff has to read it and sign for it.
Q. So, this would have been sometime at the end of '05 that you began this procedure?
A. Yes.
Q. And whose determination was it to change the procedure for distributing jail procedures?
A. Mine.

COMPU-TRAN SHORTHAND REPORTING

## Page 97

Robert LeFever

2  Q. Did anybody else have a role in that
3 decision?
4  A. No.
5  Q. Did you consult with anybody about it?
6  A. No.
7  Q. What prompted you to do it?
8  A. Better accountability.
9  Q. Anything else?
10 A. No.
11 Q. So, when this procedure was amended
12 in November of 2005 to say 15-minute supervisory
13 visits are not adequate as a suicide prevention
14 precaution, at that time the procedure would have
15 simply been placed in the housing unit and
16 booking logbooks?
17 A. Yes.
18 Q. Or procedure books?
19 A. Procedure books, yes.
20 Q. Did you ever come to learn at any
21 point in time that correction officers and
22 sergeants were not aware of that provision that I
23 just read being added to the procedure?
24 A. Yes.
25 Q. How did you first learn about that?

COMPU-TRAN SHORTHAND REPORTING

## Page 98

Robert LeFever

2  A. Somebody mentioned it during last
3 summer.
4  Q. In '07?
5  A. Yes.
6  Q. Do you recall who mentioned that to
7 you?
8  A. No, I do not.
9  Q. Was it more than one person?
10 A. It could've been.
11 Q. And in substance, were you told that
12 one correction officer wasn't aware of it, or a
13 group, or something else?
14 A. I believe a few weren't aware of it.
15 Q. And what, if anything, did you do at
16 that time?
17 A. Nothing.
18 Q. Had the procedure already been
19 changed to now go over new procedures at
20 briefing?
21 A. Yes.
22 Q. And did you mention to anyone else
23 what you learned of; namely, that there were
24 correction officers and/or sergeants who are not
25 aware of the procedure about 15-minute

COMPU-TRAN SHORTHAND REPORTING

## Page 99

Robert LeFever

2 supervisory visits are not adequate as a suicide
3 prevention precaution?
4  A. I don't understand the question.
5  Q. Did you tell anybody that you were
6 told that people, other correction officers, were
7 not aware of that provision?
8  A. No.
9  Q. Did you take any steps as a result
10 of learning that?
11 A. No.
12 Q. For example, have somebody go over
13 it in briefing, this procedure, to make sure that
14 everybody was aware of it?
15 A. I don't remember.
16 Q. Do you recall when this procedure,
17 Exhibit 18, was actually placed into the
18 procedure books at the housing units and the
19 booking room?
20 A. Sometime in February/March of '06.
21 Q. Are you sure of that?
22 A. Am I sure of that?
23 Q. Yes.
24 A. It was given to someone -- it was
25 given to people to put out.

COMPU-TRAN SHORTHAND REPORTING

## Page 100

Robert LeFever

2  Q. Who did you give it to?
3  A. I don't remember.
4  Q. Do you know if it actually made it
5 into the logbooks? I'm sorry; into the procedure
6 books?
7  A. No.
8  Q. And did you, at any point in time,
9 give this procedure to anybody to give out after
10 March of 2006?
11 A. Not that I can recall.
12 Q. Did you ever do anything to check
13 the procedure books to see if this procedure was
14 actually in there?
15 A. No, I don't remember.
16 Q. Do you recall that there came a
17 point in time when the Commission of Corrections
18 sent an investigator or two to the facility to
19 interview people concerning Spencer's death?
20 A. Yes.
21 Q. And do you recall that was in about --
22 in or about August of 2006?
23 A. Yes.
24 Q. And at that point in time, do you
25 remember, say, within a month or so of that

COMPU-TRAN SHORTHAND REPORTING