# EXHIBIT E - PART 1

1                                    ORIGINAL   1

2    UNITED STATES DISTRICT
     SOUTHERN DISTRICT OF NEW YORK
3
     - - - - - - - - - - - - - - - - - - - - - - - - - - -x
4
     DONNY A. SINKOV, as Father and
5    Potential Personal Representative of
     SPENCER SINKOV, deceased, and the
6    Estate of Spencer E. Sinkov, deceased,

7                   Plaintiffs,

8            -against-

9    DONALD B. SMITH, individually and in
     his official capacity as Sheriff of
10   Putnam County, JOSEPH A. VASATURO,
     individually, LOUIS G. LAPOLLA,
11   individually, THE COUNTY OF PUTNAM,
     New York, and AmeriCor, INC.,
12
                   Defendants.
13
     - - - - - - - - - - - - - - - - - - - - - - - - - - -x
14
15                        222 Bloomingdale Road
                          White Plains, New York
16                        February 13, 2008
                          11:18 a.m.
17
18        EXAMINATION BEFORE TRIAL of DONALD SMITH, a

19   Defendant in the above-captioned matter, held at

20   the above time and place, before a Notary Public

21   of the State of New York.

22
23                        Gale Salit,
                          Shorthand Reporter
24
25

1                                                                    2

2    A P P E A R A N C E S:

3

4        LOVETT & GOULD
              Attorneys for Plaintiff
5              222 Bloomingdale Road
              White Plains, New York  10601
6        BY:  KIM BERG, ESQ.

7

8

9    MIRANDA SOKOLOFF SAMBURSKY SLONE
     VERVENIOTIS, LLP
              Attorneys for Defendant -
10             Donald Smith
              240 Mineola Boulevard
11             Mineola, New York  11501
         BY:  ADAM I. KLEINBERG, ESQ.

12

13

14   SANTANELO, RANDAZZO & MANGONE, LLP
              Attorneys for Defendants -
15             Joseph A. Vasaturo,
              Louis G. LaPolla and
16             The County Of Putnam
              151 Broadway
17             Hawthorne, New York  10532
         BY:  JAMES RANDAZZO, ESQ.

18

19

20   WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER
              Attorneys for Defendant -
21             AmeriCor, Inc.
              Three Gannett Drive
22             White Plains, New York  10604
         BY:  TIMOTHY P. COON, ESQ.

23

24   ALSO PRESENT:    Donny A. Sinkov

25                         oOo

3

IT IS HEREBY STIPULATED AND AGREED,
by and between the attorneys for the respective
parties hereto, that the sealing and filing of
the within deposition be waived; that such
deposition may be signed and sworn to before any
officer authorized to administer an oath with
the same force and effect as if signed and sworn
to before a Justice of this Court.


IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to form, are
reserved to the time of trial.


IT IS FURTHER STIPULATED AND AGREED
that the within examination and any corrections
thereto may be signed before any Notary Public
with the same force and effect as if signed and
sworn to before this Court.

1                  - Donald Smith -                    4

2              D O N A L D      S M I T H,

3         having been duly sworn by Gale Salit,

4         a Notary Public within and for the State

5         of New York, was examined and testified

6                       as follows:

7

8                          oOo

9

10    EXAMINATION BY MS. BERG:

11         Q.     State your name and address for the

12    record, please.

13         A.     Donald Blaine Smith, 3 County

14    Center, Carmel, New York 10512.

15         Q.     Sheriff Smith, I'm going to be

16    asking you some questions here today in

17    connection with the Sinkov lawsuit.

18         A.     Yes, ma'am.

19         Q.     As before, let me know if there's

20    anything I say that you don't understand.  Also,

21    verbalize all of your responses so they can be

22    taken down for the purposes of the transcript.

23              If you feel during the deposition

24    that an answer is incomplete or incorrect, I ask

25    you just to let me know before you leave here

- Donald Smith -                                    5

today so we can make sure we have complete and

accurate answers on the record.

            Do you understand all of that?

        A.    Yes, I do.

        Q.    You're currently the Sheriff of

Putnam County?

        A.    Yes, I am.

        Q.    You were installed into that

position January 1, 2002?

        A.    That is correct.

        Q.    Since that point in time can you

describe what your duties and responsibilities

have been with respect to the Putnam County

Correctional Facility?

        A.    First of all, I'm the chief law

enforcement officer in the county and as such

the Putnam County Correctional Facility comes

under the jurisdiction of the sheriff.

        Q.    What specifically are you

responsible for with respect to that facility?

        A.    As the Sheriff of the county I set

broad policies and procedures for the operation

of the Putnam County Correctional Facility.

        Q.    Is anybody involved in setting more

- Donald Smith -                                      6

specific policies or procedures?

    A.    Yes.

    Q.    Who is that?

    A.    There's a jail administrator,
Captain Robert LeFever, and he is assisted by a
jail lieutenant, Lieutenant Pat O'Malley. And,
of course, there's a whole team of staff that
work in the jail. I also have an undersheriff,
Peter Convery, who has responsibilities for the
day-to-day operations of the department which
includes the correctional facility.

    Q.    Since becoming sheriff on January
1, 2002 did you ever do anything to review what
policies or procedures were in place in the
jail?

    A.    Yes.

    Q.    When did you do that?

    A.    Well, actually, that's an ongoing
process. But it started, as I recall, even
before I became the sheriff. As soon as I was
elected back in November of 2001 I started
endeavoring to gain as much information about
the total office of sheriff, which included the
Putnam County Correctional Facility. I had a

- Donald Smith -                                    7

difficult time getting some information because
the outgoing sheriff did not really want to set
up a transition team.  I had a transition team
that met and, you know, we were preparing to
assume all of our responsibilities on January
1st, 2002.  So I reviewed as many of the
policies and procedures on the broad spectrum of
the office of sheriff, which included the
correctional facility.

     Q.    Then did you conduct a more
specific review once you became sheriff?

     A.    Yes.  Upon becoming the sheriff I
met with my department heads -- I'm sorry, not
department heads, division chiefs and discussed
overall responsibilities.  I certainly toured
the correctional facility, I talked to people.
And, of course, as part of my preparation, you
know, I met with fellow sheriffs at the New York
State Sheriff's Association and I also attended
some training in the National Sheriff's
Institute in Longmont, Colorado.

     Q.    At any point in time did you ever
have occasion to review the State Commission of
Corrections minimum standards?

- Donald Smith -                                    8

A.     Yes, I recall reading a number of documents.  And, you know, I don't have -- at this point I don't have a specific date or recollection of when it happened, but I know I reviewed everything that was available to me. It was quite a bit of work and I reviewed everything that I could get my hands on.

Q.     Did you conduct that review in terms of the state's minimum standards sometime say within the first year of your appointment or election?

A.     I believe so, yes.

Q.     Did you also review the written policies and procedures that were specific to the Putnam County Correctional Facility?

A.     Yes, I did.

Q.     Do you recall with respect to those policies and procedures that some of them referred to the intake of new inmates?

A.     Yes, I recall that.  And I also recall discussions with Captain Butler and at the time Lieutenant LeFever and Sergeant O'Malley.

Q.     And the discussions that you had

1          - Donald Smith -                    9

2    with those three individuals, did those pertain

3    in any way to the intake procedures?

4          A.    It was the broad scope of the

5    operations of the jail, which I'm sure included

6    the intake procedures.  Because there were a

7    number of issues and concerns that I had at the

8    time and I took a number of actions on a number

9    of issues at the time.  So...

10         Q.    Do you recall if any of the

11   concerns or the issues that you acted upon

12   related in any way to the intake process?

13         A.    I don't recall any issues relating

14   to the -- specifically to the intake process.

15         Q.    Do you recall if any of the issues

16   related in any way to suicide prevention in the

17   jail?

18         A.    I was concerned about suicide

19   prevention, obviously, and we talked about it.

20   And I know that we talked about the procedures

21   that were used being in compliance with the

22   Commission of Correction.  And I was

23   specifically -- the specific concern that I

24   first had that related to the intake, and

25   virtually every aspect of an inmate's stay at

- Donald Smith -                                    10

the jail, pertained to the medical.  That was

one of the first things that I was very

concerned about, as well as I was concerned

about some of the supervisory procedures.

   Q. In terms of the suicide prevention

procedures, do you recall which of the three

individuals or more than one that you actually

discussed those with?

   A. I believe I discussed with all

three at various times, but obviously Captain

Butler was the jail administrator at the time,

so...

   Q. Has he since retired?

   A. He since has retired and

unfortunately Captain Butler passed away.

   Q. What was his first name?

   A. Gerald.

   Q. When he retired did Lieutenant

LeFever become the jail administrator as a

captain?

   A. Yes, that's correct.

   Q. And Sergeant O'Malley moved up the

chain to Lieutenant LeFever's slot?

   A. They were both promoted.  Captain

1

- *Donald Smith* -                                    11

2  LeFever -- Lieutenant LeFever was promoted to

3  captain and Sergeant Pat O'Malley was the

4  administration sergeant and was the obvious

5  choice to become the lieutenant.

6          Q.    With respect to the suicide

7  prevention policies and procedures at the Putnam

8  County Correctional Facility, do you recall

9  anything more specific that one or more than one

10  of those individuals conveyed to you about those

11  procedures?

12          A.    No.

13          Q.    Do you recall who specifically told

14  you that the procedures were in compliance with

15  the Commission standards?

16          A.    I don't recall, but again most of

17  my conversations were with Captain Butler as I

18  recall since he was the -- he was the jail

19  administrator.

20          Q.    Did you discuss with any of those

21  individuals any intake forms that were being

22  used at the facility?

23          A.    The only thing I recall is that

24  when we talked about the form that it was -- it

25  was the form approved by the Commission and it

- Donald Smith -                                          12

had been approved by the Commission during a

number of cycle reviews. We were inspected

every year by the New York State Commission of

Correction.

Q.    In terms of that approval, do you

know if that comes in any written form?

A.    No, I'm not aware of any written

form. The Commission does render annual

inspections on the jail.

Q.    Do you know if any of those annual

inspections specifically dealt in any way with

the intake forms?

A.    I have never seen anything that had

anything critical about the intake form.

Q.    Right. But do you know if as part

of the annual review that intake form was ever

looked at by a Commission member?

A.    I can't specifically say if it was

or not.

Q.    Who told you, if anyone, that the

form that the Putnam County Correctional

Facility was using when you became sheriff was

approved by the Commission?

A.    I don't specifically recall.

- Donald Smith -                                    13

1

2     Again, my conversations were primarily with

3     those three gentlemen.

4          Q.    Do you specifically recall that one

5     of those three told you that the form that the

6     Putnam County Correctional Facility was using

7     for intake was in fact approved by the

8     Commission?

9          A.    I specifically remember that it was

10    in compliance, it was in compliance with the

11    Commission.  It was basically -- in fact, it was

12    basically a replica of the Commission's form.

13    It was the Commission's form.  But it was

14    included in a complete packet of medical

15    questions so that everything would be all in one

16    packet.  That was my memory of that discussion.

17         Q.    This discussion would have occurred

18    sometime in 2002?

19         A.    2002.

20         Q.    Do you recall at that time when you

21    were told that the form was basically a replica

22    of the Commission's form whether you were

23    alerted to any differences between the

24    Commission's form and the form Putnam County

25    used?

- Donald Smith -                                    14

A.    I was not.

Q.    When did you first come to learn of
the actual differences between the two forms?

A.    The first actual difference that I
learned of the forms was in the October/November
time frame of 2007.

Q.    How did you first come to learn
that?

A.    I believe it was -- I believe it
was in a -- I believe I had asked Confidential
Advisor Bill Spain, Esquire, to do some research
for me in preparation for some disciplinary
proceedings.  And I believe that's when the
difference in the form came to my attention.

Q.    So was it Spain that brought the
difference to your attention?

A.    I believe it was -- it either --

        MR. KLEINBERG:  Anything
attorney/client privilege you don't have
to talk about.

A.    He's an attorney.  He's my
confidential advisor, so...

Q.    So are you asserting
attorney/client privilege for your

- Donald Smith -                              15

communications with Spain?

        A.    Well, if I open up the
attorney/client privilege, it's open and, you
know, I think --
            Q.    You just have to answer yes or no.
                    MR. KLEINBERG:  You have to
        answer yes, you are asserting the
        privilege.
            Q.    Yes, you are?
            A.    I have nothing to hide, but yes I
am asserting the privilege.
                    MR. KLEINBERG:  Yes, I'm
        instructing you to do that.
            Q.    Prior to your conversations with
Spain in October and November of 2007 had you
ever looked at the forms, the intake forms?
            A.    The intake forms in our jail?
            Q.    Yes.
            A.    Yes.
            Q.    Did you do that starting in 2002?
            A.    2002, yes.
            Q.    In terms of the State Commission,
you understood that they had a web site that you
could access information from?

1          - Donald Smith -                    16

2          A.    Yes.

3          Q.    Did you ever do that?

4          A.    I never went on the Web site.

5          Q.    Yourself personally?

6          A.    No, never personally.  Again, I

7    have a staff that, you know, I rely on for a lot

8    of support.

9          Q.    You indicated that you did review

10   the state's written minimum standards for county

11   jails, correct?

12         A.    Yes.

13         Q.    Did you ever have occasion to

14   review the Commission's memoranda, which are

15   issued to the jail administrators?

16         A.    From time to time I have reviewed

17   memoranda that came out from the Commission.

18         Q.    How is it that you receive

19   information that's contained in that memoranda?

20         A.    They will appear in my reading

21   file.

22         Q.    Is that something that your

23   assistant gives you?

24         A.    It would be my secretary would give

25   me a reading file or a signature file.

- Donald Smith -                                    17

Q.   Do you know if those Commission
memoranda are sent to you directly or sent
through the chain of command to you or something
else?

A.   I don't know, but I would assume
they are sent several different ways.

Q.   Do you recall if since you became
sheriff any of those Commission memoranda
pertained in any way to suicide prevention?

A.   Oh, I believe there's a -- there
have been a number of Chairman's Memorandums
that have pertained to suicide prevention.
Suicide prevention is a concern in county jails
and lock-ups throughout the State of New York
and in prisons throughout the state, throughout
the country for that matter.

Q.   You recall reviewing those memos
since January 1 of '02?

A.   I recall -- you know, can I
specifically recall a day and a specific memo, I
can't.  But I recall reviewing documents
pertaining to suicide from the Chairman, yes.

Q.   Other than the Chairman's
memoranda, any other documents from the

- Donald Smith -                            18

Commission that you reviewed pertaining in any

way to suicide prevention?

      A.    I review any reports that come down

from the Commission.  I am very involved with

mental health issues in the State of New York.

So it's a topic that deeply concerns me.  I read

everything I can get on the subject.

      Q.    Have you ever had any

communications, either written or verbal, with

the Office of Mental Health, the State's Office

of Mental Health?

      A.    I have not personally had

discussions with the State's Office of Mental

Health, but I have been involved with

Commissioner of Social Services and Mental

Health Michael Piazza from Putnam County on a

number of mental health issues affecting inmates

in the jail, affecting the public at large which

many times end up in our jail because of issues

that occur out in the public.  So I've only

dealt through the Commissioner Mike Piazza.

We've worked very, very closely and we have also

worked with the Putnam Hospital Center on these

issues.

- Donald Smith -                                    20

after Spencer Sinkov's suicide, that I directed

that every intake in the jail would be reported

to the undersheriff and that the undersheriff

would report to me and go over any issues

pertaining to intake.  Not only suicide issues,

but also any mental health issues, any medical

issues.  That was one issue.

The other issue was after I found

out in the October/November time frame about the

form I directed Captain LeFever to use the state

form, to no longer use our form, the Putnam

County form that had been there for a number of

years.

Q.    Were those policies that you say

were modified under your tenure as sheriff done

in writing or verbally?

A.    They were done verbally.

Q.    For how long did the first

modification whereby every intake was reported

to the undersheriff and then to you, how long

did that stay in place?

A.    It's still in place today.

Q.    When did it begin?

A.    It began shortly after Spencer's

- Donald Smith -                          21

death.

    Q.    Sometime then in the summer of
2006?

    A.    Right, and I can't remember the
specific date.  But it's something that we live
with every day because it involves numerous
phone calls.

    Q.    In terms of the information that's
reported to the undersheriff and then to you,
does that consist of written or verbal or both?

    A.    Verbal.  It's by telephone and it
-- it is both a push pull system if you will.
In other words, if I don't know of an intake I
get the call.  And if I just happen to hear with
my law enforcement responsibilities that someone
is coming to jail and I haven't heard from the
undersheriff, I will be calling him and asking
him what's the status and to check on it, even
if the inmate hasn't even been -- sometimes it's
a situation where someone is arraigned and
released, so I'm asking for -- it's a push pull
system.

    Q.    What information are you verbally
advised of as part of the system?

- *Donald Smith* -                                      22

1

2       A.     I'm advised of the shaded areas and

3   I'm advised of the score and I'm advised of the

4   general health of the inmate and then, of

5   course, I ask the undersheriff questions about

6   the status of the inmate.

7       Q.     In terms of --

8       A.     For example, is this a first

9   time -- is this a first time inmate who is in

10  for the first time.

11      Q.     Anything else in terms of the

12  status?

13      A.     It could be a number -- anything to

14  do with the health and welfare of the inmate.

15  And it's different depending on the situation,

16  but obviously the primary focus is the suicide

17  screening.

18      Q.     So when you say you are advised of

19  the shaded areas and the score, you mean on the

20  suicide screening prevention form?

21      A.     Yes, ma'am.

22      Q.     In terms of the general health,

23  that would be on the medical part of that

24  packet?

25      A.     That would be just on the

- Donald Smith -                                    23

general -- you know, sometimes this would occur

even before medical has been involved, just if

there's anything unusual with the inmate, with

his status.

     Q.   Are you given any information on

the housing assignment for the new inmates?

     A.   No.

     Q.   Are you given any information on

whether the new inmates are placed on any

heightened supervision?

     A.   Yes.  When you say heightened

supervision, then we go back to that previous

question.  If it's a constant watch, then I

know, you know, where constant watches are done.

     Q.   Where is that?

     A.   They are done in North Housing.

     Q.   North Housing Two?

     A.   Yes, North Housing, the special

unit with four cells.

     Q.   In terms of heightened supervision,

there's also a 15-minute level of supervision?

     A.   There's three levels of

supervision.  There's basically -- there's

general supervision, which involves a 30-minute

- Donald Smith -                                      24

check, where officers are available but the

checks are made every 30 minutes.  Then there's

active supervision.  And active supervision

involves 15-minute supervisory visits.  Then, of

course, there's constant supervision, which is

one-on-one supervision where the officer has

total eye contact, you know, with the inmate.

You could actually have one-on-two but also meet

the criteria of constant supervision.

        Q.    Where the one officer can visibly

see two inmates at the same time?

        A.    One officer can be sitting and

looking directly at two cells.  That would meet

the Commission's standard.

        Q.    In terms of the modification in or

about the summer of '06 where you are notified

by the undersheriff of new intakes, are you as

part of that process notified of individuals

placed on active supervision or just constant

watch?

        A.    Well, basically -- basically, the

main concern, of course, is the constant

supervision.  But the undersheriff during the

conversation with me will tell me, you know,

- Donald Smith -                          25

there's this problem and the person is, you

know, we put him on active supervision.  We use

the active supervision quite a bit with new

intakes, but we don't use the active supervision

for, you know, suicide prevention.

     Q.     That's been true at least since the

summer of 2006?

     A.     That those phones calls have been

made, yes.

     Q.     In terms, though, of using active

supervision as a matter of practice in the jail

for suicide prevention prior to that time, prior

to the summer of '06, do you know if that was

used?

     A.     It is our policy that the only --

the only acceptable supervision for a suicidal

inmate would be a constant watch.

     Q.     And that was the policy then prior

to the summer of 2006?

     A.     I believe so.

     Q.     What do you base your belief on?

     A.     In that that is our written policy.

     Q.     Do you know if in practice, in

other words the way that policy has actually

- Donald Smith -                                    26

been implemented, prior to the summer of 2006

whether active supervision was used for inmates

who posed a risk of suicide?

        A.    In these depositions I have heard

some information that is troubling.  But through

these depositions I have heard some issues

pertaining to that question, Miss Berg.

        Q.    Put aside what you have heard

during the course of this lawsuit.  Prior to,

for example, attending a deposition in this

case, were you aware at any point in time that

in practice staff at the jail did not place

inmates on constant watch where the form

indicated there was a risk of suicide?

        A.    No, I believed the policy was being

followed, that they were being placed on a

constant watch.

        Q.    What do you base your belief on?

        A.    First of all, just the number of

the briefings at morning staff call, the number

of constant watches that we had in the jail.  We

had a significant number of constant watches in

the jail throughout my tenure as sheriff.

        Q.    Since January of 2002?

1          - Donald Smith -                    27

2          A.    Yes.

3          Q.    Anything else that you base your

4    belief on?

5          A.    Just living -- living my duties as

6    the Sheriff of the county.  You know, many times

7    I have been in the jail, they have been on

8    suicide watches.  I've been briefed that people

9    have been put on suicide watches.  Now prior

10   to -- prior to the summer of 2006 I wasn't

11   getting a report every time an inmate was being

12   put on a constant watch.

13         Q.    Why did you implement the

14   modification to the policies now requiring that

15   you personally be notified about every new

16   intake?

17         A.    I take my duties and

18   responsibilities very seriously.  I served many

19   years in the military and I have a strong belief

20   that everyone entrusted to our care is a person

21   who has a life with hopes and dreams and I

22   certainly wanted to ensure that a failsafe

23   mechanism was put in to make sure that the

24   leadership was involved with every decision.

25         Q.    Why not implement that failsafe

- *Donald Smith* -                                    28

mechanism prior to the summer of 2006?

        A.    Prior to the summer of 2006 I

believed the -- I believed the screening process

was working.

        Q.    What did you base your belief on

prior to the summer of 2006 that that process

was working?

        A.    Every -- every -- every inspection

that we had from the Commission of Correction

was positive in this area.  We didn't have a

problem identified.  Even when we had a suicide

in I believe it was November of 2003, the

Commission of Correction came down with a team

and did a complete investigation and did not

identify any, as I recall from the report, any

issue specifically with the suicide screening

and the -- I really -- I really didn't have any

issue with -- there was an issue identified with

the psychiatrist, the support.  There was just

no indication to me that there was such a

problem.

        Q.    You indicated that you did learn of

some information during the course of this

lawsuit with respect to the actual practice in

- Donald Smith -                          29

1

2    the jail of not implementing constant watch in

3    cases where the suicide screening form was eight

4    or higher or shaded boxes were checked, correct?

5                    MR. KLEINBERG:  Objection.

6            A.    I believe what I learned during

7    this lawsuit was -- obviously, we have the

8    tragic instance pertaining to Spencer.  But I

9    learned during the lawsuit that the shaded boxes

10   were not being looked at in a manner that I

11   believed to be the case.

12           Q.    In terms of the shaded boxes not

13   being looked at in a specific manner, did you

14   understand that those boxes were shaded for a

15   particular reason?

16           A.    Yes, they are shaded for a

17   particular reason.

18           Q.    Which is?

19           A.    Which is if a shaded box is checked

20   or if the score is eight or higher, the inmate

21   should absolutely be put on a constant watch,

22   constant supervision.

23           Q.    Did you also learn, either in this

24   case or elsewhere, that correction staff in the

25   facility did not always place inmates who scored

- Donald Smith -                                    30

1

2     eight or higher on a constant watch?

3                         MR. KLEINBERG:  Objection.

4          Q.     Again prior let's say to the summer

5     of 2006.

6          A.     During these depositions I heard

7     some troubling information from some people who

8     I will have to deal with under the disciplinary

9     system within the correctional facility.

10         Q.     Meaning Vasaturo and LaPolla?

11         A.     Yes, ma'am.

12         Q.     Anyone else?

13         A.     At this time those were the only

14    two that are involved in disciplinary action at

15    this time.

16         Q.     Do you recall learning of

17    information from others in the case, namely

18    Wendover and Oliver, about constant watch not

19    being required, according to their view of the

20    practices in the jail, when an inmate scores

21    eight or higher?

22         A.     I believe there was some issues in

23    their depositions.  I don't specifically

24    remember each of their depositions, but

25    certainly there's -- when these depositions are