# EXHIBIT E - PART 2

- Donald Smith -                                    31

over I'm going to go back and review anything

identified in these depositions.  As part of our

mission statement we are a learning organization

and as such, we are going to go back and review

any issues that were identified during these

depositions.

       Q.    In terms of the information about

individuals on the correction side, not medical,

but the correction staff not implementing

constant watch if an inmate scored eight or

higher, did you ever inquire of Captain LeFever

about whether or not in his view, day-to-day

operations of the jail, that was in fact true?

       A.    I was under the impression that we

were in full compliance.

       Q.    Impression aside, did you ever ask

Captain LeFever about that?

       A.    We had many discussions on all

aspects of the operations of the jail to include

the suicide screening, training, medical

support.  And certainly the day of Spencer's

suicide one of the first people I saw after

coming out of the cell was Captain LeFever, and

I had one question for him.  And the question

- Donald Smith -                                     32

1

2    was, "Bob, what was the suicide screening?"

3    And his head dropped down -- I mean, there are

4    some events you can remember in life, they are

5    defining moments.  His head dropped down, he

6    said, "Boss, you are not going to believe this.

7    He should have been on a constant watch."  And

8    that said it all.

9                   And since -- since that time we

10   have had many conversations on suicide

11   screening.  We have studied it -- I'm talking

12   about total suicide prevention.  We have studied

13   it, and we are continuing to work on developing

14   a model of excellence.

15        Q.    Did you have any discussions with

16   LeFever, though, at any point in time about

17   specifically what you heard in this case, which

18   is that constant watch was not always

19   implemented prior to May of '06 when an inmate

20   scored eight or higher on the suicide screening

21   form?

22        A.    I don't recall a specific

23   conversation.  But as I said, I had those

24   conversations with three individuals - Captain

25   Butler, Lieutenant LeFever/Captain LeFever,

- Donald Smith -                                    33

Sergeant O'Mally/Lieutenant O'Malley, as they

were promoted. I can't specifically remember,

you know, when those conversations took place.

But we absolutely had conversations about

suicide screening.

    Q.   Who in the County of Putnam has the

authority to prefer disciplinary charges against

correction staff?

    A.   I'm the Sheriff of the county and I

have the ultimate authority.

    Q.   Does anybody else have any role in

that decision-making process?

    A.   Any member of the chain of command

can play a role.

    Q.   Does Captain LeFever have a role?

    A.   Captain LeFever can use counseling.

Captain LeFever can -- he can recommend charges.

He can recommend it verbally, he can recommend

it in writing. He plays a major role, but when

it comes to, you know, actual -- he can conduct

additional training. When it comes to actual

charges, he would do it through the chain of

command through the undersheriff and myself.

The undersheriff, of course, plays a role in it.

1                      - *Donald Smith* -                    34

2      Captain McNamara, Bill -- Confidential Advisor

3      Bill Spain would play a role in it as well.

4              Q.      In terms of discipline of

5      correction staff, is it your testimony that

6      LeFever has the authority to implement verbal or

7      written counseling without going through you?

8              A.      Yes.  Counseling -- counseling --

9      counseling can be done by any member, any

10     supervisor in the chain of command.  But

11     counseling cannot be disguised as discipline.

12     In other words, if it is a reprimand.  In other

13     words, they can counsel, they can provide

14     additional training.  But if it crosses the line

15     of being a reprimand, I believe under New York

16     State applicable laws it would have to, you

17     know, be in the purview of the sheriff.

18             Q.      In terms of the employees who work

19     in the jail, are they considered to be employees

20     of the county, of the sheriff, of both?

21             A.      They are employees -- they are

22     employees of the county.  They are county

23     employees.  The only -- the only issue with and

24     I think what you are -- maybe I -- the only -- I

25     think you are referring to the joint employer

- Donald Smith -                                      35

status, and that is under the Taylor Law.  That

is not under their status as a county employee.

                    (Recess held, after which

        the answer was repeated.)

        Q.    You had started saying something

about civil service.  Did you want to add to

your prior answer?

        A.    I'm not sure that -- you know, they

are county employees, they are county employees

with civil service status.  In other words, they

take a civil service test and they are selected

off of a list.  The only issue pertaining to the

joint or dual employer status is the fact that

the sheriff under the Taylor Law has a right now

to sit at the table when they bargain for their

contract.  The sheriff can sit at the table with

the county executive during negotiations.

That's really the only issue, but they are

county employees.

        Q.    With respect to them being county

employees, it's you the sheriff who has the

authority to do the discipline when it reaches

the level of reprimand, either a reprimand or

formal charges?

- Donald Smith -                                36

A.    My understanding is if it goes to

formal charges where a reprimand would come into

play, that it would come under the jurisdiction

of the sheriff.

Q.    who is responsible in the county

for training the correction staff?

A.    The training of the correction

staff is conducted by the jail administrator and

his staff.  Now that's the ongoing training that

is conducted, you know, within the department.

There's also institutional training

which is conducted at an academy and, you know,

those courses are -- you know, normally counties

get together and conduct that training together.

Most often that training is conducted in either

Dutchess County or Orange County.

Q.    The academy training is given at

the point of hire?

A.    The academy training is given after

they are hired.

Q.    And then the ongoing training once

they are an employee of the county is provided

through the jail administrator, at this time

captain LeFever?

- *Donald Smith -*                                       37

1

2          A.     That is correct.  And he has a

3     training officer and a training staff.  And that

4     was one of the issues that concerned me when I

5     first became the sheriff.

6          Q.     Does the jail administrator have

7     the authority then to set any types of policies

8     or procedures within the facility?

9          A.     The jail administrator certainly

10    sets many of the procedures that occur on the

11    day-to-day operations of the jail.  You know, he

12    can implement new guidance that comes down.  If

13    you look at the -- if you look at the standards

14    from the Commission of Correction, there's --

15    you know, there's a lot of issues that are

16    directly -- responsibilities are given to the

17    jail administrator.

18         Q.     In terms of the jail administrator

19    setting forth procedures, these procedures are

20    what the staff follows in the goal of carrying

21    out the broader policies that you set; is that

22    fair to say?

23         A.     That is correct.  And I would say

24    that if the -- you know, the jail administrator

25    is always working to make things more specific

- Donald Smith -                                    38

2    or to -- he goes to conferences in his own

3    right, he meets with jail administrators around

4    the state.  The Commission meets from time to

5    time.  So he certainly can take issues and

6    implement procedures.  Obviously, if there

7    was -- if there was a procedure that was going

8    to be in violation of a broader policy, I would

9    expect he would talk to me about that.

10            Q.    Take a look, if you would, at

11   Exhibit 3, the form itself.  Do you recognize

12   that as the form that Putnam County used up

13   until some point earlier this year when it was

14   changed to the state form?

15            A.    Yes, I recognize the form.

16            Q.    Do you recall when you first saw

17   this form?

18            A.    I don't recall exactly when I first

19   saw the form.

20            Q.    Would it have been sometime in

21   2002?

22            A.    I believe it would have been in

23   2002.  Because, again, I was going around asking

24   questions, receiving briefings.  You know, it

25   was like drinking from a fire hose, but I saw

- Donald Smith -                                    39

many many forms.  And again, my responsibilities

go beyond just the jail.  It was a whole litany

of law enforcement responsibilities I have as

well and I was reviewing those as well.

      Q.    You indicated earlier that you were

told that this form basically was the form that

the Commission used, correct?

      A.    That is correct.  That is my

memory.

      Q.    You then at some point in time saw

Exhibit 1, the Commission's form, correct?

      A.    Yes.

      Q.    At the time that you were told that

Exhibit 3, the county form, was basically the

form that the state used did you ask what the

differences were?

      A.    No, because -- are you talking

about when I first saw the form?

      Q.    In other words, you testified

earlier today that you were specifically told

that the form was basically the same.

      A.    Yes.

      Q.    You don't recall who told you that?

      A.    I don't.

- Donald Smith -                           40

1

2      Q.    Do you recall if you asked at that

3   point in time whether there were any

4   differences?

5      A.    I don't recall, because again the

6   form was purported to me to be the form.   In

7   other words, it was -- the only reason it was in

8   this format, I was told it was in a packet of

9   the total intake process and that's why it was

10  that way.

11     Q.    In terms of the form itself, when

12  you compare it to Exhibit 1, there are

13  differences between the state form and the form

14  the county used?

15     A.    Yes.

16     Q.    The differences specifically are

17  under the section for the action that's supposed

18  to be taken by a corrections intake officer and

19  the sergeant when a score is eight or higher,

20  correct?

21     A.    Yes.

22     Q.    The other difference is the actions

23  to be taken by the intake officer and the

24  sergeant when one or more shaded boxes are

25  checked, correct?

- Donald Smith -                                    41

                    MR. KLEINBERG:  Objection.

    A.    Yes.

    Q.    The county form under those two
circumstances does not say to the staff that
they must institute constant watch, correct?

    A.    The county form states that you are
to notify -- I'm sorry.  It says here, "notify
the shift supervisor."  And if you go into our
policies and procedures, that's where it would
indicate to the shift supervisor to initiate a
constant watch.

    Q.    Do you know what policy and
procedure that is?

    A.    It's in the Red Book.  I believe
it's in -- I believe it's Article 3, but I'm not
absolutely positive.  There's something else on
the form that's different here, too.  And that
is on the county form there's an inmate
signature and on the state form there's no
inmate signature.

    Q.    With respect, though, to the state
form, that specifically says that if an inmate
scores eight or higher not only is notification
required but instituting constant watch is

*- Donald Smith -*                              42

required?

    A.    It is very specific on the state

form.  It says it on the state form.

    Q.    And it also says on the state form

the same thing, notify a supervisor and

institute constant watch if one or more shaded

box is checked, correct?

    A.    Yes.

    Q.    In terms of the county form, it

only says that if the score is eight or higher

or a shaded box is checked, the intake officer

has to notify the shift supervisor.

                MR. KLEINBERG:  Objection.

    Q.    Is that fair to say?

    A.    Yes, that's my understanding.

    Q.    There's nothing on the form itself

which says constant watch should be implemented

under these circumstances?

    A.    That is correct.  But I still

believe without a doubt that that is the action

that's supposed to be taken.

    Q.    In terms of the basis for your

belief, you referred to it being in a county

policy in a Red Book, correct?

- Donald Smith -                                  43

1

2          A.    Yes, ma'am.

3          Q.    And the Red Book, is that the

4    document or the compilation of policies that

5    officers are given when they are hired?

6          A.    Yes.

7          Q.    In terms of the Red Book, do you

8    know if Exhibit 2, which is Article 15, is the

9    policy that you referred to being in that Red

10   Book which dictates what a tour supervisor is

11   supposed to do when an inmate has a score of

12   eight or higher or a shaded box is checked?

13         A.    I believe this is the -- this is a

14   copy of what is in the Red Book.

15         Q.    In terms of Exhibit 2, though, is

16   this the policy that you referred to just

17   moments ago in your testimony which you believe

18   sets forth what the shift supervisor is supposed

19   to do once notified by reason of the form, the

20   suicide screening form, what they're required to

21   do?

22         A.    I believe that and I also believe

23   the training that they receive, both the

24   training at -- the basic training they receive,

25   plus the additional training would make that

- Donald Smith -                                    44

true.

Q.    Have you ever attended any training
which in any way dealt with suicide prevention?

A.    I have walked into a number of
training classes, but I don't have a specific
memory of attending specific suicide training in
the Putnam County Correction Facility.  I do
remember attending some training in Longmont,
Colorado on suicide prevention, but that
training was not New York State specific.

Q.    And the correction staff in the
Putnam County facility wouldn't go to that
Longmont training, correct?

A.    No, that training was for sheriffs.

Q.    But in terms of the training that
the correction staff actually receives, are you
personally aware of what they are told during
that training about suicide prevention?

A.    Well, I have seen, obviously, the
manuals that -- where the training is conducted.
You know, the basis of the training is the
manuals from the Commission of Correction and
the New York State Office of Mental Health.  You
know, there's the basic training, there's the

- Donald Smith -                                    45

1
2      continuous training that's conducted in the
3      facility and then there's -- an officer's
4      handbook that's provided.
5          Q.    When did you first see the training
6      manuals?
7          A.    I don't recall, and I don't
8      specifically recall if I saw them in 2002 or
9      not.
10         Q.    Do you recall when you first saw
11     the officer's handbook?
12         A.    I don't.
13         Q.    Did you ever speak with anybody
14     about whether during the training that's given
15     to staff anything is specifically referenced
16     about constant supervision being required if an
17     inmate scores eight or higher on the form?
18         A.    I believe that's specifically in
19     the lesson plan.
20         Q.    But did you ever talk to anybody
21     about whether that was actually instructed
22     during these training sessions?
23         A.    I don't -- I don't have a specific
24     memory of a conversation.  I could have, but I
25     don't have a specific memory of that

- Donald Smith -                                    46

conversation.

     Q.   Did you ever speak with anybody

about whether staff in the facility are given

training, again, specifically on what -- on

implementing constant watch if a shaded box is

checked?

     A.   I don't have a specific memo on

that topic either.  But something very relevant

to this is that when I became the sheriff one of

the -- one of the many concerns I had was when I

found out that the training -- a number of

training sessions were not being conducted.  And

I specific -- in talking with the captain and I

believe the lieutenant, I also believe the

sergeant at the time, the issue was funding

because most training is done on overtime.  So I

procured $150,000 from the legislature to

implement the training.  And I believe at the

time the training issues were suicide prevention

screening, firearms training, blood borne

pathogens.  There were a number of issues, and

that discussion took place.  But specifically

did we talk about the two questions you asked

me, I don't recall.

1                    - Donald Smith -                    47

2          Q.    In terms of the Putnam County

3    Correctional Facility policy that's before you

4    as Exhibit 2, has that been modified at all

5    since you became sheriff?

6          A.    I do not believe it's been

7    modified.

8          Q.    In terms of the first page,

9    "booking officer will," under the admissions

10   screening section, you see that?

11         A.    Yes.

12         Q.    It then describes on the next page

13   the responsibilities of the intake officer or

14   the booking officer, correct?

15         A.    Correct.

16         Q.    One of the things small letter (b)

17   under that section says, administration of

18   suicide prevention screening guidelines form 330

19   ADM, do you see that?

20         A.    That is correct.

21         Q.    Number 3 says, "The booking officer

22   is required to immediately notify the tour

23   supervisor whenever a prisoner scores in the

24   high risk score of eight in column a or

25   immediate referral categories on the suicide

- Donald Smith -                              48

1
2    prevention screening form." Do you see that?

3        A.    Yes, I do.

4        Q.    And do you know what the immediate

5    referral categories are that are referred to

6    there?

7        A.    The immediate referral categories

8    are the shaded boxes.

9        Q.    And the booking officer, according

10   to this policy, is supposed to notify the

11   supervisor whenever a prisoner under number 3,

12   letter (e), appears to be significantly under

13   the influence of alcohol or drugs. Do you see

14   that?

15       A.    Yes.

16       Q.    Do you know in terms of the

17   practices in the jail during the time that you

18   were sheriff whether or not the booking officer

19   followed this policy by immediately notifying

20   the tour supervisor whenever a prisoner scored

21   an eight or higher on the suicide screening

22   form?

23       A.    I believe that was done. And in

24   fact, there were a number of cases where people

25   were put on a constant watch. It would be brief

- Donald Smith -                                    49

1

2      that a person would be put on a constant watch

3      with a score of a two simply because of

4      something that bothered the booking officer or

5      bothered the sergeant.  They had the authority

6      to even exceed the standard.

7           Q.    Do you know if in practice the

8      booking officer always notified the supervisor

9      when the referral categories, the shaded boxes,

10     were checked on the suicide screening forms?

11          A.    I sat in the depositions and I

12     obviously know that -- I know it was --

13     particularly in the case of Spencer Sinkov,

14     notification wasn't made.

15          Q.    In terms of in the case of Spencer

16     Sinkov notification wasn't made under

17     circumstances where not only was one or more

18     shaded box checked, but he also had a score

19     higher than eight?

20          A.    Yes, he had a score of ten and the

21     referral was not made.

22          Q.    In terms of the practices in the

23     jail, you know, in terms of the day-to-day way

24     that this policy is carried out, do you know if

25     the staff notified the supervisor, the tour

- Donald Smith -                                    50

supervisor in writing or verbally?

      A.    I believe they notify them both

verbally and in writing.  In other words, the

first thing they would do is call on the radio

and tell them -- tell the supervisor.  And then

the supervisor would come review the form.  So

it would be both, it would be both verbal most

likely via radio and second in writing.

      Q.    What do you base your belief on?

      A.    That it was the policy and, you

know, again I believe we run a good jail

overall.

      Q.    In terms of your belief, what do

you base that on?  In other words, did somebody

tell you that that's the way it was done, did

you personally see it, something else?

      A.    I have a lot of people that help me

perform my duties.  The sheriff has a broad

array of duties.  And I had great confidence in,

you know, my undersheriff, in Captain LeFever,

in Lieutenant O'Malley and in the sergeants.

And, you know, just based on feedback I would

get on constant watches, the number we would be

putting into place, I had a strong belief

- *Donald Smith* -                                          51

1

2  that -- and the feedback from the Commission of

3  Correction who inspected us.

4          Q.    Did any of the feedback you

5  received, in other words -- let me withdraw the

6  question.

7          Do you specifically have personal

8  knowledge as to how in practice the policy

9  that's before you as Exhibit 2 was carried out?

10         A.    Personal knowledge, obviously I

11 have personal knowledge of the form you just

12 presented me.  But on a day-to-day basis, I

13 didn't have personal knowledge.

14         Q.    In terms of the duties of the tour

15 supervisor that you referenced earlier, when,

16 you know, scores of eight or higher and/or a

17 shaded box is checked notification has to be

18 made to the tour supervisor, you then indicated

19 that the tour supervisor's duties are set forth

20 in this policy, correct?

21         A.    Yes.

22         Q.    Starting, if you would, the page at

23 the bottom handwritten 77.

24         A.    Yes.

25         Q.    Under the section, Procedural

- Donald Smith -                                52

1

2     Guidelines, "Tour supervisor will," you see

3     that?

4           A.    Yes.

5           Q.    Then it follows through the next

6     page detailing what the tour supervisor's

7     responsibilities are according to this policy,

8     correct?

9           A.    Yes.

10          Q.    In terms of the tour supervisor's

11    responsibilities on the page that's marked 77

12    letter D, "Ensure that appropriate supervision

13    is given to any prisoner who is determined to be

14    a threat to himself or herself," correct?

15          A.    That is correct.

16          Q.    The next page under the Procedural

17    Guidelines refers to the captain or the staff

18    sergeant.  You see that?

19          A.    Yes.

20          Q.    Do you have any understanding as to

21    in practice what happens when the captain and

22    the staff sergeant are both on shift, who makes

23    or who has the responsibilities for the things

24    detailed under that section?

25          A.    I see this as -- I don't see this,

1                       - Donald Smith -                    53

2      Miss Berg, as specifically addressing the

3      moment-to-moment operation.  I see this as a

4      procedural guideline, and that's what it's

5      entitled, where the captain or the sergeant

6      ensure that policies or I should say procedures

7      are in place whereby this is accomplished.

8      Because in effect, in effect it's going to be

9      the tour supervisor, a sergeant, who is

10     specifically on duty who is entrusted with

11     reviewing the screening conducted by the booking

12     officer.

13          Q.    In terms of these procedural

14     guidelines, is it your understanding then that

15     the procedures that are kept in the facility

16     would detail how this general policy is to be

17     implemented?

18          A.    Well, I believe -- I believe that

19     there are many things in this policy and

20     procedure that are -- that are pretty specific

21     and very detailed.  However, the captain, the

22     captain certainly can implement procedures

23     specifically to address issues based on his own

24     observations or feedback.  I mean he is in the

25     jail every day, he's the jail administrator.  So

- Donald Smith -                                      54

1
2      as much as I think this procedure contains a lot

3      of specificity, certainly it's within the

4      purview of the captain to identify issues and

5      give more specific procedures if he deems it

6      appropriate.

7            Q.    Have you ever seen in writing any

8      more specific procedures which in substance

9      relate to the requirements set forth in this

10     policy that's before you as Exhibit 2?

11           A.    I believe there was one procedure

12     that the captain put out that was at issue

13     pertaining to some of this.  I don't know if it

14     pertained to all of this.

15           Q.    When you did you first find out

16     about that procedure that Captain LeFever put

17     out?

18           A.    I found out about that procedure

19     when I received a copy of an anonymous letter

20     that was sent to the Commission of Correction.

21           Q.    Do you recall when that was?

22           A.    I believe it was in November -- it

23     was in November/December time frame of 2006.

24           Q.    Did the anonymous letter refer to a

25     specific procedure?

- Donald Smith -                                    55

1

2          A.      I believe it did.

3          Q.      What do you recall about that?

4          A.      I believe it referred to -- again,

5    I don't know who -- to this day I don't know who

6    wrote the document.  But I believe it referred

7    to a procedure put out by Captain LeFever in the

8    -- again, it was -- I don't have a specific

9    memory of everything in the anonymous letter,

10   but it said something about that the captain put

11   out a procedure shortly before the Commission of

12   Correction came to the facility.

13         Q.      Other than what you learned of in

14   that anonymous letter, did you have

15   communications with anybody verbally or in

16   writing about whether that was accurate?

17         A.      I had a number of conversations.

18         Q.      Who did you speak with?

19         A.      I spoke to Captain McNamara about

20   it.

21         Q.      Anyone else?

22         A.      You know, obviously an anonymous

23   letter is just that, it's an anonymous letter.

24   But it's something, you know, that -- I take any

25   type of feedback I can get to evaluate, make

- Donald Smith -                                          56

1

2       decisions and follow up.

3           Q.    So who did you speak with other

4       than Captain McNamara?

5           A.    I visited the Commission of

6       Correction and I spoke to -- I spoke to two

7       people.  I may have spoken to three, but I know

8       I spoke to two.  I spoke to a gentleman named

9       Chris Ost, who is on the medical review team,

10      and I spoke to Keith Zobel, who does the cycle

11      reviews at the jail.

12               And, you know, I had just one, one

13      concern and that was, was something provided,

14      was something provided to the Commission of

15      Correction in their evaluation after the fact.

16      And Chris Ost told me that he would -- he would

17      review every document and provide -- provide --

18      provide me every document that the Commission --

19      the Commission had.

20               And he -- he sent back the

21      documents that the Commission had and they were

22      exactly the same as were submitted initially in

23      the packet.  So there was nothing provided by

24      Captain LeFever to the Commission, you know,

25      after the fact if you will.  So I just wanted to

1                    - Donald Smith -                    57

2        make sure the Commission knew.

3                    And then that same day -- that same

4        day they were having their Christmas party in

5        Albany.  That same day I spoke to Fred Lamy

6        about some issues.  I may have mentioned it to

7        Fred Lamy.

8               Q.    Do you recall one way or the other

9        whether you --

10              A.    I don't.  I had a number of other

11       issues to talk to Fred about and I may have

12       mentioned it to him.  But I know I mentioned it

13       specifically to Chris.

14              Q.    We don't want you to guess or

15       speculate.

16              A.    Right.

17              Q.    Anything that you can recall

18       specifically discussing with Zobel or was it the

19       same substance as Ost?

20              A.    Same substance.  Basically Captain

21       McNamara and I, we were just concerned and we

22       wanted to make sure -- you know, there were a

23       number of issues in the anonymous letter that

24       didn't make any sense at all.  In other words,

25       the issue about log books.  I mean that somehow

- Donald Smith -                                    58

1
2    someone could, you know, start remaking log

3    books. Log books, you know, you just can't do

4    that unless you would have a total conspiracy

5    where people would sign, and that's just -- and

6    we know log books are used on a routine basis.

7    There were just a number of issues.

8         Q.    Did you speak with Captain McNamara

9    specifically about the issue raised in the

10   anonymous letter about a procedure being put out

11   by LeFever shortly before the Commission came to

12   the facility?

13        A.    Yes, I did.

14        Q.    What did you say to McNamara and

15   what did he say to you about that?

16        A.    We just -- you know, this is an

17   item that we still haven't got totally resolved.

18   But it's, you know, it's -- you know, when

19   something is put out, what was put out, when it

20   was put out, why it was put out. And it's an

21   issue that's still an open issue.

22        Q.    Other than that, anything else that

23   you said to McNamara and he said to you?

24        A.    We talked extensively about it, but

25   I can't specifically say I said this, he said

1                          - Donald Smith -                    59

2      that.

3              Q.    In substance do you recall what you

4      said?

5              A.    In substance we just wanted to

6      protect the integrity of the process and we

7      wanted to ensure, you know, with the Commission,

8      and also to ensure that something wasn't being

9      put out after the fact that would affect, you

10     know, disciplinary action.

11             Q.    Did you ever speak with Captain

12     LeFever about it?

13             A.    I have not spoken to him yet.  I'm

14     not sure if Captain McNamara has spoken to him

15     yet.  But obviously this is an issue that when

16     we get back to taking up the disciplinary

17     actions involving this case that will be

18     addressed.

19             Q.    And when will that be?

20             A.    That will be within the next six

21     months.  Actually, I believe that will be within

22     the next four months.  I believe we have a

23     six-month stipulation in effect.

24             Q.    And the six-month stipulation is

25     with Vasaturo and LaPolla?

1                           - Donald Smith -                    60

2          A.    Yes.

3          Q.    Is LeFever a member of any union?

4          A.    No, Captain LeFever is not a member

5     of any bargaining unit.

6          Q.    He serves at the pleasure of the

7     appointing authority, namely yourself?

8          A.    Yes, that is my understanding.

9          Q.    So you don't actually have to

10    prefer disciplinary charges against him in order

11    to terminate him; is that correct?

12         A.    No, I do not.  Of course at this

13    point in time I don't want to imply anything at

14    this point until we get all the facts.

15         Q.    In terms of this indication that

16    this procedure was put out by LeFever right

17    before the Commission of Correction came to the

18    facility, do you know if anybody within the

19    facility - correction staff, sergeants, you

20    know, CO's - if they were asked anything about

21    that by anyone?

22         A.    I don't know.

23         Q.    Did anybody ever investigate that

24    as far as you know?

25         A.    Captain McNamara is obviously, you