# EXHIBIT E – PART 3

1                    - Donald Smith -                    61

2    know, looking into the issue.  But as far as

3    where we are at right now, we still have more

4    work to do on the issue.  But again, I'm not

5    going to speculate on what we found.

6            Q.    So you're saying that Captain

7    McNamara is still looking into it now a year and

8    two months later?

9                    MR. KLEINBERG:  Objection.

10           A.    It's still a part of the overall

11   issues that we are looking into, yes ma'am.

12           Q.    Do you know what specifically

13   McNamara has done from November of '06 to now to

14   look into this issue?

15           A.    I know -- I believe he's talked to

16   the Commission of Correction.  I don't know if

17   he's spoken to any other people about this.

18           Q.    Did you ever receive any feedback

19   from him that he did anything other than talk to

20   a member or employee of the Commission?

21           A.    We have had a number of

22   conversations on this but, again, it's an open

23   issue.

24           Q.    So specifically McNamara didn't

25   tell you that he did anything other than speak

1                    - Donald Smith -                    62

2     with the Commission?

3                    MR. KLEINBERG:   I object,

4          just to the extent this is apparently an

5          ongoing investigation.

6          Q.    Did you ever ask Pat Perry to do

7     anything about this?

8          A.    I don't recall.

9          Q.    Do you recall at any point in time

10    asking Pat Perry to investigate the anonymous

11    letter?

12         A.    I could have.  I could have.  And I

13    don't have a specific memory, but that would be

14    something that -- that would be something that I

15    could have done.

16         Q.    You don't recall one way or the

17    other?

18         A.    I don't recall, because there

19    are -- there are so many issues that we deal

20    with every day.  You know, and many of them are

21    issues that don't have substance, but I still

22    like to get them looked into.  But I don't know

23    specifically if I had Pat Perry look into this

24    or not, but I could have.

25         Q.    So to date did anybody ever tell

- *Donald Smith* -                                    63

1
2       you, either McNamara, Perry, anyone else, that

3       anybody within the facility was questioned about

4       this claim that a procedure was put out sometime

5       right before the Commission came to the

6       facility?

7              A.    I don't recall.

8              Q.    Do you recall receiving anything in

9       writing from Perry with respect to his

10      investigation of the anonymous complaint or

11      letter?

12             A.    I don't recall.

13             Q.    Did you ever see Exhibit 18?

14             A.    I believe this is the document that

15      we are talking about.

16             Q.    That's the procedure that you

17      believe was referenced in the anonymous letter

18      of November 2006?

19             A.    Yes.  And I also believe I've seen

20      it in the depositions.  But I believe I've seen

21      it in conversations with Captain McNamara.  And

22      again, I don't know if I asked Pat Perry to look

23      into this or not.

24             Q.    And in terms of, just so the record

25      is clear, the conversations that you had with

- Donald Smith -                                    64

McNamara about Exhibit 18, did those relate to

the anonymous allegations that this procedure

was put out sometime right before the Commission

came to the facility?

        A.    That's exactly what it would be

about.  In other words, the bottom line is we

want to make sure that all parties be treated

fairly.  And, you know, if this had been put out

at a certain date, we want to know when it was

put out.

        Q.    In terms of procedures, these are

kept in the facility?

        A.    Yes.

        Q.    Are these the procedures that

LeFever would have the authority to issue under

the goal of implementing the broader policies

that are set forth?

        A.    Yes.

        Q.    And is the broader policy what, for

example, we have marked as Exhibit 2?

        A.    Yes, that's a broader policy.  And

again, as I said earlier, I think that's a

pretty specific policy.

        Q.    In terms of the procedure that's

- Donald Smith -                                    65

before us as Exhibit 18, did you at any point in

time have any role in drafting or modifying it?

      A.   No.

      Q.   Other than LeFever, do you know if

anybody else had any role in that?

      A.   I don't know.

      Q.   In terms of the amendment,

specifically the date of amendment February 23,

2006, it's in the shaded box, you see that?

      A.   Yes.

      Q.   But then it also has an effective

date of August 12, 2005.  Do you see that?

      A.   I see that.

      Q.   Do you have any understanding as to

what the difference is between those two?

      A.   I don't understand it.

      Q.   On the second page of the document,

bottom section under 15-Minute Supervisory

Visit, letter H, 15-minute supervisory visits

are not, underlined, adequate as a suicide

prevention precaution.  Do you see that?

      A.   Yes.

      Q.   Did you ever ask anybody prior to

this case, the depositions in this case, as to

- Donald Smith -                                    66

1
2     when, if at all, that procedure was put out?

3          A.    No.  I do not believe 15-minute

4     supervisory visits are ever, ever adequate for a

5     suicide -- a suicidal prisoner.

6          Q.    I understand that's what you

7     believe.  But do you know when the first time

8     was that that was put in writing as part of the

9     procedure in the jail?

10         A.    I don't.

11         Q.    Do you know as you sit here today

12    when Exhibit 18 in its current form was ever

13    issued, meaning placed in a procedure book or

14    given to a correction officer?

15         A.    I don't know.

16         Q.    Is that something that you say is

17    still under review?

18         A.    Yes.

19         Q.    In terms of that section, letter H

20    which I just read, and you indicated your belief

21    that 15-minute supervisory visits are never

22    adequate as a suicide prevention precaution,

23    correct?

24         A.    Yes.

25         Q.    You have any understanding as to

- Donald Smith -                                67

1  why that was put in writing if in fact the

2  practices or policies in Putnam County,

3  according to you, always indicated constant

4  watch was required?

5       A.    I don't know.  I don't know if the

6  Commission had put something out or what

7  motivated the captain to put this in the

8  procedure, I don't know.

9       Q.    You never asked Captain LeFever,

10 correct?

11      A.    Not yet.

12                  MS. BERG:  Can we take a few

13      minutes?

14                  MR. KLEINBERG:  Sure.

15                  (Recess held.)

16      Q.    Going back to Exhibit 2, turn to

17 the page that says 79 at the bottom.

18      A.    Yes.

19      Q.    Top of the page, "tour supervisor

20 will," you see that?

21      A.    Yes.

22      Q.    Then it says, "assure that constant

23 supervision is immediately provided for the

24 following types of prisoners.  One, suicidal

- Donald Smith -                                    68

prisoners," correct?

    A.    Yes.

    Q.    The term suicidal prisoner is not defined in there, correct?

    A.    It's not defined in the paragraph.

    Q.    Or anywhere in this policy?

                MR. KLEINBERG:  Objection.

    A.    I don't recall.  I can look at the whole policy, but...

    Q.    That's all right, the policy speaks for itself.

    A.    But I do believe -- I do believe that suicidal -- you know, the whole purpose of eight hours of training in the basic course and four hours in the facility is to ensure that people understand, you know, why we do the training and what the training is all about.  So I believe that, you know, it's clear what's expected.

    Q.    In terms of what's expected of the tour supervisor, it doesn't say here that he or she will institute constant supervision if a score is eight or higher on the form, correct?

                MR. KLEINBERG:  In this

2  paragraph or this page?

3              MS. BERG:  Well, what the

4  tour supervisor will do.  That's what this

5  section is.

6         A.    The whole purpose of that screening

7  form is to identify inmates who are suicidal or

8  who have a tendency to have a suicidal issue.

9  And the bottom line is -- I mean it's pretty

10 specific, that the tour supervisor will

11 implement constant supervision.

12        Q.    In terms of being suicidal, is it

13 your understanding that if the score is eight or

14 higher they are considered to be suicidal?

15        A.    Yes.

16        Q.    Or if a shaded box is checked, they

17 are considered to be suicidal?

18        A.    Under the guidelines from the

19 Commission of Correction and the Office of

20 Mental Health and the training.  And when we're

21 talking about suicidal, we are talking about as

22 best that the screening process can identify,

23 they have the potential for suicide.  And then a

24 psychiatrist, only a psychiatrist or a mental

25 health professional can take them off of a

- Donald Smith -                              70

1

2  constant watch.

3        Q.    Did you ever come to learn at any

4  point in time that correction staff

5  differentiated between somebody who is suicidal

6  and somebody who scored eight or higher on the

7  form?

8                      MR. KLEINBERG:  Objection.

9                      MR. RANDAZZO:  Objection.

10        A.    Only from these depositions I have

11  heard some discussions in this room.

12        Q.    Did you ever see any written policy

13  which specifically says, constant supervision

14  must be implemented if a score on the suicide

15  screening form is eight or higher?

16        A.    I believe it's in the training.

17        Q.    But did you ever see any written

18  policy or procedure which in Putnam County says,

19  if the score is eight or higher institute

20  constant watch?

21        A.    It's not on the form.  It's not on

22  the form itself.

23        Q.    It's not in the policies or

24  procedures that you have seen, correct?

25                      MR. KLEINBERG:  Objection.

- Donald Smith -                                      71

     A.    But that's why the correction

officer, the booking officer is notifying --

     Q.    Just answer my question, please.

           My question is, have you ever seen

that written in a policy or procedure, that you

must institute constant watch if the score is

eight or higher?

                       MR. KLEINBERG:   Objection.

     A.    In a policy or procedure, not in

training?

     Q.    Correct, that's my question.

     A.    I can't recall as I sit here where

I could just point to one right now.

     Q.    In terms of "tour supervisor will,

Section C, assure that active supervision is

immediately provided for prisoners who are

intoxicated by drugs or alcohol but who do not

appear to be a danger to themselves or others."

First, active supervision, that's the 15-minute

checks that you talked about earlier?

     A.    Yes.

     Q.    In terms of those who do not appear

to be a danger to themselves or others, is that

somebody who scored lower than eight on the form

- *Donald Smith* -                                    72

or didn't have a shaded box checked?

     A.    I think the real issue about a constant watch, a constant watch is used always for people who are suicidal or could cause a danger to themselves. They could not be suicidal, but they could cause a danger to themselves by injuring themselves or their physical condition would cause them to be a danger to themselves.

     Q.    Take a look, if you would, at the next page in terms of safety of inmate with mental health problems, number 3 under letter A. "The captain or staff sergeant shall consult with the responsible physician or his designee prior to the following actions being taken regarding prisoners who are having mental health problems." You see that?

     A.    Yes, I see that.

     Q.    In terms of those who have mental health problems, would that include somebody who scores eight or higher on the suicide screening form?

     A.    I believe anyone who scores eight or higher on the suicide form is going to be

- Donald Smith -                                    73

referred to mental health for mental health
issues, yes.

      Q.    So those people would fall into
this category of having mental health problems?

      A.    Potentially they have mental health
problems, yes.

      Q.    Other than your belief, do you know
of any written policies or procedures which in
any way clarify or define that somebody who
scores eight or higher or has a shaded box
checked is considered to have a mental health
problem?

      A.    I don't recall.

            MR. KLEINBERG:  Objection.

      Q.    In terms of the mental health
referral that you just referred to in your prior
answer, is that something that the correction
staff is responsible for doing?

      A.    Any -- any person in the facility I
believe can make a mental health referral - a
correction officer, the shift supervisor,
medical staff.  I think under any of the
standards that we have from the Commission of
Correction and from the National Commission on

- Donald Smith -                                    74

Correctional Health Care, I believe anyone can

make a referral.

    Q.    Do you know in terms of individuals

who come into the facility and have a score of

eight or higher or a shaded box checked on the

suicide screening form of any policies or

practices which require a mental health referral

be made for those individuals?

    A.    Every -- in practice everyone who

scores eight or higher is referred to mental

health, because they are going to be on a

constant watch, and only -- only a mental health

professional can take them off of the constant

watch.

    Q.    But do you know of any written

policies or procedures which say that if

somebody scores eight or higher or a shaded box

is checked on that form that they are required

to be referred to mental health?

              MR. KLEINBERG:  Objection.

    A.    I can't specifically identify a

written procedure, but I believe that is

happening as a matter of practice.

    Q.    What do you base your belief on?

- Donald Smith -                                    75

1

2          A.     On the fact that anyone, anyone who

3     scores in the suicidal category is going to

4     automatically be referred to mental health.

5          Q.     What do you base that on?

6          A.     The constant watch, they can't be

7     taken off the constant watch.  Only the mental

8     health staff can take them off the constant

9     watch.

10         Q.     Other than the fact that they can't

11    be taken off a constant watch, how do you know

12    that in practice mental health referrals are

13    made for those individuals who are considered

14    suicidal or at high risk of suicide, do you have

15    personal knowledge of that?

16         A.     I believe I recall, and I don't

17    have a specific recollection of where it is but

18    I almost -- I believe that in the National

19    Commission of Correctional Health Care standards

20    I believe -- I believe a referral is made.

21         Q.     Are those NCIC standards made

22    available to correction staff?

23         A.     Specifically are they handed out to

24    correction staff, I don't believe so.

25         Q.     So do you know of anything in

- Donald Smith -                                    76

1

2    Putnam County specifically which would set forth

3    a policy or procedure that says that if somebody

4    is suicidal or at high risk of suicide that they

5    must be referred to mental health?

6        A.    I can't specifically point that out

7    as I sit here.

8        Q.    Are you aware of whether there are

9    any programs in the facility for individuals who

10   are going to be withdrawing from drugs or

11   alcohol?

12       A.    Yes.

13       Q.    What are you aware of?

14       A.    The -- as a part of the RFP that we

15   put out in the 2002/2003 time frame, as I recall

16   that was part of the RFP.  And that

17   specifically -- specifically the detoxification

18   and follow-up with inmates was addressed in that

19   RFP.

20       Q.    That would have been the request

21   for a proposal from a company to provide medical

22   services?

23       A.    That is correct.  And I also

24   believe that in the -- I believe that -- that is

25   a part of the National Commission of

- Donald Smith -                      77

1
2   Correctional Health Care standards, which again

3   is part of -- part of -- you know, what we

4   sought with our medical care was to go from a

5   situation where we literally had time periods --

6   when I arrived at the Putnam County Sheriff's

7   Office and Correctional Facility in 2002, we had

8   a situation where we had one nurse on staff and

9   we had one part-time practical nurse that would

10  assist her.  And we had a situation where if she

11  was sick or it was a long weekend or she was on

12  vacation, the facility could go five days up to

13  seven days with no medical staff in the jail,

14  where correction officers would be handing

15  out -- dispensing -- they were blister packs,

16  but would be dispensing medications to the

17  inmates, where individuals would be coming in

18  the jail in all types of conditions 24 hours a

19  day, 7 days a week with no medical, no medical

20  staff in the jail.

21       Q.    I don't want to cut you off, but I

22  don't think your answer is addressing my

23  question.  My question was, are you aware of any

24  programs, procedures, policies which provide for

25  detoxing of inmates who come into the facility

- Donald Smith -                                    78

1

2    using drugs or alcohol.  You referenced one

3    being the request for proposal.

4          A.    Right, and that's the point I want

5    to make.  The whole idea -- the whole idea of

6    getting a medical going from limited medical

7    support in the jail to having 24 hour medical

8    coverage in the jail, for when people come in to

9    ensure the 14-day physicals are done.  They

10   weren't being done.  That was a step that I took

11   as the sheriff to get --

12         Q.    I understand you took that step,

13   but do you know of anything that was actually

14   implemented?

15         A.    Absolutely.  That was --

16         Q.    Just in terms of detoxing, though?

17         A.    Detox, and we have had many success

18   stories on detoxification in the jail.

19         Q.    So what's the program that's in

20   place then?

21         A.    The program is in place, is through

22   AmeriCor.  And they have -- they have done -- in

23   most cases that I've seen they have done an

24   outstanding job with detoxification, with

25   follow-up treatment in spite of what may have

- Donald Smith -                                    79

happened, you know, in some of the testimony

here.

      Q.    So in terms of the inmate who comes

into the facility having used drugs or alcohol

say for a period of time, is it your

understanding that AmeriCor has the

responsibility then to ensure that appropriate

detoxification occurs?

      A.    They have a program -- a program

which has been very effective many times.

      Q.    Does the correction side, the staff

that, you know, are involved in the intake or

the tour supervisor have any involvement in

getting new inmates help for withdrawal?

      A.    It is a total -- it is a total team

effort.

      Q.    So they have a responsibility also?

      A.    It's a total team effort.

      Q.    Separate for me what the correction

staff is responsible for doing when an inmate

comes into the facility having used drugs or

alcohol for a period of time?

      A.    Correction officers when they take

on their post, you know, they have a

- *Donald Smith* -                                        80

1
2    responsibility -- they have a responsibility for
3    the supervision of the inmate.  And they provide
4    that responsibility under general supervision,
5    active supervision or constant supervision.  And
6    with that supervision there are certain
7    responsibilities.  These correction officers are
8    trained.  They go through basic training, they
9    go through continuous training in the facility.
10   They are trained to, if they see an inmate in
11   distress, to contact the nursing staff.  That's
12   why the nursing staff is there.  We have
13   24-hour-a-day medical support on call.  In
14   addition to the nurse on staff, the doctor is on
15   call.  Dr. Asif, the psychiatrist is on call.
16           And I can just -- Miss Berg, I can
17   tell you of many success stories where this
18   system has worked impeccably where the doctor,
19   the psychiatrist, the nurse and the correction
20   staff have worked together.  Our correction
21   facility -- in spite of being here at this
22   deposition, our correctional facility has an
23   outstanding reputation in New York State.
24        Q.    You indicated, though, the
25   correction staff has a responsibility to contact

1                    - Donald Smith -                    81

2        nursing if an inmate is in distress.  Did you

3        ever come to learn that at some point inmates

4        who are withdrawing from drugs or alcohol may

5        not necessarily exhibit signs or symptoms of

6        withdrawal for a period of time?

7            A.    Well, withdrawal will occur based

8        on the substance you are withdrawing from --

9        obviously, believe it or not, alcohol can cause

10       more serious withdrawal problems than drugs.

11           Q.    How do you know that?

12           A.    I know that because I read, I'm a

13       professional.

14           Q.    Did you --

15           A.    My staff is -- you know, this --

16       you know, being a correction officer is a

17       profession.

18                 The other point I want to make with

19       you is that I'm the Sheriff of the county.  I

20       mean I have a broad array of responsibilities.

21       I have a jail administrator who has been on

22       staff for more than 25 years.  He attends

23       numerous training sessions.  I have training

24       officers who attend numerous training sessions.

25       Lieutenant O'Malley is a highly respected

- Donald Smith -                                    82

1

2    training officer in the State of New York.  My

3    undersheriff, Peter Convery, has over 30 years

4    of correctional experience.  Pat Perry, the

5    inspector general, was the warden of Riker's

6    Island.  I mean, I just -- I just want you to

7    know that we have put in place -- we have put --

8    in spite of putting a microscope on something

9    that may have not gone the right way, the Putnam

10   County Correctional Facility is a professional

11   place that is well respected in New York State.

12        Q.    With all due respect, I don't think

13   you need a microscope to figure out what went

14   wrong here.  And that being said, I'm going to

15   move to strike his answer as not being

16   responsive.

17              MR. KLEINBERG:  Can we take

18        a two-minute break?

19              MS. BERG:  Sure.

20              (Recess held.)

21        Q.    Are you aware of anything that is

22   in a written policy or procedure which provides

23   for monitoring of inmates who come into the

24   facility not actively withdrawing but who have

25   the risk of progressing to that level?

- Donald Smith -                                    83

A.     Again, I'm the Sheriff of the
county and, you know, I put out broad policies.
And I strongly believe that we have in place the
proper screening process conducted by the
booking officers with referrals to our medical
staff.  And you know, I really believe that when
we went from this part-time medical staff in the
jail, we put the final piece in place where we
had correction officers who were trained to do
the booking, to do the initial intake as well as
the 14-day physical.  And as I sit here today I
strongly believe that we have an active detox
program in place.  And --

Q.     Who administers the program, is it
AmeriCor?

A.     You know, that's a hard question to
give you just a short answer, because again I
strongly believe that it's the total team.  In
other words, the booking officer does the
initial medical intake, and that's in accordance
with the Commission of Correction.  And then
there's a referral, that information is given to
the nurse who is on staff.  And that is reviewed
and the nurse normally within an hour comes up

- Donald Smith -                                                84

and actually talks to the inmate.  We've now

implemented the vitals, we have added that to

the program.  So it's a total team effort.

When it comes to the

detoxification, that is a medical issue.  But I

just can't say it's isolated from correction

officers, because correction officers are

trained as to when people are in distress and

when they need to get medical staff.  And it's

been a godsend to have 24-hour medical coverage

in the jail.  And, you know, without going off

track, I'm going to focus on --

Q.    Can I just say in terms of the

short answer, that the medical staff and the

correction staff both have a responsibility when

it comes to inmates withdrawing from drugs or

alcohol?

A.    That's exactly what I'm -- I'm

trying to say that.  I'm trying to say that.

Q.    Can I show you Exhibit 26, which is

a progress note pertaining to Spencer?

A.    Yes.

Q.    Have you ever seen that before?

A.    I've seen that I believe -- I

- Donald Smith -                              85

1
2    believe I've seen that in these depositions.

3         Q.    Prior to the depositions in this

4    case?

5         A.    No, it may have been -- it may have

6    been in the packet sent to the Commission of

7    Correction.  But, you know, again there were a

8    lot of documents and I don't recall.

9         Q.    In that progress note Peter Clarke

10   indicates will monitor.  You see that?

11        A.    Yes.

12        Q.    Did you ever ask anybody what that

13   meant?

14        A.    No.

15        Q.    Do you know if any monitoring was

16   done of Spencer Sinkov?

17        A.    I know the correction officer was

18   monitoring his status.

19        Q.    Every 15 minutes?

20        A.    Every 15 minutes and perhaps even

21   more.  But as far as -- you know, I can't speak

22   for -- I can't speak for Peter Clarke.

23        Q.    Did you ever ask the correction

24   staff who was responsible for doing the

25   15-minute check anything about whether they

1                         - Donald Smith -                    86

2       observed Spencer indicating any signs or

3       symptoms of withdrawal?

4            A.    Again, Miss Berg, I'm the Sheriff

5       of the county and there's a lot of people

6       between me and --

7            Q.    Well, my first question was, did

8       you ever ask the staff this question?

9            A.    To go to the correction officer and

10      specifically ask, no, I did not.

11           Q.    Do you know if anybody else did -

12      LeFever, O'Malley, Undersheriff Convery,

13      McNamara?

14           A.    I would say it would be more

15      appropriate inside the jail staff, you know, the

16      jail administrator and his staff.

17           Q.    Do you know if that was ever done,

18      though?

19           A.    I don't know.  I know there were a

20      number of conversations.  I know as much as

21      it's, you know, it's sad for the Sinkov family

22      but, believe it or not, the correction officers

23      took this very hard as well and there's -- the

24      answer is I don't specifically know what Captain

25      LeFever did or what his staff did, but I know

- Donald Smith -                           87

1
2  there were a number of conversations.
3         Q.    Did you ever speak with Peter
4  Clarke?
5         A.    No.
6         Q.    To your knowledge was Peter Clarke
7  ever questioned by the investigators when they
8  investigated the death of Spencer?
9         A.    I don't recall.
10        Q.    Did you ever speak with Susan
11 Waters?
12        A.    About this, I don't recall.
13        Q.    Did you ever speak with Kevin Duffy
14 about Spencer Sinkov or the circumstances
15 concerning his intake and death?
16        A.    Yes.
17        Q.    How many times?
18        A.    I've spoken to Kevin a number of
19 times about suicide prevention, about this case
20 after it happened, and we still speak about
21 procedures within the jail.  You know, we try to
22 improve the quality of services, you know, on a
23 monthly basis --
24        Q.    When --
25        A.    -- in the jail.  And one of the

- Donald Smith -                                        88

things I specifically remember, I specifically

remember having a discussion with Kevin on the

issue of, you know, vital signs.  Vital signs

are not required under the National Commission

of Correctional Health Care standards or any

written standard within the Commission.  And I

specifically said, well listen, Kevin, we have

the staff here.  I'm proud of the staff.  Let's

just do it.  And the Commission recommends it,

let's just do it.  I mean...

       Q.    That would have been after

Spencer's death then?

       A.    Yes.

       Q.    Prior to Spencer's death did you

ever have any conversations with Kevin Duffy

about suicide prevention in the correctional

facility?

       A.    I'm sure.

       Q.    Do you recall?

       A.    One of the -- one of the -- one of

the -- well, maybe several discussions.  One of

the concerns I had after the suicide in November

of 2003 was the issue of mental health -- mental

health coverage in the jail.  And to get better

Case 7:07-cv-02866-CS-GAY    Document 27-5    Filed 05/07/2008    Page 30 of 31

- Donald Smith -

mental health coverage and more responsive

coverage and 24-hour-a-day on-call coverage when

needed.  I know I specifically talked to Kevin

about that.  And I know there was a point in

time where I talked to Kevin about increasing

the hours for the licensed clinical social

worker in the jail.  We initially established

it, when we provided the mental health coverage

I think we started with 12 hours.  And that was

one of the first discussions we had, was the

actual taking over of the mental health coverage

in the jail because we were not satisfied with

the previous coverage.  And then, of course, to

increase the coverage to 40 hours because --

this is a challenge for jails all across New

York State and the country.  Mental health

issues are more prevalent than ever before.

        Q.    In terms of your conversations,

though, with Kevin Duffy, other than about

increasing coverage, meaning having a

psychiatrist on call 24 hours a day, increasing

the hours for the clinical social worker, did

you ever talk to him specifically about any

suicide prevention policies or procedures?

*COMPU-TRAN SHORTHAND REPORTING*

- Donald Smith -                                    90

A.    If I'm not mistaken, Kevin Duffy
spent a day or two with us doing a study on
suicide prevention.

Q.    When was that?

A.    I want to say it was in September
of 2006.  I may not be correct on the date.

Q.    But when you say Duffy spent a day
or two with us, who do you mean?

A.    I'm talking about a project team.
I'm talking about a --

Q.    Who was that?

A.    I'm talking about an expert on the
subject that I received -- I received support
from the -- I'm trying to get the proper name.
The National -- it's an organization where
Virginia Hutchinson and -- I'm sorry, the
National Institute of Corrections.

Q.    Who is the expert that
participated?

A.    The expert who participated was
Miss Judith Cox.

Q.    Who else participated?

A.    We brought in a number of people
from the community.  People from organizations