# EXHIBIT E  -  PART 4

- Donald Smith -                                    91

like NOMI, a member of the citizens police

academy, members of the jail staff.

     Q.    Who from the jail staff?

     A.    Two or three of our correction

officers. I can't specifically -- you know,

certainly Captain LeFever.

     Q.    Did you participate in this?

     A.    Yes, I did.

     Q.    Did Undersheriff Convery?

     A.    Undersheriff Convery may have sat

in for part of it, but again this was over a

couple of days.

     Q.    How about O'Malley?

     A.    I believe he would have been there

if he wasn't out -- he had a back injury and I'm

not sure exactly on the timing of that.

     Q.    Anyone else from the sheriff's

department, either correction side or within the

office, administration?

     A.    I believe the inspector general.

     Q.    Perry?

     A.    Yes.

     Q.    Anyone else?

     A.    All I can say, there were a number

- Donald Smith -                              92

1

2   of people from the correctional staff and the

3   community.

4            Q.    Anybody from AmeriCor aside from

5   Duffy?

6            A.    Rich Demattio might have

7   participated, I don't recall.

8            Q.    What was the outcome of this one to

9   two day session, if you will?

10           A.    Well, we are working on -- we are

11  working on the whole topic of suicide prevention

12  and mental health issues.

13           Q.    Still you mean?

14           A.    Still.  I mean, this is -- this is

15  a --

16           Q.    Was there any outcome to this one

17  to two day session?

18           A.    There are some outcomes already.

19  We just implemented a contract expanding --

20  expanding the mental health coverage in the jail

21  from 12 hours a week, I'm talking about not the

22  psychiatrist but the clinical licensed social

23  worker, to 40 hours per week.

24           Q.    And that was a result of that one

25  to two day meeting?

- Donald Smith -                    93

1
2          A.    Yes.
3          Q.    Any other things that were
4    implemented specifically as a result of that?
5          A.    You know, I believe we -- you know,
6    we received positive feedback on the
7    professionalism of the jail staff and their
8    knowledge of the suicide screening guidelines.
9    We have painted the North Housing Unit with a
10   more soothing color.  You know, we are
11   continuing to look at, you know, action that we
12   can take to -- oh, we are working on a program
13   called CORIP, Community Offender Linked --
14   Community Offender Linked Reentry Initiative
15   Putnam, whereby we are looking at the overall
16   reintegration of inmates from the Putnam County
17   Correctional Facility back into the community as
18   opposed to, you know, where are they going to
19   sleep tonight, what kind of job are they going
20   to have, medications, follow up.  And we are
21   continuing to work these issues.
22               I chair or I'm the co-president of
23   the Mental Health Association of Putnam County.
24   And we are working with Commissioner Piazza
25   on -- at our last board meeting last week we

- Donald Smith -                                    94

were looking at a one point of entry for people

back into society.  I'm not probably doing

Justice to all the things we want to accomplish,

but...

          Q.    Were there any changes in policies

or procedures that came out of this one to two

day session?

          A.    Not yet, not policies and

procedures.

          Q.    In terms of your conversations with

Duffy, other than at this one to two day session

did you ever speak with him specifically about

suicide prevention policies and procedures?

          A.    I know I had a number of

conversations with him, but I can't specifically

identify he said this and I said that.

          Q.    Now you indicated earlier that you

spoke with him after this case happened, meaning

after Spencer's death.  Do you recall in

substance what you said to him and what he said

to you?

          A.    I don't specifically remember the

conversation, other than again wanting to work

cooperatively to make the system even better and

- *Donald Smith* -                              95

1

2    to make sure that we were meeting the National

3    Commission on Correctional Health Care

4    standards.

5          Q.    Did you ever see any policies or

6    procedures that AmeriCor had in place for the

7    staff they employed in the Putnam County

8    Correctional Facility?

9          A.    I've seen some documents -- I've

10   seen some documents at these depositions that I

11   recall.  But most of the documents -- again, I'm

12   the Sheriff of the county.  At my level most of

13   the documents at my level have been on the, you

14   know, the broad policy guidance to ensure that

15   we are in compliance with New York State

16   Commission of Correction and with the National

17   Commission on Correctional Health Care

18   standards.  I recall looking at provisions about

19   detoxification, the kind of treatment that

20   inmates would get, and I was pleased with the

21   programs that were being put in place.

22         Q.    Did you ever see Exhibit 28, which

23   is the 2003 procedural manual for AmeriCor?

24               Let me just clarify.  Prior to the

25   depositions in this case.

- Donald Smith -                    96

1

2      A.    You know, I know I've seen it I

3  believe at depositions, but I don't have a -- I

4  don't have a memory of specifically, you know,

5  seeing this document.

6      Q.    How about Exhibit 30, which is the

7  November 2004 policy manual for AmeriCor, again

8  prior to depositions in this case have you ever

9  seen that?

10     A.    I don't recall.  I don't have a

11  specific memory of seeing it.

12     Q.    In terms of AmeriCor, are they in a

13  contractual relationship with the county?

14     A.    Yes.

15     Q.    What's the term of the contract?

16     A.    The term of the contract is --

17  well, it started out as a six-month contract

18  because it started out in mid year, and it's an

19  annual renewable contract.

20     Q.    Has it been renewed then every year

21  after that initial six-month period?

22     A.    Yes, it has.

23     Q.    Have you been instrumental in

24  having it renewed?

25     A.    I'm a signatory to the contract,

- *Donald Smith* -                                    97

1
2       yes.
3            Q.     In terms of the services that
4       AmeriCor provides, are those detailed in writing
5       to the county as part of that contract?
6            A.     Yes, there's actually -- I believe
7       it's in an addendum to the contract, where it
8       specifically states what they will provide.
9       And, of course, it was submitted initially in
10      their RFP.  And then there have been some
11      additions to the contract; for example, the
12      addition of the mental health coverage.  And
13      then after the addition of the mental health
14      coverage the expansion to the 40 hours a week
15      for the clinical social workers, again which
16      came out of our study.
17           Q.     In terms of the initial addendum to
18      the contract, that still carries forward to the
19      subsequent renewals of the contract, correct?
20           A.     Yes.  When a contract is renewed
21      unless something is specifically deleted or
22      added, it remains in effect normally.
23           Q.     In terms of the addendum, just take
24      a look, if you would, at Bates stamped pages 545
25      and on, which are part of Exhibit 25, which were

- *Donald Smith* -                                            98

the attachments to the initial contract with

AmeriCor. Do you recognize that as the schedule

or scope of services that AmeriCor indicated it

would provide to the county?

A.    This looks very familiar. I

believe this is what was -- the addendum.

Q.    This was produced to me by

AmeriCor. You could tell on the bottom right

where it has their first initials and then the

Bates stamped pages.

A.    Yes.

Q.    Did you ever ask anybody since you

became -- well, since AmeriCor entered into this

contract, as to whether or not any of the things

AmeriCor said it would do in that scope of

services in fact are not being carried out?

A.    There's a medical audit committee

meeting that takes place normally attended by

the undersheriff, Captain LeFever and sometimes

myself. And the purpose of that meeting is to

go over, you know, the services that are

provided and to make sure that the contract is

being fulfilled. For example, if a shift would

not be filled there would be a credit back to

- *Donald Smith* -                                    99

the county.  I can't recall when a shift has not
been filled with nursing staff, for example.

    Q.    How often does the medical audit
committee meet?

    A.    It meets normally every month.
There have been sometimes when it might go an
additional month if schedules can't be arranged,
but generally we try to meet once a month.

    Q.    Is Kevin Duffy a part of that
meeting?

    A.    Yes, he's at the meeting.

    Q.    Other than yourself and
Undersheriff Convery, who else attends the
meeting?

    A.    Well, we normally -- normally the
administrator, the medical administrator
attends, which was -- previously it was Rich
Demattio.  Now Marlene would attend.  We
normally -- the undersheriff normally attends
them all.  I attend whenever my schedule
permits.  The inspector general has attended
some of them.  We have brought in outside
professional staff to help.  We have had Dr.
Amler.

- Donald Smith -                                    100

Q.    That would be only sometimes?

A.    They are certainly welcome all the time.  But particularly for the annual one, when we look at the end of the year we like to get someone from the health department.

Q.    Just the regular attendees is what I'm talking about.

A.    It's generally the lieutenant or sergeant from the jail would normally be there, you know, because we want to get input.

Q.    A different lieutenant or sergeant or the same one?

A.    No, it would be the three administrators.

Q.    So either Captain LeFever --

A.    Sergeant Sheila Hanley or Lieutenant O'Malley or Captain LeFever.

Q.    Are there minutes of these meetings?

A.    There are informal -- I believe there are informal minutes from the meetings.

Q.    Who keeps the minutes?

A.    The minutes are made by Kevin Duffy and brought back to the next meeting.

- *Donald Smith* -                                    101

1

2      Q.    What happens at the next meeting

3  with respect to those minutes, are they

4  approved?

5      A.    We just look at them and make sure

6  that we -- you know, it's basically a system of

7  ensuring that we, you know, that we follow up on

8  issues that we need to follow up on.

9                 MS. BERG:   Why don't we take

10        a lunch break?

11                 *(At this time a luncheon*

12        *recess was held, after which the*

13        *deposition resumed.)*

14  CONTINUED EXAMINATION

15  BY MS. BERG:

16      Q.    Have you ever seen the Chairman's

17  Memorandum from November 1, '99, which we have

18  marked as Exhibit 34?

19      A.    I know I have obviously seen it in

20  the deposition.  And I'm not sure if I've seen

21  it prior to the deposition.

22      Q.    How about Exhibit 35?  And it's an

23  October 5th, 2005 Chairman's Memorandum.  Focus

24  though on any time outside the context of the

25  depositions.  Have you ever seen that before?

*- Donald Smith -*                                      102

1

2       A.    Again, I don't recall, but I know

3    I've seen it during the deposition.

4       Q.    Exhibit 37, same question.

5       A.    I don't recall.

6       Q.    Final Exhibit, 38, same question.

7       A.    I don't recall this, but I know

8    I've had discussions with my staff about suicide

9    smocks.

10      Q.    Was it after this memorandum was

11   issued?

12      A.    No, I think it was summer of 2006.

13   It was like, you know, what about using suicide

14   smocks?  And of course they explained to me the

15   reasons why it's not a good idea.  By the way, a

16   suicide smock is different than a paper suit.

17      Q.    In terms of the question, that was

18   something you put to your staff?

19      A.    I was discussing, you know, every

20   aspect of suicide prevention, you know, about

21   the time we did the, you know, the notification

22   of the undersheriff.  I just wanted to make sure

23   we are not leaving any stone unturned.

24      Q.    Who responded to you in terms of

25   laying out the reasons why it wasn't a good idea

- Donald Smith -                                103

1  
2    to use the suicide smocks?

3         A.    If my memory serves me correctly,

4    it was Captain LeFever.  Could have been

5    Lieutenant O'Malley.  But I believe it was

6    Captain LeFever.

7         Q.    Did you have any discussions with

8    Captain LeFever --

9         A.    And I believe it was also -- I

10   believe I had the same conversation with Judith

11   Cox.

12        Q.    Did you have any discussions with

13   Captain LeFever or Lieutenant O'Malley about

14   changing any written policies or procedures

15   after Spencer's suicide?

16        A.    Only in the global sense of looking

17   at the long-term model of excellence, working

18   with Judy Cox.  I mean there was -- you know,

19   there was -- the issue wasn't -- the issue

20   wasn't the policy at the time.  The issue was

21   the policy being followed, that was the issue.

22        Q.    That's the way you saw the issue?

23        A.    That's the way I saw the issue.

24        Q.    Did you ever speak with LeFever at

25   any point in time specifically about changing

- *Donald Smith* -                                    104

the procedures that were in place in reference

to what we previously looked at, Exhibit 18, and

the provision that's on the second page, letter

H, which in writing says that 15-minute

supervisory visits are not adequate?

     A.   No.  And again, I don't believe

15-minute supervisory visits were ever adequate.

     Q.   But after Spencer's death did you

have any conversations with LeFever about

modifications or amendments to policies?

     A.   No, again because right from the

moment when I walked out of that cell the

question was, what was the screening, and I told

you earlier what his answer was.

     Q.   Did you ever see the form for

Spencer, which before you is Exhibit 3, in its

completed state?

     A.   I've certainly seen it at these

depositions and I believe -- I believe we -- it

was included in the packet I believe that went

to the Commission of Correction.  So we sent it

up to the Commission of Correction.  And I don't

recall what other times I may have looked at it

or discussed it.

- Donald Smith -                                    105

1

2        Q.    In terms of the form itself, did

3    you ever sit down and go over that with Captain

4    LeFever at any point in time?

5        A.    I don't recall.

6        Q.    Did you ever speak with Vasaturo

7    about his completion of that form?

8        A.    No.  And I think it's important for

9    you to have an appreciation that as the sheriff

10   with the chain of command between me and Mr.

11   Vasaturo and with the disciplinary charges

12   pending and, you know, me being the person that

13   would ultimately have to adjudicate that matter,

14   I do not believe it would have been appropriate.

15       Q.    You said disciplinary charges

16   pending, but there are no charges pending right

17   now, isn't that true?

18       A.    Well, the matter is pending.

19       Q.    What's pending?

20       A.    The adjudication of the matter.

21   The matter has not been resolved, you know, this

22   case evolved very quickly.  There was a Notice

23   of Claim very quickly and then -- you know, as a

24   matter under investigation I don't know what I

25   should...

- Donald Smith -                                    106

MR. KLEINBERG:  I believe
that suffices.

Q.    Have charges been preferred against
Vasaturo to date?

A.    Not yet.

Q.    What about LaPolla?

A.    Not yet.

Q.    To your knowledge has Vasaturo been
counseled?

A.    That would have been done by the
chain of command within the jail.

Q.    Do you know if that happened?

A.    No.

Q.    Do you know if LaPolla has ever
been counseled?

A.    No.

Q.    So when you say the matter pending,
you mean under your consideration?

A.    Yes.

Q.    Nothing else?

A.    Well, it's a -- it's clear to me
that they understand that this matter is part of
the stipulation agreement, that the matter is
going to be resolved, it will be adjudicated.

- Donald Smith -                          107

 1

 2    Q.    In what forum?

 3    A.    I don't want to prejudge a case

 4  before...

 5    Q.    Do you mean in a disciplinary forum

 6  or in this lawsuit?

 7    A.    In a disciplinary forum.

 8    Q.    When I say what forum --

 9    A.    A disciplinary forum.

10    Q.    To your knowledge has any

11  counseling or other disciplinary action been

12  taken against anybody else in the correction

13  side of the jail with respect to Spencer's

14  death?

15    A.    Not at this time.

16    Q.    Did anybody ever tell you prior to

17  the depositions in this case that Vasaturo

18  claimed he completed the form for Spencer,

19  Exhibit 3, incorrectly?

20    A.    No, not prior to the deposition.

21    Q.    Did anybody ever tell you prior to

22  the depositions in this case that when Vasaturo

23  notified LaPolla about Spencer being placed on

24  the 15-minute watch that he mentioned verbally

25  only the heroin addiction and did not mention

- Donald Smith -                                          108

1
2  the scores on the suicide screening form?
3          A.    I don't recall.
4          Q.    Did you ever discuss with anybody
5  the practice in place with respect to the P-1s
6  that are issued when somebody is placed on a
7  heightened level of supervision, in terms of who
8  typically sees those P-1s?
9          A.    No.  Again, that was a daily
10  procedure which I expect the jail administrator
11  to ensure, you know, the notification of people
12  and sharing of information.
13         Q.    That's a responsibility that's been
14  delegated down the chain of command to LeFever?
15         A.    I just believe it's a natural
16  responsibility for the person who is running the
17  jail on a daily basis to ensure that his people
18  are informed.  Now, as I walk around the jail, I
19  certainly look at things and talk to people and
20  listen to people and -- I'm always listening and
21  having my ears and eyes open.  But I'm just
22  saying I don't recall a specific, you know,
23  conversation on that subject.
24         Q.    Did you ever see the P-1 that was
25  done in Spencer's case, which we marked as

*- Donald Smith -*                          109

Exhibit 4?

     A.    I know I saw it as a part of the
lawsuit.  I'm not sure -- I'm not sure if it was
part of the packet that went to the Commission
of Correction.  It could have been, you know,
there were a lot of documents in that packet.

     Q.    Did you ever discuss with anybody
what happens with those P-1s once they are
prepared in terms of distribution within the
jail?

     A.    I know there's a very thorough
system of notification and providing documents,
but specifically on this particular one I know
there's a lot of information sharing.  You know,
I have been to some shift changes, you know, to
talk --

     Q.    Have you been to the briefings that
are done at shift change?

     A.    I've been to a few of the
briefings.  Obviously, I don't run the jail, but
I --

     Q.    Have you seen the book that the
P-1s are kept in?

     A.    I believe I've seen the book.

- Donald Smith -                              110

1

2      Q.      In the briefing room if you will?

3      A.      Yes.

4      Q.      Prior to the depositions in this

5  case did anybody ever tell you that LaPolla

6  claimed he never saw Exhibit 4 pertaining to

7  Spencer?

8      A.      I don't recall that.

9      Q.      In terms of Spencer's score, he had

10  a ten in the total column and he had three of

11  the shaded boxes checked on Exhibit 3.  Do you

12  know if he was ever referred to mental health?

13      A.      I don't specifically know if he was

14  referred to mental health, but clearly he should

15  have been.  He should have been on a constant

16  watch.

17      Q.      In terms of the decision to place

18  him on 15-minute supervisory visits as opposed

19  to constant watch, do you know who made or

20  participated in that decision, independent of

21  these depositions?

22      A.      No.

23      Q.      Independent of these depositions,

24  do you know if LaPolla had any role in that

25  decision?

- Donald Smith -                                          111

A.    No.

Q.    In terms of the referral to mental
health, would it have been the booking officer
and the tour supervisor's responsibility to make
that referral at intake?

A.    I believe that the booking officer
and the tour supervisor either/or both could
have picked up on the referral to mental health
as well as, you know, the nursing staff as far
as, you know, being a part of again this total
team effort.  We have a total team effort.

Q.    Did you ever see Exhibit 5, which
is the mental health referral done by Susan
Waters for Spencer?

A.    I've seen it as a part of the
deposition and it may have been in the packet
that went to the Commission of Correction, but I
don't have a specific -- I mean -- my focus --
my focus was on the suicide screening.

Q.    Did you ever speak with anybody
about Susan Waters' basis for completing the
mental health referral form?

A.    Not that I can recall.

Q.    As part of the required procedures

- Donald Smith -                              112

1

2   when an inmate commits suicide or dies in the

3   facility, you are required to notify the State

4   Commission, correct?

5          A.    Yes.

6          Q.    Following that notification in

7   Spencer's case an investigation was conducted by

8   the State Commission, correct?

9          A.    Yes.

10          Q.    As a result of their investigation

11   a report was issued?

12          A.    Yes.

13          Q.    Do you recall at some point in time

14   you saw a preliminary draft of that report and

15   were provided with an opportunity to comment?

16          A.    Yes.

17          Q.    Did you do that?

18          A.    Yes.

19          Q.    Prior to drafting your response to

20   the preliminary report did you get input or

21   guidance from anybody?

22          A.    Yes.

23          Q.    Who did you speak with or get

24   guidance from?

25          A.    Well, clearly -- clearly the

- Donald Smith -

113

1
2    response I believe was drafted with consultation
3    with, if my memory serves me correctly, Captain
4    McNamara and William Spain. And I'm sure that
5    if -- again, I don't have the specific
6    recollection. But if we needed any information
7    there we didn't have, I'm sure we would have
8    consulted with the jail administrator and his
9    staff.

10           Q.    Do you recall one way or another?

11           A.    I don't recall.

12           Q.    In terms of the preliminary

13    findings of the report, you recall that it

14    recommended action against both Vasaturo and

15    LaPolla, correct?

16           A.    Yes.

17           Q.    In response you advised the

18    Commission that discipline was pending?

19           A.    Yes.

20           Q.    By pending you meant that it was

21    under consideration?

22           A.    Yes, and that's -- quite frankly,

23    that is legally from the standpoint the -- it's

24    important when you are talking about due process

25    here that you don't impose discipline before you

- *Donald Smith* -                                    114

go through the procedure.  And there was some

advice given to me by my staff that I believe is

from Mr. Spain and I believe is privileged.

    Q.    Other than Spain, did you discuss

the findings in the report with anyone else?

    A.    I don't recall.

    Q.    Do you recall if you had any

communications with Captain LeFever about the

Commission's report on the death of Spencer

Sinkov?

    A.    I may have, but I don't recall.

And again, if my memory serves me, the -- you

know, this issue was -- you know, the thrust of

it went back to the suicide screening.

    Q.    Did you ever speak with anybody

from the Commission specifically about Spencer's

death?

    A.    Yes.

    Q.    Who did you speak with there?

    A.    I spoke to Chris Ost O-S-T.  And

there was another gentleman with him and I don't

remember his name specifically.

    Q.    Where was that?

    A.    That was in the conference room of

- *Donald Smith* -                                    115

the Putnam County Correctional Facility.

Q.    Was that when these members of the
Commission came to the facility to question
staff?

A.    Yes.

Q.    Do you recall specifically what you
said to Ost and this person with him and what
they said to you?

A.    Not specifically sentence by
sentence, but I remember the overall -- the
overall thrust.

Q.    What was that?

A.    Was that he should have been, you
know, on a constant watch.  And certainly I
agreed with their findings.  And that's the main
thrust I had with them during the visit.

Q.    Do you recall if that occurred in
August of 2006?

A.    I believe it was.  I know it was
when they came down for their investigation
interviews.

Q.    Was anybody else present with you?

A.    I don't recall.  I mean the captain
could have been present, but...

*- Donald Smith -*                                                116

1

2          Q.     which captain?

3          A.     well, it would have been Captain

4    LeFever or Captain McNamara, but I really don't

5    recall.  I don't believe -- I don't believe

6    anyone was, but I'm not certain of that as I sit

7    here today.

8          Q.     Did these investigators show you

9    any documents during the time that they were

10   asking you any questions?

11         A.     Not that I recall.  They were --

12   you know, they were, you know, providing --

13   basically they were giving me what's known as an

14   outbrief.  In other words, they were discussing

15   the matter with me, giving me their initial on

16   horseback, you know, reaction or findings.  And

17   obviously, that didn't -- it wasn't a final

18   report at that time, but they wanted to provide

19   me information.  And as I recall, I believe I

20   was alone with them, but I just can't be

21   certain.

22         Q.     So after they interviewed the staff

23   who was on duty at the time or the day that

24   Spencer committed suicide they then basically

25   briefed you on what they learned?

1          - Donald Smith -

2          A.    I believe I was the last person

3    they spoke to before they left.

4          Q.    Did they discuss anything with you

5    about the form, the intake form?

6          A.    No.

7          Q.    Did they discuss anything with you

8    about any policies or the procedures that the

9    jail had then in writing?

10         A.    No, and that's the -- they never --

11   they never mentioned anything about the form.

12   They never, you know, they never mentioned the

13   difference between the ADM form versus this

14   form.  And that was never discussed.

15         Q.    Did you ever bring to their

16   attention the fact that the forms that were

17   being used by Putnam County were not the forms

18   that the state had used, the ADM 330?

19         A.    No.  And it's something that when

20   this proceeding is at a point where, you know,

21   we have all the facts I'm going to certainly

22   provide them additional information in case

23   there may be other correctional facilities

24   around the state that may have additional

25   issues.

- *Donald Smith* -                                    118

1
2        Q.    Do you recall at any point in time
3   having any conversations with Captain LeFever
4   about disciplinary action against Vasaturo?
5        A.    I don't -- I don't remember
6   specifically, specifically a time and date of a
7   conversation.  But I sat here and I heard his
8   testimony about his recommendation to me that
9   they be terminated.  And I certainly, you know,
10  know that he took a hard line.  But, you know,
11  as the Sheriff of the county I've got to ensure
12  that we have -- follow due process.
13            I'm sure, Miss Berg, there were
14  some conversations.  Something like this
15  happens, you have conversations.  But I just
16  specifically now can't remember.  I remember the
17  one clear as day, the one outside the cell on
18  the day it happened.
19            And I know we were getting
20  documents together for the -- to send to the
21  Commission and I know we have done a lot of
22  conversations on suicide prevention and model of
23  excellence.  But I don't have a specific memory,
24  you know, of any other conversations with
25  Captain LeFever that I can just say he said this

- *Donald Smith* -                                    119

and I said that.

    Q.    You indicated that you recall
LeFever recommending that they be terminated.
You mean LaPolla and Vasaturo, correct?

    A.    Let me just say I remember him
taking -- taking what I believe what was a hard
line approach.

    Q.    In the depositions or somewhere
else?

    A.    I remember in the deposition.  And
you know, that is -- that would be like him to
do to, you know, say that the individual pays
the price.

    Q.    In terms of not what he said here
but what you and he discussed outside the
context of what you learned in these
depositions, did he ever recommend to you
specifically that LaPolla and/or Vasaturo be
terminated, that you can recall as you sit here
now?

    A.    I remember specifically when he sat
in this chair.

    Q.    But not in this room; in other
words, do you have recall --

- *Donald Smith* -                                    120

1

2     A.    I don't have a specific.  That gets

3   very difficult when you sit in these depositions

4   and then you try to separate the two.  But I

5   don't have a specific recollection.  So I think

6   that's my best answer, because I don't have a

7   specific recollection.

8           Q.    Did you speak with Convery at any

9   point in time about possible disciplinary

10  action?

11          A.    You know, I know I have spoken to

12  Undersheriff Convery a number of times about the

13  whole suicide prevention process and again, as

14  you know, the way he's been inserted into the

15  day-to-day operations.  But I don't have a

16  specific recollection of saying -- you know,

17  generally speaking I don't prejudge cases until

18  the charges are preferred and the facts are

19  gathered and the case comes before me.

20          Q.    Did Convery ever make any

21  recommendations to you in terms of disciplinary

22  action?

23          A.    Not that I recall.

24          Q.    Let me show you what we have

25  previously marked as Exhibit 43.  Can you