# EXHIBIT E  -  PART 5

- Donald Smith -                                    121

1
2    identify that as the correspondence you sent to
3    the Commission in response to its preliminary
4    report on the death of Spencer Sinkov?
5           A.    Yes.
6           Q.    In the second to last paragraph of
7    that document you refer to a study that was
8    being currently conducted funded by the NIC?
9           A.    Yes, that's the one that I was
10   discussing with you.
11          Q.    The one to two day session or
12   something else?
13          A.    I believe it was at least a couple
14   of days.
15          Q.    But that session where you pulled
16   in community members and an expert?
17          A.    Yes, that's the one.
18          Q.    And that has not been completed yet
19   as of today?
20          A.    No, that is -- that is going to be
21   a long-range project with some of the -- with
22   some of the issues.
23                Oh, you know, on that issue, I
24   don't believe -- I think one of the things that
25   came out of that study was the training of

- Donald Smith -                                    122

1

2      AmeriCor nurses.  I believe that was one of Miss

3      Cox's recommendations.  I believe we implemented

4      that starting in November of 2006.

5             Q.    Who required the training, was it

6      the County of Putnam, AmeriCor?

7             A.    No, it wasn't required.  I believe

8      it was a recommendation from Miss Cox that we --

9      that we -- you know, we -- again, this is one of

10     those things where you do -- you do short range,

11     medium range and long range.

12            Again, this was -- this was not

13     certainly -- certainly Spencer's death obviously

14     provided a great deal of motivation.  But I just

15     want to make it very clear, it wasn't about --

16     it wasn't about just getting a one time remedy.

17     It was about literally becoming a model of

18     excellence in suicide prevention and also mental

19     health.  And quite frankly, that's what we want

20     our facility to be.  That's why we have --

21     that's why we have put so much emphasis on this.

22            And if I can just say one other

23     thing without getting off track.  Since that

24     time -- since that time --

25            Q.    I think we're already off track.

1              - *Donald Smith* -                    123

2          A.    Since that time the Commission of

3    Correction has identified the Putnam County

4    Correctional Facility for a pilot program since

5    we have shown the interest and we got the

6    medical staff in there.  Since that time we have

7    been identified for a pilot program for

8    telemedicine.  And we are now being -- I briefed

9    the sheriffs in New York State yesterday on it.

10   We are now being set up with a telemedicine

11   terminal in the Putnam County Correctional

12   Facility, a telemedicine terminal in the Putnam

13   Hospital Center, a telemedicine terminal in the

14   doctor's office, a telemedicine terminal in the

15   psychiatrist's office to improve the -- both the

16   quality and the efficiency of the operation as a

17   pilot program funded by the Commission of

18   Correction to see if we can develop further this

19   model of excellence and whereby we can determine

20   the effects it would have on service to medical

21   services and psychiatric services to the inmate

22   population.

23          Q.    All right, I'm going to cut you

24   off.  Let's go back to what I initially asked.

25              The training that was implemented

- Donald Smith -                                    124

1

2     for the nursing staff, was the nursing staff

3     required to attend?

4           A.    We offered the training.  Miss

5     Cox -- when you say required --

6           Q.    In other words, did AmeriCor or the

7     county require these nurses to attend or was it

8     optional for them?

9           A.    Miss Cox recommended it, we adopted

10    it, Kevin Duffy accepted it as a good idea.

11    Again, we were part of a quality team.

12          Q.    When you say we adopted it, you

13    mean the county?

14          A.    Well, we -- we the county, yes.  We

15    adopted it.

16          Q.    And then Kevin Duffy agreed, so it

17    was offered to the staff, correct?

18          A.    That is correct.

19          Q.    Was the AmeriCor staff mandated to

20    attend that training, if you know?

21          A.    I believe when Kevin Duffy signed

22    up for a program he determines what his staff

23    will do and won't do.

24          Q.    Do you know if he required his

25    staff to attend or was it just an option?

- Donald Smith -                          125

1

2    A.    I can only tell you he was

3    committed to it and I believe he required them

4    to attend.

5    Q.    You base your belief on his

6    commitment to the idea?

7    A.    I base my belief on his commitment.

8    Q.    Did anybody ever tell you,

9    including Duffy, that the nursing staff was

10   mandated to attend?

11   A.    I don't recall.

12   Q.    In terms of that training, you said

13   it was November of '06, right?

14   A.    Right.

15   Q.    Was that the first time that

16   AmeriCor nursing staff had been trained in any

17   suicide prevention subjects?

18   A.    I don't know about training they

19   did internally, but I'm talking about this was

20   specific training that Miss Cox had recommended.

21   Q.    It was on suicide prevention,

22   right?

23   A.    Based again on the total team

24   approach of everybody, you know, having

25   ownership of what goes on in the jail.

- *Donald Smith* -                                    126

Q.    Prior to May 20th, 2006 when Spencer died in the facility do you know if the AmeriCor staff as a matter of practice made recommendations on the level of supervision for incoming inmates?

A.    I believe they did based on the standards from the National Commission of Correctional Health Care.  I believe -- and really, that was our blueprint.  Our blueprint for the whole AmeriCor program in addition to anything that the Commission of Correction mandated was the National Commission of Correctional Health Care, which I believe is even a higher standard than the Commission of Correction.

Q.    In terms of your belief, you base it on the fact that the National Commission had these standards.  But do you know, personally have knowledge that in fact AmeriCor staff was involved in making recommendations for the level of supervision for an incoming inmate?

A.    I can say this, I believe with certainty that to the standard of the National Commission of Correctional Health Care that we

- Donald Smith -                                127

met the standard, because we were accredited by

the National Commission.  I believe it was in --

I believe it was in -- sometime in 2004.  I

could be off on the date.

     Q.    So based on that --

     A.    We received their accreditation --

if I can finish my answer real quick.  I'll be

quick.

     Q.    We don't want you to talk too fast,

because then she can't take it down.  I just

want you to get to the point.

     A.    Okay, I'll get to the point.

     This is where my belief comes from,

because I mean I reviewed -- I reviewed those

standards.  I reviewed those standards.  As part

of the -- I mean this gets to the answer, it

really does.  As part of the process I met with

the National Commission of Correctional Health

Care and then there were -- there were -- as I

recall, there were two or three issues.  You

know, we did very very well on the visit and

then there were two or three issues we had to

follow up on in order to get the accreditation.

But we did get the accreditation.  That's where

- Donald Smith -                                      128

1
2    my belief comes from.  That's what I want to get

3    to.

4            Q.    In terms of the National

5    Commission, take a look, if you would, at

6    Exhibit 30, which at the bottom of each policy

7    references the National Health Care Commission's

8    standard.  Do you see that?

9            A.    Yes.

10           Q.    Each page has a reference to the

11   National Commission on there, right?

12           A.    Yes.  And this was -- again, a key

13   basis to our contract was the National

14   Commission.

15           Q.    This policy manual which is dated

16   November of 2004, indicates that certain things

17   will be done by the AmeriCor nursing staff,

18   correct?

19           A.    Yes.

20           Q.    It's your belief that was mirrored

21   on the National Commission standards, correct?

22           A.    That was the -- the whole thrust of

23   the contract was to the National Commission of

24   Health Care standards.

25           Q.    Do you know if in fact AmeriCor

1          - Donald Smith -                    129

2     nursing staff followed the policies that are set

3     forth in this manual specifically with regard to

4     the intake procedure?

5          A.     I don't have a specific

6     recollection.  All I can tell you is that we

7     were evaluated on the standards and we did get

8     accredited.  And we had maybe two or three

9     areas, as I recall, that we had to do some

10    follow up on before we got our accreditation.

11    Which is very common, you know, you don't get

12    100 percent.  But then you specifically follow

13    up and take the action that the National

14    Commission recommends.

15         Q.     But with all due respect,

16    accreditation is different than what actually

17    happens.  And my question really relates to what

18    happened on a day-to-day basis in the facility?

19         A.     Can I disagree with your --

20         Q.     No, you can't.

21         A.     See, here's the thing.  The

22    National Commission when they come -- I mean,

23    this is an on-site visit.  They --

24         Q.     Do you know if the National

25    Commission standards require nursing staff to

- *Donald Smith -*                                    130

1
2      make a recommendation on level of supervision

3      for an incoming inmate?

4              A.    As I sit here today, I don't

5      recall. But the day that I went and talked to

6      the National Commission I had reviewed every

7      standard before I went in to my meeting with

8      them.

9              Q.    So if it was a standard, you

10     believe it was followed. But you're not sure as

11     you sit here now if it was in fact a standard?

12             A.    That's correct, I believe it was

13     followed. As I sit here, I believe it was a

14     standard and I believe it was followed.

15             Q.    But you don't have a specific

16     recollection?

17             A.    I don't have a specific

18     recollection. I'm sorry about that.

19                          *(Recess held.)*

20                          MS. BERG:  *(Handing document*

21             *to be marked.)*

22                          *(Whereupon, Inter-Office*

23             *Memo, 12/13/06, was marked Plaintiff's*

24             *Exhibit 46 for identification.)*

25             Q.    I have marked as Exhibit 46 a copy

- *Donald Smith* -                                    131

1
2    of a December 13th, 2006 P-1 from Perry to

3    yourself regarding an investigation into the

4    anonymous letter.  And you'll see as the third

5    page the anonymous letter is attached, or at

6    least part of it?

7            A.    Yes.

8            Q.    Do you recall now that you have

9    seen this document having Inspector General

10   Patrick Perry conduct an investigation into that

11   anonymous letter?

12           A.    I don't specifically remember the

13   day, but obviously that's my signature and --

14   that's his signature and obviously I would have

15   asked him to do it.  Yes, I asked him to do a

16   lot of things.

17           Q.    Take your time to look at Exhibit

18   46.  Do you actually recall receiving this

19   document from him?

20           A.    As I sit here, I don't remember

21   receiving it.  But my belief would be I would

22   have received it.  I mean, it's addressed to me,

23   I would have received it.  I just don't have a

24   specific recollection.  But it's very common for

25   me to ask the inspector general to look in a

- Donald Smith -                                    132

myriad of things. That's why we have an

inspector general.

     Q.    In terms of the anonymous letter,

the first paragraph refers to the captain

running around updating the log books that are

never used and coming out with new policies and

procedures. You see that?

     A.    Yes.

     Q.    Earlier when you testified you

indicated you had a recollection of the November

'06 allegations in the anonymous letter about

LeFever putting policies in after the fact,

correct?

     A.    Yes, I remember the letter. I

remember talking to Captain McNamara and I

remember talking to the Commission. But I just

didn't have a recollection of the conversations

with the inspector general.

     Q.    And the policy that we referred to

was Exhibit 18, correct?

     A.    Yes.

     Q.    Now, in Perry's memo to you there's

no indication that he did anything to

investigate that allegation, correct?

- Donald Smith -                                    133

1

2     A.    Let me look at it again.   *(Perusing*

3     *document.)*  The only possible reference is --

4     possible officer misconduct is the only thing.

5     And you're right, there's no specific reference

6     to the captain.

7           Q.    In terms of Perry's investigation,

8     do you recall if you told him, you know, to

9     ignore that allegation in the anonymous letter?

10          A.    I don't recall.

11          Q.    Do you recall if he provided you

12    anything outside of this December 13th, 2006

13    memo about the anonymous letter?

14          A.    I don't have a specific memory.

15    But he meets with me every morning before staff

16    call, so he could have or he could have talked

17    to Captain McNamara.  I just don't have a

18    recollection.

19          Q.    In terms of the anonymous letter,

20    the second and third paragraphs, and I'll

21    summarize, deal with -- it's on the third page

22    of that exhibit.

23          A.    On the anonymous letter.

24          Q.    On the anonymous letter itself.

25    And you can read it fully.  But in sum the

- *Donald Smith* -                                134

allegations are that when the program officer is

absent, including on nights and weekends or for

any other reason, the North Housing Unit officer

is required to cover that post.  Is that a fair

assessment?

A.     That is true and that is still true

today with the staffing analysis.  In other

words, the program officer is a five-day-a-week

post.  It is not a seven-day-a-week post.  And

the Commission understands that.  They also

understand that most of the programs are on

Monday through Friday, but there are some

programs on the weekend, not many.  But, you

know, the Commission has looked at all aspects

of our staffing and that is still true today,

will remain true with the program officer only

being a five-day-a-week post.

Q.     But in terms of the North Housing

Unit post having to cover the program officer's

position in his or her absence, did the

Commission ever render any type of an opinion as

to whether that should be changed?

A.     Not that I know of.

Q.     In terms of the North Housing Unit

- Donald Smith -                    135

officer having to cover then two posts when the program officer is absent, does that remain true to today?

A.    That will not remain -- you are talking about the program -- the North Housing Unit officer covering the program that are in those rooms right near North Housing?

Q.    Right.

A.    That would remain true today, except Monday through Friday during the program officer's tour of duty.

And I don't want to speak for the Commission of Correction, but, you know, they understand the practical side of running a jail and that you staff positions for when they are most needed.  And they have added -- they have added an additional escort officer to our staffing and they have added a booking officer. They have added a booking officer to the A line, the overnight shift.  And with that booking officer and also with the housing control officer being able to go down into the North South housing area, except from 6 to 7:30 when, you know, inmates are awakened, I think that's a

- Donald Smith -                                    136

1
2  very satisfactory arrangement.  And --
3       Q.    But has the Commission ever told
4  you that's a satisfactory arrangement, either
5  verbally or in writing?
6       A.    Well, the whole staffing
7  analysis --
8       Q.    With all due respect, it's a yes or
9  no question.  Has the Commission ever conveyed
10 to you verbally or in writing what you just
11 described is a satisfactory resolution?
12            MR. KLEINBERG:  Objection.
13      You can answer.
14      A.    No, but if I --
15      Q.    Thank you.
16            The second page of --
17            MR. KLEINBERG:  Can you read
18      back the last question and answer, please?
19                 (The requesting testimony
20      was repeated.)
21      Q.    Take a look at the second page of
22 Exhibit 46, the third paragraph in the bottom.
23 "Policies and procedures regarding inmate
24 observation have been constantly reviewed and at
25 this time all are being explored for both

- Donald Smith -                                    137

1

2    content and timeliness of issue."  You see that?

3         A.    Yes.

4         Q.    Did you ever follow up to see what

5    the results of the supposed exploration were in

6    terms of both content and timeliness of issue?

7         A.    This was on December 13th, so the

8    only follow up that I can specifically remember

9    is following up with the Commission of

10   Correction to make sure that that wasn't some

11   document that was produced for them that had

12   relevance in their investigation.  I wanted them

13   to be aware because they were the investigating

14   agency.

15        Q.    But in terms of internally, like

16   within the facility?

17        A.    As I said, you know, this whole --

18   this whole matter is still being looked at.  But

19   as I sit here today, I don't -- I can't explain

20   why this document was issued, when it was

21   issued.

22        Q.    Exhibit 18 for the record.

23        A.    Exhibit 18.

24        Q.    Do you know what policies and

25   procedures regarding inmate observation were

- *Donald Smith* -                                          138

1

2   constantly reviewed as referenced in Perry's

3   memo to you of December 13th?

4           A.    The only thing I can -- I don't

5   know specifically.

6           Q.    Did you ever ask him?

7           A.    I may have at the time.  But again,

8   I don't have a recollection of this document

9   even though I know it obviously came to me.  But

10  I would believe -- I would believe we would be

11  talking about -- you know, as you look on this

12  document here, it says date of first issue, it

13  says 2001.  I believe it's referring to this

14  document.

15          Q.    Exhibit 18 again.

16          A.    Exhibit 18.  So from time to time

17  policies and procedures, you know, do get

18  reviewed and get updated.

19          Q.    Do you know who conducted the

20  constant review that's referenced in Perry's

21  memo to you?

22          A.    I don't know.

23          Q.    Was it you?

24          A.    No, I would believe it would be the

25  jail administrator.

- Donald Smith -                                    139

Q.    I understand your belief.  But do you know?

A.    No.

Q.    Take a look, if you would, at Exhibit 25, which is the contract addendum from AmeriCor.  The page at the bottom that's Bates stamped 557, you see where it says receiving screening on the bottom of that?

A.    I know that, but I just want to see if I can put this in perspective for myself on the timeline, because this is a...

MR. KLEINBERG:  Take as much time as you need.

Q.    Let me see if I can help you out.

A.    I'm trying to put the document in perspective.

Q.    Take a look at the third page, which is 543, and it shows that this certificate of insurance is for policy period July 1, '03 to July 1, '04.  And then if you continue to the next page, it shows the same thing in terms of the policy period.

A.    Okay.

Q.    So this was attached to the initial

140

- Donald Smith -

contract between the county and AmeriCor.  Okay?

A.    Okay.

Q.    And this is the way it was produced
to me.

A.    Okay.

Q.    Do you have a recollection that
Schedule A, the scope of services which starts
at Page 546, was attached to the initial
contract?

A.    Yes, I do.

Q.    So if you go then to Page 557 to
558, it's part of that scope of services.

A.    557.

Q.    To 558.

A.    Okay.

Q.    Receiving screening, do you see
that?

A.    I do.

Q.    Have you satisfied yourself that
you're in a comfortable position to answer my
questions now?

A.    I think I know where we are at.

Q.    Okay, good.

The receiving screening section

- *Donald Smith* -                                          141

refers to "Sheriff Smith's personnel already

have an excellent screening process in place at

the jail."  You see that?

A.    Yes.

Q.    Do you recall if you provided

anything to AmeriCor with respect to that

screening process?

A.    I believe -- and again I can't tell

you a date.  I believe that, you know, once

you're into the RFP process and you're about to

finalize the contract, I believe there's an

on-site both in the RFP process and I believe

there's an on-site with the actual preparation

of the contracts to ensure that, you know, that

we know what we are providing, the service

provider knows what they are providing; in other

words, it's not just done in a vacuum.

Q.    That's the point of my question.

Do you know if AmeriCor, specifically Duffy,

received information in terms of the policies

and procedures then in place, do you know?

A.    In general terms it is my belief.

Q.    But you don't know for sure?

A.    You know, I don't know for sure,

1                    - Donald Smith -                    142

2      but it's my general belief that he would have

3      both in the process and in the contract process.

4           Q.    On Page 561 it refers to a

5      detoxification.  You see that?

6           A.    Yes.

7           Q.    That continues, you can see, onto

8      the next page.

9           A.    Yes, I'm here now, I'm going to the

10     next page.

11          Q.    Let me know when you are ready.

12          A.    You want me to go down to 112?

13          Q.    Read as much of it as you want.  I

14     have a question for you about the first page,

15     but if you want to read the entire section

16     first, that's fine.

17          A.    Okay.  *(Perusing document.)*  Okay.

18          Q.    In terms of detoxification, the

19     first paragraph refers to in the second

20     sentence, "Inmates will initially be screened

21     during the receiving screening process," and

22     then it continues, "an additional valuation."

23     And then the next line, "nurses will record

24     vital signs, record any symptoms or signs of

25     dependence and as needed contact the physician

- Donald Smith -                                    143

1
2      for individual detoxification orders." You see

3      that?

4             A.    Yes, I do.

5             Q.    And in fact vital signs weren't

6      recorded as part of the screening process until

7      after Spencer's death, correct?

8             A.    That is my understanding.

9             Q.    Did you ever follow up with

10     AmeriCor with respect to why in their scope of

11     services contract addendum they indicated that

12     vitals would be provided but in fact they

13     weren't?

14            A.    You know, when I read this I was

15     looking at the initial screening and then I was

16     looking at the physical. If I could read that

17     again.

18                        MR. KLEINBERG:  Read as much

19            as you need.

20            A.    (Perusing document.) As I read

21     this, there's two specific events being talked

22     about here. The first one is the initial intake

23     screening and then the next one is about the

24     physical exam, which is the 14-day physical exam

25     which we complete, which these weren't being

- Donald Smith -                                    144

2   done before.  But under AmeriCor they were being

3   done prior to the 10-day.  So then it goes on to

4   say, nurses will record vital signs...as

5   needed...contact a physician for individual

6   detoxification orders.  Specifically as I sit

7   here, I don't know if that refers to the initial

8   screening or the physical exam.  I do know -- I

9   do know as a part of the physical exam vital

10  signs were taken, and that was part of the

11  standard.  But as I said, now we do the vital

12  signs.

13        Q.    You don't know if this specific

14  provision in terms of the scope of services

15  indicated to the county or to you that the

16  nurses were going to record vital signs at

17  intake, that you're unsure of?

18        A.    As I sit here today, I'm unsure of

19  that.

20        Q.    Take a look, if you would, at the

21  second paragraph last line, "Individuals at risk

22  for progression to more severe levels of

23  withdrawal will be under constant observation by

24  correctional officers."  You see that?

25        A.    Yes, I do.

- Donald Smith -                                        145

Q.      Were there any policies and
procedures in place with respect to correction
staff, correctional officers placing individuals
under constant observation if they had a risk of
progressing to a more severe level of
withdrawal?

A.      I don't know what the captain has
specifically in writing.  But I do know that on
a number of occasions we have had people on
constant watches because of withdrawal.  When
they were experiencing withdrawal there would be
coordination between the medical staff and the
doctor.  Librium would be used and they would be
put under constant watch.

Going back to what I said earlier
about the team approach, it -- you know, the
correction officer and the shift supervisor or
the nursing staff, you know, if they deem that
an inmate is either in danger of suicide,
hurting themself or have a medical condition --
there have been a number of medical conditions
where -- in other words, constant watches are
not just for suicide, constant watches are for
medical conditions as well if -- if they are

- *Donald Smith* -                                    146

deemed appropriate.

　　　Q.　So to summarize your answer, you're

not sure as you sit here today of any written

policy or procedure with respect to what's

indicated here, individuals who are at risk for

progressing to a more severe level of withdrawal

being under constant supervision?

　　　　　　　MR. KLEINBERG:　Objection.

　　　A.　Well, I know this is in writing.

　　　Q.　But was this provided to the

correction staff?  Is Exhibit 25 something the

correction staff sees?

　　　A.　I'm sure the captain and the

lieutenant and the administrative sergeant, I

believe they would see it.

　　　Q.　I understand your belief.  But do

you know?

　　　A.　I don't.

　　　Q.　Do you know if correction staff, a

correction officer, a shift supervisor, has ever

received a copy of Exhibit 25?

　　　A.　As I sit here, I don't know.

　　　Q.　Are you aware of any written

policies or procedures which say that a

- Donald Smith -                                    147

correction officer will constantly observe an

inmate who is at a risk of progressing to a more

serious level of withdrawal?

    A.    The monitoring of inmates is a part

of the training of a correction officer. It's a

part of the basic training.

    Q.    Do you know of any written policy

or procedure was my question.

    A.    I can't specifically recall one in

my mind as I sit here right now.

    Q.    Did you ever have any discussions

with Duffy about coordinating in terms of this

team approach a nurse and a correction officer

so that the nurse would advise the officer if

the individual was at risk for progressing to a

more severe level of withdrawal?

    A.    I believe we built that into the

initial screening process.

    Q.    I understand what you believe. But

did you ever have any conversations with Duffy

about having that communication occur between a

nurse to a correction officer?

    A.    I can't remember a specific date

with a conversation between me and Kevin, Kevin

- Donald Smith -                          148

1

2    Duffy and myself.

3         Q.    How about that subject?

4                    MR. KLEINBERG:  He's got to

5    finish his answer.

6         A.    Can I just say --

7         Q.    My question is, do you recall --

8                    MR. KLEINBERG:  You asked a

9    question.  He's in the middle of the

10   answer.

11                   MS. BERG:  No, he's not.

12   He's not answering my question.  If you

13   want to follow up and let him talk, you

14   can do that.

15        Q.    Do you recall, regardless of the

16   date, do you recall having a conversation with

17   Kevin Duffy at any point in time about requiring

18   nursing staff to notify a correction officer if

19   an incoming inmate is at risk of progressing to

20   a more severe level of withdrawal?

21                   MR. KLEINBERG:  Objection.

22   You can answer.

23        A.    Not specifically on that specific

24   point, but the cooperation and teamwork between

25   correction staff and medical staff was a

1                        - Donald Smith -                    149

2      conversation many times at MAC meetings.

3              Q.    Do you know if there was any

4      cooperation here between medical staff and

5      correction staff when it came to Spencer?

6              A.    I don't -- I don't -- I don't know.

7              Q.    Did you ever ask Duffy about that?

8              A.    I've talked to Kevin on many

9      occasions about cooperation, but I don't have a

10     specific recollection of that.

11             Q.    Take a look, if you would, at

12     Exhibit 30.  It's the AmeriCor policy manual

13     from November of '04.  On the page that's Bates

14     stamped 421 to 422 is a policy called Receiving

15     Screening.  Do you see that?

16             A.    Yes.

17             Q.    The policy, the third paragraph,

18     says at a minimum the receiving screening will

19     include inquiry into, and then it lists six

20     subjects, three on that page and three on the

21     next.

22             A.    Right.  *(Perusing document.)*  Yes.

23             Q.    On the second page of that Page

24     422, number four, "Receiving screening at

25     minimum will include inquiry into the use of

- Donald Smith -                                    150

1
2     alcohol and other drugs, including type of drug,
3     mode of use, amount used, frequency used, date
4     or time of last use and a history of problems
5     which may have occurred after ceasing use, e.g.
6     convulsions."  You see that?
7          A.    Yes.
8          Q.    By reading this, do you have an
9     understanding that that's something that the
10    nursing staff is at minimum supposed to do on
11    the intake of a new inmate?
12         A.    Yes.
13         Q.    And that, according to this
14    reference, is part of the National Commission on
15    Health Care standard, correct?
16         A.    Yes.
17         Q.    In Spencer's case, do you know if
18    anybody asked him anything about his use of
19    heroin, including the type -- I'm sorry, the
20    mode of use, the amount of use, the frequency of
21    use, the date or time of last use or any history
22    of problems when ceasing use?
23         A.    I don't have a memory of what was
24    on the forms when he was screened, so I don't
25    have a knowledge of what was asked.