# EXHIBIT E  –  PART 6

- Donald Smith -                                        151

1

2       Q.     Have you ever seen the first two

3  pages of the inmate medical intake record

4  pertaining to Spencer, which we have marked as

5  Exhibit 7?

6       A.     I've seen it at the deposition and

7  I believe -- I believe this was sent forward

8  with -- to the Commission of Correction.

9       Q.     Take a look, if you would, at the

10  second page and on the bottom, number 25, it

11  refers to illegal drug use.

12      A.     Yes.

13      Q.     Then there's a note 24 hours

14  heroin.

15      A.     Yes.

16      Q.     Above that it says rehab, yes, six

17  months ago.  You see that?

18      A.     Yes.

19      Q.     Above that, number 21, hospital, it

20  says detox Putnam Hospital six months ago.

21      A.     Yes.

22      Q.     There's no indication on this form

23  that he was asked anything about how he used

24  heroin; is that correct?

25      A.     From this form I can't see it on

- Donald Smith -                                    152

the form.

        Q.    There's no indication on this form

as to anything pertaining to what effects he had

the last time he detoxed, namely six months ago

at Putnam Hospital, correct?

        A.    Yes.

        Q.    And there's no indication on this

form of any observations of his skin to see, for

example, if he had needle marks or anything

along those lines, correct?

        A.    Yes.

        Q.    Did you ever ask anybody why it was

that Spencer wasn't asked the questions that are

listed specifically in AmeriCor's policy that,

again, references this National Commission

standard?

                        MR. KLEINBERG:  Objection.

                        MR. COON:  Objection.

                        MR. RANDAZZO:  Objection.

        A.    This form was completed by

Correction Officer Vasaturo.  I don't know what

questions were asked of Spencer by the nurse on

duty.  It's not indicated -- to answer your

question specifically, it's not indicated on

- *Donald Smith* -                                  153

this form.

Q.    Did you ever do anything to find out what the nurse on duty did by way of the receiving screening in terms of Spencer?

A.    In terms of Spencer but broader than Spencer obviously, beyond Spencer, is to invite the National Institute of Corrections to come in and help us evaluate where we go.  But specifically on this form this question, no.

Q.    How about the nursing staff in general, regardless of the form, did you ever inquire either through Duffy or somebody else as to whether they performed the receiving screening that's indicated in their policy, pages 421 to 422, and part of the National Commission standard?

A.    We had a number of conversations at MAC meetings about suicide, about -- or even following MAC meetings.  But I don't specifically have a recollection of the content of a specific conversation.  I don't.

Q.    Do you recall any conversations, regardless of whether it was a MAC meeting or not, about whether or not AmeriCor staff

- Donald Smith -                          154

1

2    complied with policy number 131, which is the

3    National Commission standard according to Bates

4    stamp 421 to 422?

5         A.    I don't recall.

6         Q.    Flip, if you would, to 448, which

7    is the suicide prevention policy, three pages in

8    length.

9         A.    (Perusing document.)  Okay, I read

10   it.

11        Q.    Before I get to that, I'm sorry, I

12   just want to go back for a minute to what we

13   were just discussing in terms of the initial

14   intake of Spencer and whether or not the nursing

15   staff asked the questions that were indicated on

16   pages 421 to 422.

17             And I'm going to show you the final

18   report on the death of Spencer which was done by

19   the Commission.  It was marked as Exhibit 12,

20   paragraph 9.  Okay?

21        A.    Okay.

22        Q.    Correct me if I am wrong, but that

23   paragraph indicates that the intake nurse's

24   assessment of Sinkov was inadequate?

25        A.    That is correct.

- Donald Smith -                            155

Q.    It also indicates that although Sinkov was not displaying active signs and symptoms of withdrawal at the time of admission, his reported history of recent heroin use warranted more detailed attention than was provided.  You see that?

A.    Yes.

Q.    It also indicated that the physical exam did not comport with the minimum standards, correct?

A.    That's what it says.

Q.    Did you have any follow-up discussions with Duffy or anybody else at AmeriCor with respect to intake assessments being performed by the nurses other than the recording of vital signs?

A.    I specifically remember the vital signs.  But I believe any conversation I would have had would have been on the issues involved. But as I sit here, I cannot remember the specifics of the conversation, except I do remember -- I do remember the vital signs, because that was a directive that came out of that, that I wanted the vital signs taken.

- Donald Smith -                               156

1
2      Q.     You don't recall anything else
3      about any detailed questions that should have
4      been asked of Spencer based on his reported use
5      of heroin?
6                     MR. COON:  Objection to the
7           form.
8      A.     Like I said, I've had many
9      conversations with Mr. Duffy, but as I sit here
10     today, I cannot remember specifics of the
11     conversations except that one point.
12     Q.     Back to the suicide prevention
13     policy that's pages 448 to 450.  On the first
14     page it says that "Inmates will be evaluated for
15     potential risk of suicide during the intake
16     process."  You see that sentence?
17     A.     Yes.
18     Q.     The next sentence, "Inmates
19     determined to be at risk as a result of the
20     screening process will be placed on suicide
21     precautions and immediately referred to the
22     psychiatrist."  Do you see that?
23     A.     Yes.
24     Q.     Did you understand that that was an
25     obligation of both the nursing staff and the

- Donald Smith -                                    157

2      correction staff as part of this team approach?

3                      MR. COON:  Objection.

4            A.    Well, the screening process needs

5      to be done right in the first place and then the

6      referrals need to be done, absolutely.

7            Q.    But both the nursing staff and the

8      correction staff had the obligation of

9      determining whether an inmate was at risk and

10     referring them to a psychiatrist?

11                     MR. COON:  Objection.

12           A.    I believe the correction staff has

13     the obligation to do the suicide screening.  The

14     follow up is -- the follow up is done by

15     AmeriCor.  And obviously, you know, I leave it

16     to Mr. Duffy to develop his internal policy,

17     what he holds his people accountable for.  I

18     hold him accountable to the National Commission

19     on Correctional Health Care standard.  He

20     references the standard, but as I sit here, I

21     don't know what the standard requires versus

22     what he has in the policy.

23           Q.    Did you ever check into that?

24           A.    Not that I can recall.

25           Q.    In terms of that sentence that I

- Donald Smith -                      158

1

2    just read, "Inmates determined to be at risk as

3    a result of the screening process will be placed

4    on suicide precautions," did you ever speak with

5    Duffy as to what was meant by the term suicide

6    precautions?

7         A.    I don't -- I don't recall -- I

8    don't recall reviewing this manual or seeing

9    this manual, so I don't recall any conversations

10   with Mr. Duffy.

11        Q.    Take a look, if you would, at the

12   next page, 449, top.  "Inmates who are placed on

13   suicide precaution," same term, "will be placed

14   in the facility's mental health unit or placed

15   on regular observation status such that they are

16   subject to monitoring by correctional and/or

17   health care personnel, monitoring should occur

18   every 15 minutes while the inmate is on suicide

19   precaution."  You see that?

20        A.    I do.

21        Q.    Do you know if that's consistent

22   with the National Commission standard?

23        A.    I don't know if Mr. Duffy is

24   referring to the medical staff, but certainly it

25   doesn't meet the standard of our correctional

- *Donald Smith* -                                      159

1

2   staff.  Because a 15-minute -- a 15-minute

3   monitoring by correctional staff, it would be

4   a -- require a constant supervision.  So I don't

5   know whether he's referring to the medical

6   staff.  You know, I don't want to speculate on

7   what he intended in his language there.

8        Q.    Did you ever speak with him about

9   what he intended in this language?

10       A.    Not that I can recall.

11       Q.    Or what he communicated through the

12  chain of command or otherwise to the nursing

13  staff as to whether a 15-minute or constant

14  watch should be implemented?

15       A.    I don't recall reviewing this

16  document with him at all.

17       Q.    Take a look, if you would -- let me

18  just back up.  Did you ever speak with Duffy

19  about what he communicated to his staff

20  regarding 15-minute or constant watch in terms

21  of a suicide precaution?

22       A.    Not that I could recall.

23       Q.    Page 448, again which references

24  this National Commission standard, says that

25  "Training for health care personnel will occur

- Donald Smith -                                    160

1

2    annually."  You see that?

3            A.    Yes.

4            Q.    And the training that's referenced

5    there is specifically "training to recognize

6    verbal and behavioral cues that are indicators

7    of suicide risk and how to respond

8    appropriately."  You see that?

9            A.    That's correct.

10           Q.    And the jail was accredited in

11   2004?

12           A.    As I recall, the accreditation

13   may -- if you recall, I didn't have a specific

14   recollection on the exact time.  I believe the

15   process was started in 2004 and it might have

16   been completed in 2004, it might have gone into

17   2005.  We can get you that information, when it

18   was accredited, but I don't have a recollection

19   exactly.

20           Q.    At the time it was accredited by

21   the National Commission training in fact had not

22   been provided to health care personnel; is that

23   correct?

24           A.    I don't know what training he's

25   referring to here.  The training that I was

- Donald Smith -                           161

referring to earlier I believe was suicide

screening training, you know; in other words,

the same that the correction officers get.  This

training may be internal training to him.  I

don't know what he intended.

     Q.    Did you ever ask prior to the

training in November of '06 being given to

health care personnel if AmeriCor staff received

any training in the area of suicide at all?

     A.    I don't recall.  I know they

received some training, but I don't specifically

know what training he conducted.

     Q.    Part of the investigatory process

involving the death of Spencer included members

of the sheriff's department conducting an

investigation, correct?

     A.    Yes.

     Q.    Did you ever receive any

information or feedback with respect to that

investigation?

     A.    The feedback -- the feedback that I

recall -- that was a criminal investigation.

When you have a death, an unattended death in

the community or a death in the jail, you have a

- Donald Smith -                              162

1

2    criminal investigation.  That was a criminal

3    investigation.  And there was no criminality

4    identified, as I recall.  And all the

5    information from -- I believe from that

6    investigation, plus all the reports, were

7    forwarded to the Commission for their

8    investigation.

9         Q.    In terms of the finding that there

10   was no criminality, how did you find that out?

11        A.    I believe just verbally when the

12   investigation was completed.

13        Q.    Who conveyed that to you?

14        A.    I don't recall.

15        Q.    Did you ever see any of the

16   underlying investigatory documents, statements

17   that were taken, notes, anything else?

18        A.    They were part of the packet that

19   went to the New York State Commission of

20   Correction.  I reviewed -- I believe I reviewed

21   everything before it went up, as I recall.

22        Q.    Do you recall if you reviewed, for

23   example, the sworn statements that the

24   correction staff gave to the investigators?

25        A.    I believe I reviewed the packet

- Donald Smith -                                      163

before it went up, which I believe I would have

read everything.  But as I sit here, I can't

specifically remember.

      Q.    Let me show you, for example,

Exhibit 11, which is Vasaturo's sworn statement.

Do you remember if you ever saw that before

today?

      A.    I believe I did, but I don't have a

specific recollection of, you know, when I

looked at it, when I reviewed it.

      Q.    Do you recall as you sit here

today, reviewing any of the other statements

that were given?

      A.    I believe I did.

      Q.    But you don't have a definite

recollection, though?

      A.    Because at the time I was trying to

find out all the information that I could.  But

as I sit here this many months gone by, I don't

specifically remember that I picked up this

statement and read it.  But I was, you know,

sending stuff to the Commission and I would

normally review everything that would go out to

the Commission.

- *Donald Smith* -                                    164

Q.     Prior to Spencer's suicide there
was another suicide in the jail by an inmate
named Rivera?

A.     Yes.

Q.     You were the sheriff at the time,
correct?

A.     Yes, I was.

Q.     Do you recall that there was also
an attempted suicide under your tenure?

A.     I believe we have had two attempted
suicides.  I believe one was an inmate drinking
water, trying to drink water.  And the other
one, I don't remember the specific date, but it
was -- I believe it was an attempted suicide
where he was rescued.

Q.     And the one who was rescued was
Rodriguez?

A.     I believe that's who it was.

Q.     Do you recall the method of
attempt?

A.     One was by drinking water and one
was I think trying to use hanging, which is the
most common.

Q.     Do you know if Rodriguez was under

- *Donald Smith* -                                          165

any type of routine or heightened level of

supervision?

     A.    I don't recall.

     Q.    How about the inmate who drank the

water, do you recall if he or she was under any

heightened level of supervision?

     A.    I believe there was a point in time

when he was put on, because we figured out what

he was trying to do.  It was a very unusual

method of trying to commit suicide.  But I

believe once we determined what he was doing he

was put on constant, as I recall.

     Q.    Do you know if in Rodriguez' case

he was screened using the form at that time, the

suicide screening prevention form?

     A.    I don't recall.

     Q.    You don't recall anything about his

score on that form?

     A.    I don't recall.

     Q.    How about the inmate who was

drinking water, do you recall the score on that

individual's form?

     A.    I don't recall.

     Q.    Was the Commission notified of the

- Donald Smith -                                    166

1
2    attempted suicides?

3         A.    I believe so, yes.

4         Q.    Is that required?

5         A.    Yes.

6         Q.    Do you know if they did any

7    investigation?

8         A.    I don't recall if they came down or

9    if it was done, you know, through the mail, I

10   don't recall.

11        Q.    Do you recall if there were any

12   outcomes, reports or anything generated by the

13   Commission in connection with those two

14   attempts?

15        A.    Not that I can recall.

16        Q.    In terms of Rivera, do you recall

17   that he had a history of heroin use?

18        A.    Yes, I recall that.

19        Q.    Do you recall that he, like

20   Spencer, was on a 15-minute watch?

21        A.    I believe he was on -- I believe he

22   had a six in the suicide screening.

23        Q.    But he was on a 15-minute watch,

24   correct?

25        A.    I believe he was.

1                    - Donald Smith -                167

2          Q.    And he was going through a program

3     which involved detoxing from heroin, correct?

4          A.    Yes.

5          Q.    And part of that included the

6     administration of medications?

7          A.    I believe so, yes.

8          Q.    He was not on a constant watch

9     despite the fact that he was actively going

10    through withdrawal, correct?

11                         MR. KLEINBERG:  Objection.

12         A.    As I recall -- as I recall, he

13    was -- he was on 15-minute supervision.

14         Q.    But he was not on a constant watch?

15         A.    As I recall, he was not.

16         Q.    He was also in North Housing Unit

17    One?

18         A.    As I recall, he was in North

19    Housing Unit One, yes.

20         Q.    That's where Spencer was too,

21    right?

22         A.    Yes.

23         Q.    He also committed suicide by

24    hanging from his sweat shirt?

25         A.    Yes.

- Donald Smith -                                    168

1

2          Q.    Did you ever see the Commission's

3    report on Rivera?

4          A.    Yes.

5          Q.    Take a look, if you would, at

6    Exhibit 14, specifically paragraph 19 which is

7    on page 5.  It refers to the North Housing area

8    post and the duties of that post assignment,

9    correct?

10         A.    Yes.

11         Q.    It specifically says that "In

12   addition to supervising the North Housing Unit,

13   the officer on that post also has the

14   responsibilities to supervise a program area

15   down the hall, movement into the adjacent

16   recreation yard and a separate four-cell housing

17   unit approximately 100 feet away."  Do you see

18   that?

19         A.    Yes.

20         Q.    Since the time that this report was

21   issued on January 11th, 2005 have any of those

22   responsibilities been modified?

23         A.    Yes.

24         Q.    In what way?

25         A.    The four-cell housing unit is no

- Donald Smith -                                    169

longer used except for constant watches, which

would not involve the North Housing Unit

officer.

         Q.    Any other --

         A.    And we have put in for a -- we

requested a staffing analysis and we obtained a

program officer post five days a week when most

of the activity takes place.  On the weekends,

the program rooms are very close to the North

Housing Unit and there's not a problem for that

officer to monitor inmates in with programs that

are taking place.  There aren't that many on the

weekend, primarily a Saturday bible study.

         Q.    Prior to January 11, 2005 the

four-cell housing unit, was that used all the

time or is that something that the NHU post had

only from time to time?

         A.    That was from time to time, as I

recall.

         Q.    In terms of the other

responsibilities noted in this report, the North

Housing Unit officer is still required to

supervise the program area and the recreation

yard on nights and weekends when the program

- Donald Smith -                        170

officer is not there, is that fair to say?

A.     That's fair to say. And that is --
that still is the -- is the case after the
staffing analysis. As I said earlier, the
Commission has looked at all aspects of our
operation when they do the staffing analysis.
It's quite a detailed document.

Q.     Did you ever come to learn at any
point in time that prior to Spencer's suicide,
in fact, during the period of time between the
15-minute checks that were being performed the
North Housing Unit officer who was responsible
for the 15-minute checks had to take a group of
inmates for bible study?

A.     I believe -- I believe the bible
study inmates were brought to him, the housing
officer, right at where his post is. I mean,
the program room is right near -- is right near
the North Housing Unit.

Q.     But you were aware of that prior to
today?

A.     Prior to today that that would
happen on weekends?

Q.     No, that that happened specifically

- *Donald Smith* -                                    171

1   
2   at the date and time that Spencer committed

3   suicide?

4                           MR. KLEINBERG:  Objection.

5          A.    I believe I've picked that up in

6   the depositions and I don't recall if I picked

7   it up prior to that.

8          Q.    You don't recall prior to the

9   depositions in this case having any information

10  come across your desk about the North Housing

11  Unit post having to cover the bible study within

12  the 15-minute period of checking on Spencer?

13         A.    I know -- I know that the North

14  Housing Unit, and even after the Commission of

15  Correction has done their staffing analysis,

16  that is still the case on weekends.  And I may

17  have read it in a report that came across my

18  desk, Miss Berg, but I don't specifically --

19  specifically remember that fact.  It may even be

20  in the final report, I don't recall.

21         Q.    On the date of Spencer's death -

22  May 20th, 2006 - was the North Housing Unit

23  officer responsible for movement into the

24  adjacent recreation yard?

25         A.    For the inmates from North Housing,

1                      - Donald Smith -                    172

2        and the recreation yard is right there near his

3        post.

4               Q.    And at the time that this report

5        was issued on Rivera in January of 2005 the

6        program location and the recreation yard

7        location have remained the same, correct?

8               A.    Yes.

9               Q.    In other words, back in '05 when

10       they issued this report the program area was

11       adjacent to the post for the North Housing Unit

12       officer, correct?

13              A.    Yes.

14              Q.    And the recreation yard was right

15       there as well?

16              A.    Yes.

17              Q.    Under those circumstances, the

18       final report on Rivera still says, "The

19       additional duties added to this post prevents an

20       officer from being able to maintain active

21       supervision adequately."  You see that?

22       Paragraph 19.

23                         MR. KLEINBERG:  There's more

24            to that sentence.

25              Q.    "And should be reviewed as part of

- Donald Smith -                               173

1
2   an updated staffing analysis." Do you see that?
3       A.    which was done.
4       Q.    But the report nonetheless still
5   says that "The additional duties added to this
6   post prevented the North Housing Unit officer
7   from being able to maintain active supervision
8   adequately," correct?
9       A.    That's a statement they made in
10  this report.  But they have since come back and
11  done a full staffing analysis.
12      Q.    Is that in writing?
13      A.    The staffing analysis is in
14  writing, yes.
15      Q.    Does the staffing analysis that you
16  received from the Commission in writing say
17  anything specifically about the weekends or
18  night duties of the North Housing Unit officer
19  covering the programs and the recreation yard?
20      A.    It specifically provides the
21  staffing for that time period.  And the people
22  conducting the staffing analysis totally review
23  the operations of the facility, so they
24  understand the number of inmates, the activities
25  that are taking place.  And as I said, we

- *Donald Smith* -                    174

1
2    requested the staffing analysis, the staffing
3    analysis was conducted.  And as I said, as we
4    sit here today the program officer position is a
5    Monday through Friday position based on --
6    based on the requirements from the Commission.
7            Q.    Did the Commission ever tell you in
8    words or in substance that it was, contrary to
9    this report, acceptable for the North Housing
10   Unit officer to both supervise the program area
11   and the adjacent recreation yard in addition to
12   normal duties?
13           A.    The Commission -- the Commission is
14   not going to come tell you specifically what you
15   can do or what you can't do.  They work on
16   manpower equivalents in their analysis and
17   relief factor.  And we rely on the wisdom of the
18   Commission in doing the staffing analysis.
19           Q.    So they never told you that it was
20   acceptable for the North Housing Unit to
21   continue having program area responsibilities
22   and recreation yard responsibilities on nights
23   or weekends?
24           A.    They would never specifically come
25   out and say something like that.

- Donald Smith -                          175

1
2     Q.    But they never did is my question?

3     A.    No, they never did.  But they were

4  fully informed of all aspects of the operation

5  of the correctional facility.

6     Q.    By who?

7     A.    The jail staff.

8     Q.    Who?

9     A.    When -- when --

10    Q.    Who, who is the jail staff, name

11 them?

12    A.    Captain LeFever is probably the

13 primary person they talk to when they do a

14 staffing analysis.

15    Q.    And how do you know as you sit here

16 today that Captain LeFever fully apprised the

17 Commission of anything?  How do you know that,

18 were you there?

19    A.    Miss Berg, I wasn't there, but I'm

20 just telling you --

21    Q.    So how do you know?

22    A.    I just know how they operate.  They

23 review the entire facility, they talk to

24 correction officers.

25    Q.    How do you know what LeFever

*- Donald Smith -*                                    176

communicated to them, if anything?

     A.    I wasn't there, Miss Berg.

     Q.    Take a look, if you would, at
Exhibit 14, the recommendations for the Sheriff
of Putnam County.  Number one, "The sheriff
should question the housing area officer for the
North Housing area for the accuracy of his
documented times he completed rounds."  Do you
see that?

     A.    Yes.

     Q.    Do you recall that as a result of
Rivera's death it was learned that staff was
rounding off times in the log book?

     A.    Yes.

     Q.    Do you recall that the housing area
officer referenced in a report on Rivera was
Vasaturo?

     A.    Yes.

     Q.    Did you ever question him?

     A.    We changed the policy, because we
felt like it was not just a one-person issue, it
was a systemic issue.  So the policy was changed
to ensure that rounding was no longer accepted,
to make sure that everyone knew that rounding

- *Donald Smith* -                                            177

1

2    was not accepted.

3        Q.    Did you direct somebody to change

4    that policy?

5        A.    Captain LeFever.

6        Q.    Do you know if he in fact did it?

7        A.    Yes, he did.

8        Q.    Was it a policy or procedure that

9    was changed?

10       A.    I believe it was a procedure.

11       Q.    Was the procedure a different form

12   of Exhibit 18, in other words, a previous

13   edition?

14       A.    I don't recall.

15       Q.    Did you ever see the procedure that

16   was changed?

17       A.    No, all I knew is that he changed

18   the procedure.

19       Q.    Did you ever see Exhibit 40, which

20   is a memo from Convery to LeFever about the

21   Commission's recommendations on the death of

22   Rivera?

23       A.    I remember seeing this in the

24   depositions.  I don't recall seeing it prior to

25   the depositions, but I may have.

- Donald Smith -                                    178

Q.     Did you ever see Exhibit 13, which was LeFever's response?

A.     I recall seeing it, of course, in the depositions.  And I may have seen it back then, but I don't have a specific memory of seeing the document.

Q.     This document refers to in paragraph two, "The correction officer on duty during the incident was counseled regarding his rounding of the times of his security checks."  Do you see that?

A.     Yes.

Q.     Do you recall independent of this, meaning not what I just read, but do you have a memory as you sit here today that Vasaturo was counseled with respect to rounding off the times?

A.     I don't -- I don't have a recollection of it.  But as I said earlier, I have a great undersheriff, I got a great staff.  And by the way, just so you know, when the word -- when the word sheriff is used in many documents it refers to the office of the sheriff, not specifically that the sheriff would

- Donald Smith -                                179

1
2    individually do every action himself.  I think
3    that's an important distinction.
4              Q.    Well, we know you didn't verbally
5    counsel or in any way counsel Vasaturo, correct?
6              A.    Right.
7              Q.    Do you have a recollection of
8    receiving information from somebody that that
9    occurred?
10             A.    Like I say, the document -- I
11   remember the document from the deposition.  This
12   was, you know, three and a half years ago.  I
13   don't have a specific memory.  But I talk to
14   Undersheriff Convery about many things every day
15   and I talk to Captain LeFever about many things
16   every day.  I just don't specifically have a
17   recollection of it.
18                   MS. BERG:  Let me have
19              marked as 47 a copy of an October 29, 2004
20              letter from Sheriff Smith to Commissioner
21              Lamy with respect to the Rivera report.
22                        (Whereupon, Letter,
23              10/29/04, was marked Plaintiff's Exhibit
24              47 for identification.)
25             A.    (Perusing document.)  Okay.

- Donald Smith -                                      180

1

2     Q.    You've read Exhibit 47?

3     A.    Yes, I have.

4     Q.    On the second page, first numbered

5     paragraph refers to the suicide screening

6     policies and procedures.

7     A.    Right.

8     Q.    The last sentence of that

9     paragraph, "Immediately after the incident the

10    department inspector general conducted a special

11    inspection to ensure that suicide screening

12    procedures were in compliance with current

13    directives." Do you see that?

14    A.    Yes.

15    Q.    Do you have a recollection of that

16    occurring as you sit here today?

17    A.    I don't have a recollection of it.

18    But as I said, I task the IG to do many things.

19    And obviously if I said it, it happened.

20    Q.    At this time it was Perry?

21    A.    Yes.

22    Q.    Did you ever receive anything in

23    writing from him regarding that special

24    inspection?

25    A.    I don't recall.