# EXHIBIT F  -  PART 2

125

**JOSEPH A. VASATURO**

1
2    Q.    Anything Spencer said prior to
3    being put in the holding cell?
4        A.    **Not that I recall.**
5        Q.    Did you observe at any point in
6    time that night, any conversations between
7    Investigator Portious and Spencer?
8        A.    **No, ma'am.**
9        Q.    Were there any other deputy
10    sheriff employees, either investigators or
11    deputy sheriffs, at the facility during the
12    booking process when Spencer was there?
13        A.    **Investigator Portious.  Deputy**
14    **Kristan was there, with a K.**
15        Q.    Anybody else?
16        A.    **Sergeant Hasmer was there.**
17        Q.    Anybody else?
18        A.    **Deputy wise?  I mean, anybody**
19    **else as in deputy?**
20        Q.    I thought you said Deputy Weiss.
21    I'm sorry.  Anybody else from the sheriff's
22    department?
23        A.    **Sergeant LaPolla.**
24        Q.    Focus on the sheriff's department
25    and not the correctional facility.  Anybody

126

**JOSEPH A. VASATURO**

1
2    else from the sheriff's department?
3        A.    **Not that I can recall.**
4        Q.    Did you observe Deputy Kristan to
5    be speaking with Spencer at any point in
6    time?
7        A.    **He was speaking with him.  I**
8    **don't know what he was talking about.**
9        Q.    Did you hear anything that Kristan
10    said to Spencer or Spencer said to Kristan?
11        A.    **I did not.**
12        Q.    How about Hasmer, did you observe
13    him to speak with Spencer at any point?
14        A.    **I didn't see him speaking with**
15    **him.**
16        Q.    Did you speak with any of the
17    deputy sheriff employees, either the
18    investigators or Deputy Kristan or Sergeant
19    Hasmer about Spencer at any time?
20        A.    **No.**
21        Q.    Did you ask them any questions
22    about their observations of Spencer?
23        A.    **Yes.**
24        Q.    Who did you speak with in that
25    regard?

127

**JOSEPH A. VASATURO**

1
2        A.    **Deputy Kristan.**
3        Q.    What did you say to him, and what
4    did he say to you?
5        A.    **We were speaking about if he felt**
6    **he was going to hurt himself.**
7        Q.    Who raised that subject?
8        A.    **I asked him.**
9        Q.    Why did you ask him?
10        A.    **Because it's one of my questions**
11    **here.**
12        Q.    What did Kristan say?
13        A.    **He said no.  There was no signs**
14    **of him wanting to hurt himself.  I believe**
15    **Deputy Kristan said that he feels dealing**
16    **drugs is like being a bartender.**
17        Q.    Did he say what he meant by that?
18        A.    **No.  I just said that's nice.**
19    **And that was the extent of me talking with**
20    **him.**
21        Q.    Did you have any understanding as
22    to what Kristan was trying to communicate
23    when he made that statement?
24        A.    **No.**
25        Q.    At some point in time, was Spencer

128

**JOSEPH A. VASATURO**

1
2    taking out of the holding cell?
3        A.    **Yes.**
4        Q.    What occurred at that point?
5        A.    **At that point, we started the**
6    **screening.**
7        Q.    Who did the screening?
8        A.    **I did the screening.**
9        Q.    Did anybody assist you?
10        A.    **Nobody assisted me.**
11        Q.    What do you recall about the
12    screening process?
13        A.    **It was -- it went quick.**
14        Q.    How do you perform the screening
15    process?  Do you read questions?  Do you do
16    something else?
17        A.    **It's basically reading the**
18    **questions.  I start with the pedigree.**
19        Q.    Do you recall if LaPolla was at
20    the booking area at any point in time while
21    Spencer was there?
22        A.    **Sergeant LaPolla started the**
23    **pedigree while he was locked in his cell.**
24        Q.    So, this would have been while
25    Spencer was in the holding cell?

129

JOSEPH A. VASATURO

1
2   A.   Yeah.
3   Q.   Is there anything that you can
4   recall hearing LaPolla say to Spencer or
5   Spencer saying to LaPolla at any time before
6   you began completing the forms?
7   A.   No, ma'am.
8   Q.   Did you ever speak with LaPolla
9   about his observations of Spencer?
10  A.   Yes, ma'am.
11  Q.   When?
12  A.   That night and almost all the
13  time.
14  Q.   So since that night?
15  A.   Since that night.
16  Q.   That night, what can you recall
17  saying to LaPolla and LaPolla saying to you?
18  A.   I notified Sergeant LaPolla that
19  he was on 15-minute check via the radio.
20  And that he would be placed in cell seven.
21  He didn't object.
22  Q.   Did LaPolla say anything?
23  A.   Sergeant didn't object.
24  Q.   Did he indicate his agreement with
25  that?

*COMPU-TRAN SHORTHAND REPORTING*

130

JOSEPH A. VASATURO

1
2   A.   He indicated his agreement with
3   cell seven.
4   Q.   Did he say anything about the
5   15-minute checks?
6   A.   He asked me if the P-1 was
7   finished. I told him yes.
8   Q.   Anything else that you said to
9   LaPolla or that LaPolla said to you May 19th
10  into the 20th in any way about Spencer?
11  A.   Not that I recall, ma'am.
12  Q.   Did you indicate to LaPolla at any
13  point in time why you put Spencer on a
14  15-minute check?
15  A.   Yes, ma'am.
16  Q.   What did you tell him?
17  A.   Because of answers given on the
18  medical screening and the suicide screening.
19  Q.   Was this during your verbal
20  discussion with him?
21  A.   I don't recall if I told him
22  verbally, but it was on my P-1.
23  Q.   Do you know -- withdrawn.
24      Did you deliver a copy of the P-1
25  to Sergeant LaPolla?

*COMPU-TRAN SHORTHAND REPORTING*

131

JOSEPH A. VASATURO

1
2   A.   Not directly to the sergeant, no.
3   Q.   Do you have any understanding as
4   to when, if at all, Sergeant LaPolla saw the
5   P-1?
6   A.   I'm not sure when the sergeant
7   saw the P-1.
8   Q.   Other than possibly reading it on
9   the P-1 at some point in time, did you -- do
10  you have a recollection of communicating to
11  LaPolla the reasons why Spencer was placed
12  on the 15-minute watch?
13  A.   No, ma'am. In passing that
14  night, I can't give you an exact time.
15  Q.   Do you recall doing that at any
16  time?
17  A.   No, ma'am. Aside from the P-1,
18  no.
19  Q.   And you said since that night.
20  Since May 20th, you've spoken with LaPolla
21  about Spencer?
22  A.   Yes, ma'am.
23  Q.   What have you said to him, and
24  what has he said to you?
25  A.   I just spoke with him generally

*COMPU-TRAN SHORTHAND REPORTING*

132

JOSEPH A. VASATURO

1
2   like I felt he was okay. I know it's a
3   little late to make the call now. But I
4   felt he was okay the way he was speaking
5   with us. Some of these questions here, was
6   he incoherent? I don't think so. He was
7   speak with us like we're speaking now. He
8   was joking around. Did he have something to
9   look forward to? I believe he did. He said
10  he was going to college. He has a band.
11  You know, things like that.
12  Q.   What did LaPolla say during these
13  discussions?
14  A.   You know, he basically agreed.
15  Q.   He basically agreed, is that what
16  you said?
17  A.   Yes, ma'am.
18  Q.   Anything else that LaPolla said?
19  A.   Not that I recall, ma'am.
20  Q.   Other than indicating his
21  agreement with your statements?
22  A.   Not that I recall, ma'am.
23  Q.   Did you ever come to learn at any
24  point in time that on the night of May 20,
25  2006, during the booking process, LaPolla

*COMPU-TRAN SHORTHAND REPORTING*

### JOSEPH A. VASATURO

2 spoke with Spencer about his use of heroin?
3     **A.   Yes. I believe he did.**
4     Q.   How did you find that out?
    **A.   Sergeant had said something.**
6     Q.   That night?
7     **A.   Yes.**
8     Q.   What did he say?
9     **A.   They asked him -- I believe he**
10 **asked him if he was going to be suffering**
11 **from withdrawals. I don't want to quote**
12 **that, because I'm not sure if that's exactly**
13 **what he said.**
14     Q.   That's your best recollection?
15     **A.   Yes.**
16     Q.   What, if anything, else did
17 LaPolla say?
18     **A.   This is what sticks out in my**
19 **mind. I'm not sure exactly what he said.**
20 **This is when Sergeant LaPolla started the**
21 **pedigree.**
22       **I said, serg, leave that. I'll**
23 **get it.**
24       **So he did. He started the**
25 **pedigree, and he gave it to me and we**

*COMPU-TRAN SHORTHAND REPORTING*

### JOSEPH A. VASATURO

2 **finished it.**
3     Q.   When you say "we finished it," do
4 you mean you or someone else?
5     **A.   I mean myself.**
6     Q.   When LaPolla told you that he
7 asked Spencer if he would be suffering from
8 withdrawal, did LaPolla say Spencer
9 responded to that question?
10     **A.   Yes.**
11     Q.   What did he say?
12     **A.   Spencer said no, he wouldn't be.**
13     Q.   Anything else that LaPolla told
14 you about any discussion he had with
15 Spencer?
16     **A.   No, ma'am.**
17     Q.   Did LaPolla ever indicate to you
18 that he had asked Spencer about his heroin
19 use in terms of quantity of that use or when
20 the last use was or anything along those
21 lines?
22     **A.   I don't recall, ma'am. I know**
23 **Mr. Sinkov himself told me when his last use**
24 **was.**
25     Q.   Do you recall if you had any

*COMPU-TRAN SHORTHAND REPORTING*

### JOSEPH A. VASATURO

2 conversations with LaPolla about whether
3 Spencer asked LaPolla about any kind of
4 programs for detoxing?
5     **A.   I'm not sure if he asked Sergeant**
6 **LaPolla or not, but he had inquired about**
7 **methadone.**
8     Q.   To you?
9     **A.   There was a few of us there. I'm**
10 **not sure if it was directly at me.**
11     Q.   Do you recall where he was at that
12 time? Was he still in the holding cell?
13 Was he somewhere else?
14     **A.   I believe at this point he was**
15 **out of the holding cell.**
16     Q.   So, he was doing this screening at
17 that time?
18     **A.   I'm not sure if it was before or**
19 **after the screening.**
20     Q.   When Spencer asked about the
21 methadone and you heard that, did anyone
22 respond?
23     **A.   I think the response -- I'm not**
24 **positive -- that it wasn't a habit to give**
25 **methadone at the jail.**

*COMPU-TRAN SHORTHAND REPORTING*

### JOSEPH A. VASATURO

2     Q.   Do you know who said that?
3     **A.   I'm not positive.**
4     Q.   Did anybody else respond to
5 Spencer's question?
6     **A.   Not that I can recall.**
7     Q.   Did you respond at all?
8     **A.   I believe I told him that I'm not**
9 **sure if you get methadone here.**
10     Q.   Anything else that you said?
11     **A.   That they would have to speak**
12 **with medical.**
13     Q.   Anything else that you said?
14     **A.   In that conversation, no.**
15     Q.   What did you understand methadone
16 to be used for?
17     **A.   I'm not really positive on what**
18 **methadone is used for. I would imagine**
19 **withdrawal. I don't know.**
20     Q.   Did you ask Spencer how it was
21 that he knew about methadone?
22     **A.   No, ma'am.**
23     Q.   Do you recall anything specific
24 that you said to Spencer or that Spencer
25 said to you during the screening process?

*COMPU-TRAN SHORTHAND REPORTING*

137

JOSEPH A. VASATURO

1
2      A.    Aside from answering the
3  questions?
4      Q.    Yes.
5      A.    When I asked him if he was going
6  to hurt himself, he said no.  I take care
7  of my body.  I'm the healthiest junkie
8  you'll ever meet.  That's all -- Officer
9  Connelly made a comment about his hair.  He
10 said yeah, I spend hours on it.
11     Q.    Anything else that you can recall?
12     A.    I believe he asked for food.
13     Q.    Anybody respond?
14     A.    Yeah.  We got him what was in the
15 kitchen.  There's bagels in there.  Rolls.
16 Some juice.
17     Q.    Did he eat it?
18     A.    Yeah.  He ate it.
19     Q.    When was that?
20     A.    This is after the screening.
21     Q.    Anything else that you can recall?
22     A.    Not about the booking process.
23     Q.    Or while he was in booking?
24     A.    No, ma'am.
25     Q.    Is there anything else that you

138

JOSEPH A. VASATURO

1  can recall anybody saying, anybody else
2  saying to Spencer or Spencer saying anything
3  to them other than what you testified to
4  while he was in booking?
5      A.    Anybody else, no.
6      Q.    Do you recall Spencer's physical
7  appearance that night?
8      A.    I do.
9      Q.    What do you recall about him?
10     A.    He looked -- I don't know --
11 normal.
12     Q.    What do you mean by that?
13     A.    He didn't look like he used
14 drugs.  He didn't look like he was
15 withdrawing.
16     Q.    What was his demeanor like?
17     A.    What do you mean?
18     Q.    His behavior.
19     A.    Normal.  I mean, I don't know how
20 to explain normal.  Like we're acting right
21 now.
22     Q.    Was he in your opinion, overly
23 agitated or overly relaxed?
24     A.    Not at all.

139

JOSEPH A. VASATURO

1
2      Q.    Did you observe any marks on him
3  in terms of indications that he had used
4  heroin?
5      A.    I didn't observe marks, no.
6      Q.    Did you look for any?
7      A.    No.
8      Q.    Do you recall anything about his
9  height and weight?
10     A.    I want to say he was
11 approximately my height and weight.  I'm not
12 sure.  He was thin.
13     Q.    Very thin?
14     A.    No.  Unusually thin, no.
15     Q.    When you say "approximately my
16 height --"
17     A.    Six feet, sorry.
18     Q.    Do you know how much he weighed?
19     A.    I'm not positive how much he
20 weighed.
21     Q.    Did you ask Spencer any questions
22 during the booking process about how much
23 heroin he used?
24     A.    I didn't -- I don't believe I
25 asked him how much.  I asked him when was

140

JOSEPH A. VASATURO

1  the last time.
2      Q.    That's when he said 24 hours ago?
3      A.    Yes.
4      Q.    Do you recall if he said 24 hours
5  ago or within the last 24 hours?
6      A.    He said 24 hours ago.
7      Q.    Did he say how much he had used 24
8  hours earlier?
9      A.    No.
10     Q.    Did you ask him how much heroin he
11 had used over the course of the last week,
12 month, anything along those lines?
13     A.    No.
14     Q.    Do you know if anybody ask him
15 those kind of questions?
16     A.    I'm not sure if anybody did.
17     Q.    Do you recall an individual named
18 Robert Thompson coming in that evening as
19 well?
20     A.    I do.
21     Q.    Do you recall who brought him in?
22     A.    No.
23     Q.    Do you recall if you did the
24 intake on Thompson?

141

JOSEPH A. VASATURO

1
2      A.      I don't recall.
3      Q.      Do you recall if you spoke with
4  Thompson at any point in time about Spencer
5  Sinkov?
6      A.      I don't believe I did.
7      Q.      Do you know if anybody did?
8      A.      I don't believe anybody did.
9      Q.      Did you ever come to learn at any
10  point in time that any of the deputy
11  sheriffs, the investigator, the sergeant or
12  Deputy Kristan or anyone else, had asked
13  Thompson about Spencer?
14      A.      No, ma'am.  Not that I know of.
15          MS. BERG:    Let me have
16  marked as Exhibit 3, a copy of Putnam
17  County Correctional Facility Suicide
18  Prevention Screening Guidelines.  It says
19  SOJ-32 at the top, page seven, dated May
20  20, 2006.
21      (Whereupon, Plaintiff's Exhibit 3,
22  SUICIDE PREVENTION SCREENING GUIDELINES, SOJ-32,
23  PAGE 7, DATED 5/20/06, was marked for
24  identification.)
25      Q.      Take a look if you would at

*COMPU-TRAN SHORTHAND REPORTING*

142

JOSEPH A. VASATURO

1
2  Exhibit 3 and tell me if you recognize that?
3      A.      Yes, ma'am.
4      Q.      Is that the Suicide Prevention
5  Screening Guideline form that Putnam County
6  Correctional Facility provides to you as the
7  booking officer?
8      A.      Yes, ma'am.
9      Q.      Has the form been modified as far
10  as you know in the last five years?
11      A.      Not that I'm aware of, ma'am.
12      Q.      Do you see at the top it says
13  SOJ-32.  Do you have any understanding what
14  that is?
15      A.      That's the form.
16      Q.      Are there other SOJs, if you will,
17  other forms?
18      A.      Yeah.
19      Q.      Are they all -- in other words, do
20  you know what SOJ stands for?
21      A.      Standard of jail.  I'm not sure
22  what it stands for.
23      Q.      Did you complete all the
24  handwriting on this document, Exhibit 3?
25      A.      Except for Mr. Sinkov's

*COMPU-TRAN SHORTHAND REPORTING*

143

JOSEPH A. VASATURO

1
2  signature, yes.
3      Q.      Except where it says "inmate's
4  signature," everything else is your
5  handwriting?
6      A.      Yes.
7      Q.      In terms of the numbered section,
8  did you ask Spencer all of the questions
9  listed there?
10      A.      I asked him up to question 12.
11      Q.      What is 13 through 16?
12      A.      This is supposed to be
13  observations.
14      Q.      Your observations?
15      A.      Yes.
16      Q.      What's your understanding in terms
17  of when comments are required in the comment
18  section?
19      A.      When the yes is checked in column
20  A.
21      Q.      If you take a look at No. 6, which
22  has history of drug or alcohol abuse, you
23  circled the word "drug and abuse"?
24      A.      Yes.
25      Q.      Why did you do that?

*COMPU-TRAN SHORTHAND REPORTING*

144

JOSEPH A. VASATURO

1
2      A.      Just to take out the word
3  alcohol.
4      Q.      What is your understanding as to
5  what it means by history of drug abuse?
6      A.      If you have a history -- if you
7  have a problem with it.  A history of it.
8      Q.      Meaning more than an occasional
9  use?
10      A.      Yes.
11      Q.      Did you get any information from
12  Spencer to indicate that his use of heroin
13  was more than an occasional use?
14      A.      He said he had gone to rehab, I
15  believe, six months ago, I believe.  So in
16  my mind, that would be a history or abuse.
17      Q.      It says in No. 6, "Note drug and
18  when last used," but there's no indication
19  in the comment section or anywhere else that
20  was completed.  Do you have any recollection
21  as to why that is?
22      A.      I feel I didn't write that
23  because I wrote it -- it was on the other
24  page of the packet.
25      Q.      No. 7, "Detainee has history of

*COMPU-TRAN SHORTHAND REPORTING*

145

JOSEPH A. VASATURO

1     JOSEPH A. VASATURO
2     counseling or mental health
3     evaluation/treatment." And you checked yes
4     in that column; correct?
5          A.   Yes.
6          Q.   That was based on what Spencer
7     told you?
8          A.   He said he had gone ten years ago
9     to a mental health evaluation.
10         Q.   And it says, "No current
11    psychotropic medication and name of most
12    recent treatment agency;" do you see that?
13         A.   Yes, ma'am.
14         Q.   You didn't put that information on
15    this form, did you?
16         A.   He didn't -- no, ma'am. He
17    didn't divulge that. On the other page, it
18    says do you take medication, I believe. He
19    said Lunesta. I believe that's all he said.
20         Q.   But you didn't write anything
21    about any recent treatment agency?
22         A.   No, ma'am.
23         Q.   And you recall now that Spencer
24    told you that he had had some kind of
25    counseling ten years earlier?

146

JOSEPH A. VASATURO

1
2          A.   Ten years ago.
3          Q.   Did he say what for?
4          A.   No.
5          Q.   Did you ask him?
6          A.   No.
7          Q.   Did he indicate that he had any
8     counseling since that time?
9          A.   He said he had gone to rehab. I
10    believe it was rehab six months ago.
11         Q.   Did he indicate that he had any
12    counseling at that time?
13         A.   No.
14         Q.   Did you indicate where that rehab
15    was?
16         A.   Yes. I believe he said -- no.
17    Putnam Hospital Center, I believe, he said.
18         Q.   Would that have been on the other
19    part of the form or this form?
20         A.   Yes, ma'am.
21         Q.   Where?
22         A.   On the medical. It's a packet.
23         Q.   In terms of the
24    behavior/appearance section, 13 through
25    15 --

147

JOSEPH A. VASATURO

1
2          A.   Yes, ma'am.
3          Q.   -- was checked in the yes column
4     and then there appears to be a circle around
5     it with initials to the left?
6          A.   Yes.
7          Q.   Did you initially check yes in
8     those boxes?
9          A.   I did.
10         Q.   Then you changed it to no?
11         A.   Yes, ma'am.
12         Q.   When did you change it?
13         A.   Right after I realized. I was
14    reading through it when I was signing it.
15    That's when I changed it.
16         Q.   Did you change it before or after
17    Spencer signed it?
18         A.   No -- I'm sorry. Before.
19         Q.   Do you recall why it was that you
20    initially checked yes in those three columns
21    and changed it to no?
22         A.   I don't recall. It was a miss
23    check.
24         Q.   You indicated earlier when I asked
25    you about Spencer's appearance, that it

148

JOSEPH A. VASATURO

1
2     didn't look like he used drugs or was
3     withdrawn; correct?
4          A.   Yes, ma'am.
5          Q.   Did I -- take a look at question
6     16A, "Detainee is apparently under the
7     influence of alcohol or drugs;" you checked
8     yes?
9          A.   Yes.
10         Q.   16A, you didn't change to the no
11    column?
12         A.   No, ma'am. I know that.
13         Q.   In terms of 16B, "If yes, is
14    detainee incoherent or showing signs of
15    withdrawal or mental illness," and you
16    checked yes in that box?
17         A.   Yes, ma'am.
18         Q.   Was that a mistake, also?
19         A.   Yes.
20         Q.   And you didn't change either of
21    those?
22         A.   I didn't.
23         Q.   When did you first determine that
24    those checks, those "yes" checks were
25    incorrect?

149

JOSEPH A. VASATURO

1
2    A.    When I was in with the
3    Commissioner of Corrections and thinking
4    about what went on. And I'm reading through
5    this and saying to myself, he was coherent.
6    I didn't feel he was under the influence of
7    anything at that time.
8    Q.    In terms of the general
9    comments/observation section, it says, "All
10    yes responses require written comment here;"
11    correct?
12    A.    Yes.
13    Q.    And next to 16A, which you checked
14    yes, you, in fact, put a comment in;
15    correct?
16    A.    Right.
17    Q.    Next to 16B, you also put a
18    comment in after checking the yes box?
19    A.    Yes, ma'am.
20    Q.    And you noted there, quote, "very
21    laid back"?
22    A.    Laid back. Like calm, I guess
23    you would say.
24    Q.    Did you ever receive any kind of
25    training or instruction with respect to

*COMPU-TRAN SHORTHAND REPORTING*

---

151

JOSEPH A. VASATURO

1
2    bottom --
3    A.    Yes, ma'am.
4    Q.    -- you reviewed it?
5    A.    I quickly looked it up. I was
6    like yes.
7    Q.    And that's when you made the
8    change to 13, 14 and 15?
9    A.    Yes.
10    Q.    At that point in time, you didn't
11    feel the need to change 16A and B; correct?
12    A.    Yeah. I think that was a
13    mistake, but yes.
14    Q.    And you first realized that
15    mistake when the Commissioner of Corrections
16    investigator interviewed you?
17    A.    That's when I first told people.
18    I realized when I went through again, I went
19    one by one, slowly through them, and I was
20    like this is not correct. That's when I
21    notified somebody about it.
22    Q.    Who did you notify?
23    A.    The Commissioner of Corrections.
24    Q.    When was that?
25    A.    I don't recall the exact date.

*COMPU-TRAN SHORTHAND REPORTING*

---

150

JOSEPH A. VASATURO

1
2    individuals who used drugs or who were
3    withdrawing from drugs about being very laid
4    back or anything along those lines?
5    A.    No, ma'am.
6    Q.    Did anybody ever indicate to you
7    that an indicator of drug use could be a
8    very calm demeanor?
9    A.    No, ma'am.
10    Q.    Or indicate that somebody is under
11    the influence?
12    A.    Not that I recall.
13    Q.    Why is it that you noted very laid
14    back in that particular paragraph 16B?
15    A.    Well, it says determine if he's
16    incoherent or withdrawing from mental
17    illness. In my mind, mental illness, they
18    would be a little bit more violent. I put
19    laid back. I know it's checked yes. I
20    don't feel that it was supposed to be yes.
21    I don't know where to go with that. Under
22    the influence of alcohol or drugs, I put 24
23    hours ago. I don't think 24 hours ago you'd
24    still be under the influence.
25    Q.    Prior to signing the form at the

*COMPU-TRAN SHORTHAND REPORTING*

---

152

JOSEPH A. VASATURO

1
2    Q.    Do you recall what year it was?
3    A.    '06.
4    Q.    Was it during an interview?
5    A.    Yes.
6    Q.    Did they come see you at which
7    point in time you notified the investigator
8    or did you reach out to them first?
9    A.    They came and did an
10    investigation.
11    Q.    During that investigation, you
12    were asked questions?
13    A.    Yes, ma'am.
14    Q.    Who asked you questions?
15    A.    I don't recall his name. There
16    was two investigators in the room.
17    Q.    Was anybody else present when they
18    asked you questions?
19    A.    No, ma'am.
20    Q.    Prior to being asked questions by
21    the investigators, did you speak with
22    anybody about what you should say?
23    A.    No, ma'am.
24    Q.    Or about what they would ask you?
25    A.    No.

*COMPU-TRAN SHORTHAND REPORTING*

153

JOSEPH A. VASATURO

1  
2  Q.  Did you tell anybody prior to  
3  being questioned by these two investigators  
4  from the Commissioner of Corrections that  
5  you felt your response to 16A and B was  
6  incorrect?  
7  A.  I had asked other people what  
8  they felt.  
9  Q.  Who did you ask?  
10  A.  Officer Connelly.  
11  Q.  Anyone else?  
12  A.  Officer Matias.  
13  Q.  Anyone else?  
14  A.  Officer Gianpalo.  
15  Q.  Anyone else?  
16  A.  Sergeant LaPolla.  
17  Q.  Anyone else?  
18  A.  Not that I recall.  
19  Q.  Did you ever tell any of those  
20  individuals prior to the Commissioner of  
21  Corrections investigators questioning you  
22  that your answers in column yes for 16A and  
23  16B were incorrect?  
24  A.  Not that I recall, ma'am.  
25  Q.  What did Connelly say to you about  

COMPU-TRAN SHORTHAND REPORTING

154

JOSEPH A. VASATURO

1  
2  Spencer?  
3  A.  I asked him if he felt that he  
4  was incoherent, and he said no.  
5  Q.  Did you ask him anything about  
6  whether or not he observed any signs of  
7  withdrawal or mental illness?  
8  A.  Yes.  
9  Q.  What did he say?  
10  A.  No.  
11  Q.  What did you say to Matias and  
12  what did he say to you?  
13  A.  The same couple questions, and  
14  the answer was no.  Nobody noticed anything  
15  out of the ordinary.  
16  Q.  That would have been true for all  
17  four individuals - Connelly, Matias,  
18  Gianpalo and LaPolla?  
19  A.  Yes, ma'am.  
20  Q.  Other than that subjective  
21  communication with those four people,  
22  anything else that you said to them or  
23  anything else that they said to you about  
24  Spencer?  
25  A.  Basically, that I was in shock.  

COMPU-TRAN SHORTHAND REPORTING

155

JOSEPH A. VASATURO

1  
2  Pretty much still in shock.  
3  Q.  Assuming that you had put no for  
4  16A and 16B, Spencer's score would have been  
5  eight; correct?  
6  A.  That is correct.  
7  Q.  And he still would have scored yes  
8  in two of the shaded areas on the form;  
9  correct?  
10  A.  Yes, ma'am.  
11  Q.  Under the circumstances, is it  
12  required by you as the booking officer to  
13  notify your shift supervisor?  
14  A.  Yes, ma'am.  
15  Q.  Did you do that in this case?  
16  A.  No, ma'am.  
17  Q.  Shift supervisor was LaPolla?  
18  A.  Yes, ma'am.  
19  Q.  How come you did not notify  
20  LaPolla?  
21  A.  I believe I overlooked it, ma'am.  
22  Sergeant LaPolla was -- he was in and out.  
23  I may have felt that he did see it.  I  
24  didn't personally deliver it to him, no.  
25  Q.  When you say you may have felt he  

COMPU-TRAN SHORTHAND REPORTING

156

JOSEPH A. VASATURO

1  
2  did see it, do you recall on or about May  
3  20th believing that LaPolla had seen this  
4  form?  
5  A.  No, ma'am.  I didn't personally  
6  bring it.  I didn't call him.  We didn't go  
7  over it together.  
8  Q.  You see in the section where it  
9  says, "Action to be taken by screening  
10  officer.  If total in column A is eight or  
11  more or any shaded box is checked or if the  
12  screening officer feels it is necessary,  
13  notify shift supervisor." It says that  
14  right on the form; correct?  
15  A.  Yes, ma'am.  
16  Q.  Underneath that, there's a section  
17  that says "shift supervisor notified" and  
18  there's a place to check yes or no?  
19  A.  Yes, ma'am.  
20  Q.  And there's a place for the shift  
21  supervisor's name and signature; correct?  
22  A.  Yes.  
23  Q.  All of those portions pertaining  
24  to the shift supervisor are blank; correct?  
25  A.  Yes.  

COMPU-TRAN SHORTHAND REPORTING

157

JOSEPH A. VASATURO

1
2    Q.    Who fills that out?  Is it the
3    supervisor or the booking officer?
4    **A.    The supervisor would fill that**
5    **out, but I guess it would be my job to show**
6    **him.**
7    Q.    In terms of your job to show him,
8    you're required to do that before housing is
9    assigned; correct?
10    **A.    Not necessarily, no.  No, ma'am.**
11    Q.    Aren't you required to show him
12    prior to the time that you determine what
13    level of supervision is instituted?
14    **A.    You would recommend level of**
15    **supervision and a cell, and the sergeant**
16    **would review it and yes or no it.**
17    Q.    When the sergeant reviews it, do
18    they sign off on this form, Exhibit 3?
19    **A.    Yes.  When they review the form,**
20    **they sign off on the form.**
21    Q.    No.  My question is when they
22    review the level of supervision, do they
23    sign the form?
24    **A.    Yes.**
25    Q.    And the level of supervision is

*COMPU-TRAN SHORTHAND REPORTING*

159

JOSEPH A. VASATURO

1
2    MS. BERG:    Read it back.
3    *(The record is read by the reporter.)*
4    **A.    He was notified of the 15 minute**
5    **and told him the reason of the 15 minute.  I**
6    **did it via radio.**
7    Q.    That was after the cell assignment
8    was given?
9    **A.    After I was bringing Mr. Sinkov**
10    **to his cell, I notified him via radio that**
11    **he was on the 15-minute watch.**
12    Q.    Did you at any point in time come
13    to learn that you as the booking officer
14    were required to present the screening
15    guidelines to the supervisor for the
16    supervisor's signature?
17    **A.    Yes.**
18    Q.    In this case, you didn't do that;
19    correct?
20    **A.    That is correct.**
21    Q.    At that time in May 2006, was it
22    your practice to deliver the Suicide
23    Prevention Screening Guideline form to your
24    supervisor for signature prior to housing
25    assignment?

*COMPU-TRAN SHORTHAND REPORTING*

158

JOSEPH A. VASATURO

1
2    determined before housing is assigned;
3    correct?
4    **A.    Yes.**
5    Q.    So in this case, by looking at
6    Exhibit 3, we can see that the shift
7    supervisor was not notified of the score on
8    the form; correct?
9    **A.    Yes.**
10    Q.    The number of shaded boxes, either
11    two or three, depending on whether your 16B
12    column was correct; right?
13    **A.    Yes.**
14    Q.    He was not notified of the mental
15    health supervision instituted, 15-minute
16    supervisory visit; correct?
17    **A.    Yes.**
18    Q.    There's also a section that says
19    mental health referral --
20    **A.    What was the last question?**
21    Q.    The last question?  He was not
22    notified of the mental health supervision
23    instituted, 15-minute supervisory visit?
24    MR. RANDAZZO:    The one
25    before that.

*COMPU-TRAN SHORTHAND REPORTING*

160

JOSEPH A. VASATURO

1
2    **A.    No.  I wouldn't deliver it.**
3    Q.    You wouldn't do it in any case?
4    **A.    I would notify the sergeant.  The**
5    **sergeant would come up.  Actually, come to**
6    **booking and be it there.  I never delivered**
7    **this to the sergeant.  I deliver this to**
8    **medical.**
9    Q.    In terms of the sergeant being
10    notified --
11    **A.    Yes.**
12    Q.    -- to come up to booking, in May
13    of 2006 and as of that time, was it the
14    practice for the shift supervisor to sign
15    off on the Suicide Screening Guideline form?
16    **A.    Yes.  I practiced that.  Sergeant**
17    **would sign off on my forms.**
18    Q.    Other than in Spencer's case, are
19    you aware of any other intakes that you
20    performed where the shift supervisor did not
21    sign off on the form when eight or more were
22    checked or any shaded box was checked or the
23    screening officer felt it was necessary?
24    **A.    I'm not aware of any.**
25    Q.    This is the only one that you're

*COMPU-TRAN SHORTHAND REPORTING*

161

JOSEPH A. VASATURO

1
2  aware of?
3      A.   That a sergeant hasn't signed,
4  yes.
5          Q.   The mental health referral, it
6  says no/yes, complete referral form; do you
7  see that?
8      A.   Yes.
9          Q.   Are you required to fill that part
10  out --
11     A.   Yes.
12         Q.   -- as the booking officer?
13     A.   Yes.
14         Q.   And you didn't do that in this
15  case, either, did you?
16     A.   I didn't.
17         Q.   Did you complete any kind of
18  referral form?
19     A.   I didn't do them.
20         Q.   You didn't check no here, either?
21     A.   No.
22         Q.   In terms of the referral form, is
23  that something that you as the booking
24  officer would be required to complete, or is
25  it somebody else who has that

COMPU-TRAN SHORTHAND REPORTING

162

JOSEPH A. VASATURO

1
2  responsibility?
3      A.   I can do it.  Anybody in the
4  facility can do it, but yes.
5          Q.   How about, though, in terms of the
6  intake, is it the booking officer's
7  responsibility to do the mental health
8  referral form?
9      A.   Sure.  If they feel they need
10  mental health referral, yes.
11         Q.   In No. 8, the question was,
12  "Detainee expresses extreme embarrassment,
13  shame or feeling of humiliation as a result
14  of current charge or this incarceration,"
15  and it's checked yes; correct?
16     A.   Yes.
17         Q.   You didn't write any comments
18  there; correct?
19     A.   That's correct.
20         Q.   Do you recall what Spencer said
21  about that?
22     A.   Yes.
23         Q.   What did he say?
24     A.   He said, "Being a drug dealer is
25  like being a bartender."

COMPU-TRAN SHORTHAND REPORTING

163

JOSEPH A. VASATURO

1
2      That's supposed to be no.  I
3  know it's checked yes.
4          Q.   Are you saying that you made an
5  error in column eight as well?
6      A.   Yes, ma'am.
7          Q.   And it should have been changed to
8  no?
9      A.   Yes, ma'am.
10         Q.   Did you ever tell anybody that
11  prior to today?
12     A.   I tried to explain it to the
13  commissioner.  This is  -- it's done.  I
14  don't know what to do now about it.
15         Q.   Other than the Commissioner of
16  Corrections investigators, did you ever tell
17  anybody that you felt that the answers on
18  this form were in any way incorrect?
19     A.   I notified Mr. Randazzo.
20         Q.   Other than your attorney?
21     A.   No.
22         Q.   In terms of the statement, "being
23  a drug dealer is like being a bartender,"
24  earlier when you testified, you indicated I
25  thought that officer -- Deputy Kristan had

COMPU-TRAN SHORTHAND REPORTING

164

JOSEPH A. VASATURO

1
2  made that statement?
3      A.   Right.  He made the statement.
4  These comments were made.
5          Q.   Who made the statement?
6      A.   Mr. Sinkov.
7          Q.   Not Kristan?
8      A.   Kristan was going through, I
9  guess, what he was saying.  We were talking
10  about what he was saying.
11         Q.   So Kristan said to Spencer, "being
12  a drug dealer is like being a bartender"?
13     A.   Other way around.
14         Q.   Spencer said that to Kristan?
15     A.   Yes, ma'am.
16         Q.   Was there anything else that
17  Kristan said to Spencer as far as you know?
18     A.   Not that I can recall.
19         Q.   And the comment "being a drug
20  dealer is like being a bartender," was that
21  communicated directly to you by Spencer or
22  by Deputy Kristan or both?
23     A.   Both.
24         Q.   And you didn't indicate anything
25  on here about that statement; correct?

COMPU-TRAN SHORTHAND REPORTING

165

JOSEPH A. VASATURO

1  JOSEPH A. VASATURO
2  A.   No, ma'am.
3  Q.   And you didn't indicate anywhere
4  on here the source of that statement;
   correct?
6  A.   No, ma'am.
7  Q.   Anything else that Spencer said to
8  you that relates in any way to No. 8?
9  A.   Why should I be embarrassed,
10 followed by that statement.
11 Q.   Anything else that he said?
12 A.   Pertaining to No. 8?
13 Q.   Yes.
14 A.   No.
15 Q.   Going through the Exhibit 3,
16 No. 1, do you believe your checkmark in
17 column B, no, is correct?
18 A.   Yes, ma'am.
19 Q.   No. 2, do you believe your column
20 B checkmark is correct?
21 A.   Yes, ma'am.
22 Q.   No. 3, do you believe that is
23 correct where you checked yes?
24 A.   Yes, ma'am.  That's what he told
25 me.

*COMPU-TRAN SHORTHAND REPORTING*

167

JOSEPH A. VASATURO

1  believe that should not be checked?
2  A.   That's what I believe, yes,
3  ma'am.
4  Q.   And No. 9, you checked no.  Do
5  you believe that's correct?
6  A.   Yes.
7  Q.   No. 10, you checked no.  Do you
8  believe that's correct?
9  A.   Yes.  That's what he told me.  I
10 believe it's correct.
11 Q.   No. 11, you checked yes.  Do you
12 believe that's correct?
13 A.   No.
14 Q.   That's another one that's wrong on
15 this form?
16 A.   I know what it looks like.
17 Q.   Just answer my question.
18 A.   Yes, ma'am.
19 Q.   And you believe that should be no?
20 A.   I do believe it should be no.
21 Q.   When was the first time, if at
22 all, that you told anybody that?
23 A.   I tried to explain this to the
24 Commissioner of Corrections.

*COMPU-TRAN SHORTHAND REPORTING*

166

JOSEPH A. VASATURO

1  Q.   Is there anything else that he
2  said about that?
3  A.   No.
4  Q.   No. 4, you checked yes there as
5  well?
6  A.   Yes, ma'am.
7  Q.   Do you believe that's correct?
8  A.   That's what he told me.
9  Q.   So you believe it's correct?
10 A.   I believe it was correct.
11 Q.   No. 5, you checked yes?
12 A.   Yes, ma'am.
13 Q.   Do you believe that was correct?
14 A.   That's what he told me.
15 Q.   So you don't feel you need to
16 change that?
17 A.   No.
18 Q.   No. 6, you checked yes.  Do you
19 believe that's accurate?
20 A.   Yes.
21 Q.   No. 7, you checked yes.  Do you
22 believe that's accurate?
23 A.   Yes.
24 Q.   No. 8, you checked yes.  You

*COMPU-TRAN SHORTHAND REPORTING*

168

JOSEPH A. VASATURO

1  Q.   Anyone else other than the
2  investigator from the Commissioner of
3  Corrections?
4  A.   No, ma'am.
5  Q.   What did Spencer say, if anything,
6  with respect to No. 11?
7  A.   He said he was going back to
8  college, and he had a band to look forward
9  to.
10 Q.   And you didn't write any of that
11 on this form, did you?
12 A.   I did not.
13 Q.   Anything else that Spencer said
14 pertaining to No. 11?
15 A.   No, ma'am.
16 Q.   How about No. 12, you checked yes.
17 Do you believe that's correct?
18 A.   I believe it was the first time
19 for him in our jail, yes, ma'am.
20 Q.   And 13, 14 and 15, we went
21 through.  You initially checked yes, but you
22 changed them before the form was finalized;
23 correct?
24 A.   That is correct.

*COMPU-TRAN SHORTHAND REPORTING*

169

JOSEPH A. VASATURO

1

2   Q.   Do you believe the no answers are
3   now the correct answers?
4   A.   Yes, ma'am.
5   Q.   16A and B, you checked yes on both
6   of those, and you testified that you believe
7   those were incorrect; correct?
8   A.   Correct.
9   Q.   If that made sense.
10       No. 13, "Detainee showed signs of
11  depression, crying, emotional flatness;" do
12  you see that?
13  A.   Yes, ma'am.
14  Q.   Do you have any understanding as
15  to what "emotional flatness" means?
16  A.   In my mind, it means no
17  expression.  Just answering yes, no, yes,
18  no.
19  Q.   Do you believe if anybody
20  reviewing this form saw your statement
21  about, quote, "very laid back," they might
22  think it related to somebody exhibiting
23  emotional flatness?
24       MR. RANDAZZO:   Objection to
25  the form.

COMPU-TRAN SHORTHAND REPORTING

170

JOSEPH A. VASATURO

1

2       MR. KLEINBERG:   Objection.
3       MR. RANDAZZO:   You can
4   answer it.
5   A.   In my mind, that never crossed my
6   mind.
7   Q.   In terms of your decision to place
8   Spencer on a 15-minute watch, did anybody
9   else have input into that decision?
10  A.   No, ma'am.
11  Q.   If you take a look at the ADM-330
12  form, Exhibit 1 that we went over earlier
13  today, the form is different at the bottom
14  where it says action, in that Exhibit 1, the
15  Commission of Corrections form says that if
16  eight or -- if the score is eight or more or
17  any shaded box is checked, you have to
18  institute constant watch?
19  A.   I see that.
20  Q.   On the Putnam County form, it
21  doesn't indicate that constant watch should
22  be instituted under those circumstances.  It
23  gives the booking officer the option of
24  doing routine, 15 minute or constant;
25  correct?

COMPU-TRAN SHORTHAND REPORTING

171

JOSEPH A. VASATURO

1

2   A.   Yes, ma'am.
3   Q.   In terms of the ADM-330 Exhibit 1,
4   for the medical mental health referring
5   section, it has signature and badge number
6   of screening officer; do you see that?
7   A.   Yes.
8   Q.   And on the Putnam County form,
9   that screening officer and inmate section,
10  is broken out separately; correct?
11  A.   Yes.
12  Q.   On the Exhibit 1, ADM, the
13  330-ADM, there's no signature line for the
14  inmate; correct?
15  A.   Yes.
16  Q.   But that is on the Putnam County
17  form; right?
18  A.   Yes.
19  Q.   Prior to the inmate signing the
20  Putnam County form Exhibit 3, is the form
21  filled out as it is there before you?
22  A.   Prior to him signing it?
23  Q.   Yes.
24  A.   Yes.
25  Q.   So when the inmate signs, they can

COMPU-TRAN SHORTHAND REPORTING

172

JOSEPH A. VASATURO

1

2   see that they've been placed on a specific
3   level of watch; correct?
4   A.   Yes, they can see.
5   Q.   Do you have any understanding as
6   to who determined to alter the Commission of
7   Corrections form, the ADM-330?
8       MR. RANDAZZO:   Objection to
9   the form.
10      You can answer.
11  A.   I don't know, ma'am.
12  Q.   Do you have any understanding as
13  to who made the decision not to provide the
14  ADM-330 which is required in Section 15.2 of
15  Putnam County's rules and regulations?
16  A.   No, ma'am.
17  Q.   Did you ever tell LaPolla that the
18  reason you were placing -- withdrawn.
19      Did you ever tell LaPolla as to
20  the reason or reasons why you placed Spencer
21  on a 15-minute watch?
22  A.   I believe I told him because of
23  the use of drugs and answers on the suicide
24  screening.
25  Q.   Was that on the P-1 or verbally?

COMPU-TRAN SHORTHAND REPORTING

173

JOSEPH A. VASATURO

1 
2 　A.　That was on the P-1. Verbally,
3 I'm not positive.
4 　Q.　Why did you place Spencer on a
5 15-minute watch?
6 　A.　Due to the medical screening and
7 answers given on the suicide screening.
8 　Q.　What about the medical screening
9 caused you to place him on a 15-minute
10 watch?
11 　A.　Six months ago, the recent drug
12 use on the medical. That was about it from
13 the medical.
14 　Q.　What about the suicide screening?
15 What caused you to place him on a 15-minute
16 watch?
17 　A.　Just the heightened number. Just
18 the level.
19 　Q.　That he had ten?
20 　A.　Yes.
21 　Q.　Anything else?
22 　A.　That his brother and girlfriend
23 tried to hurt themselves.
24 　Q.　Anything else as to the reason you
25 placed him on a 15-minute watch?

174

JOSEPH A. VASATURO

1 
2 　A.　No, ma'am.
3 　Q.　Is there some reason why you
4 didn't place him on constant watch?
5 　A.　From speaking with him, his
6 demeanor, his attitude, the way he was
7 answering, I know it's a little late to say
8 now, I didn't feel like he was going to hurt
9 himself.
10 　Q.　At that time in May 2006, you were
11 unaware of any requirement to put him on
12 constant watch; correct?
13 　A.　Yes, ma'am.
14 　Q.　Based on the scores that are
15 indicated on Exhibit 3?
16 　A.　Yes, ma'am.
17 　　　　MS. BERG:　Let me have
18 marked as Exhibit 4, a copy of a P-1 dated
19 May 20, 2006 from Correction Officer
20 Vasaturo to all members of correction
21 division.
22 　　　(Whereupon, Plaintiff's Exhibit 4,
23 5/20/06 P-1, was marked for identification.)
24 　Q.　Is that the P-1 that you delivered
25 to the briefing room and medical?

175

JOSEPH A. VASATURO

1 
2 　A.　The housing unit received one and
3 briefing room.
4 　Q.　Does medical receive that?
5 　A.　I didn't give one to medical, no.
6 　Q.　Have you in the past provided a
7 P-1 of that nature to medical as well?
8 　A.　Sometimes I have. Not all the
9 time.
10 　Q.　Did you ever communicate with
11 Sergeant LaPolla about that P-1?
12 　A.　Yes.
13 　Q.　Other than when he asked you if it
14 was done and you said yes?
15 　A.　No.
16 　Q.　Did you ever discuss with him
17 anything about what's contained in that P-1?
18 　A.　No.
19 　Q.　Did he ever ask you any questions
20 about the basis for the 15-minute check?
21 　A.　I believe he did. I believe I
22 told him because it was a recent use of
23 drugs.
24 　Q.　Verbally you told him that?
25 　A.　Yes.

176

JOSEPH A. VASATURO

1 
2 　Q.　Did you say anything to him when
3 he verbally asked you that about the score
4 on the suicide screening forms?
5 　A.　I don't believe he asked me about
6 the score.
7 　Q.　But when he asked you why he was
8 placed on the 15-minute check and you said
9 because of recent use of heroin, did you
10 also indicate it was because of the answers
11 given on the suicide screening as you put
12 here in the P-1?
13 　A.　No, ma'am.
14 　Q.　Is there some reason why you left
15 that out when you spoke with LaPolla?
16 　A.　No special reasons. This is
17 supposed to be read and signed by all
18 members.
19 　Q.　Did LaPolla ask you to review at
20 any point in time the medical or suicide
21 screening forms?
22 　A.　No, ma'am.
23 　Q.　On the P-1, you indicated that the
24 15-minute supervisory check was due to
25 recent use of drugs and answers given on the

177

JOSEPH A. VASATURO

1  JOSEPH A. VASATURO
2  suicide screening. I read that correctly?
3  A.  Yes.
4  Q.  And you didn't indicate anything
5  about the score on the suicide screening;
6  correct?
7  A.  No.
8  Q.  And you didn't indicate anything
9  about any shaded boxes being checked?
10  A.  No.
11  Q.  And you didn't amplify what about
12  those answers led you to place them on the
13  15-minute watch, did you?
14  A.  No, ma'am.
15  Q.  Did LaPolla or anybody else, any
16  supervisor ever ask you anything along those
17  lines?
18  A.  No, ma'am.
19  MS. BERG:  Let me have
20  marked as Exhibit 5, a copy of a Mental
21  Health Routing Sheet.
22  (Whereupon, Plaintiff's Exhibit **5**,
23  MENTAL HEALTH ROUTING SHEET, was marked for
24  identification.)
25  Q.  Have you ever seen this form

COMPU-TRAN SHORTHAND REPORTING

179

JOSEPH A. VASATURO

1  JOSEPH A. VASATURO
2  conversations with her about Spencer?
3  A.  No, ma'am.
4  Q.  There's nothing checked but the
5  written comment seems to indicate history of
6  substance abuse and family problems; do you
7  see that?
8  A.  Yes, ma'am.
9  Q.  Do you have any understanding as
10  to what Sue Waters based that statement on?
11  **A.  I can take a guess, ma'am, but**
12  **no.**
13  Q.  You never spoke with her about it?
14  A.  No, ma'am.
15  Q.  And the section that says action
16  by supervisor, referred 15-minute check,
17  move to other housing, constant watch, is
18  that something that you're required to fill
19  out?
20  **A.  Not required.  If I feel -- if I**
21  **felt he needed to see a psychiatrist, then I**
22  **would fill this out.  I would hand it to the**
23  **sergeant.  The sergeant would do the**
24  **supervisor part and hand it to medical.**
25  **From there, I don't know.**

COMPU-TRAN SHORTHAND REPORTING

178

JOSEPH A. VASATURO

1  JOSEPH A. VASATURO
2  before, Exhibit 5?
3  A.  Yes, ma'am.
4  Q.  Have you ever had occasion to
5  complete that form?
6  A.  Yes, ma'am.
7  Q.  When do you do that?
8  **A.  When you feel that they need to**
9  **be seen by a doctor.**
10  Q.  For any reason?
11  A.  Yeah, any reason.
12  Q.  Medical and psychiatric?
13  A.  Yes, ma'am.  Any reason.
14  Q.  In this case, you can see that the
15  inmate name is Spencer Sinkov?
16  A.  Yes.
17  Q.  And it's dated May 20, 2006?
18  A.  Yes, ma'am.
19  Q.  And it seemed to be filled out by
20  staff member Sue Waters, RN; do you see
21  that?
22  A.  Yes, ma'am.
23  Q.  Do you know who she is?
24  A.  Facility nurse.
25  Q.  Did you ever have any

COMPU-TRAN SHORTHAND REPORTING

180

JOSEPH A. VASATURO

1  JOSEPH A. VASATURO
2  Q.  Are you aware of any situations
3  where medical has instituted a mental health
4  referral?
5  **A.  I'm not aware of any situations,**
6  **but anybody can do it.**
7  Q.  Did you ever see any documents
8  pertaining to Paul Clark's -- Peter Clark's
9  assessment of Spencer Sinkov?
10  A.  I have not.
11  Q.  Have you ever seen any documents
12  that Americor or staff nurses complete when
13  they do that initial intake?
14  A.  No, ma'am.
15  Q.  Are you aware that they take notes
16  or maintain any records about that?
17  A.  I'm not sure what they do, ma'am.
18  Q.  Have you ever seen anything called
19  a progress note?
20  **A.  No, ma'am.  Not that I can**
21  **recall.**
22  MS. BERG:  Let me have
23  marked as Exhibit 6, a copy of a
24  typewritten document consisting of two
25  pages called a Jail Management System

COMPU-TRAN SHORTHAND REPORTING

181

JOSEPH A. VASATURO

1  JOSEPH A. VASATURO
2  Booking Slip.
3  (Whereupon, Plaintiff's Exhibit **6**,
4  JAIL MANAGEMENT SYSTEM BOOKING SLIP, was marked
   or identification.)
6  Q.  Have you ever seen Exhibit 6
7  before?
8  A.  **Yes, ma'am.**
9  Q.  Are you familiar with the form of
10 it?
11 A.  **Yes.**
12 Q.  Is that a computer-generated
13 document?
14 A.  **Yes, ma'am.**
15 Q.  Do you have any responsibility for
16 keeping any of the entries on that?
17 A.  **Yes, ma'am.**
18 Q.  What part of it do you complete?
19 A.  **The whole thing except for the**
20 **release part.**
21 Q.  When do you complete that?
22 A.  **Inmate hold remarks.**
23 Q.  When do you complete that form?
24 A.  **This is done when you do the**
25 **computer work.**

*COMPU-TRAN SHORTHAND REPORTING*

183

JOSEPH A. VASATURO

1  JOSEPH A. VASATURO
2  about the drug use?
3  A.  **I just wanted to list his**
4  **medications.**
5  Q.  Is there some reason why you
6  wanted to list his medications?
7  A.  **It's common practice to put the**
8  **medications on there.**
9  Q.  Is it common practice to include
10 anything about any other substance that the
11 inmate is ingesting or has taken?
12 A.  **No.  This is the old --**
13 Q.  Has this changed since then?
14 A.  **Well, no.  Not really.  There's a**
15 **new system in motion.  You can still put the**
16 **comments in there.  You can put everything**
17 **in there if you want.**
18 Q.  Is there anything different about
19 the new system as it would relate to listing
20 other substances somebody ingested or took?
21 A.  **No.**
22 Q.  Does your supervisor review the
23 booking slip as part of the process?
24 A.  **No.**
25 MS. BERG:  Let me have

*COMPU-TRAN SHORTHAND REPORTING*

182

JOSEPH A. VASATURO

1  JOSEPH A. VASATURO
2  Q.  When is that?
3  A.  **After everything, after the**
4  **screening is done, after the prints are**
5  **done, then you do it in the computer.**
6  Q.  Is that before the inmate is taken
7  to his cell?
8  A.  **No, it doesn't have to be.**
9  Q.  Sometimes it's after?
10 A.  **Yes.**
11 Q.  Here where it says booking
12 remarks, you wrote takes Lunesta?
13 A.  **Yes, ma'am.**
14 Q.  You didn't write anything about
15 use of heroin, did you?
16 A.  **No, ma'am.**
17 Q.  Nothing about any basis for
18 15-minute watch?
19 A.  **No, ma'am.**
20 Q.  No indication on there about any
21 history of drug use or rehab or anything
22 else; correct?
23 A.  **That's right, ma'am.**
24 Q.  Why is it that you in the booking
25 room wrote takes Lunesta but not anything

*COMPU-TRAN SHORTHAND REPORTING*

184

JOSEPH A. VASATURO

1  JOSEPH A. VASATURO
2  marked as Exhibit 7, a copy of the Inmate
3  Medical Intake record.
4  (Whereupon, Plaintiff's Exhibit **7**,
5  INMATE MEDICAL INTAKE RECORD, was marked for
6  identification.)
7  Q.  Take a look if you would at
8  Exhibit 7.  Is that something that you
9  completed as well with respect to Spencer
10 Sinkov?
11 A.  **Yes, ma'am.**
12 Q.  Is this the form that you said
13 that Sergeant LaPolla was beginning to
14 complete and you told him that you would
15 take care of it?
16 A.  **Yes, ma'am.**
17 Q.  Which part of it is LaPolla's
18 handwriting, if you know?
19 A.  **Right up to the line where it**
20 **says employer.**
21 Q.  From there down is everything you
22 wrote?
23 A.  **Yes, ma'am.**
24 Q.  Where it says personal physician,
25 Abdu, it has a line through it.  Is that

*COMPU-TRAN SHORTHAND REPORTING*

185

### JOSEPH A. VASATURO

1
2  your handwriting?
3  **A.  Yes, ma'am.**
4  **Q.**  Do you have any recollection as to
5  why you wrote that and then crossed it out?
6  **A.  I believe I crossed it out**
7  **because -- I don't recall what he said.**
8  **Q.**  On the bottom right of the
9  document, there's a box with an arrow
10  pointing up and it says reread initial date
11  5/20/06 PA Clark; do you see that?
12  **A.  Yes, ma'am.**
13  **Q.**  Do you have any understanding that
14  the Americor staff is required to review the
15  inmate medical intake record?
16  **A.  I'm not positive on their**
17  **policies, ma'am.**
18  **Q.**  On the next page, all of the
19  checkmarks in the columns, are those yours
20  as well as the comment section?
21  **A.  Yes, ma'am.**
22  **Q.**  You signed it at the bottom?
23  **A.  I did.**
24  **Q.**  And Spencer signed it?
25  **A.  Yes, ma'am.**
*COMPU-TRAN SHORTHAND REPORTING*

186

### JOSEPH A. VASATURO

1
2  **Q.**  Do you believe that any of these
3  boxes need to be changed because they're now
4  incorrect?
5  **A.  No, ma'am.**
6  **Q.**  You believe everything on this
7  page is accurate?
8  **A.  Yes, ma'am.**
9  **Q.**  26 says, "Smoke, what, how much -
10  cigs, one pack day"?
11  **A.  Cigarettes one pack a day.**
12  **Q.**  Did you ever take Spencer for a
13  cigarette break, smoking break at the rec
14  yard?
15  **A.  No, ma'am.**
16  **Q.**  Did he ever ask to go?
17  **A.  No.**
18  **Q.**  Do you know if anybody ever
19  offered for him to go?
20  **A.  I don't know, ma'am.**
21  **Q.**  Do you know if anybody ever took
22  him for one?
23  **A.  I do not know.  When he got there**
24  **at night, it's lock down.  There is no**
25  **cigarettes.**
*COMPU-TRAN SHORTHAND REPORTING*

187

### JOSEPH A. VASATURO

1
2  **Q.**  What about the next day?
3  **A.  He would be locked in because**
4  **he's unclassified.**
5  **Q.**  He wouldn't be permitted to go and
6  have a cigarette?
7  **A.  No, ma'am.**
8  **Q.**  At the discretion of the NHU
9  officer, could he be permitted to go for a
10  cigarette?
11  **A.  No, ma'am.**
12  **Q.**  Spencer was initially assigned to
13  cell 29, and it was later changed to cell
14  seven; do you recall that?
15  **A.  Yes, ma'am.**
16  **Q.**  Why was that change made?
17  **A.  It was and still is common**
18  **practice to put 15-minute checks downstairs**
19  **in the North Housing Unit.**
20  **Q.**  Is cell 29 on NHU?
21  **A.  No.**
22  **Q.**  It's a different unit?
23  **A.  Yes, ma'am.**
24  **Q.**  What's that unit?
25  **A.  West Housing Unit.**
*COMPU-TRAN SHORTHAND REPORTING*

188

### JOSEPH A. VASATURO

1
2  **Q.**  And an unclassified inmate can go
3  to West Housing Unit?
4  **A.  Yes, they can.**
5  **Q.**  You said that's common practice to
6  have 15-minute checks downstairs in NHU.
7  Why is that, if you know?
8  **A.  It is common practice for 15**
9  **minutes and unclassified.  Unclassified and**
10  **15 minutes also go upstairs if there's no**
11  **room downstairs.  I don't know why it's**
12  **common practice.**
13  **Q.**  Did anyone ever tell you why that
14  is?
15  **A.  No, ma'am.**
16  **Q.**  Did you ever have occasion to
17  review any policies or procedures that
18  Americor has in place with respect to its
19  staff?
20  **A.  No, ma'am.**
21        MS. BERG:   Let me have
22  marked as Exhibit 8, a copy of a Suicide
23  Prevention and Crisis Intervention manual.
24  It says Basic Program Trainer's Manual.
25  (*Whereupon, Plaintiff's Exhibit 8,*
*COMPU-TRAN SHORTHAND REPORTING*

189

### JOSEPH A. VASATURO

SUICIDE PREVENTION & CRISIS INTERVENTION, BASIC
PROGRAM TRAINERS MANUAL, was marked for
identification.)

Q.   Did you ever see Exhibit 8?

A.   **No, ma'am.  Not that I can
recall.**

Q.   Did you ever -- withdrawn.

On the front page, there's a
handwritten note that says C.O. never had
before.  Do you have any understanding as to
what that refers to?

A.   **No, ma'am.**

Q.   Following the bottom pages,
there's a section that says 1-4 or I-4.
It's about seven or eight pages in.
"Components of effective suicide prevention
risk management program;" do you see that?

A.   **Yes.**

Q.   "Screening for suicide risk" is
the first entry and the second one,
"supervision one-to-one only effective
supervision for suicide prevention;" do you
see that?

A.   **Yes, ma'am.**

---

### JOSEPH A. VASATURO

Q.   That's something that was
communicated to you?

A.   **I don't recall if that exact
phrasing was indicated, but if they scored a
one and you feel they need a suicide watch,
they go on suicide watch.**

Q.   With respect to the score of eight
on the form, did anybody ever instruct you
that that was an indicator that the person
was a high risk?

A.   **High risk, yes.  Automatically
constant watch, no.**

Q.   And with respect to the use of
that form, did anyone ever indicate to you
the New York State Commission on Corrections
has regulations pertaining to the scores on
that form and the shaded boxes?

A.   **Not that I'm aware of, no.**

Q.   On the next page, it indicates the
actions to be taken by officer.  "Notify
supervisor if any answers indicate
notification and check yes or no."  That
would be on the form itself; correct?

A.   **Yes, ma'am.**

---

190

### JOSEPH A. VASATURO

Q.   Did anyone ever instruct you that
constant supervision one-to-one was the only
effective supervision for suicide
prevention?

A.   **Not that I recall, ma'am.
Suicide prevention, you know, would be
one-on-one.**

Q.   With respect to -- turn if you
would to the end section, Roman Numeral
VI-10.  It's 15 to 20 pages from the end.

Did anybody ever instruct you
that with respect to the score of eight on
the suicide prevention form, that a person
with a lower score can still be a suicide
risk?

A.   **Can you repeat that?**

Q.   There's a note in the column on
the right-hand side, the score of eight is
an arbitrary threshold.  A person with a
lower score may be a suicide risk.

Did anyone ever instruct you or
train you on that?

A.   **Yes, ma'am.  I was trained in
that.**

---

192

### JOSEPH A. VASATURO

Q.   Do you have any understanding as
to why it says supervisor must be notified
prior to cell assignment?

A.   **So they can make the
determination where the cell would be.**

Q.   Do you have any understanding as
to why the supervisor is supposed to be
involved in that decision?

A.   **They would have more
understanding of the situation.**

Q.   Take a look if you would at Roman
Numeral VII-8.  "Supervising the suicidal
inmate;" do you see that section?

A.   **Yes, ma'am.**

Q.   Did anybody ever instruct you on
number -- the second bullet there, "constant
supervision should be given immediately to
all high-risk inmates"?

A.   **No, ma'am.  Not that I can
recall, no.**

Q.   Did anybody ever instruct you with
respect to the next bullet, "less than
constant supervision is inadequate for
suicidal persons.  A person can die within

193

**JOSEPH A. VASATURO**

1
2  three minutes of hanging"?
3     **A.   Yes.**
4     **Q.**   You received that as part of your
   training?
6     **A.   Yes, ma'am.**
7          MS. BERG:   I'm going to
8  have mark as Exhibit 9, a copy of a
9  document that's called Officer's Handbook,
10  Suicide Prevention and Crisis Intervention
11  in County Jails and Police Lockups.
12  (*Whereupon, Plaintiff's Exhibit 9,*
13  *OFFICER'S HANDBOOK, SUICIDE PREVENTION AND*
14  *CRISIS INTERVENTION IN COUNTY JAILS AND POLICE*
15  *LOCKUPS, was marked for identification.*)
16     **Q.**   Take a look if you would at
17  Exhibit 9. Have you ever seen that before?
18     **A.   Yes, ma'am.**
19     **Q.**   When did you first see that?
20     **A.   In in-service training.**
21     **Q.**   What year?
22     **A.   2006.**
23     **Q.**   So that was the training you had
24  in March '06?
25     **A.   Yes, ma'am.**
        *COMPU-TRAN SHORTHAND REPORTING*

194

**JOSEPH A. VASATURO**

1
2     **Q.**   So that would have been before
3  Spencer Sinkov came to the facility;
4  correct?
5     **A.   Yes, ma'am.**
6     **Q.**   Take a look if you would at page
7  17. Suicide Prevention Tools. Section on
8  the very bottom that says supervising.
9  "According to the Commission of Corrections
10  regulations, constant supervision should be
11  given to all high-risk inmates."
12          Do you see that?
13     **A.   I see that.**
14     **Q.**   So it's fair to say, is it not,
15  that prior to May of 2006, you were, in
16  fact, advised at least through the manual
17  that the Commission of Correction did have
18  regulations requiring constant supervision
19  for high-risk inmates?
20     **A.   Through this manual, I see that.**
21     **Q.**   Were you aware of any Putnam
2   County policies that mirrored that manual's
2ᵌ  statement?
24     **A.   No, ma'am.**
25          MS. BERG:   I'm sorry. I
        *COMPU-TRAN SHORTHAND REPORTING*

195

**JOSEPH A. VASATURO**

1
2  didn't hear your answer.
3     (*The record is read by the reporter.*)
4     **Q.**   Did anyone ever instruct you as
5  part of your training or otherwise that the
6  Commission of Correction regulations did not
7  mandate certain conduct on your part as an
8  employee of Putnam County?
9          MR. RANDAZZO:   Objection to
10  the form.
11     **A.   Could you repeat the question.**
12     **Q.**   Sure. Did anyone ever tell you
13  even though the Commission of Correction had
14  certain regulations, you were not obligated
15  to follow them?
16     **A.   No, ma'am.**
17     **Q.**   Were you aware at any point in
18  time that Spencer had received a visit from
19  his family?
20     **A.   I was aware when I came back to**
21  **work that day.**
22     **Q.**   How were you made aware of that?
23     **A.   I was just told that we had an**
24  **inmate commit suicide.**
25     **Q.**   Who told you that?
        *COMPU-TRAN SHORTHAND REPORTING*

196

**JOSEPH A. VASATURO**

1
2     **A.   It was shortly after his visit.**
3     **Q.**   Who told you that?
4     **A.   I don't recall, ma'am. It was**
5  **the main control officer. It was as soon as**
6  **I came in.**
7     **Q.**   Did anyone ever indicate to you
8  anything about the visit that Spencer had
9  with his family?
10     **A.   No, ma'am.**
11     **Q.**   Did you ask anyone any questions
12  about it?
13     **A.   No.**
14     **Q.**   Did anyone say anything that they
15  heard during that visit?
16     **A.   No, ma'am.**
17          MS. BERG:   Why don't we
18  take a few minutes. I'm going to see
19  where we are at. Hopefully, we can finish
20  you before lunch.
21          Off the record.
22     (*Off-the-record discussion*)
23     (*Luncheon recess taken*)
24          MS. BERG:   Can you mark
25  this as 10.
        *COMPU-TRAN SHORTHAND REPORTING*

197

JOSEPH A. VASATURO

1
2   (Whereupon, Plaintiff's Exhibit 10,
3   LOGBOOK, was marked for identification.)
4   CONTINUED EXAMINATION BY
5   MS. BERG:
6       Q.   I had marked as Exhibit 10, a copy
7   of a logbook. Let me show that to you.
8           First of all, are you familiar
9   with the document itself?
10      A.   The logbook?
11      Q.   Yes.
12      A.   Yes.
13      Q.   And it's required to be completed
14  at the NHU-1 housing unit?
15      A.   Yes.
16      Q.   Do each of the housing units have
17  their own logbooks?
18      A.   Yes.
19      Q.   When you serve on the dual post of
20  South Housing Unit and North Housing Unit-1,
21  do you make entries in each of their
22  respective logbooks?
23      A.   Yes.
24      Q.   Even though you're serving both
25  posts at the same time?

COMPU-TRAN SHORTHAND REPORTING

199

JOSEPH A. VASATURO

1
2       A.   No, no.  60-minute intervals,
3   you're supposed to -- with the 15-minute
4   checks, what they're doing.  If they're
5   laying down, standing up, sitting, watching
6   TV.
7       Q.   If everyone in NHU is on a routine
8   level of supervision, what are you writing
9   down?
10      A.   If everyone is on routine, it
11  would be that you check the housing unit.
12  How many males are there and if they're all
13  secure or not.
14      Q.   How often do you do that?  Every
15  30 minutes?
16      A.   If everybody in the unit is on
17  routine?
18      Q.   Yes.
19      A.   It's every 30 minutes.
20      Q.   What do you do at 60-minute
21  intervals?
22      A.   For the 15-minute checks, you
23  write what they're doing, their activities.
24  If they're laying down, if they're sitting
25  up, watching television.

COMPU-TRAN SHORTHAND REPORTING

198

JOSEPH A. VASATURO

1
2       A.   Yes.
3       Q.   Are you familiar with any
4   requirements with respect to what's supposed
5   to be noted in the logbook?
6       A.   Yes.
7       Q.   What's supposed to be noted in
8   there?
9       A.   Your tour, the tour of your
10  check.
11      Q.   What are you supposed to note
12  during that tour?
13      A.   If they're all secure or not. I
14  believe every 60 minutes or so.  Actually,
15  what they're doing.
16      Q.   Anything else that you're supposed
17  to note in there?
18      A.   Any activities. Medications. If
19  they go to the shower.  If they shave.
20      Q.   And that would be for all levels
21  of inmates - routine, 15-minute check?
22      A.   Yes.
23      Q.   And you said you're supposed to
24  note if they're all secured every 60
25  minutes?

COMPU-TRAN SHORTHAND REPORTING

200

JOSEPH A. VASATURO

1
2       Q.   So it's more specific?
3       A.   Yes.
4       Q.   Are you familiar with any
5   requirements with respect to noting actual
6   time of your check versus rounding off the
7   time?
8       A.   Yes.
9       Q.   What are you familiar with in that
10  regard?
11      A.   It should be the actual time of
12  your check instead of rounding off.
13      Q.   When did you first learn that?
14      A.   I'd say maybe a year and a half
15  ago.  It was being pushed.
16      Q.   When you say "being pushed," what
17  do you mean by that?
18      A.   Stressed by our leaders.
19      Q.   Do you recall anything as to why
20  it was being stressed a year and a half ago?
21      A.   I'm not sure why.
22      Q.   Were you ever counseled with
23  respect to whether or not you rounded off
24  your times in the logbooks?
25      A.   No.

COMPU-TRAN SHORTHAND REPORTING

201

**JOSEPH A. VASATURO**

1
2  **Q.** Did anyone ever ask you any
3  questions about whether or not you rounded
4  times off?
5  **A.** No.
6  **Q.** Did anybody ever indicate to you
7  that any investigation was done which caused
8  somebody to form the opinion that you were
9  rounding off time as opposed to writing down
10  actual times?
11  **A.** No.
12  **Q.** Did you ever receive any
13  discipline for doing anything like that?
14  **A.** No.
15  **Q.** In the left-hand column of the
16  logbook, it starts 001, 002 and counts down,
17  each entry giving a separate number; do you
18  see that?
19  **A.** Yes.
20  **Q.** Do they just follow sequentially;
21  correct?
22  **A.** Yes.
23  **Q.** The second column is the actual
24  time?
25  **A.** Yes.

*COMPU-TRAN SHORTHAND REPORTING*

202

**JOSEPH A. VASATURO**

1
2  **Q.** Have you ever had occasion to go
3  back into a logbook and document something
4  that you forgot to document earlier?
5  **A.** Yes.
6  **Q.** How often have you done that?
7  **A.** Two or three times.
8  **Q.** In what connection?
9  **A.** A shower. Smoke break. I'm not
10  positive what it was for, but I do recall
11  making a delayed entry, yes.
12  **Q.** Do you recall on the occasion that
13  you made the delayed entry, how you went
14  about doing it? Did you go back to the
15  entry point where it should have been
16  included or out of sequence?
17  **A.** It will be out of sequence and
18  labeled DE, delayed entry.
19  **Q.** With respect to the logbook
20  itself, if you turn the pages of Exhibit 10,
21  you can see on the top right and left side,
22  the pages seem to have, what's not cut off,
23  a typewritten number on them. Do you see
24  where that is?
25  **A.** Yes.

*COMPU-TRAN SHORTHAND REPORTING*

203

**JOSEPH A. VASATURO**

1
2  **Q.** Those numbers are already in the
3  logbook when you receive it?
4  **A.** Yes.
5  **Q.** Take a look if you would at the
6  page labeled 40. It's May 20, 2006 at the
7  top left. It says entry 1295.
8      You see where it has the 40
9  there?
10  **A.** Yes.
11  **Q.** And it looks like there's
12  something written either on top of it or
13  near it. Do you have any understanding as
14  to what that is?
15  **A.** I do not.
16  **Q.** Have you ever seen the logbooks
17  where those typewritten numbers have been
18  changed?
19  **A.** No.
20  **Q.** Turning your attention to the
21  entries for May 20, 2006 starting at page
22  40, are any of those your entries?
23  **A.** Yes.
24  **Q.** Would the first one be 1311?
25  **A.** 1311?

*COMPU-TRAN SHORTHAND REPORTING*

204

**JOSEPH A. VASATURO**

1
2  **Q.** Yes.
3  **A.** Yes.
4  **Q.** That's the first entry that you
5  made on that shift; correct?
6  **A.** Yes.
7  **Q.** Do you recall on the evening of
8  May 20th, when you were serving as booking
9  officer, that you had duty or responsibility
10  for NHU?
11  **A.** Yes.
12  **Q.** What happened?
13  **A.** I took over checks for South
14  Housing Unit officer.
15  **Q.** Why did you do that?
16  **A.** That was -- well, the housing
17  unit, that was my time to be down there.
18  **Q.** So even when you were serving as
19  booking officer, you also had to take over
20  those checks?
21  **A.** Yes.
22  **Q.** During this period of time, were
23  you also making entry in the South Housing
24  Unit logbook?
25  **A.** Yes.

*COMPU-TRAN SHORTHAND REPORTING*

205

JOSEPH A. VASATURO

1
2    Q.    Then, in terms of the shift, once
3    0730 comes around, is the South Housing Unit
4    manned by an individual and North Housing
     Unit-1 has a separate individual?
6    A.    Yes.
7    Q.    In connection with these entries,
8    can you see where it has 1306, the time is
9    0157, received one male, Sinkov, Spencer E.?
10   A.    Yes.
11   Q.    That would have been the time that
12   Spencer was escorted to his cell, number
13   seven; correct?
14   A.    Yes.
15   Q.    Do you know who made that entry?
16   A.    The names are cut -- Officer
17   Gianpalo.
18   Q.    Did you escort Spencer to his
19   cell?
20   A.    With Officer Gianpalo, yes.
21   Q.    Did you have any conversations
22   with Officer Gianpalo about Spencer?
23   A.    No, I did not.  I handed her the
24   P-1 that goes with the unit.  We both
25   brought him to the cell.

206

JOSEPH A. VASATURO

1
2    Q.    I was just asking if you had any
3    conversations with Gianpalo.
4    A.    No.
5    Q.    Starting at 0300 when you began
6    your checks, your times in the book are
7    3:00, 3:15, 3:30, 3:45, 4:00, 4:15, 4:30,
8    4:45; correct?
9    A.    Yes.
10   Q.    Did you round off any of those
11   times?
12   A.    I don't feel I rounded them off.
13   Q.    Do you think they were precise?
14   A.    I used an electronic recording
15   device that should be somewhere.  The
16   records should be somewhere of the exact
17   time.  This is the time that the clock said
18   when I rounded.  At night, it doesn't take
19   as long because they're not up and out
20   about.  They're lying down.
21   Q.    So at night, how long would it
22   take you to do the check?  For example, the
23   one you did at 3:00?
24   A.    Three minutes.
25   Q.    During the day, if you were to

207

JOSEPH A. VASATURO

1
2    perform that same check, it would be more
3    than three minutes in length?
4    A.    Or so, yeah, I would say.  Six,
5    seven minutes.
6    Q.    At the time you made these entries
7    on May 20, 2006, was there any effort to
8    push, at that time, writing down actual time
9    as opposed to rounding it off, or did that
10   come after this?
11   A.    I don't recall when it was
12   expressed to write the actual time.  But
13   again, my actual time should be on the clock
14   system.
15   Q.    With respect to your entries
16   between 3:00 and 4:45, only one of them is
17   actually referred to as a 15-minute check;
18   correct, the one for 3:15?
19   A.    That is correct.
20   Q.    Why is that?
21   A.    I'm not sure.
22   Q.    If you take --
23   A.    I have to check the whole unit
24   every 15 minutes.
25   Q.    If you take a look at the logbook

208

JOSEPH A. VASATURO

1
2    in terms of May 20, 2006, after your note of
3    15-minute check at 3:15, the very next time
4    that 15-minute supervisory check is actually
5    documented is at 8:17, line entry 1393.  Do
6    you see that?
7    A.    Yes.
8    Q.    Did you ever speak with anybody
9    who was on the North Housing Unit or
10   covering the South Housing Unit at North
11   Housing Unit together about doing the
12   15-minute checks for Spencer?
13   A.    I gave them the P-1 saying he was
14   on a 15-minute check.  That was passed on.
15   Q.    Other than that?
16   A.    No.  Not that I recall.
17   Q.    Do you know if anybody else on the
18   unit was on 15-minute checks at that time?
19   A.    There was -- I don't recall, but
20   according to this, there was two males there
21   on 15.
22   Q.    Do you recall the other male being
23   an inmate Kirby?
24   A.    The name is familiar.  I don't
25   recall Kirby himself.

209

JOSEPH A. VASATURO

1
2  Q.  You indicated earlier that the
3  State Commission of Correction had two
4  investigators come to the department and
5  interview you?
6  A.  Yes.
7  Q.  Do you recall their names?
8  A.  I don't recall their names.
9  Q.  Do you recall when the interview
10  took place?
11  A.  I don't recall if it was October
12  or November of '06.
13  Q.  Do you recall anything that you
14  spoke with the two investigators about other
15  than the changes on the suicide screening
16  form?
17  A.  They asked me the events of the
18  day and what happened from the time I got
19  there until the time I had no more contact
20  with him.
21  Q.  Did you provide them with any kind
22  of statement in writing?
23  A.  In writing, no.
24  Q.  Just verbal?
25  A.  Yes.

*COMPU-TRAN SHORTHAND REPORTING*

210

JOSEPH A. VASATURO

1
2  Q.  Were they taking notes during the
3  interview of you?
4  A.  I believe they were.
5  Q.  Do you recall telling the
6  investigators anything about the events of
7  the day that in any way differed from what
8  you testified to here?
9  A.  No.
10  Q.  Do you recall telling them
11  anything in addition to what you've told us
12  here today?
13  A.  No.
14  Q.  Do you recall prior to meeting
15  with the investigators, did anybody meet
16  with you or discuss with you the fact that
17  they were coming down to do an
18  investigation?
19  A.  No.
20  Q.  How did you know to go meet with
21  them?
22  A.  I'm not really sure what you mean
23  by that.
24  Q.  It came to be that you were at the
25  department, they were there and you were

*COMPU-TRAN SHORTHAND REPORTING*

211

JOSEPH A. VASATURO

1
2  required to go?
3  A.  The next day I reported to work.
4  My sergeant told me I needed to go see the
5  investigators.  I went over and saw the
6  investigators.  They took the statement.
7  Q.  The next day, you mean after
8  Spencer committed suicide?
9  A.  The same day.  The next day for
10  me is my next workday.
11  Q.  That would have been the Putnam
12  County Sheriff's Department investigators;
13  correct?
14  A.  Yes.
15  Q.  But there came a point in time
16  when you met with the State Commission of
17  Correction investigators, also?
18  A.  Yes.  I received a memo with my
19  name on it.
20  Q.  Other than the memo, did you have
21  any communications with anybody about
22  meeting with the investigators before you
23  spoke with them?
24  A.  No.
25  Q.  Did you ever come to learn that

*COMPU-TRAN SHORTHAND REPORTING*

212

JOSEPH A. VASATURO

1
2  the State Commission had issued a final
3  report on its investigation?
4  A.  Yes.
5  Q.  How did you find out about that?
6  A.  Through Mr. Randazzo.
7  Q.  So that was after this lawsuit was
8  filed?
9  A.  I believe it was after.  I'm not
10  sure.
11  Q.  Did you have any communications
12  with Mr. Randazzo before you were named as
13  defendant in this case?
14  A.  No.
15  Q.  With respect to the final report,
16  other than your attorney, is there anybody
17  that you spoke with regarding the
18  Commissions' findings or recommendations?
19  A.  No.
20  Q.  Did you ever see the report?
21  A.  Yes.
22  Q.  Was that with Mr. Randazzo or
23  somewhere else?
24  A.  It was with Mr. Randazzo.  I
25  believe I received a copy of it.

*COMPU-TRAN SHORTHAND REPORTING*

213

JOSEPH A. VASATURO

1

2    Q.   Did you ever review the report and
3  during your review feel that anything in
4  there was inaccurate?
5    A.   I don't recall.  I'd have to read
6  through it again.
7    Q.   With respect to the investigation
8  that was conducted by the Putnam County
9  Sheriff's Department, you said either on May
10  20th or May 21st, you met with
11  investigators; correct?
12    A.   May 20th.
13    Q.   Who was it that you met with?
14    A.   Investigator DePerno.
15    Q.   Was anybody else present?
16    A.   Investigator Nappi.
17    Q.   What occurred during your meeting
18  with them?
19    A.   I gave them a statement.
20  Investigator DePerno typed it up.
21    Q.   With respect to that statement,
22  was it something that you verbally told
23  them?
24    A.   Yes.
25    Q.   Was it in response to questions

COMPU-TRAN SHORTHAND REPORTING

214

JOSEPH A. VASATURO

1

2  they asked you?
3    A.   No.
4    Q.   What did they ask you to do?
5    A.   They said give us a list of
6  today's events.  Tell us what happened.
7    Q.   And that's what happened?
8    A.   Yes.
9    Q.   While you spoke, was Nappi typing?
10    A.   Investigator DePerno was.
11    Q.   Investigator DePerno was typing
12  while you were speaking?
13    A.   Yes.
14    Q.   At the conclusion of the process,
15  did you review a written statement?
16    A.   I read through the written
17  statement.
18    Q.   Did you sign it?
19    A.   I did.
20        MS. BERG:   Let me have
21  marked as Exhibit 11, a copy of the
22  witness' statement from May 20, 2006.
23    (Whereupon, Plaintiff's Exhibit 11,
24  VASATURO'S STATEMENT DATED MAY 20, 2006, was
25  marked for identification.)

COMPU-TRAN SHORTHAND REPORTING

215

JOSEPH A. VASATURO

1

2    Q.   At any point in time in connection
3  with giving that statement Exhibit 11, did
4  you review any documents?
5    A.   The suicide screening was there.
6    Q.   Anything else?
7    A.   No.
8    Q.   When you say the suicide screening
9  was there, was it the complete medical
10  intake packet that had the four parts, or
11  was it just the suicide screening guideline
12  page?
13    A.   It was the packet.
14    Q.   During your interview by DePerno
15  and Nappi or when you were giving a
16  statement to them, were you reviewing or did
17  you review the suicide screening portion of
18  the packet?
19    A.   No.
20    Q.   Did they ask you any questions
21  about it?
22    A.   No.
23    Q.   In your statement with respect to
24  the suicide screening, a little below
25  halfway down you write:  "As he was

COMPU-TRAN SHORTHAND REPORTING

216

JOSEPH A. VASATURO

1

2  answering these questions, he seemed okay.
3  He stated he used heroin 24 hours prior to
4  his arrest.  I finished the suicide
5  questions.  I noticed he responded yes to
6  ten of the 16 questions."  Do you see that?
7    A.   Yes.
8    Q.   At that point in time, did you
9  indicate to anyone that with respect to some
10  of the 16 questions, it was your
11  observations that were noted as opposed to
12  Spencer's answers?
13    A.   No.
14    Q.   At any point during this interview
15  by DePerno and Nappi, did you tell them that
16  you felt that any of the yes answers were
17  incorrect?
18    A.   No.
19    Q.   The next two lines down:  "After
20  the questions were over, I changed him and
21  escorted him downstairs to cell 007.  I told
22  my sergeant I put him on a 15-minute watch
23  due to recent drug use, but I overlooked
24  telling him about the suicide screening
25  responses;" do you see that?

COMPU-TRAN SHORTHAND REPORTING

217

JOSEPH A. VASATURO

1
2     A.   Yes.
3     Q.   Was this the conversation you
4  referenced earlier when you say you verbally
5  advised LaPolla that you placed Spencer on a
6  15-minute watch?
7     A.   Yes.
8     Q.   During that conversation according
9  to the sworn statement, you didn't tell
10  LaPolla anything about the suicide screening
11  responses; correct?
12     A.   **Correct. I overlooked telling
13  him about the suicide screening.**
14     Q.   Is that your recollection as you
15  sit here today?
16     A.   Yes.
17     Q.   With respect to the P-1, you
18  indicate that after Sinkov was in his cell,
19  you proceeded back to booking where you
20  entered Sinkov into JMS and wrote the P-1;
21  correct?
22     A.   **That's what this says, yes.**
23     Q.   And this was the day of these
24  events; correct?
25     A.   Yes.

218

JOSEPH A. VASATURO

1
2     Q.   Do you have any different
3  recollections as you sit here today?
4     A.   No.
5     Q.   Do you have any reason to believe
6  that that statement is inaccurate?
7     A.   Yes.
8     Q.   What's the basis for your belief?
9     A.   **It says after I dropped him off,
10  I did the P-1, but Officer Gianpalo had this
11  information here. I must have had it with
12  me. I had to do it before.**
13     Q.   Could it have been that you
14  verbally communicated to the Gianpalo about
15  the supervisory check?
16     A.   **It could be possible. I don't
17  recall.**
18     Q.   At the time that you gave the
19  statement to DePerno and Nappi, did you have
20  an understanding that you were supposed to
21  tell the truth?
22     A.   **I was telling the truth. This is
23  what I recalled.**
24     Q.   When you signed the document on
25  the 20th day of May, you signed so under

219

JOSEPH A. VASATURO

1
2  penalty of perjury; correct?
3     A.   Yes.
4     Q.   Did you understand that by signing
5  it, you were attesting to the accuracy of
6  what's contained in it?
7     A.   Yes.
8     Q.   Prior to signing it, you read the
9  typewritten portion?
10     A.   **I did. Punishable as a Class A
11  misdemeanor.**
12     Q.   With respect to the 15-minute
13  checks during the time of 0300 to 0445, when
14  you were checking on Sinkov, you indicated
15  they appeared to be sleeping; correct?
16     A.   **Appeared to be lying down.
17  Appeared to be sleeping.**
18     Q.   You wrote in your statement
19  appeared to be sleeping. It's on the second
20  page; is that correct?
21     A.   Yes.
22     Q.   With respect to your 15-minute
23  checks in the logbook, you didn't note
24  anything about what Sinkov was doing other
25  than at 0315; correct?

220

JOSEPH A. VASATURO

1
2     A.   **That's correct.**
3     Q.   And you didn't note, for example,
4  that you looked to observe whether or not
5  his chest was moving up and down or he was
6  breathing or anything to that effect?
7     A.   **I didn't write that, no.**
8     Q.   At the end of your statement, you
9  indicate that Sergeant LaPolla took over
10  your checks for that time period. What time
11  period did LaPolla do checks on May 20th?
12     A.   **While I went up to booking to
13  receive incoming property for Mr. Sinkov,
14  Sergeant LaPolla did that check for me.**
15     Q.   Using your pipe?
16     A.   **No. The sergeant has his own.**
17     Q.   You documented it in the logbook
18  as if you did it?
19     A.   No.
20     Q.   Is there any entry in the logbook
21  showing that LaPolla did any checks?
22     A.   **There should be, yes.**
23     Q.   Do you see that anywhere?
24     A.   Yes.
25     Q.   Where?

221

JOSEPH A. VASATURO

1
2    A.   0345, I think.
3    Q.   0345 appears to be -- I'm sorry.
4  0345, I see.  That's not your handwriting?
5    A.   No, ma'am.
6    Q.   And you believe that's LaPolla?
7    A.   It appears to be Sergeant
8  LaPolla's handwriting.
9    Q.   You say at the end, "At one point
10  during my shift, Sergeant LaPolla asked me
11  if I did my P-1 in reference to the
12  15-minute supervisory check"?
13    A.   Yes.
14    Q.   Do you recall when it was during
15  your shift that LaPolla asked about that?
16    A.   It was later that night.  I want
17  to say -- I don't know the exact time.  I
18  want to say between five and six.
19    Q.   LaPolla didn't ask you about the
20  P-1 when you first told him that Sinkov was
21  on 15-minute checks?
22    A.   I don't recall if he asked me.
23    Q.   Did you ever see any statements
24  given by anyone else?
25    A.   No, ma'am.

COMPU-TRAN SHORTHAND REPORTING

222

JOSEPH A. VASATURO

1
2    Q.   Did you speak with anybody else
3  about any statements that they gave either
4  to the Putnam County Sheriff's Department or
5  the State Commission of Correction?
6    A.   No.
7    Q.   Were you ever trained with respect
8  to the logbook, if you made any kind of
9  error, for example, in the time or entry,
10  how you were supposed to go about correcting
11  the error?
12    A.   No.  Like going back in time,
13  back with the times?
14    Q.   In other words, you were writing
15  entry one and instead of writing 1256, you
16  wrote 1246 and you wanted to correct it
17  right then and there.  Were you ever trained
18  in how to make the correct notation?
19    A.   Just draw a line.  No.
20    Q.   Did anybody ever indicate to you
21  that you shouldn't obliterate the original
22  entry?  You should draw a line so it's still
23  visible and write the correct entry next to
24  it?
25    A.   Just draw a line.

COMPU-TRAN SHORTHAND REPORTING

223

JOSEPH A. VASATURO

1
2    Q.   That's what you were trained to
3  do?
4    A.   I don't believe I was trained to
5  do it.  That's what I would do.
6    Q.   Did anybody ever provide you with
7  any policies on that?
8    A.   Yes.  I believe there is a policy
9  on logbook entries.
10    Q.   Is that part of the red book
11  documents that you have?
12    A.   That is part of the policy and
13  procedure book.  I'm not aware if that's in
14  the red books.  I've seen it.  I'm trying to
15  remember where.
16            MS. BERG:   Let me have
17      marked as Exhibit 12, a copy of the
18      Commissions report on the death of Spencer
19      Sinkov.
20      (Whereupon, Plaintiff's Exhibit 12,
21  FINAL REPORT STATE COMMISSION OF CORRECTION, was
22  marked for identification.)
23    Q.   In connection with Spencer Sinkov,
24  as you sit here today, do you believe that
25  you violated any existing Putnam County

COMPU-TRAN SHORTHAND REPORTING

224

JOSEPH A. VASATURO

1
2  Correctional Facility policies or
3  procedures?
4    A.   No, ma'am.  Suicide screening
5  says eight or above to notify a sergeant.
6    Q.   In connection with your conduct on
7  May 19th and into May 20, 2006, did anybody
8  ever indicate to you in words or in writing
9  that any of your conduct violated existing
10  Putnam County Correctional Facility policies
11  or procedures?
12    A.   No, ma'am.
13    Q.   Did anybody ever indicate to you
14  that disciplinary action was being
15  contemplated?
16    A.   Yes.
17    Q.   Who told you that?
18    A.   I signed a probationary period
19  paper.
20    Q.   When was that?
21    A.   I believe it was November.
22    Q.   Of?
23    A.   '07.
24    Q.   What were the circumstances of you
25  signing that paper?

COMPU-TRAN SHORTHAND REPORTING

225

JOSEPH A. VASATURO

1
2    A.   To extend probationary period.
3    Q.   Of what?
4    A.   I'm not sure. I don't know.
5    Q.   Were you on probation at the time
6   that you signed it?
7    A.   Yes.
8    Q.   What were you on probation for?
9    A.   This incident that happened now.
10    Q.   When were you first placed on
11  probation?
12    A.   Say May of '06.
13    Q.   Who advised you that you were
14  being put on probation?
15    A.   Nobody.
16    Q.   How did you know that you were
17  placed on probation?
18    A.   I just signed the extension.
19    Q.   You found out in November of '07,
20  that you had been put on probation a year
21  earlier?
22    A.   Eighteen months earlier.
23    Q.   Who brought to your attention in
24  November of '07, the issue with the
25  probationary period and asking you to sign

226

JOSEPH A. VASATURO

1
2   this paper?
3    A.   I was informed by Sergeant Hanley
4   I had to go see Captain McNamara.
5    Q.   When you saw Captain McNamara, was
6   anyone else present?
7    A.   No.
8    Q.   What did McNamara say to you and
9   what did you say to him?
10    A.   He had me -- he didn't say
11  anything to me. He had me read through the
12  paper. I signed the paper and that was it.
13    Q.   Did it say for how long your
14  probationary period would be extended?
15    A.   Six months.
16    Q.   Prior to signing it, did you
17  consult with anyone?
18    A.   Union lawyer.
19    Q.   Anyone else?
20    A.   No.
21    Q.   Who's the union lawyer?
22    A.   Mr. Baumgardner.
23    Q.   Is that from Bunion & Baumgardner?
24    A.   Yes.
25    Q.   Do you still have a copy of that

227

JOSEPH A. VASATURO

1
2   document?
3    A.   I do. Not on me.
4         MS. BERG:    I'm going to
5    call for the production of that.
6   DOCUMENT/DATA REQUESTED:_____
7    Q.   Did you have an understanding at
8   any time from November '07 until now that
9   what you signed would extend the time for
10  the county to bring charges against you?
11    A.   That was -- my understanding is
12  it extended the probationary period that I
13  was placed on. I don't know if there's
14  anything pending. I don't know.
15    Q.   Do you know if there was any
16  extension of the time in which the county
17  can bring charges against you?
18    A.   No, I don't know.
19    Q.   Other than that conversation with
20  McNamara, did anybody ever say anything to
21  you in words or in substance about
22  disciplinary action against you?
23    A.   No.
24    Q.   Do you know what the status of
25  that is today?

228

JOSEPH A. VASATURO

1
2    A.   No.
3    Q.   Do you know if other than
4   yourself, anybody else was asked to sign
5   anything similar?
6    A.   I believe Sergeant LaPolla.
7    Q.   Anyone else?
8    A.   No.
9    Q.   Take a look if you would at
10  Exhibit 12.
11         Let me back up for one more
12  second on that issue of the probationary
13  period and the document you signed.
14         Did McNamara indicate to you at
15  any point in time that you were the subject
16  of possible charges?
17    A.   No.
18    Q.   Or disciplinary action?
19    A.   No.
20    Q.   Did the paper you read indicate
21  that in any way?
22    A.   No. It indicated that it was
23  extending the 18 month probationary period.
24    Q.   Did anybody indicate to you in
25  words or in substance, that the opinion of

229

**JOSEPH A. VASATURO**

1  the county or its administrative staff was
2  that you violated some policy or procedure
3  on May 20th?
4  **A.  No.**
5  **Q.**  Take a look, if you would, at
6  Exhibit 12 which is the state's report with
7  respect to the death of Spencer Sinkov.
8  Paragraph eight which is on page three.
9  "Officer J.V., Joseph Vasaturo, placed
10 Sinkov on a 15-minute supervisory check
11 instead of constant supervision;" do you see
12 that sentence?
13 **A.  Yes.**
14 **Q.**  Did you ever discuss with anybody,
15 anything about the 15-minute supervisory
16 check versus constant supervision other than
17 what you testified to here today about your
18 conversation with Karen Jackson?
19 **A.  No.**
20 **Q.**  Did anybody ever indicate to you
21 that there were any policies that you
22 violated by placing Sinkov on 15 minute
23 versus constant supervision?
24 **A.  No.**

*COMPU-TRAN SHORTHAND REPORTING*

230

**JOSEPH A. VASATURO**

1
2  **Q.**  The next sentence says, "The shift
3  supervisor was not informed of Sinkov's
4  suicide screening score;" that's correct,
5  right?
6  **A.  Yes.**
7  **Q.**  You never notified LaPolla?
8  **A.  I never told Sergeant LaPolla**
9  **what his actual score was, that's correct.**
10 **Q.**  And it also says, "Officer J.V.,
11 Joseph Vasaturo failed to initiate constant
12 supervision on an identified high-risk
13 inmate;" do you see that?
14 **A.  Yes.**
15 **Q.**  Did anybody ever speak with you
16 about that?
17 **A.  No.**
18 **Q.**  Last sentence indicates that
19 "Officer J.V. failed to follow Putnam County
20 Jail's Policy and Procedure which states
21 immediately notify the tour supervisor
22 whenever a prisoner scores in the high risk
23 score of eight in the column A or immediate
24 referral categories on the screening form;"
25 do you see that?

*COMPU-TRAN SHORTHAND REPORTING*

231

**JOSEPH A. VASATURO**

1  **A.  Yes.**
2  **Q.**  And you, in this case, did not
3  immediately notify the tour supervisor when
4  the score was eight or higher; correct?
5  **A.  Yes.**
6  **Q.**  And you didn't notify the
7  supervisor when the shaded areas on the
8  forms were checked; correct?
9  **A.  That is correct.**
10 **Q.**  The report also indicates "Officer
11 J.V. failed to follow Putnam County jail's
12 policy and procedures which state that you
13 have to immediately notify the tour
14 supervisor whenever a prisoner, Section E,
15 appears to be significantly under the
16 influence of alcohol or drugs;" do you see
17 that?
18 **A.  Yes.**
19 **Q.**  That was the conclusion of the
20 commission; correct?
21 **A.  Yes.**
22 **Q.**  No. 4 says, "All such notification
23 will be completed by forwarding a copy of
24 the prisoner's screening form to the tour

*COMPU-TRAN SHORTHAND REPORTING*

232

**JOSEPH A. VASATURO**

1  supervisor prior to cell assignments;" do
2  you see that?
3  **A.  I do.**
4  **Q.**  And you didn't notify the
5  supervisor by providing a copy of that form
6  to him prior to the cell assignment;
7  correct?
8  **A.  That's correct.**
9  **Q.**  Did anybody ever speak with you
10 about that?
11 **A.  No.**
12 **Q.**  On the recommendation section,
13 page five, "Recommendation to the sheriff of
14 Putnam County, Number 1, the booking officer
15 who administered the suicide screening
16 guidelines to Sinkov on May 20, 2006, should
17 be disciplined;" do you see that?
18 **A.  I do.**
19 **Q.**  You were the booking officer;
20 correct?
21 **A.  Correct.**
22 **Q.**  Were you ever disciplined?
23 **A.  No.**
24 **Q.**  And the report continues that,

*COMPU-TRAN SHORTHAND REPORTING*

233

JOSEPH A. VASATURO

1  
2  "You should be disciplined for failing to
3  notify the shift supervisor of a high-risk
4  suicide inmate;" do you see that?
5      A.   I do.
6      Q.   And for failing to initiate
7  constant supervision of a high-risk inmate;
8  do you see that?
9      A.   Yes.
10      Q.   Did anyone ever counsel you or
11  discipline you about both or either of
12  those?
13      A.   No.
14      Q.   Since May 20, 2006, have there
15  been any additional or new policies
16  implemented which pertain in any way to the
17  booking process or the intake process?
18      A.   To the booking or intake process,
19  I'm not positive.  There was one for housing
20  supervision in there.
21      Q.   What's that?
22      A.   15 minute is not good for a
23  suicide prevention, I believe, it says.
24      Q.   When did that come out?
25      A.   August 4th.

*COMPU-TRAN SHORTHAND REPORTING*

234

JOSEPH A. VASATURO

1  
2      Q.   Of?
3      A.   '06.
4      Q.   How were you advised of this new
5  policy?
6      A.   They put it into the policy and
7  procedure books.
8      Q.   Is this the red book or different
9  book?
10      A.   This is a different book.  It's
11  purple and white book.
12      Q.   Where is that maintained?
13      A.   It's on all the posts.
14      Q.   How were you made aware of that
15  new policy being put in the book?
16      A.   Sergeants told us.
17      Q.   Was that at briefing or something
18  else?
19      A.   I don't recall if it was at
20  briefing or not.
21      Q.   Do you recall which sergeant told
22  you about it?
23      A.   Sergeant LaPolla had pointed it
24  out.  Sergeant Greno.
25      Q.   What did Sergeant LaPolla say to

*COMPU-TRAN SHORTHAND REPORTING*

235

JOSEPH A. VASATURO

1  
2  you?
3      A.   It's a new policy.  Just to read
4  it.
5      Q.   Anything else?
6      A.   No.
7      Q.   Did you say anything to LaPolla?
8      A.   I read through it, and I noticed
9  it says 15 is not good for suicide.
10      Q.   Did you say anything to LaPolla
11  about that?
12      A.   I just told him that I noticed
13  it.
14      Q.   What did he say in response?
15      A.   I don't recall what he said.
16      Q.   Did you say Sergeant Guarino?
17      A.   Greno.
18      Q.   What did he say about the policy?
19      A.   I didn't speak to him about it.
20      Q.   Did he point it out?
21      A.   Yes.  He was off going.  Sergeant
22  LaPolla was on coming.  I read it during
23  shift.
24      Q.   Did you speak with anybody else
25  about that new policy at any time?

*COMPU-TRAN SHORTHAND REPORTING*

236

JOSEPH A. VASATURO

1  
2      A.   No.
3          MS. BERG:   I'm going to
4      call for the production of that policy.
5  DOCUMENT/DATA REQUESTED:_____
6      Q.   Other than that, any other new
7  policies or modified policies since May 20,
8  2006?
9      A.   Not that I'm aware of -- there's
10  new policies but nothing -- I don't believe
11  anything that pertains to this.
12      Q.   Anything pertaining to housing
13  assignment or level of supervision?
14      A.   Not that I can recall.  There's a
15  few new policies.  I have to look at them
16  again.
17      Q.   Anything that would pertain in any
18  way to the intake process as far as you can
19  recall?
20      A.   The alternative to incarceration.
21  That's fairly new.  The strip-search
22  procedure.  That's fairly new.  The
23  notification of the consulate of illegals.
24  That's fairly new.  That's all I can recall
25  at this time.

*COMPU-TRAN SHORTHAND REPORTING*

237

JOSEPH A. VASATURO

1 JOSEPH A. VASATURO
2 MS. BERG: Let me have
3 marked as Exhibit 13, a copy of a letter
4 to whom it may concern dated November 2,
5 2006.
6 (Whereupon, Plaintiff's Exhibit **13**,
7 *LETTER DATED 11/2/06, was marked for*
8 *identification.*)
9 Q. Other than changes -- other than
10 new policies, have there been any policies
11 that have changed since May 20, 2006?
12 A. **That one that we were discussing**
13 **with the 15, I believe has changed.**
14 Q. Anything else?
15 A. **Not that I'm aware of.**
16 Q. The new policy would reflect what
17 was in place from August 4, '06 to now?
18 A. **To now, yes.**
19 Q. And the prior policy, what do you
20 recall that that said?
21 A. **I don't recall the exact words**
22 **that it said.**
23 Q. How did this new policy change the
24 policy that existed on May 20, '06?
25 A. **That the 15 minute is not good**
COMPU-TRAN SHORTHAND REPORTING

238

1 JOSEPH A. VASATURO
2 **for suicide screening, I believe, are the**
3 **words. I don't know the exact words.**
4 Q. Words to that effect?
5 A. **Yes.**
6 Q. Were you aware of any changes in
7 staffing, staffing assignment, staffing
8 posts that have happened since May 20, '06?
9 A. **No.**
10 Q. Has anybody indicated to you that
11 there's any analysis being conducted or
12 revision being considered in terms of
13 staffing?
14 A. **No.**
15 Q. I'm going to show you what was
16 marked as Exhibit 13 which is an anonymous
17 letter which was sent to the Commission of
18 Correction, and it's dated November 2, 2006.
19 It has a date stamp of November 7, 2006.
20 Did you ever see this before?
21 A. **Never.**
22 Q. Did you ever discuss with anybody
2 whether or not an anonymous letter or
2 unsigned letter was sent to anyone
25 pertaining to the Putnam County Correctional
COMPU-TRAN SHORTHAND REPORTING

239

1 JOSEPH A. VASATURO
2 Facility?
3 A. **No, ma'am.**
4 Q. The first paragraph says, "I work
5 for the Putnam County Sheriff's Department
6 in the corrections division. Your office
7 must be on the way down to our office. The
8 reason I can assume this is because our
9 captain is running around updating the
10 logbooks that are never used and coming out
11 with new policies and procedures;" do you
12 see that?
13 A. **I see.**
14 Q. Do you have any basis or did you
15 ever make any observations with respect to
16 the truth or falsity of the paragraph I just
17 read?
18 A. **No, ma'am.**
19 Q. Did you ever observe the captain
20 or anybody else updating the logbooks?
21 A. **No, ma'am.**
22 Q. Or coming out with new policies
23 and procedures?
24 A. **No, ma'am.**
25 Q. Are you aware of any logbooks that
COMPU-TRAN SHORTHAND REPORTING

240

1 JOSEPH A. VASATURO
2 are never used?
3 A. **No, ma'am.**
4 Q. There's a reference in the second
5 paragraph to the program officer post and
6 the fact that the NHU officer has to cover
7 that post if the program officer is absent
8 or on vacation or other absent. Do you know
9 if through November 7, '06, that was
10 accurate?
11 A. **Yes.**
12 Q. Is that true still to today?
13 A. **North has a unit officer that**
14 **covers the program when the program officer**
15 **is not there.**
16 Q. Would that be true also on hours
17 beyond 1630 and on weekends which is
18 indicated in paragraph three?
19 A. **What to be true, there's programs**
20 **after 4:30?**
21 Q. Yes.
22 A. **There are programs after 4:30.**
23 Q. And on the weekends?
24 A. **And on the weekends.**
25 Q. Which would make the North Housing
COMPU-TRAN SHORTHAND REPORTING

241

**JOSEPH A. VASATURO**

1
2  Unit have to cover both posts?
3      **A.   Yes.**
4      **Q.**   The program officer works Monday
5  through Friday; correct?
6      **A.   Correct.**
7      **Q.**   That was true in May '06?
8      **A.   I want to say yes, it was.**
9      **Q.**   And it's true to today?
10     **A.   Yes.**
11     **Q.**   Do you recall when in relation to
12  the new policy, the 15-minute check versus
13  constant watch policy you just talked about
14  on August 4, '06, when in relation to that
15  did the Commission of Correction
16  investigators interview you?
17     **A.   Probably a week later.**
18     **Q.**   In terms of this anonymous letter,
19  the second page, second paragraph says,
20  "Just a few days before the commission
21  arrived to interview everyone involved in
22  the suicide May 2006, the captain changed
23  the policy and procedure to cover the
24  department and essentially making Sergeant
25  LaPolla and Officer Vasaturo look like they

*COMPU-TRAN SHORTHAND REPORTING*

---

243

**JOSEPH A. VASATURO**

1
2      **Q.**   Norberto Rivera was the inmate; do
3  you recall that?
4      **A.   I do.**
5      **Q.**   Did you have any role in the
6  intake process involving Mr. Rivera?
7      **A.   No, ma'am.**
8      **Q.**   Did you have any role in
9  supervising him while he was housed in the
10  North Housing Unit?
11     **A.   Yes.**
12     **Q.**   What was your role?
13     **A.   I was assigned to North Housing**
14  **Unit.  My role was basically to perform**
15  **checks and make sure he was okay.**
16     **Q.**   Do you recall what type of or
17  level of check he was on?
18     **A.   I believe he was on a 15-minute**
19  **check.**
20     **Q.**   Do you recall anything about the
21  reason why he was on that 15-minute check?
22     **A.   I believe it was for withdrawal**
23  **from drugs.**
24     **Q.**   Do you recall what drugs?
25     **A.   I want to say heroin.  I'm not**

*COMPU-TRAN SHORTHAND REPORTING*

---

242

**JOSEPH A. VASATURO**

1  did not follow this procedure;" do you see
2  that?
3      **A.   I see that.**
4      **Q.**   Do you have any understanding as
5  to whether that policy and procedure change
6  was the one on August 4, '06?
7      **A.   It was only one that I recall on**
8  **August 4th.**
9      **Q.**   That was the only one.  Do you
10  know if that's what's referenced here in the
11  second paragraph of page 2?
12     **A.   I don't know if that's what's**
13  **referenced.  I recall one on August 4th.**
14     **Q.**   Are you aware of any policies that
15  were changed to essentially make it look
16  like you and Sergeant LaPolla did not follow
17  procedure?
18     **A.   I know that this policy was**
19  **updated or changed.  I don't know if that's**
20  **what was in mind.**
21     **Q.**   Were you employed by the Putnam
22  County Correctional Facility when there was
23  an inmate suicide back in 2003?
24     **A.   I was.**

*COMPU-TRAN SHORTHAND REPORTING*

---

244

**JOSEPH A. VASATURO**

1
2  positive.
3      **Q.**   Do you recall anything about
4  whether Rivera was placed on 15-minute
5  checks because of anything relating to the
6  suicide screening?
7      **A.   I'm unaware of that.  I don't**
8  **know.**
9      **Q.**   In terms of Norberto Rivera's
10  death, did you respond to the scene of the
11  hanging?
12     **A.   Yes.**
13     **Q.**   Were you the first officer there?
14     **A.   Yes.**
15     **Q.**   Were you assigned to the NHU post
16  at that time?
17     **A.   I was.**
18     **Q.**   Was the suicide committed in
19  between the 15-minute checks?
20     **A.   It was.**
21     **Q.**   Do you recall where you were
22  coming from at the time that you found
23  Norberto Rivera?
24     **A.   I was coming from the cell 16, I**
25  **believe.**

*COMPU-TRAN SHORTHAND REPORTING*

245

JOSEPH A. VASATURO

1
2  Q.  What was going on in cell 16?
3  A.  **Sergeant had asked me to see an**
4  **inmate.  I escorted the sergeant in.  She**
5  **spoke with him briefly.  I escorted the**
6  **sergeant out of the cell and then I went**
7  **around this way -- well, around in front of**
8  **this side and there he was.**  (*Indicating*)
9  Q.  Where was cell 16 in relation to
10 where Norberto Rivera's cell was?
11 A.  **It's right on the other side.**
12 Q.  You can't physically see it while
13 you're in cell 16?
14 A.  **No.**
15 Q.  How long were you with the
16 sergeant in cell 16?
17 A.  **I wasn't in cell 16.  We were on**
18 **the catwalk.  She was just speaking through**
19 **the bar.**
20 Q.  For how long were you present in
21 that vicinity?
22 A.  **A minute, if that.**
23 Q.  Were you aware of any
24 investigation that was done with respect to
25 Mr. Rivera's hanging?

*COMPU-TRAN SHORTHAND REPORTING*

246

JOSEPH A. VASATURO

1
2  A.  **No.**
3  Q.  Did you ever come to learn that
4  the county, Putnam County Sheriff's
5  Department conducted an investigation?
6  A.  **I gave a statement to the**
7  **investigators.**
8  Q.  Do you recall who the investigator
9  was in that case?
10 A.  **Investigator DePerno.**
11 Q.  Was it the same format?
12 A.  **Yes.**
13 Q.  In other words, DePerno asked you
14 what happened and you told him as he typed
15 it up?
16 A.  **Yes.**
17 Q.  Did you review a typed statement
18 at that point?
19 A.  **I did.**
20 Q.  Did you sign it?
21 A.  **Yes.**
22 Q.  Other than the Putnam County
23 sheriffs department, were you aware of any
24 other investigation including by the State
25 Commission?

*COMPU-TRAN SHORTHAND REPORTING*

247

JOSEPH A. VASATURO

1
2  A.  **Yes.**
3  Q.  What were you aware of?
4  A.  **The Commissioner of Correction**
5  **investigation.**
6  Q.  How were you made aware of that?
7  A.  **Again, I was told when I need to**
8  **report for them to ask me questions.**
9  Q.  Do you recall who questioned you
10 on that occasion?
11 A.  **I don't recall the name.**
12 Q.  Did you give them anything in
13 writing?
14 A.  **No.**
15 Q.  Did they take notes while they met
16 with you?
17 A.  **Yes.  I imagine they did.  I**
18 **don't recall.**
19 Q.  Did you ever see the final report
20 of the State Commission in the Norberto
21 Rivera case?
22 A.  **No.**
23 Q.  Did anyone ever indicate to you
24 that there were any recommendations made
25 with respect to your conduct?

*COMPU-TRAN SHORTHAND REPORTING*

248

JOSEPH A. VASATURO

1
2  A.  **No.**
3          MS. BERG:     Let me have
4  marked as Exhibit 14, a copy of the final
5  report in the matter of the death of
6  Norberto Rivera.
7          (*Whereupon, Plaintiff's Exhibit 14,*
8  *FINAL REPORT OF NORBERTO RIVERA, was marked for*
9  *identification.*)
10 Q.  Take a look if you would at
11 Exhibit 14.
12          On the recommendations page, page
13 five, I'm going to start above
14 recommendations.  Paragraph 19.  The North
15 Housing Unit is a 16-house linear housing
16 unit; you see that?
17 A.  **Yes.**
18 Q.  It says the officer maintains a
19 post right outside the block door.  In
20 addition to supervising the housing unit,
21 the officer also has responsibilities to
22 supervise a program area down the hall.
23 Movement into the adjacent recreation yard
24 and a separate four cell housing unit
25 approximately 100 feet away."  Do you see

*COMPU-TRAN SHORTHAND REPORTING*

249

JOSEPH A. VASATURO

1
2  that?
3      A.  I do.
4      Q.  That was true back in November
2003 when Norberto Rivera was housed in the
6  North Housing Unit?
7      A.  Yes.
8      Q.  Does that remain true to today?
9      A.  No.
10      Q.  What's different?
11      A.  If North-2 is open, there will be
12  an officer assigned there.
13      Q.  And that will be the separate four
14  cell housing unit?
15      A.  Yes.
16      Q.  Other than that, any other
17  differences?
18      A.  The program officer is new, but
19  I'm not positive when that was started.
20      Q.  When was the separate post for
21  NHU-2 implemented?
22      A.  I'm not positive on the date.
23  Within the --
24      Q.  Do you recall the date?
25      A.  A year back.

COMPU-TRAN SHORTHAND REPORTING

251

JOSEPH A. VASATURO

1
2  times he completed rounds.  Policies should
3  be in place to have officers document the
4  actual time they complete rounds and not
5  rounded off to the nearest half or quarter
6  hour;" do you see that?
7      A.  I do.
8      Q.  Do you know if that paragraph
9  refers to you?
10      A.  I was the housing unit officer.
11      Q.  Did anybody ever question you
12  about the accuracy of the times you
13  documented?
14      A.  No.
15      Q.  Did anybody ever indicate to you
16  that your conduct in November of 2003
17  violated any existing policies?
18      A.  No.
19          MS. BERG:  Let me have
20  marked as Exhibit 15, a copy of a
21  statement dated November 15, 2003 by this
22  witness.
23      (Whereupon, Plaintiff's Exhibit 15,
24  STATEMENT DATED 11/15/03, was marked for
25  identification.)

COMPU-TRAN SHORTHAND REPORTING

250

JOSEPH A. VASATURO

1
2      Q.  Do you recall if it was before or
3  after the death of Spencer Sinkov?
4      A.  I want to say after.
5      Q.  When you say the program officer
6  is new, what do you mean?
7      A.  The program officer is like
8  another post.
9      Q.  In terms of the program officer
10  post, that's the one we talked about where
11  if it's after 4:30 or on weekends, it's not
12  manned?
13      A.  Yes.
14      Q.  So even though --
15      A.  Well, yes.
16      Q.  Even though the post was created,
17  it's not always filled?
18      A.  Yes.
19      Q.  That would be when the NHU-1 post
20  has to cover it?
21      A.  Yes.
22      Q.  Under recommendations to the
23  sheriff, "The sheriff should question the
24  housing area officer for the North Housing
25  area for the accuracy of his documented

COMPU-TRAN SHORTHAND REPORTING

252

JOSEPH A. VASATURO

1
2      Q.  Let me show you Exhibit 15.  Do
3  you recognize that as the statement that you
4  gave to Investigator DePerno on November 15,
5  2003 in connection with the suicide of
6  Norberto Rivera?
7      A.  Yes.
8      Q.  It indicates in the bottom of the
9  first page of this statement, that after
10  your 1345 hour check, you went out North
11  Housing Unit exercise yard to smoke a
12  cigarette; do you see that?
13      A.  Yes.
14      Q.  Do you recall if anybody spoke
15  with you about whether or not that was
16  permitted?
17      A.  No.
18      Q.  Is that something you still do?
19      A.  Common practice, yes.
20      Q.  Do you observe that other
21  correction officers engage in that practice
22  as well?
23      A.  Yes.
24      Q.  Do you have any requirement to
25  document when it is that you take your

COMPU-TRAN SHORTHAND REPORTING

253

JOSEPH A. VASATURO

1  cigarette breaks?
2  A.  No.
4      MS. BERG:    Let me have
5  marked as Plaintiff's Exhibit 16, a copy
6  of the log from the North Housing Unit
7  from November 12, 2003 through November
8  15, '03.
9      (Whereupon, Plaintiff's Exhibit 16,
10 LOGBOOK, was marked for identification.)
11     Q.   Take a look at 16 which is a
12 logbook for the North Housing Unit.  I'm
13 going to turn your attention to page 84 at
14 the top left about halfway in.  The bottom
15 entry 2761 at 1933.  "Received four males,"
16 names them.  "Three females for bible
17 study." Do you see that?
18     A.   I do.
19     Q.   Have you ever been on the North
20 Housing Unit when people have -- inmates
21 have come in for bible study?
22     A.   Yes.
23     Q.   What are you required to do as the
24 North Housing Unit's correction officer if
25 that happened?

*COMPU-TRAN SHORTHAND REPORTING*

255

JOSEPH A. VASATURO

1  A.   No.  They'll travel freely --
2  well, from gate 13 around to North Housing
3  Unit.
4      Q.   When they arrive at North Housing
5  Unit is when your responsibilities take
6  over?
7      A.   Yes.
8      Q.   Where do you take them from the
9  desk in terms of bible study?
10     A.   In a program room.
11     Q.   Where is that located?
12     A.   Right in North Housing Unit.
13     Q.   How far from the desk?
14     A.   Twenty-five, maybe 30 feet.
15     Q.   Is that beyond the gate?
16     A.   It is.
17     Q.   When you take them in, you say you
18 put them in the room.  You shut the door,
19 you lock them in; correct?
20     A.   Yes.
21     Q.   Approximately, how long does all
22 of this take?
23     A.   Three minutes.  Not very
24 long.

*COMPU-TRAN SHORTHAND REPORTING*

254

JOSEPH A. VASATURO

1  A.   They leave their tags for the
2  logbooks. They enter the room. We close
3  the door. We'll continue our checks and we
4  add them into the checks.
5      Q.   So you'll be checking on them as
6  well?
7      A.   Yes.
8      Q.   When you say they leave their
9  I.D.s at the logbook, it's something they
10 physically take off and leave at the desk?
11     A.   Yes.
12     Q.   Are you required to fill out any
13 paperwork, such as this or something else?
14 (Indicating)
15     A.   Yes. You put their names in the
16 book.
17     Q.   Anything else you're required to
18 do?
19     A.   No.
20     Q.   Where do you take them for bible
21 study?
22     A.   They'll come around to North
23 Housing Unit.
24     Q.   So they're escorted to you?

*COMPU-TRAN SHORTHAND REPORTING*

256

JOSEPH A. VASATURO

1      Q.   Are you required to document
2  anything about when the bible study ends?
3      A.   Yes. That would be them leaving
4  and going back upstairs or back to their
5  housing unit.
6      Q.   Would you log that in?
7      A.   Yes.
8      Q.   Take a look if you would at the
9  page that's marked 91 at the top right.
10 Where the stamp is "officer on duty, 2974."
11 From there through the next page, are those
12 all your entries?
13     A.   Yes.
14     Q.   Did you make any entries
15 pertaining to finding Norberto Rivera?
16     A.   I did not.
17     Q.   Do you know why that was?
18     A.   My sergeant took the logbook.
19     Q.   When did your sergeant take the
20 logbook in relation to when you responded to
21 Rivera's cell?
22     A.   It seemed like it was as soon as
23 I called her.
24     Q.   In terms of --

*COMPU-TRAN SHORTHAND REPORTING*

257

JOSEPH A. VASATURO

1
2    A.    It seemed like as soon as
3    everything we knew what was going on.
4    Q.    In terms of your starting at 2974,
     it says active supervision, what does that
6    mean?
7    A.    It means they're out and about.
8    Active.
9    Q.    Was anybody on --
10   A.    Active and general supervision.
11   Q.    At this point, you don't indicate
12   whether anybody was on a 15-minute
13   check?
14   A.    No.
15   Q.    Is there some reason you didn't do
16   that?
17   A.    No.
18   Q.    Do you know if Rivera was on a
19   15-minute check by looking at this
20   logbook?
21   A.    By looking at this, I couldn't
22   tell.
23   Q.    And there's no indication on any
24   of the entries that you made pages 91 to 92
25   of 15-minute supervisory check being

*COMPU-TRAN SHORTHAND REPORTING*

JOSEPH A. VASATURO

1
2    or amend a prior answer?
3    A.    Yes.
4    Q.    Go ahead.
5    A.    I wasn't on probation.  It was
6    time to extend charges that they're going to
7    bring against me.
8    Q.    Did they indicate that they were
9    going to bring charges?
10   A.    No.
11   Q.    And it was just an extension of
12   time in connection with which they could do
13   that?
14   A.    Yes.
15   Q.    And you agreed to extend that by
16   six months beyond the eighteen months
17   statute of limitation?
18   A.    Yes.
19   Q.    To date, have any proceedings been
20   instituted against you?
21   A.    Not that I'm aware of.
22   Q.    Has anybody indicated to you
23   whether or not a decision has been made one
24   way or another?
25   A.    Not that I -- no.

*COMPU-TRAN SHORTHAND REPORTING*

258

JOSEPH A. VASATURO

1
2    performed; correct?
3    A.    No.
4    Q.    That's correct?
5    A.    Yes.  I didn't write 15 minute.
6    They were done every 15 minutes.
7    Q.    You didn't indicate that in the
8    logbook?
9    A.    No.
10   Q.    Did anybody ever discipline you
11   for that or counsel you about it?
12   A.    No.
13           MS. BERG:    In case I
14   didn't request on the record earlier, I am
15   going to request the new policy that was
16   put in August 4, '06.
17           Give us two seconds.
18   DOCUMENT/DATA REQUESTED: _____
19           (Recess taken)
20   CONTINUED EXAMINATION BY
21   MS. BERG:
2    Q.    I understand you want to clarify a
2_   prior answer?
24   A.    Excuse me?
25   Q.    I understand you want to clarify

*COMPU-TRAN SHORTHAND REPORTING*

260

JOSEPH A. VASATURO

1
2    Q.    Are you aware of any detox program
3    in the facility?
4    A.    I'm unaware of anything that
5    Americor has in place.
6    Q.    Do you have any responsibilities
7    with respect to any type of detox program or
8    provision of any type of meds to inmates who
9    are undergoing detoxication?
10   A.    The meds and everything is
11   handled by Americor.  All I do is escort
12   their nurse around.
13   Q.    You don't have any role in
14   that?
15   A.    No.
16   Q.    Are there any other answers that
17   you've given that you want to modify or
18   change?
19   A.    No.
20           MS. BERG:    I don't have
21   anything else.
22   EXAMINATION BY
23   MR. KLEINBERG:
24   Q.    I have a couple questions for you,
25   sir.  My name is Adam Kleinberg.  I

*COMPU-TRAN SHORTHAND REPORTING*

261

**JOSEPH A. VASATURO**

1
2 represent Sheriff Smith in this case.
3     If you look at what we marked as
4 Exhibit 14, Exhibit 14 is the January 11,
5 2005 final report from the Commission of
6 Correction regarding the Norberto Rivera's
7 suicide.
8     **A. Yes.**
9     **Q.** On page five, the paragraph one,
10 it says, "Policies should be in place to
11 have officers document the actual time they
12 complete rounds and not rounded off to the
13 nearest half or quarter hour;" do you see
14 that?
15     **A. I do.**
16     **Q.** When Mr. Sinkov -- withdrawn.
17     When you recorded entries in May
18 of 2006, when you checked your rounds, did
19 you record the actual time you completed the
20 rounds at that time or did you round
21 off?
22     **A.  I feel that was the actual time,**
23 **but again, the actual time it's going to be**
24 **on the electronic device.**
25     **Q.** You knew at that point in May 2006

*COMPU-TRAN SHORTHAND REPORTING*

262

**JOSEPH A. VASATURO**

1
2 to record actual time and not round
3 off?
4     **A.  I did.**
5         MR. KLEINBERG:   No further
6 questions for you, sir.
7         MR. COON:   I have no
8 questions.
9         MS. BERG:   That's it.
10
11         o0o
12
13     (Time noted:  4:16 p.m.)
14
15
16
17
18
19
20
21
2
2~
24
25

*COMPU-TRAN SHORTHAND REPORTING*

263

1
2 UNITED STATES DISTRICT COURT      )
3                 ss:
4 SOUTHERN DISTRICT OF NEW YORK     )
5
6
7     I, JOSEPH A. VASATURO, the witness
8 herein, having read the foregoing testimony of
9 the pages of this deposition, do hereby certify
10 it to be a true and correct transcript, subject
11 to the corrections, if any, shown on the
12 attached page.
13
14
15         o0o
16
17
18
19         _____
20         JOSEPH A. VASATURO
21
22 Subscribed and sworn to before me
23 this ___ day of ____, 2008.
24
25 _____

*COMPU-TRAN SHORTHAND REPORTING*

264

1
2 STATE OF NEW YORK  )
3              ) ss
4 COUNTY OF ROCKLAND )
5
6
7     I, Tracy Smith, Notary Public within
8 and for the State of New York, do hereby
9 certify:
10
11     That I reported the proceedings in the
12 within entitled matter, and that the within
13 transcript is a true record of said
14 proceedings.
15
16     I further certify that I am not
17 related to any of the parties to the action by
18 blood or marriage, and that I am in no way
19 interested in the outcome of this matter.
20
21     IN WITNESS WHEREOF, I have hereunto
22 set my hand this 3rd day of February, 2008.
23
24         _____
         TRACY SMITH,
         NOTARY PUBLIC
25

*COMPU-TRAN SHORTHAND REPORTING*

**265**

1

2   *CORRECTION SHEET*

3   Re:  SINKOV VS SMITH, ET AL

4        The following corrections, additions

5   r deletions were noted on the transcript of

6   the testimony which I gave in the above-

7   captioned matter, held on January 7, 2008.

8

9   *PAGE(S)  LINE(S)  SHOULD READ*

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18

19           _____

20        JOSEPH A. VASATURO

21  Subscribed and sworn to before me

22  this ___ day of ____, 2008.

23

24  _____

| 4  | 5/20/06 P-1 | 174 | 23 |
| 5  | MENTAL HEALTH ROUTING SHEET | 177 | 23 |
| 6  | JAIL MANAGEMENT SYSTEM BOOKING SLIP | 181 | 4 |
| 7  | INMATE MEDICAL INTAKE RECORD | 184 | 5 |
| 8  | SUICIDE PREVENTION & CRISIS INTERVENTION, BASIC PROGRAM TRAINERS MANUAL | 189 | 2 |
| 9  | OFFICER'S HANDBOOK, SUICIDE PREVENTION AND CRISIS INTERVENTION IN COUNTY JAILS AND POLICE LOCKUPS | 193 | 13 |
| 10 | LOGBOOK | 197 | 3 |
| 11 | VASATURO'S STATEMENT DATED MAY 20, 2006 | 214 | 24 |
| 12 | FINAL REPORT STATE COMMISSION OF CORRECTION | 223 | 21 |
| 13 | LETTER DATED 11/2/06 | 237 | 7 |
| 14 | FINAL REPORT OF NORBERTO RIVERA | 248 | 8 |
| 15 | STATEMENT DATED 11/15/03 | 251 | 24 |
| 16 | LOGBOOK | 253 | 10 |

*DEFENDANT'S EXHIBITS:*

   NONE

*RULINGS CONTEMPLATED:*

   NONE

**266**

***I N D E X***

PAGE#   LINE#

*EXAMINATION BY:*

| MS. BERG | 4 | 10 |
| MR. KLEINBERG | 260 | 23 |

*DOCUMENT/DATA REQUESTED:*

| Call for a copy of probationary document that was extended | 227 | 6 |
| Call for the production of that policy | 236 | 5 |
| I am going to request the new policy that was put in August 4, '06 | 258 | 18 |

*PLAINTIFF'S EXHIBITS:*

| 1 | SUICIDE PREVENTION SCREENING GUIDELINES, FORM 330-ADM | 77 | 21 |
| 2 | SECTION III, ARTICLE 15, MENTAL HEALTH EVALUATION & SERVICE | 101 | 5 |
| 3 | SUICIDE PREVENTION SCREENING GUIDELINES, SOJ-32, PAGE 7, DATED 5/20/06 | 141 | 22 |