# EXHIBIT G

**[Page 1]**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------x

DONNY A. SINKOV, as Administrator of the
Estate of SPENCER E. SINKOV, deceased,
DONNY A. SINKOV and HARA SINKOV,

Plaintiffs,

-against-

DONALD B. SMITH, individually and in his
official capacity as Sheriff of Putnam
County, JOSEPH A. VASATURO, individually,
LOUIS G. LA POLLA, individually, THE COUNTY
OF PUTNAM, NEW YORK, and AMERICOR, INC.,

Defendants.

--------------------------------------------x

222 Bloomingdale Road
White Plains, New York
January 7, 2008
4:24 p.m.

EXAMINATION BEFORE TRIAL of LOUIS LA POLLA,

a Defendant in the above-captioned matter, held

pursuant to Notice at the above time and place,

before a Notary Public of the State of

New York.

Tracy Smith,
Shorthand Reporter

24
25

*COMPU-TRAN SHORTHAND REPORTING*

**[Page 2]**

2  A P P E A R A N C E S :

3

4  LOVETT & GOULD, LLP
       Attorneys for Plaintiffs
5      222 Bloomingdale Road
       White Plains, New York 10605
6  BY: KIM BERG, ESQ.

7

8  MIRANDA, SOKOLOFF, SAMBURSKY, SLONE,
   VERVENIOTIS, LLP
9      Attorneys for Defendant -
       DONALD B. SMITH
10     The Esposito Building
       240 Mineola Boulevard
11     Mineola, New York 11501
   BY: ADAM I. KLEINBERG, ESQ.
12

13  SANTANGELO, RANDAZZO & MANGONE, ESQS.
14     Attorneys for Defendants -
       LOUIS G. LA POLLA
15     JOSEPH A. VASATURO
       COUNTY OF PUTNAM
16     151 Broadway
       Hawthorne, New York 10532
17  BY: JAMES A. RANDAZZO, ESQ.

18

19  WILSON, ELSER, MOSKOWITZ, EDELMAN &
   DICKER, LLP
20     Attorneys for Defendant -
       AMERICOR
21     3 Gannett Drive
       White Plains, New York 10604-3407
   BY: TIMOTHY P. COON ESQ.

23  ALSO PRESENT: Donny Sinkov
24               Donald Smith
25

**[Page 3]**

1

2          IT IS HEREBY STIPULATED AND AGREED,

3  by and between the attorneys for the respective

4  parties hereto, that the sealing and filing of

5  the within deposition be waived; that such

6  deposition may be signed and sworn to before any

7  officer authorized to administer an oath with

8  the same force and effect as if signed and sworn

9  to before a Justice of this Court.

10

11         IT IS FURTHER STIPULATED AND AGREED

12  that all objections, except as to form, are

13  reserved to the time of trial.

14

15         IT IS FURTHER STIPULATED AND AGREED

16  that the within examination and any corrections

17  thereto may be signed before any Notary Public

18  with the same force and effect as if signed and

19  sworn to before this Court.

20

21

22

23

24

25

*COMPU-TRAN SHORTHAND REPORTING*

**[Page 4]**

1

2              LOUIS   LaPOLLA,

3  having been duly sworn by Tracy Smith,

4  a Notary Public within and for the State

5  of New York, was examined and testified

6              as follows:

7

8                   oOo

9

10  EXAMINATION BY MS. BERG:

11      Q.   State your name and address for

12  the record, please.

13      A.   Louis LaPolla, 3 County Center,

14  Carmel, New York.

15      Q.   Sergeant LaPolla, I'm Kim Berg.

16  I'm going to ask you some questions. Let me

17  know if there's anything I say that you

18  don't understand.

19      A.   I will.

20      Q.   If you give an answer you later

21  realize is incorrect or incomplete, let me

22  know so we can have complete and accurate

23  answers before you leave.

24      A.   Okay.

25      Q.   Do you understand all that?

*COMPU-TRAN SHORTHAND REPORTING*

5

LOUIS LaPOLLA

1
2  A.  Yes.
3  Q.  Can you describe your educational
4  background?
5  A.  I have bachelor's degree,
6  criminal justice.
7  Q.  When did you receive that?
8  A.  Mid '90s. I think '98 maybe.
9  Q.  Any other post high school degrees
10  or certificates?
11  A.  As far as education, no.
12  Q.  Are you currently employed?
13  A.  Yes.
14  Q.  In what capacity?
15  A.  I'm a sergeant working in the
16  Putnam County Sheriff's Department,
17  Corrections Division.
18  Q.  For how long have you held that
19  position?
20  A.  I started -- I made sergeant in
21  August '02.
22  Q.  Prior to that, where were you
23  employed?
24  A.  I was a correction officer with
25  the Putnam County Sheriff's Department and I

6

LOUIS LaPOLLA

1
2  started in April '95.
3  Q.  Prior to April of '95, did you
4  hold any positions with any facility?
5  A.  Yes. Well, with Effective
6  Security. I was there about six years.
7  Q.  Any other correctional positions?
8  A.  No.
9  Q.  As a sergeant in the Putnam County
10  Correctional Facility, what are your job
11  duties and responsibilities?
12  A.  I supervise five officers, six
13  officers depending if there's North
14  Housing-2 is open or not. Make sure if
15  there's any questions or problems, I will
16  address them.
17  Q.  Are you assigned since August of
18  '02 to a regular shift?
19  A.  Yeah. I've been nights even from
20  as an officer. Minus one month in December
21  '05.
22  Q.  What are night shift hours?
23  A.  11:30 to 7:30.
24  Q.  With respect to your duties as
25  sergeant, do you have any role in the

7

LOUIS LaPOLLA

1
2  intakes or booking process?
3  A.  Generally if there's any
4  questions, if the booking officer has any
5  questions or feels that someone is a
6  constant watch or needs some medication or
7  any kind of questions that would come up,
8  they would address the sergeant to answer
9  the questions.
10  Q.  So the booking officer would be
11  responsible to bring those concerns to your
12  attention?
13  A.  Yes.
14  Q.  Other than when the booking
15  officer brings concerns to you as the
16  sergeant, do you have any role in the
17  booking or intake process?
18  A.  Being a supervisor, I'll go in
19  when I hear people are coming in. Make sure
20  there's no problems. You know, no one
21  that's combative. No one that can't stand
22  up. We can't accept anybody that's too
23  intoxicated or high. They would have to get
24  transported to the hospital.
25  Q.  Do you have any responsibility for

8

LOUIS LaPOLLA

1
2  filling out any of the screening paperwork?
3  A.  It's common practice to sign off
4  on the screening.
5  Q.  When you say "sign off on the
6  screening," are you referring to the suicide
7  screening?
8  A.  Medical and suicide, correct.
9  Q.  You would sign off on both?
10  A.  Yes.
11  Q.  Is that required by Putnam County
12  policy as far as you know?
13  A.  As far as I know, not 100 percent
14  sure. I don't think there's anything
15  written on that unless there's a problem.
16  Then the paperwork is forwarded to me by the
17  booking officer.
18  Q.  What do you mean if there's a
19  problem?
20  A.  High-risk shaded areas;
21  statements, suicidal statements. Don't want
22  to live anymore. Anything to that effect.
23  Q.  When you say if there's a high
24  risk, what do you mean?
25  A.  If the booking officer feels that

9

LOUIS LaPOLLA

2 the person is high risk, the screening that
3 you've gone over, it could have a high score
4 or they could have a zero and the booking
5 officer could feel they're being lied to.
6 And they can say we're not being honest with
7 us, you have to make sure to err on the side
8 of caution.
9     Q.    When you say high risk, you mean
10 high risk of committing suicide?
11     A.    Yes.  I should say high risk and
12 withdrawals, too.  Any high risk.
13     Q.    Is high risk defined anywhere as
14 far as you know in any policy or procedures
15 in Putnam County?
16     A.    It may be, but I can't recall at
17 this time.
18     Q.    Is it customary that booking
19 officers will have situations on the 11:30
20 to 7:30 shift that you supervise where
21 individuals pose a high risk of suicide?
22     A.    Yes.
23     Q.    Or where the shaded areas on the
24 form are checked?
25     A.    Yes.

10

LOUIS LaPOLLA

2     Q.    Or where they make some type of
3 suicidal statement?
4     A.    Yes.
5     Q.    In each of those cases, you're
6 supposed to be notified according to Putnam
7 County policy?
8     A.    That is correct.
9     Q.    Do you have any understanding as
10 to what the purpose of notifying you as the
11 supervisor is in connection with those
12 high-risk inmates?
13     A.    The booking officers are trained
14 to identify high risk and place them on the
15 proper supervision, and I would review,
16 concur.  I may talk to the inmate just to
17 verify.
18     Q.    Are you required to approve or
19 disapprove, if you will, the placement of an
20 inmate on some type of heightened level of
21 supervision?
22     A.    Yes.  I would say yes.
23     Q.    Does that approval have to be in
24 writing?
25     A.    I would say within the P-1 form

11

LOUIS LaPOLLA

2 in a memo, so I would say yes.
3     Q.    Is your approval as the sergeant
4 required to be in writing?
5     A.    Not necessarily, no.
6     Q.    It could be verbal?
7     A.    It could be verbal, and I could
8 delegate, tell a person to type a memo on
9 this individual or do a mental health
10 referral.  Something to that effect.
11     Q.    Have you had occasion to do a P-1
12 with respect to somebody that's on a
13 heightened level of supervision?
14     A.    Yes, I have.
15     Q.    In some cases, the booking officer
16 does the P-1?
17     A.    Yes.
18     Q.    It's not uniform who's going to do
19 it?
20     A.    No.  Usually the booking officer.
21 When it gets busy at times, I'll go in and
22 help out.
23     Q.    On the shift that you've work
24 since August '02 since you've been sergeant,
25 are you the most senior person?

12

LOUIS LaPOLLA

2     A.    Usually unless there's someone
3 doing overtime that an officer has more
4 time.  That does happen.
5     Q.    Senior in terms of more time on
6 the job?
7     A.    On the job.
8     Q.    Not senior in terms of title?
9     A.    No, unless there's a sergeant
10 doing overtime at night, and that has
11 happened.
12     Q.    With respect to your duties, are
13 they facility wide, or are they limited to a
14 specific unit?
15     A.    It's facility wide.  I'm in
16 charge of the whole jail.
17     Q.    In terms of your reporting
18 structure, who do you report to in the chain
19 of command?
20     A.    I would report to the lieutenant,
21 and if the lieutenant is out, I would report
22 to the captain.
23     Q.    Lieutenant is O'Malley?
24     A.    Yes.
25     Q.    How often do you interact with

13

LOUIS LaPOLLA

1  LOUIS LaPOLLA
2  O'Malley?
3      A.    It varies. He was out for a
4  while. Then I interacted more with the
5  captain.
6      Q.    And the lieutenant and captain
7  work the same hours as you?
8      A.    No. They're 9 to 5 basically,
9  and I'm the night shift.
10     Q.    What's the form of your
11 interaction with lieutenant and the captain?
12     A.    If there's a constant watch. If
13 there's an incident. If there's a fight.
14 Someone overdosing, which has happened.
15 Anything that would be reportable to the
16 State Commissioner of Corrections would be
17 notified to the lieutenant and higher.
18     Q.    So that would be on a given shift,
19 you would actually make notification to the
20 lieutenant or in the lieutenant's absence,
21 the captain --
22     A.    Yes.
23     Q.    -- of an unusual incident?
24     A.    Yes.
25     Q.    And you would notify them also if

COMPU-TRAN SHORTHAND REPORTING

14

LOUIS LaPOLLA

1  LOUIS LaPOLLA
2  a constant watch is instituted?
3      A.    That has happened yes, generally
4  I do.
5      Q.    In any case when a constant watch
6  is instituted, are you required to notify
7  them?
8      A.    As far as requirement, I'm not
9  sure, but I do it anyway.
10     Q.    That's your practice?
11     A.    Yes.
12     Q.    Do you know if other sergeants do
13 that?
14     A.    I believe they do, yes.
15     Q.    In terms of your interaction with
16 Lieutenant O'Malley and Captain LeFever,
17 other than when some unusual incident and
18 constant watch occurs on your shift, do you
19 have other types of interactions with them?
20     A.    Yes. If I'm in a training day,
21 the lieutenant is one of our training
22 officers.
23     Q.    Any other interaction?
24     A.    If I'm doing overtime and I
25 happen to see him.

COMPU-TRAN SHORTHAND REPORTING

15

LOUIS LaPOLLA

1  LOUIS LaPOLLA
2      Q.    Any other interactions?
3      A.    If there is -- if I remember,
4  I'll bring it up.
5      Q.    Okay.
6           Have you ever been disciplined or
7  counseled?
8      A.    No. Nothing formal.
9      Q.    Has anybody ever formally or
10 informally told you that anything you did
11 was against county policy?
12     A.    No.
13     Q.    Did anybody ever tell you verbally
14 or in writing, formally or informally, that
15 you did something that violated any
16 procedures, rules or violations?
17     A.    No.
18     Q.    Did anybody indicate to you that
19 there was any kind of action, disciplinary
20 action being contemplated against you?
21     A.    Yes. In reference to this case,
22 yes.
23     Q.    When were you first told that?
24     A.    Well, just when the incident
25 happened, there's an investigation going on.

COMPU-TRAN SHORTHAND REPORTING

16

LOUIS LaPOLLA

1  LOUIS LaPOLLA
2  It's a given. I wasn't officially notified,
3  but I understood there was one started at
4  that point May 20th. November 20th, the
5  18-month period was coming up. And I
6  believe the Friday before that just past.
7  This past November, I was given a piece of
8  paper to sign saying that I would accept an
9  extension of an investigation concerning any
10 violations of policy and procedure.
11     Q.    Who gave you that paper to sign?
12     A.    That was Sergeant Marrow, and I
13 came in on A line before. A line. It was
14 probably 11:00 or five to 11. I signed a
15 piece of paper. He took it. He gave me the
16 paper. I signed it. He took it. Sergeant
17 Marrow took it, brought it in an envelope
18 and I believe he brought it to the captain.
19 Captain LeFever's door which was locked and
20 slid it under there.
21     Q.    And that paper extended the time
22 that they could bring charges against you?
23     A.    From 18 months to two years.
24     Q.    Did it specify what the nature of
25 the charges would be?

COMPU-TRAN SHORTHAND REPORTING

17

LOUIS LaPOLLA

1
2   A.   I'm not sure if it did or not.
3   Q.   Did it indicate that it related to
4 the incident involving Spencer Sinkov?
5   A.   Yes.
6   Q.   Did you consult with anybody prior
7 to signing that?
8   A.   Yes. I called the union lawyer,
9 and I spoke with Jim Randazzo.
10   Q.   Did you speak with
11 Mr. Baumgardner?
12   A.   Yes.
13   Q.   Has anybody told you as to where
14 that stands as of today?
15   A.   No.
16   Q.   From time to time as a sergeant on
17 the midnight shift, do you go into the North
18 Housing Unit?
19   A.   Yes. I actually check each unit
20 twice a shift.
21   Q.   Do you have any requirements to
22 sign off on any logbook or documents when
23 you do your checks?
24   A.   As far as a requirement, I sign
25 to make sure that I was there. I also use

18

LOUIS LaPOLLA

1
2 the -- at that time, we were using the Morse
3 Watchman. It's a recording device. I would
4 put my code in and do the check and sign the
5 book.
6   Q.   Have you ever provided any
7 training to your subordinates?
8   A.   Provided training?
9   Q.   Yes.
10   A.   Not in an official capacity.
11   Q.   Have you ever instructed anybody
12 as to what should be done on a routine check
13 as opposed to a 15-minute check?
14   A.   No. Not to my knowledge. I
15 don't remember giving anybody instructions.
16   Q.   Have you ever given anybody any
17 directions as to what's supposed to happen?
18   A.   15 and any check, you have to
19 make sure the person is breathing and
20 they're in well -- they're alive. They're
21 not doing anything to try to hurt themselves
22 or they're not in distress medically or
23 physically or anything like that. Verbally,
24 I've said it, but not in an official
25 training class.

19

LOUIS LaPOLLA

1
2   Q.   With respect to the 15-minute
3 checks, how, if at all, do they differ from
4 the routine 30-minute checks?
5   A.   They're the same -- they're done
6 more frequently, and on the hour, you're
7 supposed to write down what the person is
8 doing. If they're doing anything from lying
9 down, to using the toilet. And also, on any
10 supervision, if anybody is doing anything
11 out of the ordinary, a sergeant must be
12 notified.
13   Q.   In terms of when you say on the
14 hour, you're supposed to write down what the
15 inmate is doing, do you mean on the hour as
16 in 12:00, 1:00 or 60 minutes, every 60
17 minutes?
18   A.   Within the hour and round it off
19 so it's not on the hour, but it would be
20 every -- the fourth check, you would write
21 down.
22   Q.   In your experience, have constant
23 watches been implemented?
24   A.   Yes.
25   Q.   And those circumstances it would

20

LOUIS LaPOLLA

1
2 be one-on-one supervision of an inmate?
3   A.   Yes.
4   Q.   Where would the constant watches
5 be housed?
6   A.   They're supposed to be housed in
7 North 2 if there's room in North 2.
8 Usually, there is.
9   Q.   Have you ever had any discussions
10 with anybody about whether the Putnam County
11 Correctional Facility has significant
12 manpower to perform constant watches?
13   A.   Have I questioned anybody?
14   Q.   No. Have you spoken with anyone
15 about that?
16   A.   I'm not sure on that one.
17   Q.   Did you ever speak with your
18 subordinates about that?
19   A.   I've spoken about having
20 manpower, sure, but that was overall
21 inclusive of constant watch.
22   Q.   In terms of constant watches, is
23 there somebody who is on each night shift
24 who could take over the function?
25   A.   Right now there is.

21

**LOUIS LaPOLLA**

Q. For how long has that been true?

A. That started -- we got extra men. To be honest, I would have to look at the records when we got extra men and that was from staff analysis.

Q. Do you recall how long ago? Was it a week, a month, a year?

A. No. It's probably seven, eight months maybe, but don't hold me to that. I have to check the records.

Q. It occurred some time in 2007?

A. Yes.

Q. What happened with respect to that post or position? It was created?

A. Yeah. What happened was we created an -- originally, housing control was in charge of booking and reliefs. Now, we have a booking officer and housing control will sign in. They go down and help out with south housing. They usually split the checks. They're there just in case we get busy or someone needs a relief. The relief factor now, a booking officer can provide relief if they're not busy.

22

**LOUIS LaPOLLA**

Q. If there was a constant watch instituted, the person assigned to housing control would do the constant watch?

A. For the most part, yes.

Q. Basically, the housing control officer then would fill in where needed on a given shift?

A. Correct.

Q. Is that position existing only on the night shift?

A. Right now, yes.

Q. Did you have any involvement in any discussions about creating that position?

A. An extra man?

Q. Yes.

A. I always want more people on the shift. I'm adamant about that.

Q. Who did you speak with about that?

A. Probably everyone.

Q. Do you recall anyone in the administration that you spoke with?

A. Probably the lieutenant, captain. I'm sure at sergeant meetings, union

23

**LOUIS LaPOLLA**

meetings, I'm sure with the union, too.

Q. Do you recall anything that you said to Captain LeFever or that he said to you about creating that additional shift or post?

A. Nothing offhand.

Q. Anything you recall saying to O'Malley?

A. Basically, we need more people in case we have an emergency. If we have hospital transport, I need people on my shift.

Q. Are there less people assigned to work in the jail on the night shift?

A. Yes.

Q. How many less?

A. You'd have to do the -- on a weekend, you don't have your program officers or modified PW people. During the week, you have all that factored in with the day shift. At night, we have main, east, west, north, booking, housing control so you have six compared to eight or nine on the day shift. Eight or nine that's without the

24

**LOUIS LaPOLLA**

program people. I mean modified PW people.

Q. Are there additional supervisors or sergeants on the day shift?

A. Sometimes you have two sergeants.

Q. On the night shift, it's one? You?

A. It's always one.

Q. Any other differences in the staffing?

A. Offhand right now, I don't know. Maybe I'd have to look into it.

Q. Are you familiar with Americor?

A. Yes.

Q. When did they first come into the facility as far as you can recall?

A. They're here for a few years.

Q. Were they here when you were appointed to sergeant in August '02?

A. They may have been. I'm not sure.

Q. What's your understanding of their role or involvement in the jail?

A. Their role is to handle any medical issues that come up. They would be

25

LOUIS LaPOLLA

2 the people that would say this person has to
3 go to the hospital. Get an ambulance here
4 now. They administer medication. They --
5 or screenings, they come up. They take
6 vitals. They'll review the screening.
7 They'll ask the inmates questions that they
8 need to know, pertinent questions. They'll
9 send them up to get the tuberculosis skin
10 test on the arm.
11    Q.    When you say that they're involved
12 in screenings, do you mean the intake
13 process?
14    A.    Well, ultimately, the whole
15 screening goes to them. They file it. They
16 look on the medical side. If there was any
17 questions, they could advise the officer or
18 me and they have access to mental health
19 routing sheets. And they can address us to
20 let us know this person you might want to
21 look into this further, their mental
22 status -- they've even called for putting
23 someone on the constant watch for alcohol.
24    Q.    Was that on one occasion or more
25 than one occasion that you can recall?

27

LOUIS LaPOLLA

2 Americor to review. Americor will review.
3 They take vitals and ask some questions on
4 whatever meds a person takes. Then they'll
5 let us know. They'll look at the screening.
6 Usually, they'll say this person is okay or
7 this person needs to get his meds. We make
8 a phone call and parents are dropping off
9 meds at the front. Let us know, we'll get
10 them.
11    Q.    With respect to the screening that
12 Americor employees do, does that occur at
13 the booking process?
14    A.    No. Their screening is done in
15 the medical department itself.
16    Q.    When an inmate comes into a
17 facility, a new arrival, are they screened
18 by Americor before going to the cell?
19    A.    They do their initial check-out
20 of the inmate, but their official screening
21 I believe is done when they do the skin test
22 on the arm. They'll do a medical update.
23    Q.    And that occurs when?
24    A.    Usually, within the first 24
25 hours, I believe. Maybe 48 hours.

26

LOUIS LaPOLLA

2    A.    One that I know. Rich DeMatio.
3 That was with me and him.
4    Q.    Is that Rich DeMatio?
5    A.    Yes.
6    Q.    In terms of the Americor's role in
7 the screening process, when does it come in
8 in relation to the inmate coming into the
9 facility?
10    A.    It varies because they could come
11 into the facility when booking is busy and
12 they'll be placed as long as they're patted
13 down and there's no initial injuries visible
14 or if they're collapsing and can't stand up
15 because they're intoxicated or high, we
16 won't take them. They'll sit in a holding
17 cell until we get to them. And there's also
18 an officer in that room.
19    Q.    Is that the booking officer?
20    A.    Yes.
21    Q.    In terms of the screening, are
22 hey done by Americor within a set time?
23    A.    I'm not sure of the set time.
24 Once the booking officer is done with the
25 screening, they will give the screening to

28

LOUIS LaPOLLA

2    Q.    Would that be true over the
3 weekend as well?
4    A.    It should be. That was my
5 belief, I should say.
6    Q.    What do you base your belief on?
7 Something you observed or something else?
8    A.    I can't tell you. I can't
9 speculate on that right now.
10    Q.    Initially, the Americor employees
11 do some kind of screening and booking?
12    A.    Yes.
13    Q.    And that's before cell assignment?
14    A.    Yes.
15    Q.    Is it your understanding during
16 that initial screening and booking, they
17 take vitals?
18    A.    Yes.
19    Q.    And ask the inmates questions?
20    A.    Yes.
21    Q.    Anything else that they do as far
22 as you?
23    A.    No, not to my knowledge. If I
24 remember something, I'll let you know.
25    Q.    In your experience, other than the

29

LOUIS LaPOLLA

1  one time where they called for someone to be
2  on a constant watch, that was Mr. DeMatio,
3  any other occasions where Americor employees
4  have recommended a heightened level of
5  supervision above routine?
6  A.  I believe they have, but I can't
7  remember when.
8  Q.  Is there any requirement for the
9  correction officers, either booking officer
10 or anyone else, to consult with Americor
11 staff before the level of supervision is
12 determined?
13 A.  Not to my knowledge.
14 Q.  You indicated that ultimately the
15 screening form which includes the medical
16 intake and the suicide screening goes to
17 medical; correct?
18 A.  Correct.
19 Q.  Do you know when in terms of
20 timing, like hours, days?
21 A.  It would be hours.  It would
22 vary.  What happens, that packet with the
23 pedigree has the charges and all that stuff
24 is entered into the JMS computer.  The
25

COMPU-TRAN SHORTHAND REPORTING

30

LOUIS LaPOLLA

1  booking officer has to type it up before
2  they drop it off.  Sometimes they get it
3  done before the inmate is placed into the
4  cell, sometimes it's after.
5  Q.  But it would be within hours?
6  A.  Yes.
7  Q.  Is someone from Americor in the
8  facility 24 hours a day, seven days a week?
9  A.  Yes.
10 Q.  When the form goes to the Americor
11 or medical area, do you know how it's
12 delivered?  Is it in a sealed envelope, is
13 it in person, is there any discussion?
14 A.  It should be in person.  If
15 there's discussions that happen, it may
16 happen; but if I'm not there, I can't tell
17 you.
18 Q.  Are you aware of any requirement
19 when the booking officer is administering
20 the Suicide Screening Guidelines, if it's a
21 score of eight or higher, they're required
22 to notify you as the tour supervisor?
23 A.  Yes.
24 Q.  Is that a written policy in Putnam
25

31

LOUIS LaPOLLA

1  County, as far as you know?
2  A.  I believe it's somewhere in all
3  the paperwork or the books.  I believe it's
4  somewhere.
5  Q.  In addition to that, if an
6  individual inmate answers yes in any of the
7  shaded areas on the suicide screening, the
8  booking officer is required to notify you?
9  A.  Immediately.
10 Q.  Finally, if there is some concern
11 on the booking officer's part, irrespective
12 of the score and irrespective of the shaded
13 boxes, they would be required to notify you
14 as the supervisor?
15 A.  Sure.  Especially if someone is
16 on the fence.  Is he routine, is it 15?  If
17 they're not sure, they would call, yes.
18 Q.  And you said that notification is
19 supposed to be immediate?
20 A.  Yes.
21 Q.  Is it required to be in writing or
22 verbal or both?
23 A.  I believe it's supposed to be in
24 writing when they forward it.
25

COMPU-TRAN SHORTHAND REPORTING

32

LOUIS LaPOLLA

1  Q.  In practice, how does that carry
2  out?  An inmate is in booking.  The booking
3  officer administers the guidelines and let's
4  say a score of eight, how do they go about
5  notifying you?
6  A.  They'll call me by radio.
7  Sergeant, we might have a problem in booking
8  with the screening.  You need to come in
9  here.
10 Q.  What happens after that?
11 A.  I'll report in, and I'll review
12 the screening, talk to the inmate.
13 Q.  And you would yourself personally
14 talk to the inmate?
15 A.  Yes.
16 Q.  Then what happens?
17 A.  Generally, I err on the side of
18 caution.  If the person is on the fence with
19 constant supervision, he's on constant
20 supervision.
21 Q.  Who ultimately has the call as to
22 whether heightened level of supervision
23 would be instituted?
24 A.  To be honest with you, any
25

COMPU-TRAN SHORTHAND REPORTING

33

LOUIS LaPOLLA

1 officer can say this person needs to be on
2 constant supervision. Me myself, if medical
3 says this person needs to be on one-on-one
4 supervision, they will be on one-on-one
5 supervision.
6     Q.   And a booking officer can make
7 that determination?
8     A.   Yes.
9     Q.   And you can also?
10     A.   Yes.
11     Q.   Can you as the sergeant, the
12 superior, overrule a booking officer's
13 recommendation for a lower level of
14 supervision?
15     A.   Can I overrule it, yes.
16     Q.   Have you ever done that?
17     A.   I don't remember ever overruling,
18 putting them on a higher watch. I don't
19 remember ever doing that.
20     Q.   In terms of the booking officer
21 making a determination to put someone on a
22 15 minute or constant watch, are you
23 required to be consulted prior to the cell
24 assignments in those cases?

COMPU-TRAN SHORTHAND REPORTING

34

LOUIS LaPOLLA

1     A.   It varies. It varies. For
2 example, Mr. Sinkov's case, I was in the
3 booking room. I had an understanding when
4 he came in. If I didn't go into that room
5 and didn't see him, I would make sure I
6 would go in there and see the inmate before
7 he's put in the cell assignment.
8     Q.   In that case with Mr. Sinkov, you
9 were aware that he was placed on a 15-minute
10 watch?
11     A.   Correct.
12     Q.   Was that before he was put in his
13 cell?
14     A.   Yeah. Before he was put in the
15 cell, it was radioed to me. As far as I
16 believe, he was being transported or
17 escorted to cell seven. And Officer
18 Vasaturo radioed that to me.
19     Q.   Are you aware of any policies or
20 procedures currently in place in the Putnam
21 County Correctional Facility with respect to
22 whether an inmate in supposed to be placed
23 on a heightened level of supervision if they
24 score eight or higher on the Suicide

COMPU-TRAN SHORTHAND REPORTING

35

LOUIS LaPOLLA

1 Screening Guidelines?
2     A.   There's nothing written as far as
3 an exact number to an exact supervision.
4     Q.   Are you aware of any regulations
5 at the level of the State Commission of
6 Correction with respect to whether an inmate
7 should be placed on a constant supervision
8 if they score eight or higher?
9     A.   Sitting here today, yes. I've
10 seen that form that you've shown before,
11 minus the set of instructions.
12     Q.   Prior to today when you sat
13 through Officer Vasaturo's deposition, are
14 you aware of any regulations the State
15 Commission of Corrections should be implemented for
16 constant watches should be implemented for
17 individuals who score eight or higher on the
18 form?
19     A.   My understanding is in all
20 honesty, that the Commission of Correction
21 does not recognize 15 minutes. That's what
22 stood out of the whole thing when I looked
23 at the form. It was either routine watches,
24 which is checked on a half hour or

COMPU-TRAN SHORTHAND REPORTING

36

LOUIS LaPOLLA

1 one-on-one.
2     Q.   Are you aware of any regulations
3 with respect to the State Commission of
4 Correction that provides for a 15-minute
5 watch?
6     A.   I'm not aware of any.
7     Q.   So, your understanding as you sit
8 here today, is that if an inmate scores
9 eight or higher on a Suicide Screening
10 Guidelines, according to the State
11 Commission, routine supervision is not
12 enough? There's no 15-minute check so it
13 would have to be constant?
14     A.   According to the state.
15     Q.   When you said that you saw the
16 form earlier, were you referring to
17 Plaintiff's 1, the ADM-330?
18     A.   Yes.
19     Q.   Had you ever seen that form before
20 today?
21     A.   I may have in the training class.
22 I couldn't tell you 100 percent. There's
23 numerous training classes that I've
24 attended. It could have been in the packet.

COMPU-TRAN SHORTHAND REPORTING

37

**LOUIS LaPOLLA**

Q.   With respect to the forms that you saw in training, do you recall if it had the language noted under action, in substance, a core of eight or higher or shaded box is checked, notify supervisor immediately and initiate constant watch?

A.   **Our form is pretty much everything except for the institute constant watch.**

Q.   When you were in the training classes that you referenced, did it have a statement on the form that you saw during those classes with respect to instituting constant watch?

A.   **I don't remember.**

Q.   You never saw the second page which is the instructions?

A.   **I don't remember. I don't recall seeing the second sheet.**

Q.   Were you aware of any written policies in the Putnam County Correctional Facility regarding placing an inmate on a heightened level of supervision if they answer yes in any of the shaded boxes?

COMPU-TRAN SHORTHAND REPORTING

38

**LOUIS LaPOLLA**

A.   **If they answer yes, you notify a supervisor. In my opinion, that's a heightened --**

Q.   So what would occur in terms of the practice in the facility since you've been sergeant as to what level of supervision would be instituted where an inmate has a yes in a shaded box?

A.   **I would talk to the inmate first and talk to my officer. Sometimes the questions come out, the inmate may answer it incorrectly. They may not have understood the question. Or maybe they changed their mind after talking to him for a little bit. Sometimes people need to calm down a little bit when they first initially come in.**

Q.   If after speaking with the inmate it's your opinion that a heightened level of supervision is required, what level is that?

A.   **Heightened constant watch.**

Q.   Did you ever receive any training or instruction that with respect to the Suicide Prevention Screening Guidelines, the purpose of the form is to notify correction

39

**LOUIS LaPOLLA**

officers of individuals who are at high risk for suicide?

A.   **Yeah. That's what the training is supposed to do.**

Q.   In your experience in the Putnam County Correctional Facility, has anybody differentiated in any of your training or instruction between someone who's at high risk for suicide and the term suicidal?

A.   **Not to my knowledge.**

Q.   There's no difference as far as you?

A.   **No. As far as I'm concerned, they both go on constant supervision.**

Q.   Has that been true since August of '02, that they both would be going on constant supervision?

A.   **If I'm aware, yes.**

Q.   Were you ever advised of any situation where an inmate scored as a high risk on the Suicide Prevention Guidelines, meaning they had eight or higher or a shaded box checked, and they were not placed on constant watch?

COMPU-TRAN SHORTHAND REPORTING

40

**LOUIS LaPOLLA**

A.   **I don't know if eight or higher. But the embarrassment question, a lot of times that's observation for somebody. What kind of position they hold in the community. If they're really overly upset to the point where they can't function or answer any questions because they're so overwhelmed, that could be constant supervision. That's one question that could be split. You can go either way on those ones.**

Q.   Other than that question, any others?

A.   **No.**

Q.   In terms of the score, if someone has eight or higher, in your experience in your practice as a sergeant, what level of supervision do you institute?

A.   **It varies because the eight, it could hit on different numbers or questions, I should say.**

Q.   Are you aware of any facility policies that require if someone has a score of eight or higher, they be placed on constant supervision?

COMPU-TRAN SHORTHAND REPORTING

41

LOUIS LaPOLLA

1
2   A.   No.
3   Q.   Were you aware of any policy
4   changes that came down in or about August of
5   .006?
6   A.   Yes.
7   Q.   What were you aware of?
8   A.   I came in August 4th going into
9   the 5th, night shift. Sergeant Greno said
10  this policy and procedure needs to get put
11  in the sergeant book. It was put into all
12  the others - north, south, east, west. All
13  the other ones were put in. I happened to
14  look at it, and I looked at the policy it
15  was replacing, and I said there's a pretty
16  big difference here.
17  Q.   What was the differences? Tell me
18  what the old policy said.
19  A.   Basically, that 15 -- I'd have to
20  say it verbatim. I'm horrible --
21  Q.   In substance?
22  A.   Basically, you check the person
23  every 15. That you have to have -- be able
24  to see the person without any electronic
25  devices and be able to immediately respond

*COMPU-TRAN SHORTHAND REPORTING*

42

LOUIS LaPOLLA

1
2   to any emergency situation or respond to the
3   situation.
4   Q.   What did the new policy say?
5   A.   It basically said the same thing,
6   but then there was added in number one, 15
7   minute supervision will not be used as a
8   suicide prevention or something to that
9   effect.
10  Q.   So what's your understanding of
11  the policy since August 4, 2006?
12  A.   That anybody that would be -- if
13  you were to put on a P-1 memo that someone
14  is on a 15 due to anything other than a
15  specific drugs or alcohol, if they put on
16  answers during the screening, you know, the
17  booking screening that we're going over,
18  then that would be constant.
19  Q.   So since August 4, 2006 and
20  correct me if I'm wrong, if somebody is
21  placed on a heightened level of supervision
22  because of answers given on the Suicide
23  Prevention Screening Guidelines, the new
24  policy says constant watch must be
25  implemented?

*COMPU-TRAN SHORTHAND REPORTING*

43

LOUIS LaPOLLA

1
2   A.   The new policy says constant --
3   15 minute supervision will not -- is not
4   used as a suicide deterrent or prevention.
5   Q.   What's left then if the answers on
6   the suicide screening are of such that it
7   shows the inmate is a high risk for suicide?
8   If you can't use 15 minutes, what do you do?
9   A.   Go to constant supervision.
10  Q.   That's your understanding of the
11  policy since August 4, '06?
12  A.   Correct.
13  Q.   Did anybody provide you with any
14  specific instructions with respect to the
15  new policy?
16  A.   As far as?
17  Q.   I don't know. Any training, any
18  directives, any indication of how it should
19  be carried out?
20  A.   No. Just handed -- well,
21  actually, I was told it was sitting by the
22  book, and I put it in and checked it.
23  Q.   Did any subordinates of yours have
24  any conversations with you about the new
25  policy?

*COMPU-TRAN SHORTHAND REPORTING*

44

LOUIS LaPOLLA

1
2   A.   Of course I went to Officer
3   Vasaturo and said, are you aware of this.
4   Q.   Why did you go to him?
5   A.   Because we're sitting right here
6   now. That's basically it.
7   Q.   What did he say to you?
8   A.   That's something. Something to
9   that effect.
10  Q.   Do you recall anything else that
11  you said or that he said?
12  A.   No. It's going back a ways.
13  Q.   Did you speak with him on or about
14  that date August 4, '06?
15  A.   He worked that same shift, so
16  yes. The 4th into the 5th.
17  Q.   With respect to Article 15 which
18  was marked as Exhibit 2, did you ever see
19  that before or any portion?
20  A.   I'm sure I have.
21  Q.   Do you know what that is?
22  A.   Yeah. It's from our red books.
23  The rules, regulations, articles of
24  administration.
25  Q.   Is that red book something you're

*COMPU-TRAN SHORTHAND REPORTING*

45

**LOUIS LaPOLLA**

2  permitted to take home with you?
3  **A.   Yeah.  I was issued one.**
ᵃ  Q.   Do you know if in connection with
5  ne policies and procedures, this was
6  effective in any way?
7  **A.   I'd have to compare them.**
8  Q.   In this document on the second
9  page, it refers specifically to the ADM-330
10  if you look at small letter B on the top?
11  **A.   ADM-330, yes.**
12  Q.   That form is not the form that's
13  used in Putnam County; correct?
14  **A.   You made me aware of that, yes.**
15  Q.   Did anybody ever indicate to you
16  any reason why the ADM-330, the New York
17  State Commission of Correction form is not
18  used in Putnam County?
19  **A.   No.**
20  Q.   Take a look if you would at
21  Exhibit 3 which is the SOJ-32.  Is that the
22  form used in Putnam County for suicide
23  screening since you've been sergeant?
24  **A.   This is part of the packet, yes.**
25  Q.   But that's the suicide screening

46

**LOUIS LaPOLLA**

2  form?
3  **A.   Yes.**
4  Q.   That's actually used; correct?
5  **A.   Yes.**
6  Q.   Has that form been modified or
7  changed in any way?
8  **A.   Not to my knowledge.**
9  Q.   Did anybody ever discuss with you
10  why that form differs from the Commission of
11  Correction form on suicide screening?
12  **A.   I don't recall.**
13  Q.   Did anybody ever discuss with you
14  why the portion referring to constant watch
15  being instituted was removed from the
16  Commission of Correction form and not put on
17  the SOJ-32?
18  **A.   I don't know.**
19  Q.   Are you aware of whether there are
20  any detox programs available to inmates that
21  come in under circumstances where they have
22  a drug or alcohol program?
23  **A.   Americor.  I believe, they try to
24  contact or if the person themselves had a
25  program, but it would be through medical.**

47

**LOUIS LaPOLLA**

2  **That's how it would go.  There's also
3  program request sheets that an inmate could
4  fill out, saying they wanted to attend AA or
5  substance abuse programs?**
6  Q.   In terms of the physical symptoms
7  of withdrawal, the Americor staff would be
8  responsible for dealing with those?
9  **A.   Well, they would be responsible
10  to appoint, but they're not conducting the
11  checks.  If an officer is conducting a check
12  and notices someone violently ill, they're
13  going to report it to the supervisor and
14  medical and then they would take it from
15  there.**
16  **I'm sorry.  You said before about
17  the policy.  The substance abuse program,
18  there's alcohol.  Those are programs
19  affiliated with -- medical doesn't have to
20  be involved with that.  It could be an
21  officer could let me know.**
22  Q.   In terms of individuals who come
23  in under the influence of alcohol or drugs,
24  have you ever been trained in how to assess
25  them appropriately as part of the booking or

48

**LOUIS LaPOLLA**

2  intake process?
3  **A.   Well, observations is one.  Like
4  I said earlier, if a person can't stand up,
5  they had too much in their system, we can't
6  treat that.  Again, if they become violently
7  ill, we notify medical.  It's more of
8  observations than any formal -- we don't get
9  involved.  We notify.**
10  Q.   Were you working at the facility
11  when Norberto Rivera was an inmate there?
12  **A.   I wasn't on that -- I don't know
13  if it was a past day or vacation, but I
14  wasn't in the facility when it happened.**
15  Q.   Were you involved in any way in
16  his intake --
17  **A.   No.**
18  Q.   -- as a supervisor?
19  **A.   I don't believe so.  I'd have to
20  go back.  I don't believe I was involved.**
21  Q.   Were you aware that he was on
22  constant watch -- on 15-minute supervisory
23  checks?
24  **A.   I'd have to go back to see,
25  because I don't know if I was on vacation**

49

**LOUIS LaPOLLA**

1  **during that period of time or not.**

2  Q.   Do you have any recollection of

3  Norberto Rivera?

4  A.   **In all honesty, no.  I know the**

5  **name but I can't put a face.**

6  Q.   Following Norberto Rivera

7  committing suicide, were you questioned?

8  A.   **No.**

9  Q.   Were you aware of an investigation

10 that was being conducted?

11 A.   **Any time there's a suicide or**

12 **death, there's an investigation.**

13 Q.   Were you involved in any way in

14 the investigation, coordinating it,

15 anything?

16 A.   **No.**

17 Q.   Nobody ever asked you any

18 questions pertaining to Mr. Rivera?

19 A.   **Not to my knowledge.**

20 Q.   Did you ever come to learn at any

21 point in time that there was any concern

22 about Officer Vasaturo rounding off the

23 times in the logbook?

24 A.   **No.**

50

**LOUIS LaPOLLA**

1  Q.   Did you ever see Exhibit 13 which

2  is a November 2, 2006 anonymous letter?

3  A.   **It's the first time.**

4  Q.   With respect to the statements

5  contained in that letter, specifically

6  paragraph one on the first page referring to

7  captain running around updating the

8  logbooks, did you ever observe that?

9  A.   **Where was that?**

10 Q.   First paragraph.

11 A.   **I'm sorry.  Did I ever witness**

12 **that?**

13 Q.   Yes.

14 A.   **No.**

15 Q.   Did anyone ever tell you they had

16 seen that?

17 A.   **I don't remember anybody telling**

18 **me updating logbooks, no.**

19 Q.   Did anybody ever indicate to

20 you -- withdrawn.

21      Did you ever observe them coming

22 out with any policies and procedures?

23 A.   **The new policy and procedure that**

24 **I was -- back in August of '06.  It was**

51

**LOUIS LaPOLLA**

1  **August 4th.  That was a new policy and**

2  **procedure that came out.**

3  Q.   Any others that you were aware of?

4  A.   **In regard to the suicide**

5  **prevention or the watches, I don't recall**

6  **offhand.**

7  Q.   The second and third paragraph

8  refers to the program officer and the fact

9  that the North Housing Unit post has to

10 cover that program officer position when the

11 program officer is absent?

12 A.   **That's correct.**

13 Q.   Has that been true the entire time

14 you've been sergeant?

15 A.   **Yeah.  Pretty much the entire**

16 **time I've been employed.**

17 Q.   That would be true on nights and

18 weekends?

19 A.   **Yes.**

20 Q.   Have you ever as part of your

21 concerns regarding staffing, indicated to

22 anyone a problem that you see with North

23 Housing Unit post covering the program

24 officer's duties?

52

**LOUIS LaPOLLA**

1  A.   **I may have said something on**

2  **speculation, because I was very big on staff**

3  **analysis.  I don't recall specific that.**

4  Q.   Do you recall having any

5  discussions with Lieutenant O'Malley or

6  Captain LeFever about that specific issue?

7  A.   **We may have at a sergeant**

8  **meeting.  I don't recall.**

9  Q.   Do you know if anything is being

10 done as part of any staffing analysis with

11 respect to that?

12 A.   **We've been hiring people.  I have**

13 **another person on at night.**

14 Q.   Would that person have

15 responsibility for covering the program

16 officer's duties?

17 A.   **Well, on the midnight shift,**

18 **there's no programs that are going on.**

19 Q.   Do you recall when you attended

20 any training that related in any way to

21 suicide prevention?

22 A.   **The dates, I couldn't.  I had one**

23 **last year.  Every year, we're supposed to**

24 **have it.**

53

LOUIS LaPOLLA

1
2    Q.    Do you recall if you've attended
3    any since you've become the sergeant other
4    than last year?
5        A.    Yeah.  Yes.  There was one prior
6    to -- was it March?  I believe it was March
7    of '06.
8        Q.    Prior to that, did you have any
9    training on suicide prevention?
10       A.    Like I said, every year.  From
11   basic, about 13 years ago or maybe 12 years
12   ago to now, every year we're supposed to
13   have it.  There may have been a year that it
14   wasn't done, but usually, it's done every
15   year.
16       Q.    With respect to Spencer Sinkov, do
17   you recall as you sit here today when he
18   came into the facility on May 20, 2006?
19       A.    I recall when he came -- the
20   specific time, I'm not sure, but I remember
21   when he came in.
22       Q.    Do you remember interacting with
23   him?
24       A.    Yes.
25       Q.    Can you tell us when in terms of

COMPU-TRAN SHORTHAND REPORTING

54

LOUIS LaPOLLA

1
2    the booking process you had interactions
3    with Spencer?
4        A.    I witnessed Officer Matias pat
5    him down.  He didn't give anybody a problem.
6    He went into a holding cell number three.
7    He was next to -- well, at the time, it was
8    an arrestee Thompson.  He didn't see a judge
9    yet.  I did the pedigree.  I took it off the
10   arrest sheet.  I know he was standing up on
11   the bench.  I asked him to please step down.
12   He did.  He was polite.  I let him know he
13   was going to get booked and processed.  And
14   then he would be able to get a phone call.
15   He said thank you.  Very polite.  Officer
16   Vasaturo told me the joke.  He laughed about
17   it.
18       Q.    The joke about him urinating?
19       A.    Yeah, yeah.
20       Q.    Anything different that you recall
21   other than what Vasaturo testified to?
22       A.    No.
23            Deputy Kristan, he made the
24   statement about this guy thinks selling
25   heroin or dealing drugs is like working at a

COMPU-TRAN SHORTHAND REPORTING

55

LOUIS LaPOLLA

1
2    bar.  He doesn't think it's anything, to
3    that effect.
4        Q.    Did you hear Kristan say that?
5        A.    Yes.
6        Q.    Was Vasaturo present at the time?
7        A.    Yes.
8        Q.    And Kristan was supposedly
9    reporting what Spencer had said in Kristan's
10   presence?
11       A.    He may have or he may have
12   repeated himself out loud.  I couldn't
13   speculate on that.
14       Q.    Do you recall hearing Spencer say
15   anything about that or to that effect?
16       A.    No, no.
17       Q.    Did you hear any communications
18   between Spencer and Thompson?
19       A.    Yes.
20       Q.    What did you hear?
21       A.    Something to the effect,
22   Mr. Sinkov was a little upset that
23   Mr. Thompson -- but he wasn't making it out
24   loud.  Looks like I'm going to be taking
25   most of the blame for this one.  He seemed

COMPU-TRAN SHORTHAND REPORTING

56

LOUIS LaPOLLA

1
2    like -- my opinion was, he was a bit
3    agitated at Mr. Thompson.
4        Q.    Do you recall what, if anything,
5    Thompson said?
6        A.    No, I don't recall.
7        Q.    Did you hear any of the Putnam
8    County Sheriff's Department employees
9    speaking with Spencer at any time?
10       A.    If I did, I don't recall.
11       Q.    Do you recall anybody discussing
12   anything in Spencer's presence or with him
13   about what type of sentence he was facing or
14   jail time or anything to that effect?
15       A.    I don't recall anything to that
16   effect.
17       Q.    Do you recall anybody asking
18   Thompson any questions about Spencer?
19       A.    If it happened, I don't remember.
20       Q.    Do you recall any of the Putnam
21   County Sheriff's Department employees asking
22   Thompson anything about whether they should
23   be worried about Spencer?
24       A.    I don't recall that.
25       Q.    When was the first time that you

COMPU-TRAN SHORTHAND REPORTING

57

LOUIS LaPOLLA

1
2  actually spoke with Spencer?  Was it while
3  he was in a holding cell?
4      A.   Yes.  I asked him to please step
5  down from the bench.
6      Q.   Other than him indicating or doing
7  it, did you say anything else to him, or did
8  you say anything else?
9      A.   I told him he was going to be
10 booked.  He'd be processed.  He'll be given
11 a phone call.  He said thank you.
12     Q.   When was the next time that you
13 actually spoke with Spencer?
14     A.   He was getting his -- I believe
15 they were taking him to his fingerprints.
16 It was either Officer Matias or Connelly.  I
17 forget which one of the two did it.  I
18 believe I asked him about the heroin or what
19 do you do and how much do you do.
20          He said a lot.
21          I said, are you going to have any
22 problems with withdrawal?
23          And he said no.
24          I said, are you sure?
25          He said no.  Do you have a

58

LOUIS LaPOLLA

1
2  methadone program?
3          I said generally no.  Are you
4  sure you're going to be okay?
5          He said he would be okay.
6          I did hear -- I didn't hear what
7  started it, but I did hear him say something
8  about being in a band.  I believe whoever
9  was taking his fingerprints said something
10 about his fingers.
11     Q.   Did you observe any marks on him?
12     A.   I don't recall.
13     Q.   Do you recall seeing any
14 indication that he had used heroin?
15     A.   You know what, honestly I didn't
16 ask him if he injected or snorted.
17     Q.   With respect to asking him about
18 heroin, what prompted you to do that?
19     A.   His charges.  I believe either
20 deputy or someone, I must have heard someone
21 in there talking about heroin.
22     Q.   When he said that he did a lot,
23 did you follow-up and ask him what that
24 meant?
25     A.   No, I didn't, ma'am.

59

LOUIS LaPOLLA

1
2      Q.   Did he indicate in any way?
3      A.   No, he didn't.
4      Q.   Did you ask him at any point in
5  time for how long he had been doing heroin?
6      A.   I don't recall.
7      Q.   Have you ever observed inmates
8  withdrawing from heroin on other occasions?
9      A.   Yes.
10     Q.   Have you ever observed inmates
11 withdrawing from heroin who show no symptoms
12 of withdrawal?
13     A.   I'd have to think about that one.
14 I'm trying to --
15     Q.   Do you recall any as you sit here
16 today?
17     A.   I think there is one offhand that
18 I think of that --
19     Q.   Do you recall that inmate's
20 initials?
21     A.   I think it was E.M.
22     Q.   Do you recall with respect to that
23 inmate, if you asked the person any
24 questions about how much heroin he was
25 doing?

60

LOUIS LaPOLLA

1
2      A.   I don't remember.  In general, I
3  usually go up to get a feel of what's going
4  on and I'll ask the inmates, are you going
5  to be okay.  Let them know they're going to
6  be booked.  Give them a little talk.  I
7  guess, orientation.  Something to let them
8  know that they're going to be -- you know.
9      Q.   In terms of your training and
10 experience with respect to individuals who
11 use a lot of heroin, have you ever been
12 given any kind of instruction on what to
13 observe, what to look for?
14     A.   If I have in all honesty, I'm not
15 recalling it now.  I just know from
16 experience with being sick, being violently
17 ill.
18     Q.   In terms of your experience, do
19 you have any understanding as to when those
20 symptoms will begin?
21     A.   I believe it's the first 48
22 hours, but I'm not 100 percent sure.
23     Q.   As of the time that Spencer was in
24 the intake process, do you know when the
25 last time was that he had used any

61

LOUIS LaPOLLA

2  substances?

3      A.   I think it was 24 hours.

4      Q.   Was that something he said to you

5  or something that was --

6      A.   Something that I heard in there,

7  in the room.

8      Q.   Do you recall who told you that?

9      A.   No. I think I just heard in

10  general. I don't know.

11      Q.   Was there anything else that you

12  specifically said to Spencer or that Spencer

13  said to you or in your presence while in the

14  booking area?

15      A.   I just asked him if he was going

16  to get sick. I'm repeating myself. I

17  didn't ask him -- like I said, I looked at

18  him and he looked okay. I've seen heroin

19  addicts enough in my career to know he was

20  definitely aware of his surroundings. He

21  did not appear to be withdrawing. He wasn't

22  shaking. He wasn't nauseous or wasn't

23  claiming to be nauseous. He said he was

24  going to be okay.

25      Q.   In terms of Spencer's intake,

COMPU-TRAN SHORTHAND REPORTING

62

LOUIS LaPOLLA

2  anything else that you said to him or that

3  he said to you other than what you just

4  testified to?

5      A.   I don't remember anything else.

6  If I do, I'll let you know.

7      Q.   After the booking process, did you

8  have any interactions with Spencer?

9      A.   Not conversation wise. But I

10  believe it was 3:30, 3:40. I'm going from

11  what you had before. I did do a check. One

12  of my two checks. I had done a check prior

13  to him going down in North Housing, and my

14  second check he was down in cell seven.

15  Lying down.

16      Q.   Do you specifically recall that?

17      A.   Yes.

18      Q.   Was he awake?

19      A.   I couldn't tell you if he was

20  awake or not. He was laying down. I

21  couldn't see if he was sleeping or not, but

22  he was breathing.

23      Q.   Did you speak with him?

24      A.   No.

25      Q.   Other than what you've described,

63

LOUIS LaPOLLA

2  any other conversations or statements that

3  you made or that Spencer made?

4      A.   Not to my recollection.

5      Q.   At any point in time on May 20,

6  2006, did you have any knowledge of any

7  prior rehab or efforts to detox that Spencer

8  Sinkov underwent?

9      A.   I'm not 100 percent sure on that

10  one. I know he was -- I mean, I was aware

11  that he was on heroin; but I'm not sure if I

12  remember -- I'm not sure if I was told at

13  that time or made aware.

14      Q.   Again on May 20, 2006, were you

15  made aware either from Spencer or anyone

16  else about any medications that Spencer was

17  taking?

18      A.   No. I don't remember.

19      Q.   Did you have any conversations

20  with Spencer about any type of rehab

21  treatment, anything like that?

22      A.   He just asked if there was

23  methadone program. I said generally no.

24  And that was it. That was the extent of the

25  conversation.

COMPU-TRAN SHORTHAND REPORTING

64

LOUIS LaPOLLA

2      Q.   At that time, what did you

3  understand methadone to be or be used for?

4      A.   It's a very controlled medication

5  used for withdrawal from heroin.

6      Q.   On what did you base your

7  statement that we generally don't have that

8  type of thing?

9      A.   Just a conversation with Nurse

10  DeMatio. I don't remember the date, but it

11  was from someone else that wanted methadone.

12  I was informed it wasn't an official written

13  down thing. That generally they don't do it

14  because it's such a controlled medication.

15  Usually, they use librium.

16      Q.   Did you tell Spencer at any point

17  in time that there were alternatives?

18      A.   No, ma'am.

19      Q.   Such as librium?

20      A.   No, ma'am.

21      Q.   Do you recall when you had the

22  conversation with Nurse DeMatio?

23      A.   No, ma'am.

24      Q.   Was it before May 20, '06?

25      A.   Yes.

COMPU-TRAN SHORTHAND REPORTING

65

LOUIS LaPOLLA

1
2    **Q.**    Did you ever speak with any of the
3    officers who transported Spencer about their
4    observations of Spencer?
5    **A.    I based it on from Deputy**
6    **Kristan -- I'm not 100 percent sure if he**
7    **was the one transporting -- he made one**
8    **comment about being the bartender.**
9    **Q.**    Other than that?
10    **A.    No. Not to my recollection.**
11    **Q.**    Take a look, if you would, at
12    Exhibit 3 which is the suicide screening
13    form pertaining to Spencer Sinkov.  When is
14    the first time you saw that?
15    **A.    When I gave my statement.**
16    **Q.**    To?
17    **A.    Investigator Nappi.**
18    **Q.**    Did Nappi have it with him at that
19    time?
20    **A.    Uh-huh.**
21    **Q.**    You have to say yes or no?
22    **A.    I'm sorry; yes.**
23    **Q.**    This would have been after Spencer
24    committed suicide?
25    **A.    That's correct.**
COMPU-TRAN SHORTHAND REPORTING

66

LOUIS LaPOLLA

1
2    **Q.**    Did you have an opportunity to
3    review that at the time that Nappi gave it
4    to you?
5    **A.    Yes.**
6    **Q.**    Did you have any conversations
7    with Nappi about the contents of that form?
8    **A.    I don't recall the exact -- the**
9    **whole interview. I gave the statement, but**
10    **I don't recall the specifics. I do know**
11    **that I stated that I wasn't informed of how**
12    **high the score was and the shaded areas.**
13    **Q.**    Was anybody else present when you
14    gave the statement to Nappi?
15    **A.    I believe Captain Hasmer. At**
16    **that time, Investigator Hasmer.**
17    **Q.**    In terms of the format of the
18    statement, were you asked any specific
19    questions?
20    **A.    You know, what I believe he said.**
21    **Tell me what happened that night or**
22    **basically who was in charge, who was**
23    **booking. How does this go. You know, I was**
24    **pretty much answering questions and he was**
25    **typing.**

67

LOUIS LaPOLLA

1
2    **Q.**    Do you recall any questions being
3    asked of you about that suicide screening
4    form for Spencer Sinkov?
5    **A.    I'm not 100 percent sure. I**
6    **don't remember.**
7    **Q.**    When you saw that suicide
8    screening form after Spencer's death, were
9    you surprised that Vasaturo had not brought
10    it to your attention?
11    **A.    Yes.**
12    **Q.**    Had you ever had that experience
13    with Vasaturo or any other correction
14    officer before?
15    **A.    No.**
16    **Q.**    Did you ever speak with Vasaturo
17    about why it is that he didn't give you the
18    information or actually physically give you
19    the form?
20    **A.    Yes.**
21    **Q.**    What did you say to him, and what
22    did he say to you?
23    **A.    Actually, I said in passing**
24    **between the statements, I said why didn't**
25    **you inform me.**
COMPU-TRAN SHORTHAND REPORTING

68

LOUIS LaPOLLA

1
2    **Q.**    What did he say?
3    **A.    He couldn't answer me.**
4    **Q.**    He didn't say anything?
5    **A.    He said, I don't know.**
6    **Q.**    Did you have an understanding as
7    you look at Exhibit 3 that based on the
8    score of ten, Vasaturo was required by
9    Putnam County policy to notify you of that
10    score?
11    **A.    Yes.**
12    **Q.**    Did you have an understanding by
13    reason of the shaded boxes, three of them
14    being checked in the yes column, that
15    Vasaturo was required to notify you of that?
16    **A.    Yes.**
17    **Q.**    Did you at any point in time speak
18    with Vasaturo about whether or not the
19    checks or the statements on that were
20    accurate or inaccurate?
21    **A.    I didn't talk to Officer Vasaturo**
22    **for a while about this. To be honest with**
23    **you, he made a general statement at one**
24    **time -- I couldn't tell you exactly when --**
25    **that he made a lot of mistakes on the**
COMPU-TRAN SHORTHAND REPORTING

69

LOUIS LaPOLLA

1
2  screening. And the first time I ever saw
3  him point out the mistakes was -- I don't
4  know when, we sat down a couple weeks ago.
5       Q.   With your attorney?
6       A.   Yes.
7       Q.   Other than what you discussed with
8  your attorney, did you have any
9  conversations with Vasaturo about any
10 inaccurate checks or comments that he wrote
11 on Exhibit 3?
12      A.   I don't remember any specifics.
13 I was just very surprised and taken back
14 because he always notifies.
15      Q.   On May 20, 2006, would you have
16 considered that to be busy in terms of
17 booking?
18      A.   Yeah. It was a busy night.
19      Q.   Do you recall how many intakes you
20 had?
21      A.   It was busy with arrests. I
22 believe there was only a couple commitments,
23 but it was busy with arrests. We assist
24 also the deputies in the booking room with
25 processing, pat down, photographs,

*COMPU-TRAN SHORTHAND REPORTING*

70

LOUIS LaPOLLA

1
2  fingerprints, property intakes.
3       Q.   On May 20, 2006 prior to the time
4  that Spencer committed suicide, had anyone
5  communicated to you anything about the score
6  on the Suicide Prevention Screening
7  Guidelines?
8       A.   The score? I just remember
9  getting the radio transmission that he was
10 on 15.
11      Q.   That was from Vasaturo?
12      A.   Yes.
13      Q.   Did Vasaturo say anything other
14 than he was placing Spencer on the 15-minute
15 watch?
16      A.   Just that he was on the 15. It
17 was my understanding it was from withdrawing
18 from drugs, from heroin.
19      Q.   That's what Vasaturo told you?
20      A.   I don't recall the specifics, but
21 that was what was inferred.
22      Q.   That's what you inferred?
23      A.   Yes.
24      Q.   Do you recall if you inferred that
25 because of your knowledge that Spencer was

71

LOUIS LaPOLLA

1
2  doing heroin, or if you inferred it because
3  of something Vasaturo said?
4       A.   It was probably both.
5       Q.   That's your best recollection?
6       A.   Yes, ma'am.
7       Q.   Did Vasaturo say anything to you
8  on May 20, 2006 about the suicide screening
9  form answers?
10      A.   I can't recall anything specific
11 except that he was on for drugs.
12      Q.   But nothing more specific about
13 the answers or the score or the shaded
14 boxes?
15      A.   Not to my recollection, no.
16      Q.   In terms of the county's policy
17 back in May '06, is the correction officer
18 in booking required to provide you with a
19 Suicide Screening Guideline form before cell
20 assignment?
21      A.   If the score is that high or
22 shaded areas are hit, he's supposed to
23 forward the paperwork to me, yes.
24      Q.   When Vasaturo told you that he
25 placed Spencer on a 15-minute watch, did you

*COMPU-TRAN SHORTHAND REPORTING*

72

LOUIS LaPOLLA

1
2  ask to see the Suicide Screening Guidelines?
3       A.   No. My thought process was I
4  had seen him. He was there and err on the
5  side of caution.
6       Q.   You didn't think it had anything
7  related to the suicide screening form?
8       A.   No.
9       Q.   At any time prior to Spencer's
10 death, did anyone communicate to you about
11 the answers on the suicide screening form in
12 any way?
13      A.   Before the death?
14      Q.   Yes.
15      A.   No, ma'am.
16      Q.   Do you recall having any
17 conversations with Vasaturo about doing a
18 P-1?
19      A.   Yes.
20      Q.   What do you recall about that?
21      A.   I did say that over the radio.
22 When he said he was on a 15, I said make
23 sure a P-1 is completed and make sure that
24 the cell he's brought to has a working
25 light.

*COMPU-TRAN SHORTHAND REPORTING*

73

LOUIS LaPOLLA

1
2  Q.  What did you mean when you told
3  him make sure the P-1 is completed?
4     A.  He was on a 15 minute. Anyone
   that's put on a 15, a P-1 memo goes out.
6     Q.  Is that true if someone is put on
7  a constant watch?
8     A.  That is correct.
9     Q.  If someone is on routine
10 supervision, is a P-1 required?
11    A.  No.
12    Q.  Do you know -- withdrawn.
13       Did you ever see the P-1?
14    A.  I saw it after the fact.
15    Q.  Meaning after Spencer died?
16    A.  Yes.
17    Q.  Do you recall under what
18 circumstances you saw it?
19    A.  I went in -- usually, I go in in
20 the beginning of the shift and go into
21 briefing, flip open the P-1 book and it was
22 sitting there.
23    Q.  Do you have any understanding as
24 to when that P-1 was actually placed in the
25 briefing book?

COMPU-TRAN SHORTHAND REPORTING

74

LOUIS LaPOLLA

1
2     A.  It had to be sometime on the
3  prior shift. You know, the shift that we
4  were working that he came in on.
5     Q.  The 11:30 to 7:30?
6     A.  Yeah.
7     Q.  When was the next time that you
8  worked after the 11:30 to 7:30 on May 19th
9  to 20th?
10    A.  I think I came in for the 20th to
11 21st, I think I did. I have to check my
12 records.
13    Q.  Is Exhibit 4, the P-1 that you saw
14 for the first time on the A line, either May
15 20th into the 21st or sometime thereafter?
16    A.  That is it.
17    Q.  On the suicide screening form,
18 Exhibit 3 that Vasaturo completed, there's
19 an indication in 16B. It says "very laid
20 back," did you see that?
21    A.  Yes.
22    Q.  Did you ever speak with Vasaturo
23 about that statement?
24    A.  No.
25    Q.  What's your understanding as a

COMPU-TRAN SHORTHAND REPORTING

75

LOUIS LaPOLLA

1
2  supervisor of why that was noted?
3     A.  He was calm. I wouldn't say he
4  was laid back. He was polite and answered
5  any question that was given to him. He
6  wasn't overly upset or overly unresponsive
7  to things. He was, like I said, he was a
8  little angry at Mr. Thompson so he did show
9  some emotion there.
10    Q.  In your training and experience,
11 do you have any knowledge as to whether if
12 someone appears to be, quote, "very laid
13 back," it's an indication that something
14 could be wrong?
15       MR. RANDAZZO:  Objection to
16    the form.
17       You can answer.
18    A.  Maybe not in those exact words
19 but I'm sure -- I'm trying to think of the
20 word. I don't know if it's indifferent.
21 Maybe overly calm. Maybe that would be a
22 better description of someone that would
23 have a problem, but laid back, I don't see a
24 problem of that.
25    Q.  Did you ever speak with Vasaturo

COMPU-TRAN SHORTHAND REPORTING

76

LOUIS LaPOLLA

1
2  as to why he wrote that?
3     A.  No.
4     Q.  In terms of the other comments
5  including references to Spencer's mother,
6  being worried about her, about the
7  girlfriend, about the brother, were any of
8  those things communicated to you prior to
9  the time that Spencer died?
10    A.  I don't recall that.
11    Q.  You see on the form where 13
12 through 15 was initially checked off in the
13 yes column and circled, initialed and
14 changed to no?
15    A.  I see it.
16    Q.  Did you speak with anyone about
17 that change, including Vasaturo?
18    A.  Those were -- when I met with the
19 attorneys a couple weeks ago or last week,
20 Officer Vasaturo went over those. And
21 that's when the first time I was hearing it.
22    Q.  You did see the form on May 20th
23 when you gave a statement?
24    A.  Yes.
25    Q.  Did anyone speak with you at that

COMPU-TRAN SHORTHAND REPORTING

77

LOUIS LaPOLLA

1
2 time about the change?
3    A.  No.  Because they're crossed off
4 and they're initialed and they're changed to
5 10.
6    Q.  Had you seen this form on May 20,
7 2006, what, if anything, would you have done
8 with respect to Spencer's level of
9 supervision?
10           MR. RANDAZZO:  Objection to
11    the form.
12           You can answer.
13    A.  I can answer it?  First thing I
14 would do is go over the shaded questions to
15 verify the answers were accurate.  I'd also
16 speak to Officer Vasaturo to make sure his
17 answers were accurate and his corrections
18 were all made.  If everything stood the way
19 it is, I would have put him on constant.
20    Q.  So assuming the form is exactly as
21 it is, then you would have placed him on
22 constant watch?
23           MR. RANDAZZO:  Objection to
24    the form.
25    Q.  Back on May 20, '06.

COMPU-TRAN SHORTHAND REPORTING

78

LOUIS LaPOLLA

1
2           MR. RANDAZZO:  You can
3    answer.
4    A.  If there was no changes, there
5 was no written policy on the number, but I
6 would put him on constant.
7    Q.  What if there were indications
8 that some of the answers were inaccurate and
9 specifically question 16, would that change
10 your opinion?
11    A.  16-B?
12    Q.  Yes.  As to what level of
13 supervision?
14           MR. RANDAZZO:  Objection to
15    the form.
16           You can answer.
17    A.  He was not incoherent, but I
18 would probably still have him on constant.
19    Q.  Why is that?
20    A.  No. 11.
21    Q.  What about No. 11?
22    A.  "Detainee is expressing feelings
23 of hopelessness and nothing to look forward
24 to."  If that wasn't -- if that was
25 accurate, then I would have put him on

79

LOUIS LaPOLLA

1
2 constant.
3    Q.  On this form, there's no
4 indication of any comments in that section,
5 even though there's a yes; correct?
6    A.  That's correct.
7    Q.  Did you ever receive any training
8 with respect to this form that if a yes box
9 is checked, the comments are supposed to be
10 filled in to the column to the right?
11    A.  I believe so.  I'm not 100
12 percent sure on the verbiage with the
13 training.
14    Q.  Did you ever speak with Vasaturo
15 as to why there were no comments with
16 respect to No. 11?
17    A.  No.
18    Q.  Did Spencer say anything to you or
19 in your presence with respect to anything
20 pertaining to No. 11?
21    A.  I just remember overhearing that
22 he was in a band.  He didn't appear to me
23 that he had any kind of suicidal intentions.
24 He was polite.  Respectful.  Made some
25 jokes.  I'm very taken back by this.

COMPU-TRAN SHORTHAND REPORTING

80

LOUIS LaPOLLA

1
2    Q.  Did he say anything to you though,
3 that in any way expressed feelings of either
4 hopelessness or something to look forward to
5 specifically?
6    A.  Nothing directly to me.
7    Q.  With respect to 16A, "detainee is
8 apparently under the influence of alcohol or
9 drugs," did you make any observations
10 yourself that would lead you to answer yes
11 or no on that question?
12    A.  Taking the inmate's word that he
13 did the drugs.  He said that he had taken --
14    Q.  And would you have said yes there?
15    A.  Yup.
16    Q.  With respect to No. 8, did you
17 have any conversations with anybody about
18 anything concerning that factor?
19    A.  No.  He didn't appear to be
20 embarrassed in my opinion.
21    Q.  Did you ask him in any way about
22 anything concerning his background or
23 experience by way of community relationships
24 or other factors?
25    A.  No.

COMPU-TRAN SHORTHAND REPORTING

81

**LOUIS LaPOLLA**

1
2  **Q.** Did you have an understanding that
3  this was the first time that Spencer had
4  been arrested?
5     **A.  That was my understanding.**
6     **Q.** When Vasaturo advised you that he
7  placed Spencer on the 15-minute watch in
8  substance due to heroin use, did you ask him
9  if there was any other reason why he did
10 that?
11    **A.  No.**
12    **Q.** Did you inquire at that time as to
13 the results of the medical intake?
14    **A.  No, ma'am.**
15    **Q.** Did you inquire at that time as to
16 the results of the suicide screening?
17    **A.  No, ma'am.**
18    **Q.** Did you ever speak with any
19 Americor staff with respect to Spencer?
20    **A.  I may have spoken to Peter Clark.**
21 **I'm not 100 percent sure.**
22    **Q.** Do you recall doing so as you sit
23 here today?
24    **A.  That night was so busy.  It's**
25 **possible.  I don't recall 100 percent, no.**

82

**LOUIS LaPOLLA**

1
2  **Q.** With respect to inmates that were
3  assigned to a 15-minute watch, is it
4  customary that they're assigned to the North
5  Housing Unit?
6     **A.  Customary but if north is full,**
7  **we can put them upstairs in east or west.**
8     **Q.** On this occasion, Spencer was
9  initially assigned to cell 29, then it was
10 changed to seven?
11    **A.  I was the one when I first came**
12 **in and had a feel for Mr. Sinkov, I said**
13 **he's decent.  He seems to be all right to**
14 **put him in cell 29.  It's a newer set up.**
15 **It's not -- the old North Housing is an old**
16 **linear style jail.  That was my discretion.**
17 **I was going to put him upstairs.  He seemed**
18 **to be not any problem except he did say he**
19 **used heroin.  When Officer Vasaturo said he**
20 **was putting him on 15, my thought process**
21 **was he was erring on the side of caution**
22 **because of his possible withdrawals.**
23    **Q.** With respect to placing Spencer
24 initially in cell 29, you said that was your
25 initial feeling or decision?

83

**LOUIS LaPOLLA**

1
2     **A.  Yes.**
3     **Q.** Had the suicide screening been
4  done at that point?
5     **A.  No.**
6     **Q.** Have you ever seen Exhibit 8?
7     **A.  I may have with all -- but this**
8  **is the trainers manual.  I don't train.  I'm**
9  **not a training officer.  I may have seen it**
10 **on the desk or something with the officers**
11 **that are training.**
12    **Q.** Do you recall ever reviewing
13 anything?
14    **A.  It's possible if I go through**
15 **this, whatever page you want me to look at.**
16    **Q.** Take a look first if you would at
17 Roman Numeral I-IV, "Components of an
18 Effective Suicide Prevention Risk Management
19 Program."  Do you see that page?
20    **A.  Yes.**
21    **Q.** It refers to screening for suicide
22 risk and then supervision one-to-one only
23 effective supervision for suicide
24 prevention.
25    **A.  That's correct.**

84

**LOUIS LaPOLLA**

1
2     **Q.** Did you ever receive training on
3  that?
4     **A.  In basic and every year we're**
5  **in-service, we have suicide screening**
6  **training.**
7     **Q.** What have you been trained on with
8  respect to that in the training sessions
9  you've attended?
10    **A.  You have to use your discretion**
11 **when you're doing your screening and your**
12 **observation and you have to err on the side**
13 **of caution.  Always notify your supervisor**
14 **of any problems.  The 15s are mostly for**
15 **withdrawing.  It's more medical.  Someone**
16 **can have a heart condition or asthma, they**
17 **can be placed on a 15.**
18    **Q.** Were you trained with respect to
19 anything pertaining to the one-on-one
20 supervision and the screening process?
21    **A.  As far as putting somebody on**
22 **after doing a screening?**
23    **Q.** Yes.
24    **A.** Yes.
25    **Q.** What were you trained with respect

85

LOUIS LaPOLLA

1
2  to that?
3    A.    We were trained that to err on
4  the side of caution. Notify supervisors.
5  The gray boxes, you notify a supervisor
6  immediately. Err on the side of caution
7  even if someone scores a zero and you feel
8  they're not coming forth and being honest
9  with you, you can put them on constant
10  supervision.
11    Q.    With respect to the training you
12  received, were you ever trained that if
13  anybody scored an eight or higher, they
14  should be placed on constant watch in terms
15  of erring on the side of caution?
16    A.    It's good to err on the side of
17  caution with eight. I know state has their
18  mandates. Our policy is not even, it
19  doesn't say it on the sheet.
20    Q.    Were you ever trained, though, is
21  my question to do that?
22    A.    It's possible.
23    Q.    Do you recall that as you sit here
24  now?
25    A.    No.

86

LOUIS LaPOLLA

1
2    Q.    Were you ever trained if someone
3  answered yes in one or more of the shaded
4  boxes, that you're supposed to institute a
5  constant watch?
6    A.    It's possible with the State and
7  it's possible with the county we did it
8  differently. Like I said No. 8, the
9  embarrassment doesn't necessarily mean
10  putting someone on a suicide watch.
11    Q.    With respect to the training
12  you've received, though, putting aside what
13  you learned today about the state's
14  regulations, were you ever given any
15  training that said in Putnam County, you're
16  supposed to put somebody on constant watch
17  if the shaded areas, one or more, aren't
18  checked?
19    A.    There's no final or absolute.
20    Q.    Today was the first time that you
21  learned about the State Commissions
22  regulations with respect to constant watch
23  being instituted for high-risk inmates?
24    A.    No. That's not true. In
25  reviewing it, I said I didn't recall it, but

87

LOUIS LaPOLLA

1
2  I'm sure at one point they may have said it.
3    Q.    You don't remember it as you sit
4  here today?
5    A.    Exactly.
6    Q.    Take a look at the exhibit before
7  you, Roman Numeral VII-8. It's at the end
8  of the packet. About ten pages in from the
9  back.
10        "Supervising the suicidal
11  inmate;" do you see that?
12    A.    Yes.
13    Q.    "Constant supervision should be
14  given immediately to all high-risk inmates"?
15    A.    Correct.
16    Q.    Were you ever trained on that?
17    A.    Yes.
18    Q.    Were you told during the training
19  what a high-risk inmate means?
20    A.    Yes.
21    Q.    What were you told?
22    A.    Anybody that you would feel
23  that's a high-risk inmate could be somebody
24  that states they're going to hurt
25  themselves. It's a gray area in my opinion,

88

LOUIS LaPOLLA

1
2  No. 11. Other high-risk inmates would be
3  mentally ill.
4    Q.    Anything about the score, the
5  total number that you were trained on?
6    A.    It's possible.
7    Q.    You don't remember that as you sit
8  here now?
9    A.    No.
10    Q.    Did you ever see Exhibit 9 which
11  is a suicide prevention officers handbook?
12    A.    I may have seen this. It might
13  have been sitting on one of the desks when
14  the training was going on.
15    Q.    Do you recall seeing this at any
16  point in time prior to today?
17    A.    It's possible.
18    Q.    Do you recall receiving a copy of
19  this during any of the training sessions or
20  in any way as part of your employment with
21  Putnam County?
22    A.    I don't recall. It is possible,
23  but I don't recall.
24    Q.    Have you ever reviewed the
25  New York State Commission of Correction

## LOUIS LaPOLLA

2 regulations?

3    A.    I'm sure I have.

4    Q.    Do you recall doing so prior to

5 today?

6    A.    A while ago.

7    Q.    Were you aware at any point in

8 time that Spencer had a visit with his

9 family on May 20, 2006?

10    A.    I didn't find out anything about

11 that until after.

12    Q.    How did you find out after?

13    A.    To be honest with you, I don't

14 know if it was before I went to give my

15 statement or after someone may have said in

16 passing. I'm not 100 percent sure who told

17 me.

18    Q.    Do you recall anything more

19 specific that was said about that?

20    A.    No.

21    Q.    Did you say anything about that?

22    A.    About what?

23    Q.    About the visit. Ask any

24 questions, comment in any way?

25    A.    I may have said I wonder what

*COMPU-TRAN SHORTHAND REPORTING*

## LOUIS LaPOLLA

2 happened during the visit, but that's just

3 speculation.

4    Q.    Were you ever provided with any

5 kind of training or instruction on

6 monitoring inmates after certain times such

7 as a visit?

8    A.    Well, that's part of, you know,

9 for suicide training, times - holidays,

10 weekends, night shift, sentencing, bad phone

11 call, bad visit.

12    Q.    Do you know if anything was done

13 with respect to Spencer's visit with his

14 family in terms of increasing or monitoring

15 him in any way?

16    A.    Not to my knowledge. I wasn't

17 informed there was a bad visit.

18    Q.    Did you ever speak with anyone

19 from the State Commission of Correction with

20 respect to Spencer?

21    A.    Yes.

22    Q.    When was that?

23    A.    That was, I believe, August 9,

24 2006 or 7th. I believe 2006.

25    Q.    It wasn't in the last four or five

## LOUIS LaPOLLA

2 months?

3    A.    No.

4    Q.    Do you recall who you spoke with?

5    A.    Two gentlemen. I'm not sure what

6 their title was.

7    Q.    Do you recall their names?

8    A.    No.

9    Q.    Did you provide them with anything

10 in writing?

11    A.    No.

12    Q.    Did they ask you questions?

13    A.    Yes.

14    Q.    Do you recall in substance what

15 they asked you and what you said?

16    A.    Pretty much what happened that

17 night. Questions on the policies and

18 procedures.

19    Q.    Do you recall what they told you

20 about the -- what you told them about the

21 policies and procedures?

22    A.    What I told them, I just -- in

23 all honesty, I don't remember. They had it

24 written down. I have to look at it.

25    Q.    Do you know if they tape-recorded

*COMPU-TRAN SHORTHAND REPORTING*

## LOUIS LaPOLLA

2 it?

3    A.    If they tape-recorded, I wasn't

4 aware of it.

5    Q.    Did they take notes in your

6 presence?

7    A.    Yes.

8    Q.    Did you ever see the Commission's

9 final report with respect to Spencer?

10    A.    Yes.

11    Q.    Do you recall under what

12 circumstances you saw that?

13    A.    I requested it. I think I got it

14 in-house mail, in interoffice mail. I think

15 that's how it was.

16    Q.    Did you speak with anyone about

17 the findings or recommendations of the

18 Commission in that case?

19    A.    I may have said something to

20 Vasaturo.

21    Q.    Do you recall?

22    A.    I don't recall.

23    Q.    Take a look at Exhibit 12 which is

24 the Commission's report in connection with

25 the death of Spencer Sinkov. Did you ever

*COMPU-TRAN SHORTHAND REPORTING*

93

LOUIS LaPOLLA

1  make any comments to anybody about any of
2  the specific recommendations that were
3  contained in that report?
4      A.    I may have but I don't remember.
5      Q.    In paragraph ten, which is on page
6  four, it says in the last sentence,
7  "Sergeant L.L., Louis LaPolla, failed to
8  properly notify -- failed to properly
9  supervise jail staff as he did not inquire
10  about the reason for Sinkov's cell
11  reassignment and why the 15-minute watch was
12  instituted;" do you see that?
13      A.    Yes, I do.
14      Q.    Do you agree or disagree with that
15  finding?
16      A.    I guess I disagree with that.
17      Q.    Why do you disagree?
18      A.    If I didn't go into the booking
19  room, if I didn't ask Mr. Sinkov questions
20  that I asked him and if I was notified -- I
21  was working with somebody that was trained
22  and I trusted and it wasn't his first day on
23  the job. That's my opinion on that.
24      Q.    Meaning Vasaturo?

94

LOUIS LaPOLLA

1      A.    Yes.
2      Q.    Were there any policies or
3  procedures that required you as the
4  supervisor to ask about the reasons why a
5  15-minute watch would be instituted?
6      A.    The red book probably has the
7  description of the supervision. I'm sure it
8  can be interpreted that way.
9      Q.    Did you ever interpret it that
10  way?
11      A.    I have to look at it again.
12      Q.    You don't recall as you sit here
13  now?
14      A.    Correct.
15      Q.    In terms of the recommendations on
16  pages five to six, specifically number two
17  on page six, "Recommends that the shift
18  supervisor on the 11:30 to 7:30 tour be
19  disciplined for failing to properly
20  supervise staff and failing to review
21  Sinkov's medical risk assessment after being
22  informed that he was placed on a 15-minute
23  watch;" do you see that?
24      A.    Yes, I do.

95

LOUIS LaPOLLA

1      Q.    Was any such disciplinary action
2  taken to date?
3      A.    Not to date.
4      Q.    Is it your understanding that the
5  document you signed in November would be to
6  extend the time under which the county could
7  take disciplinary actions --
8      A.    Yes.
9      Q.    -- based on this?
10      A.    Yes.
11          MS. BERG:   Let me have
12  marked as Exhibit 17, a copy of the
13  witness' statement from May 20, 2006.
14      (Whereupon, Plaintiff's Exhibit 17,
15  STATEMENT BY LA POLLA DATED 5/20/06, was marked
16  for identification.)
17      Q.    Is Exhibit 17, the statement that
18  you provided to Nappi and DePerno?
19      A.    Yes.
20      Q.    Did you review it before you
21  signed it?
22      A.    Yes, I did.
23      Q.    Did you understand by signing it
24  you were attesting under penalty of perjury

96

LOUIS LaPOLLA

1  to the statements contained in it?
2      A.    Yes.
3      Q.    In the fifth line down, you
4  indicate that you went over and asked
5  Spencer some questions, such as how do you
6  take your drugs. The inmate responded that
7  he injects; do you see that?
8      A.    Yes. I didn't recall when I
9  answered before.
10      Q.    Does that refresh your
11  recollection?
12      A.    In all honesty, no. This is the
13  statement I gave. I gave it as honest as I
14  could, but I just don't remember at this
15  time.
16      Q.    You remembered it on May 20th, but
17  don't recall it today?
18      A.    Yes.
19      Q.    It says about five lines from the
20  bottom, "I instructed C.O. Vasaturo that if
21  there weren't any problems with the inmate,
22  he was to be put into cell 29 of the North
23  Housing Unit"?
24      A.    Yeah. That's a -- the sheet that

97

LOUIS LaPOLLA

1
2   I gave, the original on that should be West
3   Housing Unit.  That's a typo.
4       Q.   And you did instruct cell 29 --
5       A.   That is correct.
6       Q.   -- if there were no problems?
7       A.   Correct.
8       Q.   Then you were notified by Vasaturo
9   that it wasn't going to be cell 29.  It
10  would be cell 7?
11      A.   Correct.  He was on the 15, and
12  that's where the 15 supervisions were.
13      Q.   Did you have a sense by that
14  communication by Vasaturo, that there was
15  some problem?
16      A.   No.  My thought process was he
17  was erring on the side of caution because of
18  the heroin addiction.
19      Q.   You don't indicate in your
20  statement from May 20, 2006 that Vasaturo
21  said to you at that time the reason for the
22  15-minute supervisory visit; do you see
23  that?
24      A.   That he didn't or did?
25      Q.   Did not.

98

LOUIS LaPOLLA

1
2       A.   What line are we looking at?
3       Q.   The first page where it says --
4   fourth line from the bottom, "I was notified
5   via radio"?
6       A.   Yes.
7       Q.   That sentence indicates "Vasaturo
8   told you, Sinkov was not going to cell 29"?
9       A.   That's correct.
10      Q.   "Was going to cell seven"?
11      A.   That's correct.
12      Q.   "And was going to be on a
13  15-minute supervisory visit"?
14      A.   Correct.
15      Q.   There's no indication in your
16  statement that Vasaturo said the reason for
17  that change?
18      A.   He didn't say it over the air.  I
19  believe he said it in passing, verbally.
20      Q.   But you don't say that in your
21  statement?
22      A.   No, I did not.
23      Q.   You don't reference in your
24  statement from May 20th, anything about the
25  reason being due to drugs or heroin or

99

LOUIS LaPOLLA

1
2   withdrawal?
3       A.   That is correct.
4            Can I make one statement?
5       Q.   Yes.
6       A.   This statement was given after a
7   night shift.  I came there as honest as I
8   could.  I was giving a statement, and I was
9   very tired.  That's all I can say on that.
10      Q.   Do you believe that there's
11  anything inaccurate about this, now that
12  you've reviewed it?
13      A.   Just that I didn't put down about
14  saying he was on 15 because of the heroin or
15  drugs, whatever.  Everything else seems to
16  be as accurate as I can recall.
17      Q.   In terms of Vasaturo's statement
18  about the 15-minute visit being due to the
19  heroin or the drugs, that was not said to
20  you over the radio?
21      A.   No.
22      Q.   It was said when you were passing
23  him in the hall?
24      A.   Somewhere, somehow during the
25  night.  I don't remember exactly when.

100

LOUIS LaPOLLA

1
2       Q.   Do you recall anything about the
3   circumstances of that communication?
4       A.   No.
5       Q.   Anything you can use to refresh
6   your recollection?
7       A.   To be honest with you, no.
8       Q.   Did you take any notes or keep any
9   records of your own?
10      A.   No.
11           MS. BERG:   Give us a few
12  minutes, please.
13           (Recess taken)
14  CONTINUED EXAMINATION BY
15  MS. BERG:
16      Q.   Are there any policies or
17  procedures in place with respect to
18  reevaluating or reassessing inmates who come
19  into the facility either under the influence
20  or recently having used alcohol or drugs?
21      A.   Medical may do updates for that
22  and also classification.
23      Q.   Is there anything that the
24  correction officer end is required to do in
25  terms of updated suicide screening or

101

LOUIS LaPOLLA

2  anything along those lines?

3      A.   Not necessarily.  They can put in
4  booking notes that advised to rescreen after
5  a certain amount of time, but there's no
6  written rule on that.

7      Q.   Are there any requirements that
8  somebody who comes into the facility under
9  the influence or having recently used drugs
10  or alcohol, that they are reassessed by a
11  correction officer because of the concern
12  that drugs or alcohol could mask some of the
13  symptoms of either medical or psychological
14  impairment?

15      A.   I'm not sure on that one.

16      Q.   Have you ever had occasion to
17  refer an inmate for any kind of detox
18  assistance, either medication, a program,
19  something else?

20      A.   A referral?

21      Q.   Yes.

22      A.   From me?  No.  If an inmate asks
23  is there any programs, I would say you can
24  fill out this form.  There's AA.  There's a
25  substance abuse.  Medical would be the ones

102

LOUIS LaPOLLA

2  to -- we have our doctor that administers
3  any medication if they needed.

4      Q.   It would be up to the inmate to
5  ask for that assistance?

6      A.   Pretty much, unless the medical
7  deems it necessary that for their health,
8  they need it.

9      Q.   Are there any instruction sheets
10  that are provided to the correction officers
11  in booking when filling out the Suicide
12  Screening Guidelines?

13      A.   Instruction sheets?

14      Q.   Yes.  Like the one that was page
15  two of the ADM-330.

16      A.   It's possible there's something
17  in here.  Nothing is sitting out, oh, let
18  me look at this number for an answer.
19  There's nothing to reference right
20  offhand.

21      Q.   Have you ever seen that?

22      A.   Not offhand, no.

23      Q.   Were you aware that Norberto
24  Rivera was on a 15-minute watch?

25      A.   Again, that's a name that I'd

103

LOUIS LaPOLLA

2  have to go back and check my records and
3  check to see if I was on.  I found out about
4  his suicide when I was attending a deputy's
5  father's wake.

6      Q.   Do you recall anything about his
7  incarceration?

8      A.   I don't remember.

9      Q.   In terms of observations of
10  inmates on either a routine or 15-minute
11  watch, the logbook indicates that the
12  officer will write something to the effect
13  of nine or 12 or whatever number of males,
14  all secure?

15      A.   Yeah.  Males/female all secured
16  would be everything is secured.  They're
17  breathing.  There's nothing unusual or
18  irregular happening at that time.

19      Q.   Now, on a 15-minute watch, are
20  they required to document it anymore
21  specifically?

22      A.   It's the same supervision when
23  you're doing the check, but you'll document
24  every hour.  You'll write down what they're
25  doing or if they're doing something out of

104

LOUIS LaPOLLA

2  the ordinary.  That goes for routine check,
3  too.

4      Q.   In terms of the visual checks that
5  are done --

6      A.   Yes.

7      Q.   -- again routine or 15-minute
8  checks, if somebody is lying down, say, for
9  example, in the fetal position or something
10  like that, is that something you would
11  note?

12      A.   That would be documented, and
13  that would be something you might wake the
14  inmate up and say, are you okay, or if
15  they're up, are you okay.  And if they say
16  no, we will get medical.  The nurse comes
17  and takes a look at him and take direction
18  from medical.

19      Q.   Do you recall on May 20th when you
20  did the checks at NHU and observed Spencer,
21  what he was doing?

22      A.   He was laying down.  I don't know
23  if he was sleeping.

24      Q.   In what position?

25      A.   It wasn't fetal.  I don't

105

LOUIS LaPOLLA

1
2 remember him being in a fetal position. He
3 was laying down, but I don't know if he was
4 on the back or stomach or side.
5     Q.   Could you see his skin, his face,
6 his hands, anything?
7     A.   I believe so.  I don't remember
8 what parts of the body I saw, but if I
9 didn't, I would have made sure I would
10 have.
11     Q.   Could you see if he was perspiring
12 or anything like that?
13     A.   I didn't notice him perspiring.
14     Q.   Could you see that if he was?
15     A.   Yes.  You would be able to
16 see.  It would have to be profuse.  You have
17 the gate, the cell and then their day room
18 and a gate and catwalk.  So you have a
19 little distance to look, but you could see
20 it if it was noticeable, something out of
21 the ordinary.
22     Q.   What are the lighting conditions
23 like when you do the observation?
24     A.   The lighting conditions, there's
25 a night light.  It's less bright than

106

LOUIS LaPOLLA

1
2 daylight.  And the catwalk that the officer
3 walks around, is dark.  So when you're
4 looking in, the cell is lit up, so you do
5 have good vision.
6     Q.   With respect to paper clothing,
7 are you aware of any policies governing
8 that?
9     A.   Paper clothing, that goes to
10 inmates that are on one-on-one
11 supervision.
12     Q.   Only those?
13     A.   Yes, suicide risk.
14     Q.   For how long has that been the
15 policy in Putnam County?
16     A.   Paper suits, that's since I
17 started, I've always seen that.
18     Q.   In terms of paper suits going only
19 to the one-on-one supervision?
20     A.   Correct.  It wouldn't go to
21 someone on a 15.
22     Q.   Are there any answers that you've
23 given that you want to modify or change?
24     A.   I'd have to look.
25     Q.   Anything that comes to mind?

107

LOUIS LaPOLLA

1
2     A.   Not offhand.
3          MS. BERG:  I don't have
4 anything else.
5          MR. KLEINBERG:  I have no
6 questions for you.
7          MR. COON:  I have no
8 questions.
9
10          oOo
11
12     (Time noted:  6:15 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

108

1
2 UNITED STATES DISTRICT COURT  )
3                    ss:
4 SOUTHERN DISTRICT OF NEW YORK )
5
6
7     I, LOUIS LA POLLA, the witness
8 herein, having read the foregoing testimony of
9 the pages of this deposition, do hereby certify
10 it to be a true and correct transcript, subject
11 to the corrections, if any, shown on the
12 attached page.
13
14
15          oOo
16
17
18
19          _____
20          LOUIS LA POLLA
21
22 Subscribed and sworn to before me
23 this ___ day of ____, 2008.
24
25 _____

109

```
1
2    STATE OF NEW YORK )
3                     ) ss
4    COUNTY OF ROCKLAND )

6
7         I, Tracy Smith, Notary Public within
8    and for the State of New York, do hereby
9    certify:
10
11        That I reported the proceedings in the
12   within entitled matter, and that the within
13   transcript is a true record of said
14   proceedings.
15
16        I further certify that I am not
17   related to any of the parties to the action by
18   blood or marriage, and that I am in no way
19   interested in the outcome of this matter.
20
21        IN WITNESS WHEREOF, I have hereunto
22   set my hand this 3rd day of February, 2008.
23
24                  _____
                    TRACY SMITH,
                    NOTARY PUBLIC
25
```

COMPU-TRAN SHORTHAND REPORTING

---

110

```
1
2    CORRECTION SHEET
3    Re: SINKOV VS SMITH, ET AL
4         The following corrections, additions
5    or deletions were noted on the transcript of
6    the testimony which I gave in the above-
7    captioned matter, held on January 7, 2008.
8
9    PAGE(S) LINE(S) SHOULD READ
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18
19            _____
20            LOUIS LA POLLA
21   Subscribed and sworn to before me
     his ___ day of ____ 2008.
23
24   _____
25
```

---

111

```
1
2              ***INDEX***
3
4              PAGE#    LINE#
5
     EXAMINATION BY:
6
7    MS. BERG              4        10
8
9
10   DOCUMENT/DATA REQUESTED:
11
12        NONE
13
14   PLAINTIFF'S EXHIBITS:
15
16   17  STATEMENT BY LA POLLA 95       16
         DATED 5/20/06
17
18
19   DEFENDANT'S EXHIBITS:
20
21        NONE
22
23
24   RULINGS CONTEMPLATED:
25
          NONE
```

COMPU-TRAN SHORTHAND REPORTING

# EXHIBIT H

SOJ 32  PAGE 7
rev 06/01

# PUTNAM COUNTY CORRECTION FACILITY
# SUICIDE PREVENTION SCREENING GUIDELINES

### SECTION 4

| NAME | | JAIL # | SEX | DOB | DATE | TIME |
|---|---|---|---|---|---|---|
| MOST SERIOUS CHARGE | Facility Origin Other Than PCCF | | | Detainee showed serious psychiatric problems during prior incarceration  YES _____  NO _____ | | |

| | Column A YES | Column B NO | General Comments/observations All "YES" responses require written comment here |
|---|---|---|---|
| **OBSERVATIONS OF ARRESTING/TRANSPORTING OFFICER** 1. Arresting or transporting officer believes that detainee may be a suicide risk If YES, notify shift supervisor. | ▓ | | |
| **PERSONAL DATA** 2. Detainee lacks support of family or friends in the community. | No family Friends | | |
| 3. Detainee has experienced a significant loss within the last six months. (e.g., loss of job, loss of relationship, death of close family member) | | | |
| 4. Detainee is very worried about major problems other than legal situation. (e.g., serious financial or family problem, a medical condition or fear of losing job) | | | |
| 5. Detainee's family member or significant other (spouse, parent, close friend, lover) has attempted to or has committed suicide. | | | |
| 6. Detainee has history of drug or alcohol abuse. (Note drug and when last used.) | | | |
| 7. Detainee has history of counseling or mental health evaluation/treatment. (Note current psychotropic medications and name of most recent treatment agency) | | | |
| 8. Detainee expresses extreme embarrassment, shame, or feeling of humiliation as a result of current charge or this incarceration. ( consider detainee's position in the community and shocking nature of crime) | ▓ | | |
| 9. Detainee is thinking of killing himself/herself. If YES, notify Shift Supervisor immediately. | ▓ | | |
| 10a. Detainee has previous suicide attempt. (Explore method and check for scars.) | | | |
| b. Attempt occurred in the last month. | ▓ | | |
| 11. Detainee is expressing feelings of hopelessness (nothing to look forward to) | ▓ | | |
| 12. This detainee's first incarceration in lockup/jail. | | | |
| **BEHAVIOR/APPEARANCE** 13. Detainee shows signs of depression (e.g., crying, emotional flatness). | | | |
| 14. Detainee appears overly anxious, panicked, afraid or angry. | | | |
| 15. Detainee is acting and/or talking in a strange manner. e. g., cannot focus attention, hearing or seeing things which are not there) | | | |
| 16a. Detainee is apparently under the influence of alcohol or drugs. | | | |
| b. If YES, is detainee incoherent, or showing signs of withdrawal or mental illness. If YES to BOTH 16a and 16b notify Shift Supervisor immediately. | ▓ | | |

## TOTAL of Column A

**ACTION TO BE TAKEN BY SCREENING OFFICER**
If total in Column A is 8 or more, or any shaded box is checked, or if the screening officer feels it necessary, notify shift supervisor.

Shift Supervisor notified  YES _____  NO _____  Shift Supervisor _____  Shift Supervisor Signature _____

Mental health Supervision instituted:     Routine _____     15 Min. Supervisory Visit _____     Constant _____

Mental Health referral:  NO _____  YES _____, complete referral form. Emergency _____  Non-Emergency _____

Screening Officer Name _____  Screening Officer Signature _____

     Inmate Signature _____     Date _____

Officer's comments/impressions:

Medical Staff and/or Mental Health Provider actions:

| CLASSIFICATION REVIEW |
|---|
| OFFICER _____. |
| NURSE _____ |
| DATE _____ |

# EXHIBIT I

III
Article 15
MENTAL HEALTH EVALUATION & SERVICE

15-1 MENTAL HEALTH EVALUATION POLICY:
The Putnam County Correctional Facility, in conjunction with
New York State Office of Mental Health, New York State
Commission of Correction and County Mental Health Service
Staff, has developed the Local Forensic Suicide Prevention
Program. Such program is in conformance with New York State
Commission of Correction Minimum Standards and nationally
accepted correctional practices.
PURPOSE
    a.  To assure that suicidal prisoners and prisoners with
        serious mental health problems are identified and
        treated in a timely manner.
    b.  To significantly reduce the incidence of suicide
        among persons incarcerated within the county jail.
    c.  To stabilize acutely mentally ill and/or suicidal
        prisoners and to provide for facility safety.
    d.  To prevent deterioration among locally incarcerated
        prisoners with a history of mental illness.
    e.  To provide both non-sentenced and sentenced mentally
        ill prisoners timely access to psychiatric inpatient
        care.
    f.  To foster cooperative working relationships between
        the jail and local medical/mental health service
        providers.

15-2 ADMISSION/SCREENING POLICY:
Facility personnel will make a conscious effort to identify
highly suicidal prisoners and/or prisoners with serious
mental health problems. Identification of such prisoners
will be an ongoing process which will begin at intake and
continue until prisoners are released. This endeavor shall
require the complete cooperation of all facility personnel.
PURPOSE
To reduce the incidence of suicide among the prisoner
population at the Putnam County Correctional Facility.
PROCEDURAL GUIDELINES:
A.  Booking Officer will:
    1.  Process all lawfully committed prisoners in
        accordance with the Putnam County Correctional
        Facility established policies and procedures,
        Correction Law and New York State Commission of
        Corrections Minimum Standards, Sections 7003
        (Admissions) and 7013 (Classification of Inmates -
        New).
    2.  Screen all prisoners prior to initial cell
        assignment. This screening process shall include,
        but not be limited to:

15.1

EXHIBIT
P l F
2    1D

    a.  Examination of all documents and records accompanying the prisoner for possible references to past or current mental health problems and for prescribed medication and court orders for mental health exam (e.g. CPL, Section 730 exam);

    b.  Administration of Suicide Prevention Screening Guidelines, For #330 ADM.

    c.  Assessment for physical handicap(s);

    d.  Review of existing files to determine if prisoner has attempted suicide or received psychiatric inpatient services during prior incarceration at the facility; and

    e.  Consideration of any other relevant information concerning prisoner's condition brought to the attention of the Booking Officer by any other person.

3.  Immediately notify the tour supervisor whenever a prisoner:

    a.  Scores in the high risk (Score of 8 in Column A) or immediate referral categories on the Suicide Prevention Screening Form;

    b.  Does not score high risk on the Suicide Prevention Screening Form but displays verbal or behavioral indications which lead the admission officer to believe that the prisoner may require medical or mental health attention;

    c.  Is in semiconscious or unconscious state;

    d.  Has prescribed medications within personal property;

    e.  Appears to be significantly under the influence of alcohol or drugs; and

    f.  Has court orders for mental exams, suicide watch or medical attention.

4.  All such notifications will be completed by forwarding a copy of the prisoner's screening form to the tour supervisor prior to cell assignment.

5.  Place the completed Suicide Prevention Screening Form in each prisoner's facility file at time of booking.

6.  Assign appropriate housing based upon the results of completed Form #330 ADM and other classification determination.

7.  Initiate the required documentation for prisoner referral to appropriate health service agency, if required.

B.  Block Officer will:

1.  Observe all prisoners under their supervision in accordance with provisions of Minimum Standards, Section 7003.

15.2

2. Observe all prisoners for verbal and behavioral indications of suicidal intent and/or mental illness. These observations will be routinely made during regular security checks and include but are not limited to:
   a. Semiconscious or unconscious state;
   b. Depressed state, indication of withdrawal, periods of crying, insomnia, sluggishness;
   c. Extreme restlessness, pacing up and down;
   d. Active discussion of suicide intent;
   e. Sudden drastic change in mood, eating, or sleeping habits;
   f. Giving away personal property;
   g. Loss of interest in activities or relationships of which inmate had previously enjoyed or engaged;
   h. Signs of drug or alcohol withdrawal or intoxication;
   i. Signs of serious mental health problems such as hallucinations and delusions; and
   j. Prisoner's refusal to take prescribed medication or a request for increased dosage of medication.
3. Observe and interview prisoners for signs of depression and/or hopelessness during:
   a. Periods immediately preceding or following court appearances and sentencing; and/or
   b. Periods following a significant loss by a prisoner (e.g. Death in a family) if known to the facility personnel.
4. Notify the tour supervisor whenever a prisoner meets the criteria in Section 2 or 3 above. All such notifications shall be verbal, followed by appropriate log entries.

15-3 MENTAL HEALTH REFERRAL POLICY
Facility Policy and Procedures for referring prisoners who require treatment services during incarceration will be developed jointly by this facility and appropriate treatment agencies. In developing these procedures, medical emergencies will be given priority over all other types of treatment referrals.

PURPOSE:
To assure that suicidal prisoners and prisoners with serious mental health problems receive timely access to emergency and non-emergency treatment services.

DEFINITIONS:
   A. Medical Emergency - Any situation in which a prisoner is (a) danger or dying or sustaining serious bodily damage due to a physical problem or injury (including self inflicted injuries) or (b) incapacitated by drugs or alcohol to the degree that the prisoner may be a danger to self, others, or property.

15.3

B. Mental Health Emergency - Any circumstance where, due to a mental illness, a person is at substantial and imminent danger to self or others.

C. Mental Health Non-Emergency - Any situation in which a prisoner is experiencing a mental health problem and it is believed that without intervention, the prisoner is likely to deteriorate and/or become at risk of suicide. This category shall include but need not be limited to those at risk suicide and:

   1. Prisoners who refuse (or request increased dosage of) Mental Health Medication;
   2. Prisoners with a long history of mental illness;
   3. Prisoners discharged from a psychiatric center to the custody of the facility; and
   4. Prisoners who display behavior which suggests acute emotional distress.

D. PROCEDURAL GUIDELINES

Tour Supervisor will:

1. Upon being notified by booking or block officer that a prisoner meets the criteria contained under Policy and Procedures Section C (Screening and Identification) take the following action:

   a. Verify the information through verbal and visual contact with the prisoner.

   b. Advise the block officer of any further actions necessary to ensure the safety and general welfare of the prisoner. If prisoner does not require medical or mental health services, explain to the referring officer why a referral for services was not appropriate and clarify procedures for officers, as necessary.

   c. (If medical or mental health staff are not available within the facility) personally interview and observe prisoner and determine if prisoner warrants an emergency or non-emergency referral and initiate the required referral procedures Section II.

   d. Ensure that appropriate supervision is given to any prisoner who is determined to be a threat to himself/herself.

   e. Forward a copy of Screening Form #330 ADM with the inmate if he/she is being referred to a Health Service Provider.

   f. Assure that security staff provide suitable first aid until relieved by qualified medical staff.

   g. Document any action taken in the appropriate log and by submission of Departmental Report to the Staff Sergeant.

   h. Notify the Captain and other concerned individuals as required by facility policies, procedures and chain of command.

15.4

15-4 Facility Resource Limitations
Prisoners who require mental health care beyond the resources
available to the facility will be transferred or committed to
a facility where proper care is available.

### SUPERVISION OF INMATES WITH MENTAL HEALTH PROBLEMS

POLICY: Appropriate supervision will be provided at the
Putnam Correctional Facility for all prisoners with mental
health problems. All Supervisory visits will be recorded in
the appropriate log books.

A. DEFINITIONS: Active Supervision - means the immediate
availability to prisoners or the facility staff members
responsible for care and custody of such prisoners, including
but not limited to:

   1) Supervisory visits to be conducted at 15 minute
      intervals; and

   2) The uninterrupted ability of staff members to
      communicate orally with and respond to each prisoner
      unaided by any electronic or other artificial
      amplifying device.

B. Constant Supervision - means uninterrupted personal
visual observation of prisoners by facility staff members
responsible for the care and custody of such prisoners.

PROCEDURAL GUIDELINES

1. The Captain or Staff Sergeant

   a. Ensure that at least active supervision is
      provided to prisoners with mental health
      problems.

   b. Determine if additional supervision is required
      for prisoner whose conditions, illness, or
      injury warrants it. The determination shall be
      in writing and shall state the specific facts
      and reasons underlying such determination.
      Additional supervision may include:

     (1) more frequent supervisory visits; or
     (2) constant.

   c. Make periodic reviews to insure that the
      security policy and procedures are being
      implemented by subordinate staff.

   d. Ensure that staff supervision is consistent with
      the Minimum Standards and County Law and that at
      least one staff member is of the same sex as the
      prisoner(s).

2. Facility Physician will:

   a. Have the authority to determine if additional
      supervision is required for prisoners whose
      condition, illness, or injury requires such
      supervision. Such determination shall be in
      conformance with provisions -of Part I, B.

3. <u>Tour Supervisor will:</u>
    a.  Assure that constant supervision is immediately provided for the following types of prisoners:
      (1) Suicidal prisoners;
      (2) Other prisoners with serious mental health problems.
    b.  Assure that prisoners who are in a semiconscious or unconscious state are immediately transported to an appropriate medical facility.
    c.  Assure that active supervision is immediately provided for prisoners who are intoxicated by drugs or alcohol but who do not appear to be a danger to themselves or others.
    d.  Assure that active or constant supervision will also be provided for all other prisoners who are determined by the Captain, Staff Sergeant, Tour Supervisor, Facility Physician, or Mental Health Service staff assigned to the facility to have mental health problems.
    e.  Perform any and all other duties which will promote the safety, security, and good order of the facility. Such duties may include but not be limited to:
      (1) Open communication with mental health service agencies and personnel;
      (2) Assessment of the facility's security program as it relates to prisoners with mental health problems.
      (3) Submission of recommendations on ways to improve the facility's supervision program.
    f.  Ensure that prisoners identified as having mental health problems are not placed in unsupervised isolation.

4. <u>Block Officer</u>
The Block Officer, upon being assigned to provide constant or active supervision for prisoners with mental health problems, shall perform following duties:
    a.  Review appropriate supervisory/housing log book.
    b.  Discuss the prisoner's status with the officer whom he is relieving;
    c.  Record the supervisory/housing log book entries for his shift. Such entries shall be in conformance with the facility's policy and procedures and appropriate Correction Law and Minimum Standards;
    d.  Follow all special precautions as directed by facility supervisors and/or mental health officials.
    e.  Search the prisoner under supervision each time the individual leaves or enters his/her cell;

15.6

f.  Conduct a daily search of the prisoner's cell for weapons and other potentially dangerous items. Such searches will be in accordance with the facility's established policies and procedures;

g.  Ensure that prisoners who appear to be sleeping are breathing and not in need of medical assistance;

h.  Discuss the prisoner's behavior with the mental health staff involved with the treatment of the prisoner under his/her supervision;

i.  Encourage the prisoner to participate in available and appropriate facility activities;

j.  Maintain appropriate confidentiality of records and information pertinent to the area of responsibility.

k.  Perform the required supervisory checks as prescribed by the Captain, Staff Sergeant, or Tour Supervisor.

## 15-5  SAFETY OF INMATE WITH MENTAL HEALTH PROBLEMS

POLICY:
All facility personnel will take appropriate safety precautions in handling and/or dealing with prisoners who are suspected or have been identified as having mental health problems.

PROCEDURAL GUIDELINES
PURPOSE:
To prevent prisoner suicides and to assure the general safety of prisoners with mental health problems.

A.  Safety Precautions Prior to Cell Assignment

1.  Booking Officers will perform at least the following duties:

a.  Thoroughly search all new prisoners and their clothing before placing the prisoners in a housing or detention area. Personnel performing such searches will be of same sex as the prisoner being searched.

b.  Remove all items of a potentially dangerous nature (e.g. belts, neckties, shoelaces, metal combs, matches) and store them in a safe area in accordance with facility procedures;

2.  All efforts must be made to expedite provision of emergency treatment.

3.  The Captain, or Staff Sgt. of the facility shall consult with the responsible physician or his designee prior to following actions being taken regarding prisoners who are having mental health problems:

(a)  Housing assignment;
(b)  Program assignments;
(c)  Disciplinary measures; and
(d)  Transfer in and out of the facility.

15.7

B. Safety Precautions Following Cell Assignments
   1. The Block officer will perform the following:
      (a) At the beginning of his shift, review all logs
          for information which may have been entered
          concerning the mental health status of
          prisoners.
      (b) Observe and interact with any prisoner listed
          in the log as appearing unstable or unusually
          depressed.
      (c) Perform the required personal visual
          observations and assessment of every prisoner
          under his/her care, pursuant to Supervision
          Policy, and in accordance with Commission of
          Correction Minimum Standards, Part 7003.
      (d) Render first aid to a prisoner who is found in
          an unconscious state, after requesting
          assistance, and continue such until relieved by
          trained medical personnel. This action shall
          be taken regardless of an officer's belief that
          the prisoner has expired.

C. General Safety Provisions
   1. Tour Supervisor will:
      (a) Assure that first aid kits are stored in
          readily accessible locations and that all
          disposable items (bandages, gauge, etc.) used
          in emergencies are routinely replaced;
      (b) Ensure that the first aid kits are inspected
          periodically by trained medical staff;
      (c) Arrange a private treatment area for mental
          health staff who conduct services in the
          facility. During periods when mental health
          services are conducted, an officer will be
          assigned to remain nearby to render timely
          assistance if necessary;
      (d) Meet with mental health personnel, when
          requested, to review the management and/or
          safety of mentally ill prisoners;
      (e) Take actions to assure that mental health
          treatment recommendations which meet the
          security and safety requirements of this
          facility (e.g. extra telephone call) are
          carried out on the days and shifts indicated;
      (f) Advise mental health personnel whenever
          security considerations or other factors
          prohibit a prisoner's access to services
          recommended by mental health staff;
      (g) Consult with mental health staff whenever there
          is a doubt regarding appropriate disciplinary
          sanctions to be imposed on prisoners receiving
          mental health services; and
      (h) Notify the block officers of any unusual
          precautions that should be observed during
          transportation of inmates(s) to a mental health
          service agency.

15.8

15-6  <u>MENTAL HEALTH NOTIFICATION</u>

<u>POLICY:</u>  Medical and Mental Health related information
concerning suicidal prisoners and prisoners with
serious mental health problems will be transferred
only in accordance with the following requirements:

- Summaries or copies of mental health records will
  be routinely sent to the facility to which the
  prisoner is being transferred.

<u>PROCEDURAL GUIDELINES</u>

A.  Transfer to Another Facility
  1.  <u>Security personnel will:</u>
      (a)  Notify the medical staff at least 24 hours prior
           to a routine transfer whenever feasible.
      (b)  Submit any required documentation regarding the
           said transfer.
  2.  <u>Medical personnel will:</u>
      (a)  Prepare all the required information to
           accompany the prisoner to be transferred.
      (b)  Forward to the receiving facility any portion of
           the medical record at the time of transfer.
      (c)  If necessary, prepare a written summary of
           possible medication and/or treatment needs
           during transit. The following information shall
           be included in the summary:
           (a)  medication needs during transit;
           (b)  special medical needs or problems,
                especially suicidal
           (c)  psychiatric problems, especially suicidal
           (d)  handicaps which may require special
                procedures during transportation.
      (d)  Prepare the Health Transfer Sheet, NYS Form
           #3611-A to be forwarded to other facilities.
      (e)  Prepare custodial transfer information, NYS Form
           #3610-A, to be forwarded to other facilities.
  3.  <u>Tour Supervisor will:</u>
      (a)  Assure that the receiving facility (county or
           state) is immediately informed of any signs of
           suicide potential or serious mental health
           problems exhibited by such prisoners and/or
           psychotropic medication currently prescribed for
           such prisoners.

15.9

15-7     REPORTS/DOCUMENTATION OF MENTAL HEALTH INMATES

POLICY:  A complete health record file shall be maintained
for each inmate to document accurately all health
care services, including critical information
regarding suicidal prisoners and prisoners with
serious mental health problems.  Such recording
system shall be maintained and controlled by the
facility health care authority.

PURPOSE:  To provide continuity of care and adequate safety.
PROCEDURAL GUIDELINES
15-7-A  Documentation requirements
1. At a minimum, written documentation regarding
high risk prisoners shall include:
(a) Officer's observations of prisoners' verbal
statements or behavioral signs that are
indicative of suicidal intent or serious
mental health problems.  This will include
observations made during admission and all
supervisory checks.
(b) Facility actions taken to assist prisoners
who are believed to be suicidal or mentally
ill.  These actions include:
(1) Notifications made by Booking and Block
officers to tour supervisors regarding
prisoners with mental health problems.
(2) Service referral made by facility tour
supervisors for suicidal prisoners and
prisoners with mental health problems.
(3) Special instructions issued by tour
supervisors regarding active, constant
or more frequent supervision or of
precautions to be taken managing
suicidal prisoners or prisoners with
mental health problems.
(4) Refusal to take or request increase
dosage of medications prescribed for a
mental health problem.
(5) Documentation of any emergency first
aid procedures implemented.
(6) Prisoner suicides and suicide attempts.
(7) Prisoner admissions (during incarcer-
ation) to a psychiatric inpatient
program and/or for drug or alcohol abuse
or admissions to a medical inpatient
unit.
2. All documentation shall be recorded in a format as
prescribed by Commission of Correction's Minimum
Standards or governing facility policies and
procedures and authorized by the local health
authority.

15.10

15-7B   Confidentiality
1.  Access to all medical and mental health records
    shall be controlled by the facility's medical and
    or mental health staff.
2.  Routine access to medical and mental health
    records shall be limited to those medical and
    mental health staff who require records for
    supplying clinical service to the prisoner.
3.  Medical and mental health records shall be
    released according to lawful provisions.
4.  The physician, or designees, shall have access to
    prisoner's confinement record when the physician
    believes that information contained therein may
    be relevant to the prisoner's health.
5.  The Captain, Staff Sgt. or his designee shall
    have access to the prisoners' medical and mental
    health records when the Captain / Staff Sgt.
    believes information contained therein may be
    relevant to the overall safety, security and good
    order of the facility.

15-7-C  Storage of Records
1.  All medical and mental health records shall be
    maintained separately from the confinement
    record and shall be available as prescribed by
    law.
2.  The facility shall provide adequate space and
    equipment for the storage of all medical and
    mental health records in a safe and secure
    manner.

15-7-D  Collection and Recording of Health Data
1.  Only qualified medical or mental health
    personnel shall collect and record health
    history, vital signs and other health appraisal
    data onto the approved record forms.

The Captain will meet annually with Mental Health
staff to review the mental health emergency care and
treatment services that have been provided, discuss
service needs, and explore methods of enchancing
staff and service coordination between the facility
and mental health services.

TRAINING:

The Captain will facilitate the training of all staff
following the Local Forensic Suicide Prevention
Services training model. A training coordinator
will be assigned and records kept of the training.
Mental Health staff will receive appropiate
orientation and training to the facility and its
procedures.

15.11

04

# EXHIBIT J

# Suicide Prevention and Crisis Intervention in County Jails and Police Lockups

## BASIC PROGRAM TRAINER'S MANUAL



### JANUARY 2000

*REViSiON DONE 2 2003.*

New York State Office of Mental Health

New York State Commission of Correction

Ulster County Department of Mental Health

B



EXHIBIT
PiF
8    1D
1|7|08    JP

PENGAD 800-531-6989

# Acknowledgments

This revised training program was prepared under the auspices of:

**NYS Office of Mental Health**
James L. Stone, MSW, CSW, Commissioner
Richard Miraglia, CSW, Director, Bureau of Forensic Services

**NYS Commission of Correction**
Alan J. Croce, Chairman/Commissioner
Patricia R. Tappan, Commissioner
Frederick C. Lamy, Commissioner

**Ulster County Department of Mental Health**
Ernest J. Townsend, DPA, CSW, Director

The project was supported by State Advisory Committees
which included representatives from the following agencies:

NYS Association of Chiefs of Police
NYS Sheriff's Association
NYS Conference of Mental Hygiene Directors
NAMI – New York State
NYS Division for Youth
NYS Division of Correctional Services
NYS Police Training Directors Association
NYS Division of Criminal Justice Services – Office of Public Safety
NYS Office of Mental Retardation and Developmental Disabilities
NYS Office of Alcoholism and Substance Abuse Services
Governor's Task Force On Alcoholism and Criminal Justice

Funding for the project was made available through the NYS Office of Mental Health.

**Original Edition Written by:**
Judith F. Cox
Pamela C. Morschauser
Joseph Himmelsbach
M. Peter Paravati
Lois V. Leahy
Laurie Gordan Sherman

**With Contributions from:**
C. Terence McCormick
Collie Brown
Debra Bourque
John Hickey
Julie Manning

**Revised Edition (1999) Written by:**
Pamela C. Morschauser
James R. Taisey

**Research and Editing:**
Donna Boundy

**Design and Formatting:**
Ann Cohan, Printing & Design Services

## MODULE VI

# Suicide Prevention Screening Guidelines

## OBJECTIVES

At the completion of this module, each officer, without reference to notes, will:

1. Complete and score the *Suicide Prevention Screening Guidelines.*
2. Understand the importance of communication regarding suicide risk among officers, medical, and mental health personnel.

## TRANSPARENCIES

1. Suicide Prevention Screening Guidelines Form
2. Sample Form – Refusal to Answer All Questions
3. Sample Form – Refusal to Answer Some Questions
4. Sample Form – Inability to Answer
5. Signs of Depression
6. Sample Form – Recommended Scoring for Video Screening

## HANDOUT

1. Suicide Prevention Screening Guidelines Form

**TIME NEEDED:** 90 minutes

LESSON/PROCEDURE

## INTRODUCTION

- Set of questions designed to identify inmates at high risk for suicide during early incarceration.
- **Will indicate a suicide risk for the first 24 to 72 hours of incarceration.** Recently in NYS jails, 9% of suicides were committed within hours of being taken into custody; nationally 27% occur within the first 3 hours (NCIA)
- NYS experience may reflect impact of effective screening at booking
- Effective screening can
  — save a life
  — protect an officer from legal liability should the detainee harm himself while incarcerated
- Each question is based on research that indicates its direct relationship to suicide risk. Guideline is not, however, a scientifically validated psychological testing instrument.
- Designed to be used at booking:
  — easy to incorporate into booking process
  — early detection can prevent a suicide
- Designed to help the booking officer make the most effective use of time and effort in identifying suicidal inmates.
- Will identify some risk factors for suicide which can be used to assess suicide risk throughout inmate's incarceration.

*Distribute* the *Suicide Prevention Screening Guidelines* to officers.



*Stress* that the results of screening at booking cannot be relied upon as a complete assessment of suicide risk after the first 72 hours of incarceration.

## TWO OBJECTIONS REGARDING USE OF THE SUICIDE PREVENTION SCREENING GUIDELINES

- Impossibility of completing the Guidelines during booking process due to the extensiveness of the form.
- The form contains numerous questions of a personal nature that the officer believes would be an invasion of the detainee's privacy and which he would refuse to answer.

Officers may initiate a discussion about the additional paperwork required to complete the *Suicide Prevention Screening Guidelines* at booking. Acknowledge any concerns and reinforce that during 14 years of utilization in New York State it has been shown that the form can be integrated into the booking process with little difficulty and that usually inmates are willing to answer these questions.

## WHY USE THE SUICIDE PREVENTION SCREENING GUIDELINES DURING THE BOOKING PROCESS

- Early detection can prevent a suicide
- The officer is not going to make a diagnosis nor a prediction of suicide but the form will enable him/her to identify a detainee who may be a high risk for suicide.
- Correctly identifying a suicidal detainee will result in certain procedures that may avert a crisis (e.g., housing classification; supervision). These procedures will be drafted by your facility with the assistance of the medical and mental health staff.
- Asking personal questions to access suicide potential is a necessity.

LESSON/PROCEDURE                                    <u>INSTRUCTOR'S NOTES</u>

## INITIATING THE INTERVIEWING PROCESS

Minimize the detainee's suspicions and hostilities by conveying
the following before beginning interview.
- The use of the guidelines is a routine process of booking.
- All detainees are requested to answer these questions.
- The information is important to assure his/her well being.
- Some of the questions may be personal, but they are necessary
  in assessing for suicide risk.

## OBJECTIVE 1
## SUICIDE PREVENTION SCREENING GUIDELINES
## INSTRUCTIONS: HOW TO COMPLETE THE FORM

*Show transparency:*
Blank *Suicide
Prevention Screening
Guidelines* form.



### GENERAL INFORMATION SECTION
- Complete the form in triplicate at booking, *PRIOR* to cell
  assignment.
- File *ORIGINAL COPY* according to facility's procedures.
- If referred, provide *COPY* to medical or mental health personnel.
- *THIRD COPY* is available for other purposes, such as inclusion
  in transfer packet.
- COMMENTS COLUMN
  **All "yes" responses require a note to document.**
  Booking officer should note:
  — Any information about the detainee that is relevant and
    important.
  — Any information regarding detainee's refusal or inability
    to answer questions.
- DETAINEE'S NAME: Enter detainee's last name, first name
  and middle initial.
- SEX: Enter male (m) or female (f).
- DATE OF BIRTH: Enter day, month and year.
- MOST SERIOUS CHARGE(S): Enter the most serious charge
  or charges (no more than two) from this arrest.
- DATE: Enter day, month and year that the form is being
  completed.
- TIME: Enter the time of day the form is being completed.
- NAME OF FACILITY: Enter the name of the jail or lockup.
- NAME OF SCREENING OFFICER: Print the name of the
  officer completing the form.
- PSYCHIATRIC PROBLEMS DURING PRIOR
  INCARCERATIONS
  Facility records should be reviewed to determine any prior
  mental health services to inmate.
  **Any inmate with a diagnosis of a psychotic disorder or a
  Major Depression and prior mental health services in jail
  should be referred to the supervisor immediately following
  screening and to the mental health service as soon as
  possible.**

*Stress* to officers the
necessity of noting in the
"Comments Column" any
pertinent information — either
observed by an officer or stated
by the detainee.

Each facility should have a
procedure (e.g., rolodex file,
computer file) which records
detainees with psychiatric
problems.

| LESSON/PROCEDURE | INSTRUCTOR'S NOTES |
|---|---|

## REFUSE TO ANSWER/UNABLE TO ANSWER QUESTIONS

- Information unknown to booking/screening officer should be asked of detainee.
- Detainee has a right to refuse to answer.

### If detainee REFUSES TO ANSWER questions 2 through 12:

- Write RTA in Comment Column next to each question.
  ### and
- Check either "YES" or "NO" to a question **ONLY** if the information is known to the officer completing the form.

### If during a cooperative interview the detainee REFUSES TO ANSWER one or two questions:

- Check "YES" in the box.
  ### and
- Enter RTA in Comment Column.

### If detainee is UNABLE TO ANSWER questions 2 through 12:

- Enter UTA in the Comment Column.
  ### and
- Enter reason for being unable to answer next to the unanswered question (e.g., "detainee highly intoxicated and incoherent").
  ### and
- If the information to complete questions 2 through 12 is **KNOWN** to the officer, check "YES" or "NO."

## PERSONAL DATA QUESTIONS 1–12

### ITEM 1 – Observations of Transporting Officer

- Asking for information from the transporting/arresting officer can provide pertinent information about the detainee's behavior and emotional state at the time of arrest and during transport.
- This information can be relevant and valuable during the screening process especially if the detainee refuses to answer questions.

---

*Check "YES" or "NO" based upon the verbal report of the transporting/arresting officer or information listed in the completed screening guideline provided by the transporting/arresting police agency.*

*If noted that detainee is a high risk for suicide, IMMEDIATELY notify the supervisor.*

---

**Instructor's Notes:**

*Show transparencies:*
- Sample form for **Refusal to Answer All questions**
- Sample form for **Refusal to Answer Some questions**



*NOTE:* Any time officer checks an answer to a question a detainee has refused to or is unable to answer, officer should note how the information is known to him/her.

*Show transparency:*
- Sample form for **Inability to Answer questions**



*Note:* Advise officers to complete screening if possible and then notify shift supervisor whenever direction at left appears.

LESSON/PROCEDURE                                    INSTRUCTOR'S NOTES

## ITEM 2 – Family and Friends

- Individuals without family or friends may feel isolated. An attitude of hopelessness and helplessness may exist if emotional support or a sense of belonging is lacking. (Fawcett, N.C.I.A., Danto, Burtch)
- Inmate's feeling of emotional connection is more significant than his/her geographic closeness to family and friends.
- Without emotional connections, suicide becomes a greater risk.
- When asking this question be sure that a family member or close friend is indeed "close." A close person would be defined as:
  - — SOMEONE OTHER THAN a LAWYER or BONDSMAN who will be willing to post bail.
  - — SOMEONE who WILL VISIT the detainee while incarcerated.
  - — SOMEONE who will call often or will ACCEPT A COLLECT CALL from the detainee.

*Check "YES" if detainee lacks close family or friends.*

## ITEM 3 – Significant Loss

- Loss of significant individuals in a person's life can leave them without the necessary emotional support (Rowan, AFSP). This lack of support may lead to depression and possibly suicide.

**Significant loss can be defined as:**

- Loss of employment
- Death of a loved one
- End of a relationship (including loss of a friend or pet)

**Explore this issue by asking:**

- *"Have you lost your job within the last six months?"*
- *"Has your marriage or a relationship ended within the last six months?"*
- *"Has a family member or close friend died within the last six months?"*

*Check "YES" if the detainee has reported ANY LOSS within the last six months.*

*Stress a loss is anything perceived by the detainee as a loss. Avoid making assumptions.*

## ITEM 4 – Worried About Problems

- Pre-existing problems may contribute to an increase in the detainee's stress level. Arrest and incarceration may be viewed as the "last straw."
- This question is intended to reveal the detainee's current state of mind.

**Explore this issue by asking:**

- *"Do you have any serious financial or family problems?"*
- *"Do you or anybody close to you have serious medical problems?"*
- *"Do you fear losing your job?"*

*Stress a problem is anything perceived by the detainee as a problem. Avoid making assumptions.*

LESSON/PROCEDURE                                      INSTRUCTOR'S NOTES

Future developments regarding the information gathered may have an impact on the detainee's behavior during his incarceration, (e.g., spouse may be filing for a divorce). Any information should be logged and noted in the Comment Column for future reference.

Officers should be *alert* during visits, times of mail delivery, and after phone calls.

*Check "YES" if detainee is worried about major problems other than his/her legal situation.*

## ITEM 5 – Suicide/Significant Other
- Psychiatric literature has shown that a person is more likely to attempt or complete suicide if another person "close" to them has already done so. (Danto; Handbook of Psychiatric Emergencies, NCIA)
- A significant other can serve as a role model. If a detainee has experienced the suicide of a parent, he/she may view suicide as an acceptable solution.

**Explore this issue by asking:**
- *"Has any family member or close friend committed suicide?"*

*Check "YES" if detainee has experienced a suicide within his/her community of significant others.*

## ITEM 6 – Alcohol/Drug History (Fawcett, AFSP, Rowan)
- Individuals dependent on alcohol/drugs are predisposed to depression.
- Depression is an indicator of suicide.
- Be alert to individuals with a past history of alcohol/drug abuse.
- Alcohol/drug history does not indicate addiction. It does indicate that the person has abused alcohol/drugs to the extent that they have impacted on his life.

**Explore this issue by asking:**
- *"Have you ever been arrested for DWI?"*
- *"Have you ever received treatment for an alcohol/drug problem?"*
- *"Have alcohol/drugs ever caused problems in your life; losing a job, arrests, or a medical condition?"*
- *"Has anybody ever complained about your alcohol/ drug abuse?"*

*NOTE:* The nature of the charge may reveal alcohol/drug involvement (i.e., CPCS, DWI, DWAI, etc.).

*Check "YES" if the detainee admits to an alcohol/drug problem.*

## ITEM 7 – History of Mental Health Treatment
- Persons with a history of psychiatric illness, especially depression or schizophrenia, are at a higher risk of committing suicide than the general population. (Farmer, Kamara, Barraclough)
- The New York State Commission of Correction has reported that 50% of all LOCALLY incarcerated inmates who committed suicide had a prior psychiatric diagnosis (1993–1997).

LESSON/PROCEDURE                                                          INSTRUCTOR'S NOTES

**Explore this issue by asking:**
- *"Do you have past hospitalizations for mental health problems?"*
- *"At present, do you take any prescribed medications to treat a mental health problem?"*
- *"Have you received counseling within the past six months?"*

*Check "YES" if the detainee reports any prior history of psychiatric services.*

## ITEM 8 – Embarrassment
- Certain individuals are held in high esteem within their community. An arrest is likely to damage their image and jeopardize employment or reputation.
- A person may have committed a "shocking" crime — one which disgusts and upsets the community (e.g., sexual abuse).
- Some persons may feel shame and humiliation over arrest for even a minor crime.

**Explore this issue by asking:**
- *"Do you consider your arrest and detention shameful?"*
- *"Will the nature of the crime cause embarrassment to your family?"*

**Considerations in scoring #8:**
- Don't make assumptions about how the person should feel.
- Put together as much information as possible to make a decision. Remember, it is how the person perceives the crime and/or their position.
- Try to perceive the crime as the detainee views it, (put yourself in his/her shoes).
- Utilize interview skills to assess the situation. Avoid personal judgment of the crime.

*If this question is checked "YES," IMMEDIATELY Notify the Supervisor.*

## ITEM 9 – Suicidal Statements
- Research has indicated that the most accurate way of differentiating a suicidal from a non-suicidal person is by simply asking the person about suicidal thoughts. (Lester in Beck, 1974)
- Be alert to direct statements, "I want to kill myself," or indirect statements, "I have nothing to live for."
- Indirect statements may cause feelings of uneasiness, apprehension or doubt on the officer's part.

*Check "YES" to any direct or indirect suicidal statement, and IMMEDIATELY Notify the Supervisor.*

---

**Instructor's Notes column:**

Officers should *note* the psychotropic medication and name of the treatment agency in the "Comments Column."

If the detainee states a diagnosis, it should be noted.

*Advise* officers that use of good communication skills will dispel those feelings. Communication Skills will be reviewed in Module 8.

LESSON/PROCEDURE                                                  INSTRUCTOR'S NOTES

**ITEM 10A – Previous Suicide Attempt**
- Research has shown that people who have attempted suicide are more likely to make subsequent attempts.
- Approximately 80% of all persons who commit suicide have made at least one prior attempt.
- A previous attempt is an excellent indicator for subsequent attempts.
- 30% of those who commit suicide in correctional facilities have made previous attempts. (DuRand)

**Explore this issue by asking:**
- *"Have you ever attempted suicide?"*

*If "YES" explore the method and check for scars. (Medical examination should check for scars, even if no claim of attempt.)*

**ITEM 10B – Attempt Occurred Within Last Month**
- This time frame is based upon review of suicides in New York State jails and lockups.
- Immediate referral to supervisor is required only if attempt is recent.
- Facilities may wish to immediately refer all detainess with previous attempts, no matter when they occurred.

**ITEM 11 – Hopelessness**
- Hopelessness and helplessness are the best short-term indicators of suicide risk.
- The officer wants to determine if the detainee is experiencing unbearable psychological pain, and if relief from this pain is being sought

**Explore this issue by asking:**
- *"Do you feel hopeless – NOTHING to look forward to?"*

**The question may also be asked another way:**
- *"Do you feel you have ANYTHING to look forward to?"*
- In this case, a "YES" response would be scored "NO" on form.

*Check "YES" if detainee feels hopeless and has given up.*

*If officer checks "YES," IMMEDIATELY Notify the Supervisor.*

**ITEM 12 – Incarceration History**
- Those detainees without a significant incarceration history are most likely to kill themselves shortly after confinement due to the disgrace and embarrassment stemming from their arrest and incarceration.
- A first time offender is an especially high suicide risk due to the fear of being incarcerated.
- It is important to note that detainees with an extensive criminal record are more likely to attempt suicide after several weeks or months in confinement during which time they may become increasingly despondent about their future. (Danto, 1973)

*Instructor's Notes:*

*Describe the suicide method in "Comments Column."*

This item may be difficult for officers to assess. Correctly asking the question will elicit the proper response. Scoring of this question is very important. Be certain that the officers understand how to obtain this information and the scoring process before proceeding.

<u>LESSON/PROCEDURE</u>                          <u>INSTRUCTOR'S NOTES</u>

## BEHAVIOR APPEARANCE OBSERVATIONS: ITEMS 13 – 16B

*Check "YES" or "NO" to each of these items. These are OBSERVATIONS made by the booking/screening officer.*

*NOTE: THESE ARE OBSERVATIONS, NOT QUESTIONS TO ASK THE DETAINEE.*

### ITEM 13 – Depression

- The officer should note any signs of depression.
- Be alert to non-verbal expressions and behaviors that will identify depression. (crying, apathy, extreme sadness, lethargy, etc.)

---

### Signs of Depression

| | |
|---|---|
| Hopelessness/Helplessness | Worthlessness/Guilt |
| Diminished Interest in Most Activities | Suicidal Ideations/ Thoughts of Death |
| Significant Weight Gain or Loss | Anxiety |
| Increase/Loss of Sleep | Extreme Sadness/Crying |
| Restlessness/Lethargy | Diminished Ability to Concentrate |
| Fatigue | |

---

### ITEM 14 – Anxiety/Anger/Fear

- A person who is overly anxious, afraid or angry is a high risk for suicide.
- Anxiety symptoms, both panic attacks and high generalized anxiety is major short-term suicide risk factor. (Fawcett)
- Agitation frequently precedes suicide. (Rowan)
- The officer will be identifying extreme or inappropriate expression of these emotions.
- Anxiety, fear and anger can be observed by:
  — Hand-wringing
  — Pacing
  — Profuse sweating
  — Excessive fidgeting
  — Shallow breathing

*Check "YES" if any of these signs are observed.*

---

**Instructor's Notes:**

*Emphasize* to officers that their personal observations are extremely helpful and should be noted in the "Comments Column."

*Ask* officers for the signs of depression as a review.

*Show transparency:* *Signs of Depression* again. 

LESSON/PROCEDURE                 INSTRUCTOR'S NOTES

## ITEM 15 – Strange Manner
- Note any signs of a psychosis or other mental illness.
- Be alert for hallucinations, mood swings, disorientation, alcohol/drug withdrawal, etc.

*Check "YES" if any unusual behavior or verbalizations are observed.*

## ITEM 16A – "Under the Influence" – Alcohol/Drugs
- An individual high on alcohol/drugs poses a very serious suicide risk. (Fawcett)
- Risk is also high during early period of recovery from substance abuse. (Rowan)
- Alcohol and cocaine abuse is present in more than 60% of suicides of 18–19 year olds. (AFSP)
- Ascertaining that a person is intoxicated may be difficult, especially if "under the influence" of drugs other than alcohol.

**Indicators of intoxication:**
- For stimulants – dilated pupils, sweating, rapid thoughts and speech.
- For depressants – slurred speech, slowed movements, detached mood, inability to think logically.
- For hallucinogens – removed from reality, seeing/hearing things.

*Check "YES" if the detainee appears to be intoxicated.*

## ITEM 16B – Incoherent/Withdrawal/Mental Illness
- This observation helps identify those intoxicated detainees who have a greater likelihood of attempting suicide.

*Check "YES" if the detainee is experiencing a physiological withdrawal, and IMMEDIATELY Notify the Supervisor.*

As you proceed through this frequently *remind* the officers that their observations are critical and should be noted in the "Comments Column."

## SCORING
- Booking officer totals the number of "YES" checks in Column A.
- Enter the total number of "YES" checks in the space provided.

**Notify Supervisor IMMEDIATELY if:**
- **THE TOTAL NUMBER IS 8 (EIGHT) OR MORE.**
- **ANY** SHADED BOXES ARE CHECKED
- BOOKING/SCREENING OFFICER BELIEVES A REFERRAL IS APPROPRIATE AND NECESSARY.

*Indicate* on the guidelines form how and where the scoring and disposition is entered.

*NOTE:* The score of 8 is an arbitrary threshold. A person with a lower score may be a suicide risk.

## OFFICER'S COMMENT'S / IMPRESSIONS
- Inquire about and note any other information inmate thinks jail personnel should know about him/her relating to safety

LESSON/PROCEDURE                                    INSTRUCTOR'S NOTES

## ACTION TO BE TAKEN

### BY OFFICER
- Notify Supervisor if any answers indicate notification, and check either "YES" or "NO."
- Supervisor must be notified PRIOR to cell assignment.

### BY SUPERVISOR
- Check supervision disposition:
  — Constant (one to one) is the only acceptable level of supervision for a suicide watch in NYS.
- Check "YES" or "NO" regarding referral to medical/mental health personnel.
  — If "YES," check emergency or non/emergency medical/ mental health personnel.

### MENTAL HEALTH STAFF
- All recommendations should be noted on form by medical/mental health staff.

### SIGNATURE AND BADGE NUMBER OF SCREENING OFFICER
- Enter signature and badge number

## PREPARATION FOR VIDEO

| VIDEO: | Suicide Prevention Screening Guidelines |
|--------|------------------------------------------|
| Time:  | 8 minutes |

*NOTE:* See NYSCOC Chairman's Memorandum #17.99, November 1, 1999.

---

**COMPREHENSION CHECK**

---

*Ask* officers to briefly review instructions for completing form; answer any questions.

*Start video* with Title : *Suicide Prevention Screening Guidelines.*



---

*Stop video* with Narrator saying: *"Be sure to make appropriate notes in the Comments Column any time you score a question as a yes."*

LESSON/PROCEDURE

# DISCUSSION OF VIDEO SCREENING

*Review* each question.
***Do Not Give Answers.***

***Show transparency:***
**Recommended**
**Scoring** of video
interview.



┌─────────────────────────────────────┐
│ **VIDEO:**  *Scoring Screening Form* │
│ **Time:**   9.5 minutes              │
└─────────────────────────────────────┘

***Start video*** with
Narrator saying: *"The*
*preceding screening*
*went pretty smoothly.*
*It took about seven minutes."*



***Stop video*** with Narrator
saying: *"It was a close call,*
*but unless you personally feel*
*that he is dangerous to himself,*
*he need not be given special*
*attention."*

## SUMMARY

### REVIEW OF GUIDELINES
- "Suicide Screening Prevention Guidelines" is a tool that has been proven effective in preventing suicide.
- Guidelines are effective for the first 24 hours to 72 hours of incarceration.
- Booking officer should be sensitive to the personal questions being asked to the detainee. Attitude should not be rigid, routine or mechanical.
- Due to the personal nature of the questions, a detainee may engage the officer in a lengthy discussion. Should this happen:
  1. Recognize that the detainee needs to vent his feelings.
  2. Explain to the detainee that you are unable to converse at length — but be sensitive and understanding to the detainee's feelings.
  3. IMMEDIATELY *Notify the Supervisor if warranted.*
     A referral to the appropriate service provider will be initiated.