# EXHIBIT V

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------x

DONNY A. SINKOV, as Administrator of the
Estate of SPENCER E. SINKOV, deceased,
DONNY A. SINKOV and HARA SINKOV,

                    Plaintiffs,

          -against-

DONALD B. SMITH, individually and in his
official capacity as Sheriff of Putnam
County, JOSEPH A. VASATURO, individually,
LOUIS G. LA POLLA, individually, THE COUNTY
OF PUTNAM, NEW YORK, and AMERICOR, INC.,

                    Defendants.

------------------------------------------------x

                    222 Bloomingdale Road
                    White Plains, New York
                    January 16, 2008
                    1:45 p.m.

          EXAMINATION BEFORE TRIAL of ROBERT

WENDOVER, a witness on behalf of the Defendant -

COUNTY OF PUTNAM in the above-captioned matter,

held pursuant to Notice at the above time and

place, before a Notary Public of the State of

New York.

                         Tracy Smith,
24                       Shorthand Reporter
25

---

2

APPEARANCES:

LOVETT & GOULD, LLP
    Attorneys for Plaintiffs
    222 Bloomingdale Road
    White Plains, New York 10605
BY: KIM BERG, ESQ.


MIRANDA, SOKOLOFF, SAMBURSKY, SLONE,
VERVENIOTIS, LLP
    Attorneys for Defendant -
    DONALD B. SMITH
    The Esposito Building
    240 Mineola Boulevard
    Mineola, New York 11501
BY: ADAM I. KLEINBERG, ESQ.


SANTANGELO, RANDAZZO & MANGONE, ESQS.
    Attorneys for Defendants -
    LOUIS G. LA POLLA
    JOSEPH A. VASATURO
    COUNTY OF PUTNAM
    151 Broadway
    Hawthorne, New York 10532
BY: JAMES A. RANDAZZO, ESQ.


WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER, LLP
    Attorneys for Defendant -
    AMERICOR
    3 Gannett Drive
    White Plains, New York 10604-3407
BY: BERNICE E. MARGOLIS, ESQ.


ALSO PRESENT: Donny Sinkov
              Donald Smith

---

3

1
2          IT IS HEREBY STIPULATED AND AGREED,
3    by and between the attorneys for the respective
4    parties hereto, that the sealing and filing of
5    the within deposition be waived; that such
6    deposition may be signed and sworn to before any
7    officer authorized to administer an oath with
8    the same force and effect as if signed and sworn
9    to before a Justice of this Court.
10
11          IT IS FURTHER STIPULATED AND AGREED
12    that all objections, except as to form, are
13    reserved to the time of trial.
14
15          IT IS FURTHER STIPULATED AND AGREED
16    that the within examination and any corrections
17    thereto may be signed before any Notary Public
18    with the same force and effect as if signed and
19    sworn to before this Court.
20
21
22
23
24
25

---

4

1
2          ROBERT   WENDOVER,
3    having been duly sworn by Tracy Smith,
4    a Notary Public within and for the State
5    of New York, was examined and testified
6              as follows:
7
8              oOo
9
10   EXAMINATION BY MS. BERG:
11       Q.    State your name and address for
12   the record, please.
13       A.    Robert Wendover, 3 County Center,
14   Carmel, New York 10512.
15       Q.    Officer Wendover, I'm Kim Berg. I
16   represent Donny Sinkov, Hara Sinkov and the
17   estate of Spencer Sinkov.
18              I'm going to be asking you some
19   questions. Let me know if there's anything
20   I say that you don't understand.
21       A.    Okay.
22       Q.    Try to verbalize your responses
23   instead of nodding your head or giving a
24   gesture. If you forget, I'll remind you.
25       A.    Okay.

---

**5**

ROBERT WENDOVER

1
2   Q.   If you give an answer during the
3   deposition that's incorrect or incomplete,
'   sometimes as we go along you may recall
    something, interrupt me and certainly before
6   you leave today, let me know so we can make
7   sure we have a complete and accurate
8   transcript.
9   A.   Okay.
10  Q.   Do you understand all that?
11  A.   Yes.
12  Q.   Can you describe for me your
13  educational background?
14  A.   G.E.D.
15  Q.   When did you receive that?
16  A.   1986.
17  Q.   Currently employed?
18  A.   Yes.
19  Q.   In what capacity?
20  A.   Correction officer, Putnam County
21  Correctional Facility.
22  Q.   For how long have you been
23  employed in that capacity?
24  A.   Since May 5, 2002.
25  Q.   Can you describe your duties and

COMPU-TRAN SHORTHAND REPORTING

---

**6**

ROBERT WENDOVER

1
2   responsibilities as a correction officer?
3   A.   Basically, all aspects of the
4   correctional field.
5   Q.   What does that involve?
6   A.   Care and custody. I do some
7   booking. Some transports. That pretty much
8   wraps up everything.
9   Q.   Are you assigned to the same post
10  or does your post change?
11  A.   It rotates.
12  Q.   Approximately, how often or what
13  percentage of the time have you spent in
14  booking?
15  A.   Over the past two years, probably
16  50 percent of the time was in booking.
17  Q.   Are you assigned to any particular
18  shift? Day shift? Night shift?
19  A.   I just moved to the day shift,
20  7:30 to 3:30.
21  Q.   Prior to that, what shift did you
    have?
2ᴐ  A.   3:30 to 11:30.
25  Q.   Have you ever been assigned to the
    North Housing Unit post?

---

**7**

ROBERT WENDOVER

1
2   A.   Yes.
3   Q.   Approximately, what percentage of
4   your work at Putnam County?
5   A.   I couldn't give you an accurate
6   number. It's occasionally.
7   Q.   Is it fair to say you've had the
8   booking position more than the North Housing
9   Unit post?
10  A.   Yes.
11  Q.   Did you ever have any duties with
12  respect to the visits that inmates receive?
13  A.   Yes.
14  Q.   What post were you assigned when
15  you had those duties?
16  A.   I would either be booking or
17  inmate escort officer.
18  Q.   For how long has there been a
19  position for inmate escort officer?
20  A.   As long as I've been there.
21  Q.   Are you familiar with any policies
22  or procedures in the Putnam County
23  Correctional Facility with respect to
24  intakes of prisoners --
25  A.   Yes.

COMPU-TRAN SHORTHAND REPORTING

---

**8**

ROBERT WENDOVER

1
2   Q.   -- new inmates?
3   Are you aware of any policies and
4   procedures in the correctional facility that
5   have changed in any way since May 20, 2006
6   pertaining to the intake of inmates?
7   A.   Yes.
8   Q.   What are you aware of?
9   A.   One change was a 15-minute watch
10  is no longer acceptable for suicides. For
11  suicide watch, I should say. Department of
12  Mental Health.
13  Q.   Any other changes in policies or
14  practices since May 20, 2006?
15  A.   The only other one I can recall
16  is we now sign a paper saying that we read
17  the actual change in policies.
18  Q.   When did that come about in terms
19  of signing?
20  A.   I don't recall. Over the past
21  year.
22  Q.   Do you recall when the policy came
23  out regarding 15-minute watch being no
24  longer acceptable for a suicide watch or
25  mental health issue?

9

ROBERT WENDOVER

2    A.  No.

3    Q.  How did you find out about that
4  new policy?

5    A.  I believe we were informed that
6  it was being put in the policy and procedure
7  book, and we were told to look it over.

8    Q.  Do you recall who told you about
9  it?

10    A.  No.

11    Q.  Did you have any discussions with
12  anybody about the changes in the policy?

13    A.  Not that I recall.

14    Q.  Did you ever receive any training
15  on the changes in the policy?

16    A.  No new training, no.

17    Q.  Prior to May 20, 2006, what was
18  the policy, if any, and place with respect
19  to suicide watch or mental health issue?

20    A.  We had suicide screening intake,
21  and it was my understanding it was just a
22  guide to a final decision whether you put
23  somebody on a 15-minute watch, a constant
24  watch or routine watch.

25    Q.  Prior to May 20, 2006 --

COMPU-TRAN SHORTHAND REPORTING

10

ROBERT WENDOVER

2  withdrawn.

3        The suicide screening intake that
4  you referred to, is that the same form
5  that's been used since May 20, 2006, or did
6  it change in any way?

7    A.  I believe it's the same.

8    Q.  So, is it your understanding since
9  May 20, 2006, based on any new policy or
10  procedure, that your completion of that form
11  requires sometimes in certain cases a
12  specific level of supervision?

13    A.  I'm sorry.  If you're asking does
14  that form with the information on the form
15  make me decide what supervision, yes.

16    Q.  Since May 20, 2006, with this new
17  policy coming out about 15-minute watch no
18  longer being acceptable for suicide watch or
19  mental health issue, have you received any
20  indication or training or instruction on how
21  the suicide screening form plays into that
22  role or policy?

23    A.  We have our yearly suicide
24  prevention training.

25    Q.  For how long have you had that

11

ROBERT WENDOVER

2  training?

3    A.  It's been every year since I've
4  been there.

5    Q.  Have you ever received any
6  documents as part of that training, any
7  handouts or anything like that?

8    A.  I'm sure we have.  I don't recall
9  what they were, but I'm sure we have.

10    Q.  In terms of the suicide screening
11  form, do you recognize the form?  Not the
12  handwriting but the form itself as Exhibit
13  3, as that document.

14    A.  Yes.

15    Q.  And your recollection is that form
16  was used both before and after May 20, 2006?

17    A.  Yes.

18    Q.  With respect to the total of the
19  numbers, the total column, did you ever
20  receive any training as to what should be
21  done if someone scores eight or higher on
22  that form?

23    A.  Yes.

24    Q.  Since this new policy came about
25  after May 20, 2006 regarding 15-minute watch

COMPU-TRAN SHORTHAND REPORTING

12

ROBERT WENDOVER

2  being no longer acceptable, have you
3  received any training on what it means if
4  somebody scores eight or higher?

5    A.  No different training, no.

6    Q.  What is your understanding since
7  May 20, 2006 as to what you're supposed to
8  do in terms of level of supervision if
9  somebody has a score of eight or higher?

10    A.  Notify a supervisor.

11    Q.  Anything else?

12    A.  The officer and the supervisor
13  get together and they would decide the level
14  of supervision that they felt was necessary.

15    Q.  Were you ever made aware of any
16  policies or procedures that required
17  constant supervision if somebody scored
18  eight or higher?

19    A.  No.  I've seen nothing with
20  that.

21    Q.  Even with the new amendment after
22  May 20, 2006, do you have any understanding
23  as to whether constant supervision is
24  required if someone scores eight or higher?

25    A.  No.

COMPU-TRAN SHORTHAND REPORTING

13

**ROBERT WENDOVER**

2  **Q.**  What is your understanding based
3  on your experience or training as to the
4  purpose of the Suicide Prevention Screening
5  Guideline form?
6  **A.  I believe it's a tool to decide**
7  **the level of supervision.**
8  **Q.**  Were you ever trained or
9  instructed that that form is used to
10  determine if an inmate is at high risk of
11  harming themselves?
12  **A.  Yes.**
13  **Q.**  Did you ever have an understanding
14  based on training or experience that if
15  someone scores eight or higher on that form,
16  it's an indication that they're in high risk
17  of harming themselves?
18  **A.  I was trained there was a**
19  **possibility, yes.**
20  **Q.**  Who trained you as to that being a
21  possibility as opposed to a set fact?
22  **A.  A couple different training**
23  **officers over the years.**
24  **Q.**  Do you recall who specifically
25  trained you if somebody scores eight or

*COMPU-TRAN SHORTHAND REPORTING*

14

**ROBERT WENDOVER**

1  higher, it's merely a possibility that
2  they're a risk to themselves?
3  **A.  Training officers I've had in the**
4  **past are Sergeant Jackson, Sergeant Greno**
5  **and Lieutenant O'Malley.**
6  **Q.**  Do you recall if all or just one
7  of them trained you about that?
8  **A.  I don't recall specifics.**
9  **Q.**  Did anybody ever indicate to you
10  in words or in substance during the training
11  or elsewhere that the New York State
12  Commission of Correction states in its
13  regulations that constant supervision should
14  be implemented if somebody has a score of
15  eight or more?
16  **A.  No.**
17  **Q.**  There are certain boxes on that
18  yes column that are shaded; do you see that?
19  **A.  Yes.**
20  **Q.**  Are you aware of any policies or
21  procedures at Putnam County which require
22  any action on the booking officer's part if
23  one or more than of those shaded boxes are
24  checked?

15

**ROBERT WENDOVER**

2  **A.  Yes.**
3  **Q.**  What is your understanding of
4  those policies?
5  **A.  Supervision notification.**
6  **Q.**  Anything else?
7  **A.  No.**
8  **Q.**  Did anybody ever advise you of the
9  existence of any policies or procedures
10  which required any specific level of
11  supervision or heightened level of
12  supervision if one or more shaded box was
13  checked?
14  **A.  I was advised it was a**
15  **possibility. It wasn't definite.**
16  **Q.**  Was this during your training as
17  well?
18  **A.  During my training and my time of**
19  **working and learning the process.**
20  **Q.**  Other than during training, who
21  advised you that it was a possibility that a
22  heightened level of supervision would be
23  necessary if a shaded box was checked?
24  **A.  Shift supervisors.**
25  **Q.**  Do you recall who?

*COMPU-TRAN SHORTHAND REPORTING*

16

**ROBERT WENDOVER**

2  **A.  No other officers. Just general**
3  **assistance from other people learning the**
4  **job.**
5  **Q.**  Are you aware of any changes in
6  the requirement to notify a supervisor since
7  May 20, 2006?
8  **A.  Yes.**
9  **Q.**  What are you aware of?
10  **A.  Supervisor gets notified at the**
11  **completion of every form. They come up and**
12  **look it over and sign off on it.**
13  **Q.**  What was the policy before May 20,
14  2006 or the practice, if you will, at that
15  time?
16  **A.  Just they had to be notified.**
17  **Q.**  Anything in terms of verbal or
18  written?
19  **A.  Just verbal. Verbal**
20  **notification.**
21  **Q.**  Anything in terms of when they had
22  to be notified?
23  **A.  No.**
24  **Q.**  Was the supervisor required to
25  sign off on the form, the suicide screening

17

**ROBERT WENDOVER**

1
2  form before May 20, 2006?
3      **A.   Not that I'm aware of.**
4      Q.   When the supervisor looks over the
5  form again since May 20, 2006, is that in
6  collaboration with the booking officer?
7      **A.   Yes.**
8      Q.   Is anybody else involved in that
9  review process?
10     **A.   Occasionally, the medical staff.**
11     Q.   Those would be nurses?
12     **A.   Yes.**
13     Q.   What involvement do they have in
14 that review process?
15     **A.   Just input if they saw something**
16 **that we didn't see or they felt something we**
17 **didn't feel.**
18     Q.   How do you get their input?  Do
19 they bring it to you, do you ask them?
20     **A.   Both ways.  They sometimes would**
21 **bring it up.  Sometimes you would ask them.**
22     Q.   Is there any requirement as far as
23 you know, to seek their input?
24     **A.   No.**
25     Q.   Or for them to give it to you?

*COMPU-TRAN SHORTHAND REPORTING*

18

**ROBERT WENDOVER**

1
2      **A.   No.**
3      Q.   In terms of the notification
4  provisions, were you aware of any written
5  policy or other document which indicates
6  that the supervisor has to be notified and
7  review the actual guidelines since May 20,
8  2006?
9      **A.   I don't know of anything in**
10 **writing.**
11     Q.   Did you ever see anything in the
12 booking area, either in typewritten or
13 handwritten form, regarding notification to
14 the supervisor?
15     **A.   I don't recall.  I remember**
16 **seeing it, but I don't recall where I saw**
17 **it.  Whether it was type or handwritten.**
18     Q.   In terms of the policies and
19 procedures since May 20, 2006, are you aware
20 of any changes in what an officer is
21 required to do during a 15-minute
22 supervisory check?
23     **A.   No.  No changes that I recall.**
24     Q.   Did you ever see Exhibit 18 which
25 is a copy of a procedure regarding a

19

**ROBERT WENDOVER**

1
2  logbook?
3      **A.   Yes.**
4      Q.   Do you recall when you saw that
5  for the first time?
6      **A.   Probably when I was hired.  They**
7  **gave us the policy and procedures and told**
8  **us to read through them.**
9      Q.   Do you know if this was something
10 that was given to you upon your hire?
11     **A.   I don't recall if it was given to**
12 **me immediately.  It wasn't given to me to**
13 **keep, but I was given a copy of the books to**
14 **look over, yes.**
15     Q.   It says on the top, date of first
16 issue, May 29, 2001.  Then there's an
17 effective date August 12, 2005 and date of
18 amendment February 23, 2006.  Do you see
19 those dates here, here and here?
20 (Indicating)
21     **A.   Yes.**
22     Q.   Do you recall if you received
23 anything in terms of any amendment?
24     **A.   I don't recall.**
25     Q.   Do you recall in terms of looking

*COMPU-TRAN SHORTHAND REPORTING*

20

**ROBERT WENDOVER**

1
2  at this document, what the amendments were?
3      **A.   I don't recall.**
4      Q.   Take a look at the second page at
5  the bottom underneath the section that says
6  15-minute supervisory visit, letter H.
7  "15-minute supervisory visits are not
8  adequate as suicide prevention precaution."
9  Do you see that?
10     **A.   Yes.**
11     Q.   Do you recall ever seeing that
12 before today?
13     **A.   Yes.**
14     Q.   Do you recall when for the first
15 time?
16     **A.   No.**
17     Q.   Do you remember if it was before
18 or after May 20, 2006 when Spencer Sinkov
19 committed suicide at the jail?
20     **A.   No, I don't.**
21     Q.   Did you ever come to learn at any
22 point in time that the State Commission of
23 Correction was coming to the facility to
24 interview individuals about Spencer's death?
25     **A.   Yes.**

21

ROBERT WENDOVER

2  Q.  That was in August of 2006; do you
3  recall that?
4  A.  I don't recall an exact date, but
5  I was told they would be coming to interview
6  me.
7  Q.  Did you speak with them?
8  A.  Yes.
9  Q.  You don't recall when that was?
10  A.  No, I don't remember the date.
11  Q.  In terms of that date, do you
12  recall if within a month or few weeks of
13  your interview with the commissioners or
14  investigators from the commission, if there
15  were any policies that were put in the
16  procedure books?
17  A.  I don't recall.
18  Q.  Do you recall if Exhibit 18 was
19  added to the books or a version of Exhibit
20  18 was added to the books in or about August
21  2006?
22  A.  I don't recall what the dates
23  were.
24  Q.  15-minute supervisory visit,
25  letter G says, "Each visit shall involve/

22

ROBERT WENDOVER

2  include a brief period of interaction with
3  the inmate to include but not limited to,
4  such things as the current time and place,
5  the inmate's feeling as to their current
6  confinement and the inmate's needs.  This
7  should be in a professional manner but as
8  personal as possible."  I read that
9  accurately?
10  A.  Yes.
11  Q.  With respect to that provision
12  regarding 15-minute supervisory visits, were
13  you ever trained or instructed as to what
14  specific interaction you should be having
15  during the 15-minute checks?
16  A.  Yes.
17  Q.  What were you trained or
18  instructed?
19  A.  Every 15 minutes, you go around.
20  Get a visual.  First of all, making sure
21  they're there.  If they're sleeping, make
22  sure they're breathing.  If they're awake,
23  you can ask them if they need anything.  How
24  they're doing.  It varied on the condition
25  of the inmate when he came in.

23

ROBERT WENDOVER

2  Q.  Did anybody ever tell you that
3  during the 15-minute checks, you were
4  supposed to actually interact with the
5  inmate?
6  A.  We were told we were supposed to
7  interact with all inmates.
8  Q.  But specifically for those on
9  15-minute checks, were the interactions as
10  far as you were trained, supposed to be any
11  different, more involved, more specific,
12  anything else?
13  A.  I would say yes.
14  Q.  What were you trained?
15  A.  We were trained just because it's
16  more of a one-on-one instead of being in a
17  group of 30 or 40 inmates, you're checking
18  on one inmate instead of the whole unit.  So
19  you talked more directly to them.
20  Q.  What about on the 30 minute or the
21  routine supervisions?
22  A.  It's pretty much the same thing.
23  Q.  In what way?
24  A.  You physically talk to the
25  inmates.  You check to make sure they're

24

ROBERT WENDOVER

2  breathing.  Acknowledge what they're doing
3  and see if they have any needs.
4  Q.  Did anybody ever tell you that the
5  15-minute visits were different in any way
6  than the routine visits?
7  A.  No.
8  Q.  How about documentation
9  requirements, are there any differences in
10  the way you were supposed to document in a
11  logbook, a routine visit versus a 15-minute
12  visit?
13  A.  Just the wording.
14  Q.  In what way?
15  A.  Just logging in that it was a
16  15-minute supervisory visit.
17  Q.  Did anybody ever train you that
18  you're supposed to note during a 15-minute
19  supervisory visit entry in a logbook, what
20  the inmate was doing at the time you
21  observed them?
22  A.  I believe we were trained to log
23  that in once every hour block.
24  Q.  Do you serve in any role with the
25  union?

25

*ROBERT WENDOVER*

1
2      A.    Yes.
3      Q.    What role?
       A.    **I'm union president.**
       Q.    For how long have you held that
6  position?
7      A.    **Geez.  Two and a half years.**
8      Q.    Did you ever have any
9  conversations with Correction Officer
10  Vasaturo concerning Spencer Sinkov?
11     A.    **Not really.**
12     Q.    Do you recall any as you sit here
13  today?
14     A.    **Excuse me?**
15     Q.    Do you recall any conversations as
16  you sit here today?
17     A.    **The only conversations I recall**
18  **with him were just stuff that he's going**
19  **here.  He's being sued.  Nothing in**
20  **specifics.**
21     Q.    Do you recall discussing anything
22  with him about discipline or potential
23  discipline against him?
24     A.    **I recall hearing him say --**
25  **talking to him.  I really wasn't talking.**

*COMPU-TRAN SHORTHAND REPORTING*

26

*ROBERT WENDOVER*

1
2  **He mentioned that the commission recommended**
3  **discipline.  That's the only thing I recall**
4  **with him.**
5      Q.    Did he say why?
6      A.    **No.**
7      Q.    Do you recall when that was?
8      A.    **No.**
9      Q.    Anything else that you can recall
10  saying to Vasaturo or Vasaturo saying to you
11  that in any way related to Spencer or the
12  events of May 20, 2006?
13     A.    **No.**
14     Q.    Did you ever discuss with him any
15  changes in the policies that came down after
16  Spencer's death?
17     A.    **Not that I can recall.**
18     Q.    You know Sergeant LaPolla?
19     A.    **Yes.**
20     Q.    Did you ever have any
21  conversations with him about Spencer or the
:   events of May 20th?
2.    A.    **Pretty much the same**
24  **conversations.  They really couldn't get**

27

*ROBERT WENDOVER*

1
2  lawsuit.
3      Q.    Do you recall anything LaPolla
4  said to you or that you said to him?
5      A.    **Nothing in specific.**
6      Q.    Anything general, the gist?
7      A.    **It was general, he talked a**
8  **little about the discipline possibility.  He**
9  **was pretty hush-hush about the whole thing.**
10     Q.    Do you recall saying anything to
11  LaPolla or LaPolla saying anything to you
12  about any changes in policies or procedures?
13     A.    **He did at one point say there was**
14  **a change in the policy.  Didn't tell me what**
15  **it was.**
16     Q.    Do you know what he was referring
17  to?
18     A.    **No.**
19     Q.    Do you recall if there was a
20  change at or about that time when he made
21  the statement to you?
22     A.    **No.**
23     Q.    Do you recall if you said anything
24  to him?
25     A.    **I don't remember.  I'm sure I**

*COMPU-TRAN SHORTHAND REPORTING*

28

*ROBERT WENDOVER*

1
2  **said something back to him, but I don't**
3  **recall what it was.**
4      Q.    Do the corrections officers have a
5  contract?
6      A.    **We have an expired contract.**
7  **We're out one year.**
8      Q.    And you're operating that under
9  the terms of an existing contract?
10     A.    **Yes.**
11     Q.    Who is that contract with?
12     A.    **Putnam County.**
13     Q.    Does the contract say anything
14  with respect to who is considered to be the
15  employer?
16     A.    **I don't recall exactly who it**
17  **does say.**
18     Q.    Do you recall if the contract says
19  anything about Putnam County and the sheriff
20  being joint employers?
21     A.    **It makes me a bad president.  I**
22  **don't remember if it's in there or not.**
23     Q.    Do you know who signed the
24  contract?
25     A.    **The most recent one?**

29

ROBERT WENDOVER

2  Q.   Yes.

3  A.   **Yes.**

4  Q.   Who?

5  A.   **I did, County Executive Robert**
6  **Bondi, B O N D I, Sheriff Smith and I**
7  **believe it was Paul Eldridge.**

8  Q.   Who is part of that bargaining
9  unit in terms of rank?

10  A.   **Correction officers, sergeants,**
11  **clerical workers, cooks and dispatchers.**

12  Q.   Do the lieutenants and the
13  captains have a contract as far as you know?

14  A.   **I believe they have -- they're**
15  **management.**

16  Q.   Did you ever see Exhibit 2 or any
17  part of it before today?

18  A.   **I recognize it as -- looks like**
19  **copies of pages from our red books.**

20  Q.   Do you recall when if at all you
21  received that specific portion which I
22  marked as Exhibit 2?

23  A.   **I received my red books the day I**
24  **was hired.**

25  Q.   Did you ever receive any updates

COMPU-TRAN SHORTHAND REPORTING

30

ROBERT WENDOVER

2  to it?

3  A.   **We periodically get updates, yes.**

4  Q.   Do you recall if Exhibit 2 was
5  given to you on the date of hire or if it
6  was in the form of an update?

7  A.   **I don't recall.**

8  Q.   The first page at the bottom which
9  is Section 15-2, letter A, "booking officer
10  will," do you see that?

11  A.   **Uh-huh.**

12  Q.   You have to say yes or no?

13  A.   **Yes.**

14  Q.   And then it has a number of things
15  that the booking officer is supposed to do.
16  If you go to the second page at the bottom
17  right, it says 75. "Letter B,
18  administration of Suicide Prevention
19  Screening Guideline for -- supposed to be
20  form -- 330-ADM;" do you see that?

21  A.   **Yes.**

22  Q.   The form that Putnam County uses
23  is not the 330-ADM, are you aware of that?

24  A.   **I knew it was the SOJ form, yes.**

25  Q.   Have you actually seen the 330-ADM

31

ROBERT WENDOVER

2  which I marked as Exhibit 1?

3  A.   **Yes.**

4  Q.   Do you recall under what
5  circumstances you saw this?

6  A.   **When I was in the corrections**
7  **academy.**

8  Q.   Would that have been sometime
9  right before your hire or after your hire?

10  A.   **After my hire.**

11  Q.   How long did you spend at the
12  corrections academy?

13  A.   **Three weeks.**

14  Q.   Is that in Albany?

15  A.   **No. That was in Dutchess County.**

16  Q.   What, if anything, were you told
17  about the Suicide Prevention Screening
18  Guidelines, Form ADM-330?

19  A.   **I honestly don't recall the**
20  **specifics. I know -- I believe it was shown**
21  **to us. I can't give you an honest answer**
22  **whether Dutchess used the same one. They're**
23  **the ones that showed it to me.**

24  Q.   Did you attend the Dutchess County
25  Corrections Academy as part of your

COMPU-TRAN SHORTHAND REPORTING

32

ROBERT WENDOVER

2  employment or by reason of your hire by
3  Putnam County?

4  A.   **Yes.**

5  Q.   Do you recall if when you were
6  shown the form by that correction academy,
7  if the bottom section under the action part
8  where it says, in substance, if eight -- "if
9  the score is eight or higher or a shaded box
10  is checked, notify supervisor immediately
11  and institute constant watch"?

12  A.   **I couldn't be accurate and say it**
13  **was definitely there at that time, no.**

14  Q.   Do you recall if anybody ever gave
15  you any instruction or training that the
16  New York State Commission of Correction
17  which is noted at the top right of the form
18  Exhibit 1, if they required constant watch
19  when a score of eight or higher was
20  contained on a Suicide Screening Prevention
21  form?

22  A.   **I don't recall their exact**
23  **training. I remember the training, but I**
24  **don't remember their specific words or what**
25  **they told us and stuff.**

33

**ROBERT WENDOVER**

1  
2  Q.   In any of the training that you
3  attended, did anybody ever tell you about
4  the commissions minimum standards or their
5  regulations requiring constant watch for
6  somebody who scores eight or higher?
7  A.   **I don't recall ever hearing that.**
8  Q.   Do you recall hearing that the
9  State Commission requires or suggests that
10 constant watch be implemented if any shaded
11 box is checked?
12 A.   **No.**
13 Q.   With respect to the regulations
14 which refer -- Exhibit 2 refers to the
15 ADM-330.  Did you ever ask anybody why the
16 form that Putnam County uses is different?
17 A.   **No.**
18 Q.   Did anybody ever speak with you
19 about that?
20 A.   **No.**
21 Q.   Did you ever receive any training
22 on that?
23 A.   **On?**
24 Q.   On the difference in the form that
25 Putnam County chose to use?

*COMPU-TRAN SHORTHAND REPORTING*

34

**ROBERT WENDOVER**

1  
2  A.   **No.**
3  Q.   The second page which says page 75
4  at the bottom right of Exhibit 2, No. 3,
5  "Immediately notify the tour supervisor
6  whenever a prisoner scores in the high-risk
7  score of eight in column A or immediate
8  referral categories on the Suicide
9  Prevention Screening Form;" do you see that?
10 A.   **Yes.**
11 Q.   Do you recall for how long that's
12 been a policy at Putnam County?
13 A.   **No, I don't.**
14 Q.   Do you know if that was added
15 after May 20, 2006?
16 A.   **The last question, did you mean
17 do I recall if it's been a policy here or in
18 general?**
19 Q.   In Putnam, I mean.
20 A.   **Since I've been there, that's
21 been a policy that you would notify the
22 sergeant if somebody is scoring either a
23 shaded box or high number, yes.**
24 Q.   So the change to the policy is
25 that the sergeant now actually reviews the

35

**ROBERT WENDOVER**

1  
2  form?
3  A.   **They actually review the form and
4  signed it.**
5  Q.   And they actually sign the form?
6  A.   **Yes.**
7  Q.   And they're required to review the
8  form in all cases, even if an inmate scores
9  lower than eight; correct?
10 A.   **Yes.**
11 Q.   Or if no shaded box is checked?
12 A.   **Yes.**
13 Q.   In terms of the practice in Putnam
14 County, your experience as the booking
15 officer, when you notify a tour supervisor
16 before May 20, 2006 that an inmate had a
17 score of eight or higher or shaded box was
18 checked, was that done verbally or in
19 writing?
20 A.   **We notify the supervisor
21 verbally.**
22 Q.   Is there any documentation that
23 the supervisor sees again prior to May 20,
24 2006?
25 A.   **We do -- if they were put on a**

*COMPU-TRAN SHORTHAND REPORTING*

36

**ROBERT WENDOVER**

1  
2  **constant watch or 15-minute watch, we would
3  type up a P-1 and it would -- we have a book
4  down in the briefing office.  A copy goes
5  there and a copy goes to the block where the
6  inmate will be housed.**
7  Q.   Does a copy go to the sergeant as
8  well?
9  A.   **No.  The sergeant's responsible
10 for checking P-1 books as well as with
11 everyone else.**
12 Q.   What are the P-1 books, the
13 briefing books?
14 A.   **It's a book where you keep all
15 the forms and you go through them and see
16 any changes, any new admissions that might
17 be on a 15 or constant watch, the papers are
18 in there.**
19 Q.   Where is the P-1 book kept?
20 A.   **In the briefing room.**
21 Q.   When are the sergeants and C.O.s
22 required to check that book?
23 A.   **Every day when they come in.**
24 Q.   As part of your coming on duty,
25 are you given the verbal briefing by the

37

**ROBERT WENDOVER**

1
2 tour supervisor?
3    **A.   By the previous tour supervisor**
4 **and the oncoming supervisor.**
5    **Q.**   As part of those briefings as a
6 matter of practice, are you advised when
7 somebody is on a 15 minute or constant
8 watch?
9    **A.   Yes.**
10    **Q.**   Then do you also check the P-1
11 book that's in the briefing room?
12    **A.   Yes.**
13    **Q.**   In terms of the P-1 that you say
14 is done when somebody is placed on a 15
15 minute or constant watch, are you supposed
16 to put in that P-1 the reason for the
17 heightened level of supervision?
18    **A.   Yes.**
19    **Q.**   How much specifics are you
20 supposed to give?
21    **A.   You're limited with HIPAA law, so**
22 **really narrows it down to answers given on**
23 **the booking or during the booking process.**
24    **Q.**   Back to Exhibit 2, the Putnam
25 County regulations, same page, second page

*COMPU-TRAN SHORTHAND REPORTING*

38

**ROBERT WENDOVER**

1
2 75 at the bottom right. No. 4, "All such
3 notifications will be completed by
4 forwarding a copy of the prisoner's
5 screening form to the tour supervisor prior
6 to cell assignment."
7    **A.   Okay.**
8    **Q.**   Your testimony earlier seemed to
9 indicate to me in practice that's only been
10 done since May 20, 2006; is that fair to
11 say?
12    **A.   They look at the original.**
13    **Q.**   Since May 20, 2006?
14    **A.   Yes.**
15    **Q.**   Is there any practice as far as
16 you know of giving the tour supervisor a
17 copy of the screening form?
18    **A.   No.**
19    **Q.**   Ever in your employment?
20    **A.   Not that I recall, no.**
21    **Q.**   In terms of notifying the
22 supervisor when a prisoner scores eight or
23 higher or a shaded box is checked, are you
24 familiar with any policies or procedures as
25 to when that notification has to be given to

39

**ROBERT WENDOVER**

1
2 the supervisor?
3    **A.   I believe it was notify**
4 **immediately upon completion.**
5    **Q.**   Was that true before May 20, '06
6 as well?
7    **A.   Yes.**
8    **Q.**   When you notified the supervisor
9 of those scores, is that then occurring
10 before the inmate is placed in his or her
11 housing unit?
12    **A.   Yes.**
13    **Q.**   Do you recall if you were working
14 at the facility at any point in time when
15 Spencer Sinkov was an inmate there?
16    **A.   Yes.**
17    **Q.**   Do you recall what, if any,
18 position you had that day?
19    **A.   I was booking officer.**
20    **Q.**   Did you have any role in Spencer's
21 intake or booking?
22    **A.   No.**
23    **Q.**   Was it your understanding that he
24 came into the facility the evening before or
25 the night before you came on shift?

*COMPU-TRAN SHORTHAND REPORTING*

40

**ROBERT WENDOVER**

1
2    **A.   Yes.**
3    **Q.**   So when you reported to duty on or
4 about May 20, 2006, did you go to a
5 briefing?
6    **A.   Yes.**
7    **Q.**   Do you recall who conducted the
8 briefing?
9    **A.   I believe it was Sergeant LaPolla**
10 **and Sergeant Jackson.**
11    **Q.**   And LaPolla was going off duty?
12    **A.   Yes.**
13    **Q.**   Jackson was coming on duty?
14    **A.   Yes.**
15    **Q.**   Do they conduct the briefing at
16 the same time or does one brief you and then
17 the other one steps in?
18    **A.   It varies.**
19    **Q.**   Were they both in the room at the
20 same time this day, if you can recall?
21    **A.   I don't -- they're usually both**
22 **in the room.**
23    **Q.**   What, if anything, do you recall
24 LaPolla saying about Spencer?
25    **A.   I don't recall with any**

41

ROBERT WENDOVER

1
2  certainty.
3      Q.   Do you recall anything in
4  substance that Jackson said about Spencer?
5      A.   No.
6      Q.   Do you recall if you reviewed the
7  P-1 book that day?
8      A.   I'm sure I did.  I usually do it
9  every day.
10     Q.   Do you recall if you saw anything
11 in there about Spencer?
12     A.   I recall there was a memo that he
13 was on a 15-minute watch, yes.
14     Q.   Do you recall if either sergeant
15 or both briefed the officers coming in for
16 duty that day about Spencer being on a
17 15-minute watch?
18     A.   Specifically, I don't remember,
19 no.
20     Q.   Do you recall if anybody said
21 anything about Spencer having any addiction
22 or withdrawal issues?
23     A.   During briefing?
24     Q.   Yes.
25     A.   I don't recall that.

COMPU-TRAN SHORTHAND REPORTING

42

ROBERT WENDOVER

1
2      Q.   Let me show you what was marked as
3  Exhibit 4.  Is that the P-1 you saw that day
4  when you came on duty?
5      A.   No.  Absolutely not -- I'm
6  absolutely not certain, but it looks like
7  it.
8      Q.   To your best recollection --
9      A.   Yes.
10     Q.   -- that was in the briefing book?
11     A.   Yes.
12     Q.   When did you review it, before you
13 went to your post?
14     A.   Yes.
15     Q.   Did you ever see the completed
16 suicide screening form for Spencer which was
17 marked as Exhibit 3?
18     A.   No.
19     Q.   In terms of the form itself,
20 there's a section for mental health
21 referral; do you see that?
22     A.   Yes.
23     Q.   Who's responsible for completing
24 that?
25     A.   That could be the officer or the

43

ROBERT WENDOVER

1
2  sergeant, medical.
3      Q.   It could be any of those people?
4      A.   Yes.
5      Q.   What is that portion used for?
6      A.   It's used if you think they need
7  to see a psychiatrist or psychologist.
8      Q.   Is there a psychiatrist or
9  psychologist on staff at the facility?
10     A.   Yes.
11     Q.   How often are they there?
12     A.   Now, I believe he's full-time.
13     Q.   Since when?
14     A.   Just recently, actually.
15     Q.   Within the last year?
16     A.   Within the last couple of weeks.
17     Q.   Prior to say December 1, '07, how
18 often was the psychiatrist or mental health
19 worker in the facility?
20     A.   The psychiatrist was pretty much
21 on call.  We called him and he came.
22     Q.   Who was it?
23     A.   I don't know his last name.  It
24 was Eugene.  He's a psychiatrist, Dr. Haseef
25 (ph).

COMPU-TRAN SHORTHAND REPORTING

44

ROBERT WENDOVER

1
2      Q.   Who could call the psychologist to
3  come?
4      A.   The medical department.
5      Q.   Did the booking officer or any
6  other correction officer have the ability to
7  do that?
8      A.   I don't know.
9      Q.   Did you ever have occasion to call
10 the psychologist?
11     A.   No.
12     Q.   In terms of the mental health
13 referral section, it has a space to check
14 yes or no in terms of whether the inmate was
15 being referred to mental health and whether
16 it was an emergency or non-emergency;
17 correct?
18     A.   Yes.
19     Q.   Were you ever trained in any way
20 about when as a booking officer you should
21 make a mental health referral?
22     A.   As a book officer, no.  As a
23 correction officer, yes.  If they requested
24 it, you make a referral.  If you thought
25 there was something odd or different, you

COMPU-TRAN SHORTHAND REPORTING

45

**ROBERT WENDOVER**

1
2  would make the request.
3      Q.   When you say they requested it,
4  you mean the inmate?
5      A.   The inmate, yes.
6      Q.   How about as part of the intake
7  process, did anybody ever train you or
8  instruct you as to when you should make a
9  referral to mental health based on, for
10  example, the results of the Suicide
11  Screening Guidelines or anything else?
12      A.   I don't recall.  The medical
13  department used to handle most of it on the
14  intake.
15      Q.   In terms of the intake process in
16  your experience, is there any interaction
17  between the incoming inmate and the medical
18  staff?
19      A.   Yes.  They come over and
20  interview them.
21      Q.   Anything else that you observed
22  the medical staff do as part of the booking
23  or intake process?
24      A.   Vital signs.  Just vital signs
25  and interview.

46

**ROBERT WENDOVER**

1
2      Q.   For how long have those things
3  been done by medical?  Your entire time or
4  something else?
5      A.   Since we've had full-time
6  medical, yes.
7      Q.   When was that?
8      A.   I don't remember the exact date.
9  I want to say some time in 2003.
10      Q.   Is that when Americor came into
11  the facility?
12      A.   I believe so, yes.
13      Q.   Are you familiar with any policies
14  or procedures with respect to what medical
15  is supposed to do during intake?
16      A.   No.
17      Q.   In terms of the mental health
18  referral, were you ever instructed or
19  trained that if someone scored eight or
20  higher or a shaded box was checked on the
21  Suicide Screening Guidelines, that a mental
22  health referral should be made?
23      A.   I honestly don't recall.
24      Q.   With respect to medical during the

47

**ROBERT WENDOVER**

1
2  any way about the level of supervision to be
3  instituted on a new inmate?
4      A.   Yes.
5      Q.   Is that the practice the entire
6  time you've been employed there, or did that
7  come about at some point?
8      A.   As long as I was a booking
9  officer.
10      Q.   What is the purpose of conferring
11  with medical?
12      A.   Most of the time, it was a
13  medical issue.
14      Q.   A physical medical issue?
15      A.   Yes.
16      Q.   So would you bring it to the
17  medical staff's attention?
18      A.   If they had a physical issue?
19      Q.   Yes.
20      A.   Yes.
21      Q.   How about with respect to the
22  Suicide Screening Prevention Guidelines, in
23  your experience or in practice, is the
24  booking officer required to consult with the
25  medical staff about the results of that

48

**ROBERT WENDOVER**

1
2  form?
3      A.   No.
4      Q.   Other than reviewing the P-1 that
5  was in the briefing book on the morning of
6  May 20, 2006, did you have any conversations
7  with anybody about Spencer Sinkov prior to
8  the time that he had received a visit?
9      A.   Not that I recall.
10      Q.   Do you recall that there did come
11  a point in time when he received a visit?
12      A.   Yes.
13      Q.   How were you notified of that?
14      A.   Either radio or by phone.  I
15  believe I overheard the main control officer
16  announcing that there was an initial visit
17  for him on the radio.
18      Q.   What, if anything, did you do at
19  that point?
20      A.   I believe at that point, an
21  escort officer was doing outdoor exercise,
22  so I notified the block and the sergeant
23  that I would initiate the visit.
24      Q.   Who was at the block?
25      A.   Officer Mike Oliver.

49

ROBERT WENDOVER

1
2  Q.  Who was the sergeant?
3  A.  Sergeant Jackson.
4  Q.  Did either of them say anything to
you about that?
6  A.  I'm sure they acknowledged that I
7  was doing it but nothing specific pops up.
8  Q.  What did you do from there?
9  A.  I believe at that point, I went
10  down to North Housing Unit where he was
11  housed and picked him up.
12  Q.  Did you have any conversation with
13  Spencer at that time?
14  A.  Small talk. Nothing specific.
15  Q.  Anything that you can recall?
16  A.  Not really.
17  Q.  Do you recall anything about his
18  appearance?
19  A.  His physical appearance?
20  Q.  Yes.
21  A.  I remember what he looked like.
22  Q.  You do?
23  A.  Yeah.
24  Q.  Do you remember anything about his
25  height and weight?

50

ROBERT WENDOVER

1
2  A.  Maybe 5' 7", 130 pounds. Long
3  blond hair.
4  Q.  Anything else that you can recall
5  about him? Do you recall what he was
6  wearing, for example?
7  A.  He had jail-issued clothing on.
8  Q.  Do you recall what it was?
9  A.  It would be the brown pants,
10  brown shirt.
11  Q.  Do you recall if he had a
12  sweatshirt on?
13  A.  I don't recall if he was wearing
14  it. The brown shirts have to be worn on the
15  outside.
16  Q.  Are the brown shirts long sleeve
17  or short sleeve?
18  A.  Short sleeve.
19  Q.  What colors are the sweatshirt?
20  A.  Gray.
21  Q.  Do you recall if there was a gray
22  sweatshirt underneath?
23  A.  I don't recall.
24  Q.  Anything else that you can recall
25  about that initial meeting with Spencer,

51

ROBERT WENDOVER

1
2  anything that he said, anything that you
3  said, anything about his appearance?
4  A.  He seemed fine.
5  Q.  Did you have any conversation with
6  him as to how he was feeling?
7  A.  I don't recall anything specific,
8  no.
9  Q.  Did you then escort him to the
10  visit room --
11  A.  Yes.
12  Q.  -- or area?
13  A.  Yes.
14  Q.  Prior to getting to the visitation
15  area, did you speak with anybody, any
16  correction officers, sergeant, anybody about
17  Spencer?
18  A.  Just when they transferred
19  custody of him, I spoke to Officer Oliver
20  briefly.
21  Q.  What did you say to him and what
22  did he say?
23  A.  I was taking him to the visit,
24  and I'd call him when he was done.
25  Q.  Anything that you said to Spencer

52

ROBERT WENDOVER

1
2  or Spencer said to you before you got to the
3  visitation area?
4  A.  No.
5  Q.  What happened when you got down to
6  the visitation area?
7  A.  There was three individuals in
8  there; two males, one female. I believe it
9  was his mother, father and brother. He was
10  told to sit down in the area in front of
11  them. And that they could have no physical
12  contact. And they had 15 minutes.
13  Q.  Did anybody say anything to you?
14  A.  When we first went in?
15  Q.  At any point.
16  A.  Other than hello, no.
17  Q.  Did anybody speak with you at all
18  during the 15-minute visit?
19  A.  The only thing they may have
20  asked me about the classification process.
21  Q.  Do you recall who asked you about
22  that?
23  MR. KLEINBERG:  Objection.
24  A.  No, I don't.
25  Q.  Do you have any recollection as to

53

**ROBERT WENDOVER**

1  what you said?

2  **A.  I have a standard answer with**

3  **that.  It's three to five business days.**

4  Q.    What happens after someone is

5  classified?

6  **A.  They're -- depending on their**

7  **classification, they're either put in**

8  **administrative segregation or general**

9  **population.**

10  Q.    What, if anything, -- withdrawn.

11  What, if any, restrictions are on

12  an inmate prior to classification?

13  **A.  The only restrictions is they're**

14  **not allowed phone calls.  They're locked in**

15  **their cell for 24 hours.  No TV.  No media**

16  **of any kind.  That's pretty much the only**

17  **restrictions.**

18  Q.    In terms of medical review, are

19  you aware of whether within a certain amount

20  of time, inmates are evaluated by medical

21  staff?

22  **A.  I know they are.  I don't know of**

23  **any time limit or time frame.**

24  Q.    Do you know if they have to be

*COMPU-TRAN SHORTHAND REPORTING*

54

**ROBERT WENDOVER**

1  classified before medical will see them?

2  **A.  Absolutely not.**

3  Q.    Did you ever tell anybody that?

4  **A.  No.  I would never tell anybody**

5  **that.**

6  Q.    To the left of me, your right, is

7  Mr. Donny Sinkov.  Do you recall seeing him

8  the day that Spencer had a visit?

9  **A.  Yes.**

10  Q.    Do you recall if he asked you

11  about classification?

12  **A.  I don't recall who asked me.**

13  Q.    Do you recall any conversation

14  that you had with Donny Sinkov, any

15  statements he made or any statements you

16  made?

17  **A.  The only thing I remember saying**

18  **is about the three to five business days.**

19  Q.    Anything else?

20  **A.  No.**

21  Q.    Anything that you can recall Donny

22  specifically saying to you?

23  **A.  To me, no.**

24  Q.    Do you recall during the visit,

55

**ROBERT WENDOVER**

1  were you within earshot of the people there,

2  Spencer and the other three?

3  **A.  Yeah.  I was about eight feet**

4  **away.**

5  Q.    Did you hear anything that was

6  being said?

7  **A.  Some of the stuff, yes.**

8  Q.    What do you recall?

9  **A.  I remember them talking about an**

10  **attorney.  They were going to look to hire**

11  **one, but he had said Legal Aid would take**

12  **care of him.**

13  **I recall, I believe it was his**

14  **father, told him to cooperate with the**

15  **police and give up any names and information**

16  **they needed.**

17  **He laughed and joked around with**

18  **the younger male, which I believe was his**

19  **brother.**

20  Q.    Do you recall anything that he

21  said?

22  **A.  No.  I couldn't hear everything**

23  **they were saying.  I'm not there to listen**

24  **to what they're saying.**

*COMPU-TRAN SHORTHAND REPORTING*

56

**ROBERT WENDOVER**

1  Q.    Do you recall hearing the younger

2  brother say anything?

3  **A.  Just laughing.  One of the**

4  **parents made a statement that it's not a**

5  **joke, but there was -- there were times when**

6  **they got quiet, which they're entitled to.**

7  Q.    Anything else that you can recall

8  anybody saying?

9  **A.  Not right at this time, no.**

10  Q.    Do you recall anything being said

11  about drugs or withdrawal from drugs?

12  **A.  Yes; I'm sorry.  His father asked**

13  **him if he was withdrawing.  If he did any**

14  **drugs last night and if he was withdrawing.**

15  Q.    Did Spencer respond?

16  **A.  Yes.  He said yes, I did, and I'm**

17  **not too bad right now.**

18  Q.    Do you know for how long Spencer

19  had been in the facility as of the time of

20  that visit?

21  **A.  I don't remember the exact time.**

22  **Definitely within 24 hours.**

23  Q.    Did you ever receive any training

24  with respect to drug use at this point and

57

**ROBERT WENDOVER**

1
2 withdrawal from drug usage in terms of when
3 symptoms typically appear?
4     A.   I don't recall anything right
now.
6     Q.   Did anybody ever train you or
7 advise you in words or substance that when
8 somebody is withdrawing from opiates, such
9 as heroin, symptoms typically do not peak
10 for 48 hours?
11     A.   I don't remember any specifics.
12     Q.   Anything else that you heard
13 anybody saying during the visits?
14     A.   No, I don't recall anything else.
15     Q.   Do you recall at any point in time
16 Donny Sinkov asking you about availability
17 of any kind of detox or medication for
18 withdrawal?
19     A.   No.
20     Q.   Do you recall him mentioning
21 methadone at any point in time?
22     A.   No.
23     Q.   Did you say anything to him about
24 medical?
25     A.   Not that I recall, no.

58

**ROBERT WENDOVER**

1
2     Q.   Was anybody else present at any
3 point during the visit other than yourself
4 and the four members of the Sinkov family?
5     A.   Not that I can think of.
6 Sometimes people pop in the door but nobody
7 in an official status was in there.
8     Q.   Do you recall if Sergeant Jackson
9 was present at any time?
10     A.   It's possible she popped in.  She
11 usually checks on things pretty early.
12     Q.   Do you recall one way or another?
13     A.   No.
14     Q.   Anything else that you can recall
15 being said during the visit?
16     A.   The only other thing I recall
17 being said is from me, unfortunately, when I
18 said -- when they were leaving, don't worry.
19 We'll take care of him.
20     Q.   Who did you say that to?
21     A.   To the parents.
22     Q.   Anything else that you can recall
23 anybody saying?
24     A.   No.
25     Q.   How did the visit end?

59

**ROBERT WENDOVER**

1
2     A.   They said good-bye to each other.
3 And they go to one end of the room where
4 there's a door.  And I call in the radio to
5 have the door open.  And I take the inmate
6 out into the hallway and back down to the
7 unit.
8     Q.   Do you recall where you took
9 Spencer from there?
10     A.   He was going back down to north,
11 but at that point, we stopped at medical
12 because medical wanted to see him.
13     Q.   Who was in medical at that time?
14     A.   Susan.  It's a nurse.  I can't
15 think of her last name.
16     Q.   Do you recall if it was Susan
17 Waters?
18     A.   Yes.
19     Q.   How did you know that medical
20 wanted to see Spencer at that time?
21     A.   That's where I met Officer
22 Oliver.  He told me he was going to meet me
23 there because medical had to see him.
24     Q.   When did he tell you that, when
25 you indicated you were on your way back?

60

**ROBERT WENDOVER**

1
2     A.   Yes.
3     Q.   Was that via radio?
4     A.   Yes.
5     Q.   Did Oliver meet you then at
6 medical?
7     A.   Yes.
8     Q.   What happened -- withdrawn.
9         On your way from visitation to
10 medical, did you have any conversation with
11 Spencer?
12     A.   No.
13     Q.   What happened when you got to
14 medical?
15     A.   I handed custody over to Officer
16 Oliver.  They joked a little about him
17 looking like some singer in a rock band,
18 actually.
19     Q.   How long did you stay there?
20     A.   About maybe 10, 15 seconds.  I
21 had other things I had to do.
22     Q.   Anything else you can recall
23 anybody saying - Spencer, yourself or
24 Oliver?
25     A.   I know they both talked a little

61

ROBERT WENDOVER

2 about the rock band. I don't listen to that
3 music, so I don't have any idea what they
4 were even talking about.
5   Q.   Do you recall if Susan Waters was
6 present at any point in time when you were
7 there?
8   A.   She was in the infirmary, yes.
9   Q.   Did you see her have any
10 interaction with Spencer or hear her have
11 any interactions with him?
12   A.   As I was leaving, I remember her
13 calling him to come into the infirmary.
14   Q.   Did you see Spencer go in?
15   A.   No.  My back was to him.  I was
16 walking away.
17   Q.   Do you have any understanding as
18 to why she wanted to see him?
19   A.   No, I don't.
20   Q.   Was anything said in your presence
21 at any point in time about Spencer's hair?
22   A.   I believe that's what the
23 inference was, the way he looked like a
24 member of a band.
25   Q.   Did you hear anybody say anything

COMPU-TRAN SHORTHAND REPORTING

62

ROBERT WENDOVER

2 about whether or not or about any mistaken
3 belief that Spencer was a female, a girl?
4   A.   No.
5   Q.   Did Susan Waters when she called
6 Spencer into the infirmary, call him by
7 name?  Did she call him Inmate Sinkov,
8 something else?
9   A.   Mr. Sinkov.  That's the way she
10 responds to people.
11   Q.   Anything else that you observed
12 outside of medical?
13   A.   Not that I can recall.
14   Q.   Did you have any communications
15 with anybody about Spencer or with Spencer
16 at any point in time prior to him committing
17 suicide?
18   A.   Just with the sergeant telling
19 her the visit was over.
20   Q.   So you reported that to Sergeant
21 Jackson?
22   A.   Yes.
23   Q.   When you reported that to Sergeant
24 Jackson, did you tell her anything about the
25 visit?

63

ROBERT WENDOVER

2   A.   Not that I can recall, no.
3   Q.   Did she say anything about having
4 witnessed any part of the visit?
5   A.   Not that I recall, no.
6   Q.   Did she say anything to you at all
7 about the visit?  Ask you how it went or
8 anything to that effect?
9   A.   I don't recall anything, no.
10   Q.   Did you ever speak with Oliver
11 about the visit?
12   A.   No.
13   Q.   Did you ever tell him how it went
14 or anything that occurred during the visit?
15   A.   No.
16   Q.   Did Oliver ask you?
17   A.   No, I don't think so.
18   Q.   Did you ever tell anybody what you
19 heard during the visit about Spencer
20 indicating that in terms of withdrawing from
21 drugs, it was not too bad right now?
22   A.   Not previous to the suicide, no.
23   Q.   In connection with the visitation,
24 are you required to make any record or
25 document in any way when that visit

COMPU-TRAN SHORTHAND REPORTING

64

ROBERT WENDOVER

2 occurred?
3   A.   Not that I know of.
4   Q.   Is there any log or anything kept
5 of visitors?
6   A.   Visitors usually sign in when
7 they come in the lobby.
8   Q.   How about the correction officers,
9 are they required to write anything down?
10   A.   Not that I'm aware of.
11       MS. BERG:   I'm going to
12 have marked as Exhibit 20, a copy of an
13 Inmate Visitation Schedule, and a second
14 page is a Visitor's Registration.
15   (Whereupon, Plaintiff's Exhibit 20,
16 INMATE VISITATION SCHEDULE AND VISITOR'S
17 REGISTRATION, was marked for identification.)
18   Q.   Take a look at the first page of
19 Exhibit 20.  Have you ever seen that form?
20   A.   Yes.
21   Q.   What is that?
22   A.   This is a visitation log.  I
23 misunderstood your question.  I thought you
24 meant when they come in for 15.  When it's
25 regular visits, it's my understanding every

65

**ROBERT WENDOVER**

1 **visit is logged here. I didn't know they**
2 **logged in the initial visits, also.**
3 Q. Do you know of any policies or
4 practices in Putnam County to log in the
5 initial visits?
6 A. **Not that I'm aware of, no.**
7 Q. Did you log in, in any way, shape
8 or form, the initial visit that Spencer had
9 on May 20th?
10 A. **Not that I remember, no.**
11 Q. Just the form itself, the top
12 right has "week of" and then there's a line
13 and handwritten date; do you see that?
14 A. **Yes.**
15 Q. 5/20 to 26?
16 A. **Yes.**
17 Q. Is that something that's kept at
18 the visitation area for that week?
19 A. **Yeah. I believe it is.**
20 Q. In terms of the form, are all the
21 inmates' names written in the left-hand
22 column as shown here?
23 A. **Yes.**
24 Q. Is the C.O., the correction
25

*COMPU-TRAN SHORTHAND REPORTING*

66

**ROBERT WENDOVER**

1 officer required to fill in the date and
2 time of first visit with his or her initial
3 and second visit, et cetera?
4 A. **I believe that's the way they do**
5 **it. I never work visits so I don't know.**
6 Q. Other than on this occasion where
7 you've had to escort people for a visit,
8 have you ever worked in that area?
9 A. **No. There's certain officers**
10 **that are assigned there.**
11 Q. Did you ever perform the
12 visitation duties that you had on May 20,
13 2006 on any other occasions?
14 A. **Yeah. Occasionally, we do, yes.**
15 Q. Did you ever complete the Inmate
16 Visitation Schedule in connection with those
17 other occasions?
18 A. **No.**
19 Q. In terms of the Inmate Visitation
20 Schedule on the top, out of alphabetical
21 order is Sinkov under inmate's name; do you
22 see that?
23 A. **Yes.**
24 Q. Then there's the word initial

67

**ROBERT WENDOVER**

1 under the column, date, time, first visit;
2 do you see that?
3 A. **Yes.**
4 Q. Then it says C.O. initials. It
5 looks like 5/20 and signature which appears
6 to start with sergeant, but I'm not entirely
7 clear. Do you recognize that handwriting?
8 A. **Yes.**
9 Q. Whose is that?
10 A. **Sergeant Jackson.**
11 Q. Do you have any understanding as
12 to why Sergeant Jackson noted this?
13 A. **She obviously knew something I**
14 **didn't.**
15 Q. In terms of it being the week of
16 5/20 to -- 5/22 to 26 but the date being May
17 20th, any understanding when Sergeant
18 Jackson put that note on this log?
19 A. **No.**
20 Q. Did you ever speak with her about
21 whether or not you were supposed to create
22 an entry for Sinkov?
23 A. **No.**
24 Q. Did she ever counsel you in any
25

*COMPU-TRAN SHORTHAND REPORTING*

68

**ROBERT WENDOVER**

1 way for your failure to create such an
2 entry?
3 A. **No.**
4 Q. The second page, Visitor
5 Registration Form, do you have any
6 responsibility with respect to that?
7 A. **This is just a paper they sign**
8 **out in the lobby.**
9 Q. Do you have any responsibility for
10 overseeing that in any way?
11 A. **No. Somebody checks them in**
12 **once they sign in.**
13 Q. Do you have to do that at all?
14 A. **That wasn't my responsibility,**
15 **no.**
16 Q. At some point in time, were you
17 notified via radio or something else about
18 needing assistance in North Housing Unit?
19 A. **Not personally notified but a**
20 **call came out for all officers available.**
21 Q. Is that over the radio or
22 something else?
23 A. **Over the radio.**
24 Q. Do you recall when that call came

69

**ROBERT WENDOVER**

1
2  out on May 20, 2006?
3      A.  **Not specifically.**
4      Q.  Do you have any records that you
5  can refer to that would indicate to you the
6  time of that call?
7      A.  **I don't have any with me.**
8      Q.  What would indicate?
9      A.  **I had given a statement to BCI.**
10     Q.  Anything else?
11     A.  **I had also given a statement to**
12  **Commission of Corrections, but I never got**
13  **anything from them.**
14     Q.  In terms of the statements to the
15  Commission of Corrections, was that verbal
16  or written?
17     A.  **Verbal.**
18     Q.  And the statement to BCI?
19     A.  **Verbal.**
20     Q.  Did you give a written statement
21  at any point?
22     A.  **It was verbal and writing.  They**
23  **basically questioned me, and we put it on**
24  **paper and I signed it.**
25     Q.  When you were questioned by the

*COMPU-TRAN SHORTHAND REPORTING*

70

**ROBERT WENDOVER**

1
2  BCI, were you given any documents to look at
3  or review?
4      A.  **No.**
5      Q.  In terms of timing or anything
6  else?
7      A.  **No.**
8      Q.  What happened when you arrived at
9  the North Housing Unit that day?
10     A.  **When I arrived, I responded to**
11  **the cell area.  And I noticed Mr. Sinkov was**
12  **hanging from the bars by a sweatshirt.**
13     Q.  Was anybody else at the cell area
14  at that time?
15     A.  **Officer Oliver was there.  There**
16  **was a lot of people there.  I don't remember**
17  **the actual time frame as to when they were**
18  **there.  Nurse Waters might have been there.**
19     Q.  Other than observing Spencer
20  Sinkov hanging from his sweatshirt, what, if
21  anything, else did you observe when you
22  first arrived?
23     A.  **That was it really.**
24     Q.  What happened after you arrived?
25     A.  **Other people just started**

71

**ROBERT WENDOVER**

1
2  **arriving.  Somebody -- I don't recall who it**
3  **was -- got a pair of scissors because they**
4  **had to cut the sweatshirt because it was**
5  **tied through the door so we couldn't open**
6  **the door.**
7      Q.  Meaning the cell door?
8      A.  **Yes.**
9      Q.  So, was the sweatshirt cut from
10  the outside?
11     A.  **Yes.**
12     Q.  Do you know who did that?
13     A.  **I think it was Officer Oliver.**
14     Q.  Do you recall Oliver entering the
15  cell and cutting the sweatshirt from inside?
16     A.  **No.  I'm almost positive the door**
17  **was tied shut, so there was no way to get in**
18  **there without cutting it.**
19     Q.  Do you recall who got the scissor?
20     A.  **No.**
21     Q.  After Correction Officer Oliver
22  cut the sweatshirt from the outside of the
23  cell, what happened?
24     A.  **We got the door open and the**
25  **nurse went in.  I believe that's when she**

*COMPU-TRAN SHORTHAND REPORTING*

72

**ROBERT WENDOVER**

1
2  **started CPR.**
3      Q.  Are you familiar with any policies
4  or protocol regarding providing CPR as to
5  who's supposed to do that?
6      A.  **I believe it's just a qualified**
7  **individual.**
8      Q.  Have you been trained?
9      A.  **Yes.**
10     Q.  Do you have any understanding as
11  to why in this case a medical person
12  provided CPR as opposed to a correction
13  officer?
14     A.  **I believe just because she was**
15  **there.**
16     Q.  Did anyone assist her as far as
17  you can recall?
18     A.  **Officer Bartley.**
19     Q.  Are you familiar with any policy
20  or protocol regarding stopping CPR?
21     A.  **Yes.**
22     Q.  What are you familiar with?
23     A.  **I don't remember who has the**
24  **authority, but I believe it's the medical**
25  **director is the only one that has authority**

73

ROBERT WENDOVER

1
2  to stop it.
3     Q.   Who's the medical director?
4     A.   I believe it's the hospital, a
  doctor at the hospital.
6     Q.   How is it that a doctor at a
7  hospital stops CPR going on in the jail?
8     A.   I don't know the exact protocol
9  for it.
10    Q.   At any point in time while you
11 were in the cell area, was CPR stopped?
12    A.   I believe I had left the area and
13 came back and it was stopped while I was
14 gone.
15    Q.   Where did you go when you left the
16 area?
17    A.   I think that's when I went to get
18 the BVM.
19    Q.   What's that?
20    A.   Breathing -- to help him breathe.
21    Q.   Why did you go to get that?
22    A.   Either Officer Bartley or the
23 nurse asked me to go get it.
24    Q.   Where is that kept?
25    A.   By the desk in North Housing.

COMPU-TRAN SHORTHAND REPORTING

74

ROBERT WENDOVER

1
2     Q.   When you came back, had CPR
3  stopped?
4     A.   I honestly don't recall when it
5  had stopped, the time frame.
6     Q.   You believe it stopped earlier
7  when you left the area?
8     A.   I think it was, yes.
9     Q.   That would have been when you went
10 to get the BVM?
11    A.   Yes.  It's not with 100 percent
12 certainty.
13    Q.   Prior to leaving the area to go
14 get the BVM, anything else that you observed
15 people doing?
16    A.   I think Officer Bartley had
17 oxygen on him.
18    Q.   Anything else?
19    A.   A lot of people scrambling
20 around, trying to do whatever they could,
21 but nothing sticks out.
22    Q.   Where was Oliver during this time?
23    A.   I don't recall.  He was pretty
24 shook up.
25    Q.   Did you have any conversations

75

ROBERT WENDOVER

1
2  with anybody?
3     A.   Just BCI.
4     Q.   Before you left to get the BVM?
5     A.   Just people telling me what to
6  do, go get the BVM.
7     Q.   When you got back to the cell area
8  after getting the BVM, what happened?
9     A.   At some point, they -- when
10 everything was stopped, that's when BCI
11 showed up.  There was an inmate in a cell to
12 the left of him.  They asked me to remove
13 that inmate and put him in a different area.
14 After doing that, I pretty much waited in a
15 hallway.  And after that, I went back up to
16 the booking room because I had other duties
17 I had to do.
18    Q.   Did you have any conversations
19 with anybody before you went to the booking
20 room other than what you've told us here
21 today?
22    A.   I don't think so.
23    Q.   Did you ever speak with Oliver at
24 all about anything concerning his
25 observations of Spencer either before or

COMPU-TRAN SHORTHAND REPORTING

76

ROBERT WENDOVER

1
2  after May 20th?
3     A.   Yeah.  After, I definitely have,
4  yeah.
5     Q.   What did you say to him, and what
6  did he say to you?
7     A.   Basically, it was a shock.  He
8  showed no signs.  Never in a million years
9  would you think he would have done.
10    Q.   That's what Oliver said to you?
11    A.   Yeah.
12    Q.   Did you say anything in response?
13    A.   It's pretty much the same thing.
14 It was back and forth mutual.
15    Q.   Now that you've seen that he
16 scored ten on the suicide screening and
17 three of the shaded columns were checked,
18 would that have changed your opinion on
19 whether or not his conduct, Spencer's
20 conduct was a shock?
21        MR. RANDAZZO:   Objection to
22 the form.
23        MR. KLEINBERG:   Objection.
24        MR. RANDAZZO:   You can
25 answer.

77

ROBERT WENDOVER

2  A.  Would that have changed my
3  opinion on his conduct?
4  Q.  Yes.
5  A.  From what I physically saw of
6  him, I still wouldn't have thought he would
7  have done it.
8  Q.  Anything else that you said to
9  Oliver or Oliver said to you?
10  A.  Not that I recall.
11  Q.  And your interactions with Spencer
12  Sinko consisted of the escort to the
13  visitation room, his interactions with his
14  family room during the visit that you can
15  hear and/or see and your escort of him back?
16  A.  Yes.
17  Q.  Was that a total of maybe 20
18  minutes?
19  A.  Maybe a little less. Around 20
20  minutes.
21  Q.  Did Oliver ever say to you what
22  Spencer was doing during the time he was in
23  North Housing Unit?
24  A.  Not that I recall.
25  Q.  Anything about his appearance?

COMPU-TRAN SHORTHAND REPORTING

78

ROBERT WENDOVER

2  A.  After the fact, he talked when
3  they were joking around about the rock star
4  thing. That he was  -- he laughed about it.
5  Kind of felt honored, I guess, that somebody
6  would think that of him. Other than that,
7  nothing really.
8  Q.  Did Oliver say anything about
9  whether or not he was performing supervisory
10  checks on Spencer?
11  A.  Never said anything to me about
12  it.
13  Q.  Did you ever have any
14  conversations with Correction Officer
15  Vasaturo about Spencer Sinko or the events
16  of May 20?
17  A.  Just the brief stuff I mentioned
18  in the beginning.
19  Q.  How about Sergeant Jackson, any
20  conversations with her?
21  A.  Just brief things. Nothing
22  specific.
23  Q.  Anything you can recall as you sit
24  here now?
25  A.  I had a brother commit suicide,

79

ROBERT WENDOVER

2  so it hit me harder than most people there.
3  And more or less talked about stuff like
4  that.
5  Q.  Anything related to Spencer that
6  you discussed with Sergeant Jackson?
7  A.  Not that I recall.
8  Q.  Anything that she said to you
9  about Spencer Sinko?
10  A.  Not that I recall.
11  Q.  Did you speak with anybody else
12  other than the BCI investigators and the
13  State Commission of Correction about the
14  events of May 20?
15  A.  We had Ulster County came down
16  with a crisis intervention team and talked
17  to the whole group of us that were involved
18  in it.
19  Q.  Was the purpose of that? To
20  provide assistance to the correction
21  officers --
22  A.  Yes.
23  Q.  -- who were involved?
24  A.  Yes.
25  Q.  Anything else?

COMPU-TRAN SHORTHAND REPORTING

80

ROBERT WENDOVER

2  A.  Not that I can recall, no.
3  Q.  In terms of the crisis
4  intervention team, did you meet as part of a
5  group or individual?
6  A.  Group.
7  Q.  Did anybody say anything during
8  the meeting that you can recall, anybody on
9  behalf of correction officers?
10  A.  I'm not sure I understand you.
11  Q.  There were members of the crisis
12  intervention team that came and spoke with a
13  group of correction officers; correct?
14  A.  Yes.
15  Q.  Did any of the correction officers
16  say anything during the intervention?
17  A.  Yeah. The meeting was more or
18  less to put out your feelings as to what
19  happened. How it affected you. Most
20  everybody did speak out.
21  Q.  Do you recall if Vasaturo was
22  there?
23  A.  No. I don't think he was.
24  Q.  How about LaPolla, was he there?
25  A.  No. It was just for the people

81

ROBERT WENDOVER

2 that were actually there during the
3 incident.
4     Q.   Did Oliver say anything that you
5 can recall?
6     A.   I remember him speaking.  I don't
7 remember what he said.
8     Q.   When the members of BCI came and
9 spoke with you, do you recall who it was
10 specifically?
11     A.   There was a couple of them that I
12 talked to that day that were there.
13     Q.   Who did you give a statement to?
14     A.   I'm not 100 percent sure, but I
15 think it was Investigator DePerno.
16     Q.   What was the format of that?  Did
17 he ask you questions?  Did you give him
18 information?
19     A.   A little bit of both.  They took
20 me next-door to the BCI office and asked
21 questions.  Asked me to explain what
22 happened.  What I did.
23     Q.   Did they prepare a typewritten
24 statement for you?
25     A.   Yeah.  After all the questions

COMPU-TRAN SHORTHAND REPORTING

82

ROBERT WENDOVER

1
2 were asked.
3     Q.   Did you review it?
4     A.   Yes.
5     Q.   Did you sign it after you reviewed
6 it?
7     A.   I believe I did.
8     Q.   Did you understand that you were
9 signing it under penalty of perjury?
10     A.   Yes.
11     Q.   Was there anything in the
12 typewritten statement that was inaccurate at
13 the time that you signed it?
14     A.   Not -- no.
15     Q.   Did you ever see statements
16 provided to BCI by anyone else?
17     A.   No.
18           MS. BERG:   I'm going to
19 have marked as Exhibit 21, a copy of the
20 witness' May 20, 2006 statement.
21       (Whereupon, Plaintiff's Exhibit 21,
22 STATEMENT OF WITNESS DATED 5/20/06, was marked
23 for identification.)
24     Q.   Take a look at 21.  Is that the
25 statement that you signed which was prepared

83

ROBERT WENDOVER

1
2 by BCI?
3     A.   Yes.
4     Q.   As you sit here today, do you
5 believe that's accurate?
6     A.   Yes.
7     Q.   About halfway down, there's a
8 reference to, "His father asked him if he
9 did drugs last night and if he was
10 withdrawing.  Sinkov told his father that he
11 did do drugs, and he was withdrawing but not
12 that bad."
13     A.   Yes.
14     Q.   I believe earlier when you
15 testified, you indicated that Spencer said
16 in words or something not that bad right
17 now; do you recall that?
18     A.   Yeah, I recall saying that.
19     Q.   Is there some reason why you
20 didn't put reference to him -- the rest of
21 his statement, namely not that bad right now
22 in there?
23     A.   He may not have specifically said
24 right now.
25     Q.   Do you recall one way or another?

COMPU-TRAN SHORTHAND REPORTING

84

ROBERT WENDOVER

1
2     A.   I don't recall 100 percent, no.
3     Q.   Did you ever ask Spencer anything
4 about whether or not he was experiencing any
5 symptoms of withdrawing?
6     A.   No.
7     Q.   Did you ever report to anyone that
8 Spencer indicated during the visit that he
9 was withdrawing, but that it wasn't that bad
10 right now?
11     A.   No.  Not that I recall.
12     Q.   You say there was no mention of
13 Sinkov being unhappy or mention of suicide;
14 do you see that portion?
15     A.   Yes.
16     Q.   There were portions of that visit
17 that you couldn't hear; correct?
18     A.   Yes.
19     Q.   You indicate that you escorted
20 Sinkov back to north, but stopped at medical
21 where Officer Oliver returned Sinkov to his
22 cell; do you see that?
23     A.   Yes.
24     Q.   You didn't indicate anything in
25 the statement about what you observed happen

85

**ROBERT WENDOVER**

2  outside of medical; correct?

3    A.  Correct.

4    Q.  Is there some reason why you omitted that?

6    A.  I probably forgot it.  No specific reason, no.

8    Q.  You indicate, I believe, Officer
9  Oliver cut Sinkov down.  He fell to the
10  floor; do you see that?

11    A.  Yes.

12    Q.  When you saw Oliver cut Sinkov
13  down and Sinkov fell to the floor, did
14  Sinkov hit anything?

15    A.  I believe he hit part of the bed
16  and then fell to the floor.

17    Q.  Do you recall what part of his
18  body came into contact with the bed?

19    A.  I didn't specifically see it
20  because I wasn't -- to be honest with you, I
21  wasn't staring straight at him.

22    Q.  Did you hear anything in terms of
23  Spencer's body coming into contact with
24  anything?

25    A.  You can hear something hit the

*COMPU-TRAN SHORTHAND REPORTING*

86

**ROBERT WENDOVER**

2  metal bed.

3    Q.  Did anybody say anything about
4  that in your presence?

5    A.  Not that I recall, no.

6    Q.  You indicate in the next two lines
7  in substance that you assisted Officer
8  Bartley who asked you to go get the bag
9  valve mask?

10    A.  Yes.

11    Q.  That's the BVM?

12    A.  Yes.

13    Q.  You said you went to the north
14  housing desk and took the bag and returned
15  to the cell.  The nurse told me that they
16  didn't need the mask because they stopped
17  CPR; do you see that?

18    A.  Yes.

19    Q.  Does that refresh your
20  recollection that CPR was stopped during the
21  time that you went to get the BVM?

22    A.  Yes.

23    Q.  Is there anything else that you
24  can recall about the events of May 20th
25  that's not contained in this statement

87

**ROBERT WENDOVER**

2  Exhibit 21?

3    A.  Other than the stuff we just
4  talked about, no.

5    Q.  Did you ever see the State
6  Commission's report with respect to Spencer
7  Sinkov's death?

8    A.  No.

9    Q.  Did anybody ever discuss it with
10  you other than what you said earlier about
11  Vasaturo and the fact that it recommended
12  action against him?

13    A.  There were no details discussed
14  with me, no.

15    Q.  Anything in substance?

16    A.  During a meeting with the union
17  attorneys, our civil captain, they said
18  there was -- they got the report back from
19  the commission, and they were going to
20  follow-up on it.  That's pretty much all
21  they said.

22    Q.  When was that meeting?

23    A.  I honestly don't remember.

24    Q.  Was it in 2006?

25    A.  No.  I think it was in 2007.

*COMPU-TRAN SHORTHAND REPORTING*

88

**ROBERT WENDOVER**

2    Q.  Do you recall if anything was
3  discussed at that time about extending the
4  time for the correction officer and the
5  sergeant, Vasaturo and LaPolla, to be served
6  with disciplinary charges?

7    A.  Not that I know.

8    Q.  Did you ever partake in any
9  conversations about that?

10    A.  Yes.

11    Q.  Who did you speak with?

12    A.  Union attorneys.

13    Q.  Was anybody else present when you
14  spoke with the union attorneys?

15    A.  It was on the phone.

16    Q.  Do you recall what you said to
17  them and what they said to you?

18        MR. RANDAZZO:  Objection.

19    Q.  Just yes or no.

20        MR. RANDAZZO:  Just answer
21  it yes or no, if you recall.

22    A.  Yes.

23        MS. BERG:    Are you
24  asserting privilege?

25        MR. RANDAZZO:

*COMPU-TRAN SHORTHAND REPORTING*

89

**ROBERT WENDOVER**

1
2   Attorney/client privilege.
3       **Q.** Any other conversations that you
4   had with anybody about disciplinary charges
5   or extending the time to discipline Vasaturo
6   and LaPolla?
7       **A.** No.
8       **Q.** During the meeting with the civil
9   captain, the union attorneys and yourself,
10  was Vasaturo and LaPolla present?
11      **A.** No.
12      **Q.** Other than -- was it Captain
13  McNamara?
14      **A.** Yes.
15      **Q.** Other than McNamara indicating
16  that he got the report and he would
17  follow-up, did he say anything else?
18      **A.** Not in reference to the suicide,
19  no.
20      **Q.** Did you say anything?
21      **A.** No.
22      **Q.** I'm going to show you what was
23  previously marked as Exhibit 13. Did you
24  ever see that before?
25      **A.** No.

90

**ROBERT WENDOVER**

1
2       **Q.** Any idea who wrote that?
3       **A.** No.
4       **Q.** The first paragraph refers to the
5   captain running around updating the logbooks
6   that are never used. Any idea what that's a
7   reference to?
8       **A.** No.
9       **Q.** And coming out with new policies
10  and procedures; any idea what that's in
11  reference to?
12      **A.** Looks like it refers to the
13  program officer.
14      **Q.** But in terms of the new policies
15  and procedures, do you know what that
16  specifically refers to?
17      **A.** No. Our program officer was
18  fairly new at that time.
19      **Q.** In November of 2006?
20      **A.** I remember when he started.
21  Maybe I'm misquoting myself.
22      **Q.** Take a look at the second page,
23  second paragraph starts, "Just a few days
24  before the commission arrived to interview
25  everyone;" do you see that?

91

**ROBERT WENDOVER**

1
2       **A.** Yes.
3       **Q.** "The captain changed the policy
4   and procedure to cover the department
5   essentially making Sergeant LaPolla and
6   Officer Vasaturo look like they did not
7   follow this procedure;" do you have any idea
8   what that is referring to?
9       **A.** No.
10      **Q.** Did you ever discuss that with
11  anyone?
12      **A.** No.
13      **Q.** Including Vasaturo and LaPolla?
14      **A.** We have policies and procedures
15  that change all the time.
16      **Q.** Well, specifically though relating
17  to Spencer's death and any indication by
18  Vasaturo or LaPolla that policies were being
19  changed to try to implicate them?
20      **A.** Sergeant LaPolla did mention a
21  policy change, but he didn't get into
22  specifics.
23      **Q.** Do you recall what he said about
24  that?
25      **A.** Just that a policy was put in the

92

**ROBERT WENDOVER**

1
2   procedure book and backdated.
3       **Q.** Do you recall when he told you
4   that?
5       **A.** No, I don't recall the date.
6       **Q.** Do you recall anything -- did
7   LaPolla say anything about what the
8   procedure was or the policy was?
9       **A.** I don't recall the exact
10  procedure, no.
11      **Q.** Do you recall if you had this
12  conversation with LaPolla before or after
13  you met with Captain McNamara and the union
14  attorneys about the disciplinary action?
15      **A.** I don't recall that, no.
16      **Q.** You don't remember the sequence?
17      **A.** No.
18      **Q.** Did you see any kind of policy
19  being put into the policy and procedure book
20  that was backdated?
21      **A.** Did I, no.
22      **Q.** Do you know if it was Exhibit 18,
23  the document I showed you earlier?
24      **A.** I don't know. No.
25      **Q.** Did you ever speak with anyone

93

ROBERT WENDOVER

1
2  from Americor about the events of May 20,
3  2006?
4       A.   Just the nurse. I spoke after it
5  happened. Just it's a support type of
6  thing, you know. Talking back and forth.
7       Q.   Is this Nurse Waters?
8       A.   Yes.
9       Q.   Do you recall anything specific
10 that she said to you?
11      A.   Stuff like, it's a shame. He was
12 so young. Stuff like that.
13      Q.   Anything else?
14      A.   No. Nothing really sticks out.
15      Q.   Did she say anything to you about
16 any interaction she had with Spencer?
17      A.   No.
18      Q.   Did you say anything specific to
19 her?
20      A.   Nothing that -- no.
21      Q.   Including anything about the
22 visit?
23      A.   No.
24           MS. BERG:   Give me a few
25 minutes.

COMPU-TRAN SHORTHAND REPORTING

94

ROBERT WENDOVER

1
2           (Recess taken)
3  CONTINUED EXAMINATION BY
4  MS. BERG:
5       Q.   The P-1 book that's kept in the
6  briefing room, what is physically in that
7  book?
8       A.   They're all memos. I didn't see
9  any -- oh. The one -- this one.
10 (Indicating)
11      Q.   Exhibit 4?
12      A.   This is a P-1. And it's put in
13 the binder so everybody has access to them.
14      Q.   Is the binder periodically cleaned
15 out, if you will?
16      A.   At some point it is. I don't
17 know what the -- I don't know if there's an
18 actual length of time that they left
19 everything in there, but it is cleaned out
20 at different times.
21      Q.   Let's say, for example, with
22 respect to Spencer, this P-1 is placed in
23 the briefly room book on May 20, 2006 and
24 Spencer, for argument sake, remains in the
25 correctional facility for three weeks. Is

95

ROBERT WENDOVER

1
2  it practice to brief the incoming officers
3  on each shift that, hey, look this guy came
4  in and he's still on a 15-minute check?
5  Does this have to be undated? How does it
6  work?
7       A.   Again, I'm going from my
8  knowledge. The practice is you brief on
9  something like this so that each shift or
10 each rotation each gets to hear this piece
11 of evidence or whatever you want to refer to
12 it as. I think it's three or four days that
13 covers everybody that was either off or on
14 different shifts and stuff. Any changes or
15 updates with something in reference to this,
16 whether it be mental health or medical, if
17 there was any changes, they would be
18 responsible for submitting a new memo and
19 placing it in that book.
20      Q.   Who actually physically takes the
21 old memo out and puts the new memo in?
22      A.   The old one stays in there.
23      Q.   Would the booking officer have
24 that responsibility?
25      A.   Whoever types up the memo.

COMPU-TRAN SHORTHAND REPORTING

96

ROBERT WENDOVER

1
2       Q.   When you reviewed the book on May
3  20, 2006, let's say, how many days or weeks
4  worth of P-1s were in that briefing book?
5       A.   I couldn't honestly tell you.
6  There was stack of them.
7       Q.   How thick is it?
8       A.   I couldn't give you an exact --
9  the book itself, the binder part is about
10 that thick. (Indicating)
11      Q.   Two- or three-inch ring binder?
12      A.   Yeah. It's not always full.
13 Sometimes it fills up.
14      Q.   In terms of your review as a
15 matter of your practice or procedure, do you
16 review every memo in the P-1 book, or do you
17 review the most recent ones?
18      A.   The ones I haven't reviewed, I go
19 through them.
20      Q.   Other than the P-1s, are there
21 anything else by way of documentation in the
22 briefing book such as the suicide screening
23 forms or anything else?
24      A.   No.
25      Q.   Just P-1s?

COMPU-TRAN SHORTHAND REPORTING

97

**ROBERT WENDOVER**

1
2    **A. Yes.**
3    **Q.** Any answers you've given that you
4 want to modify or change?
5    **A. Not that I can think of right**
6 **now.**
7            MS. BERG:   I don't have
8 anything else.
9            MR. KLEINBERG:   I have no
10 questions for you, sir.
11            MS. MARGOLIS:   I have no
12 questions.
13            MR. RANDAZZO:   That's it.
14
15            o0o
16
17    (Time noted:  3:35 p.m.)
18
19
20
21
22
23
24
25

*COMPU-TRAN SHORTHAND REPORTING*

---

99

1
2 *STATE OF NEW YORK  )*
3            *) ss*
4 *COUNTY OF ROCKLAND )*
5
6
7    *I, Tracy Smith, Notary Public within*
8 *and for the State of New York, do hereby*
9 *certify:*
10
11    *That I reported the proceedings in the*
12 *within entitled matter, and that the within*
13 *transcript is a true record of said*
14 *proceedings.*
15
16    *I further certify that I am not*
17 *related to any of the parties to the action by*
18 *blood or marriage, and that I am in no way*
19 *interested in the outcome of this matter.*
20
21    *IN WITNESS WHEREOF, I have hereunto*
22 *set my hand this 8th day of February, 2008.*
23
24            _____
            *TRACY SMITH,*
            *NOTARY PUBLIC*
25

*COMPU-TRAN SHORTHAND REPORTING*

---

98

1
2 *UNITED STATES DISTRICT COURT  )*
3            *ss:*
4 *SOUTHERN DISTRICT OF NEW YORK )*
5
6
7    *I, ROBERT WENDOVER, the witness*
8 *herein, having read the foregoing testimony of*
9 *the pages of this deposition, do hereby certify*
10 *it to be a true and correct transcript, subject*
11 *to the corrections, if any, shown on the*
12 *attached page.*
13
14
15            *o0o*
16
17
18
19
20    _____
            *ROBERT WENDOVER*
21
22 *Subscribed and sworn to before me*
23 *this ___ day of ____, 2008.*
24
25    _____

---

100

1
2 *CORRECTION SHEET*
3 *Re:  SINKOV VS SMITH, ET AL*
4    *The following corrections, additions*
5 *or deletions were noted on the transcript of*
6 *the testimony which I gave in the above-*
7 *captioned matter, held on January 16, 2008.*
8
9 *PAGE(S)  LINE(S)  SHOULD READ* _
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18
19            _____
20            *ROBERT WENDOVER*
21 *Subscribed and sworn to before me*
22 *this ___ day of ____, 2008.*
23
24    _____
25

*COMPU-TRAN SHORTHAND REPORTING*

101

```
1
2              ***I N D E X***
3
4               PAGE#    LINE#
5
   EXAMINATION BY:
6

7    MS. BERG            4       10

8

9   DOCUMENT/DATA REQUESTED:
10

11     NONE

12

13  PLAINTIFF'S EXHIBITS:
14

15  20  INMATE VISITATION      64       16
       SCHEDULE AND VISITOR'S
16     REGISTRATION
    21  STATEMENT OF WITNESS 82       22
17     DATED 5/20/06

18

19  DEFENDANT'S EXHIBITS:
20

21     NONE

22

23  RULINGS CONTEMPLATED:
24

25     NONE
```

COMPU-TRAN SHORTHAND REPORTING

**.**

'06 [1] - 39:5
'07 [1] - 43:17

**1**

1 [3] - 31:2, 32:18, 43:17
10 [2] - 60:20, 101:7
100 [3] - 74:11, 81:14, 84:2
10512 [1] - 4:14
10532 [1] - 2:16
10604-3407 [1] - 2:21
10605 [1] - 2:5
11501 [1] - 2:11
11:30 [1] - 6:23
12 [1] - 19:17
13 [1] - 89:23
130 [1] - 50:2
15 [7] - 22:19, 36:17, 37:7,
37:14, 52:12, 60:20, 64:24
15-2 [1] - 30:9
15-minute [22] - 8:9, 8:23,
9:23, 10:17, 11:25, 18:21,
20:6, 20:7, 21:24, 22:12,
22:15, 23:3, 23:9, 24:5,
24:11, 24:16, 24:18, 36:2,
41:13, 41:17, 52:18, 95:4
151 [1] - 2:16
16 [3] - 1:15, 100:7, 101:15
18 [4] - 18:24, 21:18, 21:20,
92:22
1986 [1] - 5:16
1:45 [1] - 1:16

**2**

2 [6] - 29:16, 29:22, 30:4,
33:14, 34:4, 37:24
20 [41] - 8:5, 8:14, 9:17,
9:25, 10:5, 10:9, 10:16,
11:16, 11:25, 12:7, 12:22,
16:7, 16:13, 17:2, 17:5, 18:7,
18:19, 20:18, 26:12, 34:15,
35:16, 35:23, 38:10, 38:13,
39:5, 40:4, 48:6, 64:12,
64:15, 64:19, 66:13, 69:2,
77:17, 77:19, 78:16, 79:14,
82:20, 93:2, 94:23, 96:3,
101:15
2001 [1] - 19:16
2002 [1] - 5:24
2003 [1] - 46:9
2005 [1] - 19:17
2006 [37] - 8:5, 8:14, 9:17,
9:25, 10:5, 10:9, 10:16,
11:16, 11:25, 12:7, 12:05,
16:7, 16:14, 17:2, 17:5, 18:8,
18:19, 19:18, 20:18, 21:2,
21:21, 26:12, 34:15, 35:16,
35:24, 38:10, 38:13, 40:4,
48:6, 66:14, 69:2, 82:20,

87:24, 90:19, 93:3, 94:23,
96:3
2007 [1] - 87:25
2008 [5] - 1:15, 98:23,
99:22, 100:7, 100:22
20th [5] - 26:22, 65:10,
67:18, 76:2, 86:24
21 [5] - 82:19, 82:21, 82:24,
87:2, 101:16
22 [1] - 101:16
222 [2] - 1:14, 2:5
23 [1] - 19:18
24 [2] - 53:16, 56:23
240 [1] - 2:10
26 [2] - 65:16, 67:17
29 [1] - 19:16

**3**

3 [5] - 2:21, 4:13, 11:13,
34:4, 42:17
30 [2] - 23:17, 23:20
330-ADM [3] - 30:20, 30:23,
30:25
3:30 [2] - 6:20, 6:23
3:35 [1] - 97:17

**4**

4 [4] - 38:2, 42:3, 94:11,
101:7
40 [1] - 23:17
48 [1] - 57:10

**5**

5 [2] - 5:24, 50:2
5/20 [3] - 65:16, 67:6, 67:17
5/20/06 [2] - 82:22, 101:17
5/22 [1] - 67:17
50 [1] - 6:16

**6**

64 [1] - 101:15

**7**

7 [1] - 50:2
75 [3] - 30:17, 34:3, 38:2
7:30 [1] - 6:20

**8**

82 [1] - 101:16
8th [1] - 99:22

**A**

ability [1] - 44:6
above-captioned [1] - 1:19
Absolutely [2] - 42:5, 54:3
absolutely [1] - 42:6
Academy [1] - 31:25

academy [3] - 31:7, 31:12,
32:6
acceptable [4] - 8:10, 8:24,
10:18, 12:2
access [1] - 94:13
accurate [4] - 5:7, 7:5,
32:12, 83:5
accurately [1] - 22:9
Acknowledge [1] - 24:2
acknowledged [1] - 49:6
action [5] - 14:23, 32:7,
87:12, 92:14, 99:17
actual [4] - 8:17, 18:7,
70:17, 94:18
ADAM [1] - 2:11
added [3] - 21:19, 21:20,
34:14
addiction [1] - 41:21
additions [1] - 100:4
address [1] - 4:11
adequate [1] - 20:8
ADM-330 [2] - 31:18, 33:15
administer [1] - 3:7
administration [1] - 30:18
administrative [1] - 53:9
Administrator [1] - 1:4
admissions [1] - 36:16
advise [2] - 15:8, 57:7
advised [3] - 15:14, 15:21,
37:6
affected [1] - 80:19
AGREED [3] - 3:2, 3:11,
3:15
Aid [1] - 55:12
AL [1] - 100:3
Albany [1] - 31:14
allowed [1] - 53:15
almost [1] - 71:16
alphabetical [1] - 66:21
ALSO [1] - 2:23
amendment [3] - 12:21,
19:18, 19:23
amendments [1] - 20:2
AMERICOR [2] - 1:10, 2:20
Americor [2] - 46:10, 93:2
amount [1] - 53:20
AND [5] - 3:2, 3:11, 3:15,
64:16, 101:15
announcing [1] - 48:16
answer [17] - 5:2, 31:21,
53:3, 76:25, 88:20
answers [2] - 37:22, 97:3
appear [1] - 57:3
appearance [4] - 49:18,
49:19, 51:3, 77:25
area [17] - 18:12, 51:12,
51:15, 52:3, 52:6, 52:10,
65:19, 66:9, 70:11, 70:13,
73:11, 73:12, 73:16, 74:7,
74:13, 75:7, 75:13

argument [1] - 94:24
arrived [5] - 70:8, 70:10,
70:22, 70:24, 90:24
arriving [1] - 71:2
aspects [1] - 6:3
asserting [1] - 88:24
assigned [5] - 6:9, 6:17,
6:24, 7:14, 66:11
assignment [1] - 38:6
assist [1] - 72:16
assistance [3] - 16:3,
68:19, 79:20
assisted [1] - 86:7
attached [1] - 98:12
attend [1] - 31:24
attended [1] - 33:3
attention [1] - 47:17
attorney [1] - 55:11
Attorney/client [1] - 89:2
Attorneys [4] - 2:4, 2:9,
2:14, 2:20
attorneys [6] - 3:3, 87:17,
88:12, 88:14, 89:9, 92:14
August [3] - 19:17, 21:2,
21:20
authority [2] - 72:24, 72:25
authorized [1] - 3:7
availability [1] - 57:16
available [1] - 68:21
awake [1] - 22:22
aware [13] - 8:3, 8:8, 12:15,
14:21, 16:5, 16:9, 17:3, 18:4,
18:19, 30:23, 53:20, 64:10,
65:7

**B**

backdated [2] - 92:2, 92:20
background [1] - 5:13
bad [7] - 28:21, 56:18,
63:21, 83:12, 83:16, 83:21,
84:9
bag [2] - 86:8, 86:14
band [3] - 60:17, 61:2,
61:24
bargaining [1] - 29:8
bars [1] - 70:12
Bartley [4] - 72:18, 73:22,
74:16, 86:8
based [4] - 10:9, 13:2,
13:14, 45:9
BCI [10] - 69:9, 69:18, 70:2,
75:3, 75:10, 79:12, 81:8,
81:20, 82:16, 83:2
bed [3] - 85:15, 85:18, 86:2
BEFORE [1] - 1:17
beginning [1] - 78:18
behalf [2] - 1:18, 80:9
belief [1] - 62:3
Berg [1] - 4:15
BERG [9] - 2:6, 4:10, 64:11,

82:18, 88:23, 93:24, 94:4, 97:7, 101:7

**BERNICE** [1] - 2:22
**best** [1] - 42:8
**between** [2] - 3:3, 45:17
**binder** [4] - 94:13, 94:14, 96:9, 96:11
**bit** [1] - 81:19
**block** [4] - 24:23, 36:5, 48:22, 48:24
**blond** [1] - 50:3
**blood** [1] - 99:18
**Bloomingdale** [2] - 1:14, 2:5
**body** [2] - 85:18, 85:23
**Bondi** [1] - 29:6
**book** [21] - 9:7, 36:3, 36:14, 36:19, 36:22, 37:11, 41:7, 42:10, 44:22, 48:5, 92:2, 92:19, 94:5, 94:7, 94:23, 95:19, 96:2, 96:4, 96:9, 96:16, 96:22
**booking** [23] - 6:7, 6:14, 6:16, 7:8, 7:16, 14:23, 17:6, 18:12, 30:9, 30:15, 35:14, 37:23, 39:19, 39:21, 44:5, 44:20, 45:22, 47:8, 47:24, 75:16, 75:19, 95:23
**books** [9] - 19:13, 21:16, 21:19, 21:20, 29:19, 29:23, 36:10, 36:12, 36:13
**bottom** [6] - 20:5, 30:8, 30:16, 32:7, 34:4, 38:2
**Boulevard** [1] - 2:10
**box** [9] - 15:12, 15:23, 32:9, 33:11, 34:23, 35:11, 35:17, 38:23, 46:20
**boxes** [2] - 14:18, 14:24
**breathe** [1] - 73:20
**breathing** [2] - 22:22, 24:2
**Breathing** [1] - 73:20
**brief** [6] - 22:2, 40:16, 78:17, 78:21, 95:2, 95:8
**briefed** [1] - 41:15
**briefing** [14] - 36:4, 36:13, 36:20, 36:25, 37:11, 40:5, 40:8, 40:15, 41:23, 42:10, 48:5, 94:6, 96:4, 96:22
**briefings** [1] - 37:5
**briefly** [2] - 51:20, 94:23
**bring** [3] - 17:19, 17:21, 47:16
**Broadway** [1] - 2:16
**brother** [4] - 52:9, 55:20, 56:3, 78:25
**brown** [4] - 50:9, 50:10, 50:14, 50:16
**Building** [1] - 2:10
**business** [2] - 53:4, 54:19
**BVM** [8] - 73:18, 74:10,

74:14, 75:4, 75:6, 75:8, 86:11, 86:21
**BY** [7] - 2:6, 2:11, 2:17, 2:22, 4:10, 94:3, 101:5
**bye** [1] - 59:2

**C**

**C.O** [2] - 65:25, 67:5
**C.O.s** [1] - 36:21
**capacity** [3] - 1:9, 5:19, 5:23
**Captain** [2] - 89:12, 92:13
**captain** [4] - 87:17, 89:9, 90:5, 91:3
**captains** [1] - 29:13
**captioned** [2] - 1:19, 100:7
**Care** [1] - 6:6
**care** [2] - 55:13, 58:19
**Carmel** [1] - 4:14
**case** [1] - 72:11
**cases** [2] - 10:11, 35:8
**categories** [1] - 34:8
**cell** [12] - 38:6, 53:16, 70:11, 70:13, 71:7, 71:15, 71:23, 73:11, 75:7, 75:11, 84:22, 86:15
**Center** [1] - 4:13
**certain** [3] - 10:11, 14:18, 42:6, 53:20, 66:10
**certainly** [1] - 5:5
**certainty** [2] - 41:2, 74:12
**certify** [3] - 98:9, 99:9, 99:16
**cetera** [1] - 66:4
**change** [10] - 6:10, 8:9, 8:17, 10:6, 27:14, 27:20, 34:24, 91:15, 91:21, 97:4
**changed** [5] - 8:5, 76:18, 77:2, 91:3, 91:19
**changes** [11] - 8:13, 9:12, 9:15, 16:5, 18:20, 18:23, 26:15, 27:12, 36:16, 95:14, 95:17
**charges** [2] - 88:6, 89:4
**check** [6] - 18:22, 23:25, 36:22, 37:10, 44:13, 95:4
**checked** [10] - 14:25, 15:13, 15:23, 32:10, 33:11, 35:11, 35:18, 38:23, 46:20, 76:17
**checking** [2] - 23:17, 36:10
**checks** [6] - 22:15, 23:3, 23:9, 58:11, 68:12, 78:10
**chose** [1] - 33:25
**circumstances** [1] - 31:5
**civil** [2] - 87:17, 89:8
**classification** [4] - 52:20, 53:8, 53:13, 54:12
**classified** [2] - 53:6, 54:2
**cleaned** [2] - 94:14, 94:19
**clear** [1] - 67:8

**clerical** [1] - 29:11
**clothing** [1] - 50:7
**collaboration** [1] - 17:6
**colors** [1] - 50:19
**column** [5] - 11:19, 14:19, 34:7, 65:23, 67:2
**columns** [1] - 76:17
**coming** [6] - 10:17, 20:23, 21:5, 36:24, 40:13, 41:15, 85:23, 90:9
**Commission** [7] - 14:13, 20:22, 32:16, 33:9, 69:12, 69:15, 79:13
**commission** [4] - 21:14, 26:2, 87:19, 90:24
**Commission's** [1] - 87:6
**commissioners** [1] - 21:13
**commissions** [1] - 33:4
**commit** [1] - 78:25
**committed** [1] - 20:19
**committing** [1] - 62:16
**communications** [1] - 62:14
**complete** [1] - 5:7, 66:16
**completed** [2] - 38:3, 42:15
**completing** [1] - 42:23
**completion** [2] - 10:10, 16:11, 39:4
**concerning** [2] - 25:10, 75:24
**condition** [1] - 22:24
**conduct** [4] - 40:15, 76:19, 76:20, 77:3
**conducted** [1] - 40:7
**confer** [1] - 46:25
**conferring** [1] - 47:10
**confinement** [1] - 22:6
**connection** [1] - 63:23, 66:17
**considered** [1] - 28:14
**consisted** [1] - 77:12
**constant** [2] - 9:23, 12:17, 12:23, 14:14, 32:11, 32:18, 33:5, 33:10, 36:2, 36:17, 37:7, 37:15
**consult** [1] - 47:24
**contact** [3] - 52:12, 85:18, 85:23
**contained** [2] - 32:20, 86:25
**CONTEMPLATED** [1] - 101:23
**CONTINUED** [1] - 94:3
**contract** [8] - 28:5, 28:6, 28:9, 28:11, 28:13, 28:18, 28:24, 29:13
**control** [1] - 48:15
**conversation** [5] - 49:12, 51:5, 54:14, 60:10, 92:12
**conversations** [12] - 25:9,

25:15, 25:17, 26:21, 26:24, 48:6, 74:25, 75:18, 78:14, 78:20, 88:9, 89:3
**cooks** [1] - 29:11
**cooperate** [1] - 55:15
**copies** [1] - 29:19
**copy** [9] - 18:25, 19:13, 36:4, 36:5, 36:7, 38:4, 38:17, 64:12, 82:19
**Correct** [1] - 85:3
**correct** [6] - 35:9, 44:17, 80:13, 84:17, 85:2, 98:10
**Correction** [9] - 5:20, 14:13, 20:23, 25:9, 29:10, 32:16, 71:21, 78:14, 79:13
**CORRECTION's** [1] - 100:2
**correction** [13] - 6:2, 32:6, 44:6, 44:23, 51:16, 64:8, 65:25, 72:12, 79:20, 80:9, 80:13, 80:15, 88:4
**Correctional** [2] - 5:21, 7:23
**correctional** [3] - 6:4, 8:4, 94:25
**Corrections** [3] - 31:25, 69:12, 69:15
**corrections** [6] - 3:16, 28:4, 31:6, 31:12, 98:11, 100:4
**counsel** [1] - 67:25
**County** [20] - 1:9, 4:13, 5:20, 7:4, 7:22, 14:22, 28:12, 28:19, 29:5, 30:22, 31:15, 31:24, 32:3, 33:16, 33:25, 34:12, 35:14, 37:25, 65:5, 79:15
**COUNTY** [4] - 1:10, 1:19, 2:15, 99:4
**couple** [3] - 13:22, 43:16, 81:11
**Court** [2] - 3:9, 3:19
**COURT** [2] - 1:2, 98:2
**cover** [1] - 91:4
**covers** [1] - 95:13
**CPR** [9] - 72:2, 72:4, 72:12, 72:20, 73:7, 73:11, 74:2, 86:17, 86:20
**create** [2] - 67:22, 68:2
**crisis** [2] - 79:16, 80:3, 80:11
**current** [2] - 22:4, 22:5
**custody** [3] - 6:6, 51:19, 60:15
**cut** [5] - 71:4, 71:9, 71:22, 85:9, 85:12
**cutting** [2] - 71:15, 71:18

**D**

**date** [13] - 19:15, 19:17, 21:4, 21:10, 21:11, 30:5, 46:8, 65:14, 66:2, 67:2,

67:17, 92:5
DATED [2] - 82:22, 101:17
dates [2] - 19:19, 21:22
days [5] - 53:4, 54:19,
90:23, 95:12, 96:3
death [4] - 20:24, 26:16,
87:7, 91:17
deceased [1] - 1:5
December [1] - 43:17
decide [3] - 10:15, 12:13,
13:6
decision [1] - 9:22
Defendant [3] - 1:18, 2:9,
2:20
DEFENDANT'S [1] - 101:19
Defendants [2] - 1:12, 2:14
definite [1] - 15:15
Definitely [1] - 56:23
definitely [3] - 32:13, 76:3
deletions [1] - 100:5
Department [1] - 8:11
department [3] - 44:4,
45:13, 91:4
DePerno [1] - 81:15
deposition [4] - 3:5, 3:6,
5:3, 98:9
describe [2] - 5:12, 5:25
desk [2] - 73:25, 86:14
details [1] - 87:13
determine [1] - 13:10
detox [1] - 57:17
DICKER [1] - 2:19
difference [1] - 33:24
differences [1] - 24:9
different [9] - 12:5, 13:22,
23:11, 24:5, 33:16, 44:25,
75:13, 94:20, 95:14
directly [1] - 23:19
director [2] - 72:25, 73:3
disciplinary [3] - 88:6,
89:4, 92:14
discipline [5] - 25:22,
25:23, 26:3, 27:8, 89:5
discuss [3] - 26:14, 87:9,
91:10
discussed [3] - 79:6, 87:13,
88:3
discussing [1] - 25:21
discussions [1] - 9:11
dispatchers [1] - 29:11
DISTRICT [4] - 1:2, 1:2,
98:2, 98:4
doctor [2] - 73:5, 73:6
document [6] - 11:13, 18:5,
20:2, 24:10, 63:25, 92:23
DOCUMENT/DATA [1] -
101:9
documentation [3] - 24:8,
35:22, 96:21
documents [2] - 11:6, 70:2

DONALD [2] - 1:8, 2:9
Donald [1] - 2:24
done [8] - 11:21, 35:18,
37:14, 38:10, 46:3, 51:24,
76:9, 77:7
Donny [2] - 2:23, 4:16,
54:8, 54:15, 54:22, 57:16
DONNY [2] - 1:4, 1:5
door [9] - 58:6, 59:4, 59:5,
71:5, 71:6, 71:7, 71:16,
71:24, 81:20
down [13] - 26:15, 36:4,
37:22, 49:10, 52:5, 52:10,
59:6, 59:10, 64:9, 79:15,
83:7, 85:9, 85:13
Dr [1] - 43:24
Drive [1] - 2:21
drug [2] - 56:25, 57:2
drugs [6] - 56:12, 56:15,
63:21, 83:9, 83:11
duly [1] - 4:3
During [4] - 15:18, 41:23,
87:16, 89:8
during [26] - 5:2, 14:11,
15:16, 15:20, 18:21, 22:15,
23:3, 24:18, 37:23, 46:15,
46:24, 52:18, 54:25, 57:13,
58:3, 58:15, 63:14, 63:19,
74:22, 77:14, 77:22, 80:7,
80:16, 81:2, 84:8, 86:20
Dutchess [3] - 31:15,
31:22, 31:24
duties [5] - 5:25, 7:11, 7:15,
66:13, 75:16
duty [5] - 36:24, 40:3,
40:11, 40:13, 41:16, 42:4

E

early [1] - 58:11
earshot [1] - 55:2
EDELMAN [1] - 2:19
educational [1] - 5:13
effect [3] - 3:8, 3:18, 63:8
effective [1] - 19:17
eight [18] - 11:21, 12:4,
12:9, 12:18, 12:24, 13:15,
13:25, 14:16, 32:8, 32:9,
32:19, 33:6, 34:7, 35:9,
35:17, 38:22, 46:19, 55:4
Either [2] - 48:14, 73:22
either [8] - 7:16, 18:12,
34:22, 41:14, 49:4, 53:8,
75:25, 95:13
Eldridge [1] - 29:7
ELSER [1] - 2:19
elsewhere [1] - 14:12
emergency [2] - 44:16
employed [3] - 5:17, 5:23,
47:6
employer [1] - 28:15

employers [1] - 28:20
employment [2] - 32:2,
38:19
end [2] - 58:25, 59:3
entering [1] - 71:14
entire [2] - 46:3, 47:5
entirely [1] - 67:7
entitled [2] - 56:7, 99:12
entry [3] - 24:19, 67:23,
68:3
escort [7] - 7:17, 7:19,
48:21, 51:9, 66:8, 77:12,
77:15
escorted [1] - 84:19
Esposito [1] - 2:10
ESQ [4] - 2:6, 2:11, 2:17,
2:22
ESQS [1] - 2:13
essentially [1] - 91:5
Estate [1] - 1:5
estate [1] - 4:17
et [1] - 66:4
ET [1] - 100:3
Eugene [1] - 43:24
evaluated [1] - 53:21
evening [1] - 39:24
events [6] - 26:12, 26:22,
78:15, 79:14, 86:24, 93:2
evidence [1] - 95:11
exact [7] - 21:4, 32:22,
46:8, 56:22, 73:8, 92:9, 96:8
exactly [1] - 28:16
EXAMINATION [4] - 1:17,
4:10, 94:3, 101:5
examination [1] - 3:16
examined [1] - 4:5
example [3] - 45:10, 50:6,
94:21
except [1] - 3:12
Excuse [1] - 25:14
Executive [1] - 29:5
exercise [1] - 48:21
Exhibit [23] - 11:12, 18:24,
21:18, 21:19, 29:16, 29:22,
30:4, 31:2, 32:18, 33:14,
34:4, 37:24, 42:3, 42:17,
64:12, 64:15, 64:19, 82:19,
82:21, 87:2, 89:23, 92:22,
94:11
EXHIBITS [2] - 101:13,
101:19
existence [1] - 15:9
existing [1] - 28:9
experience [5] - 13:3,
13:14, 35:14, 45:16, 47:23
experiencing [1] - 84:4
expired [1] - 28:6
explain [1] - 81:21
extending [2] - 88:3, 89:5

F

Facility [2] - 5:21, 7:23
facility [9] - 8:4, 20:23,
39:14, 39:24, 43:9, 43:19,
46:11, 56:20, 94:25
fact [3] - 13:21, 78:2, 87:11
failure [1] - 68:2
fair [2] - 7:7, 38:10
fairly [1] - 90:18
familiar [6] - 7:21, 38:24,
46:13, 72:3, 72:19, 72:22
family [2] - 58:4, 77:14
far [5] - 17:22, 23:10, 29:13,
38:15, 72:16
father [5] - 52:9, 55:15,
56:13, 83:8, 83:10
February [2] - 19:18, 99:22
feelings [1] - 80:18
feet [1] - 55:4
fell [3] - 85:9, 85:13, 85:16
felt [2] - 12:14, 17:16, 78:5
female [2] - 52:8, 62:3
few [3] - 21:12, 90:23,
93:24
field [1] - 6:4
filing [1] - 3:4
fill [1] - 66:2
fills [1] - 96:13
final [1] - 9:22
fine [1] - 51:4
First [1] - 22:20
first [10] - 19:5, 19:15,
20:14, 30:8, 52:14, 64:18,
66:3, 67:2, 70:22, 90:4
five [2] - 53:4, 54:19
floor [3] - 85:10, 85:13,
85:16
follow [3] - 87:20, 89:17,
91:7
follow-up [2] - 87:20, 89:17
following [1] - 100:4
follows [1] - 4:6
force [2] - 3:8, 3:18
foregoing [1] - 98:8
forget [1] - 4:24
forgot [1] - 85:6
Form [3] - 31:18, 34:9, 68:6
form [42] - 3:12, 10:4,
10:10, 10:14, 10:21, 11:11,
11:12, 11:15, 11:22, 13:5,
13:9, 13:15, 16:11, 16:25,
17:2, 17:5, 18:13, 30:6,
30:20, 30:22, 30:24, 32:6,
32:17, 32:21, 33:16, 33:24,
35:2, 35:3, 35:5, 35:8, 38:5,
38:17, 42:16, 42:19, 48:2,
64:19, 65:9, 65:12, 65:21,
76:22
format [1] - 81:16

forms [2] - 36:15, 96:23
forth [2] - 76:14, 93:6
forwarding [1] - 38:4
four [2] - 58:4, 95:12
frame [3] - 53:24, 70:17, 74:5
front [1] - 52:10
full [3] - 43:12, 46:5, 96:12
full-time [2] - 43:12, 46:5
FURTHER [2] - 3:11, 3:15

**G**

G.E.D [1] - 5:14
Gannett [1] - 2:21
Geez [1] - 25:7
general [5] - 16:2, 27:6, 27:7, 34:18, 53:9
gesture [1] - 4:24
girl [1] - 62:3
gist [1] - 27:6
given [12] - 19:10, 19:11, 19:12, 19:13, 30:5, 36:25, 37:22, 38:25, 69:9, 69:11, 70:2, 97:3
good-bye [1] - 59:2
GOULD [1] - 2:4
Gray [1] - 50:20
gray [1] - 50:21
Greno [1] - 14:5
group [4] - 23:17, 79:17, 80:5, 80:13
Group [1] - 80:6
guess [1] - 78:5
guide [1] - 9:22
Guideline [2] - 13:5, 30:19
guidelines [1] - 18:7
Guidelines [4] - 31:18, 45:11, 46:21, 47:22
guy [1] - 95:3

**H**

hair [2] - 50:3, 61:21
half [1] - 25:7
halfway [1] - 83:7
hallway [2] - 59:6, 75:15
hand [2] - 65:22, 99:22
handed [1] - 60:15
handle [1] - 45:13
handouts [1] - 11:7
handwriting [2] - 11:12, 67:8
handwritten [3] - 18:13, 18:17, 65:14
hanging [2] - 70:12, 70:20
HARA [1] - 1:5
Hara [1] - 4:16
harder [1] - 79:2
harming [2] - 13:11, 13:17
Haseef [1] - 43:24

Hawthorne [1] - 2:16
head [1] - 4:23
Health [1] - 8:12
health [12] - 8:25, 9:19, 10:19, 42:20, 43:18, 44:12, 44:15, 44:21, 45:9, 46:17, 46:22, 95:16
hear [9] - 55:6, 55:23, 61:10, 61:25, 77:15, 84:17, 85:22, 85:25, 95:10
heard [2] - 57:12, 63:19
hearing [4] - 25:24, 33:7, 33:8, 56:2
height [1] - 49:25
heightened [3] - 15:11, 15:22, 37:17
held [3] - 1:20, 25:5, 100:7
hello [1] - 52:16
help [1] - 73:20
HEREBY [1] - 3:2
hereby [2] - 98:9, 99:8
herein [1] - 98:8
hereto [1] - 3:4
hereunto [1] - 99:21
heroin [1] - 57:9
high [4] - 13:10, 13:16, 34:6, 34:23
high-risk [1] - 34:6
higher [13] - 11:21, 12:4, 12:9, 12:18, 12:24, 13:15, 14:2, 32:9, 32:19, 33:6, 35:17, 38:23, 46:20
HIPAA [1] - 37:21
hire [7] - 19:10, 30:5, 31:9, 31:10, 32:2, 55:11
hired [2] - 19:6, 29:24
hit [4] - 79:2, 85:14, 85:15, 85:25
honest [2] - 31:21, 85:20
honestly [5] - 31:19, 46:23, 74:4, 87:23, 96:5
honored [1] - 78:5
hospital [3] - 73:4, 73:5, 73:7
hour [1] - 24:23
hours [3] - 53:16, 56:23, 57:10
housed [2] - 36:6, 49:11
housing [2] - 39:11, 86:14
Housing [7] - 6:25, 7:8, 49:10, 68:19, 70:9, 73:25, 77:23
hush [2] - 27:9
hush-hush [1] - 27:9

**I**

idea [5] - 61:3, 90:2, 90:6, 90:10, 91:7
identification [2] - 64:17, 82:23

immediate [1] - 34:7
immediately [3] - 19:12, 32:10, 39:4
Immediately [1] - 34:5
implemented [2] - 14:15, 33:10
implicate [1] - 91:19
IN [1] - 99:21
inaccurate [1] - 82:12
INC [1] - 1:10
inch [1] - 96:11
incident [1] - 81:3
include [2] - 22:2, 22:3
Including [2] - 91:13, 93:21
incoming [2] - 45:17, 95:2
incomplete [1] - 5:3
incorrect [1] - 5:3
indicate [8] - 14:10, 38:9, 69:5, 69:8, 84:19, 84:24, 85:8, 86:6
indicated [3] - 59:25, 83:15, 84:8
indicates [1] - 18:5
Indicating [3] - 19:20, 94:10, 96:10
indicating [2] - 63:20, 89:15
indication [3] - 10:20, 13:16, 91:17
individual [2] - 72:7, 80:5
individually [3] - 1:8, 1:9, 1:10
individuals [2] - 20:24, 52:7
inference [1] - 61:23
infirmary [3] - 61:8, 61:13, 62:6
information [3] - 10:14, 55:16, 81:18
informed [1] - 9:5
initial [7] - 48:16, 50:25, 65:3, 65:6, 65:9, 66:3, 66:25
initials [1] - 67:5
initiate [1] - 48:23
inmate [22] - 7:17, 7:19, 13:10, 22:3, 22:25, 23:5, 23:18, 24:20, 35:8, 35:16, 36:6, 39:10, 39:15, 44:14, 45:4, 45:5, 45:17, 47:3, 53:13, 59:5, 75:11, 75:13
INMATE [2] - 64:16, 101:15
Inmate [4] - 62:7, 64:13, 66:16, 66:20
inmate's [3] - 22:5, 22:6, 66:22
inmates [7] - 7:12, 8:2, 8:6, 23:7, 23:17, 23:25, 53:21
inmates' [1] - 65:22
input [3] - 17:15, 17:18, 17:23

inside [1] - 71:15
instead [3] - 4:23, 23:16, 23:18
institute [1] - 32:11
instituted [1] - 47:3
instruct [1] - 45:8
instructed [4] - 13:9, 22:13, 22:18, 46:18
instruction [2] - 10:20, 32:15
intake [10] - 8:6, 9:20, 10:3, 39:21, 45:6, 45:14, 45:15, 45:23, 46:15, 46:25
intakes [1] - 7:24
interact [2] - 23:4, 23:7
interaction [5] - 22:2, 22:14, 45:16, 61:10, 93:16
interactions [4] - 23:9, 61:11, 77:11, 77:13
interested [1] - 99:19
interrupt [1] - 5:5
intervention [4] - 79:16, 80:4, 80:12, 80:16
interview [6] - 20:24, 21:5, 21:13, 45:20, 45:25, 90:24
Investigator [1] - 81:15
investigators [2] - 21:14, 79:12
involve [2] - 6:5, 21:25
involved [4] - 17:8, 23:11, 79:17, 79:23
involvement [1] - 17:13
IS [3] - 3:2, 3:11, 3:15
issue [7] - 8:25, 9:19, 10:19, 19:16, 47:13, 47:14, 47:18
issued [1] - 50:7
issues [1] - 41:22
IT [3] - 3:2, 3:11, 3:15
itself [4] - 11:12, 42:19, 65:12, 96:9

**J**

Jackson [13] - 14:5, 40:10, 40:13, 41:4, 49:3, 58:8, 62:21, 62:24, 67:11, 67:13, 67:19, 78:19, 79:6
jail [3] - 20:19, 50:7, 73:7
jail-issued [1] - 50:7
JAMES [1] - 2:17
January [3] - 1:15, 100:7
job [1] - 16:4
joint [1] - 28:20
joke [1] - 56:6
joked [2] - 55:18, 60:16
joking [1] - 78:3
JOSEPH [2] - 1:9, 2:15
Justice [1] - 3:9

## K

keep [2] - 19:13, 36:14
kept [5] - 36:19, 64:4, 65:18, 73:24, 94:5
KIM [1] - 2:6
Kim [1] - 4:15
kind [3] - 53:17, 57:17, 92:18
Kind [1] - 78:5
KLEINBERG [4] - 2:11, 52:23, 76:23, 97:9
knowledge [1] - 95:8

## L

LA [2] - 1:10, 2:14
LaPolla [17] - 26:18, 27:3, 27:11, 40:9, 40:11, 40:24, 80:24, 88:5, 89:6, 89:10, 91:5, 91:13, 91:18, 91:20, 92:7, 92:12
last [7] - 34:16, 43:15, 43:16, 43:23, 56:15, 59:15, 83:9
laughed [2] - 55:18, 78:4
laughing [1] - 56:4
law [1] - 37:21
lawsuit [1] - 27:2
learn [1] - 20:21
learning [2] - 15:19, 16:3
leave [1] - 5:6
leaving [3] - 58:18, 61:12, 74:13
left [8] - 54:7, 65:22, 73:12, 73:15, 74:7, 75:4, 75:12, 94:18
left-hand [1] - 65:22
Legal [1] - 55:12
length [1] - 94:18
less [3] - 77:19, 79:3, 80:18
Letter [1] - 30:17
letter [3] - 20:6, 21:25, 30:9
level [9] - 10:12, 12:8, 12:13, 13:7, 15:10, 15:11, 15:22, 37:17, 47:2
Lieutenant [1] - 14:6
lieutenants [1] - 29:12
limit [1] - 53:24
limited [2] - 22:3, 37:21
line [1] - 65:13
LINE [1] - 101:4
LINE(S [1] - 100:9
lines [1] - 86:6
listen [2] - 55:24, 61:2
LLP [3] - 2:4, 2:8, 2:19
lobby [2] - 64:7, 68:9
locked [1] - 53:15
log [6] - 24:22, 64:4, 64:22, 65:5, 65:8, 67:19
logbook [3] - 19:2, 24:11,
24:19
logbooks [1] - 90:5
logged [1] - 65:2, 65:3
logging [1] - 24:15
look [12] - 9:7, 16:12, 19:14, 20:4, 38:12, 55:11, 64:18, 70:2, 82:24, 90:22, 91:6, 95:3
looked [2] - 49:21, 61:23
looking [2] - 19:25, 60:17
looks [1] - 17:4, 29:18, 42:6, 67:6
Looks [1] - 90:12
LOUIS [2] - 1:10, 2:14
LOVETT [1] - 2:4
lower [1] - 35:9

## M

main [1] - 48:15
male [1] - 55:19
males [1] - 52:8
management [1] - 29:15
MANGONE [1] - 2:13
manner [1] - 22:7
MARGOLIS [2] - 2:22, 97:11
marked [9] - 29:22, 31:2, 42:2, 42:17, 64:12, 64:17, 82:19, 82:22, 89:23
marriage [1] - 99:18
mask [2] - 86:9, 86:16
matter [6] - 1:19, 37:6, 96:15, 99:12, 99:19, 100:7
McNamara [3] - 89:13, 89:15, 92:13
mean [3] - 34:16, 34:19, 45:4
Meaning [1] - 71:7
means [1] - 12:3
meant [1] - 64:24
media [1] - 53:16
medical [34] - 17:10, 43:2, 44:4, 45:12, 45:17, 45:22, 46:3, 46:6, 46:14, 46:24, 47:11, 47:13, 47:14, 47:17, 47:25, 53:19, 53:21, 54:2, 57:24, 59:11, 59:12, 59:13, 59:19, 59:23, 60:6, 60:10, 60:14, 62:12, 72:11, 72:24, 73:3, 84:20, 85:2, 95:16
medication [1] - 57:17
meet [3] - 59:22, 60:5, 80:4
meeting [6] - 50:25, 80:8, 80:17, 87:16, 87:22, 89:8
member [1] - 61:24
members [3] - 58:4, 80:11, 81:8
memo [6] - 41:12, 95:18, 95:21, 95:25, 96:16
memos [1] - 94:8

Mental [1] - 8:12
mental [12] - 8:25, 9:19, 10:19, 42:20, 43:18, 44:12, 44:15, 44:21, 45:9, 46:17, 46:21, 95:16
mention [3] - 84:12, 84:13, 91:20
mentioned [2] - 26:2, 78:17
mentioning [1] - 57:20
merely [1] - 14:2
met [2] - 59:21, 92:13
metal [1] - 86:2
methadone [1] - 57:21
might [2] - 36:16, 70:18
Mike [1] - 48:25
million [1] - 76:8
Mineola [2] - 2:10, 2:11
minimum [1] - 33:4
minute [3] - 23:20, 37:7, 37:15
minutes [5] - 22:19, 52:12, 77:18, 77:20, 93:25
MIRANDA [1] - 2:8
misquoting [1] - 90:21
mistaken [1] - 62:2
misunderstood [1] - 64:23
modify [1] - 97:4
month [1] - 21:12
morning [1] - 48:5
MOSKOWITZ [1] - 2:19
most [4] - 28:25, 45:13, 79:2, 96:17
Most [2] - 47:12, 80:19
mother [1] - 52:9
moved [1] - 6:19
MR [9] - 52:23, 76:21, 76:23, 76:24, 88:18, 88:20, 88:25, 97:9, 97:13
MS [9] - 4:10, 64:11, 82:18, 88:23, 93:24, 94:4, 97:7, 97:11, 101:7
music [1] - 61:3
mutual [1] - 76:14

## N

name [4] - 4:11, 43:23, 59:15, 62:7, 66:22
namely [1] - 83:21
names [2] - 55:16, 65:22
narrows [1] - 37:22
necessary [2] - 12:14, 15:23
need [3] - 22:23, 43:6, 86:16
needed [1] - 55:17
needing [1] - 68:19
needs [2] - 22:6, 24:3
Never [2] - 76:8, 78:11
never [4] - 54:5, 66:6, 69:12, 90:6

NEW [4] - 1:2, 1:10, 98:4, 99:2
new [14] - 8:2, 9:4, 9:16, 10:9, 10:16, 11:24, 12:21, 36:16, 47:3, 90:9, 90:14, 90:18, 95:18, 95:21
New [11] - 1:15, 1:22, 2:5, 2:11, 2:16, 2:21, 4:5, 4:14, 14:12, 32:16, 99:8
next [2] - 81:20, 86:6
next-door [1] - 81:20
Night [1] - 6:18
night [3] - 39:25, 56:15, 83:9
nobody [1] - 58:6
non [1] - 44:16
non-emergency [1] - 44:16
NONE [3] - 101:11, 101:21, 101:25
North [7] - 6:25, 7:8, 49:10, 68:19, 70:9, 73:25, 77:23
north [2] - 59:10, 84:20, 86:13
Notary [4] - 1:21, 3:17, 4:4, 99:7
NOTARY [1] - 99:24
note [2] - 24:18, 67:19
noted [4] - 32:17, 67:13, 97:17, 100:5
nothing [4] - 12:19, 49:7, 74:21, 78:7
Nothing [6] - 25:19, 27:5, 49:14, 78:21, 93:14, 93:20
Notice [1] - 1:20
noticed [1] - 70:11
notification [5] - 15:5, 16:20, 18:3, 18:13, 38:25
notifications [1] - 38:3
notified [9] - 16:10, 16:16, 16:22, 18:6, 39:8, 48:13, 48:22, 68:18, 68:20
Notify [1] - 12:10
notify [7] - 16:6, 32:10, 34:5, 34:21, 35:15, 35:20, 39:3
notifying [1] - 38:21
November [1] - 90:19
number [3] - 7:6, 30:14, 34:23
numbers [1] - 11:19
nurse [5] - 59:14, 71:25, 73:23, 86:15, 93:4
Nurse [2] - 70:18, 93:7
nurses [1] - 17:11

## O

O'Malley [1] - 14:6
oath [1] - 3:7
Objection [4] - 52:23, 76:21, 76:23, 88:18

objections [1] - 3:12
observations [1] - 75:25
observe [1] - 70:21
observed [5] - 24:21, 45:21, 62:11, 74:14, 84:25
observing [1] - 70:19
obviously [1] - 67:14
occasion [2] - 44:9, 66:7
occasionally [1] - 7:6
Occasionally [2] - 17:10, 66:15
occasions [2] - 66:14, 66:18
occurred [2] - 63:14, 64:2
occurring [1] - 39:9
odd [1] - 44:25
OF [9] - 1:2, 1:10, 1:19, 2:15, 82:22, 98:4, 99:2, 99:4, 101:16
office [2] - 36:4, 81:20
officer [28] - 3:7, 5:20, 6:2, 7:17, 7:19, 12:12, 17:6, 18:20, 30:9, 30:15, 35:15, 39:19, 42:25, 44:5, 44:6, 44:20, 44:22, 44:23, 47:9, 47:24, 48:15, 48:21, 66:2, 72:13, 88:4, 90:13, 90:17, 95:23
Officer [17] - 4:15, 25:9, 48:25, 51:19, 59:21, 60:15, 70:15, 71:13, 71:21, 72:16, 73:22, 74:16, 78:14, 84:21, 85:8, 86:7, 91:6
officer's [1] - 14:23
officers [15] - 13:23, 14:4, 16:2, 28:4, 29:10, 41:15, 51:16, 64:8, 66:10, 68:21, 79:21, 80:9, 80:13, 80:15, 95:2
official [2] - 1:9, 58:7
often [3] - 6:12, 43:11, 43:18
old [2] - 95:21, 95:22
Oliver [23] - 48:25, 51:19, 59:22, 60:5, 60:16, 60:24, 63:10, 63:16, 70:15, 71:13, 71:14, 71:21, 74:22, 75:23, 76:10, 77:9, 77:21, 78:8, 81:4, 84:21, 85:9, 85:12
omitted [1] - 85:5
once [2] - 24:23, 68:13
oncoming [1] - 37:4
One [2] - 8:9, 56:4
one [23] - 8:15, 14:7, 14:24, 15:12, 23:16, 23:18, 27:13, 28:7, 28:25, 31:22, 40:16, 40:17, 52:8, 55:12, 58:12, 59:3, 72:25, 83:25, 94:9, 95:22
one-on-one [1] - 23:16

ones [3] - 31:23, 96:17, 96:18
open [3] - 59:5, 71:5, 71:24
operating [1] - 28:8
opiates [1] - 57:8
opinion [2] - 76:18, 77:3
opposed [2] - 13:21, 72:12
order [1] - 66:22
original [1] - 38:12
outcome [1] - 99:19
outdoor [1] - 48:21
outside [5] - 50:15, 62:12, 71:10, 71:22, 85:2
overheard [1] - 48:15
overseeing [1] - 68:11
oxygen [1] - 74:17

P

P-1 [14] - 36:3, 36:10, 36:12, 36:19, 37:10, 37:13, 37:16, 41:7, 42:3, 48:4, 94:5, 94:12, 94:22, 96:16
P-15 [3] - 96:4, 96:20, 96:25
p.m [1] - 1:16, 97:17
PAGE [1] - 101:4
page [2] - 20:4, 30:8, 30:16, 34:3, 37:25, 64:14, 64:18, 68:5, 90:22, 98:12
PAGE(S [1] - 100:9
pages [2] - 29:19, 98:9
pair [1] - 71:3
pants [1] - 50:9
paper [3] - 8:16, 68:8, 69:24
papers [1] - 36:17
paragraph [2] - 90:4, 90:23
parents [2] - 56:5, 58:21
part [15] - 11:6, 14:23, 29:8, 29:17, 31:25, 32:7, 36:24, 37:5, 45:6, 45:22, 63:4, 80:4, 85:15, 85:17, 96:9
partake [1] - 88:8
particular [1] - 6:17
parties [2] - 3:4, 99:17
past [3] - 6:15, 8:20, 14:5
Paul [1] - 29:7
peak [1] - 57:9
penalty [1] - 82:9
people [13] - 16:3, 43:3, 55:2, 58:6, 62:10, 66:8, 70:16, 70:25, 74:15, 74:19, 75:5, 79:2, 80:25
percent [4] - 6:16, 74:11, 81:14, 84:2
percentage [2] - 6:13, 7:3
perform [1] - 66:12
performing [1] - 78:9
period [1] - 22:2
periodically [2] - 30:3, 94:14
perjury [1] - 82:9

person [1] - 72:11
personal [1] - 22:8
personally [1] - 68:20
pertaining [1] - 8:6
ph) [1] - 43:25
phone [3] - 48:14, 53:15, 88:15
physical [4] - 47:14, 47:18, 49:19, 52:11
physically [4] - 23:24, 77:5, 94:6, 95:20
picked [1] - 49:11
piece [1] - 95:10
place [3] - 1:21, 9:18, 22:4
placed [3] - 37:14, 39:10, 94:22
placing [1] - 95:19
Plains [3] - 1:15, 2:5, 2:21
PLAINTIFF'S [1] - 101:13
Plaintiff's [2] - 64:15, 82:21
Plaintiffs [2] - 1:6, 2:4
plays [1] - 10:21
point [22] - 20:22, 27:13, 39:14, 47:7, 48:11, 48:19, 48:20, 49:9, 52:15, 56:25, 57:15, 57:21, 58:3, 59:11, 61:6, 61:21, 62:16, 68:17, 69:21, 73:10, 75:9, 94:16
police [1] - 55:16
policies [20] - 7:21, 8:3, 8:13, 8:17, 12:16, 14:21, 15:4, 15:9, 18:18, 21:15, 26:15, 27:12, 38:24, 46:13, 65:4, 72:3, 90:9, 90:14, 91:4, 91:18
policy [25] - 8:22, 9:4, 9:6, 9:12, 9:15, 9:18, 10:9, 10:17, 10:22, 11:24, 16:13, 18:5, 19:7, 27:14, 34:12, 34:17, 34:21, 34:24, 72:19, 91:3, 91:21, 91:25, 92:8, 92:18, 92:19
POLLA [2] - 1:10, 2:14
pop [1] - 58:6
popped [1] - 58:10
pops [1] - 49:7
population [1] - 53:10
portion [3] - 29:21, 43:5, 84:14
portions [1] - 84:16
position [4] - 7:8, 7:19, 25:6, 39:18
positive [1] - 71:16
possibility [6] - 13:19, 13:21, 14:2, 15:15, 15:21, 27:8
possible [2] - 22:8, 58:10
post [6] - 6:9, 6:10, 6:25, 7:9, 7:14, 42:13
potential [1] - 25:22

pounds [1] - 50:2
practice [10] - 16:14, 35:13, 37:6, 38:9, 38:15, 47:5, 47:23, 95:2, 95:8, 96:15
practices [2] - 8:14, 65:5
precaution [1] - 20:8
prepare [1] - 81:23
prepared [1] - 82:25
presence [2] - 61:20, 86:4
PRESENT [1] - 2:23
present [5] - 58:2, 58:9, 61:6, 88:13, 89:10
president [2] - 25:4, 28:21
Pretty [1] - 26:23
pretty [10] - 6:7, 23:22, 27:9, 43:20, 53:17, 58:11, 74:23, 75:14, 76:13, 87:20
prevention [2] - 10:24, 20:8
Prevention [1] - 13:4, 30:18, 31:17, 32:20, 34:9, 47:22
previous [2] - 37:3, 63:22
previously [1] - 89:23
prisoner [2] - 34:6, 38:22
prisoner's [1] - 38:4
prisoners [1] - 7:24
privilege [2] - 88:24, 89:2
procedure [11] - 9:6, 10:10, 18:25, 21:16, 91:4, 91:7, 92:2, 92:8, 92:10, 92:19, 96:15
procedures [13] - 7:22, 8:4, 12:16, 14:22, 15:9, 18:19, 19:7, 27:12, 38:24, 46:14, 90:10, 90:15, 91:14
proceedings [2] - 99:11, 99:14
process [9] - 15:19, 17:9, 17:14, 37:23, 45:7, 45:15, 45:23, 46:25, 52:20
professional [1] - 22:7
program [2] - 90:13, 90:17
protocol [3] - 72:4, 72:20, 73:8
provide [1] - 79:20
provided [2] - 72:12, 82:16
providing [1] - 72:4
provision [1] - 22:11
provisions [1] - 18:4
psychiatrist [5] - 43:7, 43:8, 43:18, 43:20, 43:24
psychologist [4] - 43:7, 43:9, 44:2, 44:10
PUBLIC [1] - 99:24
Public [4] - 1:21, 3:17, 4:4, 99:7
purpose [3] - 13:4, 47:10, 79:19
pursuant [1] - 1:20
put [14] - 9:6, 9:22, 21:15,

35:25, 37:16, 53:8, 67:19, 69:23, 75:13, 80:18, 83:20, 91:25, 92:19, 94:12
Putnam [16] - 1:9, 5:20, 7:4, 7:22, 14:22, 28:12, 28:19, 30:22, 32:3, 33:16, 33:25, 34:12, 34:19, 35:13, 37:24, 65:5
PUTNAM [3] - 1:10, 1:19, 2:15
puts [1] - 95:21

## Q

qualified [1] - 72:6
questioned [2] - 69:23, 69:25
questions [6] - 4:19, 81:17, 81:21, 81:25, 97:10, 97:12
quiet [1] - 56:7

## R

radio [7] - 48:14, 48:17, 59:4, 60:3, 68:18, 68:22, 68:24
RANDAZZO [8] - 2:13, 2:17, 76:21, 76:24, 88:18, 88:20, 88:25, 97:13
rank [1] - 29:9
Re [1] - 100:3
read [4] - 8:16, 19:8, 22:8, 98:8
READ [1] - 100:9
really [8] - 25:11, 25:25, 26:24, 37:22, 49:16, 70:23, 78:7, 93:14
reason [5] - 32:2, 37:16, 83:19, 85:4, 85:7
receive [7] - 5:15, 7:12, 9:14, 11:20, 29:25, 33:21, 56:24
received [8] - 10:19, 11:5, 12:3, 19:22, 29:21, 29:23, 48:8, 48:11
recent [2] - 28:25, 96:17
recently [1] - 43:14
Recess [1] - 94:2
recognize [3] - 11:11, 29:18, 67:8
recollection [4] - 11:15, 42:8, 52:25, 86:20
recommended [2] - 26:2, 87:11
record [3] - 4:12, 63:24, 99:13
records [1] - 69:4
red [2] - 29:19, 29:23
refer [3] - 33:14, 69:5, 95:11
reference [6] - 83:8, 83:20,

89:18, 90:7, 90:11, 95:15
referral [8] - 34:8, 42:21, 44:13, 44:21, 44:24, 45:9, 46:18, 46:22
referred [2] - 10:4, 44:15
referring [2] - 27:16, 91:8
refers [4] - 33:14, 90:4, 90:12, 90:16
refresh [1] - 86:19
regarding [7] - 8:23, 11:25, 18:13, 18:25, 22:12, 72:4, 72:20
Registration [2] - 64:14, 68:6
REGISTRATION [2] - 64:17, 101:16
regular [1] - 64:25
regulations [4] - 14:14, 33:5, 33:13, 37:25
related [3] - 26:11, 79:5, 99:17
relating [1] - 91:16
remains [1] - 94:24
remember [24] - 18:15, 20:17, 21:10, 27:25, 28:22, 32:23, 32:24, 41:18, 46:8, 49:21, 49:24, 54:18, 55:10, 56:22, 57:11, 61:12, 65:11, 70:16, 72:23, 81:6, 81:7, 87:23, 90:20, 92:16
remind [1] - 4:24
remove [1] - 75:12
report [4] - 84:7, 87:6, 87:18, 89:16
reported [4] - 40:3, 62:20, 62:23, 99:11
Reporter [1] - 1:24
represent [1] - 4:16
request [1] - 45:2
REQUESTED [1] - 101:9
requested [2] - 44:23, 45:3
require [1] - 14:22
required [2] - 12:16, 12:24, 15:10, 16:24, 18:21, 32:18, 35:7, 36:22, 47:24, 63:24, 64:9, 66:2
requirement [2] - 16:6, 17:22
requirements [1] - 24:9
requires [2] - 10:11, 33:9
requiring [1] - 33:5
reserved [1] - 3:13
respect [14] - 7:12, 7:23, 9:18, 11:18, 22:11, 28:14, 33:13, 46:14, 46:24, 47:21, 56:25, 68:7, 87:6, 94:22
respective [1] - 3:3
respond [1] - 56:16
responded [1] - 70:10
responds [1] - 62:10

response [1] - 76:12
responses [1] - 4:22
responsibilities [1] - 6:2
responsibility [4] - 68:7, 68:10, 68:15, 95:24
responsible [3] - 36:9, 42:23, 95:18
rest [1] - 83:20
restrictions [3] - 53:12, 53:14, 53:18
results [2] - 45:10, 47:25
returned [2] - 84:21, 86:14
review [12] - 17:9, 17:14, 18:7, 35:3, 35:7, 42:12, 53:19, 70:3, 82:3, 96:14, 96:16, 96:17
reviewed [4] - 41:6, 82:5, 96:2, 96:18
reviewing [1] - 48:4
reviews [1] - 34:25
ring [1] - 96:11
risk [4] - 13:10, 13:16, 14:3, 34:6
Road [2] - 1:14, 2:5
Robert [2] - 4:13, 29:5
ROBERT [4] - 1:17, 98:7, 98:20, 100:20
rock [3] - 60:17, 61:2, 78:3
ROCKLAND [1] - 99:4
role [4] - 10:22, 24:24, 25:3, 39:20
room [2] - 36:20, 37:11, 40:19, 40:22, 51:10, 59:3, 75:16, 75:20, 77:13, 77:14, 94:6, 94:23
rotates [1] - 6:11
rotation [1] - 95:10
routine [4] - 9:24, 23:21, 24:6, 24:11
RULINGS [1] - 101:23
running [1] - 90:5

## S

sake [1] - 94:24
SAMBURSKY [1] - 2:8
SANTANGELO [1] - 2:13
saw [8] - 17:15, 18:16, 19:4, 31:5, 41:10, 42:3, 77:5, 85:12
Schedule [3] - 64:13, 66:17, 66:21
SCHEDULE [2] - 64:16, 101:15
scissor [1] - 71:19
scissors [1] - 71:3
score [6] - 12:9, 14:15, 32:9, 32:19, 34:7, 35:17
scored [3] - 12:17, 46:19, 76:16
scores [10] - 11:21, 12:4,

12:24, 13:15, 13:25, 33:6, 34:6, 35:8, 38:22, 39:9
scoring [1] - 34:22
scrambling [1] - 74:19
Screening [8] - 13:4, 30:19, 31:17, 32:20, 34:9, 45:11, 46:21, 47:22
screening [10] - 9:20, 10:3, 10:21, 11:10, 16:25, 38:5, 38:17, 42:16, 76:16, 96:22
sealing [1] - 3:4
second [9] - 20:4, 30:16, 34:3, 37:25, 64:13, 66:4, 68:5, 90:22, 90:23
seconds [1] - 60:20
section [4] - 20:5, 32:7, 42:20, 44:13
Section [1] - 30:9
see [37] - 14:19, 17:16, 18:11, 18:24, 19:18, 20:9, 24:3, 29:16, 30:10, 30:20, 34:9, 36:15, 42:15, 42:21, 43:7, 54:2, 59:12, 59:20, 59:23, 61:9, 61:14, 61:18, 65:14, 66:23, 67:3, 77:15, 82:15, 84:14, 84:22, 85:10, 85:19, 86:17, 87:5, 89:24, 90:25, 92:18, 94:8
seeing [3] - 18:16, 20:11, 54:8
seek [1] - 17:23
sees [1] - 35:23
segregation [1] - 53:9
sequence [1] - 92:16
sergeant [11] - 34:22, 34:25, 36:7, 41:14, 43:2, 48:22, 49:2, 51:16, 62:18, 67:7, 88:5
Sergeant [16] - 14:5, 26:18, 40:9, 40:10, 49:3, 58:8, 62:20, 62:23, 67:11, 67:13, 67:18, 78:19, 79:6, 91:5, 91:20
sergeant's [1] - 36:9
sergeants [2] - 29:10, 36:21
serve [1] - 24:24
served [1] - 88:5
set [2] - 13:21, 99:22
shaded [12] - 14:19, 14:24, 15:12, 15:23, 32:9, 33:10, 34:23, 35:11, 35:17, 38:23, 46:20, 76:17
shall [1] - 21:25
shame [1] - 93:11
shape [1] - 65:8
SHEET [1] - 100:2
sheriff [1] - 28:19
Sheriff [2] - 1:9, 29:6
Shift [1] - 15:24

*shift* [8] - 6:18, 6:19, 6:21, 39:25, 95:3, 95:9
*shifts* [1] - 95:14
*shirt* [1] - 50:10
*shirts* [2] - 50:14, 50:16
*shock* [2] - 76:7, 76:20
*shook* [1] - 74:24
*short* [1] - 50:17
*Short* [1] - 50:18
*Shorthand* [1] - 1:24
*SHOULD* [1] - 100:9
*show* [2] - 42:2, 89:22
*showed* [4] - 31:23, 75:11, 76:8, 92:23
*shown* [4] - 31:20, 32:6, 65:23, 98:11
*shut* [1] - 71:17
*sign* [8] - 8:16, 16:12, 16:25, 35:5, 64:6, 68:8, 68:13, 82:5
*signature* [1] - 67:6
*signed* [9] - 3:6, 3:17, 3:18, 28:23, 35:4, 69:24, 82:13, 82:25
*signing* [2] - 8:19, 82:9
*signs* [3] - 45:24, 76:8
*singer* [1] - 60:17
*Sinkov* [29] - 2:23, 4:16, 4:17, 20:18, 25:10, 39:15, 48:7, 54:8, 54:15, 57:16, 58:4, 62:7, 62:9, 66:22, 67:23, 70:11, 70:20, 77:12, 78:15, 79:9, 83:10, 84:13, 84:20, 84:21, 85:9, 85:12, 85:13, 85:14
*SINKOV* [5] - 1:4, 1:5, 1:5, 100:3
*Sinkov's* [1] - 87:7
*sit* [5] - 25:12, 25:16, 52:10, 78:23, 83:4
*sleeping* [1] - 22:21
*sleeve* [3] - 50:16, 50:17, 50:18
*SLONE* [1] - 2:8
*Small* [1] - 49:14
*SMITH* [4] - 1:8, 2:9, 99:24, 100:3
*Smith* [5] - 1:23, 2:24, 4:3, 29:6, 99:7
*SOJ* [1] - 30:24
*SOKOLOFF* [1] - 2:8
*someone* [5] - 11:21, 12:24, 13:15, 46:19, 53:5
*sometime* [1] - 31:8
*sometimes* [3] - 5:4, 10:11, 17:20
*Sometimes* [3] - 17:21, 58:6, 96:13
*sorry* [2] - 10:13, 56:13
*SOUTHERN* [2] - 1:2, 98:4

*space* [1] - 44:13
*speaking* [1] - 81:6
*specific* [14] - 10:12, 15:10, 22:14, 23:11, 27:5, 29:21, 32:24, 49:7, 49:14, 51:7, 78:22, 85:7, 93:9, 93:18
*Specifically* [1] - 41:18
*specifically* [9] - 13:24, 23:8, 54:23, 69:3, 81:10, 83:23, 85:19, 90:16, 91:16
*specifics* [6] - 14:9, 25:20, 31:20, 37:19, 57:11, 91:22
*SPENCER* [1] - 1:5
*Spencer* [49] - 4:17, 20:18, 25:10, 26:11, 26:21, 39:15, 40:24, 41:4, 41:11, 41:16, 41:21, 42:16, 48:7, 49:13, 50:25, 51:17, 51:25, 52:2, 54:9, 55:3, 56:16, 56:19, 59:9, 59:20, 60:11, 60:23, 61:10, 61:14, 62:3, 62:6, 62:15, 63:19, 65:9, 70:19, 75:25, 77:11, 77:22, 78:10, 78:15, 79:5, 79:9, 83:15, 84:3, 84:8, 87:6, 93:16, 94:22, 94:24
*Spencer's* [7] - 20:24, 26:16, 39:20, 61:21, 76:19, 85:23, 91:17
*spend* [1] - 31:11
*spent* [1] - 6:13
*ss* [2] - 98:3, 99:3
*stack* [1] - 96:6
*staff* [6] - 17:10, 43:9, 45:18, 45:22, 47:25, 53:22
*staff's* [1] - 47:17
*standard* [1] - 53:3
*standards* [1] - 33:4
*star* [1] - 78:3
*staring* [1] - 85:21
*start* [1] - 67:7
*started* [3] - 70:25, 72:2, 90:20
*starts* [1] - 90:23
*State* [10] - 1:21, 4:4, 4:11, 14:12, 20:22, 32:16, 33:9, 79:13, 87:5, 99:8
*STATE* [1] - 99:2
*STATEMENT* [2] - 82:22, 101:16
*statement* [14] - 27:21, 56:5, 69:9, 69:11, 69:18, 69:20, 81:13, 81:24, 82:12, 82:20, 82:25, 83:21, 84:25, 86:25
*statements* [4] - 54:16, 69:14, 82:15
*states* [1] - 14:13
*STATES* [2] - 1:2, 98:2
*status* [1] - 58:7

*stay* [1] - 60:19
*stays* [1] - 95:22
*steps* [1] - 40:17
*sticks* [2] - 74:21, 93:14
*still* [2] - 77:6, 95:4
*STIPULATED* [3] - 3:2, 3:11, 3:15
*stop* [1] - 73:2
*stopped* [10] - 59:11, 73:11, 73:13, 74:3, 74:5, 74:6, 75:10, 84:20, 86:16, 86:20
*stopping* [1] - 72:20
*stops* [1] - 73:7
*straight* [1] - 85:21
*stuff* [7] - 25:18, 32:25, 55:8, 78:17, 79:3, 87:3, 95:14
*Stuff* [2] - 93:11, 93:12
*subject* [1] - 98:10
*submitting* [1] - 95:18
*Subscribed* [2] - 98:22, 100:21
*substance* [6] - 14:11, 32:8, 41:4, 57:7, 86:7, 87:15
*sued* [1] - 25:19
*suggests* [1] - 33:9
*suicide* [20] - 8:11, 8:24, 9:19, 9:20, 10:3, 10:18, 10:21, 10:23, 11:10, 16:25, 20:8, 20:19, 42:16, 62:17, 63:22, 76:16, 78:25, 84:13, 89:18, 96:22
*Suicide* [8] - 13:4, 30:18, 31:17, 32:20, 34:8, 45:10, 46:21, 47:22
*suicides* [1] - 8:10
*Supervision* [1] - 15:5
*supervision* [13] - 10:12, 10:15, 12:8, 12:14, 12:17, 12:23, 13:7, 14:14, 15:11, 15:12, 15:22, 37:17, 47:2
*supervisions* [1] - 23:21
*supervisor* [20] - 12:10, 12:12, 16:6, 16:24, 17:4, 18:6, 18:14, 32:10, 34:5, 35:15, 35:20, 35:23, 37:2, 37:3, 37:4, 38:5, 38:16, 38:22, 39:2, 39:8
*Supervisor* [1] - 16:10
*supervisors* [1] - 15:24
*supervisory* [8] - 18:22, 20:6, 20:7, 21:24, 22:12, 24:16, 24:19, 78:9
*support* [1] - 93:5
*supposed* [13] - 12:7, 23:4, 23:6, 23:10, 24:10, 24:18, 30:15, 30:19, 37:15, 37:20, 46:15, 67:22, 72:5
*Susan* [1] - 59:14, 59:16, 61:5, 62:5

*sweatshirt* [9] - 50:12, 50:19, 50:22, 70:12, 70:20, 71:4, 71:9, 71:15, 71:22
*sworn* [6] - 3:6, 3:8, 3:19, 4:3, 98:22, 100:21
*symptoms* [2] - 57:3, 57:9, 84:5

---

T

*team* [3] - 79:16, 80:4, 80:12
*ten* [1] - 76:16
*terms* [32] - 8:18, 11:10, 12:8, 16:17, 16:21, 18:3, 18:18, 19:23, 19:25, 21:11, 28:9, 29:9, 35:13, 37:13, 38:21, 42:19, 44:12, 44:14, 45:15, 46:17, 53:19, 57:2, 63:20, 65:21, 66:20, 67:16, 69:14, 70:5, 80:3, 85:22, 90:14, 96:14
*testified* [2] - 4:5, 83:15
*testimony* [3] - 38:8, 98:8, 100:6
*THE* [1] - 1:10
*themselves* [3] - 13:11, 13:17, 14:3
*thereto* [1] - 3:17
*thick* [2] - 96:7, 96:10
*Three* [1] - 31:13
*three* [8] - 52:7, 53:4, 54:19, 55:3, 76:17, 94:25, 95:12, 96:11
*three-inch* [1] - 96:11
*tied* [2] - 71:5, 71:17
*timing* [1] - 70:5
*today* [7] - 5:6, 20:12, 25:13, 25:16, 29:17, 75:21, 83:4
*together* [1] - 12:13
*took* [3] - 59:8, 81:19, 86:14
*tool* [1] - 13:6
*top* [4] - 19:15, 32:17, 65:12, 66:21
*total* [3] - 11:18, 11:19, 77:17
*tour* [6] - 34:5, 35:15, 37:2, 37:3, 38:5, 38:16
*TRACY* [1] - 99:24
*Tracy* [3] - 1:23, 4:3, 99:7
*train* [3] - 24:17, 45:7, 57:6
*trained* [14] - 13:8, 13:18, 13:20, 13:25, 14:8, 22:13, 22:17, 23:10, 23:14, 23:15, 24:22, 44:19, 46:19, 72:8
*training* [22] - 9:14, 9:16, 10:20, 10:24, 11:2, 11:6, 11:20, 12:3, 12:5, 13:3, 13:14, 13:22, 14:11, 15:16, 15:18, 15:20, 32:15, 32:23,

33:2, 33:21, 56:24
  Training [1] - 14:4
  transcript [4] - 5:8, 98:10, 99:13, 100:5
  transferred [1] - 51:18
  transports [1] - 6:7
  TRIAL [1] - 1:17
  trial [1] - 3:13
  true [3] - 39:5, 98:10, 99:13
  Try [1] - 4:22
  try [1] - 91:19
  trying [1] - 74:20
  TV [1] - 53:16
  Two [2] - 25:7, 96:11
  two [3] - 6:15, 52:8, 86:6
  type [3] - 18:17, 36:3, 93:5
  types [1] - 95:25
  typewritten [3] - 18:12, 81:23, 82:12
  typically [2] - 57:3, 57:9

## U

  Ulster [1] - 79:15
  undated [1] - 95:5
  under [6] - 28:8, 31:4, 32:7, 66:22, 67:2, 82:9
  underneath [2] - 20:5, 50:22
  unfortunately [1] - 58:17
  unhappy [1] - 84:13
  union [6] - 24:25, 25:4, 87:16, 88:14, 89:9, 92:13
  Union [1] - 88:12
  Unit [6] - 6:25, 7:9, 49:10, 68:19, 70:9, 77:23
  unit [4] - 23:18, 29:9, 39:11, 59:7
  UNITED [2] - 1:2, 98:2
  up [14] - 6:8, 16:11, 17:21, 36:3, 49:7, 49:11, 55:16, 74:24, 75:11, 75:15, 87:20, 89:17, 95:25, 96:13
  update [1] - 30:6
  updates [3] - 29:25, 30:3, 95:15
  updating [1] - 90:5
  usage [1] - 57:2
  uses [2] - 30:22, 33:16

## V

  valve [1] - 86:9
  varied [1] - 22:24
  varies [1] - 40:18
  Vasaturo [12] - 25:10, 26:10, 78:15, 80:21, 87:11, 88:5, 89:5, 89:10, 91:6, 91:13, 91:18
  VASATURO [2] - 1:9, 2:15
  verbal [5] - 16:17, 16:19,

36:25, 69:15, 69:22
  Verbal [3] - 16:19, 69:17, 69:19
  verbalize [1] - 4:22
  verbally [2] - 35:18, 35:21
  version [1] - 21:19
  versus [1] - 24:11
  VERVENIOTIS [1] - 2:8
  via [2] - 60:3, 68:18
  visit [38] - 20:6, 21:24, 21:25, 24:11, 24:12, 24:16, 24:19, 48:8, 48:11, 48:16, 48:23, 51:10, 51:23, 52:18, 54:9, 54:25, 56:21, 58:3, 58:15, 58:25, 62:19, 62:25, 63:4, 63:7, 63:11, 63:14, 63:19, 63:25, 65:2, 65:9, 66:3, 66:4, 66:8, 67:2, 77:14, 84:8, 84:16, 93:22
  Visitation [3] - 64:13, 66:17, 66:20
  visitation [9] - 51:14, 52:3, 52:6, 60:9, 63:23, 64:22, 65:19, 66:13, 77:13
  VISITATION [2] - 64:16, 101:15
  Visitor [1] - 68:5
  Visitor's [1] - 64:14
  VISITOR'S [2] - 64:16, 101:15
  visitors [1] - 64:5
  Visitors [1] - 64:6
  visits [10] - 7:12, 20:7, 22:12, 24:5, 24:6, 57:13, 64:25, 65:3, 65:6, 66:6
  visual [1] - 22:20
  Vital [1] - 45:24
  vital [1] - 45:24
  VS [1] - 100:3

## W

  waited [1] - 75:14
  waived [1] - 3:5
  walking [1] - 61:16
  watch [22] - 8:9, 8:11, 8:23, 8:24, 9:19, 9:23, 9:24, 10:17, 10:18, 11:25, 32:11, 32:18, 33:5, 33:10, 36:2, 36:17, 37:8, 37:15, 41:13, 41:17
  Waters [5] - 59:17, 61:5, 62:5, 70:18, 93:7
  ways [1] - 17:20
  wearing [2] - 50:6, 50:13
  week [3] - 65:13, 65:19, 67:16
  weeks [5] - 21:12, 31:13, 43:16, 94:25, 96:3
  weight [1] - 49:25
  WENDOVER [4] - 1:18, 98:7, 98:20, 100:20

Wendover [2] - 4:13, 4:15
  WHEREOF [1] - 99:21
  White [3] - 1:15, 2:5, 2:21
  whole [3] - 23:18, 27:9, 79:17
  WILSON [1] - 2:19
  withdrawal [4] - 41:22, 56:12, 57:2, 57:18
  withdrawing [8] - 56:14, 56:15, 57:8, 63:20, 83:10, 83:11, 84:5, 84:9
  withdrawn [3] - 10:2, 53:11, 60:8
  witness [2] - 1:18, 98:7
  WITNESS [3] - 82:22, 99:21, 101:16
  witness' [1] - 82:20
  witnessed [1] - 63:4
  word [1] - 66:25
  wording [1] - 24:13
  words [4] - 14:11, 32:24, 57:7, 83:16
  worker [1] - 43:19
  workers [1] - 29:11
  worn [1] - 50:14
  worry [1] - 58:18
  worth [1] - 96:4
  wraps [1] - 6:8
  write [1] - 64:9
  writing [3] - 18:10, 35:19, 69:22
  written [5] - 16:18, 18:4, 65:22, 69:16, 69:20
  wrote [1] - 90:2

## Y

  year [4] - 8:21, 11:3, 28:7, 43:15
  yearly [1] - 10:23
  years [4] - 6:15, 13:23, 25:7, 76:8
  YORK [4] - 1:2, 1:10, 98:4, 99:2
  York [11] - 1:15, 1:22, 2:5, 2:11, 2:16, 2:21, 4:5, 4:14, 14:12, 32:16, 99:8
  young [1] - 93:12
  younger [2] - 55:19, 56:2
  yourself [3] - 58:3, 60:23, 89:9

# EXHIBIT W

State of New York, County of Putnam
Justice Court, Town of Putnam Valley

**FELONY COMPLAINT**
C.S.C.S. 3rd

People of the State of New York
vs.
Spencer E. Sinkov

DEFENDANT

I, Corinne Musella, a Deputy Sheriff employed by the Putnam County Sheriff's Department, by this Felony Complaint makes written accusation as follows:

That Spencer E. Sinkov, on the 7th day of April 2006, while in the Town of Putnam Valley, County of Putnam, New York. Did commit the offense of Criminal Sale of a Controlled Substance in the Third Degree, a Felony in violation of section 220.39-1 of the Penal Law of the State of New York, in that he did, at the aforesaid time and place:

COUNT ONE: A person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells a narcotic drug.

The facts upon which this felony complaint is based are as follows:

The above defendant, on the aforementioned date, at about 2020 hours, while at the end of the driveway of his residence, located at 31 Boswell Road, in the Town of Putnam Valley, Putnam County, New York. Did knowingly and unlawfully sell two small glassine envelopes containing what the defendant described as the narcotic drug heroin, to another, for $40.00 dollars in U. S. Currency.

All contrary to the statute in such case made and provided.

The foregoing factual allegations are based upon personal knowledge of the complainant (and upon information and belief being). Police Investigation.

Verification by Subscription and Notice
Under Penal Law Section 210.45
It is a crime, punishable as a Class A Misdemeanor under the laws of the State of New York, for a person, in and by a written instrument, to knowingly make a false statement, or to make a statement which such person does not believe to be true.

Affirmed under penalty of perjury
This 15th day of April 2006

Complainant

State of New York: County of Putnam
Justice Court: Town of Putnam Valley

**FELONY COMPLAINT**
C.P.C.S. 3rd

People of the State of New York
vs.
Spencer E. Sinkov

DEFENDANT

I, Corinne Musella, a Deputy Sheriff of the Putnam County Sheriff's Department, by this Felony Complaint makes written accusation as follows:

That Spencer E. Sinkov, on the 7th day of April 2006, while in the Town of Putnam Valley, County of Putnam, New York. Did commit the offense of Criminal Possession of a Controlled Substance in the Third Degree, a Felony in violation of section 220.16-1 of the Penal Law of the State of New York, in that he did, at the aforesaid time and place:

COUNT ONE: A person is guilty of criminal possession of a controlled substance in the third degree when he knowingly and unlawfully possesses a narcotic drug with intent to sell it.

The facts upon which this Felony Complaint is based are as follows:

The above named defendant on the aforementioned date, at about 2020 hours, while at the end of the driveway of his residence, located at 31 Boswell Road in the Town of Putnam Valley, Putnam County, New York. Did knowingly and unlawfully possess two small glassine envelopes of what the defendant described as heroin, a narcotic drug, with the intent to sell it.

The foregoing factual allegations are based upon personal knowledge of the complainant (and upon information and belief being). Police Investigation

Verification by Subscription and Notice
Under Penal Law Section 210.45
It is a crime, punishable as a Class A Misdemeanor under the laws of the State of New York, for a person, in and by a written instrument, to knowingly make a false statement, or to make a statement which such person does not believe to be true.

Affirmed under penalty of perjury
This 15th day of April 2006

*Deputy Corinne Musella*
Complainant

State of New York, County of Putnam
Justice Court, Town of Putnam Valley

**FELONY COMPLAINT**
C.S.C.S. 3rd

People of the State of New York
vs.
Spencer E. Sinkov

DEFENDANT

I, Corinne Musella, a Deputy Sheriff employed by the Putnam County Sheriff's Department, by this Felony Complaint makes written accusation as follows:

That Spencer E. Sinkov, on the 14th day of April 2006, while in the Town of Putnam Valley, County of Putnam, New York. Did commit the offense of Criminal Sale of a Controlled Substance in the Third Degree, a Felony in violation of section 220.39-1 of the Penal Law of the State of New York, in that he did, at the aforesaid time and place:

COUNT ONE: A person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells a narcotic drug.

The facts upon which this felony complaint is based are as follows:

The above defendant, on the aforementioned date, at about 2120 hours, while parked on Circle Road, in the Town of Putnam Valley, Putnam County, New York. Did knowingly and unlawfully sell four small glassine envelopes containing what the defendant described as the narcotic drug heroin, to another, for $80.00 dollars in U. S. Currency.

All contrary to the statute in such case made and provided.

The foregoing factual allegations are based upon personal knowledge of the complainant (and upon information and belief being).   Police Investigation.

Verification by Subscription and Notice
Under Penal Law Section 210.45
It is a crime, punishable as a Class A Misdemeanor under the laws of the State of New York, for a person, in and by a written instrument, to knowingly make a false statement, or to make a statement which such person does not believe to be true.

Affirmed under penalty of perjury
This 15th day of April 2006

Deputy Connie Musella

Complainant

State of New York: County of Putnam
Justice Court: Town of Putnam Valley

**FELONY COMPLAINT**
C.P.C.S. 3rd

People of the State of New York

vs.

Spencer E. Sinkov

DEFENDANT

I, Corinne Musella, a Deputy Sheriff of the Putnam County Sheriff's Department, by this Felony Complaint makes written accusation as follows:

That Spencer E. Sinkov, on the 14th day of April 2006, while in the Town of Putnam Valley, County of Putnam, New York. Did commit the offense of Criminal Possession of a Controlled Substance in the Third degree, a Felony in violation of section 220.16-1 of the Penal Law of the State of New York, in that he did, at the aforesaid time and place:

COUNT ONE: A person is guilty of criminal possession of a controlled substance in the third degree when he knowingly and unlawfully possesses a narcotic drug with intent to sell it.

The facts upon which this Felony Complaint is based are as follows:

The above named defendant on the aforementioned date, at about 2120 hours, while parked on Circle Road in the Town of Putnam Valley, Putnam County, New York. Did knowingly and unlawfully possess four glassine envelopes containing what the defendant described as heroin, a narcotic drug, with the intent to sell it.

The foregoing factual allegations are based upon personal knowledge of the complainant (and upon information and belief being). Police Investigation

Verification by Subscription and Notice
Under Penal Law Section 210.45

It is a crime, punishable as a Class A Misdemeanor under the laws of the State of New York, for a person, in and by a written Instrument, to knowingly make a false statement, or to make a statement which such person does not believe to be true.

Affirmed under penalty of perjury
This 15th day of April 2006

Deputy Corinne Musella
Complainant

State of New York, County of Putnam
Justice Court, Town of Putnam Valley

**FELONY COMPLAINT**
C.S.C.S. 3rd

People of the State of New York

vs.

Spencer E. Sinkov

DEFENDANT

I, Corinne Musella, a Deputy Sheriff employed by the Putnam County Sheriff's Department, by this Felony Complaint makes written accusation as follows:

That Spencer E. Sinkov, on the 20th day of April 2006, while in the Town of Putnam Valley, County of Putnam, New York. Did commit the offense of Criminal Sale of a Controlled Substance in the Third Degree, a Felony in violation of section 220.39-1 of the Penal Law of the State of New York, in that he did, at the aforesaid time and place:

COUNT ONE: A person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells a narcotic drug.

The facts upon which this felony complaint is based are as follows:

The above defendant, on the aforementioned date, at about 2210 hours, while parked at the Mobil Station, located on Bryant Pond Road, in the Town of Putnam Valley, Putnam County, New York. Did knowingly and unlawfully sell four small glassine envelopes containing what the defendant described as the narcotic drug Heroin, to another, for $80.00 dollars in U. S. Currency.

All contrary to the statute in such case made and provided.

The foregoing factual allegations are based upon personal knowledge of the complainant (and upon information and belief being).   Police Investigation.

Verification by Subscription and Notice
Under Penal Law Section 210.45
It is a crime, punishable as a Class A Misdemeanor under the laws of the State of New York, for a person, in and by a written instrument, to knowingly make a false statement, or to make a statement which such person does not believe to be true.

Affirmed under penalty of perjury
This 22nd day of April 2006

_Deputy Corinne Musella_

Complainant

State of New York: County of Putnam
Justice Court: Town of Putnam Valley

**FELONY COMPLAINT**
C.P.C.S. 3rd

People of the State of New York
vs.
Spencer E. Sinkov
DEFENDANT

I, Corinne Musella, a Deputy Sheriff of the Putnam County Sheriff's Department, by this Felony Complaint makes written accusation as follows:

That Spencer E. Sinkov, on the 20th day of April 2006, while in the Town of Putnam Valley, County of Putnam, New York. Did commit the offense of Criminal Possession of a Controlled Substance in the Third Degree, a Felony in violation of section 220.16-1 of the Penal Law of the State of New York, in that he did, at the aforesaid time and place;

COUNT ONE: A person is guilty of criminal possession of a controlled substance in the third degree when he knowingly and unlawfully possesses a narcotic drug with intent to sell it.

The facts upon which this Felony Complaint is based are as follows:

The above named defendant on the aforementioned date, at about 2210 hours, while parked at the Mobil Station, located on Bryant Pond Road, in the Town of Putnam Valley, Putnam County, New York. Did knowingly and unlawfully possess four glassine envelopes containing what the defendant described as Heroin, a narcotic drug, with the intent to sell it.

The foregoing factual allegations are based upon personal knowledge of the complainant (and upon information and belief being). Police Investigation

Verification by Subscription and Notice
Under Penal Law Section 210.45

It is a crime, punishable as a Class A Misdemeanor under the laws of the State of New York, for a person, in and by a written instrument, to knowingly make a false statement, or to make a statement which such person does not believe to be true.

Affirmed under penalty of perjury
This 22nd day of April 2006

_Deputy Corinne Musella_
Complainant

State of New York, County of Putnam
Justice Court, Town of Putnam Valley
   People of the State of New York
             vs.
         Spencer E. Sinkov

**FELONY COMPLAINT**
C.S.C.S. 3rd

DEFENDANT

I, Corinne Musella, a Deputy Sheriff employed by the Putnam County Sheriff's Department, by this Felony Complaint makes written accusation as follows:

That Spencer E. Sinkov, on the 11th day of May 2006, while in the Town of Putnam Valley, County of Putnam, New York. Did commit the offense of Criminal Sale of a Controlled Substance in the Third Degree, a Felony in violation of section 220.39-1 of the Penal Law of the State of New York, in that he did, at the aforesaid time and place:

COUNT ONE: A person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells a narcotic drug.

The facts upon which this felony complaint is based are as follows:

The above defendant, on the aforementioned date, at about 2245 hours, while on the property of the residence of 71 Mathes Street, in the Town of Putnam Valley, Putnam County, New York. Did knowingly and unlawfully sell four small glassine envelopes containing what the defendant described as the narcotic drug heroin, to another, for $80.00 dollars in U. S. Currency.

All contrary to the statute in such case made and provided.

The foregoing factual allegations are based upon personal knowledge of the complainant (and upon information and belief being).    Police Investigation.

Verification by Subscription and Notice
Under Penal Law Section 210.45
It is a crime, punishable as a Class A Misdemeanor under the laws of the State of New York, for a person, in and by a written instrument, to knowingly make a false statement, or to make a statement which such person does not believe to be true.

Affirmed under penalty of perjury
This 12th day of May 2006

_Deputy Connie Musella_
                            Complainant

State of New York: County of Putnam
Justice Court: Town of Putnam Valley

People of the State of New York
vs.
Spencer E. Sinkov
DEFENDANT

**FELONY COMPLAINT**
C.P.C.S. 3rd

I, Corinne Musella, a Deputy Sheriff of the Putnam County Sheriff's Department, by this Felony Complaint makes written accusation as follows:

That Spencer E. Sinkov, on the 11th day May 2006, while in the Town of Putnam Valley, County of Putnam, New York. Did commit the offense of Criminal Possession of a Controlled Substance in the Third Degree, a Felony in violation of section 220.16-1 of the Penal Law of the State of New York, in that he did, at the aforesaid time and place:

COUNT ONE: A person is guilty of criminal possession of a controlled substance in the third degree when he knowingly and unlawfully possesses a narcotic drug with intent to sell it.

The facts upon which this Felony Complaint is based are as follows:

The above named defendant on the aforementioned date, at about 2245 hours, while on the property of the residence of 71 Mathes Street, in the Town of Putnam Valley, Putnam County, New York. Did knowingly and unlawfully possess four glassine envelopes containing what the defendant described as Heroin, a narcotic drug, with the intent to sell it.

The foregoing factual allegations are based upon personal knowledge of the complainant (and upon information and belief being). Police Investigation

Verification by Subscription and Notice
Under Penal Law Section 210.45

It is a crime, punishable as a Class A Misdemeanor under the laws of the State of New York, for a person, in and by a written instrument, to knowingly make a false statement, or to make a statement which such person does not believe to be true.

Affirmed under penalty of perjury
This 12th day of May 2006

*Deputy Corinne Musella*
Complainant

State of New York, County of Putnam
Justice Court, Town of Putnam Valley
People of the State of New York
vs.
Spencer E. Sinkov

**FELONY COMPLAINT**
C.S.C.S. 3rd

DEFENDANT

I, Corinne Musella, a Deputy Sheriff employed by the Putnam County Sheriff's Department, by this Felony Complaint makes written accusation as follows:

That Spencer E. Sinkov, on the 19th day of May 2006, while in the Town of Putnam Valley, County of Putnam, New York. Did commit the offense of Criminal Sale of a Controlled Substance in the Third Degree, a Felony in violation of section 220.39-1 of the Penal Law of the State of New York, in that he did, at the aforesaid time and place:

COUNT ONE: A person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells a narcotic drug.

The facts upon which this felony complaint is based are as follows:

The above defendant, on the aforementioned date, at about 2015 hours, while at the end of the driveway of his residence, located at 31 Boswell Road, in the Town of Putnam Valley, Putnam County, New York. Did knowingly and unlawfully sell two small glassine envelopes containing what the defendant described as the narcotic drug heroin, to another, for $45.00 dollars in U. S. Currency.

All contrary to the statute in such case made and provided.

The foregoing factual allegations are based upon personal knowledge of the complainant (and upon information and belief being).   Police Investigation.

Verification by Subscription and Notice
Under Penal Law Section 210.45
It is a crime, punishable as a Class A Misdemeanor under the laws of the State of New York, for a person, in and by a written instrument, to knowingly make a false statement, or to make a statement which such person does not believe to be true.

Affirmed under penalty of perjury
This 19th day of May 2006

Deputy Corinne Musella

Complainant

State of New York: County of Putnam
Justice Court: Town of Putnam Valley

**FELONY COMPLAINT**
C.P.C.S. 3rd

People of the State of New York
vs.
Spencer E. Sinkov
DEFENDANT

I, Corinne Musella, a Deputy Sheriff of the Putnam County Sheriff's Department, by this Felony Complaint makes written accusation as follows:

That Spencer E. Sinkov, on the 19th day May 2006, while in the Town of Putnam Valley, County of Putnam, New York. Did commit the offense of Criminal Possession of a Controlled Substance in the Third Degree, a Felony in violation of section 220.16-1 of the Penal Law of the State of New York, in that he did, at the aforesaid time and place:

COUNT ONE: A person is guilty of criminal possession of a controlled substance in the third degree when he knowingly and unlawfully possesses a narcotic drug with intent to sell it.

The facts upon which this Felony Complaint is based are as follows:

The above named defendant on the aforementioned date, at about 2015 hours, while at the end of the driveway of his residence, located at 31 Boswell Road, in the Town of Putnam Valley, Putnam County, New York. Did knowingly and unlawfully possess two glassine envelopes containing what the defendant described as Heroin, a narcotic drug, with the intent to sell it.

The foregoing factual allegations are based upon personal knowledge of the complainant (and upon information and belief being). Police Investigation

Verification by Subscription and Notice
Under Penal Law Section 210.45

It is a crime, punishable as a Class A Misdemeanor under the laws of the State of New York, for a person, in and by a written Instrument, to knowingly make a false statement, or to make a statement which such person does not believe to be true.

Affirmed under penalty of perjury
This 19th day of May 2006

Deputy Corinne M_____
Complainant

State of New York: County of Putnam
Justice Court: Town of Carmel

**FELONY COMPLAINT**
C.P.C.S. 3rd

People of the State of New York
vs.
Spencer E. Sinkov

DEFENDANT

I, Corinne Musella, a Deputy Sheriff of the Putnam County Sheriff's Department, by this Felony Complaint makes written accusation as follows:

That Spencer E. Sinkov, on the 20th day May 2006, while in the Town of Carmel, County of Putnam, New York. Did commit the offense of Criminal Possession of a Controlled Substance in the Third Degree, a Felony in violation of section 220.16-1 of the Penal Law of the State of New York, in that he did, at the aforesaid time and place:

COUNT ONE: A person is guilty of criminal possession of a controlled substance in the third degree when he knowingly and unlawfully possesses a narcotic drug with intent to sell it.

The facts upon which this Felony Complaint is based are as follows:

The above named defendant on the aforementioned date, at about 0015 hours, while inside of the Town of Carmel Court ( while awaiting arraignment on other charges), in the Town of Carmel, Putnam County, New York. Did knowingly and unlawfully possess fifteen glassine envelopes containing what the defendant described as Heroin.

The foregoing factual allegations are based upon personal knowledge of the complainant (and upon information and belief being). Police Investigation.

Verification by Subscription and Notice
Under Penal Law Section 210.45

It is a crime, punishable as a Class A Misdemeanor under the laws of the State of New York, for a person, in and by a written instrument, to knowingly make a false statement, or to make a statement which such person does not believe to be true.

Affirmed under penalty of perjury
This 20th day of May 2006

Deputy Connie Musell
Complainant