UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

DONNY SINKOV, as Administrator of the Estate of
Spencer E. Sinkov, deceased, DONNY A. SINKOV,
and HARA SINKOV,

Plaintiffs,

-against-

DONALD B. SMITH, individually and in his official
capacity as Sheriff of Putnam County, JOSPEH A.
VASATURO, individually, LOUIS G. LAPOLLA,
individually, THE COUNTY OF PUTNAM,
New York, and AMERICOR, INC.,

Defendants.
-------------------------------------------------------------------X

Docket No.: 07-CIV-2866
(CLB)

**THE COUNTY
DEFENDANTS AND
SHERIFF SMITH'S
JOINT STATEMENT
OF UNDISPUTED
MATERIAL FACTS
PURSUANT TO
LOCAL RULE 56.1**

Defendant Donald B. Smith (hereinafter referred to as "defendant Smith" or "Sheriff Smith"),

by his attorneys, MIRANDA SOKOLOFF SAMBURSKY SLONE VERVENIOTIS LLP, and

defendants County of Putnam, Joseph A. Vasaturo, and Louis G. Lapolla (collectively referred to as

the "County defendants"), by their attorneys, SANTANGELO, RANDAZZO & MANGONE, LLP,

submit this Joint Statement of Undisputed Material Facts, pursuant to Local Civil Rule 56.1, in

support of their respective motions for a Decision and Order:

a)    pursuant to Fed. R. Civ. P. 12(c) and 56(b) awarding
summary judgment to the moving defendants; and

b)    such other and further relief as this Court may deem just,
equitable, and proper.

## BACKGROUND

1.    Sheriff Smith was elected to the position of Putnam County Sheriff in November of

1

2001 and officially took office in January of 2002.  *See* Exh. E at  pp. 5-7.[1]

2.  To this date, Sheriff Smith remains in his elected position as Sheriff. *See* Exh. E at p. 5.

3.  Sheriff Smith sets broad policies and procedures for the operation of the Putnam County Correctional Facility ("PCCF"). *See* Exh. E at p. 5.

4.  The Corrections Officers who work at the PCCF are employees of Putnam County (the "County"). *See* Exh. E at p. 35.

5.  While Sheriff Smith may sit at the bargaining table with the Putnam County Executive for purposes of negotiating the PCCF Corrections Officers' Collective Bargaining Agreement, Smith does not employ the PCCF Corrections Officers. *See* Exh. E at p. 35.

6.  At the outset of his tenure, Sheriff Smith reviewed various PCCF policies. *See* Exh. E at pp. 6-8.

7.  As part of the transition process, Sheriff Smith reviewed policies that were in existence under the prior regime, including those pertaining to the intake process and suicide prevention screening for new inmates. *See* Exh. E at pp. 8-9, 19.

8.  Specifically, Sheriff Smith spoke with Captain Gerald Butler, the then-PCCF Jail Administrator who also held the same position under the prior Sheriff, about the PCCF's inmate intake forms. *See* Exh. E at pp. 10-11.

9.  Captain Butler advised Sheriff Smith that the New York State Commission of Correction (the "Commission") performed annual inspections of the PCCF and that

---

1 All referenced exhibits are attached to the accompanying Declaration of Adam I. Kleinberg submitted in support of the

the PCCF intake form was reviewed and approved by the Commission during these reviews. *See* Exh. E at pp. 11-12; 38-39.

## THE PCCF'S SUICIDE PREVENTION POLICY

10.    The PCCF has three levels of supervision of inmates. *See* Exh. E at p. 23.

11.    Specifically, these are: i) general supervision, which requires an officer check of an inmate every 30 minutes; ii) active supervision, which requires an officer check of an inmate every 15 minutes; and iii) constant supervision, which requires one on one supervision of the inmate at all times. *See* Exh. E at pp. 23-24; Exh. F at pp. 56-57.

12.    Under Sheriff Smith, the PCCF's policy has always been that constant supervision (also referred to as a constant watch) is the only acceptable form of supervision for a suicidal inmate. *See* Exh. E at p. 25; Exh. F at pp. 55, 112; Exh. G at pp. 35-36.

13.    During the intake process, the PCCF booking officer will administer a series of questions to an inmate, make a series of observations, and complete related paperwork, including medical intake and suicide screening forms. *See* Exh. F at pp. 93, 142-43.

14.    The PCCF suicide screening form contained a series of 16 questions and observations (some with subparts) and related columns for "Yes," "No," and "Comments/Observations." *See* Exh. H.

15.    The boxes in the "Yes" column for six of the questions on the PCCF suicide screening form are shaded areas. *See* Exh. H.

___

instant motions.

3

16.   Affirmative answers to the "shaded area" questions are indicators that an inmate is a high risk candidate to attempt suicide. *See* Exh. G at pp. 9, 39.

17.   The completed intake packet, including the medical and suicide screening forms, would then go to the jail nurses. *See* Exh. F at pp. 90-91.

18.   The jail nurses are employed by defendant Americor, an entity that contracts with the County for the provision of medical services at the PCCF. *See* Exh. E at pp. 96-98.

19.   The Americor staff would review the inmate intake packet and would communicate when they felt that a heightened level of supervision was warranted. *See* Exh. F at p. 92.

20.   The lower section of the PCCF suicide screening form provides the following directive to the Booking Officer:

> If total in Column A is 8 or more, or any shaded box is checked, or if the screening officer feels it necessary, notify shift supervisor.

*See* Exh. H.

21.   With respect to the completion of the PCCF suicide screening form, Sheriff Smith testified that a constant watch must be instituted where either an inmate scores an 8 or higher on the form or there is an affirmative answer to a question that contains a shaded area. *See* Exh. E at p. 29.

22.   Only a mental health professional can take an inmate off a constant watch. *See* Exh. E at p. 74.

23.   The PCCF Corrections Officers received a policy book, commonly referred to as the "Red Book." *See* Exh. F at pp. 60-61.

24.     Article 15 of the Red Book is entitled "Mental Health Evaluation & Service." *See* Exh. I.

25.     Section 15-2 (A) (3) of the Red Book provides, in relevant part, a Booking Officer must:

> Immediately notify the tour supervisor whenever a prisoner:
>
> > a.     Scores in the high risk (score of 8 in Column A) or immediate referral categories on the Suicide Prevention Screening Form; . . .

*See* Exh. I at p. 15.2; *see also* Exh. F at pp. 72-74, 76; Exh. G at pp. 30-31.

26.     Consistent with this policy, defendant Joseph Vastauro, a PCCF Corrections Officer, testified that a booking officer must notify a tour supervisor when an inmate scores an eight or higher on the suicide screening form or where there is an affirmative answer in an immediate referral category on the form. *See* Exh. F at pp. 72-74, 76.

27.     The immediate referral categories are the shaded box areas on the suicide screening form. *See* Exh. E at p. 48; Exh. F at p. 74.

28.     In such situations, the booking officer notifies the Tour Supervisor, who is the Sergeant on duty. *See* Exh. F at pp. 72-74, 157, 160; Exh. G at pp. 31-32, 37-38.

29.     Section 15-4 (B) (3) of the Red Book provides, in relevant part, a Tour Supervisor must:

> a. Assure that constant supervision is immediately provided for the following types of prisoners:
>
> > 1)     Suicidal Prisoners;
> > 2)     Other prisoners with serious mental health problems . . .

*See* Exh. I at p. 15.6; Exh. E at p. 69; Exh. F at pp. 55, 58, 105-06.

30.    Section 15-4 (B) (3) of the Red Book further provides, in relevant part, a Tour

Supervisor must:

> a. Assure that active supervision is immediately provided for
> prisoners who are intoxicated by drugs or alcohol but who do
> not appear to be a danger to themselves or others.

*See* Exh. I at p. 15.6; Exh. E at p. 71; Exh. F at pp. 16-17, 113-14.

31.    Suicidal or other high risk inmates receiving constant supervision received paper

clothing from the PCCF staff.  *See* Exh. F  at p. 55; Exh. G at p. 106.

## SUICIDE PREVENTION TRAINING

32.    The jail administrator sets procedures to carry out the Sheriff's broad policies.  *See*

Exh. E at pp. 37-38.

33.    Sheriff Smith always believed that his subordinates were carrying out these policies

pertaining to suicidal inmates based on his personal observations, participation in

staff briefings, and the significant number of constant watches conducted in the

PCCF during his tenure.  *See* Exh. E at pp. 26-27, 48-49; Exh. F at pp. 61-62; Exh. G

at p. 85.

34.    Suicide prevention training is administered by the PCCF jail administrator and his

staff.  *See* Exh. E at p. 36; Exh. F at pp. 62-63, 74-76.

35.    The suicide prevention training is based on training manuals received from the

Commission and the NYS Office of Mental Health. *See* Exh. E at pp. 44-45; Exh. J.

36.    Section VI of the training manual provides a question by question outline as to how

to respond to the questions on a suicide screening form. *See* Exh. J at Section VI.

37.    The contents of the questions addressed in Section VI directly correlate to the questions set forth on the PCCF suicide screening form. *Compare* Exhs. H and J at Section VI.

38.    Page VI-10 of the training manual explains that a booking officer must immediately notify a supervisor where the score on the suicide screening form is 8 or more, where any shaded boxes are checked, or where the officer believes a referral is warranted. *See* Exh. J at p. VI-10.

## THE 2003 SUICIDE OF NORBERTO RIVERA

39.    On November 10, 2003, Norberto Rivera was committed to the PCCF. *See* Exh. K at p. 2

40.    In connection with Rivera's arrival, a PCCF booking officer administered the PCCF suicide screening form. *See* Exh. K at p. 2.

41.    Rivera scored a "6" on the suicide screening form. *See* Exh. K at p. 2.

42.    Although he had a history of drug abuse, given the period of abstinence prior to jail admission, and the signs of withdrawal, Rivera was not under the influence of heroin at admission. *See* Exh. K at p. 2.

43.    The booking officer placed Rivera on a 15 minute watch. *See* Exh. K at p. 2.

44.    Five days after admission to the PCCF, Rivera committed suicide by hanging himself. *See* Exh. K at p. 3.

45.    Rivera was in the North Housing Unit at the time of his death. *See* Exh. K at p.4.

46.    The Commission did an investigation of the PCCF following Rivera's suicide. *See* Exh. K.

7

47.   The Commission made three recommendations to Sheriff Smith as part of its final report: i) a policy should be in place directing corrections officers to document the actual times of their checks, rather than rounding off the times; ii) a re-evaluation of first aid equipment and, if such equipment was available, the provision of related training; iii) an updated staffing analysis should be requested with particular attention to the North Housing area post and its adjacent responsibilities. *See* Exh. K at p. 5.

48.   The Commission's report did not identify any problems or make any recommendations with regard to the PCCF's suicide screening form. *See* Exh. E at p. 28; Exh. K.

49.   Sheriff Smith addressed all three of the Commission's recommendations to him. *See* Exh. E at pp. 168-70; Exh. F at pp. 261-62; Exh. L; Exh. M.

50.   Toward this end, Sheriff Smith requested and received an updated staffing analysis from the Commission. *See* Exh. E at pp. 134-35, 173-74; 176-78, 182; Exhs. Q and R.

51.   The updated staffing analysis provided that the PCCF program officer is a five day a week post, not a seven day a week post. *See* Exh. E at pp. 134-35, 173-74; 176-78, 182; Exhs. Q and R.

52.   While not recommended to Sheriff Smith in the Commission's report, Smith actively sought and obtained increased mental health coverage and performed a suicide prevention study in the jail following Rivera's death. *See* Exh. E at pp. 85-86, 88-91; Exh. S and T.

53.   Sheriff Smith serves as the co-president of the Mental Health Association of Putnam

County. _See_ Exh. E at p. 93.

54.    At the time of Rivera's death, the Putnam County Department of Mental Health was the agency responsible for the provision of mental health services to the PCCF. _See_ Exh. S.

55.    Upon receipt of the Commission's January 2005 final report regarding Rivera's death, Sheriff Smith wrote to the Putnam County Executive, Robert Bondi, to outline his review of the PCCF's mental health needs and suggested how to improve the system for the future. _See_ Exh. S.

56.    Specifically, Smith suggested the inmates' needs would be better served by the County contracting directly for mental health care rather than relying on an overworked, understaffed public agency. _See_ Exh. S.

57.    Smith diligently pursued the matter and, in February of 2005, proposed that the County sign an addendum to its contract with Americor that would involve Americor providing increased mental health services to the PCCF inmates at a cost of an additional $105,000. _See_ Exh. T.

58.    When Sheriff Smith took over his position within the County, the jail had a limited medical staff and there were extended periods where the jail went without adequate medical staff. _See_ Exh. E at pp. 77-79.

59.    Based on Sheriff Smith's efforts, the PCCF now has 24 hour a day on-site medical coverage, including increased mental health staff availability and detoxification programs. _See_ Exh. E at pp. 77-79; Exh. T.

60.    The corrections officers and medical staff work together to identify inmates

withdrawing from drugs. *See* Exh. E at p. 84.

**THE 2006 SUICIDE OF SPENCER SINKOV**

61.    Following a month long investigation, member of the Putnam County Sheriff's Narcotics Enforcement Unit arrested Spencer Sinkov on May 19, 2006. *See* Exh. N at p. 2.

62.    Sinkov was charged with five counts of Criminal Possession of a Controlled Substance in the third degree and five counts of Criminal Sale of a Controlled Substance in the third degree. *See* Exh. N at p. 2.

63.    Sinkov was transported to the PCCF and arrived in the booking area at approximately 12:30 a.m. on May 20, 2006. *See* Exh. N at p. 2.

64.    Sgt. Lapolla was the night shift tour supervisor on duty when Sinkov arrived at the PCCF. *See* Exh. F at pp. 43- 44.

65.    Defendant Vasaturo administered the PCCF suicide screening form to Sinkov. *See* Exh. N at p. 2.

66.    Sinkov scored a 10 in Column A of the suicide screening form. *See* Exh. N at p. 2.

67.    Defendant Lapolla testified that, pursuant to County policy, Sinkov's score and affirmative answers to the shaded area questions required Vasaturo to report the suicide screening form results directly to Lapolla. *See* Exh. G at p. 68.

68.    Vasaturo did not advise Lapolla of the results, instead advising Lapolla he was instituting a 15 minute watch of Sinkov. *See* Exh. E at p. 49; Exh. F at pp. 172-73; Exh. G at pp. 70-71.

69.    Vasaturo recalled Sinkov indicating he would not hurt himself and that he was the

10

"healthiest junkie you'll ever meet." *See* Exh. F at p. 137.

70.   Vasaturo indicated he made mistakes on the form, but did not believe that Sinkov was a danger to himself. *See* Exh. F at pp. 130-32, 147-49; Exh. G at p. 68.

71.   Vasaturo instituted the 15 minute watch due to Sinkov's past drug use. *See* Exh. F at p. 173.

72.   Lapolla did not see the Suicide Prevention Screening form, but testified that, had he viewed the form as prepared by Vasaturo, he would have instituted a constant watch of Sinkov in accordance with PCCF policy. *See* Exh. G at pp. 77-78; *see also* Exh. E at pp. 31-32, 49.

73.   Lapolla had personally observed Sinkov at one point during the booking process and thought Vasaturo was simply erring on the side of caution due to Sinkov's past drug use. *See* Exh. F at p. 128; Exh. G at pp. 53-54, 71-72, 74-75.

74.   Lapolla did not inquire as to the reason why Vasaturo instituted a 15 minute watch. *See* Exh. N at p. 4.

75.   The 15 minute checks were made of Sinkov throughout the night, without incident. *See* Exh. F at pp. 206, 220; Exh. G at p. 62.

76.   Corrections Officer Michael Oliver served Sinkov breakfast in the morning of May 20, 2006. *See* Exh. U at pp. 87-88.

77.   At approximately 11 a.m. on May 20, 2006, Spencer Sinkov met with his parents and brother in the PCCF visiting room. *See* Exh. V at p. 52.

78.   Corrections Officer Oliver served Sinkov his lunch in the early afternoon of May 20, 2006. *See* Exh. U at p. 97-98.

11

79.    On May 20, 2006, at approximately 1:49 p.m., Sinkov was found hanging from his cell bars by his sweatshirt. *See* Exh. N at p. 5.

80.    PCCF's policy is that suicidal or other high risk inmates who receive constant supervision are issued paper clothing. *See* Exh. F at p. 55; Exh. G at p. 106.

## THE COMMISSION'S INVESTIGATION OF SINKOV'S DEATH

81.    Following Sinkov's death, the Commission conducted an investigation at the PCCF. *See* Exh. E at pp. 111-12; Exh. N.

82.    Prior to October or November of 2007, Sheriff Smith believed that the PCCF suicide screening form was a replica of the Commission's ADM 330 form. *See* Exh. E at pp. 13-14.

83.    The PCCF suicide screening form was part of a single intake packet that included medical intake forms. *See* Exh. E at p. 13; Exh. F at pp. 64-65.

84.    The lower section of the Commission's ADM 330 form, entitled "Action," directs a screening officer as follows: "If total checks in Column A are 8 or more, or any shaded box is checked, or if you feel it is necessary, notify supervisor and institute constant watch." *See* Exh. O.

85.    The comparable section of the PCCF form, entitled "Action To Be Taken By Screening Officer," directs a screening officer as follows: "If total in Column A is 8 or more, or any shaded box is checked, or if the screening officer feels it is necessary, notify shift supervisor." *See* Exh. P.

86.    While there is a distinction between the forms as to the institution of a constant watch, Sheriff Smith believes that the action to be taken was the same. *See* Exh. E at

12

p. 42.

87.    The Commission's report failed to identify any problems with the language set forth on the PCCF form. *See* Exh. N.

88.    In fact, within the Commission's findings, it wrote: "Officer J.V. administered the ADM 330 Suicide Screening Guidelines." *See* Exh. N at p. 3, ¶ 7.

89.    The Commission found that defendant Vasaturo's failure to institute constant supervision of Sinkov based upon the results of the suicide screening form was a failure to follow PCCF policy. *See* Exh. N at pp. 3-4.

90.    The Commission made two recommendations to Sheriff Smith: i) Vasaturo should be disciplined for his failure to adhere to PCCF policies regarding high risk inmates; and ii) Lapolla should be disciplined for his failure to review Sinkov's intake forms after learning of the institution of a 15 minute watch. *See* Exh. N at pp. 5-6.

91.    Vasaturo, Lapolla, and the County have contracted to extend the time for the filing of disciplinary charges. *See* Exh. E at p. 59.

Dated: Mineola, New York
May 6, 2008

MIRANDA SOKOLOFF SAMBURSKY
SLONE VERVENIOTIS LLP
Attorneys for Defendant
DONALD B. SMITH

_____
Adam I. Kleinberg (AIK-0468)
Melissa Holtzer (MH-6636)
The Esposito Building
240 Mineola Boulevard
Mineola, New York 11501
(516) 741-7676
Our File No.: 07-730

13

SANTANGELO, RANDAZZO
& MANGONE, LLP
Attorneys for Defendants
County of Putnam, Joseph A.
Vasaturo, and Louis G. Lapolla

_____
James A. Randazzo, Esq. (JAR-0156)
151 Broadway
Hawthorne, NY 10532
(914) 741-2929

TO:    Kim Berg, Esq.
       LOVETT & GOULD, LLP
       Attorneys for Plaintiffs
       222 Bloomingdale Road
       White Plains, NY 10605
       (914) 428-8401

       Timothy Paul Coon, Esq.
       WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
       Attorneys for Defendant Americor, Inc.
       3 Gannett Drive
       White Plains, NY 10604
       (914) 323-7000

14