UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
DONNY A. SINKOV, as Administrator of the Estate
of Spencer E. Sinkov, deceased, DONNY A.
SINKOV, and HARA SINKOV,

                              Plaintiffs,              **07 Civ 2866 (CLB)**

        -against-

DONALD B. SMITH, individually and in his official
capacity as Sheriff of Putnam County, JOSEPH A.
VASATURO,  individually, LOUIS G. LAPOLLA,
individually, THE COUNTY OF PUTNAM,
New York, and AMERICOR, INC.,

                              Defendants.

------------------------------------------------------------------x


**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**


                                        LOVETT & GOULD, LLP
                                        Attorneys for Plaintiffs
                                        222 Bloomingdale Road
                                        White Plains, New York 10605
                                        (914) 428-8401

## Table of Contents

Page

Table of Authorities ....................................................................................v

Preliminary Statement...........................................................................1

Background.................................................................................................1

     A. Each party's role in the screening of Spencer Sinkov.............................1

     B. PCCF and AmeriCor did not have policies in place which complied
with the Commission's minimum standards of instituting constant watch
for inmates whose screening results indicated they were a high risk of
suicide.................................................................................................3

     C. Defendants Smith, the County, and AmeriCor failed to adequately
train staff in the area of suicide prevention...............................................6

     D. Contrary to Defendants' disingenuous statements that Spencer was
"fine" there is objective evidence demonstrating he was a high risk of
Suicide.................................................................................................6

     E. Prior suicide by inmate Norberto Rivera who was in the custody of
the PCCF in November 2003.................................................................8

ARGUMENT

POINT I
     THE COUNTY AND SHERIFF DID NOT COMPLY WITH NEW YORK
     STATE'S MINIMUM STANDARDS FOR COUNTY FACILITIES IN THE
     AREA OF SUICIDE PREVENTION.................................................9

POINT II
     BOTH BEING SUICIDAL AND WITHDRAWING FROM DRUGS ARE
     CONDITIONS SUFFICIENTLY SERIOUS ENOUGH TO MEET THE
     OB JECTIVE PRONG OF A FOURTEENTH AMENDMENT DELIBERATE
     INDIFFERENCE CLAIM.................................................................12

POINT III
    A REASONABLE JURY COULD READILY CONCLUDE THAT
THE SUBJECTIVE PRONG HAS ALSO BEEN MET AND THUS
DEFENDANTS' WERE DELIBERATELY INDIFFERENT ......................15

A. The testimony of the lower ranking correction staff paints a very different
picture than the one proffered by Sheriff Smith and his administrative Captain,
Robert LeFever. The Court cannot determine as a matter of law which story is
accurate and must instead defer to a jury's resolution of this highly fact intensive
determination...........................................................................................16

B. Based on the facts adduced during discovery, a reasonable jury could readily
   conclude that Sheriff Smith was deliberately indifferent........................18

     1.  Smith was admittedly aware of the facts from which the inference can
       be drawn that he had actual knowledge of a substantial risk of serous
       harm to Plaintiff..............................................................................18

     2.  Smith is liable as a supervisory official...................................20

        a. Smith's failure to remedy a wrong after learning of it and
        Smith's deliberate indifference by failing to act on information
        indicating that constitutional violations were
        occurring................................................................................21

        b. Smith's maintenance of a police under which unconstitutional
        violations occurred..................................................................24

        c. Smith's gross negligence in managing his subordinates who
        committed unconstitutional acts..................................................27

     3.  Questions of fact preclude the Court from granting Smith's motion for
       summary judgment...........................................................................29

C.   A reasonable jury could conclude that Vasaturo was deliberately
indifferent...............................................................................................29

D.   A reasonable jury could conclude that LaPolla was deliberately
indifferent...............................................................................................32

E. A reasonable jury could find that AmeriCor was deliberately indifferent......35

     1.  AmeriCor's denial of actual knowledge that Spencer's screening form
       showed he was suicidal is belied by the direct evidence in this
       record...............................................................................................35

2. AmeriCor's written policies, which Duffy acknowledged were actually implemented by AmeriCor staff, were also deliberately indifferent in that they called for fifteen minute watches for suicidal inmates................................................................37

3. AmeriCor, like the County and Smith, failed to train staff in the area of suicide prevention...........................................................37

4. The facts surrounding Spencer's known history of heroin abuse simply amplify AmeriCor's deliberate indifference............................38

F. A reasonable jury could find the County of Putnam liable.......................39

G. Defendants' motions for summary judgment, particularly in light of the sharply disputed facts, must be denied..................................................42

POINT IV
DEFENDANTS COUNTY, SMITH AND AMERICOR ARE ALSO LIABLE FOR FAILING TO ADEQUATELY TRAIN STAFF IN THE AREA OF SUICIDE PREVENTION...................................................................43

A. The liability of Sheriff Smith and the County of Putnam for failing to adequately train staff...................................................................43

B. AmeriCor, Inc. is liable for failing to train its staff................................45

POINT V
THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.....................................................................................45

A. Defendants waived the ability to move for qualified immunity prior to trial by failing to abide by this Court's Order.................................................46

B. Defendants' motion for qualified immunity should be denied on the merits.......................................................................................46

POINT VI
SMITH IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE NEGLIGENCE CLAIM EITHER......................................................................50

POINT VII

IN THE EVENT THE COURT DISMISSES THE FEDERAL CLAIMS, THE COURT SHOULD CONTINUE TO EXERCISE JURISDICTION OVER THE REMAINING STATE LAW CLAIMS WHICH ARE NOT A SUBJECT OF THE INSTANT MOTION...................................................................51

Conclusion.................................................................................53

## TABLE AUTHORITES

**Cases**                                                                 **Page**

Amnesty America v. Town of West Hartford, 361 F.3d 113
    (2nd Cir. 2004)……………………………………………………………41,45

Brown v. Harris, 240 F.3d 383 (4th Cir. 2001)………………………………………34

Byrd v. Abate, 1998 WL 67665 (S.D.N.Y. 1998)…………………………18, 20, 31

City of Canton v. Harris, 489 U.S. 378 (1989)……………………………………43, 44

Clue v. Johnson, 179 F.3d 57 (2nd Cir. 1999)………………………………………44

Colon v. Coughlin, 58 F.3d 865 (2nd Cir. 1995)…………………………………20, 34

Cooke ex rel. Estate of Tessier v. Sheriff of Monroe Cty. Fla, 402 F.3d 1092
    (11th Cir. 2005)……………………………………………………………14, 47

Cooper v. County of Washtenaw, 2007 WL 557443 (6th Cir. 2007)…14, 32, 33, 34, 39, 50

Estelle v. Gamble, 429 U.S. 97 (1976)………………………………………………15

Farmer v. Brennan, 511 U.S. 825 (1994)……………………………………………12

Gaston v. Ploeger, 2007 WL 1087281 (10th Cir. 2007)………………………26, 49

Gil v. Vogilano, 131 F.Supp.2d 486 (S.D.N.Y. 2001)………………………………42

Gonzalez v Cecil County, Maryland, 221 F.Supp.2d 611 (D.Md.2002)……………14

Hare v. Corinth, Miss., 74 F.3d 633 (5th Cir. 1996)………………………………14

Hathaway v. Coughlin, 99 F.3d 550 (2nd Cir. 1996)……………………………13, 15

Jeffes v. Barnes, 208 F.3d 49 (2nd Cir. 2000)………………………………………42

Kelsey v. City of New York, 2006 WL 3725543, *4 (E.D.N.Y. 2006)………………14

McNulty v. Chinlund, 62 A.D.2d 682 (3rd Dept. 1978)………………………………9

Mandell v. County of Suffolk, 316 F.3d 368 (2nd Cir. 2003)……………………45

Morrison v. Washington County, 700 F.2d 681 (11th Cir. 1983)…………………14

New York State Commission of Correction v. Ruffo, 157 A.D.2d 987 (3rd Dept. 1990)...9

Oklahoma City v. Tuttle, 471 U.S.808 (1985)…………………………………………...40

Pagan v. County of Orange, 2001 WL 32785, *3 (S.D.N.Y. 2001)……….15, 16, 18, 19, 20, 44, 50, 51

Rucci v. Thoubboron, 68 F.Supp.2d 311 (S.D.N.Y. 1999)…………………………...44-45

Sheriff's Silver Star Association of Oswego County, Inv. v. County of Oswego, 56 F.Supp.2d 263 (N.D.N.Y. 1999)………………………………………………….40

Weber v. Dell, 804 F.2d 796 (2nd Cir. 1986)……………………………………...42, 44

Weyant v. Okst, 101 F.3d 845 (2nd Cir. 1996)…………………………...12, 15, 31, 42, 47

Williams v. Coughlin, 875 F.Supp. 1004 (W.D.N.Y. 1995)…………………………12

Woodward v. Correctional Medical Services of Illinois, Inc., 368 F.3d 917 (7th Cir. 2004)……………………………………… ………………………………39, 40

**Statutes**

9 NYCRR §7000.1(b) *et seq*..………………………………………………………8

## PRELIMINARY STATEMENT

This action arises out of the death of Spencer Sinkov while incarcerated in the Putnam County Correctional Facility on May 20, 2006. Spencer's parents have brought claims on behalf of themselves and Spencer's Estate pursuant to 42 U.S.C. §1983 for violations of the Fourteenth Amendment. In addition, supplemental state law claims for negligence and wrongful death are interposed.

Defendants, by three separate motions, now move for partial summary judgment pursuant to Rule 56 of the FRCP seeking dismissal of the federal due process claim brought on behalf of the Estate of Spencer Sinkov. Only Defendant Donald B. Smith has moved for dismissal of the state law negligence claim interposed against him.

For the reasons set forth herein, Defendants motions should be denied in all respects.[1]

## BACKGROUND

Contrary to Defendants' fictitious spin of the facts in this matter, this is much more than just a case of two correction personnel negligently failing to adhere to established policies and procedures which negligence resulted in Spencer' death. It is important to note that in making their motions, much of the relevant evidence has been ignored by Defendants and they have relied on "facts" which are sharply disputed. A comparison of each defendant's arguments shows even disputes amongst them as to the "facts" of this case.

### A. Each party's role in the screening of Spencer Sinkov

That being said, by way of background, on May 20, 2006, Spencer Sinkov was arrested and brought to the Putnam County Correctional Facility (hereinafter "PCCF") at approximately 12:30 a.m. Defendant Vasaturo was the booking officer who screened Spencer upon intake and who learned, by reason of the Spencer's score of "10" on the suicide screening and the fact that three

---

[1] Rather than file three separate briefs in opposition to the three Defendants' briefs, which comprise 59 pages in total, Plaintiffs oppose all motions in this one memorandum of law.

shaded categories were checked, that Spencer was at a high risk for committing suicide (Vasaturo

Dep. p. 128; Berg Aff. Exs. 4 and 12).   Despite that direct knowledge that Spencer was at risk of

suicide, Vasaturo was deliberately indifferent in failing to place Spencer on a "constant watch" –

which method of supervision has been only method approved by the New York State Commission

as being effective for suicide prevention (Plaintiffs' 56.1 Statement ¶¶1-11).

     The level of supervision instituted for Spencer's known risk of suicide, namely checks

performed every fifteen minutes, has been held to be "plainly inadequate" and a violation of the

minimum standards set forth at 9 NYCRR §7003.3(h) (Berg Aff. Ex. 1).

     Vasaturo's supervisor, Defendant LaPolla, was the Sergeant on duty that night and the

highest ranking officer in the PCCF for the 11:30 p.m. to 7:30 a.m. shift (LaPolla Dep. pp. 6, 11-12)

Although LaPolla claims he did not review the suicide screening conducted for Spencer, evidence

exists contradicting LaPolla's denials – including Vasaturo's testimony, LeFever's testimony, and a

written memorandum which was discussed in LaPolla's presence at shift change (Plaintiffs' 56.1

Statement ¶¶70-76).  In addition, LaPolla was admittedly aware that Spencer's original housing

assignment was changed by Vasaturo and that the new location, namely North Housing Unit

("NHU") was where inmates in need of supervision were placed (Vasaturo Dep. p. 187).

     Against these facts, and reasonably inferring from these facts that LaPolla knew Spencer

was at risk of harming himself, LaPolla too failed to comply with New York State Commission of

Correction's minimum standards in that he did not place Spencer on a constant watch and he was

grossly negligent in supervising his subordinate, Defendant Vasaturo, who similarly failed to do so

(Plaintiffs' 56.1 Statement ¶¶1-11; LeFever Dep. pp. 113-115; Smith Dep. pp. 110, 115).

     In addition to correction's staff being involved in the booking of new inmates into the

PCCF, since 2003, AmeriCor, Inc. has also been integral in the receiving and screening process.

AmeriCor provides medical services to the County and the Sheriff as detailed in its contract and addendum thereto (see Berg Aff. Ex. 10).

AmeriCor staffed the jail with one registered nurse on each shift who physically worked in the "medical department" at the PCCF. That registered nurse was responsible for screening inmates who were coming into the facility. The nurse also was required to review the suicide screening performed on all new inmates and had the authority to require constant watches for suicidal inmates. On May 20, 2006, Nurse Clarke was working the $11:30 - 7:30$ shift and saw Spencer at intake (Plaintiffs' 56.1 Statement ¶¶40-45, 62).

Also by reason of their contract with the County, AmeriCor was responsible for providing care to inmates who came into the facility under the influence of alcohol or drugs (LeFever Dep. p. 46). Although AmeriCor had policies in place that on their face recognized the serious risk to inmates who experience withdrawal after admission into the PCCF, staff were never trained or told that they had to comply with those policies. As a result of that deliberate indifference, Spencer's risk of suicide was amplified as it has been conceded that withdrawing from alcohol or drugs can be so physically painful and psychologically uncomfortable that suicide may seem like the only relief available at the time (LeFever Dep. p. 75).

Sheriff Smith, who became Sheriff in 2002, had a non-delegable duty under New York State law for the safety and care of inmates incarcerated in the PCCF. See New York Correction Law §500-c. This of course includes a duty to protect them from self inflicted harm. See Point III, *infra*.

**B. PCCF and AmeriCor did not have policies in place which complied with the Commission's minimum standards of instituting constant watch for inmates whose screening results indicated they were a high risk of suicide**

Smith testified that upon becoming Sheriff in 2002, he reviewed the policies and procedures in the PCCF, all documents and forms, including those pertaining to the suicide screening process. He also reviewed the Commission of Correction's published minimum standards and was aware of

his obligation under those regulations, and state law, to ensure that suicidal inmates were properly identified at intake and that his staff complied with these minimum standards -- which standards indisputably required a constant watch be implemented for any inmates who posed a risk of suicide. Smith also received and reviewed the Commission's periodic newsletters called "Chairman's Memorandum" many of which highlighted suicide prevention requirements in County jails (Plaintiffs' 56.1 Statement ¶1, 12; Berg Aff. Exs. 1 and 5).[2]

Here, a reasonable jury could readily conclude that Sheriff Smith was deliberately indifferent to his obligations and by reason of his failure to ensure compliance with these minimum standards Spencer died only thirteen hours after he was admitted into the PCCF. For contrary to the Sheriff's purported "beliefs" as to the existence of effective suicide prevention policies, in fact the evidence in this record shows that the County and Sheriff did not in fact have policies in effect as of May 20, 2006 which mandated constant watch for suicidal prisoners (Plaintiffs' 56.1 Statement ¶¶12-39).

Rather, the purported written "policy" that Defendants rely upon for the basis of their instant motion was either: (1) never communicated to staff; and/or (2) never followed as correction personnel have testified consistently that the practice in the PCCF as of May 20, 2006 was not to implement constant watches for suicidal inmates (Plaintiffs' 56.1 Statement ¶¶13-27).[3]

New York's minimum standards not only required effective screening of new inmates at intake to determine if these inmates were at risk of suicide but also required county jails to use a very specific suicide screening form which form was designed to identify those who posed a risk of

---

[2] It is particularly telling that Defendants have completely ignored the existence of these minimum standards in the arguments they make to this Court for summary judgment. However, it is not particularly surprising since their ignorance of these minimum standards have been a long time custom and practice at the PCCF.

[3] In addition, the policy relied upon by Defendants is not as clear as they make it seem. For although under the section for booking it inmates it provides for the administration of the 330-ADM, we know that form was not actually used. And under that same section there is no statement to the effect that constant watch is required for suicidal inmates or that fifteen minute watches are not sufficient, much less any indication that if an inmate scores 8 or higher or has shaded boxes checked they must be placed on a constant watch (Kleinberg Aff. Ex. I).

harming themselves.  That form took into account numerous "factors" which could contribute to a person being suicidal and very clearly spelled out how to tally the results. If inmates answered "yes" to eight or more of the questions on the State mandated form, they were deemed suicidal. In addition, if their answers to any of six specific questions were "yes", which questions were clearly designated by a shaded box on the form itself, they were deemed suicidal. Finally, the State mandated form specifically directed correction staff to "immediately notify a supervisor and institute constant watch" if a score of 8 or higher was obtained or any shaded box was checked (Plaintiffs' 56.1 Statement ¶¶1-11; Berg Aff. Exs. 1, 3 and 5).

Here, the suicide screening form used at the PCCF on the date of Spencer's suicide, and for many years before that time, was materially altered because it did not contain the directive to institute a constant watch.  As such, personnel at the PCCF administering the form were not directed to place inmates on a constant watch if they scored 8 or higher or had shaded areas checked on the form (Berg Aff. Ex. 4; Plaintiffs; 56.1 Statement ¶¶13-16).  Smith was aware that the form used in the PCCF was not identical to that mandated by the State (Smith Dep. pp. 8-13).

Rather, in the PCCF, the practice was to leave it up to the discretion of the booking officer to determine what level of supervision to institute.  However, with respect to how they exercised that discretion, the uniform testimony of the staff at the jail (two of whom are not named defendants in this case and thus have no motive to lie) was that as of May 20, 2006 there were no policies or procedures which required constant watch for inmates who scored eight or higher on the suicide screening form or has shaded areas checked (Plaintiffs' 56.1 Statement ¶¶17-22, 33-39).

In fact, it was not until after Spencer committed suicide that PCCF slipped a written procedure into effect which, for the very first time, stated a policy that fifteen minute watches were not to be used as suicide prevention measures. The policy was inserted into the books just days before the Commission of Correction came to the facility to interview individuals involved in

5

Spencer's death but was deceitfully backdated to February 2006 to make it appear as if it was in place when Spencer committed suicide (Plaintiffs' 56.1 Statement ¶¶33-39; Berg Aff. Ex. 8).

Consistent with the PCCF policies and practices which did not require constant watch for suicidal inmates, AmeriCor polices also violated New York State's minimum standards as they did not require constant watch for suicidal inmates but instead only directed the institution of a 15 minute watch (Berg Aff. Ex. 9, bates stamped pp. 448-450; Duffy Dep. pp. 165-166; Smith Dep. pp. 157-158).

## C. Defendants Smith, the County, and AmeriCor failed to adequately train staff in the area of suicide prevention

PCCF were also never trained that 15 minute watches were insufficient as a suicide prevention tool. They were never trained or instructed that constant watch was required for suicidal inmates by reason of the State's minimum standards.  And they were never trained that constant watch was required for inmates whose scores were eight or higher or had shaded boxes checked on the suicide screening form (Wendover Dep. pp. 14-15; LaPolla Dep. pp. 8586; Vasaturo Dep. pp. 76, 78-80, 110, 174, 191-192; Oliver Dep. p. 43).

Furthermore, AmeriCor staff were never trained on suicide prevention until after Spencer committed suicide while in custody of the PCCF (Clarke Dep. pp. 11-13, 19-20, 27-28; Waters Dep. p. 8, 12-14).

## D. Contrary to Defendants' disingenuous statements that Spencer was "fine" there is objective evidence demonstrating he was a high risk of suicide

Defendants' claims that Spencer appeared fine and showed no indication of being suicidal, are simply stated, not believable when juxtaposed against the written results of the suicide screening (Berg Aff. Ex. 4).

There exists indisputable evidence that Spencer was at a high risk for committing suicide when he was admitted to the PCCF at 12:30 a.m. on May 20, 2006. The total score on Spencer's

suicide screening form was "10" – well over the threshold of "8" and clearly shows he was suicidal. In addition, Spencer's form had not one but three shaded boxes checked on that form – also clearly showing he was suicidal. Perhaps most telling is the fact that he answered yes to having "feelings of hopelessness (nothing to look forward to)", this was his first time in jail, and that he was addicted to heroin at the time of his incarceration (Berg Aff. Ex. 4).

In addition, Spencer showed other signs of not being "fine" and "okay", contrary to Defendants' attempts to masquerade that he was suicidal, in that: (1) he did not actually eat the breakfast or lunch that was provided to him (Oliver Dep. pp. 87-88; Berg Aff. Ex. 27); (2) he was observed lying down the entire time he was in his cell (Berg Aff. Ex. 19), although the correction officer on the day shift admittedly could not see his face because it was a blocked view (Oliver Dep. p. 100); (3) Spencer looked awful, with dark circles under his eyes, very pale and clammy just 2 ½ hours prior to his suicide (D. Sinkov Dep. p. 69; H. Sinkov Dep. p. 20); (4) Spencer was 6'1" but weighed only 135 pounds (Berg Aff. Ex. 4); and (5) it is not disputed that Spencer said in front of Correction Officer Wendover that he was starting to withdraw from heroin (Wendover Dep. pp. 56, 83; H. Sinkov Dep. p. 14; D. Sinkov Dep. p. 69; 50-h Tr. p. 36).

Consistent with the scores on that screening form, Spencer in fact did commit suicide thirteen hours after he was admitted into the PCCF by hanging from his jail issued sweatshirt (Wendover Dep. pp. 68, 70-71; Berg Aff. Ex. 19).

At the time of his suicide, and based on the testimony described above, Spencer was entering the more severe stage of withdrawal. It has not been disputed that individuals experiencing withdrawal symptoms typically start out having mild symptoms which symptoms intensify and "peak" anywhere from 24 to 72 hours after the last use of heroin. At the time of his suicide, Spencer had last used heroin approximately 37 hours earlier. It has also been established that the

7

mental and physical pain associated with heroin withdrawal can lead individuals to believe suicide

is their only option (Plaintiffs' 56.1 Statement ¶¶85-89; LeFever Dep. p. 75).

**E. Prior suicide by inmate Norberto Rivera who was in the custody of the PCCF in November 2003**

Just 2 ½ years earlier, another inmate (Norberto Rivera) committed suicide while housed in

NHU, and like Spencer, was on a fifteen minute watch under circumstances where he was

withdrawing from heroin and utilized his jail issued sweatshirt to hang himself from his cell bars.

Just prior to Rivera's death, the NHU post was tending to his adjacent duties in the recreation yard

and with a sergeant who was speaking with another inmate (Vasaturo Dep. pp. 243-245; Berg Aff.

Ex. 22 p. 4 ¶14).

The State Commission of Correction's report on Rivera's death specifically noted that the

NHU officer's additional duties of supervising the housing unit, program area, recreation yard and

separate 4 cell unit prevented the "officer from be able to maintain active supervision adequately."

(Berg Aff. Ex. 22, p. 4 ¶14; Vasaturo Dep. pp. 244-245; Smith Dep. pp. 168-169, 172-173). Despite

these findings, the NHU post remained the same 2 ½ years later when Spencer committed suicide

(Smith Dep. pp. 168-172; Vasaturo Dep. pp. 27-28, 30-33, 36-37, 239-241, 249-250; LaPolla Dep.

pp. 20-21, 51-52). And here, just minutes prior to Spencer's death, the NHU officer was dealing

with the bible study program down the hall from his post at NHU – showing the NHU officer was

still unable to adequately maintain supervision (Berg Aff. Ex. 19, entry #373).

Although additional relevant facts are discussed more fully under the Point headings below,

in sum, each of the Defendants "buried their heads in the sand" to the known risk of Spencer

committing suicide and acted in a deliberately indifferent manner by failing to ensure his safety.

Not only did these failures go against the well published and well known State's minimum

standards but they amount to an egregious case of deliberate indifference. Indeed, a reasonable jury

8

could readily conclude that, contrary to Defendants' version of events, this was much more than a case of two corrections staff negligently failing to do their job.

## ARGUMENT

### POINT I

### THE COUNTY AND SHERIFF DID NOT COMPLY WITH NEW YORK STATE'S MINIMUM STANDARDS FOR COUNTY FACILITIES IN THE AREA OF SUICIDE PREVENTION

It is critical to consider the minimum standards established by the New York State Commission of Correction in the area of suicide prevention in County jails. These mandatory regulations, which Defendants not only failed to comply with in 2006 but continue to ignore even on their respective motions, "set the stage" for a jury's finding of deliberate indifference. These mandatory regulations also distinguish the facts of this case from those cited by Defendants in support of their motions – most of which are outside of New York State where there is no indication that any similar regulations governing suicide prevention existed and most of which even pre-date New York's movement to improve suicide prevention practices in County jails.

In the State of New York, under the authority of Article 3, Section 45 of the New York State Correction Law, the New York State Commission of Correction has promulgated "rules and regulations establishing minimum standards for the care, custody, correctional treatment, supervision, discipline and other correctional programs for all persons confined in local correctional institutions." *See* 9 NYCRR §7000.1(b), *et seq*. The Commission's authority to set forth minimum standards in the form of these mandatory regulations has been upheld as a valid exercise of their powers by Court in this state. *See* McNulty v. Chinlund, 62 A.D.2d 682, 687 (3rd Dept. 1978); New York State Commission of Correction v. Ruffo, 157 A.D.2d 987 (3rd Dept. 1990).

These minimum standards require County facilities such as the PCCF to: (1) use a state mandated form to screen inmates at intake in an effort to identify those who are at a high risk for

9

suicide; AND (2) with respect to those identified inmates, place them on a constant watch. Constant watch, by Commission's rules and regulations, is in fact the only acceptable level of supervision for a suicidal inmate. Fifteen minute or other periodic checks do not comply with the State's minimum standards (LeFever Dep. pp. 73-74, 87-88, 90-91; Berg Aff. Ex. 1).

In the context of this case, Defendants Smith, the County and AmeriCor admit that they were aware of these minimum standards and the requirement that they ensure their staff comply with them (Smith Dep. pp. 8, 16; LeFever Dep. pp. 88, 91, 106; Duffy Dep. pp. 33-34). In fact, Smith, and thus the County, have been repeatedly reminded of these minimum standards by reason of the Commission's issuance of periodic newsletters entitled "Chairman's Memorandum" which have from time to time focused on the need for suicide prevention measures that comport with the Commission's minimum standards (LeFever Dep. pp. 17, 102-103; Smith Dep. pp. 16, 17; Berg Aff. Exs. 1, 2 and 5).[4]

Perhaps the most pivotal memorandum that is continually referred to again and again was issued in 1999. Another copy was even sent to the County and Smith again in 2005 -- the year prior to Spencer's death (see Berg Aff. Ex. 2). That memorandum clearly spells out the mandate that suicidal inmates be placed on a constant watch. The Commission cited to other cases where inmates were placed on 15 minute watches as suicide precautions, stating:

> "This was plainly inadequate and as such a violation of section 7003.3(h), because the selection of the type of additional supervision was inadequate and inappropriate. A SUPERVISORY INTERVAL OF 15 MINUTES IS NOT ADEQUATE AS A SUICIDE PREVENTION PRECAUTION. It is a well established fact that inmates can hang themselves with fatal results in less than five minutes. Therefore if the objective is to prevent suicide, ONLY CONSTANT OBSERVATION IS EFFECTIVE....There are conditions, illnesses and injuries for which a supervisory interval reduced to 15 minutes is entirely adequate and appropriate, but suicide attempt is not one of them."

(LeFever Dep. pp. 88-89; Berg Aff. Ex. 1 (emphasis in original).

---

[4] These memoranda are also available for free at the Commission's website. See www.scoc.state.ny.us.

Against this backdrop, the next relevant inquiry is how does one determine if an inmate is at risk of committing suicide. The Commission addressed that inquiry as well when it, together with the State Office of Mental Health, devised a Suicide Screening Prevention Guideline form called the "330-ADM" (Berg Aff. Ex. 3; LeFever Dep. pp. 24, 104, 105-107; LaPolla Dep. pp. 38-39; Smith Dep. p. 69; Oliver Dep. pp. 36-37).

On October 5, 2005, the Commission issued a Chairman's Memorandum which stated that County facilities <u>must</u> use this precise form to identify inmates who pose a risk for suicide during initial screening. The Commission wrote:

> "Those involved in Corrections know that a large percentage of inmates arrive at correctional facilities with mental health issues ranging from depression to schizophrenia to having suicidal thoughts. An inmate, just as people in the general public, can have mental illness and not be suicidal, or can be suicidal with no other mental illness, or they can be both mentally ill and suicidal. In order to identify these inmates, facilities must heed 9 NYCRR §7013.17...A screening instrument(s) shall be utilized to elicit and record information on each inmate relating to ...history of mental illness...potential for self-injury or suicide. Since the 1980's, the Commission has held that the **only** instrument that is in compliance with §7013.7(b)(5) is the Suicide Screening Form, which was a joint project of the Commission and New York State Office of Mental Health. **This continues to be the case.**" (Berg Aff. Ex. 5).[5]

Clearly, the purpose of the form (wholly ignored by Defendants here) is to assist correction personnel in identifying inmates who are a high risk for committing suicide since suicidal intent is often times not outwardly verbalized – particularly to law enforcement officials involved in booking them into jail.

The State's form is also clear in spelling out what action needs to be taken. For once the sum total of the "yes" answers reaches the threshold of eight or more, or when one or more of the immediate referral categories denoted by shaded areas on the form are checked, the person is determined to be suicidal (Berg Aff. Ex. 3). Under those circumstances, the language on the face of

---

[5] In a September 18, 2007 Chairman's Memorandum, it was again stated that the screening of detainees by correction personnel was to be done "using Commission Form 330ADM" and that "rigorous direct supervision of high risk prisoners" was required in order to comply with both New York State Correction Law §500-b and Minimum Standards Part 7013 (Chairman's Memorandum No. 10-2007, annexed to Berg Aff. as Ex. 6).

the State's form (330-ADM) **specifically directs** the "Action" to be taken: "If total checks in Column A are 8 or more, or any shaded box is checked, or if you feel it is necessary, notify supervisor **and institute constant watch**." (Berg Aff. Ex. 3 (emphasis added)).

It is against these minimum standards that the jury could readily conclude each of the Defendants acted with deliberate indifference and in violation of Spencer's Fourteenth Amendment right to due process. Thus, despite Defendants' refusal to address these minimum standards in the context of the instant motions for summary judgment, the Court cannot ignore them as Defendants might have us do. *See e.g.* Williams v. Coughlin, 875 F.Supp. 1004 (W.D.N.Y. 1995) (Courts may use correctional guidelines and standards in determining whether the facilities' operations were deliberately indifferent).

## POINT II

## BOTH BEING SUICIDAL AND WITHDRAWING FROM DRUGS ARE "CONDITIONS" SUFFICIENTLY SERIOUS ENOUGH TO MEET THE OBJECTIVE PRONG OF A FOURTEENTH AMENDMENT DELIBERATE INDIFFERENCE CLAIM

Under both the Eighth and Fourteenth Amendments, duties are imposed on jail officials to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citations omitted).

It is axiomatic that "the official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." Weyant v. Okst, 101 F.3d 845, 856 (2nd Cir. 1996), *citing see e.g.,* Liscio v. Warren, 901 F.2d 274, 276-77 (2nd Cir. 1990). Put differently, the official may be liable where he acts in a deliberately indifferent manner to inmate health or safety. Farmer, 511 U.S. at 834.

12

The deliberate indifference standard includes an objective and subjective prong. With respect to the objective prong, the alleged deprivation must be sufficiently serious in the sense that it contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain". Hathaway v. Coughlin, 99 F.3d 550, 553 (2nd Cir. 1996), citing Hathaway v. Coughlin, 37 F.3d 63, 66 (2nd Cir 1994), citing Nance v. Kelly, 912 .2d 605, 607 (2nd Cir. 1990) (Pratt, J. dissenting).[6]

Here, AmeriCor speciously argues that Spencer was not suffering from a serious medical condition which could result in death, degeneration or extreme pain (AmeriCor Memorandum of Law, p. 5). In contrast, the other defendants have correctly conceded that being suicidal and suffering from heroin addiction and withdrawal are both sufficiently serious conditions to meet the objective component of deliberate indifference (see County Memorandum of Law, p. 10).

AmeriCor's arguments are, from both a factual and legal standpoint, ridiculous on their face.

As a matter of fact, it cannot be seriously contested that any reasonable person would conclude that being suicidal contemplates a condition of urgency that may result in death.

Equally as a matter of fact, with respect to heroin withdrawal, even AmeriCor's own written policies/procedures demonstrate the extreme pain which is associated with heroin withdrawal (see Berg Aff. Ex. 11, bates stamped page p. 518, stating that withdrawal can include "anxiety, agitation, muscle cramps, nausea, vomiting and tremors...tachycardia, hypertension, increased respirations, elevated temperature, diarrhea and dehydration" and bates stamped p. 520 indicating additional signs of withdrawal as including "confusion", "slurred speech", "ataxia", and "hallucinations").

Moreover, from a legal standpoint, numerous courts have consistently held that a risk of suicide is a sufficiently serious condition to trigger the requirements of due process under the

---

[6] The subjective component of deliberate indifference is discussed in Point III, infra.

Fourteenth Amendment.[7] *See* <u>Kelsey v. City of New York</u>, 2006 WL 3725543, *4 (E.D.N.Y. 2006) ("when in the custody of police, an arrestee has the right to care and protection, including protection for suicide"); <u>Weyant</u>, 101 F.3d at 856 (in the detainee suicide context, the relevant inquiry is whether defendants were deliberately indifferent to the medical need of the detainee to be protected from himself."); <u>Cooke ex rel. Estate of Tessier v. Sheriff of Monroe Cty. Fla</u>, 402 F.3d 1092, 1115 (11th Cir. 2005) ("pretrial detainees like [plaintiff] have a Fourteenth Amendment due process right 'to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide.") *quoting* <u>Belcher v. City of Foley</u>, 30 F.3d 1390, 1396 (11th Cir. 1994) (citations omitted); *see also* <u>Hare v. Corinth, Miss.</u>, 74 F.3d 633, 647 & 648 n. 3 (5th Cir. 1996) (collecting cases involving claims for failure to protect individuals in custody from suicide); <u>Cooper v. County of Washtenaw</u>, 2007 WL 557443 (6th Cir. 2007) (suicidal tendencies are serious medical needs), *citing* <u>Horn</u>, 22 F3d at 660 and <u>Barber v. City of Salem, Ohio</u>, 953 F.2d 232, 239-240 (6th Cir. 1992); *see also* County Defendants' Memorandum of Law, p. 10.

Numerous courts have similarly held that withdrawal from drugs and alcohol, and in particular heroin withdrawal, are all sufficiently serious conditions triggering due process requirements. *See* <u>Gonzalez v. Cecil County, Maryland</u>, 221 F.Supp.2d 611, 616 (D.Md.2002) (heroin withdrawal is a serious medical condition); <u>Morrison v. Washington County</u>, 700 F.2d 681 (11th Cir 1983) (withdrawal from alcohol).

---

[7] It is important to note that in making these arguments, AmeriCor intentionally blends the subjective and objective components of the claim by arguing that subjectively nursing staff had no knowledge that Spencer was a suicide risk or withdrawing from heroin. These arguments could not be further from the truth and the facts demonstrating the baseless nature of these contentions are addressed in Point III, *infra*, under the subjective prong of the deliberate indifference claim.

**POINT III**

**A REASONABLE JURY COULD READILY CONCLUDE THAT THE SUBJECTIVE PRONG HAS ALSO BEEN MET AND THUS DEFENDANTS' WERE DELIBERATELY INDIFFERENT**

With respect to the subjective component of the Fourteenth Amendment claim it has been uniformly held that deliberate indifference is the equivalent to "reckless disregard" for the risk posed by the detainee's condition. This is "something more than mere negligence" but less than intentional conduct. "Proof of intent is not required, for the deliberate indifference standard 'is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" Weyant, 101 F.3d at 856, *citing* Farmer v. Brennan, 511 U.S. 825, *see generally* Estelle v. Gamble, 429 U.S. 97, 104-05 (1976); *see also* Hathaway, 99 F.3d at 553.

This subjective element can be satisfied when the prison official "knows of and disregards an excessive risk to inmate health or safety." Hathaway, 99 F.3d at 553. To that end, the official must be "aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Pagan v. County of Orange, 2001 WL 32785, *3 (S.D.N.Y. 2001).

Finally, the risk to inmate health or safety does not need to be specific to the plaintiff but can be a risk shared by a group of inmates. Pagan, 2001 WL *3, *citing* Farmer, 511 U.S. at 837.

Here, facts exist from which a jury could conclude that some of the defendants, such as Vasaturo, LaPolla and Americor who were actually involved in the intake of Spencer, knew of the risk of suicide by Spencer specifically by reason of his scores on the form and were deliberately indifferent to that risk when they failed to place him on a constant watch. *See* Point III(C), (D) and (E), *infra*.

15

In addition, facts exist from which a jury could conclude that those higher ranking officials, such as Smith (and even Captain LeFever), who were not specifically involved in Spencer's intake still understood the risk of suicide by a group of inmates who had "yes" answers to eight or more questions or "yes" to one or more of the "shaded" questions on the suicide screening form. Further, these facts could reasonably lead to the conclusion that Smith and the County were deliberately indifferent to that risk by not having policies and procedures in place mandating that constant watch be implemented.

In this case, as in other similar to the one at hand, the issue of whether officials actually drew the inference that a substantial risk of serious harm to inmate health or safety existed and disregarded that risk are questions of fact for the jury. *See* Pagan, 2001 WL at *3, *citing* Byrd v. Abate, 1998 WL 67665 (S.D.N.Y. 1998) and Warren v. Keane, 937 F.Supp. 301, 305 (S.D.N.Y. 1996).

## A. The testimony of the lower ranking correction staff paints a very different picture than the one proffered by Sheriff Smith and his administrative Captain, Robert LeFever. The Court cannot determine as a matter of law which story is accurate and must instead defer to a jury's resolution of this highly fact intensive determination.

Putting aside momentarily the baseless arguments made by Defendants that they did not believe Spencer was suicidal, discovery has yielded two very distinct versions of the facts pertaining to the policies and practices in the PCCF.

One version is that proffered by Sheriff Smith which in sum is that there were policies in place in the PCCF as of May 20, 2006 which required constant watch for inmates who were suicidal. Therefore, according to Smith, when Spencer scored a "10" on the suicide form, had three shaded boxes checked, but was not placed on a constant watch it was due to Defendants Vasaturo and LaPolla not following that policy.

The second version of the "facts" is that of Vasaturo and LaPolla – which version is supported by testimony of two other subordinate, correction personnel who are not named as

defendants in this action. It is these lower level staff, holding the ranks of correction officer and sergeant, who actually carried out the day to day practices of the PCCF. These four individuals testified consistently that, contrary to Smith's version of events, there was no policy in place requiring a constant watch for suicidal inmates. Rather, as these four individuals consistently stated, the policies and practices in the PCCF on May 20, 2006 was that suicidal inmates were routinely placed on 15 minute checks – a level that has been determined to be "plainly inadequate" by the New York State Commission of Correction (Berg Aff. Ex 5). And according to the uniform testimony of these four individuals, the August 2006 policy that was backdated to February 2006 but not actually put in place until after Spencer's death was the first time any policy required that constant watch be implemented for suicidal inmates (Plaintiffs' 56.1 Statement ¶¶33-39).

Similarly, with respect to AmeriCor, there are two very distinct versions of the facts.

According to AmeriCor, its personnel had no role in the screening of inmates for the risk of suicide or in implementing heightened levels of supervision. But like its co-defendants' version of events, the actual staff who carry out the day to day functions in the jail testified that nursing staff played an integral role in the intake process, reviewed the screening forms including suicide screening, and not only had the authority to but actually did institute heightened levels of supervision for inmates in the PCCF (Plaintiffs' 56.1 Statement ¶¶40-45).

On the basis of these diametrically opposed versions of the practices in the PCCF as of May 20, 2006, the Court as a matter of law cannot determine which version of the facts a jury will credit. The Court cannot weigh the credibility of the witnesses upon whose testimony these versions of the policies and practices are now based. And the Court cannot therefore grant Defendants' motions for summary judgment.

**B. Based on the facts adduced during discovery, a reasonable jury could readily conclude that Sheriff Smith was deliberately indifferent**

Nonetheless, going one step further and viewing these facts in the light most favorable to Plaintiffs, there exists ample evidence from which a jury could conclude that Sheriff Smith is liable for the deprivation of Spencer's Fourteenth Amendment rights.

Sheriff Smith "is mandated by state law to have custody of the Jail and is responsible for the care, custody and control of inmates who are lawfully committed to his custody." Pagan, 2001 WL 32785 at *1 (S.D.N.Y. 2001); *see also* New York Correction Law §500-c.

Considering his non-delegable duty to care for the inmates under his control together with Smith's testimony regarding his knowledge of the State's minimum standards, a jury could readily find that he acted in a deliberately indifferent manner in violation of Spencer's Fourteenth Amendment rights.

**1. Smith was admittedly aware of the facts from which the inference can be drawn that he had actual knowledge of a substantial risk of serious harm to Plaintiff**

There can be no dispute that Smith was aware of facts from which the inference could be drawn that there was a risk of serious harm to Spencer. For the risk of harm of which Smith was aware was to those inmates in general who, like Spencer, were identified as suicidal on screening forms but who not protected from the risk of harming themselves by reason of the absence of reasonable measures to eliminate that serious risk of harm. *See e.g.* Byrd v. Abate, 1998 WL 67665, *5 (S.D.N.Y. 1988) (the defendant was aware of facts indicating that the inmate, due to his placement in a particular housing unit, belonged to an identifiable group prisoners who were at risk of substantial harm.).

Here Smith admits awareness of the State's minimum standards and to having received and reviewed the Chairman's Memoranda -- many of which specifically focused on the need for his facility to have procedures and practices in place that complied with these minimum standards

(Smith Dep. pp. 8, 16, 17; Berg Aff. Exs. 1, 5, 6). Smith admits that he was aware that the State had a suicide screening form and that a different version was used in the PCCF. Id. He was also was aware that inmates who scored eight or higher on the suicide screening form were deemed a high risk for committing suicide (Smith Dep. p. 69).

Under these circumstances, it is reasonable to conclude that Smith was aware if procedures were not in place to adequately safeguard suicidal inmates from harming themselves then in fact serious harm would be the result.

In order, to satisfy this part of the deliberate indifference test, Plaintiffs need not show that Smith was aware of the excessive risk posed to Spencer himself or that Smith was involved in any way in the booking or processing of Spencer into the jail. Rather, since Smith has the non-delegable duty to protect inmates from the serious risk of suicide, it is enough that Plaintiff show that inmates in Spencer's similar circumstances faced that same excessive risk and that Smith was aware of that risk. *See e.g.* Pagan, 2001 WL 32785 at *3 (holding it was not necessary for inmate-plaintiff to show Sheriff had knowledge that another inmate would attack him in particular, just that there was an excessive risk of harm shared by other inmates in his situation), *citing* Byrd v. Abate, 1998 WL 67655 (S.D.N.Y. 1988) (officials were aware of facts from which the inference could be drawn that there was an identifiable group of prisoners who were at risk of substantial harm); and Warren v. Keane, 937 F.Supp. 301, 305 (S.D.N.Y. 1996) (because the Surgeon General warned of the risks of environmental tobacco smoke a rational fact finder could infer that defendants were on notice of that danger).

Here, Smith knew that a failure to observe suicidal inmates on a one-on-one basis presented a substantial risk of harm that category of inmates (Berg Aff. Exs. 1, 5; Smith Dep. pp. 69). He was aware of this because he read and reviewed the Chairman's memoranda and knew of the State's minimum standards that any other level of supervision was inadequate as inmates could die in less

than five minutes of hanging (Berg Aff. Ex. 1). This is factually similar to the Southern District's

holding in Pagan: "given the mental health of the inmates at Dorm 6 [Sheriff] Bigger and the

deputies were aware of facts from which the inference can be drawn that a failure to observe the

inmates presented a substantial risk of harm." Pagan, 2001 WL 32785 at *4.  H

Thus, the remaining question as to whether Smith actually drew the inference and

disregarded that risk necessarily rests with the trier of fact. Id., citing Byrd v. Abate, 1998 WL

67655, *6 ("whether they drew that inference was a question of fact that was to be resolved by a

jury). Byrd also held that a question of material fact remained despite defendant's claim that his

actions comported with existing jail policies. Byrd, 1998 WL 67665 at *6.

### 2. Smith is liable as a supervisory official

As in Pagan, where the Sheriff did not have personal knowledge of the particular

circumstances of the inmate's problem, here too the Sheriff can be liable even though he was not

personally aware of Spencer's admission into the facility or the results of the suicide screening. See

e.g. Pagan, 2001 WL 32785 at *4. Sheriff Smith can still be found to have disregarded the risk

posed to suicidal inmates despite the lack of his personal involvement in Spencer's admission into

the facility.

That is because a supervisory official such as the Sheriff can be found to be personally

involved in the alleged constitutional violation by his: "(1) direct participation in the alleged

constitutional violation; (2) failure to remedy a wrong after learning of it; (3) creation or

maintenance of a policy under which unconstitutional violations occurred; (4) gross negligence in

managing subordinates who committed unconstitutional acts; or (5) deliberate indifference by

failing to act on information indicating that constitutional violations were occurring." Id. at 4, citing

Colon v. Coughlin, 58 F.3d 865, 873 (2nd Cir. 1995).

On the facts of this case, a jury can find Smith liable by one or more of these means.

20

### a. Smith's failure to remedy a wrong after learning of it and Smith's deliberate indifference by failing to act on information indicating that constitutional violations were occurring

First, there is ample evidence from which a reasonable jury could conclude that Smith failed to remedy "a wrong" after learning of its existence and that he failed to act on information indicating that constitutional violations were occurring.

Initially, in 2002, Smith testified that he reviewed the PCCF policies, procedures, forms and everything he could get his hands on (Smith Dep. pp. 6-8). Taking him at his word, a reasonable jury could readily conclude that he therefore learned at that time that the PCCF did not have any policies or procedures which required constant watch for inmates who were determined to be suicidal and more particularly those who were whose to be suicidal by reason of their intake forms.

**In fact, even Smith himself testified that he could not recall seeing any policies or procedures which specified that inmates who had scores of 8 or higher or had shaded boxes checked on the suicide screening form were required to be placed on a constant watch (Smith Dep. pp. 70-71). And the Jail Captain, Robert LeFever, similarly testified that he could not explain why the PCCF policies and procedures did not include any words to the effect that only constant observation is effective as a suicide prevention measure (LeFever Dep. p. 91).**

Also in 2002, Smith was aware of the State's minimum standards (Smith Dep. pp. 8, 16). Those minimum standards required that the PCCF utilize the 330-ADM as its screening tool upon intake of new prisoners. That requirement was clearly set forth again in 2005 (prior to Spencer's death) in Chairman's Memorandum 16-2005 (Berg Aff. Ex. 5).

Here, Smith testified he was told that the PCCF form was "basically" the same as the state form. He did not say he was told that it was identical – which is patently what the Commission required. From this testimony a reasonable jury could find Smith was aware of facts from which he

knew that the form was not the same as required by the State and he failed to take reasonable measures to make sure it complied with the State's requirements (Smith Dep. p. 12).[8]

Furthermore, the difference in the State versus the PCCF form was consistent with the difference in the State's minimum standards and the jail's practices – namely the PCCF removed the language on the PCCF form directing staff to institute constant watch AND the practices in the PCCF did not require constant watch for inmates who has a score of 8 or had one or more shaded boxes checked (compare Berg Aff. Exs. 3 and 4; LaPolla Dep. pp. 34-35, 39-41, 85-86; Wendover Dep. p. 12; Vasaturo Dep. pp. 75-76, 69, 174, 223-224; Oliver Dep. p. 41).

Even the policy now relied upon by Defendant Smith does not direct the screening officer to implement a constant watch. In fact, it says nothing as to the screening officer's duties to do anything with respect to the results of the screening form (Kleinberg Decl. Ex. I).

And if the policies were as clear as Smith now claims to the Court why then would a policy be created in August of 2006 to say what Smith claims was already in existence?  And why would it be deceptively backdated to make it seem as if it was in the books prior to Spencer's death? (Plaintiffs' 56.1 Statement ¶¶32-39).

In addition to Smith's own review of the policies and procedures, in November 2003, inmate Norberto Rivera committed suicide while on a fifteen minute watch, while withdrawing from heroin, and while housed in the NHU.  The Commission of Correction's report on Rivera's death, issued on January 11, 2005, disclosed that the NHU officer was unable to adequately supervise inmates on that unit because he/she had too many other duties to tend to – including program officer

---

[8] Smith's claim that he believed the form complied with the State's minimum standards could be found incredible by a jury based on the fact that Smith himself testified he knew of nothing which said the Commission found it to be acceptable and in fact did not know if the Commission ever even reviewed the PCCF suicide screening form (Smith Dep. p. 12).  In addition, when a jury compares Smith's "belief" with the very clear language in the October 2005 Chairman's memorandum it could easily conclude Smith's belief is far-fetched and not grounded on any facts (see Berg Aff. Ex. 5 clearly stating the only instrument which complies with the minimum standards screening requirements is the 330-ADM).

duties, the recreation yard, and a separate four cell housing unit (now known as NHU-2) (Berg Aff. Ex. 22). The Commission recommended that the post be reviewed (Berg Aff. Ex. 22).

Although Smith then requested, 2 months later, an updated staffing analysis, nothing prevented him from taking immediate action to relieve the NHU post of its tangential responsibilities so as to make sure the inmates in NHU were adequately supervised. In fact, no changes were made to the NHU post prior to Spencer's death and thus it is reasonable to conclude that the NHU position was still unable to adequately supervise inmates on the unit (Smith Dep. pp. 168-172; Vasaturo Dep. pp. 27-28, 31-33, 239-241, 249-250; LaPolla Dep. pp. 20-21, 51-52; Oliver Dep. pp. 12-13). And even when the staffing analysis was issued, Smith still sought to postpone the hire of necessary additional personnel for two more years (Berg Aff. Ex. 31).

This deficiency is further directly related to Spencer's circumstances, which will simply highlight for the jury how Smith's failure to remedy a known wrong caused yet another constitutional violation. For just minutes before Spencer was found hanging in his cell, the NHU officer was tending to the program officer's duties and bringing a group of 11 inmates to bible study down the hall (Berg Aff. Ex. 19).

In addition to these facts, in November 2005, the Commission sent Smith and LeFever an evaluation which specifically recommended that they review the Chairman's Memorandum 17-99 "for clarification with regards to providing additional supervision." (Berg Aff. Ex. 2). Chairman's Memorandum 17-99 specified in relevant part:

> "The Medical Review Board investigated several inmate suicides in 1998-1999 in which a determination for additional supervision was made pursuant to section 7003.3(h). In these cases the supervisory visit interval was shortened from 30 minutes to 15 minutes for inmates on suicide prevention precautions. This was plainly inadequate and as such a violation of section 7003.3(h), because the selection of the type of additional supervision was inadequate and inappropriate. A SUPERVISORY INTERVAL OF 15 MINUTES IS NOT ADEQUATE AS A SUICIDE PREVENTION PRECAUTION. It is a well established fact that inmates can hang themselves with fatal results in less than five minutes. Therefore if the objective is to prevent suicide, ONLY CONSTANT OBSERVATION IS EFFECTIVE....There are

conditions, illnesses and injuries for which a supervisory interval reduced to 15 minutes is entirely adequate and appropriate, but suicide attempt is not one of them."

(Berg Aff. Ex. 1).

Smith, as the Sheriff and in his supervisory capacity, had an obligation to make sure the PCCF was in compliance with the very clear directives in this memorandum. And we know from the consistent testimony of LaPolla, Vasaturo, Oliver and Wendover that a policy requiring constant watch was not in fact put in place until August 4, 2006 – 2 ½ months after Spencer's death and five days before the Commission's investigators arrived at the PCCF to investigate Spencer's death. That policy, for the very first time, stated that fifteen minute checks were not adequate as a suicide precaution (LaPolla Dep. pp. 41-43, 50-51; Vasaturo Dep. pp. 234-235, 237-238; Wendover Dep. pp. 91-92; Berg Aff. Ex. 8).[9]

### b. Smith's maintenance of a policy under which unconstitutional violations occurred

Although Smith attempts to dispute the testimony of his four subordinates, evidence exists that prior to Spencer's suicide in May of 2006 the PCCF did not have any policies, procedures, or even training to instruct staff to place inmates on constant watch under circumstances where the very tool they were required to use by reason of the Commission's directives showed these inmates to be at a high risk for suicide (see Smith Memorandum of Law, pp. 2, 8-9 and compare to Plaintiffs' 56.1 Statement ¶¶13-39).

---

[9] To the extent Defendants argue that since the Commission of Correction's investigation concluded with a finding that LaPolla and Vasaturo failed to follow policies in place in PCCF there must have been policies in place, several points completely dispel that argument. First, a reasonable jury could conclude that despite this conclusion by the Commission, policies were not in place which provided for constant watch of suicidal inmates (Plaintiffs' 56.1 Statement ¶¶12-39). Second, the Commission does not address in its report the on going practice in the PCCF prior to Spencer's suicide of failing to provide constant watch for suicidal inmates (Id.). Third, evidence exists showing that a policy was slipped into the books five days before the Commission came to investigate Spencer's death and any conclusion by the Commission about the existence of policies was based on misleading information supplied by the PCCF (Plaintiffs' 56.1 Statement ¶¶33-39). Finally, the trier of fact must be permitted to draw its own conclusions based on all of the evidence presented at trial. And here there is sufficient evidence to negate the Commission's finding that policies existed requiring constant watch for suicidal inmates at the time of Spencer's death on May 20, 2006.

Against these facts, particularly when viewed in the light most favorable to Plaintiffs, Smith clearly maintained a policy under which violations of the Fourteenth Amendment occurred. At minimum, this presents a disputed issue of material fact which the Court cannot resolve in favor of Smith as a matter of law.

Thus, although Smith has a non-delegable duty and responsibility to ensure the safe keeping of inmates in the PCCF he now attempts to lay blame on his trustworthy subordinates, including LeFever, almost to the point of stating that they deceived him into believing there were policies and practices in place which complied with the State's minimum standards (Smith Dep. pp. 6-12).

However, a jury could readily disbelieve Smith's claims that he was told everything in the PCCF complied with the State's minimum standards. For Smith bases his "belief" on communications with LeFever. But LeFever himself testified that he knew as far back as 1988 that the PCCF suicide screening form differed from the one mandated by the State Commission of Correction (LeFever Dep. pp. 65-67). Thus, it is incredible for Smith to now claim that LeFever made material representations to him in 2002 that the forms were the same as those required by the Commission of Correction (Smith Dep. pp. 13-14).

Similarly, LeFever testified that there were no policies or procedures in place which provide guidance to staff as to what to do with respect to the total score on the suicide screening forms or if a shaded box is checked (LeFever Dep. pp. 27-29). Again, a jury could find Smith's claims at this point not credible that his review of policies and procedures showed the existence of something that never in fact existed.

Equally important, LeFever testified that he had no explanation as to why PCCF policies and procedures did not say that constant observation was the only acceptable and effective method for

suicide prevention (LeFever Dep. p. 91). Again, Smith's claims to the contrary are rendered incredible.[10]

In fact, Smith's own testimony undercuts his claim that he "believed" everything in the PCCF was consistent with the minimum standards. For when further inquiry was made, he readily he could not recall who said what, he could not recall specifically what these jail officials told him, he did not know if the Commission ever looked at any policies/forms or rendered any opinion as to their adequacy (or lack thereof), and never saw anything in writing indicating that they approved PCCF policies/forms (Smith Dep. pp. 8-14).

On this record, a reasonable jury could conclude he was aware that there were no policies in place requiring constant watch for inmates who scored eight or higher on the suicide screening forms or had shaded boxes checked and was therefore deliberately indifferent in his failure to insure the safety of suicidal inmates in his custody (LaPolla Dep. pp. 34-35, 40-41, 85-86; Wendover Dep. p. 12; Vasaturo Dep. pp. 75-76, 79, 174, 223-224; Oliver Dep. p. 41; LeFever Dep. pp. 27-28). **Even Smith admitted he could not recall the existence of any such policy when asked to answer this pointed question at his deposition (Smith Dep. pp. 70-71).**

The same holds true with respect to the suicide screening form. Based on the fact that he was specifically told it was not identical to the State's form, and based on the fact that in October 2005 the Chairman's Memorandum specifically instructed County facilities that only the 330-ADM complied with the minimum standards, Smith is liable for permitting a practice to continue whereby staff were given a form that did not direct the implementation of a constant watch.

---

[10] The facts of this case are distinguishable from the Gaston matter relied upon by Smith (*see* Smith's Memorandum of Law, pp. 9-10, *citing* Gaston v. Ploeger, 229 Fed.Appx. 702 (10th Cir. 2007). For here, unlike Gaston, Smith had personal knowledge of both the State's minimum standards and the Chairman's Memoranda which explained those standards, including the requirement that constant watch be implemented for inmates who score eight or higher or have shaded boxes checked. Unlike Gaston, Smith admitted that he reviewed all forms and procedures when he became Sheriff back in 2002. Yet, he never brought the facility into compliance with the minimum standards.

Additionally, America's policies and procedures were consistent with the PCCF custom and practice -- namely to place inmates only on a 15 minute watch as a suicide precaution (Berg Aff. Ex. 9 bates stamped pp. 448-449). Knowing this fact as well could support a jury's finding that Smith maintained a policy and practice under his tenure as Sheriff whereby inadequate and patently insufficient means were used as suicide precautions.

Add to this the fact that staff were not trained to implement constant watch for suicidal inmates, that one-on one supervision was required for suicidal inmates and not just discretionary, and that those who scored eight or higher on the form or had shaded boxes checked must be on a constant watch, and a jury could reasonably find Smith was deliberately indifferent. *See also* Point IV, *supra* with respect to Smith's liability on a failure to train theory.[11]

### c. Smith's gross negligence in managing his subordinates who committed unconstitutional acts

A reasonable jury could also conclude that Smith was grossly negligent in managing his subordinates who committed unconstitutional acts.

To that end, LeFever testified that he was aware that: (1) the State's suicide screening form differed from the one used at the PCCF in that the PCCF form removed the language directing officers to implement a constant watch (Lefever Dep. pp. 65-67); (2) there were no policies or procedures in place which provided guidance to staff as to what to do with respect to the total score on the suicide screening forms or if a shaded box is checked (LeFever Dep. pp. 27-29); and (3) he had no explanation as to why PCCF policies and procedures did not say that constant observation was the only acceptable and effective method for suicide prevention (LeFever Dep. p. 91).

---

[11] To the extent Smith argues that he was not deliberately indifferent to Spencer's serious condition because he has routinely sought to improve medical services offered in the jail is completely irrelevant to the facts that pertain to this case. For rather than focus on the facts that are pertinent to this case – namely the lack of any policies, the modified suicide screening form, the lack of any training, and the actual practices of not instituting constant watch for suicidal prisoners – Smith obviously attempts to distract the Court from these key facts by focusing on his irrelevant actions of improving medical services in the jail.

Yet, Smith makes it sound as if he relied upon LeFever to make sure that the PCCF complied with the minimum standards. If Smith is to be believed, then LeFever seriously failed in complying with this duty but yet no action was taken against LeFever – despite the fact that he is not a member of any union, serves at the pleasure of Smith, and any disciplinary action would not first require compliance with New York State Civil Service Law (Smith Dep. p. 60).

In addition, LeFever then egregiously put a backdated policy into the procedure books five days before the Commission arrived at the PCCF to investigate Spencer's death to make it seem like at the time of Spencer's death a policy existed which sated that 15 minute supervision was not adequate as a suicide prevention tool.  Smith was aware of LeFever's conduct but yet to date has taken no action against him for this egregious behavior – much less even questioned LeFever as to what occurred or why he did what he did (Smith Dep. pp. 53-55, 59-60, 65-67; LeFever Dep. pp. 90, 100-101; Berg Aff. Ex. 8).

Similarly, with respect to gross negligence in managing subordinates, Smith misrepresented to the Commission that Vasaturo was counseled back in 2003 for rounding off times in the log book (Berg Aff. Ex. 24, second page ¶2).  In contrast, Vasaturo stated that he was never questioned, counseled or disciplined for rounding off times (Vasaturo Dep. p. 201, 250-251). And he apparently continued to make false entries in the log books as evidenced by his entries for the NHU and SHU posts on May 20, 2006 – to wit: (1) all time he entered was on the quarter hour exactly, showing he was still rounding off times; and (2) he inaccurately documented that he performed checks on NHU and SHU at the very same times – a feat which is physically impossible (Berg Aff. Exs. 19and 25).

And with respect to both Vasaturo and LaPolla, no disciplinary action has been taken against either for their conduct in connection with Spencer's death.  Here too a reasonable jury could conclude the Smith once again misrepresented to the Commission that they were under discipline as

28

he wrote in 2006 they were "currently pending discipline" (Berg Aff. Ex. 26; LaPolla Dep. p. 15; Vasaturo Dep. pp. 224, 228-233).

### 3. Questions of fact preclude the Court from granting Smith's motion for summary judgment

Similar to the Court's holding in Pagan, here too there clearly are disputed facts as to whether Smith acted in a deliberately indifferent manner under the Colon v. Coughlin supervisory liability theories. *See* Colon v. Coughlin, 58 F.3d 865, 873 (2nd Cir. 1995). As a result, the Court must deny Smith's motion for summary judgment.

### C. A reasonable jury could conclude that Vasaturo was deliberately indifferent

With respect to Defendant Vasaturo, a reasonable jury could readily find that he actually drew the inference that Spencer was at a high risk of committing suicide and that he acted in a deliberately indifferent manner to that known risk when he failed to place Spencer on a constant watch – the only acceptable level of supervision for a suicidal inmate and, according to Smith, the level of supervision required by PCCF policies.

Vasaturo completed the suicide screening form. He noted on the form that Spencer expressed feelings of hopelessness, knew others who attempted suicide, was addicted to heroin, was under the influence in that he was "very laid back", and that this was Spencer's first time in jail (Berg Aff. Ex. 4).

Although Vasaturo now claims that he may have completed that suicide screening form incorrectly, a jury could find this post-lawsuit claim incredible – particularly in light of the fact that he never brought that claim to anyone's attention at the PCCF prior to his deposition in this case in January 2008 even though he was questioned by PCSD investigators about his conduct on May 20, 2006 (Vasaturo Dep. pp. 148-151). In addition, Vasaturo made changes on the form itself on May 20, 2006 while completing it because he realized that he made a mistake and those mistakes are clearly initialed next to the crossed out entries (Berg Aff. Ex. 4). These other portions of form were

29

never changed by him then or to today. And although he now claims he "tried" to tell the Commission in August of 2006 he erred on the form, there is no indication in any of the Commission's records or its final report that Vasaturo ever claimed any such thing. Rather, on these facts a jury will see this claim for what it is – another attempt to cover up, bury their heads in the sand, and ignore what really happened.

Not only does Vasaturo's post-lawsuit claim that the form was incorrect lack credibility but it also does not change the fact that on May 20, 2006, the form clearly showed Spencer was suicidal.[12]

Similarly, any contention by Vasaturo that Spencer appeared fine and okay at intake is belied by the very clear results of the screening form. He scored a "10" and had three shaded boxes checked. He was addicted to heroin. And even according to LaPolla, the "yes" answer to the question of expressing feelings of hopelessness was a telltale sign of his high risk of harming himself. In addition, other facts show that he did not appear "okay." For even at intake he was 6'1" and only 135 pounds (Berg Aff. Ex. 9). And nowhere on the screening form does Vasaturo indicate in any way that Spencer was joking around, laughing, or that he appeared to be "fine" as he now claims (Berg Aff. Ex. 4).

Nonetheless, Vasaturo (and equally his codefendants) arguments that Spencer did not appear to be suicidal really begs the question – what does one look and act like when suicidal? The answer to that question is never uniform as suicidal intent can be exhibited by conduct, actions, statements, non-statements, history, and a myriad of other factors (see Ex. 4 which lists sixteen different areas of inquiry used to determine if an inmate is suicidal as well as the correction officers observations of the inmate's behavior and conduct). In fact, that is precisely why the State Commission, in

---

[12] Upon examination of his testimony in this area, it is particularly telling that Vasaturo initially claimed only two of the answers were wrong. When it was pointed out that Spencer's score still would have been eight or higher, Vasaturo changed his testimony to say now that other answers were wrong (Vasaturo Dep. pp. 155, 163, 165-169). For this reason as well, a jury could easily disbelieve Vasaturo's testimony.

conjunction with the Office of Mental Health, devised a suicide screening form designed to specifically identify inmates who are at high risk of suicide (Berg Aff. Ex. 1, 5).

It is against these facts that a reasonable jury could see right through Vasaturo's contentions as another effort to masquerade what the suicide screening form was intended to and actually did uncover in Spencer's case. Thus, rather than admit the form's importance, Vasaturo and his co-defendants continue to bury their heads in the sand, ignoring what the screening form told them on May 20, 2006 and what that screening form will tell a jury now.

To the extent that Vasaturo claims he took measures to protect Sinkov the adequacy of those measures is the quintessential jury question.

For if a jury credits Smith's testimony that policies were in place and training was given to advise correction officers that constant watch was required, Vasaturo clearly had knowledge that the only adequate measure of protection would have been a constant watch. Against this testimony, it would entirely reasonable for a jury to conclude that the measures implemented by Vasaturo, namely the fifteen minute watch, were grossly insufficient and amounted to deliberate indifference (*see also* Berg Aff. Ex. 1). And those measures proved to be grossly inadequate as Spencer hung himself only 13 hours after he was admitted into the facility smack in the middle of the fifteen minute checks.[13]

Thus, as a reasonable jury could easily find Vasaturo was deliberately indifferent when he failed to implement a constant watch for Spencer -- the only acceptable method of suicide precaution in the State. At a minimum, the disputed issues of fact require denial of his motion. *See* Weyant, 101 F.3d at 857 ("While Okst proffered his own view that Charles's condition was not

---

[13] Of course, it is entirely conceivable on this record that a jury may disbelieve Smith's version of the events and instead credit Vasaturo's testimony that he was never made aware of any policies requiring constant watch nor was he trained to implement constant watch under these circumstances. However, this jury issue as to whose version of the events they believe cannot be decided by the Court as matter of law. Even if it is found that their actions were consistent with policies in place at the PCCF on May 20, 2006, they could still be found liable if a jury concludes they knew of the risk of harm Spencer faced and they failed to take adequate measures to ensure his safety. *See* Byrd, 1998 WL 67665 at *6.

sufficiently serious to require immediate medical treatment…a jury need not credit Okst's testimony as to his observations…").

Going one step further, if LaPolla's testimony is believed (and that portion of Vasaturo's which is consistent at times with LaPolla's) a reasonable jury could find that Vasaturo was deliberately indifferent in failing to notify LaPolla of the score on the suicide screening form. *See* Cooper v. County of Wastenaw, 2007 WL 557443, *11 (6th Cir. 2007) (summary judgment denied for correction officer who knew that a failure to notify his co-worker of a suicide risk would result in a violation of the inmate's constitutional rights).

## D. A reasonable jury could conclude that LaPolla was deliberately indifferent

As with Vasaturo, LaPolla also claims he is entitled to summary judgment but bases his arguments on a sharply disputed series of material facts.

Contrary to LaPolla's arguments, facts exist from which a reasonable jury could conclude that he was aware of the results of the suicide screening form, that there was a concern about those results, and that he was therefore deliberately indifferent when as a supervisor he failed to ensure that Spencer was placed on a constant watch.   LaPolla's ignorance of these facts mandates denial of his motion.

More specifically, Vasaturo testified that he believed at that time, on May 20, 2006, that LaPolla had seen the suicide screening form (Vasaturo Dep. pp. 155-156).  LeFever was also told that LaPolla was aware of Spencer's score on the suicide screening from (LeFever Dep. pp. 120-122).

In addition, Vasaturo testified that he radioed LaPolla and verbally told him that the reason the cell location was changed and Spencer was on a fifteen minute watch was because of answers given on the suicide screening form (Vasaturo Dep. pp. 16, 158-159, 173). And although Vasaturo waffled back and forth in his testimony as to whether he ever told LaPolla that the reason was

related to the suicide screening form, even AmeriCor's counsel interprets Vasaturo's testimony in this same manner as its 56.1 Statement ¶17 states is an undisputed fact that Vasaturo told LaPolla that he placed Spencer on a 15 minute watch and changed him to cell 7 due to the answers given on the suicide screening form (see AmeriCor 56.1 ¶17). If opposing counsel draws this conclusion, then certainly a reasonable jury could do the same.

In addition to being verbally told of the suicide screening being the reason for the fifteen minute watch, the "P-1" prepared by Vasaturo clearly states the reason Spencer was placed on the inadequate 15 minute watch was due to his answers on the suicide screening form. That P-1 was hand delivered by Vasaturo to the briefing room and C.O. Wendover recalled that it was in the briefing book when he came on duty at 7:30 a.m. Consistent with the practices in the jail, LaPolla as the outgoing Sergeant was present at that shift change briefing (Wendover Dep. pp. 35-37, 40; Vasaturo Dep. p. 70; LeFever Dep. pp. 124-125; Oliver Dep. pp. 77-78). Under these circumstances, a reasonable jury could conclude that Vasaturo saw the P-1 prior to Spencer's death and thus had actual knowledge that the suicide screening results were problematic.

In addition, Vasaturo testified that his practice was also to give the sergeant a copy of that P-1 (Vasaturo Dep. p. 71).

Finally, LaPolla himself admits that he was notified that Spencer was being placed in NHU cell #7 rather than the original cell (#29 in West Housing Unit) and that the NHU location was where inmates on heightened supervision were placed. A jury could readily find, as did the Commission of Correction, that LaPolla's failure to inquire of his subordinate as to the scores on the suicide screening form constituted deliberate indifference on the face of these facts.

The facts with respect to LaPolla are similar to those in the case of Cooper v. County of Wastenaw, 2007 WL 557443 (6th Cir. 2007). In Cooper, Corrections Officer Watchowski claimed he was unaware that the decedent was on suicide watch. However, another individual testified that

he informed Defendant Watchowski of the suicide watch. The Court held that a jury could reasonably believe that Watchowski at least "perceived enough facts to give rise to an inference of the risk" of suicide and that satisfied the subjective component of the deliberate indifference claim. Cooper, 2007 WL 557443 *9. As such, since the Defendant Watchowski was "on notice" that decedent was a suicide risk, "it is appropriate to presume that Watchowski had the requisite knowledge." Thus, Plaintiff does not need to prove the he consciously disregarded the risk of suicide. Id.

Here too, a reasonable jury could readily conclude that LaPolla was aware of enough facts from which he actually drew the inference that Spencer was a high risk for harming himself and that he, both as an officer and as the highest ranking member on duty that night, acted in a deliberately indifferent manner in failing to implement a constant watch.[14]

In sum, under the Colon v. Coughlin supervisory liability theories, a reasonable jury could readily find that LaPolla: (1) directly participated in the constitutional violation by failing to place Spencer on a constant watch after learning that his answers on the suicide screening form caused Vasaturo to change his cell location; (2) failed to remedy a wrong after learning of it -- namely failed to remedy Vasaturo's indifference in placing Spencer on an inadequate level of supervision; (3) was grossly negligent in managing his subordinate, namely Vasaturo, for this very same reason; and (4) was deliberately indifferent by failing to act on information indicating a constitutional violation was in the process of occurring. See Colon, 58 F.3d at 873.

---

[14] These facts are entirely distinguishable from the Brown case relied upon by the County defendants in that in Brown, the decedent was actually placed on a constant watch. Thus, the defendants there took reasonable measures to protect the decedent from harming himself (see County Defendants' Memorandum of Law, p. 14 citing Brown v. Harris, 240 F.3d 383, 390-391 (4th Cir. 2001). Here, unlike in Brown, Spencer was not on a constant watch. Rather, Spencer was placed on a heightened level of supervision that had been very clearly deemed "inadequate" by the Commission of Correction and against minimum standards for supervision of inmates in County jails (Berg Aff. Exs. 1 and 5). Even in New York, had Spencer been placed on a constant watch, the failure to give him a paper gown/suicide smock would not have violated minimum standards as the Commission of Correction has specifically held that paper gowns are not necessary if the inmate is adequately supervised in a one-on-one setting (Berg Aff. Ex. 29).

**E. A reasonable jury could find that AmeriCor was deliberately indifferent**

As with its co-defendants, AmeriCor's motion for summary judgment also relies on material facts that are significantly disputed. For this reason, its motion must also be denied.

**1. AmeriCor's denial of actual knowledge that Spencer's screening form showed he was suicidal is belied by the direct evidence in this record**

First, at the outset it is important to dispel the sole basis for AmeriCor's motion. For rather than admit that the conduct of its nursing staff and its own policies were deliberately indifferent to suicidal inmates in general and Spencer in particular, AmeriCor instead attempts to push off its failure on correction personnel.

To that end, AmeriCor's claim that only the booking officer and correction staff had knowledge of the suicide screening results for all new inmates is completely disingenuous and could not be further from the truth. For here, discovery shows that even though it is the booking officer who physically completes the suicide screening form, AmeriCor staff are aware of the results within two hours of a new inmate's admission into the PCCF. For not only is that form shown to AmeriCor staff within two hours, and the original delivered to the medical department who maintains it in the inmate chart, but AmeriCor staff also sign off on the packet indicating they have reviewed those forms (LaPolla Dep. pp. 29-30; Vasaturo Dep. pp. 90-91; Oliver Dep. p. 45-46; LeFever Dep. p. 153; Clarke Dep. pp. 31-34; Berg Aff. Ex. 10, p. 557; Duffy Dep. pp. 68-69).

This is not only what occurred in practice at the jail but also what AmeriCor's written policies provided (see Berg Aff. Ex. 10, bates stamped p. 557-558; Duffy Dep. pp. 68-69, 73-74). Consistent with this practice, Clarke signed off indicating he reviewed Spencer's intake forms and admitted that he looked at it t make sure it was completed (*see* Berg Aff. Ex. 12, cover page; Clarke Dep. p. 36).[15]

---

[15] Clarke and Waters both claimed that prior to November 2006, although the suicide screening form was part of the medical packet they were required to review and initial in fact they did not as a matter of practice review the suicide

Also contrary to AmeriCor's attempts to deceive the Court, nursing staff had the authority to and in practice have called for the institution of heightened levels of supervision, including a constant watch (LaPolla Dep. pp. 25-26, 28; Duffy Dep. pp. 73-74; Clarke Dep. pp. 25-26). And according to Sheriff Smith, it was a "team" approach in connection with which AmeriCor nurses had an integral role (Smith Dep. p. 79). AmeriCor's written policies also confirm this (see Berg Aff. Ex. 9, bates stamped p. 388 stating that "healthcare personnel are required to notify correctional personnel regarding an inmate's significant health needs that may affect....the inmate's housing assignment" and lists those inmates with significant health needs as those who are "mentally ill or suicidal.").

Thus, to the extent AmeriCor argues that there is no basis for AmeriCor to understand Spencer was a suicide risk, this is clearly a disputed issue of material fact. However, viewing this testimony in the light most favorable to Plaintiffs, a reasonable trier of fact could find that Clarke knew of the results on the suicide screening form and that he was deliberately indifferent in failing to call for a constant watch for Spencer (Berg Aff. Ex. 4). **To that end, AmeriCor cannot back away from its President, Kevin Duffy's, admission in writing to the Commission of Correction that Spencer "did score high enough on the Suicide Prevention Screening Guidelines to warrant follow up services." (Berg Aff. Ex. 17).**

A jury could also find that in addition to Clarke, Nurse Waters was aware of the results of Spencer's suicide screening and she too was deliberately indifferent in failing to implement a constant watch. For she completed a mental health referral sheet indicating that Spencer had a history of substance abuse and family problems (Berg Aff. Ex. 16). And she says she had no conversation with Spencer other than when she told him she thought he was a girl (AmeriCor 56.1

---

screening form (Clarke Dep. pp. 31-34; Waters Dep. p. 16). Contrary to this testimony, Clarke did admit that with respect to Spencer he saw the Suicide Screening form because he "would have just looked and saw that it was – it was done; it was all signed" (Clarke Dep. p. 36). In addition, Waters admitted that correction staff would point out to medical if a score was eight or higher and sometimes she would review the form herself (Waters Dep. pp. 16, 45).

Statement ¶ 34). Thus, although she claims she could not now recall what the source of the information was that she put on the mental health referral form, a reasonable jury could conclude it came from the suicide screening form because: (1) that form contained information on which both problems were clearly noted (Berg Aff. Ex. 4); and (2) AmeriCor policies required a mental health referral to be completed by nursing staff if any of the shaded boxes were answered yes or the total score was eight or higher (Berg Aff. Ex. 10, bates stamped p. 588).

### 2. AmeriCor's written policies, which Duffy acknowledged were actually implemented by AmeriCor staff, were also deliberately indifferent in that they called for fifteen minute watches for suicidal inmates

In addition to the actual knowledge on the part of these AmeriCor registered nurses, who were the only AmeriCor employees in the entire facility on their respective shifts and thus left with the ultimate discretionary decision making authority, written policies were clearly deliberately indifferent and in violation of the State's minimum standards. Those policies specified that: "inmates determined to be at risk as a result of the screening process will be placed on suicide precautions....Monitoring should occur every 15 minutes while the inmate is on suicide precautions (Berg Aff. Ex. 9, bates stamped pp. 448-450; Duffy Dep. pp. 165-166; Smith Dep. pp. 157-158).

It is further evidence of the County and Smith's deliberate indifference that the policy of AmeriCor was consistent with theirs – namely for 15 minute watches for suicidal prisoners. *See* Point III(B), *supra*.

### 3. AmeriCor, like the County and Smith, failed to train staff in the area of suicide prevention

AmeriCor staff were not trained at all in the area of suicide prevention until November 2006 – six months after Spencer committed suicide while in custody at the PCCF (Clarke Dep. pp. 11-13, 19-20, 27-28; Waters Dep. pp. 8, 12-14). AmeriCor is liable for this reason as well. *See* Point IV, *infra*,

### 4. The facts surrounding Spencer's known history of heroin abuse simply amplify AmeriCor's deliberate indifference

Finally, as to AmeriCor's deliberate indifference, the facts surrounding Spencer's known use of heroin and the failure to monitor him for withdrawal symptoms, amplify that deliberate indifference.

For AmeriCor nursing staff, by reason of their training and experience, were also aware that a person withdrawing from drugs or alcohol was at a greater risk for suicide because of the physical and mental pain of withdrawal. "Somebody who's withdrawing from alcohol or drugs, especially if the person is addicted, can be so physically painful and psychologically uncomfortable that suicide may seem like the only relief available at the time" (LeFever Dep. p. 75).

With that principle in mind, together with the Commission's finding that AmeriCor's intake assessment was woefully inadequate as more detailed attention should have been paid to Spencer's known history of drug use and potential for withdrawal, deliberate indifference is apparent.

Even AmeriCor's own written policies and procedures prove that regardless of how Spencer appeared at intake, he should have been closely monitored for the onset of withdrawal symptoms.

Those policies show that while withdrawal symptoms may be mild at first, and not include tremors or vomiting, they usually peak 24 to 72 hours after last use  (Clarke Dep. p. 68; Waters Dep. pp. 55-56; Duffy Dep. p. 153; Berg Aff. Ex. 11, p. 518). Spencer was clearly smack in the middle of that range when he committed suicide. For assuming Clarke's testimony is accurate, and that Spencer used heroin 24 hours prior to his admission into the facility, he was at approximately 37 hours after last use when he committed suicide at 1:49 p.m..

AmeriCor clearly appreciated this fact and the need for monitoring of heroin addicts, as its own written policies provided that: (1) inmates who report a history of heroin use "are to be evaluated for the potential for onset of symptoms of narcotic withdrawal" by the nurse on duty (Berg Aff. as Ex. 11, p. 518-520); and (2) inmates at risk for progression to severe symptoms of

withdrawal will be kept under observation by medical or correctional personnel." (Berg Aff. Ex. 9, p. 454). However, here too, AmeriCor was following in the footsteps of the County and the Sheriff. For although they claimed to have policies and procedures which on paper appeared to be aimed at protecting inmates from pain and death, in practice those policies were never communicated to staff and staff did not follow them (Clarke Dep. pp. 68-69, 73-74; Waters Dep. p. 54).

Consistent with the practices in the jail, whereby inmates who were withdrawing were not given any care unless they first requested it, Nurse Waters then acted in a deliberately indifferent manner when she saw Spencer moments after his visit with his parents but failed to implement a constant watch. A jury could readily credit the testimony of Donny and Hara Sinkov that just moments earlier Spencer looked awful, appeared sick, appeared clammy, and was very pale – all indications that his symptoms of withdrawal were intensifying.[16]

Clearly, on this record, AmeriCor's argument for judgment in its favor which is based on a flawed version of facts that there was "no evidence the decedent was actively withdrawing from heroin nor that he was suicidal" is belied by the facts adduced during discovery.[17] AmeriCor's motion must therefore be denied.

## F. A reasonable jury could find the County of Putnam liable

To the extent the County claims it cannot be held liable because there were no policies, customs or practices in the County which violated Spencer's rights, this is belied by the evidence adduced during discovery.

---

[16] In a factually similar case not only was a jury's verdict upheld which found the medical company deliberately indifferent by reason of, *inter alia*, the lack of training and the failure of nurses to review screening intake forms, but an award of $1.5 million in punitive damages was also upheld. *See* Woodward v. Correctional Medical Services of Illinois, Inc., 368 F.3d 917 (7th Cir. 2004),

[17] AmeriCor incorrectly argues that Plaintiffs have to show proximate cause. In fact, in cases where it is clear that the inmate is suicidal (such as here by reason of the suicide screening form), there is no requirement to provide proximate cause since "even a layperson would easily recognize the necessity" of taking preventative action. *See* Cooper, 2007 WL 557443, 12 (citations omitted). Nonetheless, proximate cause is ultimately a jury question. Id.

First, a jury could credit the uniform testimony of LaPolla, Vasaturo, Oliver and Wendover that the custom and practice in the PCCF at the time Spencer committed suicide was to place suicidal inmates on patently inadequate 15 minute watch (LaPolla Dep. pp. 39-41; Vasaturo Dep. p. 59, 109-112; Berg Aff. Ex. 5). After all, that is precisely what was done with respect to Spencer.

The County of Putnam can therefore be liable for the unconstitutional practice in place in the PCCF which did not provide for constant watch for suicidal inmates. For it is well established that when a custom and practice is so pervasive it implies that the municipality approved it. *See* Sheriff's Silver Star Association of Oswego County, Inv. v. County of Oswego, 56 F.Supp.2d 263 (N.D.N.Y. 1999), *citing* City of St. Louis v. Praprotnik, 485 U.S. 112, 130 (1988); Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985) and Monell, 436 U.S. at 690.

Contrary to Defendants' version of events, this case presents much more than a one time unconstitutional act which led to Spencer's death. And in any event Defendants do not get a "one free suicide pass. The Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence' of the municipality's failure to act." Woodward v. Correctional Medical Services of Illinois, Inc., 368 F.3d 917, 929 (7th Cir. 2004), *citing* Bd. Of Cty. Comm'rs of Bryan Ctys, 520 U.S. at 409. Here it certainly was.

As in Woodward, the evidence shows a pervasive, continual, long-time practice of failing to comply with the State's minimum standards, failing to protect suicidal inmates from harming themselves, and failing to provide the care required by the Fourteenth Amendment. There is a direct link between this practice and Spencer's suicide. Id.

In addition, even if the jury found that a written policy was in place providing for constant watch, when employees consistently follows an unconstitutional practice, as Vasaturo and LaPolla did here when (according to them) they did not place Spencer on a constant watch because that was

not the policy in the PCCF, their actions "may be considered the act of the municipality itself." *See* Amnesty America v. Town of West Hartford, 361 F.3d 113, 125 (2nd Cir. 2004), *citing* Monell, 436 U.S. at 691-692 and Pembauer v. City of Cincinnati, 475 U.S. 469, 479-80 (1986); *see also* Woodward, 368 F.3d at 929 ("ignoring a policy is the same as having no policy in place in the first place.").

This of course includes a scenario where the municipality has a policy that it then causes employees to apply unconstitutionally. That unconstitutional application binds the municipality. Id. Thus, if the jury were to believe Smith's testimony that a policy requiring constant watch was in place but also finds that by reason of the County modifying its suicide screening form and failing to have any written procedure requiring constant watch, and failing to adequately train, its employees were caused to apply a suicide precaution policy in an unconstitutional manner, the County is liable.

Furthermore, the unidentified but high ranking employee who modified the State's suicide screening form under the prior administration clearly is a policy maker whose actions bind the County. Id., *citing* McMillan v. Monroe County, 520 U.S. 781 (1997); Praprotnik, 485 U.S. at 129-30; and Pembauer, 475 U.S. at 480-83. For LeFever testified that it was someone of a higher rank than him who made the deliberate choice to remove the mandatory language from the form (LeFever Dep. pp.65-68).

Going one step further, the record evidence, particularly when viewed in the light most favorable to Plaintiffs, shows that County policymakers, including Smith, knew of the excessive risk to inmate safety posed by the lack of any clear policies, training, and directives pertaining to the suicide screening forms and the State's mandate to institute a constant watch for these identified suicidal inmates. Yet, by failing to implement adequate policies, the State screening form, and training on constant watches, these policymakers were deliberately indifferent. Their failures bind the County under §1983. For it cannot be disputed that at a very minimum, the County is liable for

41

the acts or omissions of the Sheriff. *See* Weber v. Dell, 804 F.2d 796 (2nd Cir. 1986); Jeffes v.

Barnes, 208 F.3d 49 (2nd Cir. 2000).[18]

Finally, the County can be held liable for the actions and omissions of AmeriCor who: (1)

was deliberately indifferent when Clarke and Waters failed to put Spencer on a constant watch; (2)

failed to have any policy in place requiring constant watch for suicidal inmates, instead explicitly

violating New York minimum standards by imposing only a 15 minute watch; (3) was deliberately

to Spencer's withdrawal from heroin and the effect that may have had on his suicidal intent; and (4)

failed to train its staff in the area of suicide prevention until after Spencer committed suicide (*see*

Point III(E), *supra* and Point IV, *infra*). That is because the County has a non-delegable duty that is

not removed by contracting with a third party to provide medical care. *See* Gil v. Vogilano, 131

F.Supp.2d 486, 493 (S.D.N.Y. 2001), *citing* Covington v. Westchester County Jail, 1998 WL 26190

at *3 (S.D.N.Y. Jan. 26, 1998) (*citing* Ancata v. Prison Health Servs., Inc. 769 F.2d 700, 705 (11th

Cir. 1985).

## G. Defendants' motions for summary judgment, particularly in light of the sharply disputed facts, must be denied

These facts, when viewed in the light most favorable to the non-moving Plaintiffs, are

patently sufficient to amount to deliberate indifference on the part of the Defendants. As a result,

Defendants' motions for summary judgment must be denied.

This is particularly true in light of Defendants' arguments which are based on their asserted

"beliefs" that Spencer was not suicidal or that policies existed which complied with the minimum

standards. Simply stated:

> "The state of the defendant's knowledge is normally a question of fact to be determined after
> a trial." *citing* "Liscio v. Warren, 901 F.2d at 276-77 (reversing grant of summary
> judgment); Archer v. Dutcher, 733 F.2d 14, 17 (2nd Cir. 1984) (reversing grant of summary
> judgment where, though the inmate-plaintiff eventually received medical attention, there
> was a question as to whether prison officials' five-hour delay in securing that attention

---

[18] Thus, if Smith is found liable, the County can also be liable for his acts and omissions.

constituted deliberate indifference to the plaintiff's needs and suffering); *see also* <u>Farmer v.</u> <u>Brennan</u>, 511 U.S. at ---, ('Whether a prison official had the requisite knowledge of a substantial risk i[s] a question of fact subject to demonstration in the usual ways....')." <u>Weyant</u>, 101 F.3d at 856-857.

**POINT IV**

**DEFENDANTS COUNTY, SMITH AND AMERICOR ARE ALSO LIABLE FOR FAILING TO ADEQUATELY TRAIN STAFF IN THE AREA OF SUICIDE PREVENTION**

The testimony of both PCCF staff and AmeriCor staff is uniform – they were not trained prior to Spencer's suicide on May 20, 2006 that constant watch was required when an individual scored eight or higher or had shaded box(es) checked on the suicide screening form. Under these circumstances, the County, Sheriff, and AmeriCor are liable on a failure to train theory. *See* <u>City of</u> <u>Canton v. Harris</u>, 489 U.S. 378 (1989).

In connection with a failure to train claim, the Court should look at whether the training provided was adequate for the particular employee's duties. In addition, the deficiency in the training must be closely related to the injury that resulted. <u>Id</u>.

Here, there can be no dispute that the failure to adequately train staff in the area of suicide prevention is closely related to the injury that resulted – namely the suicide by Spencer Sinkov. Thus, Plaintiffs have clearly met that prong of the failure to train claim.

**A. The liability of Sheriff Smith and the County of Putnam for failing to adequately train staff**

With respect to the correction personnel, a reasonable jury could readily find that the training provided to employees was not adequate for those employees whose duties it was to administer and review suicide screening prevention forms, tally the scores on the form and number of shaded boxes, and implement levels of supervision based on the results of that suicide screening in a way that complied with New York State's minimum standards.

More specifically, a jury could find credible the testimony of Defendants LaPolla and Vasaturo, especially since it was confirmed by non-defendants Wendover and Oliver, that the

43

training provided to Corrections Officers by the PCCF did not instruct officers to place an inmate on constant watch if they scored eight or higher or if a shaded box was checked on the Suicide Screening form (Wendover Dep. pp. 14, 15; LaPolla Dep. pp. 85, 86; Vasaturo Dep. pp. 76, 174, 191, 192; Oliver Dep. p. 43). Similarly, they were not instructed or trained that New York State Commission of Corrections required constant watch if an inmate scores eight or higher or has a shaded box checked (Vasaturo Dep. pp. 78-80, 191, 192). In addition, PCCF did not train its staff that when a score of eight or higher was obtained or a shaded box was checked the person was considered to be suicidal (Vasaturo Dep. p. 110).

It cannot be disputed that Sheriff Smith had the ultimate responsibility for training staff employed in the PCCF. In fact, he had a non-delegable duty to safeguard prisoners in the PCCF and to ensure that staff were adequately trained in how to carry out that important function. *See e.g.*, Pagan, 2001 WL 32785 *1 ("The Sheriff is mandated by state law to have custody of the Jail and is responsible for the care, custody and control of inmates who are lawfully committed to his custody."). "Moreover, delegation of a statutory duty to lawfully appointed deputies does not allow a sheriff to absolve himself of responsibility for their actions." Id., *citing* Wilson v. Sponable, 81 A.D.2d 1, 5, 439 N.Y.S.2d 549, 551 (N.Y.App.Div. 1981).

. The County is clearly liable for the acts of the Sheriff (*see* Weber v. Dell, 804 F.2d 796 (2nd Cir. 1986) -- here in failing to adequately train staff as he is a policy maker with final decision making authority over this area. For it is well settled that "[w]here an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy." Clue v. Johnson, 179 F.3d 57, 62 (2nd Cir. 1999) *citing* Rookard v. Health & Hosps. Corp, 710 F.2d 41, 45 (2nd Cir. 1983). Even a "single act of a municipal officer is sufficient to establish municipal liability if that individual officer is possess of 'final policy-making authority with respect to the area in which the action is taken.'" Rucci v. Thoubboron, 68 F.Supp.2d 311, 325

(S.D.N.Y. 1999), *citing* McMilian v. Monroe Cty., 520 U.S. 781, 785 (1997); *see also* Mandell v. County of Suffolk, 316 F.3d 368, 385 (2nd Cir. 2003) (same).[19]

In addition, even if a jury was to find that, according to Smith's testimony that he delegated the training function to Captain LeFever (Smith Dep. pp. 36-38), under those circumstances LeFever had the ultimate responsibility and the County would still be bound by the failure to train subordinates since LeFever's acts in those circumstances are those of a policy maker. Id.

## B. AmeriCor, Inc. is liable for failing to train its staff

With respect to AmeriCor, nursing staff did not receive any training at all in the area of suicide prevention prior to Spencer's death. In fact, prior to November 2006, AmeriCor staff did not receive anything written or verbal by way of instruction, direction, or training on what to do if an inmate scored eight or higher on the suicide screening form or had a shaded box checked (Clarke Dep. pp. 11-13, 19-20, 27-28; Waters Dep. pp. 8, 12-14).[20]

Based on these facts, particularly when viewed in the light most favorable to the non-movants, Defendants Smith, the County, and AmeriCor are liable for failing to adequately train their staff in the area of suicide prevention.

**POINT V**

**THE INDIVDIUAL DEFENDANTS ARE NOT
ENTITLED TO QUALIFIED IMMUNITY**

Defendants Smith, LaPolla and Vasaturo move for qualified immunity. For the reasons set forth herein, their motions must be denied.

---

[19] The County would be liable for failing to train its employees even if a jury were to find that, as per Smith's testimony, a policy was in place requiring constant watch for suicidal inmates. *See* Amnesty America, 361 F.3d at 125-126 (even if municipality has a constitutional policy if employees are caused to apply it in an unconstitutional manner because they are inadequately trained, the municipality is liable).

[20] Nurse Waters stopped CPR twenty-five minutes before the paramedics arrived and without first contacting the hospital or doctor (Berg Aff. Exs. 20 and 21). This was contrary to policy and protocol -which required contact with the hospital or doctor prior to stopping CPR (Wendover Dep. pp. 72-73; LeFever Dep. p. 136; Berg Aff. Ex. 2, p. 4, ¶17). However, Waters claims she did not know of any policies or procedures with respect to when CPR could be stopped (Waters Dep. pp. 91-92). This is yet another example of the failure to train AmeriCor staff.

## A. Defendants waived the ability to move for qualified immunity prior to trial by failing to abide by this Court's Order

The individual defendants have waived the right to move for qualified immunity prior to

trial since they did not abide by this Court's Order that any such motion be made prior to discovery

at the outset of the case (*see* Berg Aff. Ex. 33, ¶3(d) "Failure to comply with this provision of this

Order shall operate as a waiver of the opportunity to resolve the issue of qualified immunity by

motion prior to trial.").

Defendants' pleas to have this Court ignore this Order should not be countenanced. It is

plain and simple: Defendants ignored the Court's very clear direction in a Civil Case Discovery

Plan at a time when they were represented by competent counsel who were well aware of the rules

for motions for qualified immunity by reason of their repeated appearances in front of this Court in

numerous other cases where qualified immunity defenses have been asserted.

In addition, as to their pitch that Plaintiffs' depositions would not have been useful, they still

could have moved on the facts asserted in the pleading – which of course is "plaintiffs' version" of

the events leading to Spencer's death.  It was after all the Plaintiffs who knew of enough facts to

include in the Complaint.

Finally, had Defendants truly believed that a motion for qualified immunity at the outset was

premature or needed to await some limited discovery, then they should have done what counsel has

done in other cases before this Court – namely request permission from the Court to proceed with

discovery and reserve the right to move on qualified immunity once ample evidence was adduced.

## B. Defendants' motion for qualified immunity should be denied on the merits

Should the Court consider the merits of Smith, LaPolla and Vasaturo's motions for qualified

immunity, those motions should be denied.

First, no one seriously disputes that Plaintiff's rights were clearly established back in 2006

when Spencer committed suicide while in the custody and care of the PCCF. *See* County's

Memorandum of Law, p. 10 "'It is well settled that an arrestee has the right to care and protection, including protection from suicide.' *citing* Hudson v. Palmer, 468 U.S. 517, 526-27 (1984); Cook ex. rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir. 2005) ('[P]retrial detainees like [plaintiff] have a Fourteenth Amendment due process right "to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide")(*quoting* Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994)."; *see also* Weyant, 101 F.3d at 858 (holding the due process rights of an unconvicted inmate are clearly established).

And no one disputes that the State Commission of Correction, under the authority of State Correction Law, has promulgated minimum standards for County jails which standards required constant watch for inmates who scored eight or higher or had a shaded box checked on the suicide screening form (see Plaintiffs' 56.1 Statement ¶¶1-11).  To the extent Defendants somehow claim that this right to have adequate protection from harming oneself was not clearly established – that claim is completely bogus.

Second, as for whether defendants' actions or inactions were reasonable, the answer "depends on whether one believes their version of the facts." Weyant, 101 F.3d at 857. Since the facts are "sharply disputed" the issue of "qualified immunity therefore cannot be resolved as a matter of law." Id.

Third, when these facts are viewed in the light most favorable to the non-moving Plaintiffs, it becomes patently clear that no reasonable official in Defendants' shoes would have thought their conduct was objectively reasonable.

1. Defendant Smith

As discussed fully *supra* at Point III(B), the Court cannot credit as a matter of law Defendant Smith's self-serving beliefs that everything in the PCCF was in compliance with the

State's minimum standards. Simply stated, that was the furthest thing from the truth. For the evidence adduced shows that, contrary to his testimony: there were no policies or procedures mandating constant watch for suicidal inmates, particularly those identified on the screening form as being suicidal; the training provided to staff was grossly inadequate as it too did not instruct staff that those who scored eight or higher or had shaded boxes were at high risk of harming themselves and thus were to be placed on a constant watch; and the form the PCCF used, although modified prior to Smith's tenure, was reviewed by Smith when he took office and clearly deviated from the State's minimum standards.

     As the Sheriff, he was responsible for ensuring that policies were in place which reasonably protected inmates from harming themselves – particularly when inmates at a high risk were screened at intake and the objective screening tool showed they were a high risk.

     In addition, Smith was on notice prior to Spencer's death that the NHU post was spread to thin to adequately cover his/her duties by reason of the Commission's report on the death of Norberto Rivera. Yet, as of May 20, 2006, no changes had been made to ensure that the NHU officer – which is where heightened supervision inmates are routinely assigned – was able to cover his duties in a manner that would ensure the safety and well being of the inmates in that unit.

     These facts, coupled with the Defendants' attempts to slip a backdated policy into the procedure books, are clearly not those of an objectively reasonable official – especially when that official knows of that his subordinate pulled this act of deceit days before the Commission was coming to the PCCF to investigate and did absolutely nothing to counsel or discipline that subordinate for his outrageous conduct. This failure to discipline applies equally to his refusal to take any action against Vasaturo and LaPolla.[21]

----

[21] Again, although a stipulation was entered extending time to prefer charges, to date there is no evidence anything whatsoever was done and the time to prefer those charges expired on or about May 20, 2008.

In fact it was not until the Sinkov family filed a Notice of Claim, and then instituted this lawsuit, that: (1) Smith changed the policy to now require sergeants to sign off on all suicide screening forms; (2) Smith ordered the State suicide screening form be used instead of the modified PCCF form; (3) LaPolla and Vasaturo was first apprised of any possibility of disciplinary action; (4) Americor nursing staff were trained by corrections personnel in the area of suicide prevention; and (5) the Undersheriff and Sheriff are notified of inmates whose scores are eight or higher or shaded boxes are checked.[22]

A jury could find based upon these facts and the others fully analyzed in Point III(B), that Smith was deliberately indifferent. Under those circumstances, Smith's actions and omissions were therefore far from being objectively reasonable.[23]

## 2. Defendants Vasaturo and LaPolla

Similarly, Vasaturo and LaPolla's arguments for qualified immunity are based upon a sharply contested record. As fully analyzed in Points III(C) and (D), their denials of knowledge that Spencer was at risk of committing suicide are not credible. A jury could find their self-serving beliefs inaccurate in the face of the scores on the suicide screening form and comments contained

---

[22] All of these facts readily distinguish this case from Gaston which is relied upon by Smith in his motion. For in Gaston, there was only one suicide in the Sheriff's eight year tenure, the inmate was in the facility for six weeks before he committed suicide, and there was no objective measurement tool as in Spencer's case showing that the inmate was suicidal. See Gaston v. Ploeger, 2007 WL 1087281 (10th Cir. 2007). Here, Spencer was in the facility for a mere 13 hours and the State's minimum standards were not complied with from the outset – including the form that was used to screen Spencer, the lack of any policies in place mandating a constant watch, and the practices in the jail of implementing only 15 minute supervisory checks for elevated scores on the screening forms. In addition, under Smith's less than eight year tenure, there has been more than one suicide.

[23] Of course, qualified immunity does not apply to the claim against Smith in his official capacity. To the extent Smith argues that the official capacity claim is duplicative of that against the County that is not entirely accurate. For the County can be liable on several theories – as discussed in Point III, supra, including custom and practice, being liable for the acts of its policymakers, and for failing to train staff to implement constant watches. The County and Smith are represented by separate counsel and could very well claim opposing facts would relieve them of liability. As such, the Court should not dismiss the claims against Smith in his official capacity as duplicative of the claims against the County. This equally applies to the state law negligence claims.

on that form. As such, it was not objectively reasonable for them to put Spencer on watch already determined to be inadequate.[24]

The Court of course cannot credit these Defendants' version of events and therefore cannot grant them qualified immunity. *See, e.g.,* Cooper, 2007 WL 557443 *9 (where evidence exists from which jury could find Defendants denials of actual knowledge of decedent's suicidal tendencies are not believable qualified immunity was denied since Defendant had fair warning that his actions [or inactions] were unconstitutional).

## POINT VI

## SMITH IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE NEGLIGENCE CLAIM EITHER

In a half hearted argument, Defendant Smith also argues that he is entitled to judgment dismissing the negligence claims against him because as the Sheriff he cannot be held vicariously or personally liable for the acts or omissions of his subordinates (*see* Smith Memorandum of Law, p. 15).

The Pagan case, cited *supra*, clearly shows that Smith is not entitled to summary judgment on the negligence claim either. Pagan v. County of Orange, 2001 WL 32785 (S.D.N.Y. 2001).[25]

First, as noted in Pagan, the Sheriff's liability on the negligence claim is premised on the same contentions as the federal claims. Id. at *4.

_____

[24] The same holds true for all defendants' arguments that Spencer appeared "okay." Those arguments lack credibility, and are contested in any event. For even at intake, Spencer was clearly not okay in that he was 6'1" and only 135 pounds (Berg Aff. Ex. 12). According to his parents when they visited him at 11:00 a.m., Spencer looked awful, was clammy, had dark circles under his eyes, and was very pale (D. Sinkov Dep. p. 69; H. Sinkov Dep. p. 20). In addition, the claim that Spencer was eating and appeared to be resting are contested in that Oliver himself testified he did not know what if anything Spencer ate and the photographs show his breakfast was still in his cell, uneaten, after he committed suicide (Oliver Dep. pp 87-88, 100; Berg Aff. Ex. 27) From these facts, together with the very objective results of the suicide screening form (Berg Aff. Ex. 4), a reasonable jury could discount defendants' contentions that Spencer appeared "okay" and did not appear to be suicidal.

[25] It is particularly telling that Defendants cite to numerous out of circuit cases with respect to deliberate indifference and suicidal inmates, but they completely ignore the precedent set by Pagan in the Southern District of New York which would deny them summary judgment.

Case 7:07-cv-02866-CS-GAY    Document 31    Filed 05/28/2008    Page 58 of 60

"Because Section 500-c of the Corrections Law makes the sheriff ultimately responsible for an inmate's safekeeping, the sheriff can be liable for negligence" for failing to, in this case, protect inmates from themselves in cases of suicide. Pagan, 2001 WL 32785, *4, citing Kemp v. Waldron, 125 Misc.2d 197, 479 N.Y.S.2d 440 (N.Y.Sup.Ct. 1984).

"Moreover, delegation of a statutory duty to lawfully appointed deputies does not allow a sheriff to absolve himself of responsibility for their actions." Id., citing Wilson v. Sponable, 81 A.D.2d 1, 5, 439 N.Y.S.2d 549, 551 (N.Y.App.Div. 1981).

In sum, for the same reasons stated in Point III, IV and V, supra, a reasonable jury could find that Spencer's death was foreseeable under circumstances where: he was suicidal while in the custody of the PCCF, as proven by the result of the suicide screening form; and there was no policy, practice, or training (much less any clear directive on the screening form) that required the implementation of a constant watch to protect him from harming himself.

Here again, the Court cannot determine the issues of material fact pertaining to Smith's liability. Smith's motion for summary judgment on the negligence claim must be denied [b]ecause '[t]he very question of whether defendant's conduct amounts to negligence is inherently a question for the fact-trier....'". Pagan, 2001 WL 32785 at *5, citing Wilson v. Sponable, 81 A.D.2d 1, 5, 439 N.Y.S.2d 549, 552 (N.Y. App. Div. 1981).[26]

## POINT VII

### IN THE EVENT THE COURT DISMISSES THE FEDERAL CLAIMS, THE COURT SHOULD CONTINUE TO EXERCISE JURISDICTION OVER THE REMAINING STATE LAW CLAIMS WHICH ARE NOT A SUBJECT OF THE INSTANT MOTION

Defendants also argue that if the federal claim is dismissed, the Court should decline to exercise supplemental jurisdiction over the state law claims.

---

[26] Vasaturo, LaPolla, the County of Putnam, and AmeriCor, Inc., did not move for summary judgment on the negligence claims asserted against them.

However, here if the Court dismissed the federal claims and declined to exercise jurisdiction over the supplemental state law claims, Plaintiffs could refile those state law claims as against AmeriCor, Inc. in federal court on the ground of diversity jurisdiction. AmeriCor is a Delaware corporation with its principle place of business in Delaware (Duffy Dep. pp. 7, 8). As against AmeriCor there would be complete diversity as Plaintiffs reside in New York. Finally, the amount in controversy, where the loss of life exists, is clearly well above the threshold $75,000.

Under these circumstances, the claims against AmeriCor would be tried in federal court (under the jurisdiction of which discovery has been completed) but the claims against the remaining defendants would be tried in state court in a separate action. However, the same witnesses would be called in both actions to counter each other's attempts to place blame on the other defendant. The duplication of resources, witness time, and expense mandates against dismissing these state law claims for lack of jurisdiction.

Going one step further, once Plaintiffs refile against AmeriCor in federal court on diversity grounds, under the circumstances present here where AmeriCor is clearly blaming the County defendants for what occurred, AmeriCor may even feel it was necessary to bring the County defendants into the diversity action on a third party claim.

And since the facts surrounding the case and controversy against AmeriCor are the same nucleus of facts surrounding the claims against the County Defendants, the documents to be used in both cases are the same, the witnesses are the same, and the basic theories of recovery are the same, the Court should exercise its discretion to retain jurisdiction over the state law claims.

In fact, the only possible thing Defendants could gain by a dismissal for lack of supplemental jurisdiction is delay. For they too would incur additional costs if the matter had to be tried in two separate Courts and their witnesses had to appear twice.

As such, the Court should continue to exercise jurisdiction over the state law claims even if the federal law claims are dismissed.

## CONCLUSION

Defendants' partial motions for summary judgment seeking dismissal of Plaintiffs' federal law claims should be denied in all respects. Smith's additional argument for dismissal of the negligence claim against him should be denied.

Dated: White Plains, New York
      May 28, 2008

                              LOVETT & GOULD LLP
                              By:
                              Kim Berg (KB 425)
                              Attorneys for Plaintiffs
                              222 Bloomingdale Road
                              White Plains, New York 10605
                              Telephone: 914-428-8401
                              Facsimile:  914-428-8916