**EXHIBIT 1**

PLAINTIFF'S
EXHIBIT NO.
FOR IDENTIFICATION
1-30.08
DATE:        RPTR: DB



# CHAIRMAN'S MEMORANDUM
# NO. 17-99   NOVEMBER 1, 1999

**TO:**   SHERIFFS,   JAIL   ADMINISTRATORS,   POLICE   CHIEFS,   COMMISSIONERS OF CORRECTION,   TRAINING   COORDINATORS,   DIRECTORS   OF   COMMUNITY SERVICES, FACILITY MEDICAL DIRECTORS, FACILITY MENTAL HEALTH PROGRAM DIRECTORS

**RE:**   MINIMUM STANDARDS PART 7003: ADDITIONAL SUPERVISION REQUIREMENTS

During the period 1990-1995, the Commission amended the Minimum Standards for county facilities, Part 7003, Security and Supervision, to provide for more flexibility in inmate supervision in direct supervision settings. The Commission also amended the regulation as it pertains to those inmates whose condition, illness or injury warrants additional or enhanced supervision. Investigations of several recent inmate deaths by the Commission's Medical Review Board found facility compliance with one or more provisions of Minimum Standards section 7003.3 (h-k) to be problematic. The Commission believes it is important to highlight the interpretation of substantive compliance with this regulation, as these compliance problems are directly implicated in the very outcomes that Part 7003 was amended to help prevent.

**Determination of the Need For Additional Supervision (section 7003.3(h):**

This subsection requires the facility administrator or designee and/or the facility physician to make a determination as to whether an inmate's condition, illness, or injury warrants additional supervision. This means that **either** or **both** the jail administrator/designee and/or jail physician can make such a determination, and that such a determination must be made when an inmate's condition, state of health, or bodily integrity is other than normal. There is an **affirmative duty** to do so. The same subsection requires the chief administrative officer to order the additional supervision if it is determined to be warranted. Neither duty may be waived.

**Types of Additional Supervision**

The types of additional supervision set forth in subdivision 1-3 of section 7003.3(h) include:

!        more frequent supervisory visits;

!        active supervision when only general supervision is required;

!        constant supervision.

---

**New York State Commission of Corretion**
**4 Tower Place**
**Albany, New York 12203-3702**
**(518) 485-2346**

**Alan J. Croce, Chairman/Commissioner**

**Patricia R. Tappan, Commissioner**
**Frederick C. Lamy, Commissioner**

"More frequent" supervisory visits pertains to the interval between supervisory visits. The Medical Review Board investigated several inmate suicides in 1998-99 in which a determination for additional supervision was made pursuant to section 7003.3(h). In these cases the supervisory visit interval was shortened from 30 minutes to 15 minutes for inmates on suicide prevention precautions. This was plainly inadequate and as such a violation of section 7003.3(h), because the selection of the type of additional supervision was inadequate and inappropriate.

### A SUPERVISORY INTERVAL OF 15 MINUTES IS NOT ADEQUATE AS A SUICIDE PREVENTION PRECAUTION.

It is a well established fact that inmates can hang themselves with fatal results in <u>less than five minutes</u>. Therefore, if the objective is to prevent suicide, **ONLY CONSTANT OBSERVATION IS EFFECTIVE.** The definition of constant supervision is found in section 7002.2(d). The required elements include *uninterrupted personal visual observation* from a post that affords *a continuous clear view* of those under constant supervision, and sufficient proximity to afford the ability to *immediately and directly intervene* in any situation that threatens health or safety. In some settings, this requires the assignment of a correction officer to each inmate under constant supervision (commonly referred to as *one-on-one supervision)*. In others, the physical plant configuration may allow more than one inmate to be constantly supervised by a single officer. Video surveillance is not sufficient to satisfy these requirements. There are conditions, illnesses and injuries for which a supervisory interval reduced to 15 minutes is entirely adequate and appropriate, but suicide attempt is not one of them.

<u>Documentation of Additional Supervision:</u>

Section 7003.3(i) requires orders for additional supervision to be recorded. Section 7003.3(j)(5) requires that a record be made of:

!    the reason(s) for such order (i);

!    the date(s) and time(s) during which such orders are to be in effect (ii);

!    the name of the staff member issuing the order(s) (iii);

!    the dates and the time that the additional supervision was performed (iv);

!    the name of the staff member conducting the supervision (v);

!    periodic observations of condition or behavior (vi).

New York State Commission of Corretion          Alan J. Croce, Chairman/Commissioner
4 Tower Place
Albany, New York 12203-3702                      Patricia R. Tappan, Commissioner
(518) 485-2346                                   Frederick C. Lamy, Commissioner

In addition to the documentation of the *process* of ordering additional supervision of inmates whose condition, illness or injury warrants it, section 7003.3(j)(6) requires documentation of *significant events and activities* occurring during additional supervision. Those events and activities which may have a bearing on the reason additional supervision was originally ordered are deemed *significant*. Events and activities include both speech and behaviors. For example, an inmate who is exhibiting tearfulness, refusal to communicate, or intractable insomnia is experiencing significant events or activities, particularly if the inmate is under additional supervision for mental health problems. Of necessity therefore, compliance with the provisions for additional supervision requires some level of periodic interaction between the subject inmate and staff assigned to perform the additional supervision.

Requirements for additional supervision of inmates whose condition, illness or injury warrants it were promulgated with the understanding that "direct supervision" settings provide for more flexibility in supervising inmates who are **not** deemed to need special attention. The Commission has recognized the need for this flexibility by, for example, lengthening the minimum intervals for supervisory visits under active supervision to 30 minutes. It becomes all the more important, however, to then identify inmates who need additional supervision, to exercise enhanced vigilance where they are concerned and to keep good records of the supervision provided.

Questions and comments may be directed to Donald Nadler, Deputy Director of Operations or to the Field Supervisor in charge of the Unit serving your facility.

Alan J. Croce, Chairman/Commissioner

New York State Commission of Correction
4 Tower Place
Albany, New York 12203-3702
(518) 485-2346

Alan J. Croce, Chairman/Commissioner

Patricia R. Tappan, Commissioner
Frederick C. Lamy, Commissioner

Page 4

**EXHIBIT 2**



STATE OF NEW YORK ● EXECUTIVE DEPARTMENT
## STATE COMMISSION OF CORRECTION

80 WOLF ROAD, 4TH FLOOR
ALBANY, NEW YORK 12205-2670
(518) 485-2346
FAX (518) 485-2467

CHAIRMAN
Daniel L. Stewart

COMMISSIONERS
Frederick C. Lamy
Frances T. Sullivan

November 21, 2005

Sheriff Donald B. Smith
Putnam County Office of Sheriff
3 County Center
Carmel, New York 10512

RE:  Minimum Standard Evaluation

Dear Sheriff Smith:

Pursuant to Article 3, Section 45, of the New York State Corrections Law, the New York State Commission of Correction conducted an evaluation of the Putnam County Jail. The evaluation was conducted the week of November 1st, 2005. Attached you will find the results of the Commission staff findings along with recommendations and required actions.

The evaluation was conducted by Commission staff member Keith Zobel. All findings, recommendations and required actions were discussed in depth with you, Captain LeFever and Lieutenant O'Malley at the conclusion of the review.

The Commission would like to thank your staff for their cooperation in expediting the facility audit. Please take the necessary steps to ensure that the Minimum Standard violations are satisfactorily addressed.

The enclosed facility evaluation is considered preliminary. Please acknowledge receipt of this report to the Commission, and submit the action you plan to take to address any deficiencies outlined in the report by December 28, 2005. Once comments are reviewed (or if none are received by December 28, 2005) this report will be deemed finalized and subject to FOIL.

Sincerely

Alan J. Croce
Chairman/Commissioner

cc: Captain Robert LeFever, Putnam County Jail
ATTACHMENT

*An Equal Opportunity/Affirmative Action Employer*

# NEW YORK STATE COMMISSION OF CORRECTION

## Albany, New York



# LOCAL CORRECTIONAL FACILITY EVALUATION
## FOR THE
## PUTNAM COUNTY JAIL
### CARMEL, NEW YORK

## NOVEMBER 1-3, 2005

### ALAN J. CROCE
*Chairman/Commissioner*

### FREDERICK C. LAMY
*Commissioner*

### FRANCES T. SULLIVAN
*Commissioner*

# MINIMUM STANDARDS REVIEW

PARTS: Part 7002, Admissions; Part 7003, Security and Supervision; Part 7004, Correspondence; Part 7007, Good Behavior Allowances against Definite Sentences and Certain Civil Commitments; Part 7009, Food Service; Part 7013, Classification; Part 7015, Sanitation; Part 7022, Reportable Incidents; Part 7024, Religion; Part 7025, Packages; Part 7031, Legal Services; Part 7039, Fire Prevention; Part 7040, Maximum Facility Capacity; and Part 7051, Funeral and Deathbed Visits.

The evaluation disclosed that the facility was in compliance with such Standards, the exception being the following:

**Part 7003, Security and Supervision**

**Section 7003.3 (j)(5)(vi) Supervision of prisoners in facility housing areas.** Commission staff discovered periodic staff observations of a prisoner's condition or behavior were not being documented when a prisoner was placed on additional supervision. The required documentation is currently being maintained when a prisoner is placed on constant supervision. However, such documentation is not maintained when inmates are placed on other types of additional supervision (e.g., 15 minute watches) by the Chief Administrative Officer.

### Action Required

When the Chief Administrative Officer or Facility Physician order additional supervision of a prisoner based on the prisoner's condition, illness, or injury that requires more frequent supervisory visits or active supervision when only general supervision is required, the facility shall ensure that periodic staff observations of the prisoner's condition or behavior are documented.

### Recommendation

Attached is a copy of Chairman's Memorandum No. 17-99. The facility should review the attached memorandum for clarification with regards to providing additional supervision.

**Section 7003.10 Locks and Other Securing Devices.** Commission staff discovered that the facility's weekly inspection records do not substantiate that the security inspection encompassed the entire facility.

### Action Required

The facility shall develop a written document to ensure that the inspection records sufficiently detail the results of the weekly locks and other securing devices inspection.

**Part 7013, Classification**

**Section 7103.11 Staff Training.** Commission staff discovered that not all staff who are involved in the classification process have been trained in a Commission approved classification training.

**Action Required**

> **All staff who are assigned to complete an initial screening and risk assessment, assignment to facility housing areas, or a classification review must complete training that is approved by the Commission pursuant to Part 7013.11 (c).**

**Part 7039, Fire Prevention and Safety**

**Section 7039.5 Fire prevention and safety practices and training.** Commission staff discovered that the facility's weekly inspection records do not substantiate that an inspection encompassed the entire facility.

**Action Required**

> **The facility shall develop a written document to ensure that inspection records sufficiently detail the results of the fire safety inspection.**

**Part 7040, Maximum Facility Capacity**

This part will be addressed under separate cover.

**Part 7063, Chemical Agents**

This part will be evaluated in the near future and will then be addressed under separate cover.

**EXHIBIT 3**

Form 33J ADM (CC) (4/01)

State of New York
COMMISSION OF CORRECTION
Office of Mental Health

# SUICIDE PREVENTION SCREENING GUIDELINES

| DETAINEE'S NAME | SEX | DATE OF BIRTH | MOST SERIOUS CHARGE(S) | DATE | TIME |
|---|---|---|---|---|---|
| | | | | | |

| NAME OF FACILITY | NAME OF SCREENING OFFICER | Detainee showed serious psychiatric problems during prior incarceration .  YES _____  NO _____ |
|---|---|---|

*Check appropriate column for each question*

| | Column A YES | Column B NO | General Comments/Observations All "YES" Responses Require Note to Document |
|---|---|---|---|
| **OBSERVATIONS OF ARRESTING/TRANSPORTING OFFICER** | | | |
| 1. Arresting or transporting officer believes that detainee may be a suicide risk. If YES, notify supervisor. | | | |
| **PERSONAL DATA** | | | |
| 2. Detainee lacks support of family or friends in the community. | No Family Friends | | |
| 3. Detainee has experienced a significant loss within the last six months (e.g., loss of job, loss of relationship, death of close family member). | | | |
| 4. Detainee is very worried about major problems other than legal situation (e.g., serious financial or family problems, a medical condition or fear of losing job). | | | |
| 5. Detainee's family member or significant other (spouse, parent, close friend, lover) has attempted or committed suicide. | | | |
| 6. Detainee has history of drug or alcohol abuse. (Note drug and when last used.) | | | |
| 7. Detainee has history of counseling or mental health evaluation/treatment. (Note current psychotropic medications and name of most recent treatment agency.) | | | |
| 8. Detainee expresses extreme embarrassment, shame, or feelings of humiliation as result of charge/incarceration (consider detainee's position in community and shocking nature of crime). If YES, notify supervisor. | | | |
| 9. Detainee is thinking about killing himself. If YES, notify supervisor. | | | |
| 10a. Detainee has previous suicide attempt. (Explore method and check for scars.) | | | |
| b. Attempt occurred within last month. If YES, notify supervisor. | | | |
| 11. Detainee is expressing feelings of hopelessness (nothing to look forward to). If YES, notify supervisor. | | | |
| 12. This is detainee's first incarceration in lockup/jail. | | | |
| **BEHAVIOR/APPEARANCE** | | | |
| 13. Detainee shows signs of depression (e.g., crying, emotional flatness). | | | |
| 14. Detainee appears overly anxious, panicked, afraid or angry. | | | |
| 15. Detainee is acting and/or talking in a strange manner (e.g., cannot focus attention; hearing or seeing things which are not there). | | | |
| 16a. Detainee is apparently under the influence of alcohol or drugs. | | | |
| b. If YES, is detainee incoherent, or showing signs of withdrawal or mental illness? If YES to both a & b, notify supervisor. | | | |

**TOTAL Column A** _____

Officer's Comments / Impressions

**ACTION**
If total checks in Column A are 8 or more, or any shaded box is checked, or if you feel it is necessary, notify supervisor and institute constant watch.

Supervisor Notified:     YES _____     NO _____

Constant Supervision Instituted:     YES _____     NO _____

Detainee Referred to Medical / Mental Health:     YES _____     NO _____     If YES;

| EMERGENCY | NON-EMERGENCY |
|---|---|
| medical _____ | medical _____ |
| mental health _____ | mental health _____ |

Signature and Badge Number of Screening Officer: _____

Medical / Mental Health Personnel Actions: (To be completed by medical / MH staff)

EXHIBIT
FIF
1     10
1/7/08     P

PENGAD 800-831-6989

*Over*

## INSTRUCTIONS FOR COMPLETING
## SUICIDE PREVENTION SCREENING GUIDELINES – FORM 330 ADM

### GENERAL INFORMATION

It is recommended that the form be completed in triplicate for all detainees prior to cell assignment and be distributed as follows: top copy in detainee's file, second copy to medical or mental health personnel at referral, and the third copy for use according to facility's procedures.

| | |
|---|---|
| Comment Column: | All "YES" responses require note to document: |
| | 1. information about the detainee that officer feels is relevant and important; |
| | 2. information specifically requested in questions; |
| | 3. information regarding detainee's refusal or inability to answer questions. |
| Detainee's Name: | Enter detainee's first and last name and middle initial. |
| Sex: | Enter male (m) or female (f). |
| Date of Birth: | Enter month, day and year. |
| Most Serious Charge(s): | Enter the most serious charge or charges (no more than two [2]) from this arrest. |
| Date: | Enter month, day and year form was completed. |
| Time: | Enter the time of day the form was completed. |
| Name of Facility: | Enter name of jail or lock-up. |
| Name of Screening Officer: | Print name of officer completing form. |
| Psychiatric Problems During Prior Incarceration: | The screening officer should check facility files to determine if the inmate had attempted suicide or was referred for mental health services during prior incarceration. NOTE: Persons with a diagnosis of schizophrenia or major depression should be referred immediately to mental health as they are generally more at risk for suicide than persons with other psychiatric disorders. |

### INSTRUCTIONS FOR ITEMS 1–16

#### General Instructions

Check the appropriate YES or NO for items 1–16.

If information required to complete these questions is unknown to screening officer, such information should be obtained by asking detainee to answer questions. However, detainee has the right to refuse to answer.

If detainee refuses to answer questions 2–12, enter RTA (refused to answer) in the Comment Column next to each question. In addition, complete the YES or NO boxes only if information is known to you.

If during an otherwise cooperative interview, detainee refuses to answer one or two question: Check YES in the box(es) next to the unanswered question(s) and enter RTA in the comment box next to each unanswered question.

If detainee is unable to answer all questions 2–12, enter UTA (unable to answer) in the Comment Column next to each question. Also enter reason (e.g., not English speaking) for not answering these questions in the Comment Column next to Question 2. In addition, complete the YES or NO boxes only if information is known to you.

#### Observation of Transporting Officer

ITEM (1)    Check YES or NO based upon the written/verbal report of the arresting/transporting officer or upon the screening form completed by the arresting agency. If YES, notify supervisor.

NOTE: The following questions and observations should not be read word for word but restated in your own words.

#### Personal Data Questions

ITEM (2)    Family/friends: Check NO if someone other than a lawyer or bondsman would (1) be willing to post detainee's bail, (2) visit detainee while he/she is incarcerated, or (3) accept a collect call from detainee.

ITEM (3)    Significant loss: Ask all three components to this question—loss of job, loss of relationship and death of close friend or family member.

ITEM (4)    Worried about problems: Ask about such problems as financial, medical condition or fear of losing job. Check YES if detainee answers YES to any of these.

ITEM (5)    Family/significant other attempted suicide: Significant other is defined as someone who has an important emotional relationship with detainee.

ITEM (6)    Alcohol or drug history: Check YES if detainee has had prior treatment for alcohol/drug abuse or if prior arrests were alcohol/drug related.

ITEM (7)    History of counseling or mental health evaluation/treatment: Check YES if detainee (1) has ever had psychiatric hospitalization, (2) is currently on psychotropic medication, or (3) has been in outpatient psychotherapy during past six months. Note current psychotropic medication and name of most recent treatment agency.

ITEM (8)    Check YES if detainee expresses extreme shame as result of arrest or feels that arrest/detention will cause humiliation to self/significant others. If YES, notify supervisor.

ITEM (9)    Suicidal: Check YES if detainee makes suicidal statement or responds YES to direct question, "Are you thinking about killing yourself?" If YES, notify supervisor.

ITEM (10a&b)    Previous attempt: Check YES if detainee states he has attempted suicide. If YES or NO, explore method and note scars. Obtain as much information as possible re method and time of attempt. If YES to 10b, notify supervisor.

ITEM (11)    Hopeless: Check YES if detainee states feeling hopeless, that he has given up, that he feels helpless to make his life better. If YES, notify supervisor.

ITEM (12)    Criminal History: Ask detainee or check files to determine if this is detainee's first incarceration.

#### Behavior/Appearance Observations

YES or NO must always be checked for each of these items. They are observations made by the screening officer. They are not questions.

ITEM (13)    Depression: Indicators include behavior such as crying, emotional flatness, apathy, lethargy, extreme sadness, unusually slow reactions.

ITEM (14)    Overly anxious, afraid, panicked, or angry: Indicators include behavior such as handwringing, pacing, excessive fidgeting, profuse sweating, cursing, physical violence, etc.

ITEM (15)    Acting in strange manner: Check YES if you observe unusual behavior or speech such as hallucinations, severe mood swings, disorientation, withdrawal, etc. If detainee is hearing voices telling him to harm himself, make an immediate referral to mental health services.

ITEM (16a)    Under influence: Check YES if detainee is apparently intoxicated on drugs or alcohol.

ITEM (16b)    Incoherence, withdrawal, or mental illness: Means physical withdrawal from substance. If YES to both a & b, notify supervisor.

COMMENTS/IMPRESSIONS: Note any "gut" feelings or general impression re suicide risk.

### SCORING

Count all checks in Column A. Enter total. Notify supervisor if (1) total is 8 or more, (2) any shaded area is checked, (3) if you feel notification is appropriate.

### BOOKING OFFICER SIGNATURE AND BADGE NUMBER

Sign form and enter badge number.

### DISPOSITION

| | |
|---|---|
| Corrections Personnel: | Supervisor notified: check YES or NO. Notification should be made prior to cell assignment. |
| | Note if constant supervision instituted. |
| | Note emergency/non-emergency referral to medical and/or mental health personnel. |
| Medical/Mental Health Personnel: | Medical/mental health staff should note recommendations and actions taken. |

**EXHIBIT 4**

SOJ 32  PAGE 7
rev 06/01

# PUTNAM COUNTY CORRECTION FACILITY
## SUICIDE PREVENTION SCREENING GUIDELINES

SECTION 4

| NAME | | JAIL # | SEX | DOB | DATE | TIME |
|---|---|---|---|---|---|---|
| MOST SERIOUS CHARGE | | Facility Origin Other Than PCCF | | | Detainee showed serious psychiatric problems during prior incarceration  YES _____  NO _____ | |

| | Column A YES | Column B NO | General Comments/observations All "YES" responses require written comment here |
|---|---|---|---|
| **OBSERVATIONS OF ARRESTING/TRANSPORTING OFFICER** 1. Arresting or transporting officer believes that detainee may be a suicide risk. If YES, notify shift supervisor. | *(shaded)* | ✓ | |
| **PERSONAL DATA** 2. Detainee lacks support of family or friends in the community. | No Family Friends | ✓ | |
| 3. Detainee has experienced a significant loss within the last six months. (e.g., loss of job, loss of relationship, death of close family member) | ✓ | | mother has cancer |
| 4. Detainee is very worried about major problems other than legal situation. (e.g., serious financial or family problem, a medical condition or fear of losing job) | ✓ | | mother, worried about girlfriend |
| 5. Detainee's family member or significant other (spouse, parent, close friend, lover) has attempted to or has committed suicide. | ✓ | | mother on accessful brother, girlfriend |
| 6. Detainee has history of drug or alcohol abuse. (Note drug and when last used.) | ✓ | | |
| 7. Detainee has history of counseling or mental health evaluation/treatment. (Note current psychotropic medications and name of most recent treatment agency) | ✓ | | |
| 8. Detainee expresses extreme embarrassment, shame, or feeling of humiliation as a result of current charge or this incarceration. (consider detainee's position in the community and shocking nature of crime) | *(shaded)* | | |
| 9. Detainee is thinking of killing himself/herself. If YES, notify Shift Supervisor immediately. | *(shaded)* | ✓ | |
| 10a. Detainee has previous suicide attempt. (Explore method and check for scars.) | *(shaded)* | ✓ | |
| b. Attempt occurred in the last month. | | | |
| 11. Detainee is expressing feelings of hopelessness (nothing to look forward to) | *(shaded)* | | |
| 12. This detainee's first incarceration in lockup/jail. | | ✓ | |
| **BEHAVIOR/APPEARANCE** 13. Detainee shows signs of depression (e.g., crying, emotional flatness). | | ✓ | |
| 14. Detainee appears overly anxious, panicked, afraid or angry. | | ✓ | |
| 15. Detainee is acting and/or talking in a strange manner. e.g., cannot focus attention, hearing or seeing things which are not there) | | ✓ | |
| 16a. Detainee is apparently under the influence of alcohol or drugs. | *(shaded)* | | 24 hours ago |
| b. If YES, is detainee incoherent, or showing signs of withdrawal or mental illness. If YES to BOTH 16a and 16b notify Shift Supervisor immediately. | | | very laid back |

**TOTAL of Column A**  10

**ACTION TO BE TAKEN BY SCREENING OFFICER**
If total in Column A is 8 or more, or any shaded box is checked, or if the screening officer feels it necessary, notify shift supervisor.

Shift Supervisor notified  YES _____  NO _____   Shift Supervisor _____   Shift Supervisor Signature _____

Mental health Supervision instituted:   Routine _____   15 Min. Supervisory Visit ✓   Constant _____

Mental Health referral:  NO _____  YES _____, complete referral form.  Emergency _____  Non-Emergency _____

Screening Officer Name _____   Screening Officer Signature _____

Inmate Signature _____   Date 05/29/06

Officer's comments/Impressions: _____

Medical Staff and/or Mental Health Provider actions: _____

| CLASSIFICATION REVIEW |
|---|
| OFFICER _____ |
| NURSE _____ |
| DATE _____ |

EXHIBIT
P14
3    10
1/7/08    73
PENGAD 800-631-6989

72

**EXHIBIT 5**

PLAINTIFF'S
EXHIBIT NO. _35_
FOR IDENTIFICATION
DATE: _1/30/08_ RPTR: DB



# CHAIRMAN'S MEMORANDUM
# NO. 16-2005    OCTOBER 5, 2005

**TO:   SHERIFFS, CHIEF ADMINISTRATIVE OFFICERS, COMMISSIONERS OF CORRECTION, TRAINING COORDINATORS**

**RE:   MENTAL HEALTH FORM**

Those involved in corrections know that a large percentage of inmates arrive at correctional facilities with mental health issues ranging from depression to schizophrenia to having suicidal thoughts. An inmate, just as people in the general public, can have mental illness and not be suicidal, or can be suicidal with no other mental health illness, or they can be both mentally ill and suicidal. In order to identify these inmates, facilities must heed 9 NYCRR §7013.17 **Initial screening and risk management.** This section states in part:

(a) Each inmate, upon admission to a facility, shall undergo an initial screening and risk assessment which shall consist of a screening interview, visual assessment and review of commitment documents. Such screening and risk assessment shall occur immediately upon an inmate's admission.
(b) A screening instrument(s) shall be utilized to elicit and record information on each inmate relating to the following:
      (1) history of mental illness or treatment
      (2) potential for self-injury or suicide

Since the 1980's the Commission has held that the only instrument that is in compliance with §7013.7(b)(5) is the Suicide Screening Form, which was a joint project if the Commission and the New York State Office of Mental Health. **This continues to be the case.**

However, each facility was allowed to provide its own method of determining an inmate's history of mental illness or treatment as required in §7013.7(b)(4). The purpose of this memorandum is to make you aware of an instrument that has been designed and tested by mental health professionals, to quickly identify those who may need mental health services. The National Institute of Corrections announced a statistically significant, yet simple form, which can be utilized by facilities to show compliance with §7013.7(b)(4). The announcement states, in part, that the GAINS EBP Center of Latham, NY, with funding from the National Institute of Justice, "has developed a new mental health screening tool for jails called the Brief Mental Health Screen (BJMHS). It is a tool for booking officers to screen incoming detainees for the need for further mental health assessment.

The screening instrument was validated in a study conducted in four jails, two in Maryland and two in New York. The study identified 11% of the jail population as requiring further assessment. It correctly identified 73% of males and 62% of females, which was validated using a standardized clinical instrument (SCID).

---

New York State Commission of Correction        Alan J. Croce, Chairman/Commissioner
80 Wolf Road, 4th Floor
Albany, New York 12205        Frederick C. Lamy, Commissioner
(518) 485-2330        Frances T. Sullivan, Commissioner

-2-

The screen took only an average 2.5 minutes to administer and consists of only eight yes/no questions. It is easily integrated into the screening process, and requires little training, with instructions included with the BJMHS download.

Further information and a link to the instrument itself can be found at http://gainscenter.samhsa.gov/html/resources/MHscreen.asp.

This URL will give you the link to both the form and the article published in the magazine Psychiatric Services (July 2005), that gives a description of the process and the results of the form in identifying a large percentage if those who need mental health assessment and treatment, over and above those who are identified as suicidal. If you have any questions, please feel free to contact the GAINS EBP Center at 1-800-311-4246 or gainsebp@prainc.com.

The Commission believes that the use of this form as a supplement to the Suicide Screening Form, will help identify those inmates who are in need of mental health services to improve their safety and well being while in your custody, and to afford additional liability protection for jail administrations.

Alan J. Croce, Chairman/Commissioner

New York State Commission of Correction
80 Wolf Road, 4th Floor
Albany, New York 12205
(518) 485-2330

Alan J. Croce, Chairman/Commissioner

Frederick C. Lamy, Commissioner
Frances T. Sullivan, Commissioner

**EXHIBIT 6**

PLAINTIFF'S
EXHIBIT NO. 37
FOR IDENTIFICATION
DATE: 1·30·08  RPTR: DB



# CHAIRMAN'S MEMORANDUM
# NO. 10-2007 September 18, 2007

**TO:   SHERIFFS,   CHIEF   ADMINISTRATIVE   OFFICERS,   COMMISSIONERS   OF
CORRECTION, POLICE CHIEFS, HEALTH SERVICES ADMINISTRATORS**

**RE:   SUICIDE IN LOCAL CORRECTIONAL FACILITIES**

The Commission's Correction Medical Review Board reports a marked and troubling increase in the rate of inmate suicide in local correctional facilities in upstate New York and Long Island. As of the beginning of the third quarter of this year, there have been 12 suicides in county jails and police department lockups in 2007. When adjusted for population, this represents a rate 47% higher than the 2005-2006 average for county jails and a nearly two-fold increase in police lockup facilities. While the precise causes of these changes remain unclear, the Medical Review Board has advised the Commission that a review and reiteration of the essential elements of suicide prevention in custody is warranted.

Since 1985, the Commission has been engaged in a statewide collaborative effort with the New York State Office of Mental Health and with sheriffs and jail administrators around the state to improve mental health crisis intervention and prevent suicide in local correctional facilities. The Local Forensic Suicide Prevention - Crisis Service Model is an initiative designed to facilitate the identification, referral and treatment of prisoners who are suicidal and/or seriously mentally disturbed. The program, which is a mandated aspect of compliance with NYS Correction Law §500-b and with *Minimum Standards* Part 7013 Classification, establishes direct service linkages among county jails, police lockups, and local mental health service providers. The program also clearly defines roles and responsibilities of mental health and local correctional agencies in the identification and management of prisoners at high risk for suicide attempt.

The Local Forensic Suicide Prevention - Crisis Service Model consists of the following major components:

♦   Policy and procedure guidelines to clarify roles of county jail, police department lockup and mental health agency personnel;

♦   Screening of detainees by trained correction/police officers using Commission Form 330ADM;

♦   Supervision - rigorous direct supervision of high risk prisoners;

♦   Mental health observation housing;

♦   Mental health crisis intervention;

**New York State Commission of Correction**
**80 Wolf Road, 4th Floor**
**Albany, New York 12205**
**(518) 485-2346**

**Daniel E. Stewart, Chairman**

**Frederick C. Lamy, Commissioner**
**Frances T. Sullivan, Commissioner**

♦      Scheduled mental health evaluation and treatment;

♦      External hospitalization when warranted;

♦      Training which integrates roles and functions of local law enforcement and mental health staff; and

♦      Critical incident review of prisoner suicide attempts and deaths.

Sheriffs, Commissioners of correction, jail administrators and police chiefs are reminded that careful attention to the maintenance of this program in New York has shown proven results over the past 20 years in reducing rates of suicide in custody and in improved mental health services in jails. This program, in particular its screening and training components, is also a required element of compliance with New York State Correction Law §500-b and *Minimum Standards* Part 7013 Classification.

The Commission, in cooperation with the New York State Office of Mental Health, provides regular field training offerings of the 16-hour Instructor Development (Train-the-Trainer) certification program in the Local Forensic Suicide Prevention - Crisis Service Model as well as the eight hour Suicide Prevention Basic Course and a four-hour refresher of the Basic Course. Thus far in 2007, two Instructor Development programs have been delivered, another is scheduled for October 2007. Additional programs are offered based upon demand.

All New York State correction and law enforcement executives are encouraged to assess the training and program participation status of their departments and to avail themselves of this valuable resource.

For further information, please contact Christopher Ost at the Commission's Forensic Medical Unit in Albany at (518) 485-2475.

---

**Daniel L. Stewart, Chairman**

**New York State Commission of Correction**
**80 Wolf Road, 4th Floor**
**Albany, New York 12205**
**(518) 485-2346**

**Daniel E. Stewart, Chairman**

**Frederick C. Lamy, Commissioner**
**Frances T. Sullivan, Commissioner**

**EXHIBIT 7**

# Suicide Prevention and Crisis Intervention in County Jails and Police Lockups

## BASIC PROGRAM TRAINER'S MANUAL





JANUARY 2000

*revision book 2003*

New York State Office of Mental Health

New York State Commission of Correction

Ulster County Department of Mental Health

B



**MODULE I**

# Introduction

## OBJECTIVES

At the completion of the training module, each officer will be able to, without reference to notes:

1. Describe three reasons for implementing the suicide prevention program.
2. List seven components of an effective suicide prevention program.
3. List four goals of the suicide program.
4. Explain officer's responsibility and liability in suicide prevention.

## TRANSPARENCIES

1. Forensic Suicide Prevention Crisis Service Project 1986–2000
2. Components of an Effective Suicide Prevention Risk Management Program

## HANDOUTS

1. Suicides in Local Correctional Facilities
2. Epidemiology of Suicides in NYS Jails and Lockups

**TIME NEEDED:** 30 minutes

LESSON/PROCEDURE

INSTRUCTOR'S NOTES

## OBJECTIVE 1
## NEED FOR SUICIDE PREVENTION

- Nationally, suicide is the leading cause of death for inmates in jails and lockups. (Hayes, 1989)
- Suicide rate in these facilities is nine times greater than for the general population. (Hayes, 1989)
- In 1986, in New York State, suicide was the leading cause of death in custody with mortality rates routinely as high as 74 deaths per 100,000 inmates. This was 8 times higher than in the general population.
- Although the rate of suicide in New York State jails and lockups has been reduced to a rate of 23 per 100,000 inmates, the suicide rate within these facilities is still more than twice that in the general population.

## DESIGN OF PROGRAM

In 1984, the NYS Office of Mental Health and the NYS Commission of Correction initiated the design of a model to address the problem of jail suicide. They were joined by Ulster County Mental Health Department and the DCJS Office of Public Safety.

The program was designed to:
- Reduce the number of inmate suicides and attempts in county jails and police lockups.
- Assure timely crisis intervention and follow-up for inmates with serious mental illness.
- Enhance the safety of high risk suicidal inmates and decrease litigation for correctional facilities
- Enhance the quality of communication/coordination between local detention and correctional facilities and local mental health service providers.

Agencies involved in design: combined effort of correctional/police, mental health, state, county and municipal agencies.
- The New York State Office of Mental Health
- The New York State Commission of Correction
- Ulster County Department of Mental Health

Assisted by advisory committee of:
- New York State Association of Chiefs of Police
- New York State Sheriff's Association
- NYS Division of Alcoholism and Alcohol Abuse
- NYS Division of Criminal Justice Services, Office of Public Safety
- NYS Division of Substance Abuse Services
- NYS Office of Mental Retardation and Developmental Disabilities
- Governor's Task Force on Alcoholism

*Test* all electronic equipment prior to instruction.

*Distribute: Suicides in Local Correctional Facilities.*



| LESSON/PROCEDURE | INSTRUCTOR'S NOTES |
|---|---|

Pilot projects conducted in:
- Erie County
- Greene County
- Nassau County
- Oswego county
- Ulster County

Successful statewide implementation, 1986−present, resulted in:
- Significant reduction of completed suicides despite significant increase in jail population.
- Reported improvement in mental health services and inter-agency coordination.

---

### Forensic Suicide Prevention Crisis Service Project   1986–2000

| Initial Program (1986) | Additions to Program |
|---|---|
| Eight hour basic training for jail/lock-ups | Revised basic training (2000) |
| Suicide Prevention Screening Guidelines | Refresher training (1993) |
| Policy and procedure guidelines | Revised Mental Health (1993) Resource Handbook |
| Mental Health Resource Handbook | Two-day training for forensic mental health staff (1993) |

*Show transparency:*
*Forensic Suicide Prevention Crisis Service Project 1986–2000.* 

---

Need for Continued Prevention Efforts
- Suicides continue to occur in jails and lockups.
- Admissions to jails and lockups continue to increase.
- Population in jails and lockups include significant numbers of persons with psychiatric diagnoses or previous mental health treatment.
- Suicides seem to be occurring later in incarceration.

**COMPREHENSION CHECK**

**Distribute:** *Epidemiology of Suicides in NYS Jails & Lockups* and discuss findings.

**Note** the change in the point during incarceration when most suicides occur in NYS and discuss possible reasons.

---

| **VIDEO:** | *Introduction* |
|---|---|
| | *Statement of Chairman Croce and Commissioner Lamy NYS Commission of Correction* |
| **Time:** | 3.5 minutes |

**Start video with** Chairman Croce saying: *"Part of your job..."* 

**Stop video** at conclusion of Commissioner Lamy's statement: *"...Morally and ethically, suicide prevention is the right thing to do."*

**EXHIBIT 8**

PUTNAM COUNTY CORRECTION FACILITY
OFFICE OF THE SHERIFF

# PROCEDURE

| PROCEDURE # |
|---|
| 010199 |

| DATE OF FIRST ISSUE |
|---|
| MAY 29, 2001 |

**SUBJECT**

HOUSING UNIT SUPERVISION
LOGBOOK ENTRIES

C:procedures022206

| EFFECTIVE DATE |
|---|
| August 12, 2005 |

| TERMINATION DATE |
|---|
| NONE |

| TOTAL PAGES   10 |
|---|
| ATTACHMENTS  -0- |

**RELATED PROCEDURES**

SECURITY & SUPERVISION
MEDICAL SERVICES

**DISSEMINATION**

ALL UNIFORMED

**AMENDED**
09/02, 04/04, 07/05, 08/05,
11/05 changed Definitions-15 Minute Visit- second a. & b. to e.,  f. —changed words of second b. to include:
   observations; 60 minute intervals, added interact a visit.
02/06 added Significant events and activities

**PURPOSE**

The New York State Minimum Standard requires that the inmates in their housing unit be supervised in various manners. The Facility Procedure has been enhanced with an additional types of supervision to foster a safe and secure Facility by properly supervising the inmates in the Facility.

EXHIBIT
P 1 F
18    LD
1/16/08    JS
PENGAD 800-631-6989

1

1.          DEFINITIONS

Supervisory Visit    abridged from the minimum standards

     a.     A personal visual observation of each inmate in the officer's care.

     b.     a personal observation of each individual housing unit (cell) and surrounding area in the officers care.

General supervision    abridged from the minimum standards

     a.     a Supervisory visit in 30 minute intervals

     b.     the availability of the staff to the inmates.

     c.     time of supervisory visit,

     d.     signature on entry line

     e.     sequentially numbered

Active Supervision    abridged from the minimum standards

     a.     a supervisory visit in 30 minute intervals

     b.     the immediate availability of the officers by the inmates under his/her care

     c.     uninterrupted ability to communicate between the officer and inmates unaided by any devices.

     d.     the ability of the officer to immediately respond to an emergency situation.

15 Minute Supervisory Visit

     a.     a supervisory visit in 15 minute intervals

     b.     the immediate availability of the officers by the inmates under his/her care

     c.     uninterrupted ability to communicate between the officer and inmates unaided by any devices.

     d.     the ability of the officer to immediately respond to an emergency situation.

     e.     there is to be an entry made in the housing unit logbook, where the visit is conducted, containing the actual time of the visit and the name(s) of the inmate(s) checked AND,

     f.     observations of inmate's condition and behavior; at 60 minute intervals commencing with first visit.

     g.     Each visit shall involve include a brief period of interaction with the inmate to include but not limited to; such things as the current time and place, the inmate's feelings as to their current confinement, and the inmate's needs. This should in a professional manner but as personal as possible.

     h.     15 minutes supervisory visits <u>are not</u> adequate as a suicide prevention precaution.

Constant Supervision abridged from the minimum standards

 a.  the continuous clear view of all inmates under the officer's care

 b.  the uninterrupted personal visual observation of the inmate under the officer's care.

 c.  the ability to immediately and directly intervene in response to situations or behavior which might threaten the health or safety of the inmate, staff or the general public.

 d.  post assignment to be designated by the shift supervisor.

 e.  there is to be an entry made in the housing unit logbook, where the visit is conducted, containing the actual time of the visit and the name(s) of the inmate(s) checked.

 f.  the prisoner's condition and behavior along with any significant events and activities are to be noted in the entry. This visit shall involve include a brief conversation with the inmate to include but not limited to; such things as the current time and place, the inmate's feelings as to their current confinement, and the inmate's needs. This should in a professional manner but as personal as possible.

2. SIGNIFICANT EVENTS and ACTIVITIES

The events and activities which may have bearing on the reason to establish additional supervision includes both speech and behavior.

EXAMPLES:  an inmate who is exhibiting fear, refusal to communicate, or intractability insomnia.

The speech and behavior that requires additional supervision necessitates the requirement of periodic interaction between the inmate and the correction officer assigned to conduct the supervisory visit to foster the well being of the inmate.

3. SUPERVISION ON HOUSING UNITS

 A. _East and West Housing Units_ shall be supervised under;

   Active Supervision.

   General Supervision during lockdown times.

 B. _North Housing Unit_ shall be supervised;

   North (tier) 1; Active Supervision. [cells 5 -20]

   North (tier) 1; General Supervision. [cells 5 -20], during lockdown times.

   North (tier) 2; General Supervision, at all times [cells 1-4]

C.    *South Housing Unit* shall be supervised under;

Active Supervision.

General Supervision during lockdown times.

4.    LOGBOOK ENTRIES

A.    Active Supervision Log Book Entry

1.    when a security post is located in a Housing Unit each supervisory visit *is not to* be recorded in a logbook. [direct supervision units]

2.    when a security post is not located within a housing unit each supervisory visit *is to be* recorded in a logbook[linear remote design]

2.    when the facility Administrator establishes a housing unit as supervised under Active Supervision the use of mechanical or electronic time recording devices are *not required.*

3.    when the Facility Administrator establishes a housing unit as Supervised under Active Supervision *only the* date and time the supervision was initiated and the date and time the supervision was ended need to be entered.

4.    any unusual incidents are to be entered in the logbook.

B.    Logbook entries shall be, but not limited to:

1.    made in ink,
2.    in a bound ledger,
3.    contain name of staff,
4.    signature of staff.

C     Log Book entries that are *not* required for *East & West Housing Units* are as follows;

1.    An entry for random or routine checks of the housing unit.

a.    See definitions in this procedure.

D.    Logbook entries that *are* required *East & West Housing Units* are as follows:

1.    Sign on duty, using format as approved by the Facility Administer.

a.    See housing unit stamp.

b.    Officer's signature is required.

2.    Sign Off Duty, using the format as approved by the Facility Administrator.

a.    See housing unit stamp.

    b.    Officer's signature is required.

3.    The consecutive line number for each entry.

4.    The time of the visit is made or the time entry is made.

    a.    The time of the incident is placed in the text of entry.

5.    Meals served.

    a.    Refusals require the inmate(s) name.

6.    Medications issued.

    a.    An entry that inmates where off the unit for medications is to be entered in the logbook.

    b.    An entry that the inmates received medication on the housing unit is to be entered in the logbook.

7.    Exercise

    a.    The time the inmates are released from the housing unit for exercise is to be recorded.

    b.    The time that the actual exercise period starts is to be recorded.

        1.    The Exercise Officer shall radio the start time and the end time of the exercise period, to the Housing Unit Officer from where the inmates originated.

            a.    Exercise periods start when the last inmate is in the exercise yard. Travel time to and from the exercise yard does not count as exercise time. See the Minimum Standards.

    d.    Whenever outdoor exercise is cancelled an entry is to be made that indoor exercise was held.

8.    Scheduled Lock Downs

    a.    The start time and end time.

9.    Un-Scheduled Lock Downs

    a.    The start time and end time.

    b.    An entry is to be made in the logbook as to the reason(s) behind the lockdown.

10. Headcounts

    a. The start time and end time.

    b. Any headcount(s) ordered by a supervisor in addition to the standard headcount times shall be entered into the logbook.

11. Floor PDA lock-in

    a. The start time and end time of the lock-in.

    b. A log book entry as the circumstances that required the PDA lock in.

12. Misbehavior Reports; with or without a lockdown.

    a. A log book entry as the circumstances that resulted in the filing of the misbehavior reports.

13. As directed by a Superior.

    a. A logbook entry as directed by a Sergeant, Lieutenant, or Captain containing the information that they convey to be written.

14. Unusual Incident;

    a. all incidents other than the usually occurring activities are to be entered in the logbook. If you are not sure what an Unusual Incident is contact the Shift Sergeant. See Minimum Standards.

    b. Entries are to be in _red ink_.

15. Compliant Form numbers and Grievance Form numbers are to be entered.

    a. Complaint form number, is the first letter of the housing unit and the entry line number from the logbook.

E. Logbook entries that _are_ required in _North and South Housing Units_ are as follows:

1. An entry for each random or routine check of the housing unit.

2. Sign on duty, using format as approved by the Facility Administer.

    a. See housing unit stamp.

    b. Officer's signature is required.

3. Sign Off Duty, using the format as approved by the Facility Administrator.

    a. See housing unit stamp.

    b. Officer's signature is required.

4.    The consecutive line number for each entry for each supervisory visit.

5.    The time the supervisory visit is made or the entry is made.

    a.    The time of the incident is placed in the text of entry.

6.    Meals served.

    a.    Refusals require the inmate(s) name

7.    Medications issued.

    a.    An entry that inmates where off the unit for medications is to be entered in the logbook.

    b.    An entry that the inmates received medication on the housing unit is to be made.

8.    Exercise

    a.    The time the inmates are released from the housing unit for exercise is to be recorded.

    b.    The time that the actual exercise period starts is to be recorded.

        1.    The Exercise Officer shall radio the start time and the end time of the exercise period, to the Housing Unit Officer from where the inmates originated.

            a.    Exercise periods start when the last inmate is in the exercise yard. Travel time to and from the exercise yard does not count as exercise time. See the Minimum Standards.

    c.    Whenever outdoor exercise is cancelled an entry is to be made that indoor exercise was held.

9.    Scheduled Lock Downs

    a.    The start time and end time.

10.    Un-Scheduled Lock Downs

    a.    The start time and end time.

    b.    An entry is to be made in the logbook as to the reason(s) behind the lockdown

11.    Headcounts

    a.    The start time and end time.

b.  Any headcount(s) ordered by a supervisor in addition to the standard headcount times shall be entered into the logbook.

12.  Floor PDA lock-in

a.  The start time and end time of the lock-in.

b.  A log book entry as the circumstances that required the PDA lock in.

13.  Misbehavior Reports; with or without a lockdown.

a.  A log book entry as the circumstances that resulted in the filing of the misbehavior reports.

14.  As directed by a Superior.

a.  A logbook entry as directed by a Sergeant, Lieutenant, or Captain containing the information that they convey to be written.

15   Unusual Incident;

a.  all incidents other than the usually occurring activities are to be entered in the logbook. If you are not sure what an Unusual Incident is contact the Shift Sergeant. See Minimum Standards.

b.  Entries are to be in *red ink*.

16.  An entry is to be made for *each* and every supervisory visit in the housing unit(s).

17.  Complaint Form numbers and Grievance Form numbers are to be entered.

a.  Complaint form number, is the first letter of the housing unit and the entry line number from the logbook.

F.  Logbook entries that *are* required for the *Housing Control Room*, the following:

1.  Sign on duty, using format as approved by the Facility Administer.

a.  See post stamp.

b.  Officer's signature is required.

2.  Sign Off Duty, using the format as approved by the Facility Administrator.

a.  See post stamp.

b.  Officer's signature is required.

3.  The consecutive line number for each entry.

8

4.      The time of the entry is made.

5.      The names of the inmates who leave the East and West Housing units and their destination.

         a.      The reason why they are leaving the unit.

6.      The names of the inmates who return to the, East and West Housing Units. The return destination is not required.

5.     SUPERVISION OF INMATES OUTSIDE OF A HOUSING UNIT

     A.     General Workers 1 & 2 shall be supervised under;

         General Supervision.

       1.     The Correction Officer or Staff Members or Service Providers assigned to this post shall perform a supervisory visit on the inmates in accordance this procedure.

         a.      This visit is to be recorded in the designated logbook.

       2.     The entries as set forth in this procedure.

     B.     Programs shall be supervised under;

         Active Supervision.

       1.     The Correction Officer or Staff Members or Service Providers assigned to this post shall perform a supervisory visit on the inmates in accordance with procedure.

         a.      This visit is to be recorded in the designated logbook.

       2.     The entries as set forth in this procedure.

     C.     Court appearances, Hospital Details and Transports shall be supervised under;

         Constant Supervision.

       1.     The Correction Officer or Staff Members or Service Providers assigned to this post shall perform a supervisory visit on the inmates in accordance this procedure.

         a.      This visit is to be recorded in the designated logbook.

       2.     The entries as set forth in this procedure.

     D.     Medical or Mental Health watches, as directed by a superior shall be supervised under;

         Constant Supervision.

1.    The Correction Officer assigned to this post shall perform a supervisory visit on the inmates in accordance this procedure.

      a.    This visit is to be recorded in the designated logbook.

2.    The entries as set forth in this procedure.

6.    RECORD KEEPING

   A.    The documents necessary to complete the requirements of this procedure are to be maintained as by the Assistant Facility Administrator and law.

   B.    The Facility Administrator may require additional record keeping, by separate memorandum.

**EXHIBIT 9**



PLAINTIFF'S
EXHIBIT NO. 30
FOR IDENTIFICATION
DATE: 1.7.08    RPTR: DB

# AmeriCor, Inc.

# Policy Manual

# Putnam County Correctional Facility

November 2004

AMER000000378

**CHHC OB INC.**

| Policy: | **Communication on Special Needs Inmates** |
|---------|---------------------------------------------|
| Number: | **107** |
| Page: | **1 of 1** |

Health care personnel are required to notify correctional personnel regarding an inmate's significant health needs that may affect classification decisions involving the inmate's housing assignment, work assignment limitations, program assignments, disciplinary measures, and admission to and transfer from other institutions.

Correctional personnel should consult with medical personnel before making any movements or decisions involving inmates with special needs. In an emergency situation, where correctional staff are required to take action which they feel is necessary to protect the inmate, staff or others, medical personnel will be notified immediately.

The Health Services Administrator and Medical Director will be permitted access to the inmate's confinement record when the information may be relevant to the inmate's health and course of treatment.

Included among special needs patients are those who are:

| | |
|---|---|
| 1. Chronically ill | 6. Mentally ill or suicidal |
| 2. Physically Handicapped | 7. Developmentally disabled |
| 3. Pregnant | 8. Infected with a communicable disease |
| 4. Frail or elderly | 9. On dialysis |
| 5. Terminally ill | 10. Under the age of 18 |

Reference: NCCHC Standard    J-A-08 (essential)

| Effective Date:<br>   May 11, 2003 | Approved by:<br>_____<br>Signature<br>_____<br>Print Name<br>Title | _____<br>Signature<br>Kevin Duffy<br>Print Name<br>President<br>Title |
|---|---|---|
| Revised/Reviewed:<br>   November 15, 2004 | | |
| Replaces | | |

9

| Policy: | **Receiving Screening** |
| Number: | **131** |
| Page: | **1 of 2** |

All inmates will be given a Receiving Screening by health care or health trained personnel immediately upon their arrival at the facility. Inmates transferred from other facilities, who are accompanied by their initial health screening forms and their medical records from the transferring site, may be excepted from this policy as long as their information is reviewed and verified by qualified medical personnel.

Inmates arriving at the Facility with an altered level of consciousness or who are bleeding, mentally unstable or otherwise in need of emergency medical attention will be immediately referred to the local emergency room or on site medical personnel for evaluation and treatment. Inmates returned from a hospital should not be accepted into the Facility without a discharge summary and a medical clearance for commitment to the Facility.

At a minimum, the Receiving Screening will include:

Inquiry into:

1. Current illnesses, health and dental problems, infectious and communicable diseases, and, for females, health problems specific to women, including pregnancy.

2. Current or past lethargy, weakness, weight loss, loss of appetite, fever, night sweats and other symptoms suggestive of infectious or communicable diseases.

3. Medications taken and special health requirements, including medical dietary requirements.

| Reference: NCCHC Standard J-E-02 (essential) | | |
| --- | --- | --- |
| Effective Date:<br><br>May 11, 2003 | Approved by: | |
| Revised/Reviewed:<br><br>November 15, 2004 | Signature | Signature<br><br>Kevin Duffy |
| Replaces | Print Name | Print Name<br><br>President |
| | Title | Title |

AMER000000421

| Policy: | **Receiving Screening** |
|---|---|
| Number: | **131** |
| Page: | **2 of 2** |

4. Use of alcohol and other drugs, including types of drugs used, mode of use, amount used, frequency used, date or time of last use, and a history of problems which may have occurred after ceasing use (e.g., convulsions).

5. Past and present treatment or hospitalization for mental illness or suicide attempt and current suicidal ideation.

6. Allergies

Observation of:

1. Appearance (e.g. sweating, tremors, anxious, disheveled).

2. Behavior (e.g. disorderly, inappropriate, incoherent) and state of consciousness.

3. Breathing (e.g. persistent cough or hyperventilation).

4. Condition of the skin (e.g. signs of trauma, bruises, lesions, jaundice, rashes, infestations, and needle marks or other indications of drug abuse) and ease of movement (e.g. gait, body deformities).

Inmates with immediate health needs (e.g. medication orders, prenatal follow up) will be referred to the appropriate health care provider. Potentially infectious inmates will be isolated.

The screener completing the Receiving Screening Form will document the time and date the form was completed, any referrals that were made, the housing unit the inmate was cleared for, and a signature and title on the form.

Reference: NCCHC Standard    J-E-02 (essential)

| Effective Date:<br><br>May 11, 2003 | Approved by:<br>_____ | _____ |
|---|---|---|
| Revised/Reviewed:<br><br>November 15, 2004 | Signature<br>_____ | Signature<br>Kevin Duffy |
| Replaces | Print Name<br>_____ | Print Name<br>President |
| | Title | Title |

AMER000000422

| Policy: | **Suicide Prevention** |
|---|---|
| Number: | **152** |
| Page: | **1 of 3** |

Inmates will be evaluated for potential risk of suicide during the intake process using the Receiving Screening Form and, where applicable, the Suicide Prevention Screening Guidelines Form or a similar evaluation tool. Inmates determined to be at risk as a result of this screening process will be placed on suicide precautions and immediately referred to the psychiatrist. Additional risk evaluations will be made as needed during an inmate's incarceration depending on the individual inmate's circumstances

Healthcare personnel, and correctional personnel who work directly with inmates, will be trained to recognize verbal and behavioral cues that are indicators of suicide risk and how to respond appropriately to those cues. Training for healthcare personnel will occur annually. Training for correctional personnel may be provided annually but must, at a minimum, be provided once every two years.

Inmates who are determined to be at risk, or who have attempted suicide in the past, will be promptly referred to mental health personnel for additional assessment and treatment. Such referrals will be seen by the psychiatrist, psychologist or psychiatric nurse practitioner in a face-to-face encounter within three working days.

Evaluations by mental health providers must be documented in an inmate's permanent medical record and must specify the inmate's level of suicide risk as well as the level of supervision needed. When program assignments and/or the need for transfer to an inpatient psychiatric facility is deemed necessary, that must also be documented in the evaluation. The need for continuing reassessment while on suicide precautions and for periodic reassessment after removal from suicide precautions will be determined by the mental health provider.

Reference: NCCHC Standard     J-G-05 (essential)

| Effective Date: | Approved by: | |
|---|---|---|
| May 11, 2003 | _____ | *K Duffy* (signature) |
| Revised/Reviewed: | Signature | Signature |
| November 15, 2004 | | Kevin Duffy |
| Replaces | Print Name | Print Name |
| | | President |
| | Title | Title |

69

AMER000000448

| Policy: | **Suicide Prevention** |
|---|---|
| Number: | **152** |
| Page: | **2 of 3** |

Inmates who are placed on suicide precautions will be placed in the Facility's mental health unit or placed on regular observation status such that they are subject to monitoring by correctional and/or healthcare personnel. Monitoring should occur every 15 minutes while the inmate is on suicide precautions. All observations will be documented in the housing officer's log, the inmate's medical record, a cell card or log, or some other form identified by Facility policy for documenting such observations. Inmates on suicide precautions will not be placed in isolation unless provisions for constant observation have been implemented.

Correctional personnel will immediately refer any inmate suspected of being a suicide risk to healthcare personnel. Healthcare personnel will advise correctional personnel of the need to observe inmates who are suicide risks. Facility administration will be notified by healthcare personnel whenever an inmate is determined to be at risk.

While any qualified member of the health care or correctional staffs can place an inmate on suicide precautions, the psychiatrist is the only staff member authorized to remove an inmate from suicide precautions.

Inmates transferred to mental health providers outside the Facility will be sent with completed Medical Information Transfer Summary Forms.

| Reference: NCCHC Standard | J-G-05 (essential) | |
|---|---|---|
| Effective Date:<br><br>　　May 11, 2003 | Approved by: | |
| Revised/Reviewed:<br><br>　　November 15, 2004 | Signature | Signature<br><br>Kevin Duffy |
| Replaces | Print Name | Print Name<br>President |
| | Title | Title |

AMER000000449

| Policy: | **Suicide Prevention** |
| Number: | **152** |
| Page: | **3 of 3** |

Procedures for responding to suicide attempts; notification of family and authorities in the event of completed or attempted suicides; and documentation required for attempted or completed suicides will be reviewed with healthcare and correctional personnel on a regularly scheduled basis.

All attempted or completed suicides will be reported to and reviewed by the Medical Audit Committee and the Quality Improvement Committee. Suicide attempts will be reviewed in medical shift reports and medical staff meetings. Counseling for staff responding to completed suicides will be provided through on site mental health personnel or by referral to off site mental health providers as necessary.

Reference: NCCHC Standard    J-G-05 (essential)

| Effective Date:<br><br>May 11, 2003 | Approved by: | |
| Revised/Reviewed:<br><br>November 15, 2004 | Signature | Signature<br><br>Kevin Duffy |
| Replaces | Print Name | Print Name<br><br>President |
| | Title | Title |

71

AMER000000450

| Policy: | **Intoxication and Withdrawal** |
| Number: | **155** |
| Page: | **1 of 1** |

All inmates will be evaluated for their use of or dependence on drugs and alcohol when the receiving screening is performed. Inmates reporting the use of alcohol or other drugs will be evaluated for possible intoxication and their degree of reliance on and potential for withdrawal from these substances.

Medical detoxification will be carried out in-house whenever possible and will be done only under physician supervision in accordance with local, state and federal laws. Detoxification Protocols for the observation and treatment of inmates manifesting symptoms of withdrawal will be followed. Direct orders will be obtained from the physician as needed.

Inmates at risk for progression to severe symptoms of withdrawal will be kept under observation by medical or correctional personnel.

Inmates experiencing severe withdrawal symptoms may be referred to the local hospital by the site physician.

Pregnant inmates reporting a history of drug or alcohol abuse will be referred to the physician for assessment and, as needed, treatment.

In general, inmates entering the Facility on methadone will be placed on a physician supervised methadone withdrawal program. Pregnant inmates on methadone will be continued on their methadone regimens however to avoid risk to their fetuses.

| Reference: NCCHC Standard   J-G-06 (essential) | | |
|---|---|---|
| Effective Date:<br><br>May 11, 2003 | Approved by: | |
| Revised/Reviewed:<br><br>November 15, 2004 | Signature<br><br>_____ | Signature<br>Kevin Duffy |
| Replaces | Print Name<br><br>_____ | Print Name<br>President |
| | Title | Title |

AMER000000454

**EXHIBIT 10**

# AmeriCor, Inc.



# SCHEDULE A

# SCOPE OF SERVICES

## TABLE OF CONTENTS

### TABLE OF CONTENTS

BACKGROUND OF FIRM ............................................................. 1
1.  Description of Firm ............................................................. 1
2.  Experience of Firm ............................................................. 1
3.  Accreditation ............................................................. 2
4.  Contract Cancellations ............................................................. 3
5.  References ............................................................. 4
DESCRIPTION OF SERVICES ............................................................. 5
1.  Scope of Services ............................................................. 5
    1.1  Staff Licensure ............................................................. 5
    1.2  Nursing Coverage ............................................................. 6
    1.3  Physician Coverage ............................................................. 6
    1.4  Dentist Coverage ............................................................. 6
    1.5  Hospital Care ............................................................. 6
    1.6  Off Site Services ............................................................. 7
         Abortions ............................................................. 7
    1.7  On-Site Services ............................................................. 8
         Laboratory Services ............................................................. 8
         Radiology Services ............................................................. 9
         Infant Care ............................................................. 9
         Emergency Care ............................................................. 9
         Medical Diets ............................................................. 10
         HIV and Hepatitis Testing ............................................................. 10
    1.8  Receiving Screening ............................................................. 10
    1.9  Histories and Physical Exams ............................................................. 11

# AmeriCor, Inc.



In the event of an emergency, our personnel will immediately respond to the scene to assess the ill or injured individual. The individual will then be stabilized and, if necessary, be transferred to the local Emergency Room for additional treatment. The nurse on duty will contact the hospital by phone and provide details of the individual's condition. A written report will be sent to the hospital with the individual.

Emergency services provided to inmates will be the financial responsibility of AmeriCor. Emergency services provided to employees or visitors within the jail will be provided free of charge. Any costs incurred for employee care after transfer from the jail will be the financial responsibility of the County. Visitors and others not employed by the County will be responsible for any costs they incur after transfer from the jail.

AmeriCor will be responsible for the cost incurred when an ambulance is required to transport an inmate to a local hospital. AmeriCor will bill the responsible agency/county for ambulance transportation of all inmates boarded in from other counties, government agencies, and private agencies counties. The nurse on duty will ask the senior correctional officer at the jail to arrange for security. Correctional officers will accompany the inmate per jail procedure. The nurse will remain with the inmate until the ambulance arrives and will provide a status report to the responding paramedics or Emergency Medical Technicians when they arrive.

## Medical Diets

Our physician will order medical diets for inmates who, because of their medical condition, need a diet not normally prepared for the inmate population. These medical diets will only be ordered when clinically necessary. These orders will state the type of diet to be provided and the duration for which it is to be provided. We will work with your staff to ensure that the diets are within the capabilities of the facility. We will also periodically review the need for continuing the inmate on the medical diet. We will not order religious or "preference" diets but will refer such requests to the facility chaplain or the Facility Administrator.

## HIV and Hepatitis Testing

AmeriCor will perform HIV and hepatitis testing as clinically necessary or upon an inmate's request. Disclosure of HIV-related information will be in accordance with state law.

## 1.8.    Receiving Screening

Sheriff Smith's personnel already have an excellent screening process in place at the jail that appears to comply with the requirements of NCCHC Standard J-E-02 *Receiving Screening*. We, at AmeriCor, believe in the axiom "If it isn't broken, don't fix it". Our staff will therefore follow existing procedures that call for the booking officer to complete an *Inmate Medical Intake Record* and a *Suicide Prevention Screening* on each inmate at the time of the inmate's arrival at the jail as your administrative staff have requested. A registered nurse will then review these forms and, as necessary, perform additional evaluations and tuberculosis

AMER000000557

# AmeriCor, Inc.



screening within four hours of an inmate's commitment to the facility. Should an inmate arrive at the jail injured, nursing personnel will respond immediately and treat or refer the inmate as medically appropriate. Regardless of an inmate's condition at the time of his or her arrival at the jail, our personnel will respond immediately whenever the booking officer requests their assistance.

The Receiving Screening will, at minimum, include the following:

1. Documentation of current illnesses and health problems, including medications taken, and special health requirements including mental, dental and communicable diseases;

2. Behavior observations, including state of consciousness, mental status, and whether the inmate is under the influence of alcohol or drugs or in need of detoxification;

3. Notation of body deformities, trauma markings, bruises, ease of movement, etc.;

4. Screening for tuberculosis;

5. A status classification to assist in making housing assignments; and

6. Referral of an inmate for emergency medical services or other specialist services as clinically indicated.

A registered nurse will promptly review all Receiving Screenings. Inmates who require treatment will be treated at that time and, if necessary, referred to the physician for appropriate follow-up. Any inmate with a mental health condition will be referred to mental health personnel for evaluation and treatment. Inmates that receive a suicide screen score of 8 or higher or who answer "Yes" to questions 1, 8, 9, 10b, 11 or 16b will be referred to mental health staff for further evaluation.

During the screening process, inmates will be given information both verbally and in writing on how to access medical services to ensure that they have full access to the health care program provided at the Jail.

## 1.9.    Histories and Physical Exams

As you know, the National Commission on Correctional Health Care makes a distinction between a Health Assessment and a Physical Examination, i.e. the assessment is a series of questions and the examination is a hands-on examination of the inmate. We will ensure that a complete history and comprehensive physical exam is completed by a licensed health care professional within fourteen (14) days of an inmate's commitment to the jail. These physical exams will meet NYSCOC and the Sheriff's Department's requirements and will be performed in compliance with NCCHC Standard J-E-04 *Health Assessment.* They will include:

1. A review of the Receiving Screening results by a nurse or physician;

# AmeriCor, Inc.



## Medication Administration

We intend to improve your current medication administration system by having nurses administer all prescription medications. This change will free up the correctional officers who currently perform this task and relieve the Sheriff's Department and Putnam County from the legal liability and staffing costs associated with this task. Medications will continue to be administered just outside the housing units as is your current practice to ensure security of the system and keep inmate traffic within the jail to a minimum, unless amended by the Sheriff or his agent.. Medication Administration Records (MAR's) will be used to document the administration of all prescription medications.

We anticipate that you will continue your current practice of allowing inmates to obtain self administered over-the-counter analgesics (Tylenol) from the housing unit control rooms and are willing to provide this medication to the jail free of charge.

## Pharmacy Options

We also encourage you to place certain over-the-counter medications such as antacids (e.g. Maalox) and athlete's foot preparations (e.g. Tinactin) on the Commissary List. This will give inmates the same responsibility for some of their care that they would have if they were at home and would generate a small income for the jail that could then be used to offset the County's cost of operating the jail. We will work with you to develop a list of simple, non abusable medications that can be added to the Commissary List if you wish.

Finally, we understand that implementing a Keep-On-Person (KOP) system is not feasible at this time given current NYSCOC regulations. Such a system, allowing inmates to keep certain non-abusable medications on their persons, has been extraordinarily successful in other jails across the country in allowing inmates some control over their own care while simultaneously improving the quality of the health care system. Should regulations change in the future to allow implementation of a KOP system, we would be happy to assist you in developing it.

## 1.11. Detoxification

A Medical Detoxification Program that conforms to NCCHC Standards J-G-06 *Intoxication and Withdrawal* and J-G-08 *Inmates with Alcohol and Other Drug Problems* as well as NYSCOC directives for drug and/or alcohol addicted inmates. Inmates will initially be screened during the receiving screening process. An additional evaluation for their use of or dependence on drugs and/or alcohol will be performed when the physical exam is completed. Nurses will record vital signs, record any symptoms or signs of dependence and, as needed, contact the physician for individual detoxification orders.

Inmates experiencing severe intoxication (overdose) or withdrawal will be transferred to an appropriate inpatient facility, as directed by the physician. Established guidelines for the treatment and observation of individuals manifesting mild or moderate symptoms of intoxication or withdrawal from alcohol and other drugs will be followed within the Jail. Individuals at risk for progression to more severe levels of withdrawal will be under constant

AMER000000561

# AmeriCor, Inc.



observation by correctional officers. Medical detoxification will be accomplished only under medical supervision and in accordance with local, state, and federal laws.

The following procedures will be implemented for addicted inmates who have normal vital signs and who are stable and otherwise healthy:

1. All inmates being detoxified will be seen by a physician or appropriate qualified health care professional as soon as possible and a physician-approved individualized treatment plan will be initiated.

2. Methadone, per the requirements of your RFP, will not be used for detoxification. The only exception to this policy is pregnant inmates and then only when the viability of the fetus would be threatened if methadone were not provided. Such an exception is believed necessary for reasons of medical ethics and legal liability. We expect such exceptions will be extremely rare and will assume responsibility for making the necessary arrangements when they are required.

3. All inmates who are being detoxified will be carefully observed and treated in a timely manner as their conditions require.

4. Nurses will monitor inmates on a regular basis during detoxification. A physician will supervise the inmate's detoxification and modify the treatment plan when clinically necessary.

5. Inmates will be advised of appropriate community agencies that they may contact for continuing rehabilitation assistance following their release from custody.

## 1.12. Consulting Services

AmeriCor agrees to provide consulting services on any aspect of the health care system that may be required by Putnam County during the term of the healthcare contract at no additional cost to the County.

## 1.13. Medical Records

AmeriCor will maintain a single, hard copy, integrated medical record that documents all services provided for each inmate in accordance with the requirements of NCCHC Standard J-H-01 *Health Record Format and Contents*. We will also ensure the confidentiality of all medical records consistent with all New York State and federal regulations and NCCHC Standard J-H-02 *Confidentiality of Health Records and Information*. We will not utilize an electronic medical record format but will comply with the provisions of the newly implemented federal Health Insurance Portability and Accountability Act (HIPPA).

Medical records will follow the problem-oriented medical format. All entries in the record will document the time and date of each encounter and will show the signature and title of healthcare provider rendering the service. Documentation from all off site specialty consults, emergency room referrals and inpatient hospitalization stays will be made a part of the

**EXHIBIT 11**



PLAINTIFF'S
EXHIBIT NO. 28
FOR IDENTIFICATION
DATE: 1/17/08   RPTR: DB

# AmeriCor, Inc.

# Procedure Manual

## Putnam County Correctional Facility

## 2003

AMER000000487

# AmeriCor, Inc.

| Procedure: | Receiving Screening | Number: | 107 |
| --- | --- | --- | --- |
| Date: | August 15, 2003 | Page: | 1 of 2 |

An *Inmate Medical Intake Record* (IMIR) will be completed on each inmate by the Booking Officer at the time the inmate is committed to the PCCF. If this "Receiving Screening" is unremarkable, the Booking Officer will then contact the medical office and notify the nurse on duty of the commitment.

Within four hours of this notification, the nurse must report to the Booking Unit, collect the completed IMIR and review it for completeness and any ongoing medical needs (e.g. asthma) the inmate may have. If no immediate nursing intervention is determined to be needed after evaluating the IMIR, the nurse will note the date and time of the review and sign the IMIR in the lower right corner of the form.

If the Booking Officer believes there is a medical problem that requires attention, the officer will immediately contact the medical office. The nurse on duty will respond to the Booking Unit immediately, evaluate the inmate and determine whether or not the inmate can be admitted to the facility.

If the inmate is not medically stable (e.g. inmate is bleeding, disoriented or unresponsive, has a suspected fracture, etc.), the nurse will advise the transporting officer to take the inmate to the emergency room for further evaluation and treatment. When the transporting officer returns from the emergency room with the inmate, he must bring paperwork from the hospital stating the inmate has been treated; what treatment was provided; what follow up treatment, if necessary, will be needed; and that the inmate is medically stable. The nurse will then approve the inmate for intake, make whatever treatment plans that are necessary to ensure appropriate medical follow up within the PCCF and document the entire process in the inmate's medical record.

If the inmate has already been seen at a hospital prior to arrival at the PCCF and is accompanied by the required hospital paperwork, the Booking Officer will notify the nurse at the time of the inmate's arrival. The nurse will respond immediately, review the paperwork from the hospital and make plans for whatever follow up treatment that will be needed.

If the inmate is medically stable but requires medical follow up (e.g. intoxicated but subject to going into withdrawal; on chronic medications for diabetes, seizures, pregnant, etc.), the nurse will accept the inmate, document the medical condition in the inmate's medical record and, depending on the inmate's medical problem, either contact the physician for orders or schedule the inmate to be seen at the next Physician's Sick Call. The nurse will then note the date and time the inmate was seen and sign the IMIR in the lower right corner of the form.

AMER000000494

# AmeriCor, Inc.

| Procedure: | Receiving Screening | Number: | 107 |
|---|---|---|---|
| Date: | August 15, 2003 | Page: | 2 of 2 |

If an inmate is determined to be medically stable and is accepted by the Booking Officer prior to notification of the nurse and the nurse, on review of the IMIR, believes a medical problem that requires follow up exists, the nurse will see the inmate immediately, determine what, if any intervention is needed and then either contact the physician or schedule the inmate to be seen at the next appropriate (i.e. physician, dentist, etc.) Sick Call.

In all cases, the nurse must date, time and sign the lower right hand corner of the IMIR to document that the inmate was medically screened within the four hour time limit. The IMIR will then be placed in the inmate's medical record. Any additional documentation that is indicated or required is to be made on a progress note in the inmate's medical record. Any orders received from a physician are to be recorded on the *Physicians' Order Form* in the inmate's medical record and then followed as appropriate. Paperwork from a hospital is also to be placed in the medical record.

All Receiving Screenings are to be documented both on the *Shift Report Form* and in the History and Physical Log Book.

AMER000000495

# AmeriCor, Inc.

| | | | |
|---|---|---|---|
| Procedure: | Opiate Detoxification | Number: | 120 |
| Date: | March 3, 2004 | Page: | 1 of 3 |

Inmates who report a history of opiate (including, but not limited to, heroin and methadone) use when committed to the facility are to be evaluated for the potential for the onset of symptoms of narcotic withdrawal.

Symptoms depend on the frequency and pattern of use; the amount of opiate consumed; and the period of time elapsed between the last use of the narcotic and the time of commitment to the facility. These factors should be documented as part of the nursing assessment. Symptoms, when they occur, may range from mild to severe and will generally peak between 24 and 72 hours after the last use.

Signs of mild withdrawal include runny nose; watery eyes; irritability; loss of appetite; and hot and cold flashes.

Signs of moderate withdrawal include anxiety; agitation; muscle cramps; nausea and vomiting; and tremors.

Signs of severe withdrawal include all of the symptoms of mild to moderate withdrawal and may include tachycardia; hypertension; increased respirations; elevated temperature; diarrhea and dehydration occurring 24 hours after last use of opiate; panic; and insomnia.

Nursing personnel treating an inmate for narcotic withdrawal should take the steps identified in A and B below. Withdrawal medications identified in C below should be started only if the inmate is symptomatic and only after the physician has been contacted.

## A. Documentation, Diet, Vital Signs & Lab Tests

1. Initiate a *Flow Chart For Alcohol/Drug Withdrawal* Form (attached);
2. Place the inmate on a regular diet;
3. Record vital signs q 4 hrs for 8 hours, then q shift for as long as the inmate is being treated for withdrawal;
4. Obtain a specimen for a Urinalysis and draw blood for a CBC and chemistry panel;
5. Administer a PPD if there is no prior positive history;
6. Perform an EKG

## B. Basic Medications

1. Multivitamin - one po daily times 30 days
2. Thiamine – <u>Either</u> 100 mg po times 3 days <u>or</u> 100 mg IM daily times 3 days
3. Ibuprofen – 600 mg q 4 hrs PRN, up to a maximum of 4 doses within 24 hours, times 5 days

AMER000000518

# AmeriCor, Inc.

| | | | |
|---|---|---|---|
| **Procedure:** | Opiate Detoxification | **Number:** | 120 |
| **Date:** | March 3, 2004 | **Page:** | 2 of 3 |

## C. Withdrawal Medications

**IMPORTANT:** The following is not a Standing Medical Order. It is a guideline for treatment personnel. **Nurses may not start prescription medications until they have contacted the physician and obtained a patient specific telephone order.**

Note: Librium is to be withheld if the inmate is asleep when the dose is scheduled to be given. Call the physician if 2 consecutive doses of Librium are held.

### Day One

1. Mild to moderate withdrawal – Librium 50 mg po stat, then Librium 50 mg po q 4 hrs times 24 hours
2. Severe Withdrawal – Librium 100 mg po q 4 hrs if needed for severe tremulousness, restlessness or anxiety; or if BP is 20 mm higher than the previously recorded BP; or if the heart rate is 30 beats per minute higher than the previously recorded rate.

### Day Two

1. Mild to moderate withdrawal – Librium 40 mg po q 4 hrs times 24 hours
2. Severe withdrawal – Librium 100 mg po q 4 hrs if needed for severe tremulousness, restlessness or anxiety; or if BP is 20 mm higher than the previously recorded BP; or if the heart rate is 30 beats per minute higher than the previously recorded rate.

### Day Three

1. Mild to moderate withdrawal – Librium 30 mg po q 6 hrs times 24 hours
2. Severe withdrawal – Librium 100 mg po q 4 hrs if needed for severe tremulousness, restlessness or anxiety; or if BP is 20 mm higher than the previously recorded BP; or if the heart rate is 30 beats per minute higher than the previously recorded rate.

### Day Four

1. Librium – 20 mg po q 6 times 24 hours

### Day Five

1. Librium – 10 mg po q 6 hrs times 24 hours.

AMER000000519

## AmeriCor, Inc.

## FLOW CHART FOR ALCOHOL & DRUG WITHDRAWAL

Inmate Name: _____     Inmate ID #: _____

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Date →→→→→→→ | | | | | | | |
| Time (AM or PM) →→→ | | | | | | | |
| Pulse          Sitting/Standing | / | / | / | / | / | / | / |
| BP | / | / | / | / | / | / | / |
| Temperature | | | | | | | |
| Respirations | | | | | | | |
| Sweating          (Y/N) | | | | | | | |
| Weakness          (Y/N) | | | | | | | |
| Anxiety          (Y/N) | | | | | | | |
| Agitation          (Y/N) | | | | | | | |
| Drowsiness          (Y/N) | | | | | | | |
| Nausea          (R/NR) | | | | | | | |
| Vomiting          (O/R) | | | | | | | |
| Diarrhea          (O/R) | | | | | | | |
| Confusion          (Y/N) | | | | | | | |
| Slurred Speech          (Y/N) | | | | | | | |
| Ataxia          (Y/N) | | | | | | | |
| Tremors          (Y/N) | | | | | | | |
| Hallucinations          (Y/N) | | | | | | | |
| Nurse's Initials | | | | | | | |

Code:    Y = Yes    N = No    O = Observed    R = Reported    NR = Not Reported

Explain all "Yes" and "Observed" notations above and enter date, time and nurse's initials

| |
|---|
| |
| |
| |
| |
| |
| |
| |

Continue notations on reverse side if additional space is needed

AMER000000520

**EXHIBIT 12**

SOJ 32 page 1
rev 06/01

# PUTNAM COUNTY CORRECTION FACILITY
## INMATE MEDICAL INTAKE RECORD

**SECTION 1**

| DATE 05-2006 | TIME | NAME Sinkov, Spencer E | JAIL # 01506 | DOB 04-12-85 | Age 21 |
|---|---|---|---|---|---|

| Sex M | Height 6'01" | Weight 135 | Hair Bro | Eyes Blu | Mustache N | Beard N | Skin Liht | Race White |
|---|---|---|---|---|---|---|---|---|

| FACILITY of origin PCCF | Marital Single | Language English | Ethnicity Non Hisp | Education C-01 | read/write Yes | Religion |
|---|---|---|---|---|---|---|

| Place of Birth Peekskill | Year entered U.S. Cit | Last Incarceration | Soc. Sec. Num 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 |
|---|---|---|---|

| Commitment Charge CSCS 3rd | Home Address 31 Boswell Rd (Putnam Valley) 10579  914-572-7840 | Occupation N/A |
|---|---|---|

EMPLOYER - Address - Telephone Number - Immediate Supervisor

PERSONAL PHYSICIAN - Address - Telephone

EMERGENCY NOTIFICATION - Relationship - Address - Telephone Number
Mother  nara sinkov                           845  538 365-4

INSURANCE COMPANY - Address - Telephone - Policy Number
Fathers

**SECTION 2**        **TUBERCULOSIS SCREENING AT INTAKE**

Ask the following questions , circling the response YES or NO in Column 1 or 2.

| | Column 1 | Column 2 | ReRead |
|---|---|---|---|
| Do you currently have a cough with: | | | |
| Fever? | N | Y | |
| Bloody sputum? | N | Y | |
| Night sweats? | N | Y | |
| Weight loss? | N | Y | |
| Cough for two weeks or more ? | N | Y | |
| Have you lived with or had close contact with anyone with TB? | N | Y | |
| Have you currently immigrated from Asia, Africa, Latin America or South America? | N | Y | |
| Have you ever had TB? | N | Y | |
| If yes; Did you take medication without interruption? | Y | N | |
| If yes; How long did you take medication? | Y | N | |
| Have you had a TB skin test on your arm? | Y | N | |
| If yes; Was it positive? | N | Y | |
| If yes; Did you take medication for TB prevention? | Y | N | |
| Have you been incarcerated in the past 5 years? | Y | N | |
| OFFICER: Does the inmate look sick? | N | Y | |

**TOTAL**   O

If there is three (3) or more answered in Column 2 the inmate SHALL BE kept in segregation until a medical evaluation is completed. MEDICAL STAFF; a chest X-ray and medical consultation SHOULD BE obtained as soon as possible. SHIFT SUPERVISOR; must sign when, 3 or more in Column 2: _____

| CORRECTION OFFICER Vasaturo | DATE 05/20/06 |
|---|---|
| MEDICAL STAFF, if 3 or more | DATE |
| CLASSIFICATION OFFICER | DATE |
| MEDICAL STAFF, review w/ classification | DATE |

REREAD INITIALS  DATE 5-22-06

SOJ 32 PAGE 2
REV 06/01

**PUTNAM COUNTY CORRECTION FACILITY**
**MEDICAL SCREENING AT INTAKE**

SECTION 3

| NAME | | JAIL # | SEX | DOB | DATE | TIME |
|---|---|---|---|---|---|---|
| | | | | | | |

This inmate was previously incarcerated in the Putnam County Correction Facility.    YES _____    NO ____

| DO YOU CURRENTLY HAVE OR HAVE YOU HAD: | Column A YES | Column B NO | Answers given by inmate/ General Comments/Observations All "YES" responses require written comment here |
|---|---|---|---|
| A. PRIMARY MEDICAL PROBLEM | | ✓ | |
| B. EMERGENCY TREATMENT | | ✓ | |
| C. CURRENT MEDICATION | ✓ | ✓ | lunesta |
| D. INJURIES OBSERVED | ✓ | | |
| 1. ASTHMA | | ✓ | |
| 2. BREATHING PROBLEMS | | ✓ | |
| a. HEART TROUBLE | | ✓ | |
| b. HIGH BLOOD PRESSURE | | ✓ | |
| 4. DENTAL PROBLEMS/DENTURES | | ✓ | |
| 5. DIABETES | | ✓ | |
| 6. EPILEPSY/SEIZURES | | ✓ | |
| 7. HEPATITIS   A   B   C   D | | ✓ | |
| 8. LIVER OR KIDNEY DISEASE | | ✓ | |
| 9. STOMACH PROBLEMS/ULCERS | | ✓ | |
| 10. STD | | ✓ | |
| 11.   left blank intentionally | | ✓ | |
| 12. PREGNANCY | | | |
| 13. ALLERGIES to food, meds, envir | | ✓ | |
| 14. ILLNESS | | ✓ | |
| 15. FRACTURES | | ✓ | |
| 16. SCARS/DEFORMALITIES | | ✓ | |
| 17. PHYSICAL DISABILITY | ✓ | | |
| a. VISION OR EYE PROBLEM | | ✓ | |
| b. PRESCRIPTION LENSES | | ✓ | |
| 19. ALCOHOL/ALCOHOL | ✓ | | Socially |
| 20. PRIOR MEDICAL TREATMENT | | | |
| 21. HOSPITAL Where? When? What? | ✓ | | DeTox - Beekman hosp. 6 months ago |
| 22. SURGERY Where? When? What? | | | |
| 23. DRUG Where? When? What? | ✓ | | 6 months ago |
| 25. ILLEGAL DRUG USE | ✓ | | 24 hours heroin |
| 26. SMOKE When? How much? | | ✓ | cigs 1 pack day |

**ACTION TO BE TAKEN BY SCREENING OFFICER**
Immediate Medical Problem requires the notification of the Shift Supervisor.
If total of boxes checked is excessive, or if the screening officer feels it necessary, notify shift supervisor.

Shift Supervisor notified  YES _____  NO _____  Shift Supervisor Name _____  Shift Supervisor Signature _____

Medical Supervision instituted:  Routine ✓  15 Min. Supervisory Visit _____  Constant _____

Medical referral:  NO _____  YES _____, complete referral form.  Emergency _____  Non-Emergency _____

| Screening Officer Name : VacaTero | Screening Officer Signature | CLASSIFICATION REVIEW |
|---|---|---|
| Inmate Signature | Date 05/20/06 | OFFICER _____ |
| | | NURSE _____ |
| | | DATE _____ |

AMER000000003

SOJ 32  PAGE 7
rev 06/01
SECTION 4

## PUTNAM COUNTY CORRECTION FACILITY
### SUICIDE PREVENTION SCREENING GUIDELINES

| NAME | | | JAIL # | SEX | DOB | | DATE | TIME |
|---|---|---|---|---|---|---|---|---|

| MOST SERIOUS CHARGE | Facility Origin Other Than PCCF | Detainee showed serious psychiatric problems during prior incarceration   YES _____   NO _____ |
|---|---|---|

| | Column A YES | Column B NO | General Comments/observations All "YES" responses require written comment here |
|---|---|---|---|
| **OBSERVATIONS OF ARRESTING/TRANSPORTING OFFICER** 1. Arresting or transporting officer believes that detainee may be a suicide risk   If YES, notify shift supervisor. | | ✗ | |
| **PERSONAL DATA** 2. Detainee lacks support of family or friends in the community. | No Family Friends | ✗ | |
| 3. Detainee has experienced a significant loss within the last six months. (e.g., loss of job, loss of relationship, death of close family member) | ✗ | | mother has cancer |
| 4. Detainee is very worried about major problems other than legal situation. (e.g., serious financial or family problem, a medical condition or fear of losing job) | ✗ | | mother, worried about girlfriend |
| 5. Detainee's family member or significant other (spouse, parent, close friend, lover) has attempted to or has committed suicide. | ✗ | | brother on sucessful brother, girlfriend |
| 6. Detainee has history of drug or alcohol abuse. (Note drug and when last used.) | ✗ | | |
| 7. Detainee has history of counseling or mental health evaluation/treatment. (Note current psychotropic medications and name of most recent treatment agency) | ✗ | | |
| 8. Detainee expresses extreme embarrassment, shame, or feeling of humiliation as a result of current charge or this incarceration. ( consider detainee's position in the community and shocking nature of crime) | | | |
| 9. Detainee is thinking of killing himself/herself.   If YES, notify Shift Supervisor immediately. | | ✗ | |
| 10a. Detainee has previous suicide attempt. (Explore method and check for scars.) | | ✗ | |
|   b. Attempt occurred in the last month. | | | |
| 11. Detainee is expressing feelings of hopelessness (nothing to look forward to) | | | |
| 12. This detainee's first incarceration in lockup/jail. | ✗ | | |
| **BEHAVIOR/APPEARANCE** 13. Detainee shows signs of depression (e.g., crying, emotional flatness). | ✗ | ✗ | |
| 14. Detainee appears overly anxious, panicked, afraid or angry. | ✗ | ✗ | |
| 15. Detainee is acting and/or talking in a strange manner. e.g., cannot focus attention, hearing or seeing things which are not there) | ✗ | ✗ | |
| 16a. Detainee is apparently under the influence of alcohol or drugs. | ✗ | | 24 hours ago |
|   b. If YES, is detainee incoherent, or showing signs of withdrawal or mental illness.   If YES to BOTH 16a and 16b notify Shift Supervisor immediately. | ✗ | | Very laid back |

### TOTAL of Column A    10

**ACTION TO BE TAKEN BY SCREENING OFFICER**
If total in Column A is 8 or more, or any shaded box is checked, or if the screening officer feels it necessary, notify shift supervisor.

Shift Supervisor notified YES _____  NO _____   Shift Supervisor _____   Shift Supervisor Signature _____

Mental health Supervision instituted:   Routine _____   15 Min. Supervisory Visit ✗   Constant _____

Mental Health referral:   NO _____   YES _____ , complete referral form.  Emergency _____   Non-Emergency _____

| Screening Officer Name _Van Tyro_ | Screening Officer Signature _____ |
|---|---|
| Inmate Signature _____ | Date _05 / 29 / 06_ |

Officer's comments/Impressions:

Medical Staff and/or Mental Health Provider actions:

| CLASSIFICATION REVIEW |
|---|
| OFFICER _____ |
| NURSE _____ |
| DATE _____ |

SOJ 32  PAGE 8
rev 01/01

SECTION 7

# PUTNAM COUNTY CORRECTION FACILITY
## DIAGNOSIS AND TREATMENT SUMMARY
### THIS INCARCERATION

| NAME | JAIL # | SEX | DOB | DATES OF INCARCERATION |
|---|---|---|---|---|
| | | | | |

| DATE | DIAGNOSIS AND TREATMENT |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**FREE TEXT NOTE BOX**

AMER000000005

AmeriCor, Inc.

**Master Problem List**

Inmate Name: _Sinkou, Spencer_____     ID # _21506_____

This form is to be used to briefly identify all acute and chronic medical, dental and mental health conditions and medical interventions. Examples: #1, 1983, Asthma, See treatment plan, Ongoing or #2, 10-15-05, dental cavity, referred to dentist, cavity filled 11-26-05 or #3, Unknown, Allergy to peanuts, diet ordered, Ongoing, etc. Progress notes should reflect a number that corresponds to the problem number in column 1.

| Problem # e.g. 1, 2, 3, etc. | Date of Onset e.g. 6-15-83 | Problem Type e.g. asthma, cold, etc. | Treatment Goal e.g. See Tx Plan, treated, etc. | Resolution e.g. Ongoing Tx, Resolved 1-6-05 |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

10/22/05

AMER000000006

AmeriCor, Inc.        **Physicians' Orders**

**Name:** SINKOV, SPENCER          **ID No:** 21506

**Allergies:** NKA          **DOB:** 4.22.85

**Date:** /    /                    **Time:**

**Date:** /    /                    **Time:**

**Date:** /    /                    **Time:**

**Date:** /    /                    **Time:**

AMER000000007

**EXHIBIT 13**

PLAINTIFF'S
EXHIBIT NO. 26
FOR IDENTIFICATION
DATE: 1-17-08   RPTR: DB

J 28

PUTNAM COUNTY CORRECTIONAL FAC  IY

## PROGRESS NOTES

(To be used by All Health Providers)

| TE | PROGRESS NOTES | SIGNATURE |
|---|---|---|
| 5200 | Received in Booking A=O Normal gait non tremulo good spirits stats feels fine last used heroin 24 hours ago will monitor patient | |

SINKOU SPENCER
Patient's Name and Number

PCCF
Facility

1   69

Sheet Number

**EXHIBIT 14**

NEW YORK STATE COMMISSION OF CORRECTION

------------------------------------

In the Matter of the Death      :      FINAL REPORT OF THE
                                :      NEW YORK STATE COMMISSION
of Spencer Sinkov, an inmate of :      OF CORRECTION
the Putnam CJ                   :
                                :

------------------------------------

TO:   Sheriff Donald B. Smith
      Putnam County Sheriff's Office
      Three County Center
      Carmel, NY 10512



FINAL REPORT OF SPENCER SINKOV

PAGE 2

GREETINGS:

WHEREAS, the Medical Review Board has reported to the NYS Commission
of Correction pursuant to Correction Law, section 47(1)(d),
regarding the death of Spencer Sinkov who died on May 20, 2006 while
an inmate in the custody of the Putnam County Sheriff's Office, the
Commission has determined that the following final report be issued.

FINDINGS:

1. Spencer Sinkov was a 21 year old male who died on 5/20/06 from a
   suicidal hanging while incarcerated at the Putnam County Jail.
   Sinkov was discovered hanging by his shirt affixed to cell bars by
   an officer at approximately 1:49 p.m. Sinkov's death could have
   been prevented had proper suicide prevention precautions been taken
   and had department policy and procedures been properly followed.

2. Spencer Sinkov was reportedly born on 4/22/85 in Peekskill, NY. He
   lived with his parents and his younger brother in Putnam County.
   Sinkov graduated from high school in 2003 and went on to study music
   in college. Sinkov was an accomplished musician and played bass
   guitar in a local band. In addition, he had recently completed an
   associates degree at Westchester Community College and was looking
   to complete his bachelors.

3. Sinkov had a recent history of heroin use. He reportedly was using
   heroin daily by injecting. Sinkov had also begun to deal heroin and
   other drugs as a way of supporting his habit. Sinkov had no prior
   criminal record. In the instant offense, he was charged with five
   counts of Criminal Possession of a Controlled Substance 3rd and five
   counts of Criminal Sale of a Controlled Substance 3rd after a month
   long investigation by the Putnam County Sheriff's Narcotics
   Enforcement Unit.

4. There was no significant medical history for Sinkov other than
   taking Lunesta for sleep. He had no chronic conditions and was not
   under any physician's care. There was no reported mental health
   history for Sinkov.

5. On 5/19/06, Spencer Sinkov was arrested by members of the Putnam
   County Sheriff's Department's Narcotics Enforcement Unit. Sinkov
   was charged with five of both Criminal Possession of a Controlled
   Substance and Criminal Sale of a Controlled Substance. Bail was set
   at $50,00 or $100,000 bond. It was his first criminal arrest as an
   adult.

FINAL REPORT OF SPENCER SINKOV                                    PAGE 3

6.    At approximately 12:30 a.m. on 5/20/06, Spencer Sinkov was received
      into the Putnam County Jail booking area. Officer J.V. was assigned
      to booking and processed Sinkov into the jail.    Officer J.V.
      proceeded through the booking and medical screening questions.
      Sinkov reported current heroin use stating his last use was 24 hours
      earlier.

7.    Officer J.V. administered the ADM 330 Suicide Screening Guidelines.
      Sinkov scored a 10 with affirmative answers to:

      #3 Detainee has experienced significant loss in last six months:
      reported his mother has cancer

      #4 Detainee is very worried about major problems other than legal:
      stated he was worried about his mother and girlfriend

      #5 Detainee's family member or significant other attempted or
      committed suicide: answered that both his brother and girlfriend had
      attempted in the past

      #6 Detainee has a history of drug or alcohol abuse: affirmative for
      current heroin addiction

      #7 Detainee has history of counseling or mental health treatment:

      #8 Detainee expresses extreme embarrassment, shame, or feeling of
      humiliation due to charge:

      #11 Detainee is expressing feeling of hopelessness:

      #12 Detainee's first incarceration in jail lockup: This was Sinkov's
      first detention

      #16a Detainee is apparently under the influence of alcohol or drugs:
      answered yes as to his reported use of heroin 24 hours earlier

      #16b Detainee is showing signs of withdrawal or mental illness:
      answered yes stating Sinkov was "very laid back"

8.    Officer J.V. placed Sinkov on a 15 minute supervisory check instead
      of constant supervision. The shift supervisor was not informed of
      Sinkov's suicide screening score. Officer J.V. failed to initiate
      constant supervision on an identified high risk inmate.
      Additionally, Officer J.V. failed to follow Putnam County Jail's
      policy and procedures which state:

FINAL REPORT OF SPENCER SINKOV                                    PAGE 4

*15-2 Admissions/Screening Policy*
*3.  Immediately notify the tour supervisor whenever a prisoner (a)*
*scores in the high risk (score of 8 in column A) or immediate*
*referral categories on the Suicide Prevention Screening Form.*

*(e) Appears to be significantly under the influence of alcohol or*
*drugs.*

*4.  All such notifications will be completed by forwarding a copy*
*of the prisoner's screening form to the tour supervisor prior to*
*cell assignment.*

*6.  Assign appropriate housing based upon the results of completed*
*form ADM #330 and other classification determination*

9.   At the jail, Sinkov was under the care of Americor, Inc., a business
corporation holding itself out as a medical care provider.  Business
corporations are not permitted by law to engage in the practice of
medicine in New York.  Sinkov was evaluated by jail RN P.C.  A brief
clinical encounter note was written in the chart stating "*Received
in booking.  A & O (alert and oriented).  Normal gait non tremulous.
Good spirits.  States feels fine.  Last used heroin 24 hrs. ago.
Will monitor.*"  The RN's assessment of Sinkov is inadequate.  There
were no recorded vital signs, no documented physical exam and no
documented history.  Although Sinkov was not displaying active signs
and symptoms of withdrawal at the time of admission, his reported
history of recent heroin use warranted more detailed attention than
was provided.  Additionally the physical exam is not in comportment
with the intentions of 9 NYCRR §7010.1(b), Health Services Policy:

*Prompt screening is essential to identify serious or life-
threatening medical conditions requiring immediate evaluation and
treatment.  Appropriate medical appraisal of inmates is necessary
to reduce the risk that a serious physical deficiency or medical
emergency will be obscured by drug or alcohol ingestion.*

10.  Shift Supervisor, Sgt. L.L., ordered Officer J.V. to place Sinkov
in cell #29 once booking was completed.  Officer J.V. placed Sinkov
in cell 007 of the North Housing Unit to conduct the 15 minute
supervisory watch.  Sgt. L.L. was advised by radio that Sinkov was
placed on a 15 minute check but was not informed about the suicide
screening results.  Sgt. L.L. failed to properly supervise jail
staff as he did not inquire about the reason for Sinkov's cell
reassignment and why the 15 minute watch was instituted.

11.  Sinkov was checked every 15 minutes through the rest of the shift
and was observed sleeping.  Shift change occurred at 7:30 a.m. and
Officer M.O. assumed supervision of the North Housing Unit.  Sinkov

FINAL REPORT OF SPENCER SINKOV                                    PAGE 5

remained on the 15 supervisory hecks.  Sinkov was documented as sleeping throughout the morning.

12.    At approximately 10:50 a.m., Sinkov received a visit from his parents at the jail.  Sinkov visited for approximately 15 minutes and discussed with his parents about hiring an attorney.  Sinkov's father asked if he had used drugs and was withdrawing.  Sinkov was overheard saying he was withdrawing but was not experiencing ill effects.  Sinkov's visit ended at approximately 11:05 a.m. and he was returned to his cell.

13.    Sinkov was fed lunch at approximately 11:30 a.m. and then had his meal tray collected at 12:09 p.m.  Officer M.O. documented doing rounds in the North Housing Unit at 1:13 p.m., 1:25 p.m. and 1:39 p.m.

14.    At 1:49 p.m., Officer M.O. found inmate Sinkov hanging from the cell bars by his sweatshirt.  Sinkov had tied the shirt at the top of the front cell bars and sat down.  He was found facing the back of the cell with one foot on the floor and one foot on the bunk.  Officer M.O. called for immediate assistance.  Officer K.B. from the South Housing Unit arrived next and retrieved a pair of scissors to help cut Sinkov down.  Sgt. K.J., RN S. W. and Officers R.B. and R.W. arrived next.  Officer M.O. entered the day space and cut the shirt away from Sinkov.  Sinkov had to be cut down first as the ligature would block the cell from opening.  Once cut down, Sinkov fell to the floor.

15.    RN S.W. entered the cell and checked Sinkov for vitals.  He had no pulse or respirations and CPR was begun.  Officer R.B. assisted RN S.W. with CPR by administering oxygen.  Officer R.W. had left to retrieve a bag valve resuscitator from the officer's post, however, when he returned the RN stated she wouldn't need it as they had terminated CPR efforts.

16.    At approximately 2:00 p.m., a paramedic from Alamo Ambulance arrived on the scene.  He found no pulse or respirations on Sinkov and no CPR was in progress.  A cardiac monitor was attached and showed asystole in all three cardiac leads.  A determination was made not to continue resuscitation efforts at approximately 2:07 p.m.  The Putnam County Coroner arrived and pronounced Sinkov dead at 3:01 p.m.

RECOMMENDATIONS:

TO THE SHERIFF OF PUTNAM COUNTY:

1.    The booking officer who administered the suicide screening guidelines to Sinkov on 5/20/06 should be disciplined for failing to following the Putnam County Jail's policy and procedures for admissions and screening whereby he:

FINAL REPORT OF SPENCER SINKOV                    PAGE 6

-    failed to notify the shift supervisor of a high suicide risk
     inmate
-    failed to initiate constant supervision of a high risk inmate

2.    The shift supervisor assigned to the 11:30 p.m. to 7:30 a.m. tour
      should be disciplined for failing to properly supervise staff and
      failing to review Sinkov's medial/risk assessment after being
      informed Sinkov was being placed on a 15 minute supervisory watch
      as per department policy and procedure.


      <u>TO THE PRESIDENT OF AMERICOR, INC.</u>:

      The nurse who conducted the intake assessment for Sinkov on 5/20/06
      should be disciplined for failing to conduct a proper assessment
      including, but not limited to, recording of vital signs, physical
      exam findings, and pertinent medical history.  Additionally, all
      inmates should be given a medical assessment when sufficient medical
      staff is available to provide such.


      WITNESS, HONORABLE FREDERICK C. LAMY, Commissioner, NYS Commission
of Correction, 80 Wolf Road, 4th Floor, in the City of Albany, New York
12205 this 22nd day of December, 2006.


                                        Frederick C. Lamy
                                        Commissioner

FCL:mj
06-M-84
9/06

cc:  Kevin Duffy, President and CEO,
       Americor, Inc.

**EXHIBIT 15**

P-1

# Putnam County Sheriff's Department

## Inter - Office Memorandum

Date: May 20, 2006

To:      All members Correction Division

From:   Correction Officer Joseph Vasaturo

SUBJECT:  15 MINUTE SUPERVISORY CHECK


Inmate SINKOV, SPENCER housed in North  Housing Unit cell #007   is on a 15 minute supervisory check. This is due to recent use of drugs and answers given on the suicide screening.



**EXHIBIT 16**

SOJ 02
rev 6/97

MENTAL HEALTH --
ROUTING SHEET

Date: _5-20-06_

[ ] Requested by Staff

[ ] Requested by Inmate

INMATE NAME: _Sirkou Spencer_ DOB: _4-22-85_ JAIL # _21506_

STAFF MEMBER REFERRING: _Sweakes rw_ PC # _____

**1A - INMATES BEHAVIOR OBSERVED BY STAFF MEMBER:** (Check applicable)

_____ Appears depressed
_____ Appears withdrawn
_____ Crying
_____ Anxiety/fear
_____ Obsessions/compulsions
_____ Pacing
_____ Unusually happy

_____ Drastic change in behavior
_____ Disoriented
_____ Inappropriate behavior
_____ Not sleeping (prolonged)
_____ Not eating (prolonged)
_____ Incoherent conversations
_____ Other

**1B - EXPLAIN OBSERVATIONS:** (Write Details) _Hx of substance abuse_
_and family problems._
_____
_____
_____

(If from outside source, write FULL name and telephone number)

**2 - ACTION BY SUPERVISOR:** _____    [ ] MOVED TO OTHER HOUSING
    [ ] REFERRED                              [ ] CONSTANT WATCH
    [ ] 15 MINUTE CHECK

| TO BE COMPLETED BY MENTAL HEALTH STAFF |

**3 - EVALUATED BY MENTAL HEALTH DATE:** _____ BY: _____
                                                    (print)

(Diagnosis, treatment, medications and recommendations)

_____
_____
_____
_____
_____
_____
_____
_____
_____

Supervision: Routine (R) _____ 15 Minute (P2) _____ Constant (P1) _____

    [ ] 402.9    [ ] 508   [ ] CNYCP, Marcy [ ] 939/401

SIGNATURE OF MENTAL HEALTH EVALUATOR _____

EXHIBIT
P1f
5      1D
1/7/08    75

PENGAD 800-631-6989

**EXHIBIT 17**



# AmeriCor, Inc.

October 23, 2006

Honorable Frederick C. Lamy
Commissioner & Chairman
Medical Review Board
State Commission of Correction
80 Wolf Road, 4th Floor
Albany, NY 12205-2670



Re: Response to Preliminary Report MRB # 06-M-84

Dear Commissioner Lamy,

I have reviewed the Commission's September 25, 2006 preliminary report, MRB# 06-M-84, on inmate Spencer Sinkov's death at the Putnam County Correctional Facility (PCCF) on May 20, 2006. Our response is as follows:

1. <u>Intake Screening</u>

    A. The report alleges that that "The RN's assessment of Sinkov is inadequate." Nurse P. C. is a New York State licensed registered nurse with extensive experience in both a major urban hospital's emergency room and a correctional facility. He did evaluate Mr. Sinkov when notified of the inmate's admission into the facility's Booking Unit. He did review the completed *Inmate Medical Intake Record*. As noted in the Commission's report, Mr. Sinkov had "no significant medical history" and "no chronic conditions and was not under any physician's care" and that "There was no reported mental health history".

    B. The nurse also personally interviewed the inmate immediately following his booking and within thirty minutes of his arrival at the facility and did not find any indications of apparent medical or mental impairment.

    C. While inmate Sinkov did score high enough on the *Suicide Prevention Screening Guidelines* to warrant follow up services, he was demonstrating no physical or verbal indications that he was contemplating suicide and had already been placed on fifteen minute checks by the booking officer. Later that same morning, the day shift RN also completed a referral form for mental health evaluation.

    D. The Commission's report alleges that "the physical exam is not in comportment with the intentions of 9 NYCRR §7010.1 (b)". We disagree. That section of the standards identifies "serious or life-threatening medical conditions" and the report has already stated there was no significant

medical history, chronic conditions or reported mental health history. Section 7010 requires a <u>screening</u> which Mr. Sinkov received. Since there was no indicative medical history and no current indication of need, neither a complete set of vital signs nor additional <u>medical examination</u> were indicated.

E.  The PCCF was accredited by the National Commission on Correctional Health Care under the *Standards for Health Services in Jails* in February of this year. The relevant standard, J-E-02 Receiving Screening, addresses all aspects of what is required by an intake screening. Like section 7010 of the state standards, it neither requires nor suggests that vital signs be taken. The intake screening therefore fully complied with both state and national standards. In reviewing the matter with Sheriff Donald Smith, he recommended that vital signs, while not required by the standards, should nevertheless be obtained on all new commitments. We concur and have implemented just such a procedure.

2.  <u>Medical Assessments of Inmates</u>

A.  <u>Receiving Screenings</u>, as reported in 1, E above, are performed immediately on all inmates committed to the Putnam County Correctional Facility in accordance with state and national standards.

B.  <u>Health Assessments</u> are required by both New York State Minimum Standards and National Commission on Correctional Health Care Standards to be completed within fourteen days of an inmate's commitment to a jail facility. Procedures in place at the PCCF ensure that these standards are met by having the health assessments completed within ten days of commitment.

3.  <u>Alleged Corporate Practice of Medicine</u>

A.  AmeriCor, Inc. does not practice medicine.

B.  The practice of medicine at the Putnam County Correctional Facility is the province of Michael J. Nesheiwat, M.D. He is president of the medical staff and Chairman of the Department of Medicine at the Putnam Hospital Center and a member of the board of the Putnam County Department of Health.

C.  Dr. Nesheiwat has been appointed to the position of Jail Physician by act of the Putnam County Legislature. As medical director for the facility, he is responsible for making medical decisions.

4. <u>Summary</u>

    A. The receiving screening performed by Nurse P. C. at the time of Mr. Sinkov's commitment to the Putnam County Correctional Facility was timely and complied with both New York State Minimum Standards and National Commission on Correctional health Care Standards governing intake screenings. No disciplinary action is therefore indicated.

    B. Health assessments are required by both NYS and NCCHC Standards within 14 days of commitment. Mr. Sinkov was in the facility for approximately 13 hours. No assessment was therefore indicated.

    C. AmeriCor, Inc. does not practice medicine. Such practice is reserved to a NYS licensed physician appointed as the Jail Physician by action of the Putnam County Legislature.

We appreciate the Commission's review of this incident and look forward to working with you in the future. Please let us know if there are any additional questions or you require any further information.

Sincerely,

Kevin Duffy
President & CEO

cc:    Sheriff Donald B. Smith

**EXHIBIT 18**

COPY                    l

1

2

3    - - - - - - - - - - - - - - - - - - - X

4         In the Matter of the Claim of

5    DONNY A. SINKOV, as father and potential
     personal representative of SPENCER E.
6    SINKOV, deceased, and the Estate of
     SPENCER E. SINKOV, deceased,

7

8                    -against-

9    THE COUNTY OF PUTNAM.

10
     - - - - - - - - - - - - - - - - - - - X
11

12                        151 Broadway
                          Hawthorne, New York 10532
13                        Monday, December 18, 2006
                          2:15 p.m.
14

15                        Examination of Claimant,

16   DONNY A. SINKOV, held pursuant to Section 50-h of

17   the General Municipal Law of the State of New

18   York, at the above time and place, before

19   Adrienne Healy, a Certified Shorthand Reporter

20   and Notary Public within and for the State of New

21   York.

22                COURT REPORTING ASSOCIATES, INC.
                     1699 Route 6; P.O. Box 113
23                    Carmel, New York 10512
                         (845) 225-0024
24

25

36

1                      Donny A. Sinkov

2    you visited with him?

3            A.      There was a prison guard there.

4            Q.      Do you know that prison guard's

5    name?

6            A.      No, I don't.

7            Q.      Did you have a conversation

8    with Spencer during that 15 minutes?

9            A.      Yes.

10           Q.      And do you recall what was

11   said?

12           A.      I asked Spencer how he was.  He

13   said that he was starting to go through

14   withdrawal.  I asked him what he was being

15   charged with and he said the detectives told him

16   that he'd be in jail for 25 years, that it was a

17   class something or other felony.

18                   I told him that I was gonna get

19   him a lawyer.  He said he was told that a Legal

20   Aid lawyer would be appointed for him.  And then

21   he said again that he was gonna be in jail for

22   the next 25 years and that we weren't gonna see

23   him anymore.

24           Q.      Besides indicating that he

25   thought he would be in jail for 25 years, did he

37

1                      Donny A. Sinkov

2    discuss with you what the charges were against

3    him?

4           A.     No.  But he didn't say that's

5    what he thought, he said that that's what the

6    detectives told him.

7           Q.     Can you describe his demeanor

8    during that time period?

9           A.     He looked very unhappy.  He

10   looked depressed.  He looked very pale.  He

11   looked cold.  He had dark circles under his

12   eyes, and he looked sick.

13          Q.     Did you ask him what he had

14   been doing when he got arrested?

15          A.     No.

16          Q.     Do you recall him saying

17   anything else during the time that you were

18   visiting with him?

19          A.     No, I don't recall.

20          Q.     And were all four of you

21   present together during the entire 15 minutes?

22          A.     We were all in the same room.

23          Q.     Were you sitting down or

24   standing?

25          A.     Spencer, my wife and I were

38

1                          Donny A. Sinkov

2      sitting down and the guard was standing in the

3      corner of the room.

4                Q.     What about Trevor?

5                A.     And Trevor was sitting, too.

6                Q.     He was seated at a table?

7                A.     Yes.

8                Q.     Did your wife have any

9      conversations with Spencer?

10               A.     I don't remember exactly what

11     she said to him.

12               Q.     Do you recall anything in

13     substance that she said?

14               A.     No, I don't.

15               Q.     What about Trevor?  Did he have

16     any conversations with his brother?

17               A.     I don't remember.

18               Q.     Do you remember any other

19     conversations other than what you've already

20     testified about that occurred during that

21     meeting?

22               A.     Yes.  I told the prison guard

23     that Spencer was going through heroin withdrawal

24     and could he be given methadone or something

25     like that.

39

1                    Donny A. Sinkov

2              Q.     What did that prison guard say?

3              A.     He said that we don't do that

4       here.

5              Q.     Did you say anything else to

6       him?

7              A.     Yes.  I asked, if he couldn't

8       be given that, could he be given some kind of

9       medical treatment for his heroin withdrawal.

10             Q.     And did the prison guard

11      respond?

12             A.     He said that Spencer couldn't

13      receive anything for five days until he was

14      classified.

15             Q.     Did you say anything else?

16             A.     I told Spencer that I'll call

17      my attorney as soon as I get home and that he

18      would be in touch with him.

19             Q.     Did you have any other

20      conversations with the prison guard?

21             A.     No.

22             Q.     Did your son say anything to

23      you during that 15-minute meeting that led you

24      to believe that he wanted to commit suicide?

25             A.     No.

**EXHIBIT 19**

SATURDAY MAY 20 2006 A Line

Date: 5/20/06   Day: Saturday   A
Correction Officer _____ on/off duty _____ housing unit
24 Keys and log book checked, reviewed, inspected, supplies,
18 Utensils, post equipment, _____, gates, fires, screens, security windows
doors, firefighting equipment checked and found operational.
(Deficiencies noted below)
___ males/females counted on unit, ___ males/females off unit, 8 total
males/females assigned to unit all secure, under general supervision

| | | |
|---|---|---|
| 1296 2300 | NH checked 8 A/A | |
| 1297 2341 | 15 minute supervision unit inmate Kirby | |
| | checked 1 apple same | |
| 1298 0029 | NH checked 8 males same | |
| 1299 0016 | NH checked 8 male same | |
| 1300 0030 | NH checked 8 males all secure | |
| 1301 0046 | NH checked 8 male same | |
| 1302 0059 | NH checked 8 male same | |
| 1303 0116 | NH checked 8 male same | |
| 1304 0129 | NH checked 8 male same | |
| 1305 0145 | NH checked 8 male same | |
| 1306 0152 | Reed 1 male intake Parcel 7 | |
| | #2160/6 cell #7 Age 21 unch 15 min | |
| | 15 V checked | |
| 1307 0158 | NH checked 9 males same | |
| 1308 0214 | NH checked 9 male same | |
| 1309 0221 | NH checked 9 male same | |
| 1310 0244 | NH checked 9 males same | |
| 1311 0306 | NH checked 9 males all secure | |
| 1312 0315 | 15m check under rung down all secure | |
| 1313 0330 | NH checked 9 males all secure | |
| 1314 0315 | NH checked 9 males all secure | |
| 1315 0400 | NH checked 9 males all secure | |
| 1316 0415 | NH checked 9 males all secure | |
| 1317 0430 | NH checked 9 males all secure | |
| 1318 0445 | NH checked 9 males all secure | |
| 1319 0500 | NH checked 9 male same | |
| 1320 0516 | NH checked 9 male same | |
| 1321 0530 | NH checked 9 males same | |
| 1322 0541 | NH checked 9 males same | |
| 1323 0611 | NH checked 9 male same | |
| 1324 0620 | showers/razors offered 9 male declined | |
| 1325 0644 | NH checked 9 male same | |
| 1326 0629 | NH checked 9 male same | |
| 1327 0641 | NH checked 9 male same | |
| 1328 0650 | inmate ready to medical to check blood | |
| | sugar and receive medication → returned | |
| | to assigned cell | |
| 1329 0658 | NH checked 9 male same | |

| | | |
|---|---|---|
| 1330 0713 | NH |
| 1337 0726 | Date: |
| | Correction |
| | 24 Key |
| | 18 Ute |
| | doors, fi |
| | males/fe |
| 1338 0720 | Date: |
| | Correction |
| | 24 Key |
| | 18 Ute |
| | doors, fire: |
| | 9 ma |
| | males/fem |
| 1339 0733 | "Inma |
| 1340 0750 | NH ch |
| 1341 0754 | N Hu |
| 1342 0803 | NH c |
| 1343 0817 | 15 min/u |
| X X X | talk, |
| 1344 0829 | Trans |
| 1345 0843 | 15 min s |
| | talk, |
| 1346 0851 | Medi |
| 1347 0905 | NH c |
| 1348 0912 | Outdo |
| 1349 0919 | 15 min |
| 1350 0933 | NH |
| 1351 0946 | 15 min |
| 1352 0959 | NH |
| 1353 1012 | Outdoor |
| 1354 1015 | Outdoor |
| 1355 1026 | NH c |
| 1356 1043 | 15 min |
| 1357 1049 | Retd O |
| 1358 1100 | NH |
| 1359 1107 | Cpcd |
| 1360 1118 | 15 min s |
| 1361 1133 | Inma |
| 1362 1145 | 15 min S |
| 1363 1200 | nú |
| 1364 1213 | 15 m |
| 1365 1227 | NH c |
| 1366 1232 | Trans |
| 1367 1245 | 15 min |
| 1368 1258 | NH c |

| | 1380 | 0713 | NHV checked 9 males all secure |
| | 1381 | 0720 | Date: 5/20/06  Day: Saturday  Shift: A |
| | | | Correction Officer ___ on/off duty NHV ___ housing unit |
| | | | 24 Keys and logbook checked and reviewed. Inspected: supplies, |
| | | | 18 Utensils, post equipment, locks, gates, bars, screens, security windows, |
| | | | doors, firefighting equipment checked and found operational. |
| | | | (Deficiencies noted below). |
| | | | 9 males/females counted on unit, 0 males/females off unit, 9 total |
| | | | males/females assigned to unit, all secure. Unit on active supervision |
| | 1338 | 0720 | Date: 5/20/06  Day: Saturday  Shift: B-Live |
| | | | Correction Officer Oliver  on/off duty North  housing unit |
| | | | 24 Keys and logbook checked and reviewed. Inspected: supplies, |
| | | | 18 Utensils, post equipment, locks, gates, bars, screens, security windows, |
| | | | doors, firefighting equipment checked and found operational. |
| | | | (Deficiencies noted below). |
| | | | 9 males/females counted on unit, 0 males/females off unit, 9 total |
| | | | males/females assigned to unit, all secure. Unit on Active supervision |
| | 1339 | 0733 | "Tomato fed no recreation" |
| | 1340 | 0750 | NHV check 9 males all secure |
| | 1341 | 0754 | NHV Area checked All secure |
| | 1342 | 0803 | NHV ch 9 males all sec |
| | 1343 | 0817 | 15 minutes check Sinkave lying down, Kirby + Brady up |
| | | xxx | talk to each other |
| | 1344 | 0829 | Trays collected 9 males all sec |
| | 1345 | 0843 | 15 min ck check Sinkave lying down, Kirby + Brady up |
| | | xxx | talk to each other all sec |
| | 1346 | 0851 | Meds given out by facility nurse 9 males all sec |
| | 1347 | 0905 | NHV ch 9 males all sec |
| | 1348 | 0912 | Outdoor exercise began |
| | 1349 | 0919 | 15 min ck ch Sinkave lying down, Kirby in rec all sec |
| | 1350 | 0931 | NHV check 9 males all sec |
| | 1351 | 0946 | 15 min ck Sinkave lying down, Kirby in rec |
| | 1352 | 0959 | NHV ck 9 males all sec |
| | 1353 | 1012 | Outdoor exercise ends 9 males all sec |
| | 1354 | 1015 | Outdoor exercise begins for PDA McCarrick |
| | 1355 | 1026 | NHV ck 9 males all sec |
| | 1356 | 1043 | 15 min ck check Sinkave lying down, Kirby cleaning cell all sec |
| | 1357 | 1049 | Retd 0 male Sinkave out to Waybourne for visit |
| | 1358 | 1100 | NHV ck 8 males all sec |
| | 1359 | 1107 | Rcvd 0 male Sinkave from visit 9 males all sec |
| | 1360 | 1118 | 15 min ck check Sinkave lying down + Kirby watch TV |
| | 1361 | 1133 | Inmate fed no recreation 9 males all sec |
| | 1362 | 1145 | 15 min ck check Sinkave + Kirby eating all sec |
| | 1363 | 1200 | NHV ck 9 males all sec |
| | 1364 | 1213 | 15 min ck ck Sinkave + eating lying down all sec |
| | 1365 | 1227 | NHV ck 9 males all sec |
| | 1366 | 1232 | Trays collected 9 males all sec |
| | 1367 | 1245 | 15 min ck ck Kirby watch TV Sinkave lying down all sec |
| | 1368 | 1258 | NHV ck 9 males all sec |

42

369 1306 ANU Artu (reeКell All Secur
370 1313 15 min strct chk kids inside TV, Sidroom sleeping all sec
371 1325 NAU clnd (9) males all sec
372 1339 NAU clnd (8) males all sec
373 1348 Rec'd (9) males + (1) female per bible study
374 1349 Inmate Sinkow, Spencer #21506 hanging in his cell
KA N hanging on the bars on 3D gate
375 1352 Nurse Waters on unit to administer first aid
376

**EXHIBIT 20**

**DISPATCH INFORMATION**

CALL LOCATION: Putnam County Jail

CODE: BEGIN / END / TOTAL

- END
- AT SCENE
- FROM SCENE
- AT DESTINATION
- IN SERVICE
- IN QUARTERS

**PATIENT INFORMATION**

SPONSOR NAME: _____ LAST NAME: _____

Putnam County Correctional Facility

APPT/UNIT NUMBER: _____ (PHONE) - _____

City/Town: _____ ZIP: _____ - +4

D.O.B. MO / DD / YR  Sex: M / F

SS#: _____

Physician: _____

Call Received as:
- ● EMERGENCY
- ○ NON EMERGENCY
- ○ STANDBY

CARE IN PROGRESS ON ARRIVAL:
- ○ None  ○ Citizen  ○ PD/FD/Other First Responder  ○ Other EMS  ○ PAD used

○ Residence  ○ Health  ○ Farm  ○ Industrial  ○ Other Work  ○ Recreational  ○ Road  ● Other

**MECHANISM OF INJURY:** Unknown

- ○ MVA ( ✓ seat belt used → )
- ○ Struck by vehicle
- ○ Fall of ___ feet
- ○ Unarmed assault
- ○ GSW
- ○ Machinery
- ○ Extrication required   ___ minutes
- Seat belt used? ○ Yes ○ No ○ Unknown

**CHIEF COMPLAINT:** Cardiac Arrest

**SUBJECTIVE ASSESSMENT:** U/A found 21 y/o male laying supine on the floor ⊖ Pulse ⊖ Breathing noted. Correctional officer states "we did a check at 1340h

**PRESENTING PROBLEM** (Fill in circle)
- ○ Airway Obstruction
- ○ Respiratory Arrest
- ○ Respiratory Distress
- ○ Cardiac Related (Potential)
- ● Cardiac Arrest
- ○ Allergic Reaction
- ○ Syncope
- ○ Stroke/CVA
- ○ General Illness/Malaise
- ○ Gastro-Intestinal Distress
- ○ Diabetic Related (Potential)
- ○ Pain
- ○ Unconscious/Unresp.
- ○ Seizure
- ○ Behavioral Disorder
- ○ Substance Abuse (Potential)
- ○ Poisoning (Accidental)
- ○ Shock
- ○ Head Injury
- ○ Spinal Injury
- ○ Fracture/Dislocation
- ○ Amputation
- ○ Other
- ○ Major Trauma
- ○ Trauma-Blunt
- ○ Trauma-Penetrating
- ○ Soft Tissue Injury
- ○ Bleeding/Hemorrhage
- ○ OB/GYN
- ○ Burns
- Environmental
  - ○ Heat
  - ○ Cold
  - ○ Hazardous Materials
- ● Obvious Death

**PAST MEDICAL HISTORY**
- ○ None
- ○ Allergy to _____
- ○ Hypertension  ○ Stroke
- ○ Seizures  ○ Diabetes
- ○ COPD  ○ Cardiac
- ○ Other (List)  ○ Asthma

Current Medications (List):

**VITAL SIGNS**

| | TIME | RESP | PULSE | B.P. | LEVEL OF CONSCIOUSNESS | GCS | R | PUPILS | L | SKIN | STATUS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Rate: 0  ○ Regular ○ Shallow ○ Labored | Rate: 25  ○ Regular ○ Irregular | 0 / 0 | ○ Alert ○ Voice ○ Pain ● Unresp. | 3 | ○ Normal ○ Dilated ○ Constricted ○ Sluggish ○ No-Reaction | ○ Cool ○ Warm ○ Moist ○ Dry | Unremarkable ○ Pale ○ Cyanotic ○ Flushed ○ Jaundiced | ○ C ● O ○ U ○ P ○ S |
| | | Rate: ___  ○ Regular ○ Shallow ○ Labored | Rate: ___  ○ Regular ○ Irregular | / | ○ Alert ○ Voice ○ Pain ○ Unresp. | | ○ Normal ○ Dilated ○ Constricted ○ Sluggish ○ No-Reaction | ○ Cool ○ Warm ○ Moist ○ Dry | Unremarkable ○ Pale ○ Cyanotic ○ Flushed ○ Jaundiced | ○ C ○ O ○ U ○ P ○ S |
| | | Rate: ___  ○ Regular ○ Shallow ○ Labored | Rate: ___  ○ Regular ○ Irregular | / | ○ Alert ○ Voice ○ Pain ○ Unresp. | | ○ Normal ○ Dilated ○ Constricted ○ Sluggish ○ No-Reaction | ○ Cool ○ Warm ○ Moist ○ Dry | Unremarkable ○ Pale ○ Cyanotic ○ Flushed ○ Jaundiced | ○ C ○ O ○ U ○ P ○ S |

**OBJECTIVE PHYSICAL ASSESSMENT:** and 10mm later came back and found him in between the bars as he hung himself." CPR was started by the nurse then stop and CPR hasn't been started again.

**COMMENTS:** Appx time from ⊖ Rigor noted in the jaw unable to check for any DOADEDET when CPR was started was appx 25 min." PIB. ⊖ Pulse ⊖ Resp Unable due to the staff asking us not to move him. Pt Pronnounced at 1410.

**TREATMENT GIVEN** (FILL IN CIRCLE)
- ○ Moved to ambulance on stretcher/backboard
- ○ Moved to ambulance on stair chair
- ○ Walked to ambulance
- ○ Airway Cleared
- ○ Oral / Nasal Airway
- ○ Esophageal Obturator Airway / Esophageal Gastric Tube Airway (EOA/EGTA)
- ○ EndoTracheal Tube (E/T)
- ○ Oxygen Administered @ ___ L.P.M., Method _____
- ○ Suction Used
- ○ Artificial Ventilation Method _____
- ○ C.P.R. in progress on arrival by: ○ Citizen ○ PD/FD/Other First Responder ○ Other
- ○ C.P.R. Started @ Time ▶ ___ Time from Arrest Until C.P.R. ▶ ___ Minutes
- ○ EKG Monitored (Attach Tracing) [Rhythm(s)] _____
- ○ Defibrillation/Cardioversion No. Times ___ ○ Manual ○ Semi-automatic

- ○ Medication Administered (Use Continuation Form)
- ○ IV Established Fluid _____ Cath. Gauge ___
- ○ Mast Inflated @ Time _____
- ○ Bleeding / Hemorrhage Controlled (Method Used: _____)
- ○ Spinal Immobilization Neck and Back
- ○ Limb Immobilized w/ ○ Fixation ○ Traction
- ○ (Heat) or (Cold) Applied
- ○ Vomiting Induced @ Time ___ Method _____
- ○ Restraints Applied, Type _____
- ○ Baby Delivered @ Time ___ In County _____
  - ○ Alive ○ Stillborn ○ Male ○ Female
- ○ Transported in Trendelenburg position
- ○ Transported in left lateral recumbent position
- ○ Transported with head elevated
- ○ Other: _____

**DISPOSITION** (See List): — Obvious Death —

DISP. CODE: O I D

CONTINUATION FORM USED: YES

**CREW**

| IN CHARGE | DRIVER'S NAME | NAME | NAME |
|---|---|---|---|
| Wheelock | ○ CFR ○ EMT ○ AEMT # | ○ CFR ○ EMT ○ AEMT # | ○ CFR ○ EMT ○ AEMT # |
| ● EMT  4193448 | | | |

© COPYRIGHT 1986 NEW YORK STATE DEPARTMENT OF HEALTH

AGENCY COPY

EMS 100 (11/86) provided by NYS-EMS PROGRAM
DOH 3283 (4/04)

**EXHIBIT 21**

SPRC 30 REV. 7/88

# STATEMENT

Page # __1___

This statement was taken by: Inv. Nicholas DePerno Jr_____ of the Putnam County Sheriff's Department. Statement

taken at Putnam County Sheriff's Department, Carmel _____ New York.

Taken on _____May 20, 2006_____ at _____2:36_____ PM

From: NAME: Susan Waters_____ AGE: __39_____ D.O.B. 09/15/1966

ADDRESS: 3 County Center, Carmel, New York 10512_____  PHONE: _____

BUS: 225.5255 X333

CELL: _____

I work at the Putnam County Correctional Facility as a Registered Nurse. I am employed with AmeriCor. That's the medical company that runs the medical department in the jail. On May 20, 2006 I was working the 7:30Am to the 4:00PM shift. At approximately 1:53PM I received a call while I was in the medical office. I don't know who it was that called me. A CO told me, "there seems to be a problem in North". I grabbed a pair of gloves, locked my office and ran to North Housing desk. Officer Blanchard stated to me that there was somebody hanging. She was grabbing a pair of scissors from the desk. I followed her into North to cell 7. At which time I observed an inmate hanging from the front bars to the left of the door by a gray sweatshirt. The inmate appeared to be deceased. He was white in color and saliva was noted coming from his mouth and around his chin. At this time I recognized the inmate to be somebody who I had a brief conversation with at approximately 11:00AM. I don't recall who cut the inmate down. The sweatshirt was cut from the outside of the cell because his cell gate was closed. When the CO cut the inmate down he fell to the floor. When he fell he hit the metal table with the right side of his head. After the inmate fell down the gate was opened by a CO. I'm not sure who opened it. At this time I went into the cell. I pulled his legs straight and accessed him for vital signs. He was not breathing, there was no chest movement and there was no pulse. His eyes were open, fixed and dilated. He was ashen, waxy looking and warm to the touch. I started CPR with the help of Officer Bartley. Approximately fifteen minutes later we stopped CPR. Inv. Nappi had arrived at this time and stated he was the arrest from last night. This is when I found out who the inmate was. I notified HSA, Rich DeMattio. He is the Head Nurse in charge. I asked him to call Mr. Duffy who is the AmeriCor President. At this time the ambulance arrived with the paramedic and took the scene over.

Verification By Subscription And Notice Under Penal Law Section 210.45

It is a crime, punishable as a Class A misdemeanor under the laws of the State of New York, for a person, in and by a written instrument, to knowingly make a false statement which such person does not believe to be true.

Affirmed under penalty of perjury this

20th day of May 2006

_Susan Waters_
(Signature)



PLAINTIFF'S
EXHIBIT NO. _33_
FOR IDENTIFICATION
DATE: _1-23-08_ RPTR: _RB_

43

**EXHIBIT 22**

NEW YORK STATE COMMISSION OF CORRECTION

---------------------------------

In the Matter of the Death          :

of Norberto Rivera, an inmate of :
the Putnam County Jail               :

                                     :

---------------------------------

FINAL REPORT OF THE
NEW YORK STATE COMMISSION
OF CORRECTION

TO:    Sheriff Donald B. Smith
       Putnam County Sheriff's Office
       Three County Center
       Carmel, New York 10512



**FINAL REPORT OF NORBERTO RIVERA**                    **PAGE 2**

GREETINGS:

    WHEREAS, the Medical Review Board has reported to the NYS Commission of Correction pursuant to Correction Law, section 47(1)(d), regarding the death of Norberto Rivera who died on November 15, 2003 while an inmate in the custody of the Putnam County Sheriff's Office, the Commission has determined that the following final report be issued.

<u>FINDINGS</u>:

1.    Inmate Norberto Rivera was a 41 year old male who died from an apparent suicidal hanging on 11/15/03 while incarcerated at the Putnam County Jail. He had been incarcerated since 11/10/03 when arrested on Robbery 1st charges.

2.    Rivera was born on 3/18/58 in Puerto Rico and lived most of his life in the Bronx, New York area. His immediate family included his parents and a wife. Little else is known of Rivera's social history.

3.    Rivera's criminal history began in 1980 with an arrest for Criminal Possession of a Controlled Substance 3rd. Rivera had a long history of drug related offenses which accumulated to twelve misdemeanor and felony arrests, seven jail terms and one term in state prison. In the instant offense, he was arrested on Robbery 1st charges after committing a home invasion break in.

4.    

5.    On 11/10/03, Rivera was committed to the Putnam County Jail. His suicide screening form showed a score of six with affirmative answers for having a history of drug abuse, depression and currently being under the influence. Given the period of abstinence prior to jail admission and the signs of withdrawal at jail admission, the Board found that Mr. Rivera was not under the influence of heroin upon admission to jail. A risk assessment and medical screening were completed. He appeared to be entering withdrawal. He was placed on a fifteen minute watch and had a referral made out to mental health by the shift sergeant.

6.    Upon his admission, Rivera was assessed by medical staff. ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ His medical assessment revealed he was in active withdrawal from heroin. He was placed on a detox program which included Librium 50 mg q8h for seven days and Reglan 10 mg for

**FINAL REPORT OF NORBERTO RIVERA**                                    **PAGE 3**

associated nausea.  A Clonidine patch was added to control his blood pressure.

7.      Rivera was seen by medical staff at minimum every eight hours for medication administration and monitoring.  On 11/13/03, it was noted that Rivera had a sharp increase in his blood pressure.  Per the jail physician, Rivera was given an additional dose (20 mg) of Librium as it was suspected his hypertension was related to increased anxiety.  No other significant medical events occurred with Rivera until the terminal event.

8.      ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████  According to medical staff, this was observed to be a regular and reoccurring policy of the psychiatrist, i.e., to not see patients who were intoxicated or in withdrawal.  This was a deliberate refusal to provide services and represents inadequate mental health care. ████████████████████████████████████████ ███████  The Commission investigation revealed this to be untrue.  (See Finding #9.)  Dr. P.S. stated to Commission investigators that he could not recall who on the medical staff made such a statement to him.

9.      Rivera was housed in the north housing unit in cell 11.  He remained on a 15 minute watch his entire course of incarceration.  Based upon a review of records and interviews of medical and security staff, no changes in behavior or unusual incidents were noted between the time of admission up to the date of the terminal event.  Rivera's demeanor and behavior gave no indication that he was in a violent or agitated state.

10.     On 11/15/03, Rivera began the day with normal facility routine.  He ate his breakfast meal at approximately 7:30 a.m. and was seen by the nurse at approximately 9:30 a.m.

11.     At approximately 10:45 a.m., Rivera began banging on his cell wall.  During his 11:00 a.m. round, the housing unit officer witnessed Rivera still banging on his cell wall.  He informed Rivera that if he didn't quit banging on the walls, his bedding would be removed.  Rivera complied but kept asking the officer when he was going to get his "psychiatric meds."  The officer said he would check with the nurse and get back with him.

12.     After completing the 11:00 a.m. round, the housing area officer heard Rivera banging on his cell walls again.  He contacted his supervisor and advised her that he was going to remove Rivera's bedding items due to his disruptive behavior.  The sergeant arrived in the area at approximately 11:17 a.m. and approved the measure.  At 11:25 a.m., two officers entered Rivera's cell and removed his

**FINAL REPORT OF NORBERTO RIVERA**                    **PAGE 4**

bedding. Rivera was compliant and did not offer any resistance. A disciplinary report was then filed by the housing unit officer.

13.    Upon entering Rivera's cell, the housing area officer discovered Rivera had broken the glass light fixture. Another officer entered his cell and replaced the light fixture and bulb. Rivera was instructed to lock back in his cell which he compliantly did. At approximately 11:35 a.m., lunch was served on the unit. Inmate was let out of his cell to obtain his meal and then was re-secured in his cell.

14.    The housing area officer recorded making his next rounds at 11:45 a.m., 12:00 p.m., 12:15 p.m., 12:30 p.m., 12:45 p.m., 1:00 p.m., 1:30 p.m. and 1:45 p.m. On his 1:45 p.m. round, he stated he recalled seeing inmate Rivera standing over his sink area. At the completion of the 1:45 p.m. round, the housing area officer stated he returned to his desk to make a log book entry. He then entered the recreation yard which door is adjacent to the desk post. From there, he stated he met with the sergeant who needed to speak with an inmate on the other side of the North Housing area. He stated he escorted the sergeant to the inmate's cell and then returned to walking the housing area.

15.    At approximately 1:55 p.m., the housing area officer discovered inmate Rivera in a kneeling position with his sweatshirt tied off around his neck and affixed to the front cell bars. He called for immediate assistance and the sergeant and three other officers immediately responded. One officer opened the door control panel while two officers tried to enter Rivera's cell. The officer had difficulty entering the cell due to the fact that Rivera had tied of to both parts of the cell slider door.

16.    The two officers got the cell door open enough to enter and began to untie Rivera. Once untied, they laid him down on the cell bunk and began CPR. The sergeant brought a response kit with an oxygen respirator and the facility nurse also responded. The nurse took over CPR along with another officer. CPR was continued until the arrival of EMS units.

17.    At approximately 2:03 p.m., a paramedic unit arrived on the scene. The paramedic switched the oxygen delivery from a simple face mask to a bag value resuscitator and attached Rivera up to a cardiac monitor. The cardiac monitor showed asystole in three different leads. The paramedic contacted medical control at the Putnam Hospital Center and requested an order to cease resuscitation. After conferring with the medical control doctor, the paramedic was given the order to cease the resuscitation and Rivera was pronounced dead at 2:20 p.m.

18.    Part II of the inmate death notification (form M1-87) received at the Commission contained a statement from Dr. P.S., the psychiatrist, stating he could not see Rivera due to his being