UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

DONNY A. SINKOV, as Administrator of the
Estate of Spencer E. Sinkov, deceased,
DONNY A. SINKOV, and HARA SINKOV,

                                        Plaintiffs,

                -against-

DONALD B. SMITH, individually and in his
official capacity as Sheriff of Putnam County,
JOSEPH A. VASATURO, individually, LOUIS
G. LAPOLLA, individually, THE COUNTY OF
PUTNAM, New York, and AMERICOR, INC.,

                                        Defendants.

------------------------------------------------------------X

07 Civ. 2866 (CLB)

**PLAINTIFFS' COUNTER-
STATEMENT OF MATERIAL
FACTS IN DISPUTE PURSUANT
TO LOCAL RULE 56.1**

Defendants have submitted two Statements of Fact pursuant to Rule 56.1 -- one on behalf

of Defendants Smith, Vasaturo, LaPolla and the County and one on behalf of AmeriCor, Inc.

Plaintiffs submit the following Counter-Statement of Material Facts in Dispute which

contains a concise statement of the material facts which are in dispute. Following Plaintiffs' 56.1

Statement, Plaintiffs have responded to each of the statements contained in Defendants'

respective 56.1 Statements.

## PLAINTIFFS' COUNTER-STATEMENT OF MATERIAL FACTS IN DISPUTE

### I. New York State's minimum standards required constant watch for suicidal inmates

1. In the State of New York, under the authority of Article 3, Section 45 of the New

York State Correction Law, the New York State Commission of Correction has promulgated

"rules and regulations establishing minimum standards for the care, custody, correctional

treatment, supervision, discipline and other correctional programs for all persons confined in

local correctional institutions." *See* 9 NYCRR §7000.1(b), *et seq.* Both Smith and LeFever were

admittedly aware of these minimum standards (Smith Dep. pp. 8, 16; LeFever Dep. pp. 88, 91, 106).[1]

2.    The Commission of Correction regularly reminds local jail officials of their obligations to comply with these minimum standards by sending periodic newsletters entitled "Chairman's Memoranda." These newsletters have often focused on the mandatory requirements for suicide prevention in County jails. They are sent on average of 10-20 times per year. LeFever and Smith both acknowledged that they regularly received and reviewed the Chairman's Memoranda (LeFever Dep. pp. 17, 102-103; Smith Dep. pp. 16, 17).[2]

3.    The minimum standards require County facilities, such as the Putnam County Correctional Facility (hereinafter "PCCF"), to screen incoming inmates for purposes of identifying those who are at a high risk for suicide. As to those individuals who are deemed to be a suicide risk, they then are required to be continuously observed on a one-on-one basis – also referred to as a "constant watch". Constant watch is in fact the only acceptable level of supervision for a suicidal inmate. Fifteen minute or other periodic checks do not comply with the State's minimum standards (LeFever Dep. pp. 73-74, 87-88, 90-91; Berg Aff. Exs. 1, 3, 5).[3]

4.    One of the "Chairman's Memorandum" issued for the first time in November 1999 but constantly referred to in later publications by the Commission, clearly spells out the requirements for a constant watch for any inmate who is identified as suicidal. The memorandum specifically stated:

"The Medical Review Board investigated several inmate suicides in 1998-1999 in which a determination for additional supervision was made pursuant to section 7003.3(h). In

[1] All of the deposition transcripts cited herein are annexed to the Declaration of Timothy P. Coon and the Declaration of Adam I. Kleinberg in support of the Defendants' motions for summary judgment.
[2] The minimum standards, forms to use to comply with those standards, and the Chairman's memoranda are available for public view on the Commission's website. See www.scoc.state.ny.us
[3] The term "inmate" is used synonymously with the term "detainee" since the governing legal standards for a convicted inmate under the Eighth Amendment are the same as those for a pre-trial detainee under the Fourteenth Amendment.

these cases the supervisory visit interval was shortened from 30 minutes to 15 minutes for inmates on suicide prevention precautions. This was plainly inadequate and as such a violation of section 7003.3(h), because the selection of the type of additional supervision was inadequate and inappropriate. A SUPERVISORY INTERVAL OF 15 MINUTES IS NOT ADEQUATE AS A SUICIDE PREVENTION PRECAUTION. It is a well established fact that inmates can hang themselves with fatal results in <u>less than five minutes</u>. Therefore if the objective is to prevent suicide, ONLY CONSTANT OBSERVATION IS EFFECTIVE....There are conditions, illnesses and injuries for which a supervisory interval reduced to 15 minutes is entirely adequate and appropriate, but suicide attempt is not one of them."

(LeFever Dep. pp. 88-89; Commissioner's memorandum 17-99, dated November 1, 1999, annexed to Berg Aff. as Ex. 1).

5. Not only was the 1999 Chairman's Memorandum referred to in training materials provided to the County by the Commission, but it was specifically sent to both Sheriff Smith and Captain LeFever on November 21, 2005 -- six months prior to Spencer Sinkov's admission to the PCCF. That 2005 correspondence specifically told Smith and LeFever: "Attached is a copy of Chairman's Memorandum No. 17-99. The facility **should review the attached memorandum for clarification with regards to providing additional supervision.**" (November 21, 2005 letter to Smith from Commissioner Croce, annexed to Berg Aff. as Ex. 2 (emphasis added)).

## II. The New York State Commission of Correction requires jails to identify inmates who pose a risk for suicide at initial intake by using the State's suicide screening form

6. In order to identify inmates who are at risk for committing suicide, the State Commission of Correction and State Office of Mental Health together devised a Suicide Screening Prevention Guideline form called the "330-ADM" (Suicide Screening form annexed to Berg Aff. as Ex. 3; LeFever Dep. pp. 24, 104, 105-107; LaPolla Dep. pp. 38-39; Smith Dep. p. 69; Oliver Dep. pp. 36-37).

7. On October 5, 2005, the Commission issued a Chairman's Memorandum which stated that County facilities must identify inmates who pose a risk for suicide during initial screening by using the 330-ADM. The Commission wrote:

> "Those involved in Corrections know that a large percentage of inmates arrive at correctional facilities with mental health issues ranging from depression to schizophrenia to having suicidal thoughts. An inmate, just as people in the general public, can have mental illness and not be suicidal, or can be suicidal with no other mental illness,, or they can be both mentally ill and suicidal. In order to identify these inmates, facilities must heed 9 NYCRR §7013.17...A screening instrument(s) shall be utilized to elicit and record information on each inmate relating to ...history of mental illness...potential for self-injury or suicide. Since the 1980's, the Commission has held that the **only** instrument that is in compliance with §7013.7(b)(5) is the Suicide Screening Form, which was a joint project of the Commission and New York State Office of Mental Health. **This continues to be the case**." (10/5/05 Chairman's Memorandum, annexed to Berg Aff. as Ex. 5).[4]

8. The State's Suicide Screening form 330-ADM contains sixteen areas of inquiry with a corresponding space for the corrections' officers' observations and general comments. Each of the question areas is designed to elicit from the inmate information to determine whether he or she poses a risk of harming themselves or others -- including whether this is the person's first time in jail, whether the person expresses any embarrassment or shame about their alleged crime, whether they have a history of drug or alcohol abuse, whether they express feelings of hopelessness, and whether they are worried about major problems other than their current legal situation (Berg Aff. Ex. 3).

9. Once the sixteen questions are answered, the "yes" answers are totaled and the total number is then placed at the bottom of column A on the form. There are also six questions on the form which are considered "immediate referral categories" which are readily identifiable because they are shaded on the form itself (Berg Aff. Ex. 3).

---

[4] In a September 18, 2007 Chairman's Memorandum, it was again stated that the screening of detainees by correction personnel was to be done "using Commission Form 330ADM" and that "rigorous direct supervision of high risk prisoners" was required in order to comply with both New York State Correction Law §500-b and Minimum Standards Part 7013 (Chairman's Memorandum No. 10-2007, annexed to Berg Aff. as Ex. 6).

10. Clearly, not every suicidal individual outwardly expresses their suicidal intent. Thus, the form contains sixteen areas which if answered "yes" would indicate a likelihood that the individual may pose a risk to harm himself. Once the sum total of the yes answers reaches a critical level of eight or more, or once one of the immediate referral shaded boxes is checked, the person is deemed to be suicidal and must be placed on a constant watch.

11. The State's mandatory form (330-ADM) specifically directs the "Action" to be taken by the booking officer. It clearly states: "If total checks in Column A are 8 or more, or any shaded box is checked, or if you feel it is necessary, notify supervisor **and institute constant watch.**" (Berg Aff. Ex. 3) (emphasis added).

### III. PCCF did not comply with New York State's minimum standards for identifying and then implementing constant watch for suicidal inmates

12. Upon taking office in 2002, Smith reviewed the PCCF policies and procedures, the State's minimum standards, and had discussions with Captain LeFever and Captain Butler about the policies (Smith Dep. pp. 6-8). He also reviewed the Chairman's Memoranda that are issued from time to time including those pertaining to suicide prevention in County facilities (Smith Dep. pp. 16-17). He admittedly understood that those who scored eight or higher or had shaded boxes on the suicide screening forms were suicidal (Smith Dep. p. 69).[5]

### A. The PCCF modified the State's Suicide Screening Form to remove the directive for implementing constant watch

13. Upon arrival to the PCCF, a new inmate is processed by the "Booking Officer" which includes administration of a medical screening packet part of which is a form entitled "Suicide

---

[5] A review of Smith's testimony shows that he really did not recall who he spoke with or the details of any conversations. Thus, while he claimed initially he was told the PCCF screening form was "basically" the same as the State's, when that answer was the subject of follow up questions he could not recall who (if anyone) said that or what exactly was said. In addition, although he claimed that he was told the State approved the suicide screening form used at the PCCF, when follow up questions were asked he admitted he really did not know if the Commission ever looked at the PCCF form or expressed any opinion on whether it was acceptable (Smith Dep. p. 12).

Prevention Screening Guidelines" (Berg Aff. as Ex. 4; Vasaturo Dep. pp. 53-54, 64-65; Oliver Dep. pp. 45-46).

14.   Rather than administer the only form that complies with the State's minimum standards, the PCCF instead modified their Suicide Prevention Screening form by **eliminating the clear directive to place inmates on constant watch** if they scored 8 or higher on the form, or if any shaded box was checked, or if any other reason warranted (Vasaturo Dep. pp. 77-78, 103-104, 170-171; LaPolla Dep. p. 37; Oliver Dep. pp. 33-34; LeFever Dep. pp. 65-66; Smith Dep. p. 70; compare State Form annexed to Berg Aff as Ex. 3 with PCCF Suicide Screening Form, annexed to Berg Aff. as Ex. 4).[6]

15.   Rather than direct the institution of a constant watch for inmates who were at risk for suicide as determined by the answers on the screening form, the PCCF form instead only stated that if an inmate scored eight or higher or a shade box was checked then booking officer was supposed to "notify shift supervisor" (Berg Aff. Ex. 4).

16.   Smith and LeFever understood that inmates who scored eight or more on the suicide screening form raised a "flag" that the inmate is "at high-risk" and is suicidal (LeFever Dep. pp. 31, 56; Smith Dep. p. 69).[7]

17.   Yet, rather than direct the institution of a mandatory constant watch for suicidal inmates, including those who met the criteria listed on the 330-ADM form, the PCCF's form left the decision as to what level of supervision should be instituted up to the judgment and discretion of the booking officer and/or sergeant (Oliver Dep. pp. 37, 76; Berg Aff. Ex. 4).

---

[6] LeFever acknowledged that although in writing the PCCF policies say to use the 330-ADM that was not in fact the form that PCCF actually provided to staff (LeFever Dep. p. 68).

[7] The term "high risk" inmate is synonymous with a suicidal inmate (LeFever Dep. p. 39).

**B. PCCF also did not have any procedures requiring constant watch for inmates    who were suicidal**

18.  And with respect to exercising that judgment and discretion, prior to May 20, 2006 when Spencer Sinkov committed suicide while in custody at the PCCF, the jail did not have any written policies or procedures stating that inmates who were identified as suicidal by reason of their score of eight or higher or because they had a shaded box(es) checked on the Suicide Screening form must be placed on constant watch (LaPolla Dep. pp. 34-35, 40-41, 85-86; Wendover Dep. p. 12; Vasaturo Dep. pp. 75-76, 79, 174, 223-224; Oliver Dep. p. 41; LeFever Dep. p. 27-28; Smith Dep. pp. 70-71).[8]

19.  Thus, in May of 2006 there was no policy in place requiring Spencer Sinkov be placed on a constant watch due to the high score of "10" that he received on the Suicide Screening Form or the fact that he had three shaded boxes checked (Vasaturo Dep. pp. 173-174, 223-224; Berg Aff. Ex. 4).[9]  Rather, all the booking officer was required to do if a score was eight or higher was notify his supervisor (Vasaturo Dep. pp. 223-224).  This was clearly against the Commission's regulations/minimum standards.

20.  In addition, although LaPolla claimed he understood constant supervision should be implemented for someone who is at high risk for suicide, as a matter of actual practice in his experience as a Sergeant in the PCCF an inmate whose score on the suicide screening form was 8 or higher did not always receive a constant watch. In fact, the PCCF policies did not provide for constant watch in all cases of suicidal prisoners until after Spencer's suicide when on August

---

[8] Smith's testimony was that he could not recall any such policy or procedure as he was present at his deposition (Smith Dep. pp. 70-71).
[9] Vasaturo's claim that he did not believe Spencer would hurt himself, and he implemented a fifteen minute watch, highlights the precise reason why the State required use of the 330-ADM required constant watch for a score of eight or higher on that form (see Vasaturo Dep. p. 174). The Correction Officer's purported belief is frankly irrelevant in the face of this objective measurement tool for determining those at risk of suicide.

4, 2006 a backdated policy was slipped into the log books days before the Commission arrived to investigate Spencer's suicide (LaPolla Dep. pp. 39-41). *See also* ¶¶33-39, *infra*.

21.    Captain LeFever, who was responsible for drafting implementing procedures as well as overseeing all staff and the daily operations at the PCCF, could not explain why PCCF policies and procedures did not include any words stating that <u>only</u> constant observation is effective as a suicide precaution (LeFever Dep. pp. 7, 9-11, 91).

22.    The lack of clear policies and the on-gong practice in the PCCF was not only against the State's published minimum standards, but contrary to the State Commission of Correction directives to training instructors: "Prior to training it is essential that local mental health and police/correctional officials draft coordinated suicide prevention procedures...We cannot over-emphasize the importance of developing procedures; the program cannot succeed unless staff knows what to do with an identified high-risk inmate." (LeFever Dep. pp. 85-86; relevant portion of Basic Program Trainer's Manual annexed to Berg Aff. Ex. 7).[10]

### C. In actual practice, inmates who were identified as a high risk of suicide were not automatically placed on a constant watch

23.    In addition to the lack of clear policies and procedures, the actual custom and practice at the PCC with respect to inmates who scored eight or higher or had shaded boxes checked on the suicide screening form the inmate was <u>not</u> to automatically place him/her on constant watch (LaPolla Dep. p. 40).

24.    As LaPolla explained, the practice in the facility varied depending on which questions the inmate answered "yes" rather than on the sum total of those answers. Thus, if an inmate was overly upset to the point where they could not answer questions that could be a

---

[10] Other portions of this Trainer's Manual have been annexed to the Declaration of Adam I. Kleinberg as Ex. J.

constant watch. But other than that it always varied. Nothing required constant watch because of the accumulation of yes answers to the point of having eight or more (LaPolla Dep. pp. 39-41).

25.    Vasaturo gave a similar explanation as to the PCCF custom and practice. He was trained that only those who actually expressed an intent to harm themselves were considered suicidal and thus were to be placed on constant watch (Vasaturo Dep. pp. 109-110). Absent an inmate's expressed statement of intent to harm oneself, the inmate was not considered "suicidal." And although they may be considered "high risk" they were still not required to be placed on constant watch (Vasaturo Dep. pp. 109-112).

26.    Even according to Correction Officer Oliver, who is not a party to this lawsuit, inmates were on a constant watch if they expressed an intent to harm themselves – which could be directly to a corrections officer, a mental health worker, or even a family member who then notifies jail personnel (Oliver Dep. p. 20-21).

27.    Thus, contrary to the State's minimum standards, as a matter of routine practice those inmates who had heightened numbers on the suicide screening were placed on only a fifteen minute watch (Vasaturo Dep. p. 59).

### D. PCCF did not instruct staff during training to place inmates on constant watch if their score on the suicide screening form was eight or higher or a shaded box was checked

28.    In addition to the lack of any policies, the training provided to Corrections Officers by the PCCF also did not instruct officers to place an inmate on constant watch if they scored eight or higher or if a shaded box was checked on the Suicide Screening form (Wendover Dep. pp. 14, 15; LaPolla Dep. pp. 85, 86; Vasaturo Dep. pp. 76, 174; Oliver Dep. p. 43).

29.   Similarly, they were not instructed or trained that the New York State Commission of Corrections required constant watch if an inmate scores eight or higher or has a shaded box checked (Vasaturo Dep. pp. 78-80, 110, 191, 192).

### E. Consistent with PCCF policies, AmeriCor's policies and practices provided for only a 15 minute watch for suicidal inmates. AmeriCor staff received no training prior to November 2006 in the area of suicide prevention

30.   AmeriCor polices specifically stated that: "Inmates determined to be at risk as a result of the screening process will be placed on suicide precautions...inmates who are placed on suicide precaution will be placed in the facility's mental health unit or placed on regular observation status such that they are subject to monitoring by correctional and/or health care personnel. Monitoring should occur every 15 minutes while the inmate is on suicide precautions." (emphasis added; Smith Dep. pp. 157-158; See AmeriCor Suicide Prevention Policy No. 152, bates stamped 448-450, annexed to Berg Aff. as Ex. 9).

31.   President of AmeriCor, Kevin Duffy, confirmed that corrections staff implemented 15 minute watches as a suicide precaution (Duffy Dep. pp. 165-166). He also indicated that that same level of supervision was what AmeriCor's policies provided (Duffy Dep. p. 166).

32.   Prior to November 2006, AmeriCor staff did not receive anything written or verbal by way of instruction, direction, or training on what to do if an inmate scored eight or higher on the suicide screening form or had a shaded box checked. They did not have training in the area of suicide prevention until after Spencer committed suicide (Clarke Dep. pp. 11-13, 19-20, 27-28; Waters Dep. pp. 8, 12-14).

**F. After Spencer's suicide, and just prior to the Commission's investigation in August 2006, the PCCF attempts to put a backdated suicide prevention policy into the procedure books**

33. It was only _after_ Spencer's suicide that policies were implemented in the PCCF requiring constant watch for all suicidal inmates. To that end, on or about August 4, 2006, Sergeant LaPolla was directed to place a new/amended policy and procedure into the housing unit books. LaPolla "looked at the policy it was replacing and [he] said there's a pretty big difference here." (LaPolla Dep. pp. 41, 50-51; see Policy "Housing Unit Supervision", page 2, "15 Minute Supervisory Visit" subsection "h", annexed to Berg Aff. as Ex. 8; Vasaturo Dep. pp. 234-235).

34. This amended policy stated for the first time that "15 minutes supervisory visits are not adequate as a suicide prevention precaution" (LaPolla Dep. pp. 41-43; Vasaturo Dep. pp. 235, 237-238; Berg Aff. Ex. 8, page 2, 15 Minute Supervisory Visit section (h)).

35. PCCF disingenuously backdated the August 4, 2006 policy amendment to November 2005 and/or February 2006 – thereby attempting to make it appear as if this policy was in effect prior to Spencer's suicide (Wendover Dep. pp. 91-92; Berg Aff. Ex. 8, cover page). Although Lefever claimed this procedure was in existence prior to Spencer's death, he then conceded he was unaware of whether this procedure was ever distributed and placed into the housing procedure books prior to August 4, 2006. He was however aware that staff stated they were not aware of the procedure prior to that time (LeFever Dep. pp. 97-100).

36. LeFever also admitted that he "may have" asked another staff member to make sure this policy was in the procedure books at the same time that the State Commission came to the facility, on or about August 9, 2006, to investigate Spencer's death (LeFever Dep. pp. 90, 100-101).

37. Smith learned of concerns that LeFever had put out a procedure regarding the suicide precautions at or about the time the Commission came to the PCCF to investigate Spencer's death. To date, Smith has not taken any action to determine if this was accurate and he has not taken any remedial action against LeFever (Smith Dep. pp. 53-55, 59-60).[11]

38. Smith, who was responsible for establishing broad policies and procedures for the PCCF, did not know when the first time was that anything was put in writing as part of a procedure telling staff that fifteen minute checks were not adequate as a suicide prevention tool. He claimed that was still under review and to date has not asked Capt. LeFever about that (Smith Dep. pp. 65-67).

39. Thus, only since August 4, 2006, constant watch is now required when an individual scores as a high risk inmate based on the results of the Suicide Prevention Screening Guidelines form (LaPolla Dep. p. 43).

## IV. AmeriCor's role in the booking of new inmates into the PCCF

40. Upon arrival to the PCCF, a new inmate is processed by the "Booking Officer" which includes administration of a medical screening packet part of which is a form entitled "Suicide Prevention Screening Guidelines" (see form annexed to Berg Aff. as Ex. 4; Vasaturo Dep. pp. 53-54, 64-65; Oliver Dep. pp. 45-46).

41. Once the medical screening packet, including suicide screening form, is completed it is shown to and given to AmeriCor's medical staff. This occurs within two hours of an inmate's arrival to the facility (LaPolla Dep. pp. 29-30; Vasaturo Dep. pp. 90-91; Oliver Dep. p. 45-46; LeFever Dep. p. 153).

---

[11] A reasonable jury could conclude that Smith was not so concerned about suicide prevention as he now claims he was. For he never inquired as to what policies were in effect or whether the person he delegated responsibilities to in setting procedures grossly failed in carrying out his job duties and responsibilities to the detriment of suicidal inmates under Sheriff Smith's care and custody.

42.    According to the written scope of services AmeriCor was to provide as part of its contract with the County, AmeriCor nursing staff would review the medical and suicide screening forms after they are completed by the booking officer and perform any additional evaluations of the inmate. Nursing staff are required to initial the cover page of the screening packed upon completion of their review (Clarke Dep. pp. 31-34; AmeriCor services "Receiving Screening", bates stamped page 557, annexed to Berg Aff. as Ex. 10; Duffy Dep. pp. 68-69).[12]

43.    As part of the Receiving Screening AmeriCor's policies provided: "a registered nurse will promptly review all Receiving Screenings...Inmates who receive a suicide screen score of 8 or higher or who answer "Yes" to questions 1, 8, 9, 10b, 11 or 16b will be referred to mental health staff for further evaluation (Berg Aff. Ex. 10, bates stamped page 558).

44.    Contrary to AmeriCor's contentions, as part of the booking process, AmeriCor nursing staff, the booking officer and the sergeant all have the authority to call for the implementation of a constant watch (LaPolla Dep. pp. 25-26, 28, 32-33; Oliver Dep. p. 16; Smith Dep. pp 73-74; Vasaturo Dep. p. 91; Duffy Dep. pp. 73-74).

45.    And as a matter of custom and practice, if AmeriCor staff had any mental health or medical concerns about an inmate at booking they would let the sergeant or booking officer know (Clarke Dep. pp. 25-26).   In addition, according the AmeriCor's written policies "health care personnel are required to notify correctional personnel regarding an inmate's significant health needs that may affect...the inmate's housing assignment..." including for inmates who are "mentally ill or suicidal" (Berg Aff. Ex. 9, bates stamped page 388).

---

[12] Clarke and Waters both claimed that prior to November 2006, although the suicide screening form was part of the medical packet they were required to review and initial in fact they did not as a matter of practice review the suicide screening form and they were not aware of any policy or procedure that required such a review (Clarke Dep. pp. 31-34, 58-59; Waters Dep. pp. 16, 40-42). Clarke however did admit that with respect to Spencer he saw the Suicide Screening form because he "would have just looked and saw that it was – it was done; it was all signed" (Clarke Dep. p. 36). In addition, Waters admitted that Correction staff would point out to medical if a score was eight or higher and, even if they did not, she would sometimes just review the form herself (Waters Dep. pp. 16, 45).

**V. Practices with respect to inmates who have a history of drug use or are under the influence when arriving at the facility**

46. As part of the booking of new inmates, one of the question areas on the suicide screening form is whether the inmate is under the influence of alcohol or drugs and whether he shows any signs of withdrawal (Berg Aff. Ex. 4, 16a and b).

47. As part of the booking process, AmeriCor staff were required to inquire of incoming inmates about whether the inmate was under the influence of alcohol or drugs or in need of detoxification. The nurses are required to ask about: any drugs used, what type of drugs, the mode of use, frequency of use, date or time of last use and history of problems after ceasing use in the past. They were also required to check the inmate's skin for any "needle marks or other indications of drug abuse." (AmeriCor Receiving Screening policy, bates stamped 421-422, annexed to Berg Aff. as Ex. 9; Schedule A to AmeriCor contract with County, bates 558, annexed to Berg Aff. as Ex. 10; Clarke Dep. pp. 41-46; Waters Dep. pp. 64-65; Smith Dep. pp. 149-150; Duffy Dep. pp. 59-60, 80-82).[13]

48. Similarly, as part of AmeriCor's "Intoxication and Withdrawal" policy, inmates were to be evaluated at the receiving screening for "their use of or dependence on drugs and alcohol." "Inmates reporting the use of alcohol or other drugs will be evaluated for possible intoxication and their degree of reliance on and potential for withdrawal from these substances....Inmates at risk for progression to severe symptoms of withdrawal will be kept under observation by medical or correctional personnel." (Berg Aff. Ex. 9, bates stamped page 454).

49. Also as part of the booking process AmeriCor's policies provided that "If the inmate is medically stable but requires medical follow up (e.g. intoxicated but subject to going into

---

[13] AmeriCor's policies were drafted in 2004 with the aim of having the National Institute of Corrections accreditate the PCCF. Based on those policies, many of which we now know were never communicated to AmeriCor staff, accreditation was granted to PCCF in 2006 (Smith Dep. pp. 126-130).

withdrawal...) the nurse will...either contact the physician for orders or schedule the inmate to be seen at the next physician's sick call (Clarke Dep. pp. 48-49; AmeriCor Procedure "Receiving Screening", bates stamped 494-495, annexed to Berg Aff. as Ex. 11).

50.    For those inmates who report a history of heroin use, they "are to be evaluated for the potential for onset of symptoms of narcotic withdrawal" by the nurse on duty (AmeriCor Opiate Detoxification Procedure, bates stamped 518-520, annexed to Berg Aff. as Ex. 11).

## VI. Level of inmate supervision implemented and referrals for mental health services are made at the time of intake of a new inmate

51.    After the inmates are screened at booking, their housing unit and level of supervision is determined prior to the inmate being placed in a cell. An inmate could be placed on: (1) regular supervision and thus be checked every thirty minutes; (2) more frequent supervision, such as checks being performed every fifteen minutes; or (3) constant watch, whereby a correction officer is constantly observing the inmate in a one-on-one set up (Vasaturo Dep. p. 57; Smith Dep. pp. 23-24).

52.    In addition, the booking officer, sergeant, and medical staff are all responsible for referring inmates for a mental health evaluation (Wendover Dep. pp. 42-43; Vasaturo Dep. p. 161-162, 180; LeFever Dep. p. 152; Smith Dep. p. 111; Waters Dep. pp. 43-44).

53.    According to Smith, anyone who scores eight or higher or has a shaded box checked is to be referred for mental health evaluation. Yet, he could not recall any written policies or procedures which provided for a referral under those circumstances (Smith Dep. pp. 72-74).

54.    As part of its contract with Putnam County, AmeriCor indicated it would provide certain services to the PCCF. This included having nursing staff at intake refer inmates who had a score of eight or higher on the suicide screening form or a shaded box checked for a mental health evaluation (bates stamped page 558, annexed to Berg Aff. as Ex. 10).

15

55. Despite this writing, Nurse Clarke stated he was never made aware of this requirement and did not ever refer Spencer for mental health evaluation although he acknowledged that he could have (Clarke Dep. pp. 59-62).

## VII. Spencer Sinkov's booking process and cell assignment

56. On May 19, 2006, Spencer Sinkov, then twenty-one years old, was arrested and brought to the PCCF by members of the Sheriff's Department. Spencer had never been arrested before and had no criminal record (Complt. ¶15; County Defendants' Answer ¶15).

57. Vasaturo, as the Booking Officer, completed the medical packet, including the suicide screening form, for Spencer Sinkov's intake (Vasaturo Dep. p. 128; Berg Aff. Ex. 12) On that night shift, 11:30 p.m. to 7:30 a.m., Sergeant LaPolla was the most senior person in the PCCF – which was always the case (LaPolla Dep. pp. 6, 11-12).

### A. Spencer scores a "10" on the Suicide Screening form with 3 shaded boxes checked

58. Spencer answered "yes" to 10 questions, including three shaded boxes, on the suicide screening form, to wit: #3. experiencing significant loss within the last six months; #4. being very worried about major problems other than the current legal situation; #5. having had a family member or significant other who had attempted suicide; #6. having a history of drug abuse; #7. having a history of counseling or mental health treatment; #8. expressing extreme embarrassment, shame or humiliation as a result of current incarceration; #11. expressing feelings of hopelessness; #12. being incarcerated for the first time; and #16a. appearing to be under the influence of drugs and showing signs of withdrawal or mental illness (Berg Aff. Ex. 4). In addition, as to #16(b) "Is detainee incoherent, or showing signs of withdrawal or mental illness" the answer was yes and the comment was "very laid back." (Berg Aff. Ex. 4).

16

59.    Based on the results of the suicide screening form Spencer was identified at intake as suicidal. Although he should have been placed on constant watch and referred for mental health evaluation, he was not (LeFever Dep. pp. 113-114, 132-133).

**B. Defendants fail to follow up on Spencer's history of drug use**

60. It was known to LaPolla, Vasaturo and Nurse Clarke during booking that Spencer had a history of heroin use. LaPolla asked Spencer about his use of heroin and Spencer told LaPolla that he did "a lot" of heroin. Spencer asked about the availability of a methadone program, in response to which LaPolla said that was not an option. Although there were alternatives to methadone for withdrawal, LaPolla did not advise Spencer of these alternatives (LaPolla Dep. pp. 57-58, 64). LaPolla never asked any follow up questions to find out how much heroin Spencer had in fact used or for how long he had been using (LaPolla Dep. pp. 58-59).[14]

61. Similarly, although Spencer advised Vasaturo that he had used heroin twenty-four hours earlier, Vasaturo never asked how much heroin Spencer used in the course of the last week, month, or anything along those lines (Vasaturo Dep. p. 140).

62. As part of the receiving screening, Spencer advised AmeriCor's intake nurse, Peter Clarke, that he had used heroin within the last 24 hours (Clarke Dep. pp. 77-78). As a result, Clarke should have followed up to see if there were any indications supporting Spencer's claim that he used heroin – such as needle marks or symptoms of withdrawal (Duffy Dep. pp. 151-152). Clarke did not inquire of Spencer as to the mode of use, amount used, frequency used, or a

---

[14] LaPolla also claimed that he asked Spencer whether he [Spencer] would have a problem withdrawing and Spencer said no, he would be okay (LaPolla Dep. p. 58). It is incredible that a Sergeant in corrections would rely on the word of a person who admittedly used a lot of heroin as to whether that individual would be able to withdraw without problem. LaPolla himself knew from first hand experience that withdrawal involved severe symptoms, usually within 48 hours, that included the person being "sick, being violently ill." (LaPolla Dep. p. 60). Vasaturo similarly testified that he was trained the signs and symptoms of withdrawal did not begin for 24 to 48 hours after the person last used the substance (Vasaturo Dep. pp. 98-99).

history of any problems that may have occurred after ceasing use in the past. In addition, he did not check Spencer's skin for any evidence of track marks (Clarke Dep. pp. 41-45).

63. This is important because according to AmeriCor's written policies: withdrawal "symptoms depend on the frequency and pattern of use; the amount of opiate consumed; and the period of time elapsed between the last use of the narcotic and the time of commitment to the facility. These factors should be documented as part of the nursing assessment. Symptoms, when they occur, may range from mild to severe and will generally peak between 24 and 72 hours after last use." (Berg Aff. Ex. 11, bates stamped p. 518).

64. In addition, although Nurse Clarke indicated in his "progress notes" that he **will monitor**" Spencer, he admitted that he never did monitor or follow up on Spencer after the intake was done (Clarke Dep. pp. 48-49; Progress Notes, annexed to Berg Aff. as Ex. 13).

65. And even though Spencer was subject to going into withdrawal, Clarke did not contact the physician for orders or schedule him to be seen at the next physician's sick call (Clarke Dep. pp. 48-49).

66. The Commission of Correction concluded as part of its final report on the investigation into Spencer's death that Nurse Clarke's intake assessment of Spencer was inadequate. For although Spencer was not displaying signs of active withdrawal, his reported history of recent heroin use warranted more detailed attention than that which was provided (Commission's Report in the death of Spencer Sinkov, annexed to Berg Aff. as Ex. 14, p. 4, ¶9).[15]

---

[15] Smith was aware the Commissions finding but never followed up with AmeriCor to ensure that more attention was paid at intake to those reporting drug use (Smith Dep. pp. 154-156). He only recalled that he followed up to make sure nurses recorded vital signs for all new admits (Id.).

**C. Spencer's cell assignment is changed to NHU #7 and he is placed on a 15-minute check**

67. During the booking process, LaPolla instructed Vasaturo to place Spencer in cell #29, which is in West Housing Unit, unless there were any problems. Vasaturo thereafter radioed LaPolla and advised him that Spencer was going to be placed on a fifteen-minute watch in a different cell, namely North Housing Unit (NHU) cell #7 (LaPolla Dep. pp. 34, 70, 96-97). North Housing Unit is where heightened supervision inmates are typically placed (Vasaturo Dep. p. 187).

68. As a matter of policy, if the score on the screening form is above eight, any of the high risk shaded areas are checked or suicidal statements have been made, the Booking Officer is required to notify the Sergeant – which is usually done via radio (LaPolla Dep. pp. 8, 9-10, 30-32; Vasaturo Dep. pp. 73-74). As a matter of practice, notification to the Sergeant would also occur for individuals who pose a risk of withdrawal (LaPolla Dep. p. 9).

69. An internal memorandum, called a "P-1", is then drafted by the booking officer or the sergeant for any inmate who is placed on a heightened level of supervision explaining the reason(s) for the increased supervision (LaPolla Dep. p. 11; Vasaturo Dep. p. 69).

70. Consistent with this policy, Vasaturo testified that he told LaPolla the reason for the 15 minute watch was because of answers given on the suicide screening form (Vasaturo Dep. p. 16). He could not recall if he told LaPolla verbally but did recall the reason for the 15 minute watch was stated in the "P-1" (Vasaturo Dep. p. 130). He later confirmed that when he notified LaPolla of the fifteen minute watch "and told him the reason of the 15 minute. I did it via radio" (Vasaturo Dep. p. 158-159).[16] According to Vasaturo and consistent with what was stated in the

---

[16] Here again, Vasaturo's credibility is at issue. For later in his deposition he testified that he "believe[s]" he told LaPolla that Spencer was on a 15 minute watch "because of the use of drugs and answers on the suicide screening" but that he could not recall if he did so verbally. He did recall those reasons were stated in the P-1 he prepared

"P-1" he prepared, Spencer was placed on a fifteen minute watch "due to recent use of drugs and answers given on the suicide screening" (Vasaturo Dep. p. 173; May 20, 2006 "P-1" annexed to Berg Aff. as Ex. 15).

71. Oliver, who was on the 7:30 a.m. to 3:30 p.m. shift, noted in the log book every ½ hour that Spencer was lying down (Berg Aff. Ex. 19). Oliver conceded that during his checks on Spencer he had a blocked view and could not actually see Spencer's face (Oliver Dep. p. 100).

## VIII. LaPolla's claim that he was unaware of the score on the suicide screening form prior to Spencer's death is a material question of disputed fact

72. LaPolla's claim that he was unaware of the score on Spencer's suicide screening form presents a question of fact (LaPolla Dep. p. 71-72). For Vasaturo believes that at that time, on May 20, 2006, LaPolla had seen the suicide screening from although he did not personally go over the form with LaPolla (Vasaturo Dep. pp. 155-156).

73. LeFever was also told that LaPolla was aware of Spencer's score on the suicide screening from (LeFever Dep. pp. 120-122).

74. LaPolla himself admitted he could call the specifics of what Vasaturo told him as to the reason for the 15 minute watch but he assumed it was due to heroin withdrawal (LaPolla Dep. p. 70).

75. Nonetheless, the "P-1" states one of the reasons for the heightened supervision included the answers given on the suicide screening form. That form was hand delivered by Vasaturo to the book in the briefing room (Wendover Dep. pp. 35-36; Vasaturo Dep. p. 70).

---

(Vasaturo Dep. pp. 172-173). Just a few questions later, Vasaturo now claimed that it was LaPolla who asked him why the fifteen minute check was instituted and in response Vasaturo told LaPolla that it was due to a recent use of drugs. He now denied saying anything to LaPolla about the score on the suicide screening from (Vasaturo Dep. pp. 175-176). Also, contradicting this testimony, LaPolla testified that he did not ask Vasaturo about why he was being placed on fifteen minute watch or about the results of the suicide screening form (LaPolla Dep. p. 81). LaPolla also claimed he did not ask Vasaturo why he changed the cell assignment from cell 29 to cell 7 but assumed it was because Spencer would be possibly withdrawing from heroin and because of the "heroin addiction" (LaPolla Dep. pp. 82, 97).

The Sergeant, as with any other officer, is required to check these books to see whether any new admissions are on a heightened level of supervision (Wendover Dep. p. 36). In addition, at shift change, incoming staff are briefed by both the sergeant from the previous shift and the sergeant who is coming on duty. Part of the briefing requires the outgoing sergeant to review all of the P-1s from his/her shift (LeFever Dep. pp. 124-125; Wendover Dep. pp. 36-37). Vasaturo's practice was also to personally give the sergeant a copy of that P-1 (Vasaturo Dep. p. 71).

76. C.O. Wendover recalled when he came on duty at 7:30 a.m. on May 20, 2006, the briefing was conducted by Sergeant LaPolla who was going off duty and Sergeant Jackson who was coming on duty (Wendover Dep. p. 40; Oliver Dep. pp. 77-78). Wendover also recalled that a P-1 was in the briefing book about Spencer being on a fifteen minute watch (Wendover Dep. pp. 41-42).[17]

## IX. AmeriCor's denial of any knowledge that Spencer was suicidal is belied by the fact that nurse Clarke initialed the medical packet indicating he reviewed it and Waters (for unexplained reasons) referred Spencer for mental health evaluation

77. Clarke initialed that he reviewed Spencer's medical intake packet which packet included the suicide screening form (see cover page of medical packet annexed to Berg Aff. Ex. 12). Clarke also wrote in his notes of the intake of Spencer that he "will monitor" Spencer (Berg Aff. Ex. 13). He never did.

78. At some point during her shift, AmeriCor Nurse Waters completed a mental health evaluation sheet referring Spencer for evaluation noting a history of substance abuse and family problems (Berg Aff. Ex. 16). This information must have come from the suicide screening form as Waters denies having any conversations with Spencer except when she mistakenly thought he was a girl (as described in AmeriCor's 56.1 Statement ¶34).

---

[17] According to AmeriCor's 56.1 Statement ¶17 it is an undisputed fact that Vasaturo told LaPolla that he placed Spencer on a 15 minute watch and changed him to cell 7 due to the answers given on the suicide screening form (see AmeriCor 56.1 ¶17).

21

79.  Contrary to President of AmeriCor Kevin Duffy's claim that Spencer's outward appearance did not warrant any follow up when he wrote to the Commission of Correction he admitted that Spencer's score on the Suicide Screening Prevention Guidelines form did in fact warrant follow up by his staff (Duffy Dep. pp. 159-160; Duffy letter to Commissioner Lamy dated October 23, 2006, annexed to Berg Aff. as Ex. 17).

## X. Spencer visits with his family at 11:00 a.m. on May 20, 2006 at which time it is evident the onset of withdrawal was occurring

80. On May 20, 2006, at approximately 11:00 a.m., Spencer was escorted to the inmate visitors' room to visit with his mother, father and brother (Wendover Dep. p. 52).

81. During the visit, C.O. Wendover specifically heard Donny Sinkov asked Spencer if he was withdrawing. In response, Spencer stated he was starting to go through withdrawal but that it was "not that bad yet" or "not too bad right now" (Wendover Dep. pp. 56, 83; H. Sinkov Dep. p. 14; D. Sinkov Dep. p. 69; 50-h transcript p. 36, annexed to Berg Aff. as Ex. 18).

82. Donny Sinkov asked Wendover if there was any type of methadone treatment that could be given to Spencer for his heroin addiction. Wendover replied that "we don't do that here." Donny then asked if there was any kind of medical treatment Spencer could get and Wendover replied that Spencer was not yet classified, he would not be for five days and so he was not entitled to anything (H. Sinkov Dep. p. 15; D. Sinkov Dep. p. 69; 50-h Tr. pp. 38-39).

83. During the visit, Spencer "looked awful" and "he looked sick". He was extremely pale, had dark circles under his eyes, and he looked clammy and cold. He was very thin and looked translucent (H. Sinkov Dep. p. 20; D. Sinkov Dep. p. 69; 50-h Tr. p. 37).

84. After Spencer's visit with his family concluded, he was escorted to the medical department because AmeriCor nurse Susan Waters requested to see him (Wendover Dep. p. 59).

When they arrived at medical, Waters called Spencer into her office by name (Wendover Dep. pp. 61, 62).

## XI. Spencer was not monitored despite the fact that signs and symptoms of withdrawal from heroin appear within 72 hours after last use

85.   Signs and symptoms from heroin withdrawal can be mild to severe. The intensity of the withdrawal symptoms usually peaks between 24 and 72 hours after the person last used the substance (Vasaturo Dep. pp. 98-99; Clarke Dep. p. 68; Waters Dep. pp. 55-56; Duffy Dep. p. 153; Berg Aff. Ex. 11, bates stamped p. 518).

86.   The initial symptoms can include a runny nose, watery eyes, loss of appetite, hot and cold flashes, nausea, vomiting, and diarrhea (Waters Dep. p. 56; Berg Aff. Ex. 11, bates stamped p. 518).   However, withdrawing from alcohol or drugs can be so physically painful and psychologically uncomfortable that suicide may seem like the only relief available at the time (LeFever Dep. p. 75).

87.   As part of the intake, knowing Spencer had used heroin within the prior 24 hours, Nurse Clarke did not ask Spencer anything about his appetite, whether he had any nausea, whether he had any diarrhea or vomiting, whether he had any muscle cramps. He did not take his temperature or feel his skin and he did not record any vital signs (Clarke Dep. pp. 74-76, 80).

88.   AmeriCor's written policies states that "individuals at risk for progression to more severe levels of withdrawal will be under constant observation by correctional officers." However, this was not the practice in the PCCF and, consistent with that practice, Spencer was never placed under constant observation (LeFever Dep. pp. 159-160; bates stamped page 561, annexed to Berg Aff. as Ex. 10; Waters Dep. pp. 70-72; Clarke Dep. pp. 68-69).

89.   Contrary to this purported "policy", in actual practice it was up to the inmate to tell a nurse that he or she was having withdrawal symptoms as opposed to the nurse monitoring an

inmate who was at risk for progressing to serious levels of withdrawal (Clarke Dep. pp. 73-74; Waters Dep. p. 54).[18]

## XII. Spencer commits suicide approximately thirteen hours after he is admitted to the PCCF

90.    At or about 1:49 p.m., a call came over the radio for all officers to respond to North Housing Unit (Wendover Dep. p. 68; NHU log book, page 42, entry #374 for 1349 hours, annexed to Berg Aff. as Ex. 19).

91.    Spencer Sinkov was found hanging from his jail issued sweatshirt which was tied around the cell door.  Someone had to retrieve a pair of scissors to cut the sweatshirt in order to gain entry into the cell (Wendover Dep. pp. 70-71).

92.    Once entry was gained, AmeriCor Nurse Waters started CPR (Wendover Dep. p. 72).

93.    Wendover then went to get the BVR – a device to assist breathing. When Wendover returned, Waters had already stopped CPR (Wendover Dep. pp. 73-74, 86).

94.    Contrary to policy and protocol, Waters stopped CPR 25 minutes prior to ambulance personnel arriving (Ambulance record, annexed to Berg Aff. as Ex. 20;  Statement of Susan Waters, annexed to Berg Aff. as Ex. 21 (indicating Waters stopped CPR, the investigators arrived, she asked the HSA to contact Mr. Duffy, and then the ambulance arrived with the paramedic).[19]

## XIII. LeFever is notified of Spencer's suicide

95. LeFever was called in on Saturday May 20, 2006 as a result of Spencer's suicide. Upon his arrival, he made sure the logbook was secure and staff were separated. He then immediately

---

[18] Waters admitted that when she came on shift on May 20, 2006 she was advised that Spencer Sinkov was admitted overnight and that he had a history of heroin use (Waters Dep. p. 58).

[19] PCCF policy is that CPR cannot be stopped except after conferring with a medical doctor or hospital (Wendover Dep. pp. 72-73; LeFever Dep. p. 136). See also Commission's Report on the death of Norberto Rivera, page 4, ¶17 showing that CPR was not ceased prior to the paramedics arrival and the paramedics conferred with the medical control doctor prior to stopping CPR (annexed to Berg Aff. as Ex. 22).

went to the medical department to obtain a copy of the suicide screening form (LeFever Dep. pp. 110-113).

96. Nurse Susan Waters showed LeFever the form. LeFever looked at the form and said "this is a problem" and/or "this is not good" (LeFever Dep. pp. 113-114; Waters Dep. pp. 22-23). LeFever explained it was a problem because Spencer scored a 10 on the suicide screening form and he was not on a constant watch (LeFever Dep. p. 114).

97. LeFever then met with Sheriff Smith and told him that he had the suicide screening form and "it's not good." (LeFever Dep. p. 115). He also told Smith that Spencer should have been on a constant watch (Smith Dep. pp. 31-32).

98. According to the Commission, Spencer should have been placed on a constant watch (Smith Dep. pp. 110, 115).

## XIV. Prior suicide in November 2003 by inmate Norberto Rivera

99. On or about November 15, 2003, another inmate of the PCCF, Norberto Rivera, committed suicide by hanging himself from his jail issued sweatshirt tied to his cell bars (Complt. ¶12; County Defendants' Answer ¶12).

100. Rivera (like Spencer) was on a fifteen minute watch. His watch was due to his withdrawal from heroin (Vasaturo Dep. pp. 243-244). Rivera (like Spencer) committed suicide in between the fifteen minute checks that were performed (Vasaturo Dep. p. 244).

101. Just prior to Rivera's suicide, and similar to the day on which Spencer committed suicide, the NHU officer had to perform additional duties – in Rivera's case going into the Recreation yard and then meeting with a Sergeant and another inmate on the other side of NHU (Commission Report on death of Norberto Rivera, page 4 ¶14, annexed to Berg Aff. as Ex. 22; Vasaturo Dep. pp. 244-245).

102. The Commission of Corrections report on the death of Rivera stated with respect to the NHU officer: "The officer maintains a post right outside the block door. In addition to supervising the housing unit, the officer also has responsibilities to supervise a program area down the hall, movement into the adjacent recreation yard and a separate four cell housing unit approximately 100 feet away." (Smith Dep. pp. 168-169; Berg Aff. Ex. 22). The Commission specifically indicated "The additional duties added to this post prevents an officer from being able to maintain active supervision adequately." (Smith Dep. pp. 172-173; Berg Aff. Ex. 22).

103. Despite this conclusion, on the weekend shift during which Spencer committed suicide, the duties of the NHU post remained the same as when the Commission wrote it was spread too thin in its report on Rivera (Berg Aff. Ex. 22; Smith Dep. pp. 168-172).

104. More specifically, even in 2006 the NHU officer was stationed at a desk at one of the circular area of cells on that unit. He or she still had the responsibility of performing checks on inmates in that unit, escorting those inmates to the shower, telephone, library and recreation yard (Vasaturo Dep. pp. 27-28, 33).

105. The NHU officer also had the responsibility of escorting inmates to the program area which is adjacent to the NHU but through a separate gate (Vasaturo Dep. pp. 30-31). At the time of Spencer's death, a program officer was normally responsible for supervising those in the program area but on the mid-shift (3:30-11:30) and all shifts on weekends there is no program officer so the NHU unit officer assumes that additional responsibility (LaPolla Dep. pp. 51-52; Vasaturo Dep. pp. 31-32, 239-241; Oliver Dep. pp. 12-13; Smith Dep. p. 169). Spencer was admitted to the facility after midnight on Friday and killed himself on Saturday afternoon.

106. At the time of Spencer's death, the NHU officer still had responsibility for the additional four cell area known as NHU-2 (Vasaturo Dep. pp. 249-250). And it was not until

2007 that the PCCF was staffed with someone who could perform a constant watch on the night shift (LaPolla Dep. pp. 20-21).[20]

107. In addition, the NHU officer has responsibility for the eight cells in SHU on the night shift (Vasaturo Dep. pp. 36-37).

108. During the Commission's investigation of Rivera's death, it was recommended that Vasaturo be counseled for rounding off times he noted in the log book rather than the actual time he performed the supervisory checks. Smith falsely advised the Commission that Vasaturo was counseled because Vasaturo readily admitted he was never counseled or even questioned about his time entries (Vasaturo Dep. pp. 201, 250-251; October 29, 2004 letter from Sheriff Smith to Commissioner Lamy, annexed to Berg Aff. as Ex. 24).

109. Despite the Commission's recommendation, Vasaturo still falsely documented times in the log books as evidenced by his entries on May 20, 2006 where he purported to perform checks on inmates in NHU at the very same time he wrote that he was performing checks on inmates in another housing unit – SHU. And all the times were still rounded off to the quarter hour (see Berg Aff. Exs. 19 and 25).

## XV. Since Spencer's death modifications in the operations of the PCCF have been made

### A. After Spencer's suicide PCCF put a backdated suicide prevention policy into the procedure books

110. As described in ¶¶32-38 *supra*, on or about August 4, 2006, an amended policy was inserted into the procedure books for the first time including a directive that a fifteen minute watch was not sufficient as a suicide prevention method (LaPolla Dep. pp. 41-43, 50-51; Berg Aff. Ex. 5; Vasaturo Dep. pp. 234-235, 237-238; Wendover Dep. pp. 91-92; LeFever Dep. pp. 97-101).

---

[20] This contradicts Smith's testimony where he claimed that the four cells were not the responsibility of the NHU post after 2005 (Smith Dep. pp. 168-170).

**B. Sergeants are now required to sign off on their review of the suicide screening forms and notify the Undersheriff of any new intakes**

111. Shortly after Spencer committed suicide, a new procedure was added requiring sergeants to review all intakes, including the suicide screening form, and sign off showing their review was conducted. Prior to Spencer's death, it was recommended that sergeants review the forms but it was not required (LeFever Dep. pp. 92-93; Oliver Dep. p. 65; Wendover Dep. p. 16).

112. In addition, at that same time, a new procedure was set up whereby every intake is now reported to the Undersheriff and the Undersheriff confers with the Sheriff on any issues pertaining to the intake of a new inmate focusing on the suicide prevention screening (Smith Dep. pp. 20-23).

**C. PCCF now uses the State mandated form 330-ADM**

113. In or about January 2008, Smith decided to stop using the suicide screening form that did not comply with the minimum standards and directed LeFever to use the 330-ADM form instead (LeFever Dep. pp. 76-77; Smith Dep. p. 19-20). This change was done to "make it easier" and "simplify" (LeFever Dep. p. 78).

**D. AmeriCor staff is required to take vital signs for all incoming inmates**

114. In or about November 2006, a new policy was instituted requiring nursing staff to take vital signs on all incoming inmates (Clarke Dep. pp. 23-24; Duffy Dep. pp. 56-57).

**XVI. LaPolla and Vasaturo have not been subjected to any disciplinary action**

115. On October 25, 2006, Sheriff Smith wrote to the Commission and indicated that both C.O. Vasaturo and Sergeant LaPolla were "currently pending discipline" for failing to follow County policies in connection with Spencer's death (10/25/06 memorandum from Smith to Commissioner Lamy, annexed to Berg Aff. as Ex. 26).

28

116. Contrary to this representation, LaPolla and Vasaturo have not been disciplined, counseled, or formally or informally told they violated any County policies or procedures (LaPolla Dep. p. 15; Vasaturo Dep. pp. 224, 228-229, 229-233; Smith Dep. pp. 106-107). They also have not received any further instruction, counseling or training (LeFever Dep. pp. 141-144).[21]

117. Smith claimed that no action has been taken because the matter "evolved very quickly" and it is under investigation (Smith Dep. pp. 105). It has been two years since Spencer's death. Yet, he claims it has not been resolved when the policy was actually issued (Smith Dep. pp. 59-64).

118. Although on November 20, 2007 LaPolla and Vasaturo signed an agreement to extend the time frame within which they could be subjected to disciplinary action for an additional six months, that six month period expired on or about May 20, 2008 (LaPolla Dep. p. 16; Vasaturo Dep. p. 259). There is no indication from Defendants as to the status of any disciplinary action against these defendants.

---

[21] Of course, according to LaPolla and Vasaturo, since there were no policies in place requiring constant watch for someone such as Spencer, they did not violate any policies.

**PLAINTIFFS' RESPONSE TO DEFENDANT AMERICOR'S 56.1 STATEMENT**

1.     Plaintiffs, DONNY A. SINKOV, as Administrator of the Estate of Spencer E. Sinkov, deceased, (hereinafter "Sinkov" or "the decedent") DONNY A. SINKOV, and HARA SINKOV, brought an action to recover for damages alleged to have been caused by the defendants, DONALD B. SMITH, individually and in his official capacity as Sheriff of Putnam County ("Sheriff Smith"), JOSEPH A. VASATURO ("Vasaturo"), individually, LOUIS G. LAPOLLA ("LaPolla"), individually, THE COUNTY OF PUTNAM, New York, and AMERICOR, INC., as set forth in the Complaint (See Exhibit A annexed to the Declaration of Adam I. Kleinberg), the Answer of AMERICOR, INC. ("AmeriCor") (See Exhibit D annexed to the Declaration of Adam I. Kleinberg) and the Answer of DONALD B. SMITH, individually and in his official capacity as Sheriff of Putnam County, JOSEPH A. VASATURO, individually, LOUIS G. LAPOLLA, individually, THE COUNTY OF PUTNAM, New York, (See Exhibit B annexed to the Declaration of Adam l. Kleinberg).

     **Response:    Admit.**

2.     The plaintiffs' assert federal jurisdiction based upon the alleged violation of Sinkov's Fourteenth Amendment Rights, in violation of 18 U.S.C. § 1983.

     **Response:    Admit.**

3.     The plaintiffs are the Estate of Spencer Sinkov, Decedent, and Donny and Hara Sinkov, the decedent's parents.

     **Response:    Admit.**

4.     Donald B. Smith, was the Sheriff of Putnam County at the time of the alleged occurrence. The Sheriff promulgates policies with respect to the Putnam County Correctional

Facility ("PCCF"). (See Deposition Transcript of Captain Robert LeFever, Page 14, Lines 7-17, annexed to the Declaration of Timothy P. Coon as Exhibit "A").

**Response:**    **Admit.**

5.  Joseph A. Vasaturo ("Vasaturo") was a Putnam County Corrections Officer at the time of the alleged occurrence. (See Deposition Transcript of Joseph Vasaturo, Page 6, Lines 24-25, annexed as Exhibit "F" to the Declaration of Adam I. Kleinberg).

**Response:**    **Admit.**

6.  Louis G. LaPolla ("LaPolla") was a Sergeant at the PCCF at the time of the alleged occurrence. (See Deposition Transcript of Louis LaPolla, Page 5, Lines 15-17, annexed as Exhibit "G" to the Declaration of Adam I. Kleinberg).

**Response:**    **Admit.**

7.  AmeriCor was a health-care company that provides services in small, county jails. (See Deposition Transcript of Kevin Duffy, Page 6, Lines 3-5 annexed as Exhibit "B" to the Declaration of Timothy P. Coon). On or about July 1, 2003, AmeriCor entered into a contract with the County of Putnam to provide such medical services and has been providing these services since. (See Deposition Transcript of Kevin Duffy, Page 14, Lines 4-5, 21-25, annexed as Exhibit "B" to the Declaration of Timothy P. Coon). (See also relevant portions of Scope of Services annexed as Exhibit "C" to the Declaration of Timothy P. Coon).

**Response:**    **Admit.**

8.  Captain Robert LeFever ("Captain LeFever"), the Captain at PCCF was responsible for putting in place procedures to implement the policies formed by the Sherriff. (See Deposition Transcript of Captain Robert LeFever, Page 10, Lines 20-25 annexed as Exhibit "A" to the Declaration of Timothy P. Coon). Captain LeFever is a twenty-seven year veteran at PCCF. (See

Deposition Transcript of Captain Robert LeFever, Page 5, Lines 12-25 annexed as Exhibit "A" to the Declaration of Timothy P. Coon).

**Response:     Admit LeFever is a 27 year veteran of the PCCF and that as a Captain he had the authority to draft and issue procedures. The procedures specify for staff how they are supposed to actually carry out their day to day job duties in the PCCF (LeFever Dep. p. 14).**

9. Peter Clarke was a registered nurse employed by AmeriCor and was on duty when Sinkov was brought to Central Booking. (See Deposition Transcript of Peter Clarke, Page 6, Lines 9-10, Page 8, Lines 5-7, Pages 42-44, annexed as Exhibit "D" to the Declaration of Timothy P. Coon).

**Response:     Admit.**

10. Susan Waters was a registered nurse employed by AmeriCor who came on duty the morning of May 20, 2006 and later performed CPR on Sinkov. (See Deposition Transcript of Susan Waters, Page 16, Lines 12-14, Page 7, Lines 12-15, Page 58, Lines 4-14, Page 33, Lines 14, annexed as Exhibit "E" to the Declaration of Timothy P. Coon).

**Response:     Admit.**

11. Robert Wendover was a corrections officer employed by the County of Putnam on May 20, 2006. (See Deposition Transcript of Corrections Officer Robert Wendover, Page 5, Lines 19-24 annexed as Exhibit "V" to the Declaration of Adam L Kleinberg).

**Response:     Admit.**

12. Michael Oliver was a corrections officer employed by the County of Putnam on May 20, 2006. (See Deposition Transcript of Corrections Officer Michael Oliver, Page 6, Lines 15-16 annexed to the Declaration of Adam I. Kleinberg as Exhibit "U").

**Response:    Admit.**

13. On or about May 19, 2006, the decedent was arrested and charged with five counts of both Criminal Possession of a Controlled Substance and Criminal Sale of a Controlled Substance. After his arrest, Sinkov was thereafter brought to the PCCF by members of the Putnam County Sheriff's Department. (See Final Report of the New York State Commission Correction, Page 2, ¶5, annexed to the Declaration of Adam L Kleinberg as Exhibit "N")(See also copies of felony complaints against Spencer Sinkov, annexed to the Declaration of Adam I. Kleinberg as Exhibit "W").

**Response:    Admit but deny the relevance and materiality of what the "charges" were against Spencer Sinkov as: (1) he had no arrest record and was never convicted of anything (Complt. ¶15; County Defendants' Answer ¶15); and (2) his right under the Fourteenth Amendment are not decreased because he was charged with a crime.**

14. On or about May 20, 2006, at approximately 12:30 a.m., the decedent arrived at Central Booking. (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 122, Line 3, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F"). At that time, the decedent was placed into a holding cell for approximately one hour. His mood was lighthearted and Vasaturo was joking with the decedent. (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 123, Lines 13-17, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F"). Further, at that time there was no an indication the decedent would hurt himself. (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 127, Lines 3-16, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F").

**Response:**     Admit that Spencer came into the facility at approximately 12:30 a.m. on May 20, 2006 and that he was placed in a holding cell for approximately one hour during which time he was "booked" into the facility.

It is a misstatement of Vasaturo's testimony that Spencer's "mood was lighthearted." Vasaturo testified that "we were – everything was lighthearted with him. We joked around with him." (Vasaturo Dep. p. 123). In addition, on the intake form Vasaturo noted that Spencer was "very laid back" under the section indicating he was showing signs of drug use or withdrawal (Berg Aff. Ex. 4, #16b).

Deny that there was no indication Spencer would hurt himself as he scored "10" on the Suicide Screening form and had three shaded boxes checked indicating that he was a high risk for committing suicide (Berg Aff. Ex. 4).

15. LaPolla met Sinkov during the intake process. After being patted down, he was placed into a holding cell. LaPolla took the decedent's pedigree information for the intake screening and found the decedent to be polite and responsive. (See Deposition Transcript of Sergeant Louis LaPolla, Page 54, Lines 4-17, annexed to the Declaration of Adam I. Kleinberg as Exhibit "G"). LaPolla also discussed the decedent's heroin use. In response to how much heroin did the decedent use, the decedent stated, "a lot." LaPolla then asked the decedent if he was going to have any problems with withdrawal, and the decedent said, "No." The decedent did ask about a methadone program, and LaPolla advised him there was no methadone program at PCCF. LaPolla then asked again about whether the decedent would be okay relating to any withdrawal problems, and the decedent said he would be okay. (See Deposition Transcript of Sergeant Louis LaPolla, Pages 57-58, Lines 17-25, 1-10, annexed to the Declaration of Adam I. Kleinberg as Exhibit "G").

**Response:**     Admit this is what LaPolla claimed occurred when Spencer was brought into the facility.  Add that LaPolla also stated he was aware of other detoxification options but never told Spencer of these options (LaPolla Dep. pp. 63-64).

These self serving denials aside, once again, the Suicide Screening form clearly shows that Spencer was at high risk for committing suicide and had a history of heroin use, including showing signs of being under the influence at admission (Berg Aff. Ex. 4).

Furthermore, the signs and symptoms of withdrawal do not appear immediately, are generally mild at onset, and then peak between 24-72 hours after the last use of heroin. The initial symptoms can be mild at onset including things such as a runny nose, watery eyes, and loss of appetite (Berg Aff. Ex. 11, bates stamped p. 518).

16. At this time, the decedent looked okay. He exhibited no symptoms of withdrawal. He was not shaking, was not nauseous nor was he claiming to be nauseous. (See Deposition Transcript of Sergeant Louis LaPolla, Page 61, Lines 15-24, annexed to the Declaration of Adam L. Kleinberg as Exhibit "G"). The decedent was calm. He was not overly upset nor was he unresponsive. (See Deposition Transcript of Sergeant Louis LaPolla, Page 75, Lines 3-9, annexed to the Declaration of Adam I. Kleinberg as Exhibit "G"). Sinkov did not express any suicidal ideations. He was respectful and made some jokes. (See Deposition Transcript of Sergeant Louis LaPolla, Page 79, Lines 21-25, annexed to the Declaration of Adam I. Kleinberg as Exhibit "G").

**Response:**     Admit LaPolla claimed Spencer was respectful, joking and did not claim to be nauseous or shaking. Deny that Spencer was not overly upset as the score on the suicide screening form shows that he was suicidal and expressed feelings of hopelessness (Berg Aff. Ex. 4).

Deny that Spencer "looked okay" in that he was 6'1" and weighed only 135 pounds. A reasonable jury could conclude he did not look okay (Berg Aff. Ex. 12).

Furthermore, Spencer reported a history of heroin abuse to Vasaturo, LaPolla and NurseClarke, admittedly stating that he used "a lot" of heroin and had a history of heroin abuse. As such, further inquiry should have been made by AmeriCor staff into the mode of use, frequency of use, and whether there were any prior problems when ceasing use (Berg Aff. Ex. 11, bates stamped p. 518).

Similarly, the signs and symptoms of withdrawal start out mild and do not peak for 24 to 72 hours after last use. Spencer had used heroin within the prior 24 hours and thus should have been monitored for progression to more severe levels of withdrawal (Berg Aff. Ex. 11, bates stamped p. 518).

Here, no evaluation was done by Clarke to evaluate if Spencer had any symptoms of the onset of withdrawal, such as to see if Spencer felt nauseous, had diarrhea or any vomiting, was running a temperature, had a runny nose or watery eyes, had needle marks on his skin, and whether his vital signs were normal (Clarke Dep. pp. 41-45.) In addition, LaPolla and Vasaturo never followed up on Spencer's substance abuse issues to see how much heroin Spencer had used (LaPolla Dep. pp. 58-59; Vasaturo Dep. p. 140).

17. Sometime thereafter, Vasaturo completed the screening intake, including the completion of the Putnam County Correctional Facility Suicide Prevention Screening Guidelines Form SOJ-32. ("Suicide Screening") (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 128, Lines 7-8, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F"). (See also Suicide Screening Form of Spencer Sinkov, annexed to the Declaration of Adam I. Kleinberg as Exhibit "P"). No one assisted him. (See Deposition Transcript of Corrections

Officer Joseph Vasaturo, Page 128, Lines 9-10, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F"). After completing the screening intake, he verbally notified LaPolla that he was placing the decedent on a 15-minute watch and he was placing him in cell 7. He told LaPolla he was doing so due to medical screening and answers provided on the suicide screening. At no time did Sergeant LaPolla change the assignment. (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 129, Lines 18-24, Page 130, Lines 12-18, annexed to the Declaration of Adam L Kleinberg as Exhibit "F").

**Response:     Admit but add that Spencer should have been placed on a constant watch due to the answers provided on the suicide screening and the significant potential for drug withdrawal (LeFever Dep. p. 114; Smith Dep. pp. 110, 115).**

18. When Vasaturo asked the decedent if he was going to hurt himself, the decedent replied, "No." (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 137, Lines 5-10, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F"). The decedent further stated he was the healthiest junkie Vasaturo would ever meet, that he took care of his body. (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 137, Lines 5-10, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F"). Further, the decedent had asked for some food at this time and was given a bagel or roll and some juice, which he ate. (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 11-18, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F").

**Response:     Admit that this is what Vasaturo claims but again stress that Defendants continue to ignore the fact that Spencer's score on the suicide screening form was very elevated, having answered yes to 10 questions AND having answered yes to three immediate referral categories (the shaded boxes) (Berg Aff. Ex. 4). The very purpose of the**

**suicide screening form, namely to identify those at high risk of committing suicide, is**

**continually ignored by Defendants' repetitive statements that Spencer denied he would**

**harm himself or that Spencer looked "okay". The results were indisputable – he was**

**suicidal (Berg Aff. Ex. 4).**

19.    With respect to his physical appearance, Vasaturo stated that the decedent looked

"normal." (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 138, Lines

10-12, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F"). He found the decedent

to be coherent, and did not believe he was under the influence at the time. Sinkov was calm. (See

Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 149, Lines 1-7, 22-23,

annexed to the Declaration of Adam I. Kleinberg as Exhibit "F").

**Response:    Deny. On the suicide screening form, Vasaturo specifically noted in**

**column 16b that Spencer was showing signs of drug intoxication in that he was more than**

**just "calm" and characterized him as "very laid back." (Berg Aff. Ex. 4). Contrary to this**

**paragraph #19, Vasaturo's testified that he did not know if Spencer was under the**

**influence (Vasaturo Dep. p 150, line 24).**

20. The decedent had a score of ten and had more than one shaded box on the SOJ32, on

the suicide screen performed by Vasaturo. (See Suicide Screening Form of Spencer Sinkov

annexed to the Declaration of Adam L Kleinberg as Exhibit "P"). Despite the requirement to do

so, Vasaturo did not notify his supervisor. (See Suicide Screening Form of Spencer Sinkov,

annexed to the Declaration of Adam I. Kleinberg as Exhibit "P). (See also, Deposition Transcript

of Corrections Officer Joseph Vasaturo, Page 155, Lines 11-16, annexed to the Declaration of

Adam I. Kleinberg as Exhibit "F"). (See also, Putnam County Policy Article 15, Mental Health

Evaluation and Service, annexed to the Declaration of Adam I. Kleinberg as Exhibit "l").

**Response:     Admit.   However, LaPolla was later notified that Spencer was placed on a 15 minute watch and his cell was changed due to the answers on the suicide screening form (see AmeriCor 56.1 Statement ¶17; Plaintiffs' 56.1 Statement ¶¶70-76).**

21. Vasaturo alone determined that the decedent was to be placed on a 15-minute watch. (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 170, Lines 710, annexed to the Declaration of Adam L Kleinberg as Exhibit "F"). At no time did Vasaturo think that the decedent would hurt himself. (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 174, Lines 8-9, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F").

**Response:     Admit that Vasaturo determined to place Spencer on a 15 minute watch and that he now claims he did not think Spencer would hurt himself. However, that is the very purpose of the Suicide Screening form, the results of which were patently clear that Spencer was suicidal (Berg Aff. Ex. 4). Thus, Vasaturo's self serving belief is rendered incredible.**

22.   If an inmate scores an eight or higher, or one or more shaded boxes are checked, a supervisor is to be notified. (See Deposition Transcript of Captain Robert LeFever, Page 29-30, Lines 21-25, 1-4, annexed to the Declaration of Timothy P. Coon as Exhibit "A"). (See also Deposition Transcript of Sergeant Louis LaPolla, Page 30, Lines 19-24, annexed to the Declaration of Adam I. Kleinberg as Exhibit "G"). The level of supervision would be determined based upon score, and observation, with a score of eight or higher requiring a constant watch. (See Deposition Transcript of Captain Robert LeFever, Page 63-64, Lines 2125, 1-16, annexed to the Declaration of Timothy P. Coon as Exhibit "A"). AmeriCor did not have any role in determining the level of supervision with respect to a possible suicide risk. (See Deposition Transcript of Captain Robert LeFever, Page 58-59, Lines 25, 1-16, annexed to the Declaration of

39

Timothy P. Coon as Exhibit "A"). (See also Deposition Transcript of Sergeant Louis LaPolla,

Page 29, Lines 9-14, annexed to the Declaration of Adam I. Kleinberg as Exhibit "G"). Further,

PCCF was not required to notify AmeriCor when and if an inmate scored an eight or higher on

the suicide screening. (See Deposition Transcript of Captain Robert LeFever, Page 153-4, Lines

24-25, 1-5, annexed to the Declaration of Timothy P. Coon as Exhibit "A"). (See also,

Deposition Transcript of Corrections Officer Robert Wendover, Page 47-48, Lines 21-25, 1-3,

annexed to the Declaration of Adam I. Kleinberg as Exhibit "V").

**Response:**    **Admit that according to the Commission of Correction's minimum**

**standards if an inmate scored eight or higher two things were supposed to happen: (1)**

**supervisor is to be notified; and (2) inmate is supposed to be placed on a constant watch**

**(LeFever Dep. pp. 73-74, 87-91; Berg Aff. Exs. 1 and 5).**

**Deny that the minimum standards were adhered to in PCCF since there were no**

**policies or procedures which stated that if an inmate scored eight or higher they were to be**

**placed on a constant watch. In addition to the lack of any policy or procedure, the form**

**itself was altered so that the very clear directive to institute a constant watch under these**

**circumstances was now removed. And during training, officers were not told to institute**

**constant watch where the score was eight or higher or a shaded box was checked. Finally,**

**in practice, inmates who scored eight or higher or had shaded boxes checked were not**

**always placed on constant watch. Rather, it is apparent that only if they expressly stated**

**they may hurt themselves was a constant watch instituted (*see* Plaintiffs' 56.1 Statement**

**¶¶12-39, *supra*).**

**Deny that AmeriCor staff had no role in determining the level of supervision to be**

**implemented. AmeriCor staff received and reviewed the suicide screening forms included**

in the medical intake packet. They also asked inmates questions and had the authority to call for a heightened level of supervision. In addition, they were supposed to communicate any concerns to corrections staff, which in practice they actually did (LaPolla Dep. pp. 25-26, 28, 29-30; Vasaturo Dep. pp. 90-91; Oliver Dep. pp. 45-46; LeFever Dep. p. 153; Clarke Dep. pp. 25-26, 31-34; Berg Aff. Ex. 10, bates stamped pp. 557-558; Duffy Dep. pp. 68-69, 73-74; Berg Aff. Ex. 9, bates stamped p. 388).

Add that like the PCCF, AmeriCor policies were deliberately indifferent in that they provided for only a 15 minute watch for an inmate who was suicidal (Berg Aff. Ex. 9, bates stamped pp. 448-450; Duffy Dep. pp. 165-166).

23. AmeriCor's role was to provide medical services to the inmates. AmeriCor would do an initial screening at booking, and then within the first 24 hours, a more comprehensive screening is done at the medical office. (See Deposition Transcript of Sergeant Louis LaPolla, Page 27, Lines 1-25, annexed to the Declaration of Adam I. Kleinberg as Exhibit "G"). (See also, Deposition Transcript of Corrections Officer Robert Wendover, Page 46-47, Lines 24-25, 1-20, annexed to the Declaration of Adam I. Kleinberg as Exhibit "V").

Response:     Admit that AmeriCor saw the inmate at booking, as in Spencer's case. However, AmeriCor nurses did not follow up on Spencer's heroin use, did not check Spencer's vitals, and ignored the fact that Spencer was at risk of suicide (Clarke Dep. pp. 41-45; Berg Aff. Ex. 14, p. 6).

Deny that a more comprehensive medical assessment was done within 24 hours.  In fact, a medical assessment was not done for 14 days after admittance into the facility (*see* AmeriCor 56.1 ¶26, *infra*).

24. AmeriCor has no role in completing the suicide screening, nor has it ever had a role in filling out the suicide screening prior to the death of the decedent. (See Deposition Transcript of Captain Robert LeFever, Page 26, Lines 8-10, annexed to the Declaration of Timothy P. Coon as Exhibit "A"). The SOJ-32 is administered by the correction officer. (See Deposition Transcript of Captain Robert LeFever, Page 29, Lines 12-17, annexed to the Declaration of Timothy P. Coon as Exhibit "A").

**Response:    Admit that the jail staff physically completed the Suicide Screening form but deny that AmeriCor had no role in the booking process. Again, AmeriCor received a copy of the form as part of the original medical packet which was delivered to AmeriCor staff within two hours of admission and was required to be reviewed and initialed by AmeriCor staff (LaPolla Dep. pp. 29-30; Vasaturo Dep. pp. 90-91; Oliver Dep. pp. 45-46; LeFever Dep. p. 153). AmeriCor staff also had the authority to recommend heightened levels of supervision for inmates in the PCCF (LaPolla Dep. pp. 32-33; Oliver Dep. p. 15; Smith Dep. pp. 73-74; Vasaturo Depl p. 91; Duffy Dep. pp. 73-74). AmeriCor and corrections' staff were also responsible for referring inmates for mental health evaluation (Wnedover Dep. pp. 42-43; Vasatuor Dep. pp. 161-162; LeFever Dep. p. 152; Smith Dep. p. 111; Waters Dep. pp. 43-44).**

25. AmeriCor's contract with Putnam and the National Commission on Correctional Health Care requires AmeriCor to obtain a complete history and comprehensive physical examination within fourteen (14) days of an inmate commitment. (See relevant portions of AmeriCor Scope of Services annexed as Exhibit "C" to the Declaration of Timothy P. Coon)

**Response:    Admit.**

26. Sometime during the booking process, the Sinkov spoke with AmeriCor Nurse Peter Clarke. ("Nurse Clarke"). At that time, Nurse Clarke discussed his heroin use. Sinkov advised Nurse Clarke that he had used a bag of heroin 24 hours ago. (See Deposition Transcript of Peter Clarke, Page 42, Lines 5-13, Page 44, Lines 22-23, annexed to the Declaration of Timothy P. Coon as Exhibit "D"). The decedent advised Nurse Clarke that he had no medical problems and that he felt fine. When asked if he felt sick, the decedent responded no. Nurse Clarke then advised the decedent about medical and that if he felt sick, tell the officers he needed to see medical. (See Deposition Transcript of Peter Clarke, Page 43, Lines 12-22, Page 73, Lines 21-25, annexed to the Declaration of Timothy P. Coon as Exhibit "D").

**Response:    Admit that Clarke claims this is what occurred but his progress notes do not contain this information.  Add that Clarke admitted he never checked for needle marks, never asked Spencer questions about his heroin use, never checked Spencer's vitals, or did any other follow up in response to learning that Spencer had used heroin within the past twenty four hours (Clarke Dep. pp. 41-45).**

**In addition, Clarke obviously recognized that Spencer was in need of observation as he wrote in his progress notes "will monitor".  Clarke admits he never in fact monitored Spencer (Clarke Dep. pp. 48-49).**

27. After speaking with the decedent, Nurse Clarke wrote a progress note which stated, "received in booking A&E [alert and oriented] normal gait non tremulous good spirits stats feels fine." He further wrote will follow, meaning that if a complaint was brought to his attention by an officer, medical would assist. (See Progress Notes, annexed to the Declaration of Timothy P. Coon as Exhibit "F"). (See also Deposition Transcript of Peter Clarke, Page 52, Lines 5-23, annexed to the Declaration of Timothy P. Coon as Exhibit "D"). Sinkov did not look sick. (See

Deposition Transcript of Peter Clarke, Page 74, Lines 22-24, annexed to the Declaration of

Timothy P. Coon as Exhibit "D"). Indeed, he was joking around. (See Deposition Transcript of

Peter Clarke, Page 78, Lines 14-19, annexed to the Declaration of Timothy P. Coon as Exhibit

"D"). The decedent denied any medical problems. (See Deposition Transcript of Peter Clarke,

Page 79, Lines 3-4, annexed to the Declaration of Timothy P. Coon as Exhibit "D").

**Response:     Although Clarke claims that Spencer was "alert and oriented", in**

**contrast Vasaturo described Spencer as "very laid back." (Berg Aff. Ex. 4, ¶16b).**

**In addition, Clarke's claim that his note "will monitor" meant only if Spencer asked**

**for monitoring is, on its face, not credible. Certainly, a jury could view his self-serving**

**explanation as bogus (Berg Aff. Ex. 13).**

**And here again, the contention that Spencer looked "fine" misses the point entirely.**

**The objective measurement tool, namely the suicide screening form, clearly showed**

**Spencer was not "fine", was suicidal, and was in need of constant supervision (Berg Aff.**

**Ex. 4).**

28. After leaving Central Booking, the decedent was placed in cell #7 in the North

Housing Unit on a fifteen minute watch.

**Response:     Admit. Add that this violated New York State's minimum standards**

**(Berg Aff. Exs. 1, 3 and 5).**

29.     That morning, the decedent ate breakfast. (See Deposition Transcript of Corrections

Officer Michael Oliver, Pages 87-88, annexed to the Declaration of Adam I. Kleinberg as

Exhibit "U").

**Response:     Admit Spencer was given breakfast but deny that Spencer actually**

**ate. C.O. Oliver gave Spencer a breakfast tray but admitted he did not know "how much**

**he ate" and did not "remember what he ate." (Oliver Dep. pp. 87-88). Furthermore, he**

**described breakfast as a bagel and yogurt (Oliver Dep. p. 88). The bagel was not eaten as**

**shown by pictures of the cell after he committed suicide (see photograph annexed to Berg**

**Aff. as Ex. 27).**

30.     At approximately 10:50 a.m., the decedent was visited by his mother, father and

brother. (See Final Report of the New York State Commission Correction, Page 5, ¶12, annexed

to the Declaration of Adam L Kleinberg as Exhibit "N"). He was escorted to the visit by

Corrections Office Wendover. (See, Deposition Transcript of Corrections Officer Robert

Wendover, Page 48, Lines 14-17, annexed to the Declaration of Adam I. Kleinberg as Exhibit

"V"). (See also Deposition Transcript of Corrections Officer Michael Oliver, Page 89, Lines 720,

annexed to the Declaration of Adam 1. Kleinberg as Exhibit "U"). At the time Wendover

retrieved the decedent for his visit, he seemed fine. (See Deposition Transcript of Corrections

Officer Robert Wendover, Page 51, Lines 2-4, annexed to the Declaration of Adam L Kleinberg

as Exhibit "V").

**Response:     Admit that Spencer received a visit from his family and that**

**Wendover escorted Spencer. Deny that Spencer seemed "fine" in that he did "looked**

**awful", "looked sick", was extremely pale, had dark circles under his eyes, was clammy**

**and cold (D. Sinkov Dep. p. 69; H. Sinkov Dep. p. 20; 50-h Tr. p. 37).**

31. During the visit, the decedent's parents asked the decedent whether he was going

through withdrawal. The decedent replied that it was not too bad. (See Deposition Transcript of

Corrections Officer Robert Wendover, Page 56, Lines 11-18, annexed to the Declaration of

Adam I. Kleinberg as Exhibit "V"). (See also Deposition Transcript of Hara Sinkov, Page 14,

Lines 11-13, annexed to the Declaration of Timothy P. Coon as Exhibit "G"). (See Deposition

Transcript of Donny A. Sinkov, Page 68-69, Lines 25, 1-4, annexed to the Declaration of

Timothy P. Coon as Exhibit "H"). At no time did the decedent ever discuss thoughts of suicide

with his mother. (See Deposition Transcript of Hara Sinkov, Page 13, Lines 15-18, annexed to

the Declaration of Timothy P. Coon as Exhibit "G"). The decedent did not express any suicidal

thoughts during this visitation. (See Deposition Transcript of Donny Sinkov, Page 22-24,

annexed to the Declaration of Timothy P. Coon as Exhibit "H").

**Response:    Admit that during the visit Donny asked Spencer if he was going**

**through withdrawal and Wendover heard Spencer state he was in fact withdrawing but**

**that it was not that bad yet. Add that as of this time it had been approximately 34 hours**

**since Spencer last used heroin. As such, the signs and symptoms of withdrawal could have**

**been just beginning and certainly had not yet peaked (Berg Aff. Ex. 11, bates stamped p.**

**518).**

**Deny that it is relevant as to whether Spencer verbally expressed any suicidal**

**thoughts to his family because that is the purpose of the suicide screening form which**

**indisputably indicated Spencer was at a high risk of committing suicide (Berg Aff. Ex. 4).**

32.    At approximately 11:05 a.m., the visit ended and Wendover escorted the decedent

to meet Oliver for transfer of the decedent. This took place outside of the medical department.

(See Deposition Transcript of Corrections Officer Robert Wendover, Page 59, Lines 21-22,

annexed to the Declaration of Adam I. Kleinberg as Exhibit "V"). (See also, Deposition

Transcript of Corrections Officer Michael Oliver, Page 91, Lines 13-20, Page 92, annexed to the

Declaration of Adam I. Kleinberg as Exhibit "U"). At the time Wendover handed the decedent

over to Oliver, Oliver and the decedent joked about the decedent looking like a rock star. (See

Deposition Transcript of Corrections Officer Robert Wendover, Page 60, Lines 15-18, annexed to the Declaration of Adam I. Kleinberg as Exhibit "V").

**Response:     Admit that Spencer was escorted back to NHU but, according to Wendover, the medical department and specifically AmeriCor nurse Susan Waters, wanted to see Spencer which is why they stopped at medical Nurse Waters then called Spencer into the infirmary by name (Wendover Dep. pp. 59-62).**

**Further admit that these witnesses claimed Spencer joked about looking like someone from a famous rock band but deny the relevance and materiality of this statement. It does not alter in any way the suicide screening results.**

33.     At approximately 11:00 a.m., AmeriCor Nurse Susan Waters ("Nurse Waters") saw the decedent for the first time, while he was sitting outside of the medical office. (See Deposition Transcript of Susan Waters, Page 76, Lines 13-20, annexed to the Declaration of Timothy P. Coon as Exhibit "E"). Nurse Waters was advised at the start of her shift of the decedent's admission to the facility and his history of heroin use, but that he had no signs and symptoms of withdrawal. (See Deposition Transcript of Susan Waters, Page 58, Lines 4-14, annexed to the Declaration of Timothy P. Coon as Exhibit "E").

**Response: Admit this is what Waters' claims. Clarke had no recollection of the supposed conversation (Clarke Dep. pp. 46-47).**

34.     When Nurse Waters saw the decedent sitting outside of the medical office, she thought he was a female prisoner. (See Deposition Transcript of Susan Waters, Page 77, Lines 13-21, annexed to the Declaration of Timothy P. Coon as Exhibit "E"). In front of the decedent, Nurse Waters asked Officer Blanchard if that was the female that need Motrin. The decedent started to laugh. Nurse Waters told Sinkov that she thought he was a girl. The decedent laughed

and said that is what everyone thought when they see him, he should get a haircut. (See Deposition Transcript of Susan Waters, Page 80, Lines 5-19, annexed to the Declaration of Timothy P. Coon as Exhibit "E"). At this time, the decedent appeared to be fine. (See Deposition Transcript of Susan Waters, Page 84, Lines 17-18, annexed to the Declaration of Timothy P. Coon as Exhibit "E").

**Response:     Deny in part.  Admit that Waters claimed to have this conversation but contradicting Waters' version, according to C.O. Oliver, Spencer did not laugh when Waters stated she through he was a girl but only "smiled".  Oliver also said that Spencer did not say anything in response to Waters' testimony (Oliver Dep. pp. 94-96).**

**Deny that Spencer appeared to be "fine."  For if he was "fine" then Waters would not have completed a referral for Spencer to be evaluated by mental health – which she admitted she did at some point on her May 20th shift although she incredibly claimed she could not recall why she completed that form (Waters Dep. pp. 88-90).**

**In addition, just minutes earlier Spencer appeared sick, clammy, very pale, with dark circles under his eyes and "translucent" (D. Sinkov Dep. p. 69; H. Sinkov Dep. p. 20; 50-h Tr. p. 37).  Thus, at his interaction with Waters just minutes later, his appearance would not have been "fine."**

35.     After seeing the decedent, Nurse Waters wrote a progress note indicating that she saw the decedent outside of medical and that he was without signs of withdrawal, was in good spirits and was laughing and joking around. His gait was steady and no complaints were made by the decedent. (See Progress Notes, annexed to the Declaration of Timothy P. Coon as Exhibit "F"). She also filled out a Mental Health Routing Sheet. (See Deposition Transcript of Susan Waters, Page 87, Lines 19-25, annexed to the Declaration of Timothy P. Coon as Exhibit

"E")(See also, Mental Health Routing Sheet, annexed to the Declaration of Timothy P. Coon as Exhibit "I").

**Response:     Admit that Waters wrote a progress note but clarify that she did not write the note until <u>after</u> Spencer committed suicide two hours later (Waters Dep. pp. 35-36).   Although Waters wrote that Spencer did not offer any complaints, she readily admitted that she never asked him if he was okay or had any complaints (Waters Dep. pp. 102). In addition, in the progress notes Waters initially wrote that his gait was "unsteady" but then changed it to say that he was steady (Waters Dep. pp. 101-102).  Further admit that Waters completed a referral for Spencer to be evaluated by mental health showing she appreciated he was not "okay" (Waters Dep. pp. 88-90).**

36.     At approximately 11:02, the decedent was back in his cell. (See Deposition Transcript of Corrections Officer Michael Oliver, Page 133, Lines 13-21, annexed to the Declaration of Adam L Kleinberg as Exhibit "U"). The decedent told Oliver that "everything was ok, it was an alright visit." (See Deposition Transcript of Corrections Officer Michael Oliver, Page 97, Lines 14-18, annexed to the Declaration of Adam I. Kleinberg as Exhibit "U").

**Response:     Admit Spencer was back in his cell at approximately 11:07 a.m. (Oliver Dep. p. 107). Deny that Spencer said "everything was ok, it was an alright visit." Oliver testified that it was C.O. Wendover who said this and <u>not</u> that Spencer said this (Oliver Dep. p. 97).**

37.     Thereafter, at approximately 11:30 a.m., the decedent ate some of his lunch. (See Deposition Transcript of Corrections Officer Michael Oliver, Page 98, Lines 19-23, annexed to the Declaration of Adam I. Kleinberg as Exhibit "U") (See also Final Report of the New York

State Commission Correction, Page 5, X13, annexed to the Declaration of Adam I. Kleinberg as Exhibit "N").

**Response:**     **Admit that Spencer was given lunch but deny that he ate much of anything. According to Oliver, when he collected the lunch tray he observed that Spencer had only eaten the top buns of the burgers and the tray still had the other food on it (Oliver Dep. pp. 98-99).**

38.     Oliver collected the decedent's tray at 12:09 p.m. and performed 15-minute checks of the decedent thereafter. (See Final Report of the New York State Commission Correction, Page 5, ¶13, annexed to the Declaration of Adam I. Kleinberg as Exhibit "N").

**Response:**     **Admit the lunch tray was collected.  Admit that Oliver claimed to conduct the fifteen minute checks as noted in the log book. However, even though Oliver was supposed to be making sure Spencer was okay, he readily admitted that during the checks his view of Spencer was blocked he could not see Spencer's face. In addition, all Spencer did was lie on his bed. Oliver could not even tell if Spencer was sleeping.  He observed that Spencer was wearing a sweatshirt but yet  still had a blanket on him (Oliver Dep. pp. 90-91, 100).**

**Further, just minutes before he found Spencer hanging, Oliver escorted inmates to bible study program. The entry time was altered in the log book and even Oliver could not tell what the accurate time was that he performed the program officer duties (Oliver Dep. p. 112; Berg Aff. Ex. 19, last page, entry #373).**

39.     At or about 1:49 p.m., the decedent was found hanging from the bars of his cell. (See Deposition Transcript of Corrections Officer Michael Oliver, Page 99, Lines 4-7, annexed

to the Declaration of Adam L Kleinberg as Exhibit "U"). (See Final Report of the New York

State Commission Correction, Page 5, ¶14, annexed to the Declaration of Adam L Kleinberg as

Exhibit "F").

**Response:    Admit Spencer was found hanging and that the time noted in the**

**NHU logbook was 1:49 p.m. but clarify: C.O. Oliver did not make the 1:49 time entry**

**contemporaneously but rather went back to the log book later and filled it in; the time that**

**Oliver noted in the log book was not based on his own personal recollection but rather**

**what the Sergeant told him to put in the book as to the time (Oliver Dep. pp. 117-118).**

40.    Nurse Waters was called to the cell and performed CPR on Sinkov until the

paramedics arrived. (See Deposition Transcript of Susan Waters, Page 33, Lines 1-4, annexed as

Exhibit "E" to the Declaration of Timothy P. Coon).

**Response:    Admit that Waters was called but deny that she performed CPR on**

**Sinkov until the paramedics arrived.  Her own sworn statement contradicts this testimony.**

**In fact, Waters prematurely stopped CPR prior to the paramedics arriving and according**

**to ambulance records stopped 25 minutes before they arrived (Wendover Dep. pp. 72-74;**

**Berg Aff. Exs. 20 and 21).**

51

## PLAINTIFFS' RESPONSE TO DEFENDANT SMITH, VASATURO, LAPOLLA AND THE COUNTY'S 56.1 STATEMENT

### BACKGROUND

1.  Sheriff Smith was elected to the position of Putnam County Sheriff in November of 2001 and officially took office in January of 2002. See Exh. E at pp. 5-7.[1]

**Response:    Admit.**

2.  To this date, Sheriff Smith remains in his elected position as Sheriff. See Exh. E at p. 5.

**Response:    Admit.**

3.  Sheriff Smith sets broad policies and procedures for the operation of the Putnam County Correctional Facility ("PCCF"). See Exh. E at p. 5.

**Response:    Admit. Sheriff Smith is responsible for making sure that the PCCF has policies and procedures that are consistent with the State's minimum standards (LeFever Dep. pp. 79-80). There are specific procedures which direct staff how to carry out the broader policies (Smith Dep. pp. 7-8, 64). Smith also has the responsibility for taking disciplinary action against employees of the PCCF, although Capt. LeFever could verbally counsel or further train his subordinates (Smith Dep. pp. 33-34, 36).**

4.  The Corrections Officers who work at the PCCF are employees of Putnam County (the "County"). See Exh. E at p. 35.

**Response:    Admit but add that according to the collective bargaining agreement, the PCCF employees are jointly employed by the County of Putnam and the Sheriff (contract, annexed to Berg Aff. as Ex. 28). In addition, with respect to all personnel matters, Sheriff Smith has the final discretionary decision making authority (Smith Dep.**

pp. 33-35). Finally, the Sheriff's duty to care for inmates in the County jail are mandated by state law. *See* New York Correction Law §500-c.

5. While Sheriff Smith may sit at the bargaining table with the Putnam County Executive for purposes of negotiating the PCCF Corrections Officers' Collective Bargaining Agreement, Smith does not employ the PCCF Corrections Officers. See, Exh. E at p. 35.

**Response:    Deny. *See* ¶4 above.**

6. At the outset of his tenure, Sheriff Smith reviewed various PCCF policies. See Exh. E at pp. 6-8.

**Response:    Admit. According to Smith he performed a comprehensive review of PCCF policies and procedures, toured the correctional facility, met with other Sheriffs, reviewed the State Commission's minimum standards, discussed jail operations with the jail administrators (then Captain Butler, Lieutenant LeFever and Sergeant O'Malley), reviewed how medical services were provided in the jail, and reviewed numerous documents (Smith Dep. pp. 6-11).**

7. As part of the transition process, Sheriff Smith reviewed policies that were in existence under the prior regime, including those pertaining to the intake process and suicide prevention screening for new inmates. See Exh. E at pp. 8-9, 19.

**Response:    Admit. See immediately preceding paragraph #6.**

**Add that Smith had to therefore be aware that there was no procedure in place for staff to follow in carrying out their day to day job functions which complied with the State's minimum standards. In addition, based on his review of forms and documents, ne**

53

must have been aware that the PCCF suicide screening form differed from the State's mandated screening form (*see* Plaintiffs' 56.1 Statement ¶¶12-39, *supra*).

8.   Specifically, Sheriff Smith spoke with Captain Gerald Butler, the then-PCCF Jail Administrator who also held the same position under the prior Sheriff, about the PCCF's inmate intake forms. See Exh. E at pp. 10-11.

**Response:     Admit that Smith claims he spoke with Butler, LeFever and O'Malley but clarify that Smith really could not recall the substance of his conversations with any of these individuals (Smith Dep. pp. 11-12).**

9.   Captain Butler advised Sheriff Smith that the New York State Commission of Correction (the "Commission") performed annual inspections of the PCCF and that the PCCF intake form was reviewed and approved by the Commission during these reviews, See Exh. E at pp. 11-12; 38-39.

**Response:     Deny.  Smith could not recall specifically who he spoke with. In addition, he admitted that he never saw anything in writing from the Commission approving the PCCF suicide screening form AND he could not say whether or not the Commission ever even looked at the PCCF suicide screening form (Smith Dep. pp. 11-12).[22]**

THE PCCF's SUICIDE PREVENTION POLICY

10.   The PCCF has three levels of supervision of inmates. See Exh. E at p. 23.

**Response:     Admit.**

---

[22] LeFever testified that although he was instrumental in developing the PCCF suicide screening form back in 1992, he did not remember who made the determination to modify the state's form and remove the provision that requires constant watch if the score is eight or higher or a shaded box is checked. He did recall that it was not his decision and was someone higher in the chain of command than him (LeFever Dep. pp. 19-20, 66-67, 80-81). For Smith to now say that LeFever was part of the group that told him the state form was the same is inconsistent with LeFever's knowledge that it was significantly different and as such creates a jury question as to Smith's credibility.

11.   Specifically, these are: i) general supervision, which requires an officer check of an inmate every 30 minutes; ii) active supervision, which requires an officer check of an inmate every 15 minutes; and iii) constant supervision, which requires one on one supervision of the inmate at all times. See Exh. E at pp. 23-24; Exh. F at pp. 56-57.

**Response:    Admit.**

12. Under Sheriff Smith, the PCCF's policy has always been that constant supervision (also referred to as a constant watch) is the only acceptable form of supervision for a suicidal inmate. See Exh. E at p. 25; Exh. F at pp. 55, 112; Exh. G at pp. 35-36.

**Response:    Deny. See Plaintiffs' 56.1 Statement ¶¶12-39, *supra*.  There were no policies or procedures which required constant watch for suicidal inmates – clearly a violation of New York State's minimum standards for County jail.  Staff were never trained to impose a constant watch for an inmate at risk of committing suicide. And the County's modified intake form removed the directive from the face of the form to institute constant watch where the total score was eight or higher or a shaded box was checked. Finally, in actual practice staff assigned inmates who were suicidal to a fifteen minute supervisory check, rather than constant watch.**

13. During the intake process, the PCCF booking officer will administer a series of questions to an inmate, make a series of observations, and complete related paperwork, including medical intake and suicide screening forms. See Exh, F at pp. 93, 142-43.

**Response:    Admit.**

14.   The PCCF suicide screening form contained a series of 16 questions and observations (some with subparts) and related columns for "Yes," "No," and

"Comments/Observations." See Exh. H..

     **Response:**    **Admit.**

15.   The boxes in the "Yes" column for six of the questions on the PCCF suicide screening form are shaded areas.  See Exh. .H.

     **Response:**    **Admit.**

16.   Affirmative answers to the "shaded area" questions are indicators that an inmate is a high risk candidate to attempt suicide. See Exh. G at pp. 9, 39.

     **Response:**    **Admit.   In addition to the shaded areas, a total score of eight or higher is an indicator that an inmate is suicidal (Berg Aff. Ex. 3).  Add that according to New York State minimum standards, inmates who score eight or higher OR who have one or more shaded areas checked are required to be placed on a constant watch (LeFever Dep. pp. 73-74, 87-88, 90-91; Berg Aff. Exs. 1 and 2).**

17.   The completed intake packet, including the medical and suicide screening forms, would then go to the jail nurses. See Exh. F at pp. 90-91.

     **Response:**    **Admit.  In addition, the nurses, employed by AmeriCor, also sign off on the form indicating they have reviewed its contents, which Nurse Clarke did in this case (Berg Aff. Ex. 4).**

18.   The jail nurses are employed by defendant AmeriCor, an entity that contracts with the County for the provision of medical services at the PCCF. See Exh. E at pp. 96-98.

     **Response:**    **Admit.  Add that AmeriCor staffed the jail with one registered nurse per shift (Duffy Dep. p. 24).**

19.    The AmeriCor staff would review the inmate intake packet and would communicate when they felt that a heightened level of supervision was warranted. See Exh. F at p. 92.

**Response:    Admit.**

20.    The lower section of the PCCF suicide screening form provides the following directive to the Booking Officer: If total in Column A is 8 or more, or any shaded box is checked, or if the screening officer feels it necessary, notify shift supervisor. See Exh. H.

**Response:    Admit.  Add that the form used by PCCF removed the language from the State's required form which directed institution of constant watch (compare Berg Aff. Ex. 3 and Berg Aff. Ex. 4).**

21. With respect to the completion of the PCCF suicide screening form, Sheriff Smith testified that a constant watch must be instituted where either an inmate scores an 8 or higher on the form or there is an affirmative answer to a question that contains a shaded area. See Exh. E at p. 29.

**Response:    Admit that Smith confirmed what is required by New York State minimum standards but deny that that was PCCF policies or practices. Evidence exists showing this minimum standard was not complied with by the PCCF. *See* Plaintiffs' 56.1 Statement ¶¶12-39, *supra.***

22.    Only a mental health professional can take an inmate off a constant watch. See Exh. E at p. 74.

**Response:    Admit.**

23.    The PCCF Corrections Officers received a policy book, commonly referred to as the "Red Book." See Exh. F at pp. 60-61.

**Response:     Admit.**

24.     Article 15 of the Red Book is entitled "Mental Health Evaluation & Service." See Exh. I.

**Response:     Admit.**

25.     Section 15-2 (A) (3) of the Red Book provides, in relevant part, a Booking Officer must: Immediately notify the tour supervisor whenever a prisoner: a. Scores in the high risk (score of 8 in Column A) or immediate referral categories on the Suicide Prevention Screening Form; ... See Exh. I at p. 15.2; see also Exh. F at pp. 72-74, 76; Exh. G at pp. 30-31.

**Response:     Admit that the policy referred to under the section "Admission/Screening Policy" provides that the Booking Officer shall administer the 330-ADM (which again was not the form used by the County) and notify the supervisor if the score is eight or higher or an immediate referral category is checked (Kleinberg Decl. Ex. I).**

**Add that nothing under the "Admission/Screening Policy" section states that constant supervision should be instituted by someone who scores eight or higher, or answers yes in the immediate referral categories, or is suicidal (Kleinberg Aff. Ex. I, section 15-2). Rather, the policy says to "Assign appropriate housing based upon the result of the completed Form #330 ADM." (Id. at §15-2(A)(6)). Again, the form used by the PCCF did not tell the correction officer what to do once the suicide screening form was completed but left it to their discretion (see Berg Aff. Ex. 4).**

26.     Consistent with this policy, defendant Joseph Vasaturo, a PCCF Corrections Officer, testified that a booking officer must notify a tour supervisor when an inmate scores an

eight or higher on the suicide screening form or where there is an affirmative answer in an immediate referral category on the form. See Exh. F at pp. 72-74, 76.

**Response:    Admit. PCCF Suicide screening form also indicated that notification to the supervisor must occur under these circumstances (Berg Aff. Ex. 4).**

27.    The immediate referral categories are the shaded box areas on the suicide screening form. See Exh. E at p. 48; Exh. F at p. 74.

**Response:    Admit.**

28.    In such situations, the booking officer notifies the Tour Supervisor, who is the Sergeant on duty. See Exh. F at pp. 72-74, 157, 160; Exh. G at pp. 31-32, 37-38.

**Response:    Admit.**

29.    Section 15-4 (B) (3) of the Red Book provides, in relevant part, a Tour Supervisor must:  a. Assure that constant supervision is immediately provided for the following types of prisoners:

1)    Suicidal Prisoners;

2)    Other prisoners with serious mental health problems. . .

See Exh. I at p. 15.6; Exh. E at p. 69; Exh. F at pp. 55, 58, 105-06.

**Response:    Admit that this is what is in writing but clarify this is not a "policy" that pertains to intake/admission. As indicated in ¶25 *supra*, the "Admission/Screening" policy did not direct that constant supervision be provided to inmates who score eight or higher, have a shaded box (immediate referral category checked), or are suicidal (Berg Aff. Ex, §15-2).**

**The section quoted here is for "Facility Resource Limitations" and applies to inmates with "mental health problems." The term mental health problem is not defined.**

The policy inconsistently provides that inmates with "mental health problems" are to be given "at least active supervision" – which is defined as a supervisory visit every fifteen minutes (Kleinberg Aff. Ex. I, §15-4 ¶A and ¶1 under "Procedural Guidelines").

Then, under section 3 (page 15.6) the Tour Supervisor is supposed to ensure constant supervision for suicidal inmates. However, there is no reference to the suicide screening form and how the scores on the suicide screening form or shaded boxes interplay with this provision. There is also no definition of "suicidal prisoner" (Kleinberg Decl. Ex. I p. 15.6 §3). In other words, nothing said that a score of 8 or higher or having a shaded box checked required the institution of constant watch.

Furthermore, regardless of what is written in this policy, the simple fact remains that in practice staff were not informed until _after_ Spencer's suicide that 15 minute watches were insufficient for suicide precautions. At the time of Spencer's death, even the intake form did not state that constant watch had to be provided. And officers were not trained that those who were identified as suicidal by reason of the scores on the form were to be placed on constant watch (_see_ Plaintiffs' 56.1 Statement ¶¶12-39, _supra_).

30.    Section 15-4 (B) (3) of the Red Book further provides, in relevant part, a Tour Supervisor must:

a. Assure that active supervision is immediately provided for prisoners who are intoxicated by drugs or alcohol but who do not appear to be a danger to themselves or others. See Exh. I at p. 15.6; Exh. E at p. 71; Exh. F at pp. 16-17, 113-14.

**Response:**    Admit that this is what the Red Book states in writing. Clarify, that active supervision is a fifteen minute watch.

60

31.     Suicidal or other high risk inmates receiving constant supervision received paper clothing from the PCCF staff. See Exh. F at p. 55; Exh. G at p. 106.

**Response:**     **Deny. According to Captain LeFever "we don't us them." And if they had, it would have been against the Commission of Correction's minimum standards (LeFever Dep. pp. 16-17, 19; Berg Aff. Ex. 29).**

SUICIDE PREVENTION TRAINING

32.     The jail administrator sets procedures to carry out the Sheriff's broad policies. See Exh. E at pp. 37-38.

**Response:**     **Admit but add that the Sheriff is still responsible for implementing specific procedures spelling out how officers carry out their day to day duties (LeFever Dep. p. 14).**

33.     Sheriff Smith always believed that his subordinates were carrying out these policies pertaining to suicidal inmates based on his personal observations, participation in staff briefings, and the significant number of constant watches conducted in the PCCF during his tenure. See Exh. E at pp. 26-27, 48-49; Exh. F at pp. 61-62; Exh. G at p. 85.

**Response:**     **Admit that this is what Smith claims but deny that a jury will find his self serving belief credible for several reasons.**

**First, Smith as the Sheriff had a non-delegable duty and responsibility to make sure that the PCCF complied with the State's minimum standards. He reviewed the minimum standards when he became Sheriff, as well as the PCCF policies and procedures, and forms. Thus, a reasonable jury could readily conclude that he knew there was no procedure in place requiring constant watch for suicidal inmates and that the form did not comply with the State's minimum standards. See Plaintiffs' Memorandum of Law.**

61

Second, readily accessible at the State's website and explained in numerous Chairman's Memoranda which Smith reviewed was that the State mandated suicide screening form 330-ADM be used. Smith claims he was told the form was "basically the same" but he never checked to see if it was for himself. It cannot be disputed that he had a responsibility and duty to see that the PCCF form was identical to the form which he knew the State required. And of course, the removal on the PCCF form of the language requiring constant watch is not consistent with the State's minimum standards (Berg Aff. Exs. 1, 3, 4 and 5).

Third, Lefever's testimony was that he was aware the forms differed, he did not know of any policy or procedure that constant watch was required where an inmate scored eight or higher on the form or had a shaded box checked, and he could not explain why that was. It is inconceivable that he would then tell Smith, as Smith now claims, that PCCF had forms and policies that complied with the State's minimum standards (see LeFever Dep. pp. 27-29, 65-67, 91).

Fourth, regardless of what Smith claims he personally believed, in practice the employees of the PCCF did not institute constant watches for inmates who were suicidal. Rather, a fifteen minute check was implemented. And this of course violated minimum standards. Smith, as the Sheriff, had the ultimate supervisory responsibility over all jail staff and supervisory duty to ensure they were following the State's minimum standards. This he grossly failed to do. *See* Plaintiffs' 56.1 Statement ¶¶12-39, *supra*.

Fifth, the constant watches that were actually implemented under Smith's tenure appear to be only in cases where an inmate specifically expressed suicidal thoughts. In

other words, unless an inmate expressly indicating an intent to harm himself, a constant watch was not implemented (Oliver Dep. pp. 41-42; Vasaturo Dep. pp. 109-112).

34.    Suicide prevention training is administered by the PCCF jail administrator and his staff. See Exh. E at p. 36; Exh. F at pp. 62-63, 74-76.

**Response:    Admit.**

35.    The suicide prevention training is based on training manuals received from the Commission and the NYS Office of Mental Health. See Exh. E at pp. 44-45; Exh. J. 36.

**Response:    Admit.**

36.    Section VI of the training manual provides a question by question outline as to how to respond to the questions on a suicide screening form. See Exh. J at Section VI.

**Response:    Admit that the training manual includes this but there is no evidence showing that this outline and how to respond to question were ever the subject of any actual training given to PCCF employees.**

37.    The contents of the questions addressed in Section VI directly correlate to the questions set forth on the PCCF suicide screening form. Compare Exhs. H and J at Section VI.

**Response:    Admit.**

38.    Page VI-10 of the training manual explains that a booking officer must immediately notify a supervisor where the score on the suicide screening form is 8 or more, where any shaded boxes are checked, or where the officer believes a referral is warranted. See Exh. J at p. V I-10.

**Response:    Admit this is what the training manual says.**

THE 2003 SUICIDE OF NORBERTO RIVERA

39.    On November 10, 2003, Norberto Rivera was committed to the PCCF. .See Exh. K at p. 2

**Response:    Admit.**

40.    In connection with Rivera's arrival, a PCCF booking officer administered the PCCF suicide screening form. See Exh. K at p. 2.

**Response:    Admit.**

41.    Rivera scored a "6" on the suicide screening form. See Exh. K at p. 2.

**Response:    Admit.**

42.    Although he had a history of drug abuse, given the period of abstinence prior to jail admission, and the signs of withdrawal, Rivera was not under the influence of heroin at admission. See Exh. K at p. 2.

**Response:    Admit that Rivera had a history of heroin abuse, depression but clarify that at the time of admission he was "under the influence." (*see* Commission Report on the death of Norberto Rivera, page 2, ¶5, annexed to Berg Aff. as Ex. 22). However, Rivera appeared to be "entering" withdrawal (<u>Id</u>.). Rivera was given a medical regimen which provided him with medications for his withdrawal from heroin (Smith Dep. pp. 166-167; Berg Aff. Ex. 22. pp. 2-3, ¶6).**

43.    The booking officer placed Rivera on a 15 minute watch. See Exh. K at p. 2.

**Response:    Admit.**

44.    Five days after admission to the PCCF, Rivera committed suicide by hanging himself. See, Exh. K at p. 3.

**Response:    Admit.**

45.    Rivera was in the North Housing Unit at the time of his death. See Exh. K at p.4.

**Response:    Admit and add that:**

**(1) Rivera was housed in the same housing unit as Spencer Sinkov;**

**(2) Rivera, like Spencer, was on a 15 minute watch;**

**(3) Rivera, like Spencer, hung himself using his jail issued sweatshirt;**

**(4) Just prior to Rivera's suicide, the NHU officer was taking care of other duties including the recreation yard and meeting with another inmate. Similarly, just prior to Spencer's suicide, the NHU officer was taking care of the program post's duties which required the NHU officer to bring the inmates to the program room down the hall (Berg Aff. Exs. 14, 22 and 25; Plaintiffs' 56.1 Statement ¶¶99-109, *supra*).**

46.    The Commission did an investigation of the PCCF following Rivera's suicide. See Exh. K.

**Response:    Admit.**

47.    The Commission made three recommendations to Sheriff Smith as part of its final report: i) a policy should be in place directing corrections officers to document the actual times of their checks, rather than rounding off the times; ii) a re-evaluation of first aid equipment and, if such equipment was available, the provision of related training; iii) an updated staffing analysis should be requested with particular attention to the North Housing area post and its adjacent responsibilities. See Exh. K at p. 5.

**Response:    Admit but clarify that with respect with the first recommendation the Commission also recommended questioning the housing area officer, namely Vasaturo, about the adequacy of his log book times and that a policy should be in place requiring actual times be recorded and not rounded off times (Berg Aff. Ex. 22, page 5 ¶1). Finally, although in his letter to the Commission Smith claimed Vasaturo was never questioned**

65

much less counseled for rounding off times in the log book, in fact he never was (Berg Aff. Ex. 24; Vasaturo Dep. pp. 200-201).

In addition, in its preliminary report the Commission recommended that the Sheriff review the policy and procedure for performing suicide prevention screening to ensure that a procedure is in place to recognize that initial screening is only valid for up to 72 hours and not on any inmate who is under the influence of drugs or alcohol (see September 28, 2004 Memorandum from Undersheriff Convery to Captain LeFever ¶1, annexed to Berg Aff. as Ex. 30).

With respect to the staffing analysis, one was not requested until March 2, 2005 and received until October 2006 (Kleinberg Decl. Exs. Q and R). However, there were no changes to the NHU post in the 2 ½ years from the date of Rivera's death to the date of Spencer's death on May 20, 2006 (Vasaturo Dep. pp. 30-32, 249-250; LaPolla Dep. pp. 20-21, 51-52). He was not precluded from making the necessary changes to make sure the NHU post was not spread too thin prior to receiving the staffing analysis.

Furthermore, the staffing analysis recommended the hire of 2 employees around the clock plus one additional officer on top of that for the 11-7 shift (Kleinberg Decl. Ex. R, page 11). The Sheriff sought to postpone the hire the eight additional staff recommended by the Commission so that it occurred in a staggered manner so that two additional staff would be hired in the third and fourth quarters of 2007 and six additional staff throughout 2008 (November 20, 2006 letter from Smith to Chairman Stewart, annexed to Berg Aff. as Ex. 31). Apparently, the Commission rejected that suggestion and determined that three additions must be made immediately (see January 19, 2007 memorandum from Captain LeFever to Jail Sergeants, annexed to Berg Aff. as Ex. 32).

48.     The Commission's report did not identify any problems or make any recommendations with regard to the PCCF's suicide screening form. See Exh. E at p. 28; Exh. K.

**Response:     Admit but clarify that there is no evidence that the Commission ever reviewed the PCCF screening form at any time. Even Smith testified he was not sure if they ever did review it (Smith Dep. p. 12). Clearly, it did not comply with the State's requirement to use its form as the language directing the officer to take specific action, namely implementing a constant watch, was removed from the PCCF form (Berg Aff. Exs. 3 and 4).**

49.     Sheriff Smith addressed all three of the Commission's recommendations to him. See Exh. E at pp. 168-70; Exh. F at pp. 261-62; Exh. L; Exh. M.

**Response:     Deny. Vasaturo was never questioned or counseled for rounding off times in the log book (Smith Dep. pp. 176-177; Vasaturo Dep. pp 201, 250-251).**

**In addition, with respect to the staffing analysis, one was not requested until March 2, 2005 and received until October 2006 (Kleinberg Decl. Exs. Q and R). And there were no changes to the NHU post in the 2 ½ years from the date of Rivera's death to the date of Spencer's death (see ¶47, supra).**

**Smith claimed to the Commission that after Rivera's death, a special inspection was done to ensure that suicide screening procedures were in compliance with current directives (Smith Dep. p. 180). We know from the memoranda that in fact the only thing looked at was to see if the facility had any policy requiring inmates to be rescreened after 72 hours and/or under the influence of drugs or alcohol. That was what the inquiry was limited to by Undersheriff Convery's memorandum and that was what LeFever limited his**

response to as well (*see* Convery's memorandum and LeFever's response, annexed to Berg Aff. as Ex. 30).

50.    Toward this end, Sheriff Smith requested and received an updated staffing analysis from the Commission. See Exh. E at pp. 134-35, 173-74; 176-78, 182; Exhs. Q and R.

**Response:    Admit.  However, the Sheriff did not request an updated staffing analysis until March 2, 2005 and one was not provided until October 2006 (Kleinberg Decl. Exs. Q and R).  Although nothing precluded him from taking any action during that almost three year period, he in fact did not do anything to alleviate the NHU post from having to tend to numerous other duties.**

51.    The updated staffing analysis provided that the PCCF program officer is a five day a week post, not a seven day a week post. See Exh. E at pp. 134-35, 173-74; 176-78, 182; Exhs. Q and R.

**Response:    Admit but add that the Commission never told Smith or the PCCF that it was acceptable to have the NHU post also cover the program officer's duties on weekends (Smith Dep. pp. 134-136).  In contrast, the Commission's report on the death of Norberto Rivera indicated that the NHU officer was prevented from adequately performing active supervision due to the numerous other responsibilities attendant to that position (Berg Aff. Ex. 22).**

52.    While not recommended to Sheriff Smith in the Commission's report, Smith actively sought and obtained increased mental health coverage and performed a suicide prevention study in the jail following Rivera's death. See Exh. E at pp. 85-86, 88-91; Exh. S and T.

**Response:**     **Admit that Smith sought increased mental health coverage by expanding AmeriCor's provision of services into mental health.**

**Deny that Smith performed a "suicide prevention study" in the jail following Rivera's death. According to Smith's testimony, and not pointed out by Defendants, is that Smith testified that "Kevin Duffy spent a day or two with us doing a study on suicide prevention" and it was in September 2006 – thus long after Rivera committed suicide and four months _after_ Spencer committed suicide (Smith Dep. p. 90).**

53.     Sheriff Smith serves as the co-president of the Mental Health Association of Putnam County. See Exh. E at p. 93.

**Response:**     **Admit but deny the relevance and materiality of this statement.**

54.     At the time of Rivera's death, the Putnam County Department of Mental Health was the agency responsible for the provision of mental health services to the PCCF. See Exh. S.

**Response:**     **Admit but deny the relevance and materiality of this statement.**

55.     Upon receipt of the Commission's January 2005 final report regarding Rivera's death, Sheriff Smith wrote to the Putnam County Executive, Robert Bondi, to outline his review of the PCCF's mental health needs and suggested how to improve the system for the future. See Exh. S.

**Response:**     **Admit and add that Smith indicated the County needed to increase mental health services for inmates (Kleinberg Decl. Ex. S).**

56.     Specifically, Smith suggested the inmates' needs would be better served by the County contracting directly for mental health care rather than relying on an overworked, understaffed public agency. See Exh. S.

**Response:      Admit and add that it was AmeriCor that would be contracted with for the provision of mental health services.**

57.      Smith diligently pursued the matter and, in February of 2005, proposed that the County sign an addendum to its contract with AmeriCor that would involve AmeriCor providing increased mental health services to the PCCF inmates at a cost of an additional $105,000. See Exh. 1.

**Response:      Admit but deny the relevance and materiality of this statement.**

58.      When Sheriff Smith took over his position within the County, the jail had a limited medical staff and there were extended periods where the jail went without adequate medical staff. See Exh. E at pp. 77-79.

**Response:      Admit but deny the relevance and materiality of this statement.**

59.      Based on Sheriff Smith's efforts, the PCCF now has 24 hour a day on-site medical coverage, including increased mental health staff availability and detoxification programs. See Exh. E at pp. 77-79; Exh. T.

**Response:      Admit but deny the relevance and materiality of this statement.**

60.      The corrections officers and medical staff work together to identify inmates withdrawing from drugs. See Exh. E at p. 84.

**Response:      Admit that according to Smith it is a team effort involving both corrections personnel and AmeriCor nurses to identify inmates who are withdrawing (Smith Dep. p. 79). However, according to AmeriCor, it is up to the inmate to state he is going through withdrawal and ask for help (Clarke Dep. p. 52; Waters Dep. p. 54).**

THE 2006 SUICIDE OF SPENCER SINKOV

70

61.    Following a month long investigation, member of the Putnam County Sheriff's Narcotics Enforcement Unit arrested Spencer Sinkov on May 19, 2006. See Exh. N at p. 2.

**Response:    Admit but deny the relevance and materiality of any investigation or its duration.**

62.    Sinkov was charged with five counts of Criminal Possession of a Controlled Substance in the third degree and five counts of Criminal Sale of a Controlled Substance in the third degree. See Exh. N at p. 2.

**Response:    Admit but deny that the "charges" are in any way relevant or material to the claims in this case or the issues presented on the motion for summary judgment. Spencer had never been arrested before, had no criminal record and was never convicted of anything (County Defendants' Answer ¶15).**

63.    Sinkov was transported to the PCCF and arrived in the booking area at approximately 12:30 a.m. on May 20, 2006. See Exh. N at p. 2.

**Response:    Admit.**

64.    Sgt. LaPolla was the night shift tour supervisor on duty when Sinkov arrived at the PCCF. See Exh. F at pp. 43- 44.

**Response:    Admit. As was standard operating practice, LaPolla was the highest ranking employee in the PCCF on the midnight shift (Vasaturo Dep. p. 49).**

65.    Defendant Vasaturo administered the PCCF suicide screening form to Sinkov, See Exh. N at p. 2.

**Response:    Admit.**

66.    Sinkov scored a 10 in Column A of the suicide screening form. See Exh. N at p. 2.

**Response:    Admit.  He also had three shaded areas checked (Berg Aff. Ex. 4).**

67.    Defendant LaPolla testified that, pursuant to County policy, Sinkov's score and affirmative answers to the shaded area questions required Vasaturo to report the suicide screening form results directly to Lapolla. See Exh. G at p. 68.

**Response:    Admit.**

68.    Vasaturo did not advise Lapolla of the results, instead advising Lapolla he was instituting a 15 minute watch of Sinkov. See Exh. E at p. 49; Exh. F at pp. 172-73; Exh. G at pp. 70-71.

**Response:    Deny.  Although LaPolla claims he was unaware of Spencer's score on the suicide screening form, there is evidence to contradict this self-serving denial. See Plaintiffs' 56.1 Statement ¶¶70-76, *supra*.**

69.    Vasaturo recalled Sinkov indicating he would not hurt himself and that he was the "healthiest junkie you'll ever meet." See Exh. F at p. 137.

**Response:    Admit this is what Vasaturo claims but deny that it is relevant in the face of a clear indication from the suicide screening from the Spencer was suicidal (Berg Aff. Ex. 4). Vasaturo's claim that he did not believe Spencer would hurt himself, and he implemented a fifteen minute watch, highlights the precise reason why the State required use of an objective measurement, namely the 330-ADM, which then required constant watch for a score of eight or higher on that form. The Correction Officer's purported belief is frankly irrelevant in the face of this objective measurement tool for risk of suicide.**

70.    Vasaturo indicated he made mistakes on the form, but did not believe that Sinkov was a danger to himself. See Exh. F at pp. 130-32, 147-49; Exh. G at p. 68.

**Response:**     Admit that Vasaturo claimed he made mistakes on the suicide screening form but highlight that Vasaturo's credibility is significantly at issue. For although Vasaturo completed the form in May of 2006, he never told anyone that he believed he incorrectly completed the form – despite the fact that he was questioned that day by Putnam County Investigators. (Vasaturo Dep. pp. 148-151). Regardless, even with the changes he initially testified he would have made, Spencer's score still would have been eight and two shaded boxes checked thereby requiring he be placed on a constant watch. (Vasaturo Dep. p. 155). After realizing that the score was still eight or higher, and two shaded boxes were checked, Vasaturo again changed his testimony to now say he believed two other answers were incorrect. Again, he never previously brought these claimed errors to anyone's attention in the PCCF (Vasaturo Dep. pp. 163, 165-169).

71.     Vasaturo instituted the 15 minute watch due to Sinkov's past drug use. See Exh. F at p. 173.

**Response:**     Admit Vasaturo instituted a 15 minute watch but he clarified it was due to: (1) Spencer's score on the suicide screening form; and (2) a history of drug use (Vasaturo Dep. p. 173; Berg Aff. Ex. 8).

And of course, although determined to be plainly inadequate by the Commission, here the institution of a fifteen minute watch was routine as well as consistent with the procedures, practices and training correction employees received (*see* Plaintiffs' 56.1 Statement ¶¶12-39, *supra*).

72.     Lapolla did not see the Suicide Prevention Screening form, but testified that, had he viewed the form as prepared by Vasaturo, he would have instituted a constant watch of

Sinkov in accordance with PCCF policy. See Exh. G at pp. 77-78; see also Exh. E at pp. 31-32, 49.

**Response:**    **Admit this is what LaPolla now claims after the fact but clarify that LaPolla stated if he had seen the form he would have first questioned Spencer, then questioned Vasaturo, and then if the form stayed as is would have "probably" placed Spencer on a constant watch – not because of the score on the form but because the answer to question #11 was yes – that Spencer expressed feelings of hopelessness and nothing to look forward to (LaPolla Dep. pp. 77-80). LaPolla never said that he would have instituted a constant watch because of any PCCF. Contrary to Defendants' statement here, LaPolla was unaware of any policy pertaining to the total number of "yes" answers or shaded boxes checked on the screening form (LaPolla Dep. pp. 34-35, 40-41, 77-78, 85).**

**In addition, there is evidence contradicting LaPolla's claim that he did not see Spencer's screening form. Vasaturo testified he believed on May 20, 2006 that LaPolla had in fact seen that form (Vasaturo Dep pp. 155-156).**

73.    Lapolla had personally observed Sinkov at one point during the booking process and thought Vasaturo was simply erring on the side of caution due to Sinkov's past drug use. See Exh. F at p. 128; Exh. G at pp. 53-54, 71-72, 74-75.

**Response: Admit this is what LaPolla now claims but add that there is evidence indicating LaPolla was aware one of the reasons Spencer was placed on a 15 minute watch was due to his answers on the suicide screening form and LaPolla never followed up, as a supervisor, on that issue (*see* Plaintiffs' 56.1 Statement ¶¶68-76, *supra*).**

74.    Lapolla did not inquire as to the reason why Vasaturo instituted a 15 minute watch. See Exh. N at p. 4.

**Response:**    **Admit but again clarify that there is evidence to indicate that Vasaturo told LaPolla verbally and/or in writing that the reason was due to the answers on the suicide screening form and history of drug use (see Plaintiffs' 56.1 Statement ¶¶70-76, *supra*). LaPolla's failure to inquire further was deliberately indifferent.**

75.    The 15 minute checks were made of Sinkov throughout the night, without incident. See Exh. F at pp. 206, 220; Exh. G at p. 62.

**Response:**    **Admit that checks were made of Sinkov every fifteen minutes according to the log book but deny that they were actually done or documented accurately. That is because when Defendant Vasaturo was supposedly performing the checks, he was required to check on 2 housing units - NHU and SHU - and document in two separate log books those checks. These logs books show that Vasaturo continued to round off times as every entry by him was on the quarter hour – starting at 0300 and continuing to 0445. In addition, Vasaturo did not accurately document his times as he wrote that he was checking inmates in NHU at the very same time he claimed to be checking inmates in SHU – which is physically impossible. A review of the logs show that other officers with those same duties never logged the checks in for NHU and SHU at the very same time. To perform both checks simultaneously is physically impossible (compare log book for NHU, paged 40, annexed to Berg Aff. as Ex. 19 and compare to log book for SHU page 420, annexed to Berg Aff. as Ex. 25).**

76.    Corrections Officer Michael Oliver served Sinkov breakfast in the morning of May 20, 2006. See Exh. U at pp. 87-88.

**Response:**    **Admit.**

77.    At approximately 11 a.m. on May 20, 2006, Spencer Sinkov met with his parents and brother in the PCCF visiting room. See Exh. V at p. 52.

**Response:    Admit.**

78.    Corrections Officer Oliver served Sinkov his lunch in the early afternoon of May 20, 2006. See Exh. U at p. 97-98.

**Response:    Admit.**

79.    On May 20, 2006, at approximately 1:49 p.m., Sinkov was found hanging from his cell bars by his sweatshirt. See Exh. N at p. 5.

**Response:    Admit.**

80.    PCCF's policy is that suicidal or other high risk inmates who receive constant supervision are issued paper clothing. See Exh. F at p. 55; Exh. G at p. 106.

**Response:    Deny. According to Captain LeFever "we don't us them." If they had, it would have been against the Commission of Correction's minimum standards (LeFever Dep. pp. 16-17, 19; Berg Aff. Ex. 29).**

THE COMMISSION'S INVESTIGATION OF SINKOV'S DEATH

81.    Following Sinkov's death, the Commission conducted an investigation at the PCCF. See Exh. E at pp. 111-12; Exh. N.

**Response:    Admit.**

82.    Prior to October or November of 2007, Sheriff Smith believed that the PCCF suicide screening form was a replica of the Commission's ADM 330 form. See Exh. E at pp. 13-14.

**Response:    Admit that Sheriff Smith claims this was his belief but a jury could find his self-serving belief incredible. He claims he was initially told that the form was**

76

"basically" the same and a jury could find that under those circumstances he was in fact aware it differed from the State's form. He was also a recipient of the 2005 Chairman's memoranda which clearly stated the State's form was the only screening tool that complied with the minimum standards (Smith Dep. pp. 6-13; Berg Aff. Ex. 5).

In addition, the Sheriff had a non delegable duty to ensure compliance with the State's minimum standards and the use of the appropriate form. *See* Plaintiffs' Memorandum of Law.

83.     The PCCF suicide screening form was part of a single intake packet that included medical intake forms. See Exh. E at p. 13; Exh. F at pp. 64-65.

**Response:     Admit.**

84.     The lower section of the Commission's ADM 330 form, entitled "Action," directs a screening officer as follows: "If total checks in Column A are 8 or more, or any shaded box is checked, or if you feel it is necessary, notify supervisor and institute constant watch." See Exh. O.

**Response:     Admit. Emphasize the 330-ADM specifically stated "institute constant watch" under these circumstances (Berg Aff. Ex. 3).**

85.     The comparable section of the PCCF form, entitled "Action To Be Taken By Screening Officer," directs a screening officer as follows: "If total in Column A is 8 or more, or any shaded box is checked, or if the screening officer feels it is necessary, notify shift supervisor." See Exh. P.

**Response:     Admit and emphasize that the PCCF form did not require constant watch which failure to comply with the State's minimum standards was consistent with the PCCF policies, practices and procedures that were equally inadequate (Berg Aff. Ex. 4).**

86.    While there is a distinction between the forms as to the institution of a constant watch, Sheriff Smith believes that the action to be taken was the same. See Exh. E at 42.

**Response:    Admit this is what Smith testified to at his deposition but add that a reasonable jury may find his "belief" completely not credible in light of the other evidence adduced during discovery, including the uniform testimony of the corrections' staff that the practices in place were to place suicidal inmates on 15 minute watches. *See* Plaintiffs' 56.1 Statement ¶¶12-39, *supra*.**

**In addition, if Smith truly believed that the policies and procedures adequately advised staff of the requirement of a constant watch then the PCCF would not have had to issue a new policy on August 4, 2006 and try to play it off as if it existed prior to Spencer's death by backdating it (Plaintiffs' 56.1 Statement ¶¶33-39).**

87.    The Commission's report failed to identify any problems with the language set forth on the PCCF form. See Exh. N.

**Response:    Admit but deny the relevance or materiality of this statement as it is not disputed that the PCCF form materially differed from the ADM 330 and did not comply with the minimum standards set forth by New York State.  Smith admitted he was not sure if the Commission ever reviewed the screening form or rendered any opinion as to whether the form was in compliance with minimum standards (Smith Dep. p. 12).**

88.    In fact, within the Commission's findings, it wrote: "Officer J.V. administered the ADM 330 Suicide Screening Guidelines." See Exh. N at p. 3, ¶ 7.

**Response:    Admit this language was in the Commission's report but add that does not change the fact that the PCCF form was not in fact the 330-ADM.**

89.    The Commission found that defendant Vasaturo's failure to institute constant supervision of Sinkov based upon the results of the suicide screening form was a failure to follow PCCF policy. See Exh. N at pp. 3-4.

**Response:    Admit.  However, there was no actual policy in place at the time of Spencer's death which required the institution of constant watch for inmates who were identified as suicidal by reason of the scores on the form.  It was not until after Spencer committed suicide that the PCCF placed a new policy into the procedures books on August 4, 2006, five days before the Commission came to the PCCF to investigate, but backdated the policy to February 2006. Thus, when the Commission came to the PCCF on or about August 9, 2006, it appeared as if PCCF had a policy requiring constant watch when in fact it did not (LaPolla Dep. pp. 41-43, 50-51; Vasaturo Dep. pp. 235, 237-238; Berg Aff. Ex. 8, page 2, 15 Minute Supervisory Visit section (h); Wendover Dep. pp. 91-92; LeFever Dep. pp. 97-101).**

90.    The Commission made two recommendations to Sheriff Smith: i) Vasaturo should be disciplined for his failure to adhere to PCCF policies regarding high risk inmates; and ii) Lapolla should be disciplined for his failure to review Sinkov's intake forms after learning of the institution of a 15 minute watch. See Exh. N at pp. 5-6.

**Response:    Admit that these were the findings of the Commission and refer the Court to ¶89. *supra*.**

**While Smith wrote in his October 25, 2006 letter to Commissioner Lamy that both Vasaturo and LaPolla were "currently pending discipline in accordance with all applicable laws including Civil Service Law Article 75" (Berg Aff. Ex. 26), in fact to date LaPolla and**

**Vasaturo have not been the subject of any counseling, discipline or even remedial training**

**(LaPolla Dep. p. 15; Vasaturo Dep. pp. 224, 228-233).**

      91.     Vasaturo, Lapolla, and the County have contracted to extend the time for the

filing of disciplinary charges. See Exh. E at p. 59.

      **Response:**     **Admit but add that the time to file expired on May 20, 2008 and there**

**is no indication from Defendants as to the status of that "extension" or any disciplinary**

**action against Vasaturo and LaPolla.**

Dated: White Plains, NY
      May 28, 2008

                           LOVETT & GOULD LLP
                           By: _____
                           Kim Berg (KB1425)
                           Attorneys for Plaintiffs
                           222 Bloomingdale Road
                           White Plains, New York 10605
                           (914) 428-8401