UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONNY A. SINKOV, as Administrator of the Estate of Spencer E. Sinkov, deceased, DONNY A. SINKOV, and HARA SINKOV,<br><br>                                      Plaintiffs,<br><br>    -against<br><br>DONALD B. SMITH, individually and in his official capacity as Sheriff of Putnam County, JOSEPH A. VASATURO, individually, LOUIS G. LAPOLLA, individually., THE COUNTY OF PUTNAM, New York, and AMERICOR, INC.,<br><br>                                 Defendants. | **07 Civ.2866(CLB)**<br><br>**AMERICOR'S COUNTER-STATEMENT OF MATERIAL FACTS IN DISPUTE PURSUANT TO LOCAL RULE 56.1 AND REPLY** |

AmeriCor, Inc. ("AmeriCor"), by its attorneys WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, submits this response to Plaintiff's Counterstatement of Facts, pursuant to Local Rule 56.1.

Preliminarily, AmeriCor objects to the plaintiff's submission to the extent that it improperly includes non-material facts as well as arguments, in contravention of Fed. R.Civ. 56 and the Court's Local Rules. *See, e.g., Bristol Meyers Squibb Co. v. Rhone-Poulenc Rorer, Inc.,* 2001 WL 1263299 (S.D.N.Y. 2001). Notwithstanding, and subject to the objections, AmeriCor submits the following responses.

## I.   <u>New York State's minimum standards required constant watch for suicidal inmates</u>

1.     In the State of New York, under the authority of Article 3, Section 45 of the New York State Correction Law, the New York State Commission of Correction has promulgated "rules and regulations establishing minimum standards for the care, custody, correctional

treatment, supervision, discipline and other correctional programs for all persons confined in local correctional institutions." *See 9* NYCRR §70000.1(b), *et seq.* Both Smith and LeFever were admittedly aware of these minimum standards (Smith Dep. pp. 88, 91; LeFever Dep. pp. 88, 91, 106).

> **Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

2.    The Commission of Correction regularly reminds local jail officials of their obligations to comply with these minimum standards by sending periodic newsletters entitled "Chairman's Memoranda." These newsletters have often focused on the mandatory requirements for suicide prevention in County jails.   They are sent on average of 10-20 times per year. LeFever and Smith both acknowledged that they regularly received and reviewed the Chairman's Memoranda (LeFever Dep. pp. 17, 102-103; Smith Dep. pp. 16, 17).

> **Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

3.    The minimum standards <u>require</u> County facilities, such as the Putnam County Correctional Facility, (hereinafter "PCCF"), to screen incoming inmates for purposes of identifying those who are at a high risk for suicide.   As to those individuals who are deemed to be a suicide risk, they then are required to be continuously observed on a one-on-one basis also referred to as a "constant watch".   Constant watch is in fact the <u>only</u> acceptable level of supervision for a suicidal inmate. Fifteen minute or other periodic checks do not comply with the State's minimum standards (LeFever Dep. pp. 73-74, 87-88, 90-91; Berg Aft' Exs. 1, 3, 5).

> **Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

2016404.1

4.    One of the "Chairman's Memorandum" issued for the first time in November 1999 but constantly referred to in later publications by the Commission, clearly spells out the requirements for a constant watch for any inmate who is identified as suicidal. The memorandum specifically stated:

> "The Medical Review Board investigated several inmate suicides in 1998-1999 in which a determination for additional supervision was made pursuant to section 7003.3(h). In these cases the supervisory visit interval was shortened from 30 minutes to 15 minutes for inmates on suicide prevention precautions. This was plainly inadequate and as such a violation of section 7003.3(h), because the selection of the type of additional supervision was inadequate and inappropriate. A SUPERVISORY INTERVAL OF 15 MINUTES IS NOT ADEQUATE AS A SUICIDE PREVENTION PRECAUTION. It is a well established fact that inmates can hang themselves with fatal results in <u>less than five minutes</u>. Therefore if the objective is to prevent suicide, ONLY CONSTANT OBSERVATION IS EFFECTIVE....There are conditions, illnesses and injuries for which a supervisory interval reduced to 15 minutes is entirely adequate and appropriate, but suicide attempt is not one of them."

(LeFever Dep. pp. 88-89; Commissioner's memorandum 17-99, dated November 1, 1999, annexed to Berg Aff. as Ex. 1).

**Response:    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

5.    Not only was the 1999 Chairman's Memorandum referred to in training materials provided to the County by the Commission, but it was specifically sent to both Sheriff Smith and Captain LeFever on November 21, 2005 -- six months prior to Spencer Sinkov's admission to the PCCF. That 2005 correspondence specifically told Smith and LeFever: "Attached it a copy of Chairman's Memorandum No. 17-99. The facility **should review the attached memorandum for clarification with regards to providing additional supervision.**" (November 21, 2005 letter to Smith from Commissioner Croce, annexed to Berg Aft as Ex. 2 (emphasis added).

**Response:**    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.

## II.    II. The New York State Commission of Correction requires jails to identify inmates who pose a risk for suicide at initial intake by using the State's suicide screening form

6.    In order to identify inmates who are at risk for committing suicide, the State Commission of Correction and State Office of Mental Health together devised a Suicide Screening Prevention Guideline form called the "330-ADM" (Suicide Screening form annexed to Berg Aff. as Ex. 3; LeFever Dep. pp. 24, 104, 105-107; LaPolla Dep. pp. 38-39; Smith Dep. p. 69; Oliver Dep. pp. 36-37).

**Response:**    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.

7.    On October 5, 2005, the Commission issued a Chairman's Memorandum which stated that County facilities must identify inmates who pose a risk for suicide during initial screening by using the 330-ADM.  The Commission wrote:

> "Those involved in Corrections know that a large percentage of inmates arrive at correctional facilities with mental health issues ranging from depression to schizophrenia to having suicidal thoughts.  An inmate, just as people in the general public, can have mental illness and not be suicidal, or can be suicidal with no other mental illness, or they can be both mentally ill and suicidal.  In order to identify these inmates, facilities must heed 9 NYCRR §7013.17...A screening instrument(s) shall be utilized to elicit and record information on each inmate relating to ...history of mental illness...potential for self injury or suicide.  Since the 1980's, the Commission has held that the .on instrument that is in compliance with §7013.7(b)(5) is the Suicide Screening Form, which was a joint project of the Commission and New York State Office of Mental Health.  This continues to be the case." (10/5/05 Chairman's Memorandum, annexed to Berg Aff as Ex. 5)

**Response:**    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.

8.     The State's Suicide Screening form 330-ADM contains sixteen areas of inquiry with a corresponding space for the correction officers' observations and general comments. Each of the question areas is designed to elicit from the inmate information to determine whether he or she poses a risk of harming themselves or others -- including whether this is the person's first time in jail, whether the person expresses any embarrassment or shame about their alleged crime, whether they have a history of drug or alcohol abuse, whether they express feelings of hopelessness, and whether they are worried about major problems, other than their current legal situation (Berg Aff. Ex. 3).

**Response:     Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

9.     Once the sixteen questions are answered, the "yes" answers are totaled and the total number is then placed at the bottom of column A on the form. There are also six questions on the form which are considered "immediate referral categories" which are readily identifiable because they are shaded on the form itself (Berg Aff. Ex. 3).

**Response:     Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

10.     Clearly, not every suicidal individual outwardly expresses their suicidal intent. Thus, the form contains sixteen areas which if answered "yes" would indicate a likelihood that the individual may pose a risk to harm himself. Once the sum total of the yes answers reaches a critical level of eight or more, or once one of the immediate referral shaded boxes is checked, the person is deemed to be suicidal and must be placed on a constant watch.

**Response:     Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

11.    The State's mandatory form (330-ADM) specifically directs the "Action" to be taken by the booking officer. It clearly states, "If total checks in Column A are 8 or more, or any shaded box is checked, or if you feel it is necessary, notify supervisor and institute constant watch."(Berg Aff. Ex. 3) (emphasis added).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

### III.    PCCF did not comply with New York State's minimum standards for identifying and then implementing constant watch for suicidal inmates.

12.    Upon taking office in 2002, Smith reviewed the PCCF policies and procedures, the State's minimum standards, and had discussions with Captain LeFever and Captain Butler about the policies (Smith Dep. pp. 6-8). He also reviewed the Chairmen's Memoranda that are issued from time to time including these pertaining to suicide prevention in County facilities (Smith Dep. pp. 16-17). He admittedly understood that those who scored eight or higher or had shaded boxes on the suicide screening forms were suicidal (Smith Dep. p. 69).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same. However, the Court should note that the decedent was at a risk for suicide, he was not suicidal.**

### A. The PCCF modified the State's Suicide Screening Form to remove the directive for implementing constant watch

13.    Upon arrival to the PCCF, a new inmate is processed by the "Booking Officer" which includes administration of a medical screening packet part of which is a form entitled "Suicide Prevention Screening Guidelines" (Berg Aff. as Ex. 4; Vasaturo Dep. pp. 53-54, 64-65; Oliver Dep. pp. 45-46).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff and the County's responses to same.**

14.    Rather than administer the only form that complies with the State's minimum standards, the PCCF instead modified their Suicide Prevention Screening form by **eliminating the clear directive to place- inmates on constant watch** if they scored 8 or higher on the form, or if any shaded box was checked, or if any other reason warranted (Vasaturo Dep. pp. 77-78, 103-104; 170-171; LaPolla Dep. p. 37; Oliver Dep. pp. 33-34; LeFever Dep. pp. 65-6.6; Smith Dep. p. 70; compare State Form annexed to Berg Aff. as E. 3 with PCCF Suicide Screening Form, annexed to Berg Aff as Ex. 4).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

15.    Rather than direct the institution of a constant watch for inmates who were at risk for suicide as determined by the answers on the screening form, the PCCF form instead only stated that if an inmate scored eight or higher or a shade box was checked then booking officer was supposed to "notify shift supervisor" (Berg. Aff. Ex. 4).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

16.    Smith and LeFever understood that inmates who scored eight or more on the suicide screening form raised a "flag" that the inmate is "at high-risk" and is suicidal (LeFever Dep. pp. 31, 56; Smith Dep. p. 69).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same. However, the Court should note that the decedent was at a risk for suicide, he was not suicidal.**

- 7 -

17.    Yet, rather than direct the institution of a mandatory constant watch for suicidal inmates, including those who met the criteria listed on the 330-ADM form, the PCCF's form left the decision as to what level of supervision should be instituted up to the judgment and discretion of the booking officer and/or sergeant (Oliver Dep. pp. 37, 76;. Berg .Aff. Ex. 4).

**Response:    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

### B. PCCF also did not have any procedures requiring constant watch for inmates who were suicidal

18.    And with respect to exercising that judgment and discretion, prior to May 20, 2006 when Spencer Sinkov committed suicide while in custody at the PCCF, the jail did not have any written policies or procedures stating that inmates who were identified as suicidal by reason of their score of eight or higher or because they had a shaded box(es) checked on the Suicide Screening Form must be placed on constant watch (LaPolla Dep. pp. 34-35, 40-41, 85-86; Wendover Dep. p. 12; Vasaturo Dep. pp. 75-76; 79, 174, 223-224; Oliver Dep. p. 41; LeFever Dep. 27-28; Smith Dep. pp. 70-71).

**Response:    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same. However, the Court should note that the decedent was at a risk for suicide, he was not suicidal.**

19.    Thus, in May of 2006 there was no policy in place requiring Spencer Sinkov be placed on a constant watch due to the high score of "10" that he received on the Suicide Screening Form or the fact that he had three shaded boxes checked (Vasaturo Dep. pp. 173-174, 273-224; Berg Aff. Ex. 4). Rather, all the booking officer was required to do if a score was eight or higher was notify his supervisor (Vasaturo Dep. pp. 223.-224). This was clearly against the Commission's regulations/minimum standards.

**Response:    Neither admits or denies and respectfully refers this Court to the
Sheriff's and the County's responses to same.**

20.    In addition, although LaPolla claimed he understood constant supervision should

be implemented for someone who is at high risk for suicide, as a matter of actual practice in his

experience as a Sergeant in the PCCF an inmate whose score on the suicide screening form was

8 or higher did not always receive a constant watch.  In fact, the PCCF policies did not provide

for constant watch in all cases of suicidal prisoners until after Spencer's suicide when on August

4, 2006 a backdated policy was slipped into the log books days before the Commission arrived to

investigate Spencer's suicide (LaPolla Dep. pp. 39-41). *See also* ¶¶33-39, *infra.*

**Response:    Neither admits or denies and respectfully refers this Court to the
Sheriff's and the County's responses to same.**

21.    Captain LeFever, who was responsible for drafting implementing procedures as

well as overseeing all staff and the daily operations at the PCCF, could not explain why PCCF

policies and procedures did not include any words stating that only constant observation is

effective as a suicide precaution (LeFever Dep. pp. 7, 9-11, 91).

**Response:    Neither admits or denies and respectfully refers this Court to the
Sheriff's and the County's responses to same.**

22.    The lack of clear policies and the on-gong practice in the PCCF was not only

against the State's published minimum standards, but contrary to the State Commission of

Correction directives to training instructors: "Prior to training, it is essential that local mental

health and police/correctional officials draft coordinated suicide prevention procedures...We

cannot over-emphasize the importance of developing procedures; the program cannot succeed

unless staff knows what to do with an identified high-risk inmate." (LeFever Dep. pp. 95.-85; relevant portion of Basic Program Trainer's Manual annexed to Berg Aff. Ex. 7).

**Response:     Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

### C. In actual practice inmates who were identified as a high risk of suicide were root automatics placed on a constant watch

23.     In addition to the lack of clear policies and procedures, the actual custom and practice at the PCCF with respect to inmates who scored eight or higher or had shaded boxes checked on the suicide screening form the inmate was not to automatically place him/her on constant watch (LaPolla Dep. p. 40).

**Response:     Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

24.     As LaPolla explained, the practice in the facility varied depending on which questions the inmate answered "yes" rather than on the sum total of those answers.  Thus, if an inmate was overly upset to the point where they could not answer questions that could be a constant watch but other than that it always, varied.  Nothing required constant watch because of the accumulation of yes answers to the point of having eight or more (LaPolla Dep. pp. 39-41).

**Response:     Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

25.     Vasaturo gave a similar explanation as to the PCCF custom and practice.  He was trained that only those who actually expressed an intent to harm themselves were considered suicidal and thus were to be placed on constant watch (Vasaturo Dep. pp. 109-110).  Absent an inmate's expressed statement of intent to harm oneself, the inmate was not considered "suicidal."

2016404.1

And although they may be considered "high risk" they were still not required to be placed on constant watch (Vasaturo Dep. pp. 109-112).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

26.     Even according to Correction Officer Oliver, who is not a party to this lawsuit, inmates were on a constant watch if they expressed an intent to harm themselves which could be directly to a corrections officer, a mental health worker, or even a family member who then notifies jail personnel (Oliver Dep. p. 20-21).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

27.     Thus, contrary to the State's minimum standards, as a matter of routine practice those inmates who had heightened numbers on the suicide screening were placed on only a fifteen minute watch (Vasaturo Dep. p. 59).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

**D. PCCF did not instruct staff during training to place inmates on constant watch if their score on the suicide screening form was eight or higher or a shaded box was checked**

28.     In addition to the lack of any policies, the training provided to Corrections Officers by the PCCF else did not instruct officers to place an inmate on constant watch if they scored eight or higher or if a shaded box was checked on the Suicide Screening form (Wendover Dep. pp. 14, 15; LaPolla Dep. pp. 85, 86; Vasaturo Dep. pp. 76, 174; Oliver Dep. p. 43).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

- 11 -

29.    Similarly, they were not instructed or trained that the New York State
Commission of Corrections required constant watch if an inmate scores eight or higher or has a
shaded box checked" (Vasaturo Dep. pp. 78-80, 110, 191, 192).

**Response:**    **Neither admits or denies and respectfully refers this Court to the
Sheriff's and the County's responses to same.**

### E. Consistent with PCCF policies, AmeriCor's policies and practices provided for only a 15 minute watch for suicidal inmates. AmeriCor staff received no training prior to November 2006 in the area of suicide prevention

30.    AmeriCor polices specifically stated that, "Inmates determined to be at risk as a
result of the screening process will be placed on suicide precautions...inmates who are placed on
suicide precaution will be placed in the facility's mental health unit or placed on regular
observation status such that they are subject to monitoring by correctional and/or health care
personnel.    Monitoring should occur every 15 minutes while the inmate is on suicide
precautions." (emphasis added; Smith Dep. pp. 157-158; See AmeriCor Suicide Prevention
Policy No. 152, bates stamped 448-450, annexed to Berg Aff. as Ex. ).

**Response:**    **Admits in part and denies in part. The entirety of the quote reads as
follows:**

**"Inmates determined to be at risk as a result of this screening process will be placed
on a suicide precautions and immediately referred to the psychiatrist. Additional
risk evaluations will be made as needed during an inmate's incarceration depending
on the individual inmate's circumstances."**

**It further states:**

**"Inmates who are determined to be at risk, or who have attempted suicide in the
past, will be promptly referred to mental health personnel for additional assessment**

- 12 -

and treatment. Such referrals will be seen by the psychiatrist, psychologist or psychiatric nurse practitioner in a face-to-face encounter within three working days." (See AmeriCor Suicide Prevention Policy No. 152, bates stamped 448-450, annexed to the Declaration of Kim Berg as Exhibit "9").

While Nurse Waters could not recall the basis for her filling out the mental health referral form for the decedent, the form was in fact filled out prior to the decedent's suicide. (See Deposition Transcript of Susan Waters, Page 87, Lines 19-25, annexed to the Declaration of Timothy P. Coon as Exhibit "E")(See also, Mental Health Routing Sheet, annexed to the Declaration of Timothy P. Coon as Exhibit "I").

Further, the decedent was placed upon a suicide precaution by C.O. Vasaturo, a 15 minute watch. This is consistent with the AmeriCor approved contract at the time of the decedent's suicide. (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 129, Lines 18-24, Page 130, Lines 12-18, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F", See also Suicide Prevention Policy No. 152, bates stamped 448-450, annexed to the Declaration of Kim Berg as Exhibit "9").

The relevant policy concerning receiving screenings states:

> Sheriff Smith's personnel already have an excellent screening process in place at the jail that appears to comply with the requirements of NCCHC Standard J-E-02 *Receiving Screening*. We, at AmeriCor, believe in the axiom "If it isn't broken, don't fix it." Our staff will therefore follow existing procedures that call for the booking officer to complete an *Inmate Medical Intake Records* and a *Suicide Prevention Screening* on each inmate at the time of the inmate's arrival at the jail as your administrative staff have requested.

(See AmeriCor services "Receiving Screening" bates stamped page 557, annexed to the declaration of Kim Berg as Exhibit 10).

- 13 -

31.    President of AmeriCor, Kevin Duffy, confirmed that corrections staff implemented 15 minute watches as a suicide precaution (Duffy Dep. pp. 1.65-166).  He also indicated that that same level of supervision was what AmeriCor's policies provided.  (Duffy Dep. p. 166).

**Response:    Admit.    Further, Sinkov was placed on a 15 minute watch as implemented by the PCCF.  (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 129, Lines 18-24, Page 130, Lines 12-18, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F").**

32.    Prior to November 2006, AmeriCor staff did not receive anything written or verbal by way of instruction, direction, or training on what to do if an inmate scored eight or higher on the suicide screening form or had a shaded box checked.  They did not have training in the area of suicide prevention until after Spencer committed suicide (Clarke Dep. pp. 11-13, 19-20, 27-28; Waters Dep. Pp. 8, 12-14).

**Response:    Admit in part and deny in part.  AmeriCor objects to any mention to what changes, if any, were implemented by AmeriCor after the death of the decedent as inadmissible subsequent remedial measures in an attempt to establish negligence.**

**Should the Court consider such information, at no time prior to the suicide of the decedent was AmeriCor required to fill out or review the suicide screening form. AmeriCor's review, if any, of the suicide screening form was not related to content, but rather was part and parcel of an overall intake medical packet which was reviewed to ensure the form was completed.  (See Deposition Transcript of Peter Clarke, Page 32, Lines 8-12, annexed as Exhibit "D" to the Declaration of Timothy**

P. Coon). **What level of supervision that was to be assigned for an incoming inmate
was the responsibility of the PCCF. (See Deposition Transcript of Peter Clarke,
Pages 19-20, annexed as Exhibit "D" to the Declaration of Timothy P. Coon).**

**AmeriCor was only responsible to ensure that an inmate was medically fit to be
admitted into the jail facility and did not require medical services that were beyond
the capability of the facility. (See AmeriCor Procedure "Receiving Screening" bates
stamped 494-495, annexed to the Declaration of Kim Berg as Exhibit "11")(See also,
Deposition Transcript of Kevin Duffy, Page 54 annexed as Exhibit "B" to the
Declaration of Timothy P. Coon).**

### F. After Spencer's suicide, and just prior to the Commission's investigation in August 2006, the PCCF attempts to put a backdated suicide prevention policy into the procedure books

33.     It was only _after_ Spencer's suicide that policies were implemented in the PCCF
requiring constant watch for all suicidal inmates.   To that end, on or about August 4, 2006,
Sergeant LaPolla was directed to place a new/amended policy and procedure into the housing
unit books.   LaPolla "looked at the policy it was replacing and [he] said there's a pretty big
difference here." (LaPolla Dep. pp. 41,, 50-51; see Policy "Housing Unit Supervision", page 2,
"15 Minute Supervisory Visit" subsection "h", annexed to Berg Aff. as Ex. 8; Vasaturo Dep. pp.
234-235).

**Response:     Neither admits or denies and respectfully refers this Court to the
Sheriff's and the County's responses to same.**

34.     This amended policy stated for the first time that "15 minutes supervisory visits
are not adequate as a suicide prevention precaution" (LaPolla Dep. pp. 41-43; Vasaturo Dep. pp.
235, 237-238; Berg. Aff. Ex. 8, page 2, 15 Minute Supervisory Visit section (h).

**Response:**     **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

35.     PCCF disingenuously backdated the August 4, 2006 policy amendment to November 2005 and/or February 2006 - thereby attempting to make it appear as if this policy was in effect prior to Spencer's suicide. (Wendover Dep. pp. 91-92; Berg Aff. Ex. 8, cover page). Although LeFever claimed this procedure was in existence prior to Spencer's death, he then conceded he was unaware of whether this procedure was ever distributed and placed into the housing procedure books prior to August 4, 2006.  He was however aware that staff stated they were not aware of the procedure prior to that time (LeFever Dep. pp. 97-1:00).

**Response:**     **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

36.     LeFever also admitted that he "may have" asked another staff Member to make sure this policy was in the procedure books at the same time that the State Commission came to the facility, on or about August 9, 2006, to investigate Spencer's death (LeFever Dep: pp. 90, 100-101).

**Response:**     **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

37.     Smith learned of concerns that LeFever had put out a procedure regarding the suicide precautions at or about the time the Commission came to the PCCF to investigate-Spencer's death.  To date, Smith has not taken any action to determine if this was accurate and he has not taken any remedial action against LeFever (Smith Dep. pp. 53-55, 59-60).

**Response:**     **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

2016404.1

38.    Smith, who was responsible for establishing broad policies and procedures for the PCCF, did not know when the first time was that anything was put in writing as part of a procedure telling staff that fifteen minute checks were not adequate as a suicide prevention tool. He claimed that was still under review and to date has not asked Capt. LeFever about that (Smith Dep. pp. 65-67).

**Response:    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

39.    Thus, only since August 4, 2006, constant watch is now required when an individual scores as a high risk inmate based on the results of the Suicide Prevention Screening Guidelines form (LaPolla Dep. p. 43).

**Response:    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

**IV.    AmeriCor's role in this booking of new inmates into the PCCF**

40.    Upon arrival to the PCCF, a new inmate is processed by the "Booking Officer" which includes administration of a medical screening packet part of which is a form entitled "Suicide Prevention Screening Guidelines" (see form annexed to Berg Aff. as Ex. 4; Vasaturo Dep. pp. 53-54, 64-65; Oliver Dep. pp. 45-46).

**Response:    Admits.**

41.    Once the medical screening packet, including suicide screening form, is completed it is shown to and given to AmeriCor's medical staff. This occurs within two hours of an inmate's arrival to the facility (LaPolla Dep. pp. 29-30; Vasaturo Dep. pp. 90-91; Oliver Dep, p. 45-46; LeFever Dep. p. 153).

- 17 -

**Response:**     Admit in part and deny in part.  As set forth more fully in AmeriCor's Rule 56.1 statement, the Suicide Screening Form is not "shown" to AmeriCor staff. The medical packet, as a matter of course, is placed on the door of the AmeriCor office.  The form is reviewed to ensure it was complete.  (See Deposition Transcript of Peter Clarke, Page 32, Lines 8-12, annexed as Exhibit "D" to the Declaration of Timothy P. Coon).

There was no PCCF policy which required PCCF employees to notify AmeriCor if an inmate scored eight or higher or had one or more shaded boxes.  (See Deposition Transcript of Captain Robert LeFever, Page 153, annexed as Exhibit "A" to the Declaration of Timothy P. Coon).   There was no policy or requirement that employees of the PCCF were to consult with AmeriCor.  (See Deposition Transcript of Sergeant Louis LaPolla, Pages 29-30, annexed to the Declaration of Adam I. Kleinberg as Exhibit "G") and while plaintiff attempts to rely upon the testimony of C.O. Oliver in support of their contention, C.O. Oliver actually testified that he did not know if AmeriCor reviewed the Suicide Screening Form.  (See Deposition Transcript of Corrections Officer Michael Oliver, Pages 45-46, annexed to the Declaration of Adam I. Kleinberg as Exhibit "U").

42.     According to the written scope of services AmeriCor was to provide as part of its contract with the County, AmeriCor nursing staff would review the medical and suicide screening forms after they are completed by the booking officer and perform any additional evaluations of the inmate.  Nursing staff are required to initial the cover page of the screening packed upon completion of their review Clarke Dep. pp. 31-34; AmeriCor services "Receiving Screening," bates stamped page 557, annexed to Berg Aff as Ex. 10; Duffy Dep. pp. 68-69).

Response:    Admit in part and deny in part. AmeriCor staff would perform any additional evaluations of an inmate if required and warranted by the circumstances. (See Deposition Transcript of Peter Clarke, Pages 31-34, annexed to the Declaration of Timothy P. Coon as Exhibit "D", See also AmeriCor services "Receiving Screening" bates stamped page 557, annexed to the declaration of Kim Berg as Exhibit 1. Further, the plaintiffs confuse the initial intake which occurs within two hours of admission into the facility, i.e. to ensure an inmate is fit for admission into the facility, with the further, full intake which occurs within the first 14 days. (See 1.9 Histories and Physical Exam, bates stamped 558 and annexed to the declaration of Kim Berg as Exhibit 10, See also Receiving Screening bates stamped 557). (See also Deposition Transcript of Kevin Duffy, Page 105, annexed as Exhibit "B" to the Declaration of Timothy P. Coon). (While nursing staff is required to initial the medical intake packet to ensure it was completed, at the time of the decedent's suicide, it was not required to complete or review the Suicide Screening Form. The Suicide Screening Form was the responsibility of the PCCF.

With respect to Footnote 12, [where plaintiffs allege Plaintiffs claim that prior to November 2006, it was not practice for AmeriCor to review the suicide screening form, although part of the medical packet. Clarke admitted that he saw the Suicide Screening form because he "would have just looked and saw that it was - it was done; it was all signed" (Clarke Dep. p. 36). Waters admitted that Correction staff would point out to medical if a score was eight or higher and, even if they did not, she would sometimes just review the form herself (Waters pep. pp. 16, 45)], admit in part and deny in part. Any changes to AmeriCor policy or procedure made

subsequent to the suicide of the decedent is inadmissible to establish any alleged negligence on the part of AmeriCor. Further, we note that this policy/procedure change was voluntarily implemented by AmeriCor. At no time did the Commission state that AmeriCor policy or procedure was defective in this regard. (See Final Report of the New York State Commission Correction annexed to the Declaration of Adam I. Kleinberg as Exhibit "N"). At the time of the decedent's suicide, AmeriCor was not required to review the Suicide Screening Form only to ensure that the medical forms were completed. Both Nurse Waters and Clarke confirmed this in their testimony. Nurse Clarke testified that the nurses were not required to review the form for accuracy. (See Deposition Transcript of Peter Clarke, Pages 58-59, annexed to the Declaration of Timothy P. Coon as Exhibit "D") Nurse Waters testified that AmeriCor would review the form only if an officer pointed out something to the nurse. (See Deposition Transcript of Susan Waters, Page 16, annexed to the Declaration of Timothy P. Coon as Exhibit "E").

43.     As part of the Receiving, Screening AmeriCor's policies provided "a registered nurse will promptly review all Receiving, Screenings...Inmates who receive a suicide screen score of 8 or higher or who answer "Yes" to questions I, 8, 9, 10b, 11 or 16b will be referred to mental health staff for further evaluation" (Berg Aff. Ex. 10; bates stamped page 558).

        a.   **Response:     Admit.     Further, a Mental Health Referral Form was completed with respect to the decedent, by Nurse Waters, prior to his death. (See Deposition Transcript of Susan Waters, Page 87, Lines 19-25, annexed to the Declaration of Timothy P. Coon as Exhibit "E")(See also, Mental**

> Health Routing Sheet, annexed to the Declaration of Timothy P. Coon as
> Exhibit "I").

44.    Contrary to AmeriCor's contentions, as part of the booking, process, AmeriCor
nursing staff, the booking officer and the sergeant all have the authority to call for the
implementation of a constant watch Dep. pp. 25-26, 28, 32-13; Oliver .Dep. p. 16; Smith Dep. pp
73-74.; Vasaturo Dep. p. 91; Duffy Dep. pp. 73-74).

> **Response:**    **Admits in part and denies in part.  At no time has AmeriCor denied**
> **that is did have the authority to place an inmate on constant watch.  However, the**
> **determination of what watch was required based upon the Suicide Screening Form.**
> **This determination was made by the PCCF upon completion of the form at booking.**

45.    And as a matter of custom and practice, if AmeriCor staff had any mental health
or medical concerns about an inmate at booking they would let the sergeant or booking officer
know (Clarke Dep. pp. 25-26). In addition, according the AmeriCor's written policies "health
care personnel are required to notify correctional personnel regarding an inmate's significant
health needs that may affect...the inmate's housing assignment..." including for inmates who are
"mentally ill or suicidal" (Berg Aff EX. 9, bates stamped page. 388).

> **Response:**    **Admit in part and deny in part.  The AmeriCor policy relating to**
> **Special Needs Inmates includes inmates who are chronically ill, physically**
> **handicapped, pregnant, frail or elderly, terminally ill, mentally ill or suicidal,**
> **developmentally disabled, infected with communicable diseases, on dialysis or under**
> **the age of 18.  (See AmeriCor policy Communication on Special Inmates, bates**
> **stamped 388 and annexed to the declaration of Kim Berg as Exhibit 9)  Further, as**

set forth more fully in AmeriCor's Rule 56.1 statement, there was no indication that the alleged knowledge that the decedent was suicidal was imputed to AmeriCor.

## V.    Practices with respect to inmates who have a history of drug use or are under the influence when arriving at the facility

46.    As part or the booking of new inmates, one of the question areas on the suicide screening form is whether the inmate is under the influence of alcohol or drugs and whether he shows any signs of withdrawal (Berg Aff. Ex. 4, 16a and b).

**Response:    Admit.    There was absolutely no indication that the decedent was suffering from active heroin withdrawal.**

47.    As part of the booking process, AmeriCor staff were required to inquire of incoming inmates about whether the inmate was under the influence of alcohol or drugs or in need of detoxification.  The nurses are required to ask about any drugs used, what type of drugs, the mode of use, frequency of use, date or time of last use and history of problems after ceasing use in the past.  They were also required to check the inmate's skin for any "needle marks or other indications of drug abuse." (AmeriCor Receiving Screening policy, bates stamped 421-422, annexed to Berg Aff. as Ex. 9; Schedule A to AmeriCor contract with County, bates 538, annexed to Berg. Aff. as Ex. 10; Clarke Dep. pp. 41-4.6; Waters: Dep. pp. 64-65:; Smith Dep. pp. 149:-150; Duffy Dep. pp. 59-60, 80-82).

**Response:    Admit in part and deny in part.  Again, plaintiffs are manipulating the evidence to state something which is inaccurate.  During the booking process, "health trained personnel" which included PCCF employees, were required to inquire into the drug use of an incoming inmate.  Nurse Clarke also had extensive discussions with the decedent concerning his drug use.  Each inmate was advised at booking by both nurses and corrections officers that 24 hour medical care is**

- 22 -

available. All they have to do is report it and medical follow-up will be provided. (See Deposition Transcript of Kevin Duffy, Page 107, 142 annexed as Exhibit "B" to the Declaration of Timothy P. Coon).

AmeriCor Receiving Screening Policy states, "All inmates will be given a Receiving Screening by health care or health trained personnel immediately upon their arrival at the facility." Health trained personnel also include the corrections officers. (See AmeriCor Receiving Screening policy, bates stamped 421 annexed to the declaration of Kim Berg as Exhibit 9.") (See Deposition Transcript of Kevin Duffy, Page 146, annexed as Exhibit "B" to the Declaration of Timothy P. Coon).

48.    Similarly, as part of AmeriCor's "Intoxication and Withdrawal" policy, inmates were to be evaluated at the receiving screening for "their use of or dependence on drugs and alcohol." "Inmates reporting the use of alcohol or other drugs will be evaluated for possible intoxication and their degree of reliance on and potential for withdrawal from these substances....Inmates at risk for progression to severe symptoms of withdrawal will be kept under observation by medical or correctional personnel." (Berg Aff. Ex. 9, bates stamped page 454).

Response:    Admit in part and deny in part. Plaintiffs again only quote select portions of the relevant policy. The policy discusses medical/pharmaceutical detoxification and protocols. Thereafter, the policy addresses inmates at risk for progression to severe symptoms of withdrawal and further provides for referral to a hospital should the symptoms become that severe. (See AmeriCor Intoxication and Withdrawal Policy, bates stamped 454 and annexed to the declaration of Kim Berg as Exhibit 9.)

- 23 -

In addition, as set forth more fully in AmeriCor's Rule 56.1 Statement, Nurse Clarke inquired into the decedent's use of heroin as well as how he was feeling and whether he was in distress from withdrawal. The decedent assured Nurse Clarke that he was indeed fine. As such, Nurse Clarke advised the decedent to notify a corrections officer should he become sick and require medical assistance and that such assistance would be available at any time.

49.    Also as part of the booking process AmeriCor's policies provided that "If the inmate is medically stable but requires medical follow up (e.g. intoxicated but subject to going into withdrawal...) the nurse will...either contact the physician for orders or schedule the inmate to be seen at the next physician's sick call" (Clarke Dep. pp. 48-49; AmeriCor Procedure "Receiving Screening", bates stamped 494-495, annexed to Berg Alf. as Ex. 11).

Response:    Admit in part and deny in part. Plaintiffs again selectively choose two lines from a two page document in an effort to construe a policy as something other than it is. The Receiving Screening Procedure makes it clear that the nurse involvement in the booking process is limited to evaluation of the inmate to determine whether the inmate can be admitted into the facility. (See Deposition Transcript of Sergeant Louis LaPolla, Page 27, Lines 1-25, annexed to the Declaration of Adam I. Kleinberg as Exhibit "G"). (See AmeriCor Procedure "Receiving Screening" bates stamped 494-495, annexed to the Declaration of Kim Berg as Exhibit "11"). (See also, Deposition Transcript of Corrections Officer Robert Wendover, Page 46-47, Lines 24-25, 1-20, annexed to the Declaration of Adam I. Kleinberg as Exhibit "V").

The procedure language cited to by the plaintiffs actually states,

> If the inmate is medically stable but requires medical follow up (e.g. intoxicated but subject to going into withdrawal; on chronic medications for diabetes, seizures, pregnant, etc.), the nurse will accept the inmate, document the medical condition in the inmate's medical record and, depending on the inmate's medical problem, either contact the physician for orders or schedule the inmate to be seen at the next Physician's Sick Call.

The procedure requires staff to contact a physician or schedule an inmate for a visit *"depending on the inmate's medical problem."* (emphasis added). (See AmeriCor Procedure "Receiving Screening" bates stamped 494-495, annexed to the Declaration of Kim Berg as Exhibit "11").

The fact that the decedent had used heroin within 24 hours of admittance into the facility was documented. The decedent's physical status was also documented. There is no evidence that the decedent was going through active withdrawal such that medical care was required.

50.    For those inmates who report a history of heroin use, they "are to be evaluated for the potential for onset of symptoms of narcotic withdrawal" by the nurse on duty (AmeriCor Opiate Detoxification Procedure, bates stamped 518-520, annexed to Berg Mt as Ex. 11).

Response:    Admit.    As set forth more fully in AmeriCor's Rule 56.1 Statement, Nurse Clarke evaluated the decedent for the potential onset of symptoms. He discussed the decedent's heroin use, current physical state and was told the decedent was feeling fine. He further informed the decedent that medical services would be available if the decedent started to feel sick.

## VI.    Level of inmate supervision implemented and referrals for mental health services are made at the time of intake of a new inmate

51.    After the inmates are screened at booking, their housing unit and level of supervision is determined prior to the inmate being placed in a cell.  An inmate could be placed on: (1) regular supervision and thus be checked every thirty minutes; (2) more frequent supervision, such as checks being performed every fifteen minutes; or (3) constant watch, whereby a correction officer is constantly observing the inmate in a one-on-one set up (Vasaturo DO, p. 57; Smith Dep. pp.. 23-24).

> **Response:**    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.

52.    In addition, the booking officer, sergeant, and medical staff are all responsible for referring inmates for a mental health evaluation (Wendover Dep. pp. 42-43; Vasaturo Dep. p. 161-162, 180; LeFever Dep.. p. 152; Smith Dep, p. 111; Waters Dep. pp.43-44).

> **Response:**    **Admit.  A Mental Health Referral Form was filled out by Nurse Waters prior to the suicide of the decedent.  (See Deposition Transcript of Susan Waters, Page 87, Lines 19-25, annexed to the Declaration of Timothy P. Coon as Exhibit "E")(See also, Mental Health Routing Sheet, annexed to the Declaration of Timothy P. Coon as Exhibit "I").**

53.    According to Smith, anyone who scores eight or higher or has a shaded box checked is to be referred for mental health evaluation.  Yet, he could not recall any written policies or procedures which provided for a referral under those circumstances. (Smith Dep. pp. 72-74).

> **Response:**    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.

54.     As part of its contract with Putnam County, AmeriCor indicated it would provide certain services to the PCCF.  This included having nursing staff at intake refer inmates who had a score of eight or higher on the suicide screening form or a shaded box checked for a mental health evaluation (bates stamped page 558, annexed to Berg Aff. as Ex. 10).

**Response:     Admit.  A Mental Health Referral Form was filled out by Nurse Waters prior to the suicide of the decedent.  (See Deposition Transcript of Susan Waters, Page 87, Lines 19-25, annexed to the Declaration of Timothy P. Coon as Exhibit "E")(See also, Mental Health Routing Sheet, annexed to the Declaration of Timothy P. Coon as Exhibit "I").**

55.     Despite this writing, Nurse Clarke stated he was never made aware of this requirement and did not ever refer Spencer for mental health evaluation although he acknowledged that he could have (Clarke Dep. pp. 59-62).

**Response: Admit in part and deny in part.  A Mental Health Referral Form was filled out by Nurse Waters prior to the suicide of the decedent.  (See Deposition Transcript of Susan Waters, Page 87, Lines 19-25, annexed to the Declaration of Timothy P. Coon as Exhibit "E")(See also, Mental Health Routing Sheet, annexed to the Declaration of Timothy P. Coon as Exhibit "I").**

**VII.     Spencer Sinkov's booking's Process and cell assignment**

56.    On May 19, 2006, Spencer Sinkov, then twenty-one years old, was arrested and brought to the PCCF by members of the Sheriffs Department.  Spencer had never been arrested before and had no criminal record (Complt.¶15; County Defendants' Answer 115).

**Response:    Admit but further note that whether Spencer had been arrested before or had a criminal record is irrelevant.**

57.    Vasaturo, as the Booking Officer, completed the medical packet, including the suicide screening form, for Spencer Sinkov's intake (Vasaturo Dep. p. 128; Berg Aff. Ex. 12).  On that night shift, 11:30 p.m. to 7:3:0. a.m., Sergeant LaPolla was the most senior person in the PCCF which was always the case (LaPolla Dep. pp. 6, 11-12).

**Response:    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.  However, admits that Vasaturo was the booking officer who completed the decedent's suicide intake form.  (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 128, Lines 7-8, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F").  (See also Suicide Screening Form of Spencer Sinkov, annexed to the Declaration of Adam I. Kleinberg as Exhibit "P").**

## A. Spencer stores a "10" on the Suicide Screening form with 3 shaded boxes-checked

58.    Spencer answered "yes" to 10 questions, including three shaded boxes, on the suicide screening form, to wit: #3 experiencing significant loss within the last six months; #4. being very worried about major problems other than the current legal situation; #5 having had a family member or significant other who had attempted suicide; #6 having a history of drug abuse; #7 having a history of counseling or mental health treatment; #8 expressing extreme embarrassment, shame or humiliation as a result of current incarceration; #11 expressing feelings

of hopelessness; #12 being incarcerated for the first time; and #16a appearing to be under the influence of drugs and showing signs of withdrawal or mental illness (Berg Aff. Ex. 4). In addition, as to #16(b) "Is detainee incoherent, or showing signs of withdrawal or mental illness" the answer was yes and the comment was "very laid back." (Berg ff. Ex. 4).

> **Response:** **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same. However, it should be noted that C.O. Vasaturo admitted he made errors on the form. (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Pages 144-151, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F").**

59.    Based on the results of the Suicide screening form Spencer was identified at intake as suicidal. Although he should have been placed on constant watch and referred for mental health evaluation, he was not (LeFever Dep. pp. 113-114, 132-133).

> **Response: Denied as the score on the Suicide Screening form does not indicate that an inmate is suicidal. Rather, the score is an indicator of a "high risk" for suicide. The decedent was placed on a fifteen minute watch by the PCCF. It is not as if no steps were taken concerning the decedent's health and safety. In addition, a mental health referral form was filled out by AmeriCor staff after the decedent's admittance to the facility. (See Deposition Transcript of Susan Waters, Page 87, Lines 19-25, annexed to the Declaration of Timothy P. Coon as Exhibit "E")(See also, Mental Health Routing Sheet, annexed to the Declaration of Timothy P. Coon as Exhibit "I").**

- 29 -

**B. Defendants fail to follow up on Spencer's history of drug use**

60.      It was known to LaPolla, Vasaturo and Nurse Clarke during booking that Spencer had a history of heroin use.  LaPolla asked Spencer about his use of heroin and Spencer told LaPolla that he did "a lot" of heroin.  Spencer asked about the availability of a methadone program, in response to which LaPolla said that was not an option.  Although there were alternatives to methadone for withdrawal, LaPolla did not advise Spencer of these alternatives (LaPolla Dep. pp. 57-58, 64).  LaPolla never asked any follow up questions to find out how much heroin Spencer had in fact used or for how long he had been using (LaPolla Dep. pp. 58-59).

> **Response:**      **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.  Admits that Nurse Clarke was aware that the decedent had used heroin within 24 hours prior to his admittance into the facility.**

61.      Similarly, although Spencer advised Vasaturo that he had used heroin twenty-four hours earlier. Vasaturo never asked how much heroin Spencer used in the course of the last week, month, or anything along those lines (Vasaturo Dep. p. 140).

> **Response:**      **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

62.      As part of the receiving screening, Spencer advised AmeriCor's intake nurse, Peter Clarke, that he had used heroin within the last 24 hours (Clarke Dep. pp. 77-78).  As a result, Clarke should have followed up to see if there were any indications supporting Spencer's claim that he used heroin - such as needle marks or symptoms of withdrawal (Duffy Dep. pp. 151, 152).  Clarke did not inquire of Spencer as to the mode of use, amount used, frequency used, or a history of any problems that may have occurred after ceasing use in the past.  In

- 30 -