addition, he did not check Spencer's skin for any-evidence of track marks (Clarke Dep. pp. 41-45).

> **Response:    Admit in part and deny in part.  The decedent told Nurse Clarke that he had used heroin within the last 24 hours.  The plaintiffs claim that Nurse Clarke should not have taken the word of the decedent is simply preposterous.  There was no reason for Nurse Clarke to doubt the decedent's statements concerning his heroin use or statements concerning how he was feeling.  There were no physical manifestations to contradict what the decedent reported.  There is absolutely no evidence that had Nurse Clarke looked for track marks on the decedent's arm that any other action than which was taken by the PCCF (placing the decedent on a 15 minute watch).  Nurse Clarke did ask the decedent questions concerning whether he was going through withdrawal.  The decedent said he was feeling fine.**

63.    This is important because according to AmeriCor's written policies: withdrawal "symptoms depend: on the frequency and pattern of use; the amount of opiate consumed; and the period of time elapsed between the last use of the narcotic and the time of commitment to the facility.  These factors should be documented as part of the nursing assessment symptoms, when they occur, may range from mild to severe and will generally peak between 24 and 72 hours after last use." (Berg Aff. Bx. 11, bates stamped p. 518).

> **Response:    Admit.    Nurse Clarke as well Nurse Waters documented their physical observations of the decedent.    (See Progress Notes, annexed to the Declaration of Timothy P. Coon as Exhibit "F").  There is no evidence that the decedent was suffering from heroin withdrawal such that medical care was required.**

64.    In addition, although Nurse Clarke indicated in his "progress notes" that he "**will monitor**" Spencer, he admitted that he never did monitor or follow up on Spencer after the intake was done (Clarke Dep. pp. 48-49; Progress Notes, annexed to Berg Aff as. Ex. 13).

**Response:    Deny.    First, Nurse Clarke's shift ended the following morning. Further, Nurse Clarke testified that when he wrote "will monitor" he meant "That means if the inmate has any further complaints, you know, continue to – you know, to monitor the inmate.    (See Deposition Transcript of Peter Clarke, Page 52, annexed to the Declaration of Timothy P. Coon as Exhibit "D").    Further, the decedent was being monitored every 15 minutes by the PCCF.**

65.    And even though Spencer was subject to going into withdrawal, Clarke did not contact the physician for orders or schedule him to be seen at the next physician's sick call (Clarke Dep. pp. 48-49).

**Response:    Deny.    There is no evidence that the decedent was subject to going to withdrawal or was in fact actively withdrawing from heroin such that medical care was required.    There was absolutely no requirement, nor do the plaintiffs identify a requirement, that the decedent had a medical condition such that a call to the physician was required or a referral to the next physician's sick call was required. Further, as testified to by Kevin Duffy, only if the decedent was going through active withdrawal would he be referred to a physician.    An inmate is not going to be referred to a physician simply because there is a chance he would go through withdrawal.    (See Deposition Transcript of Kevin Duffy, Pages 112-113, annexed as Exhibit "B" to the Declaration of Timothy P. Coon).    Had the decedent exhibited**

any signs of active withdrawal such medical care required would have been provided.

66.     The Commission of Correction concluded as part of its final report on the investigation into Spencer's death that Nurse Clarke's intake assessment of Spencer was inadequate. For although Spencer was not displaying signs of active withdrawal, his reported history of recent heroin use warranted more detailed attention than that which was provided (Commission's Report in the death of Spencer Sinkov, annexed to Berg Al as Ex. 14, p. 4, ¶9).

> Response: Admit in part and deny in part. The Commission of Correction confirms that the decedent showed no signs of active withdrawal. While the Commission did state that it believed that Nurse Assessment of the decedent was inadequate in light of his statement that he used heroin within 24 hours, there is no evidence that this alleged inadequate assessment was the cause of the decedent's suicide. The only criticism that the Commission had was that while Nurse Clarke performed a verbal assessment, this assessment was not documented. The physical exam (i.e. the taking of vital signs) the Commission stated was required was actually not required pursuant to the AmeriCor policy nor was it required by National Standards. (See 1.9 Histories and Physical Exam, bates stamped 558 annexed to the declaration of Kim Berg as Exhibit 10). Again, there is no evidence that suggested that the decedent was suffering from heroin withdrawal to the extent he either needed medical attention or could be considered a suicide risk. There is absolutely no evidence that the decedent had a runny nose, watery eyes, was irritable, had a loss of appetite, hot/cold flashes, was anxious or agitated, had muscle cramps, nausea, was vomiting, had tremors,

tachycardia, hypertension, elevated temperature, diarrhea, dehydration, panic or insomnia. (See AmeriCor Opiate Detoxification Procedure annexed to the declaration of Kim Berg as Exhibit 11, bates stamped p. 518).

### C. Spencer's cell assignment is changed to NHU #7 and he is placed on a 15 minute check

67.    During the booking process, LaPolla instructed Vasaturo to place Spencer in cell #29, which is in West Housing Unit, unless there were any problems. Vasaturo thereafter radioed LaPolla and advised him that Spencer was going to be placed on a fifteen-minute watch in a different cell, namely North Housing Unit. (NHU) cell #7 (LaPolla Dep. pp. 34, 70, 96-97). North Housing Unit is where heightened supervision inmates are typically placed (Vasaturo Dep. p. 187).

> **Response:**    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.

68.    As a matter of policy, if the score on the screening form is above eight, any of the high risk shaded areas are checked or suicidal statements have been made, the Booking Officer is required to notify the Sergeant - which is usually done via radio (LaPolla Dep. pp. 8, 9-10, 30-32; Vasaturo Dep. pp. 73-74). As a matter of practice, notification to the Sergeant would also occur for individuals who pose a risk of withdrawal (LaPolla Dep. p. 9).

> **Response:**    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.

69.    An internal memorandum, called a "P-1", is then drafted by the booking officer or the sergeant for any inmate who is placed on a heightened level of supervision explaining the reason(s) for the increased supervision (LaPolla Dep. p. 11; Vasaturo Dep. p. 69).

2016404.1

**Response:**    **Admits, however notes to the Court that a P-1 is not part of the inmate's medical file nor is a copy provided to AmeriCor.**

70.    Consistent with this policy, Vasaturo testified that he told LaPolla the reason for the 15 minute watch was because of answers given on the suicide screening form (Vasaturo Dep. p. 16). He could not recall if he told LaPolla verbally but did recall the reason for the 15 minute watch was stated in the "P-1" (Vasaturo Dep. p. 130). He later confirmed that when he notified LaPolla of the fifteen minute watch "and told him the reason of the 15 minute I did it via radio" (Vasaturo Dog. p. 158-159). According to Vasaturo and consistent with what was stated in the "P-1" he prepared, Spencer was placed on a fifteen minute watch "due to recent use of drugs and answers given on the suicide screening" (Vasaturo Dep. p 173; May 20, 2006 "P-1" annexed to Berg Aff. as Ex. 15).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

71.    Oliver, who was on the 7:30 a.m. to 3:30 p.m. Shift, noted in the log book every ½ hour that Spencer was lying-down (Berg Aff. Ex. 19). Oliver conceded that during his checks on Spencer he had a blocked view and could not actually see Spencer's face (Oliver Dep. p. 100).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

## VIII.    LaPolla's claim that he was unaware of the score on the suicide screening form prior to Spencer's death is a material question of disputed fact

72.    LaPolla's claim that he was unaware of the score on Spencer's suicide screening form presents a question of fact (LaPolla Dep. p. 71-72). For Vasaturo believes that at that time,

- 35 -

on May 20, 2006, LaPolla had seen the suicide screening form although he did not personally go over the form with LaPolla (Vasaturo. Dep, pp. 155-156).

> **Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

73.    LeFever was also told that LaPolla was aware of Spencer's score on the suicide screening from (LeFever Dep. pp. 120-122).

> **Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

74.    LaPolla himself admitted he could not recall the specifics of what Vasaturo told him as to the reason for the 15 minute watch but he assumed it was due to heroin withdrawal (LaPolla Dep. p. 70).

> **Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

75.    Nonetheless, the "P-1" states one of the reasons for the heightened supervision included the answers given on the suicide screening form. That form was hand delivered by Vasaturo to the book in the briefing room (Wendover Dep. pp. 35-36; Vasaturo Dep. p. 70). The Sergeant, as with any other officer, is required to check these books to see whether any new admissions are on a heightened level of supervision (Wendover Dep. p. 36). In addition, at shift change, incoming staff are briefed by both the sergeant from the previous shift and the sergeant who is coming on duty. Part of the briefing requires the outgoing sergeant to review all of the P-1s from his/her shift (LeFever Dep. pp. 124-125; Wendover Dep. pp. 36-37). Vasaturo's practice was also to personally give the sergeant a copy of that P-1 (Vasaturo Dep. p.71).

2016404.1

**Response:** **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

76.    C.O. Wendover recalled when he came on duty at 7:30 a.m. on May 20, 2006, the briefing was conducted by Sergeant LaPolla who was going off duty and Sergeant Jackson who was coming on duty (Wendover Dep. p. 40; Oliver Dep. pp. 77-78). Wendover also recalled that a P-1 was in the briefing book about Spencer being on a fifteen minute watch (Wendover Dep. pp. 41-42).

**Response:** **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same. With respect to Footnote 17, we note that plaintiffs' counsel misinterprets ¶17 within AmeriCor's Rule 56.1 statement. At no time did AmeriCor state that the decedent's cell assignment was changed.**

**IX.    AmeriCor's denial of any knowledge that Spencer was suicidal is belied by the fact that nurse Clarke initialed the medical packet indicating he reviewed it and Waters (for unexplained reasons) referred Spencer for mental health evaluation**

77.    Clarke initialed that he reviewed Spencer's medical intake packet which packet included the suicide screening form (see cover page of medical packet 'annexed to Berg Aff. Ex. 12). Clarke also wrote in his notes of the intake of Spencer that he "will monitor" Spencer (Berg Aff. Ex. 13). He never did.

**Admit in part and deny in part. Nurse Clarke did initial the medical screening packet. However, his testimony was that he only reviewed the Suicide Screening Form to ensure it was completed, not for its content, accuracy or for the purpose determining cell assignment or placement. He testified that "will monitor" meant that had the decedent sought help or issued complaints, he would follow-up. (See**

- 37 -

Deposition Transcript of Peter Clarke, Page 32, Lines 8-12, Page 52 annexed as Exhibit "D" to the Declaration of Timothy P. Coon).

78.     At some point during her shift, AmeriCor Nurse Waters completed a mental health evaluation sheet referring Spencer for evaluation noting a history of substance abuse and family problems (Berg Aff. Ex. 16). This information must have come from the suicide screening form as Waters denies having any conversations with Spencer except when she mistakenly thought he was a girl (as described in AmeriCor's 56.1 Statement ¶34).

**Response: Admit in part and deny in part. Nurse Waters did complete a Mental Health Referral Form. (See Deposition Transcript of Susan Waters, Page 87, Lines 19-25, annexed to the Declaration of Timothy P. Coon as Exhibit "E")(See also, Mental Health Routing Sheet, annexed to the Declaration of Timothy P. Coon as Exhibit "I").**

**Plaintiffs' statement that this form must have been completed based upon the Suicide Screening Form is nothing more than speculation and lends no evidentiary basis in the record. Nurse Waters did testify that on shift change she discussed the decedent's entrance into the facility with Peter Clarke. (See Deposition Transcript of Susan Waters, Page 58, Lines 4-14, annexed to the Declaration of Timothy P. Coon as Exhibit "E").**

79.     Contrary to President of AmeriCor Kevin Duffy's claim that Spencer's outward appearance did not warrant any follow up when he wrote to the Commission of Correction he admitted that Spencer's score on the Suicide Screening Prevention Guidelines form did in fact warrant follow up by his staff (Duffy Dep. pp.. 159-160; Duffy letter to Commissioner Lamy dated October 23; 2006, annexed to Berg Aff. as Ex. 17).

- 38 -

**Response:**    During his deposition testimony, Mr. Duffy explained what follow-up would have been required. He testified that if the decedent had been agitated or in some way indicated that he was distraught, that would have warranted a follow-up. The decedent would have had to either have said something verbally or by virtue of physical appearance to warrant a follow up. (See Deposition Transcript of Kevin Duffy, Page 159, annexed as Exhibit "B" to the Declaration of Timothy P. Coon). The decedent said nothing nor did he exhibit any physical signs that he was in distress.

## X.    Spencer visits with his family at 11:00 a.m. on May 20: 2906 at which time it is evident the onset of withdrawal was occurring

80.    On May 20, 2006, at approximately 11:00 a.m., Spencer was escorted to the inmate visitors' room to visit with his mother, father and brother (Wendover Dep. p. 52).

**Response:**    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.

81.    During the visit, C.O. Wendover specifically heard Donny Sinkov ask Spencer if he was withdrawing. In response, Spencer stated he was starting to go through withdrawal but that it was "not that bad yet" or "not too bad right now" (Wendover Dep: pp. 56.83; H. Sinkov Dep. p. 14; D. Sinkov Dep. p. 69; 50-h transcript p. 36, annexed to Berg Aff. as Ex. 18).

**Response:**    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same. However, this confirms AmeriCor's position that the decedent was not actively withdrawing from heroin such that medical attention was required.

82.    Donny Sinkov asked Wendover if there was any type of methadone treatment that could be given to Spencer for his heroin addiction. Wendover replied that "we don't do that

2016404.1

here." Donny then asked if there was any kind of medical treatment Spencer could get and Wendover replied that Spencer was not yet classified, he would not be for five days and so he was not entitled to anything. (H. Sinkov Pep.. p. 15; D. Sinkov Dep. p. 69, 50-h Tr. pp. 338-39).

> **Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

83.    During the visit, Spencer "looked awful" and "he looked sick". He was extremely pale, had dark circles under his eyes, and he looked clammy and cold. He was very thin and looked translucent (H. Sinkov Dep. p. 20; D. Sinkov Dep, p. 69; 50-h Tr. p. 37).

> **Response:**    **Neither admits or denies. There is no evidence that the decedent was actively withdrawing from heroin such that medical attention was required.**

84.    After Spencer's visit with his family concluded, he was escorted to the medical department because AmeriCor nurse Susan Waters requested to see him (Wendover Dep. p. 59). When they arrived at medical, Waters called Spencer into her office by name (Wendover Dep. pp. 61, 62).

> **Response:**    **Deny that Nurse Waters requested to see the decedent. As set forth more fully in AmeriCor's Rule 56.1 Statement, Nurse Waters testified that the decedent was simply outside of the medical office waiting to be transported back to his cell at the time she interacted with the decedent. At no time did Nurse Waters call the decedent into her office. Nevertheless, which version is true is irrelevant. If Nurse Waters did in fact call the decedent to the medical office, this contradicts the plaintiffs' claims that AmeriCor did not follow-up with the decedent. Either way, Nurse Waters saw the decedent prior to his death. At this time the decedent**

- 40 -

appeared fine, was without signs of withdrawal and did not give any complaints that

he was feeling ill from withdrawal from heroin.

## XI.    Spencer was not monitored despite the fact that signs and symptoms of withdrawal from heroin appear within 72 hours after last use

85.    Signs and symptoms from heroin withdrawal can be mild to severe. The intensity

of the withdrawal symptoms usually peaks between 24 and 72 hours after the person last used the

substance (Vasaturo Dep. pp. 98-99; Clarke Dep. p. 68; Waters Dep. pp. 55-56; Duffy Dep. p.

153; Berg Aft: Ex. 11, bates stamped p. 518).

> **Response:    Admit that withdrawal <u>can</u> be mild to severe.  There was no evidence**
>
> **that the decedent was suffering from any of the symptoms as referenced in**
>
> **AmeriCor's response to paragraph 66.**

86.    The initial symptoms can include a runny nose, watery eyes, loss of appetite, hot

and cold flashes, nausea, vomiting, and diarrhea (Waters Dep. p. 56; Berg Ail. Ex. 11, bates

stamped Ix 518). However, withdrawing from alcohol or drugs can be so physically painful and

psychologically uncomfortable that suicide may seem like the only relief available at the time

(LeFever Dep. p. 75).

> **Response:    Neither admits or denies.  The plaintiffs submit no expert testimony,**
>
> **i.e. medical expert opinion to support these claims.  However, there is no evidence**
>
> **that the decedent was withdrawing from heroin such that he was suffering from**
>
> **runny nose, watery eyes, loss of appetite, hot and cold flashes, nausea, vomiting and**
>
> **diarrhea or that he was in such physical pain and psychologist discomfort such that**
>
> **suicide was the only relief.**

87.    As part of the intake, knowing Spencer had used heroin within the prior 24 hours,

Nurse Clarke did not ask Spencer anything about his appetite, whether he had any nausea,

whether he had any diarrhea or vomiting, whether he had any muscle cramps. He did not take his temperature or feel his skin and he did not record any vital signs (Clarke Dep.-pp. 74-76, 80).

> **Response:** **Admit in part and deny in part. As set forth more fully above, Nurse Clarke discussed the decedent's heroin use, how he was feeling and the treatment that was available should he become ill from withdrawal.**

88.    AmeriCor's written policies states that "individuals at risk for progression to more severe levels of withdrawal will be under constant observation by correctional officers." However, this was not the practice in the PCCF and consistent with that practice, Spencer was never placed under constant observation (LeFever Dep. pp. 159-160; bates stamped page 561, annexed to Berg. Aff. as Ex. 10; Waters Dep. pp. 70-72; Clarke Dep. pp. 68-69).

> **Response:** **Admit in part and deny in part. There is no evidence that the decedent was in withdrawal. The aforementioned policy relates to inmates who are in withdrawal and undergoing detoxification.**

89.    Contrary to this purported "policy," in actual practice it was up to the inmate to tell a nurse that he or she was having withdrawal symptoms as opposed to the nurse monitoring an inmate who was at risk for progressing to serious levels of withdrawal (Clarke. Dep. pp. 73-74; Waters Dep. p. 54).

> **Response:** **Deny. The decedent was being monitored by the PCCF every 15 minutes. Further, there is no evidence that just because the decedent had used heroin within 24 hours that he was in withdrawal or at risk for progressing to serious levels of withdrawal.**

## XII.    Spencer commits suicide approximately thirteen hours after he is admitted to the PCCF

90.    At or about 1:49 p.m., a call came over the radio for all officers to respond to North Housing. Unit (Wendover Dep. p. 68; NHU log book, page 42, entry- #374 for 1349 hours, annexed to Berg Aff. as Ex. 19).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

91.    Spencer Sinkov was found hanging from his jail issued sweatshirt which was tied around the cell door. Someone had to retrieve a pair of scissors to out the sweatshirt in order to gain entry into the cell (Wendover Dep. pp. -70-7 1).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

92.    Once entry was gained, AmeriCor Nurse Waters started CPR (Wendover Dep. p. 72).

**Response:**    **Admits.**

93.    Wendover then went to get the BVR - a device to assist breathing. When Wendover returned, Waters had already stopped CPR (Wendover Dep. pp. 73-74, 80).

**Response:**    **Admits in part and denying in part. Nurse Waters stopped CPR upon arrival of EMS personnel. Ambulance Call Report (annexed to the declaration of Kim Berg as Exhibit 20). (See also Statement of Susan Waters, annexed to the declaration of Kim Berg as Exhibit 21). (See Deposition Transcript of Susan Waters, Pages 34-35, annexed to the Declaration of Timothy P. Coon as Exhibit "E").**

94.    Contrary to policy and protocol, Waters stopped CPR 25 minutes prior to ambulance personnel arriving (Ambulance record, annexed to Berg Aff. as Ex. 20; Statement of

Susan Waters, annexed to Berg Aff. as Ex. 21 (indicating Waters stopped CPR, the investigators arrived, she asked the HSA to contact Mr. Duffy, and then the ambulance arrived with the paramedic).

> **Response:  There is no evidence that Nurse Waters stopped CPR 25 minutes prior to the arrival of EMS personnel.  A review of the Ambulance Call Report (annexed to the declaration of Kim Berg as Exhibit 20) simply states, "CPR was started by the nurse then stop and CPR hasn't been started again.  Appx time from when CPR was ended was approximately 25 min."  A reasonable review of this language indicates that CPR was performed for 25 minutes, not, as plaintiff counsel claims, was stopped 25 minutes prior to the arrival of EMS personnel.  A review of the ambulance call reports indicates that the EMS personnel arrived at the scene at 14:00 hours, a mere 8 minutes after notification of a problem at the jail (notification was received at approximately 13:52).  Twenty five minutes had not even passed yet. Further, Nurse Waters' statement states as follows, "Approximately fifteen minutes later we stopped CPR...At this time the ambulance arrived with the paramedic and took over the scene."  No where in the statement does it say CPR was performed and stopped 25 minutes prior to the arrival of EMS personnel.  In addition, no where in the Commission report does it state that CPR was prematurely ceased.  No where do plaintiffs cite to a policy or procedure concerning the cessation of CPR. Perhaps most importantly, there is not a single piece of evidence that the cessation of CPR, whether done according to protocol or not,  had anything to do with, or contributed to, the death of Spencer Sinkov.  (See Deposition Transcript of Susan**

Waters, Pages 34-35, annexed to the Declaration of Timothy P. Coon as Exhibit "E").

## XIII. LeFever is notified of Spencer's suicide

95.    LeFever was called in on Saturday May 20, 2006 as a result of Spencer's suicide. Upon his arrival, he made sure the logbook was secure and staff were separated. He then immediately went to the medical department to obtain a copy of the suicide screening form (LeFever Dep. pp. 110-113).

**Response:    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

96.    Nurse Susan Waters showed LeFever the form. LeFever looked at the form and said "this is a problem" and/or "this is not good" (LeFever Dep. pp. 113-114; Waters Dep. pp. 22-23). LeFever explained it was a problem because Spencer scored a 10 on the suicide screening form and he was not on a constant watch (LeFever Dep. p. 114).

**Response:    Admits.**

97.    LeFever then met with Sheriff Smith and told him that he had the suicide screening form and "it's not good." (LeFever Dep. p. 115). He also told Smith that Spencer should have been on a constant watch (Smith Dep. pp. 31-32).

**Response:    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

98.    According to the Commission, Spencer should have been placed on a constant watch (Smith Dep. pp. 110, 115).

**Response:    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

XIV.   **Prior suicide in November 2003 by inmate Norberto Rivera**

99.    On or about November 15, 2003, another inmate of the PCCF, Norberto Rivera, committed suicide by hanging himself from his jail issued sweatshirt tied to his cell bars (Complt. ¶12; County Defendants' Answer ¶12).

> **Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.   Nevertheless, it is respectfully submitted that the prior suicide of Norberto Rivera is irrelevant to the instant matter.  AmeriCor was not responsible for mental health at the facility at the time of this suicide.**
>
> **In Rivera, the inmate at issue was actively withdrawing from heroin and receiving medical treatment for same.   Prior to his suicide, Rivera was agitated and violent. He had requested, and was refused, psychiatric care.  As a result of the Commission investigation, it merely recommended that AmeriCor use a simple oxygen face mask delivery device on a non-breathing patient and additional training on resuscitation and CPR be provided if found necessary.  As set for more fully in AmeriCor's initial Rule 56.1 statement, the decedent in the instant matter showed no signs of active withdrawal from heroin such that medical or psychiatric care was required.  The decedent was in good spirits and continually joked with both medical and PCCF staff.  At no time was active medical treatment for heroin withdrawal requested by the decedent.  At no time was medical treatment for withdrawal denied to the decedent. Both PCCF and AmeriCor staff made it clear to the decedent that should he begin to actively withdraw from heroin, to notify anyone on staff and assistance would be provided.**

- 46 -

100.    Rivera (like Spencer) was on a fifteen minute watch. His watch was due to his withdrawal from heroin (Vasaturo Dep. pp. 243-244). Rivera (like Spencer) committed suicide: in between the fifteen minute checks that were performed (Vasaturo Dep. p. 244).

**Response:    AmeriCor respectfully refers this Court to its response to ¶99.**

101.    Just prior to Rivera's suicide, and similar to the day on which Spencer committed suicide, the NHU officer had to perform additional duties in Rivera's case going into the Recreation yard and then meeting with a Sergeant and another inmate on the other side of NHU (Commission Report on death of Norberto Rivera, page 4 ¶14, annexed to Berg Aff. as Ex. 22; Vasaturo Dep. pp. 244-245).

**Response:    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

102.    The Commission of Corrections report on the death of Rivera stated with respect to the NHU officer: "The officer maintains a post right outside the block door. In addition to supervising, the housing unit, the officer also has responsibilities to supervise a program area down the hall, movement into the adjacent recreation yard and a separate four cell housing unit approximately 100 feet away" (Smith Dep. pp. 168-169; Berg Aff. Ex. 22). The Commission specifically indicated  "the additional duties added to this post prevents an officer from being able to maintain active supervision adequately." (Smith Dep. pp. 1.72-173; Berg Aff. Ex. 22).

**Response:    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

103.    Despite this conclusion, on the weekend shift during which Spencer committed suicide, the duties of the NHU post remained the same as when the Commission wrote it was spread too thin in its report on Rivera (Berg Aff. Ex. 22; Smith Dep. pp. 169-172).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

104.    More specifically, even in 2006 the NHU officer was stationed at a desk at one of the circular area of cells on that unit. He or she still had the responsibility of performing checks. on inmates in that unit, escorting those inmates to the shower, telephone, library and recreation yard (Vasaturo Dep. pp. 27-28, 33).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

105.    The NHU officer also had the responsibility of escorting inmates to the program area which is adjacent to the NHU but through a separate gate (Vasaturo Dep. pp, 30-31). At the time of Spencer's death, a program officer was normally responsible for supervising those in the program area but on the mid-shift (3:30-11:30) and all shifts on weekends there is no program officer so the NHU unit officer assumes that additional responsibility (LaPolla Dep. pp. 51-52; Vasaturo Dep. pp. 31-32, 239-241; Oliver Dep. pp. 12-13; Smith Dep. p. 169). Spencer was admitted to the facility after midnight on Friday and killed himself on Saturday afternoon.

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

106.    At the time of Spencer's death, the NHU officer still had responsibility for the additional four cell area known as NHU-2 (Vasaturo Dep. pp. 249-250). And it was not until 2007 that the PCCF was staffed with someone who could perform a constant watch on the night shift (LaPolla Dep. pp. 20-21).

**Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

107.    In addition, the NHU officer has responsibility for the eight cells in SHU on the night shift (Vasaturo Dep. pp, 36-37).

**Response:    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

108.    During the Commission's investigation of Rivera's death, it was recommended that Vasaturo be counseled for rounding off times he noted in the log book rather than the actual time he performed the supervisory checks. Smith falsely advised the Commission that Vasaturo was counseled because Vasaturo readily admitted he was never counseled or even questioned about his time entries (Vasaturo Dep. pp. 201, 250-25.1; October 29, 2004 letter from Sheriff Smith Commissioner Lamy; annexed to Berg. Aff. as Ex. 24).

**Response:    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

109.    Despite the Commission's recommendation, Vasaturo still falsely documented times in the log books as evidenced by his entries on May 20, 2006 where he purported to perform checks on inmates in NHU at the very same time he wrote that he was performing, checks on inmates in another housing unit - SHU. And all the times were still rounded off to the quarter hour (see Berg Aff Exs. 19 and 25).

**Response:    Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

**XV.    Since Spencer's death modifications in the operations of the PCCF have been made**
**A. After Spencer's suicide PCCF put a backdated suicide prevention policy into the Procedure books**

110.    As described in ¶¶32-38 supra, on or about August 4, 2006, an amended policy was inserted into the procedure books for the first time including a directive that a fifteen minute

2016404.1

watch was not sufficient as a suicide prevention method. (LaPolla Dep. pp. 41-43, 50-51; Berg Aff. Ex. 5; Vasaturo Dep. pp. 234-235, 23.7-238; Wendover Dep. pp. 91-92; LeFever Dep. pp. 97-101).

**Response:** Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.

### B. Sergeants are now required to sign off on their review of the suicide screening forms and notify the Undersheriff of any new intakes

111.    Shortly after Spencer committed suicide, a new procedure was added requiring sergeants to review all intakes, including the suicide screening form, and sign off showing their review was conducted. Prior to Spencer's death, it was recommended that sergeants review the fortes but it was not required (LeFever Dep. pp. 92-93; Oliver Dep. p. 65; Wendover Dep. p. 16).

**Response:** Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.

112.    In addition, at that same time, a new procedure was set up whereby every intake is now reported to the Undersheriff and the Undersheriff confers with the Sheriff on any issues pertaining to the intake of a new inmate focusing on the suicide prevention screening (Smith Dep. pp. 20-.23).

**Response:** Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.

### C. PCCF now uses the State mandated form 330-ADM

113.    In or about January 2008, Smith decided to stop using the suicide screening form that did not comply with the minimum standards and directed LeFever to use the 330-ADM form

instead (LeFever Dep. pp. 76-77; Smith Dep. p. 19-20). This change was done to "make it easier" and "simplify" (LeFever Dep. p. 78).

> **Response:** **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

### D. AmeriCor staff is required to take vital signs for all incoming inmates

114.    In or about November 2006, a new policy was instituted requiring nursing stair to take vital signs on all incoming inmates (Clarke Dep. pp. 23-24; Duffy Dep. pp. 56-57).

> **Response:** **Admit that AmeriCor staff nurses now take the vital signs of all incoming inmates. However, any measures taken by AmeriCor after the suicide of the decedent are inadmissible as a matter of law to establish any alleged negligence on the part of AmeriCor. Further, at the time of the decedent's suicide, AmeriCor was not required by contract to take the vital signs of all incoming inmates nor was this required by the Commission or the National Standards.**

## XVI.   LaPolla and Vasaturo have not been subjected to any disciplinary action

115.    On October 25, 2006, Sheriff Smith wrote to the Commission and indicated that both C.O. Vasaturo and Sergeant LaPolla were "currently pending discipline" for failing to follow County policies in connection with Spencer's death (10/25/06 memorandum from Smith to Commissioner Lamy, annexed to Berg Aff. as Ex. 26).

> **Response:** **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

116.    Contrary to this representation, LaPolla and Vasaturo have not been disciplined, counseled, or formally or informally told they violated any County policies or procedures (LaPolla Dep: p. 15; Vasaturo Dep. pp. 224, 228-229, 229-233; Smith Dep. pp. 106-107). They

- 51 -

also have not received any further instruction, counseling or training (LeFever Dep. pp. 141-144).

> **Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

117.    Smith claimed that no action has been taken because the matter "evolved very quickly" and it is under investigation. (Smith Dep. pp. 105). It has been two years since Spencer's death. Yet, he claims it has not been resolved when the policy was actually issued (Smith Dep. pp. 59-64).

> **Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same.**

118.    Although on November 20, 2007 LaPolla and Vasaturo signed an agreement to extend the time frame within which they could be subjected to disciplinary action for an additional six months, that six month period expired on or about May 20, 2008 (LaPolla Dep. p. 16; Vasaturo Dep. p. 259). There is no indication from Defendants as to the status of any disciplinary action against these defendants.

> **Response:**    **Neither admits or denies and respectfully refers this Court to the Sheriff's and the County's responses to same. In addition, AmeriCor does not have any role with respect to the disciplinary matters of PCCF employees. Therefore, plaintiffs' statement that "there is no indication from Defendants as to the status of any disciplinary action against these defendants" is inaccurate as it assumes AmeriCor plays any role in such discipline.**

### REPLY

1.    AmeriCor respectfully refers this Court to AmeriCor's Rule 56.1 statement with respect to the undisputed facts of this matter.    Nevertheless, there are certain additional statements made by plaintiffs and contained within Plaintiffs' Response to Defendant AmeriCor's Rule 56.1 statement that bare comment.

2.    In paragraph 22 of their response, the plaintiffs claim that AmeriCor had the authority to institute a heightened level of supervision.    AmeriCor has never denied this. AmeriCor's position is that after speaking with the decedent there were no indications that the decedent was at risk for suicide nor did anything he say or how he appeared raise concerns. Further, while AmeriCor policy provided for a 15 minute watch of inmates, which was consistent with the PCCF policy, there is no evidence that such as policy was deliberately indifferent to the needs of the decedent. Further, only the Sheriff can issue policies.

3.    In paragraph 23 of their response, the plaintiffs concede that AmeriCor simply "saw" the inmate at booking, confirming that AmeriCor's role at booking is not as detailed and integral as the plaintiffs have been attempting to claim. Further, the plaintiffs concede that the suicide screening score merely indicates a high risk for suicide and that in fact does not indicate an inmate is in fact suicidal.

4.    In paragraph 31 of their response, the plaintiffs speculate that the decedent had last used heroin approximately 34 or 37 hours prior to his visit with his parents. There is no factual evidence of this assertion. Plaintiffs further state that signs and symptoms of withdrawal could have been just beginning and certainly had not yet peaked.    Speculation and "could have's" are insufficient to defeat a motion for summary judgment as a matter of law. Further, the plaintiffs deny that the fact that the decedent did not express any suicidal ideations during his

2016404.1

visitation is irrelevant. This is highly relevant as it is direct evidence of the decedent's state of mind.

5.      In paragraph 31 of their response, the plaintiffs state that Nurse Waters could not recall why she completed the Mental Health Referral Form. It is undisputed that the form was completed. It does not matter if Nurse Waters can recall why the form was filled out so long as it was. Further, Nurse Waters was briefed concerning the decedent's admittance into the facility when the shift change occurred.

6.      In paragraph 35 of their response, the plaintiffs state that Nurse Waters' completion of the Mental Health Referral Form showed her "appreciation" that the decedent was not okay. This statement is pure conjecture, speculation and assumes facts that are not in evidence in the record before this Court.

7.      In paragraph 37 of their response, the plaintiffs state that while the decedent ate the buns of his lunch but did not eat the burgers in attempt to indicate the decedent had no appetite is appalling in light of the fact that plaintiffs are well aware the decedent was a vegetarian. (See Saint Vincent's Hospital Nutritional Assessment of Spenser Sinkov dated September 4, 2005 annexed as Exhibit "A" to the Declaration of Timothy P. Coon).

### FACTS THAT REMAIN UNDISPUTED

8.      When the decedent arrived at Central Booking his mood was lighthearted and he was joking with the corrections officers. (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 123, Lines 13-17, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F"). At that time there was no an indication the decedent would hurt himself. (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 127, Lines 3-16, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F").

2016404.1

9.      Sergeant LaPolla met Sinkov during the intake process.  The decedent's heroin use was discussed.  He was asked if he was going to have problems with withdrawal and the decedent replied "no."  (See Deposition Transcript of Sergeant Louis LaPolla, Pages 57-58, Lines 17-25, 1-10, annexed to the Declaration of Adam I. Kleinberg as Exhibit "G").  The decedent looked okay and exhibited no symptoms of withdrawal.  (See Deposition Transcript of Sergeant Louis LaPolla, Page 61, Lines 15-24, annexed to the Declaration of Adam I. Kleinberg as Exhibit "G").  Sinkov did not express any suicidal ideations.  (See Deposition Transcript of Sergeant Louis LaPolla, Page 79, Lines 21-25, annexed to the Declaration of Adam I. Kleinberg as Exhibit "G").

10.     Vasaturo completed the screening intake, including the completion of the Putnam County Correctional Facility Suicide Prevention Screening Guidelines Form SOJ-32. ("Suicide Screening")  (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 128, Lines 7-8, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F").  (See also Suicide Screening Form of Spencer Sinkov, annexed to the Declaration of Adam I. Kleinberg as Exhibit "P").  No one assisted him.  (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 128, Lines 9-10, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F").  After completing the screening intake, he verbally notified LaPolla that he was placing the decedent on a 15-minute watch and he was placing him in cell 7.  He told LaPolla he was doing so due to medical screening and answers provided on the suicide screening.  At no time did Sergeant LaPolla change the assignment.  (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 129, Lines 18-24, Page 130, Lines 12-18, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F").

11.    When Vasaturo asked the decedent if he was going to hurt himself, the decedent replied, "No." (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 137, Lines 5-10, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F"). With respect to his physical appearance, Vasaturo stated that the decedent looked "normal." (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 138, Lines 10-12, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F"). He found the decedent to be coherent, and did not believe he was under the influence at the time. (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 149, Lines 1-7, 22-23, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F").

12.    The decedent had a score of ten and had more than one shaded box on the SOJ-32, on the suicide screen performed by Vasaturo. (See Suicide Screening Form of Spencer Sinkov annexed to the Declaration of Adam I. Kleinberg as Exhibit "P"). Despite the requirement to do so, Vasaturo did not notify his supervisor. (See Suicide Screening Form of Spenser Sinkov, annexed to the Declaration of Adam I. Kleinberg as Exhibit "P). (See also, Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 155, Lines 11-16, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F"). (See also, Putnam County Policy Article 15, Mental Health Evaluation and Service, annexed to the Declaration of Adam I. Kleinberg as Exhibit "I").

13.    Vasaturo alone determined that the decedent was to be placed on a 15-minute watch. (See Deposition Transcript of Corrections Officer Joseph Vasaturo, Page 170, Lines 7-10, annexed to the Declaration of Adam I. Kleinberg as Exhibit "F").

14.    AmeriCor did not have any role in determining the level of supervision with respect to a possible suicide risk. (See Deposition Transcript of Captain Robert LeFever, Page

58-59, Lines 25, 1-16, annexed to the Declaration of Timothy P. Coon as Exhibit "A"). (See also Deposition Transcript of Sergeant Louis LaPolla, Page 29, Lines 9-14, annexed to the Declaration of Adam I. Kleinberg as Exhibit "G"). Further, PCCF was not required to notify AmeriCor when and if an inmate scored an eight or higher on the suicide screening. (See Deposition Transcript of Captain Robert LeFever, Page 153-4, Lines 24-25, 1-5, annexed to the Declaration of Timothy P. Coon as Exhibit "A"). (See also, Deposition Transcript of Corrections Officer Robert Wendover, Page 47-48, Lines 21-25, 1-3, annexed to the Declaration of Adam I. Kleinberg as Exhibit "V").

15.    AmeriCor's role was to provide medical services to the inmates. AmeriCor would do an initial screening at booking to ensure that an inmate was fit to be admitted into the facility. Then within the first 24 hours, a more comprehensive screening is done at the medical office. (See Deposition Transcript of Sergeant Louis LaPolla, Page 27, Lines 1-25, annexed to the Declaration of Adam I. Kleinberg as Exhibit "G"). (See also, Deposition Transcript of Corrections Officer Robert Wendover, Page 46-47, Lines 24-25, 1-20, annexed to the Declaration of Adam I. Kleinberg as Exhibit "V").

16.    AmeriCor has no role in completing the suicide screening, nor has it ever had a role in filing out the suicide screening prior to the death of the decedent. (See Deposition Transcript of Captain Robert LeFever, Page 26, Lines 8-10, annexed to the Declaration of Timothy P. Coon as Exhibit "A"). The SOJ-32 is administered by the correction officer. (See Deposition Transcript of Captain Robert LeFever, Page 29, Lines 12-17, annexed to the Declaration of Timothy P. Coon as Exhibit "A").

17.    AmeriCor's contract with Putnam and the National Commission on Correctional Health Care requires AmeriCor to obtain a complete history and comprehensive physical

examination within fourteen (14) days of an inmate commitment. (See relevant portions of AmeriCor Scope of Services annexed as Exhibit "C" to the Declaration of Timothy P. Coon)

18.     Sometime during the booking process, the Sinkov spoke with AmeriCor Nurse Peter Clarke. ("Nurse Clarke"). The decedent's heroin use was discussed. (See Deposition Transcript of Peter Clarke, Page 42, Lines 5-13, Page 44, Lines 22-23, annexed to the Declaration of Timothy P. Coon as Exhibit "D"). The decedent advised Nurse Clarke that he had no medical problems and that he felt fine. Nurse Clarke then advised the decedent about medical and that if he felt sick, tell the officers he needed to see medical. (See Deposition Transcript of Peter Clarke, Page 43, Lines 12-22, Page 73, Lines 21-25, annexed to the Declaration of Timothy P. Coon as Exhibit "D"). At the time of this discussion the decedent was alert and oriented, had a normal gait, was non- tremulous and in good spirits (See Progress Notes, annexed to the Declaration of Timothy P. Coon as **Exhibit "F"**). (See also Deposition Transcript of Peter Clarke, Page 52, Lines 5-23, annexed to the Declaration of Timothy P. Coon as Exhibit "D").

19.     During the visit the decedent had with his family, the decedent seemed fine. (See Deposition Transcript of Corrections Officer Robert Wendover, Page 51, Lines 2-4, annexed to the Declaration of Adam I. Kleinberg as Exhibit "V"). The decedent stated his withdrawal was not too bad. (See Deposition Transcript of Corrections Officer Robert Wendover, Page 56, Lines 11-18, annexed to the Declaration of Adam I. Kleinberg as Exhibit "V"). (See also Deposition Transcript of Hara Sinkov, Page 14, Lines 11-13, annexed to the Declaration of Timothy P. Coon as **Exhibit "G"**). (See Deposition Transcript of Donny A. Sinkov, Page 68-69, Lines 25, 1-4, annexed to the Declaration of Timothy P. Coon as **Exhibit "H"**). The decedent did not express any suicidal thoughts during this visitation. (See Deposition Transcript of Donny Sinkov, Page 22-24, annexed to the Declaration of Timothy P. Coon as Exhibit "H").

20.    After the visit the decedent encountered Nurse Waters outside of the medical office.  At this time, the decedent appeared to be fine.  (See Deposition Transcript of Susan Waters, Page 84, Lines 17-18, annexed to the Declaration of Timothy P. Coon as Exhibit "E").  He was without signs of withdrawal, was in good spirits and was laughing and joking around.  His gait was steady and no complaints were made by the decedent.  (See Progress Notes, annexed to the Declaration of Timothy P. Coon as Exhibit "F").  She also filled out a Mental Health Routing Sheet.  (See Deposition Transcript of Susan Waters, Page 87, Lines 19-25, annexed to the Declaration of Timothy P. Coon as Exhibit "E")(See also, Mental Health Routing Sheet, annexed to the Declaration of Timothy P. Coon as **Exhibit "I"**).

Dated:  White Plains, New York
    June 11, 2008

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

By:    _____
    Timothy P. Coon (TC 3357)
    Bernice E. Margolis (BM0702)
    Attorneys for Defendant AmeriCor
    3 Gannet Drive
    White Plains, New York 10604
    (914) 323-7000

    File No.: 07621.00174

TO:    Lovett & Gould, LLP
    Attorneys for Plaintiffs
    Attn.: Kim Berg, Esq.
    222 Bloomingdale Road
    White Plains, NY 10605
    (914) 428-8401
    Fax:  (914) 428-8916

    Santangelo Randazzo & Mangone, LLP
    Attorneys for Co-Defendants
    Attn.: James Randazzo, Esq.

- 59 -

151 Broadway
Hawthorne, New York 10532
(914) 741-2929
Fax: (914) 741-2920

Miranda Sokoloff Sambursky Slone Verveniotis LLP
Attorneys for Co-defendants DONALD B. SMITH
Attn.: Adam I. Kleinberg, Esq.
The Esposito Building
240 Mineola Boulevard
Mineola, NY 11501
516.741.7676 (TEL)
516.741.9060 (FAX)

2016404.1